1   TIFFANY CHEUNG (CA SBN 211497)
    TCheung@mofo.com
2   BEN PATTERSON (CA SBN 268696)
    BPatterson@mofo.com
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California 94105-2482
    Telephone: 415.268.7000
5   Facsimile: 415.268.7522

6   Attorneys for Defendants
    MCKESSON TECHNOLOGIES, INC. AND MCKESSON
7   CORPORATION

8

9                UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12

| | |
|---|---|
| TRUE HEALTH CHIROPRACTIC, INC., et al., | Case No.  13-cv-02219-HSG |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| MCKESSON CORPORATION, et al., | Honorable Haywood S. Gilliam, Jr. |
| Defendants. | Hearing Date:  September 10, 2015 Time:  2:00 p.m. Courtroom:  Courtroom 15, 18th Floor |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

I.      INTRODUCTION ........................................................................................................1

II.     PROCEDURAL HISTORY .........................................................................................2

III.    FACTUAL BACKGROUND .......................................................................................3

      A.     Customers Invited Promotional Faxes in a Variety of Ways. ...............................3

      B.     No Records Identify the Recipients of Promotional Faxes. ..................................4

      C.     Plaintiffs Cannot Identify a Feasible Way to Determine the Fax Recipients. .......5

      D.     Both Named Plaintiffs Consented To Be Sent Faxes. ..........................................6

      E.     The President of True Health Has Admitted to Fraud. .........................................7

IV.    LEGAL STANDARD ...................................................................................................8

V.     ARGUMENT ................................................................................................................8

      A.     Plaintiffs Cannot Demonstrate Predominance. ....................................................8

            1.     Plaintiffs Must Prove Lack of Consent in Their Affirmative Case and the FCC Could Not Vary That Requirement. .......................................9

            2.     Individual Issues Regarding Consent Defeat Predominance. ...................12

            3.     Individual Issues Regarding Class Membership Also Defeat Predominance. ........................................................................................14

      B.     Plaintiffs Cannot Demonstrate an Identifiable and Ascertainable Class. ............15

            1.     Plaintiffs' New Class Is Fatally Overbroad Because It Includes Purported Class Members Who Cannot Recover. .....................................16

            2.     The New Purported Class of All Fax "Recipients" Is Unidentifiable. .....17

                  a.     Plaintiffs' Purported "Recipient" Class Is Not Ascertainable. .....17

                  b.     Plaintiffs' "Best Practical Notice" Argument Does Not Satisfy the Requirement of an Ascertainable Class. ....................19

                  c.     Plaintiffs' Purported "Expert" Evidence Does Not Overcome Their Ascertainability Problem. .................................21

      C.     Both Named Plaintiffs Are Inadequate and Atypical of the Purported Class. ......22

      D.     The Proposed Class Is Neither Manageable nor Superior. ..................................24

      E.     Plaintiffs' Rule 23(b)(2) Class Is Barred Because the TCPA Authorizes the Individual Recovery of Monetary Damages. ......................................................24

VI.    CONCLUSION ..........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Ades v. Omni Hotels Mgmt.*,
No. 2:13-cv-02468-CAS(MANx),
2015 U.S. Dist. LEXIS 65493 (C.D. Cal. May 18, 2015) ...................................................... 22

*Allen v. Similasan Corp.*,
306 F.R.D. 635 (S.D. Cal. 2015)....................................................................................... 21

*Am. Copper & Brass, Inc. v. Lake City Indus. Prods.*,
757 F.3d 540 (6th Cir. 2014)............................................................................................ 18

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................................................................ 8

*Aranda, et al. v. Caribbean Cruise Line, Inc., et al.*,
1:12-cv-04069 (N.D. Ill. July 17, 2015) ............................................................................ 22

*Baird v. Sabre Inc.*,
995 F. Supp. 2d 1100 (C.D. Cal. 2014) ............................................................................ 13

*Bais Yaakov of Spring Valley v. FCC*,
No. 14-1234 (D.C. Cir.) ...................................................................................................... 11

*Balschmiter v. TD Auto Fin. LLC*,
303 F.R.D. 508 (E.D. Wis. 2014) ...................................................................................... 25

*Berlowitz v. Nob Hill Masonic Mgmt., Inc.*,
No. C-96-01241 MHP, 1996 WL 724776 (N.D. Cal. Dec. 6, 1996) ..................................... 16

*Brazil v. Dell Inc.*,
No. C-07-01700-RMW, 2010 WL 8816312 (N.D. Cal. Mar. 29, 2010) ............................... 25

*Brey Corp. v. LQ Mgmt. LLC*,
No. JFM-11-718, 2014 WL 943445 (D. Md. Jan. 30, 2014) ................................................ 20

*Cal. Cosmetology Coalition v. Riley*,
110 F.3d 1454 (9th Cir. 1997)............................................................................................ 10

*Chevron v. NRDC, Inc.*,
467 U.S. 837 (1984)........................................................................................................... 10

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) .................................................................................................... 8, 9

*Compressor Eng'g Corp. v. Mfrs. Fin. Corp.*,
292 F.R.D. 433 (E.D. Mich. 2013) ................................................................................ 18, 20

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Connelly v. Hilton Grand Vacations Co.*,
  294 F.R.D. 574 (S.D. Cal. 2013) ................................................................ 12, 25

*Cook Inlet Treaty Tribes v. Shalala*,
  166 F.3d 986 (9th Cir. 1999) ................................................................................ 11

*Costelo v. Chertoff*,
  258 F.R.D. 600 (C.D. Cal. 2009) ........................................................................ 15

*Cottle-Banks v. Cox Commc'ns, Inc.*,
  No. 10CV2133-GPC (WVG), 2013 WL 2244333 (S.D. Cal. May 21, 2013) ....................... 16

*Dunford v. Am. DataBank, LLC*,
  64 F. Supp. 3d 1378 (N.D. Cal. 2014) ................................................................. 23

*Emanuel v. Los Angeles Lakers, Inc.*,
  No. CV-12-9936-GW, 2013 WL 1719035 (C.D. Cal. Apr. 18, 2013) .................................. 13

*Faulk v. Sears Roebuck & Co.*,
  No. 11-CV-02159 YGR, 2013 U.S. Dist. LEXIS 57430 (N.D. Cal. Apr. 19, 2013) ............... 9

*Fields v. Mobile Messengers Am., Inc.*,
  No. C 12-05160 WHA, 2013 WL 6073426 (N.D. Cal. Nov. 18, 2013) ........................... 9, 13

*Gannon v. Network Tel. Servs., Inc.*,
  No. CV 12-9777-RGK, 2013 WL 2450199 (C.D. Cal. June 5, 2013) ................. 14, 15, 16, 24

*Hendricks v. Starkist Co.*,
  No. 13-cv-00729-HSG, 2015 U.S. Dist. LEXIS 96390 (N.D. Cal. July 23, 2015) ............... 15

*Imhoff Inv., LLC v. Alfoccino, Inc.*,
  No. 14-1704, 2015 WL 4079438 (6th Cir. July 7, 2015) ....................................... 18

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) .......................................................................... 8

*In re Hotel Tel. Charges*,
  500 F.2d 86 (9th Cir. 1974) ................................................................................ 8

*In re Jeffrey Roman Shope, D.C., License No. 2333*,
  Case No. 97 OBCE 121 (June 30, 1998) ............................................................... 8

*In re Proxima Corp. Sec. Litig.*,
  No. 93-1139, 1994 WL 374306 (S.D. Cal. May 3, 1994) ......................................... 23

*In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
  29 FCC Rcd. 13998 (Oct. 30, 2014) ............................................................... 11, 12

*IRA Holtzman C.P.A. & Assocs. Ltd. v. Turza*,
  728 F.3d 682 (7th Cir. 2013) .............................................................................. 11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Jamison v. First Credit Servs., Inc.*,
   290 F.R.D. 92 (N.D. Ill. 2013) ....................................................................... 13, 14

*Jamison v. First Credit Servs., Inc.*,
   No. 12-C-4415, 2013 WL 3872171 (N.D. Ill. July 29, 2013) .................................. 23

*Jones v. ConAgra*,
   No. 14-16327 (9th Cir. 2014) ........................................................................... 15

*Kavu, Inc. v. Omnipak Corp.*,
   246 F.R.D. 642 (W.D. Wash. 2007) ............................................................... 19, 25

*Kaye v. Merck & Co., Inc.*,
   No. 10-cv-1546, 2014 WL 2002447 (D. Conn. May 15, 2014) ............................... 10

*Kristensen v. Credit Payment Servs.*,
   12 F. Supp. 3d 1292 (D. Nev. 2014) ..................................................................... 9

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,
   No. CV 12-cv-04457-SC, 2015 WL 4537957 (N.D. Cal. July 27, 2015) .................... 25

*Meyer v. Portfolio Recovery Assocs. LLC*,
   707 F.3d 1036 (2012) ......................................................................................... 9

*Meyer v. Portfolio Recovery Assocs., LLC*,
   No. 11CV1008 AJB (RBB), 2011 WL 11712610 (S.D. Cal. Sept. 14, 2011) ............... 25

*O'Connor v. Boeing N. Am., Inc.*,
   180 F.R.D. 359 (C.D. Cal. 1997) ........................................................................ 17

*O'Connor v. Boeing N. Am., Inc.*,
   184 F.R.D. 311 (C.D. Cal. 1998) ........................................................................ 15

*Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*,
   No. 12-2230-CIV, 2014 WL 7366255 (S.D. Fla. Dec. 24, 2014) ............................ 12

*Physicians Healthsource, Inc. v. Stryker Sales Corp.*,
   65 F. Supp. 3d 482 (W.D. Mich. 2014) ............................................................... 12

*Rader v. Teva Parenteral Meds., Inc.*,
   276 F.R.D. 524 (D. Nev. 2011) .......................................................................... 17

*Raitport v. Harbour Capital Corp.*,
   No. 09-cv-156-SM, 2013 WL 4883765 (D.N.H. Sept. 12, 2013) ........................... 10

*Sandusky Wellness Center LLC v. Medtox Scientific, Inc.*,
   No. 12-2066, 2014 WL 3846037 (D. Minn. Aug. 5, 2014) ......................... 17, 18, 19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Schleicher v. Wendt,*
No. 02-CV-1332, 2009 WL 761157 (S.D. Ind. Mar. 20, 2009),
*aff'd*, 618 F.3d 679 (7th Cir. 2010) ........................................................................ 23

*Shamblin v. Obama for America,*
No. 13-cv-2428, 2015 U.S. Dist. LEXIS 54849 (M.D. Fla. April 27, 2015) ......................... 13

*Smith v. Microsoft Corp.,*
297 F.R.D. 464 (S.D. Cal. 2014) ................................................................... *passim*

*USA v. Shope,*
Case No. 15-cr-00189-GLF (S.D. Ohio) ................................................................ 8

*Utility Air Regulatory Grp. v. EPA,*
134 S. Ct. 2427 (2014) ........................................................................... 10

*Vandervort v. Balboa Capital Corp.,*
287 F.R.D. 554 (C.D. Cal. 2012) .............................................................. 11, 19

*Vigus v. Southern Illinois Riverboat/Casino Cruises, Inc.,*
274 F.R.D. 229 (S.D. Ill. 2011) ............................................................... 16, 24

*Wal-Mart Stores, Inc. v. Dukes,*
131 S. Ct. 2541 (2011) ..................................................................... 8, 24, 25

*Wang v. Chinese Daily News, Inc.,*
737 F.3d 538 (9th Cir. 2013) ...................................................................... 24

*Werdebaugh v. Blue Diamond Growers,*
No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) .............................. 21

*Williams v. Oberon Media, Inc.,*
468 F. App'x 768 (9th Cir. 2012) ................................................................. 15

*Wolph v. Acer Am. Corp.,*
272 F.R.D. 477 (N.D. Cal. 2011) ................................................................. 15

*Xavier v. Philip Morris USA, Inc.,*
787 F. Supp. 2d 1075 (N.D. Cal. 2011) ........................................................... 15

*Zinser v. Accufix Research Inst., Inc.,*
253 F.3d 1180 (9th Cir. 2001) ..................................................................... 9

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**STATUTES**

47 U.S.C.
  § 227 ........................................................................................................................... 2
  § 227(b)(1)(C) ........................................................................................................... 10
  § 227(b)(1)(C)(i) ......................................................................................................... 1
  § 227(b)(1)(C)(iii) ....................................................................................................... 1
  § 227(b)(2)(D) ............................................................................................................. 1
  § 227(b)(3) ................................................................................................................. 25

Cal. Civ. Proc. Code § 1985.3(f) .................................................................................. 22

Cal. Pub. Util. Code § 2891 .......................................................................................... 22

**RULES**

Fed. R.Civ. P.
  Rule 23 ......................................................................................................................... 8
  Rule 23(b)(2) ................................................................................................... 2, 24, 25
  Rule 23(b)(3) ..................................................................................................... 2, 8, 24
  Rule 23(b)(3)(c) ......................................................................................................... 17

## I.    INTRODUCTION

Two chiropractic businesses filed this lawsuit and seek over $100 million for receiving four faxed pieces of paper that allegedly failed to include instructions on how to opt out of receiving those faxes.  In the operative complaint, Plaintiffs sought to certify a class of businesses that received *unsolicited* faxes.  Acknowledging that their original proposed class could not be certified, Plaintiffs assert for the first time in their class motion a new class definition that includes "recipients" of unsolicited and ***solicited*** faxes — faxes that "recipients" invited or gave permission to receive.  Plaintiffs' new strategy and class definition also fail.

Plaintiffs' new class includes recipients of solicited faxes and thus includes members with no claims.  This overbroad class is also unidentifiable and unascertainable.  The fax transmission records do not show who owned the fax machine (owner), who subscribed to the fax number (subscriber), or who actually picked up the fax (recipient).  Plaintiffs attempt to avoid the ascertainability requirement by arguing that the class member can be the owner, subscriber, ***or*** recipient, but a TCPA claim for a single fax transmission cannot belong to multiple parties.  Individualized inquiries into the circumstances surrounding each fax transmission would be required to identify the class members.

Further, individual, not common, issues overwhelmingly predominate.  Those individual issues include not only the question of who received the fax, but also who consented to receiving the fax.  The provisions of the TCPA on which Plaintiffs base their claims — including the requirement that faxes include an "opt-out" notice — uniformly and unambiguously apply only to *unsolicited* faxes.  47 U.S.C. §§ 227(b)(1)(C)(i), (iii), (b)(2)(D).  That the fax sent was unsolicited (i.e., sent without consent) is a required element of the Plaintiffs' affirmative case.  Given that Defendants sent faxes only to current customers and obtained consent in multiple ways, including oral communications with customers, individual questions regarding each class member's consent to receive the faxes overwhelm any common issues and defeat predominance.

Neither of the named Plaintiffs is an adequate or typical class representative.  Plaintiff True Health's sole owner has admitted to fraud in a consent decree, and True Health is the target of a continuing FBI fraud investigation.  Fraud-related offenses detract from the claims of the

1  class and raise doubts about the named plaintiff's credibility and integrity, rendering True Health

2  inadequate and atypical.  The record also demonstrates that both Plaintiffs consented to receive

3  the faxes at issue.  The named Plaintiffs are not adequate class representatives.

4        Plaintiffs' final effort to avoid the fatal problems with their (b)(3) class by asserting a

5  (b)(2) class for injunctive relief also fails.  Courts in this Circuit have repeatedly rejected attempts

6  by TCPA plaintiffs to certify a (b)(2) class because plaintiffs are primarily seeking monetary

7  damages.  No class can be certified here.

8  **II.     PROCEDURAL HISTORY**

9        On May 15, 2013, True Health Chiropractic, Inc. ("True Health") filed this putative class

10  action alleging McKesson Corporation sent "unsolicited advertisements" by facsimile (or "fax")

11  in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.  (ECF

12  No. 1-1.)[1]  True Health alleged that it received a single unsolicited fax advertisement on April 20,

13  2010.  (*Id.*¶ 11.)  Plaintiff filed a first amended complaint on June 20, 2013.  (ECF No. 7.)

14        Plaintiff sought leave to file a second amended complaint on May 5, 2014 (ECF No. 69),

15  and the Second Amended Complaint ("SAC") was filed on July 18, 2014.  (ECF No. 90.)  The

16  SAC added McLaughlin Chiropractic Associates, Inc. ("McLaughlin") as a Plaintiff, and added

17  McKesson Technologies, Inc. ("MTI") as a Defendant.  McLaughlin alleged that it received three

18  unsolicited fax advertisements, on February 3, 2010; February 22, 2010; and May 11,

19  2010.  (SAC ¶ 13.)  Plaintiffs assert that none of the faxes contained an "opt-out notice"

20  informing the recipient how to opt out of receiving future faxes.  (*Id.*¶ 19.)  The SAC alleged the

21  following class definition:  "All persons who (1) on or after four years prior to the filing of this

22  action, (2) were sent telephone facsimile messages of material advertising the commercial

23

24      [1] Plaintiffs attempt to direct attention away from the problems with their class motion by

25  referencing a May 2008 letter regarding unrelated allegations.  But this purported "citation" to
"McKesson" has no bearing on the issues in this motion.  This letter was not even sent to

26  Defendant McKesson Corporation, Defendant MTI, or the business unit at issue, PPS.  Plaintiffs'
further attempt to distract the Court with irrelevant discovery disputes should also be rejected.

27  (*See* Pls.' Mot. for Class Certification ("Mtn."), ECF No. 209 at 6-8.)  Defendants have refuted
Plaintiffs' baseless accusations in their Opposition to Plaintiffs' Second Motion for Sanctions
(ECF No. 210) and their proposed Surreply (ECF No. 218-2).

28

1   availability of any property, goods, or services by or on behalf of Defendants, (3) from whom

2   Defendants did not obtain prior express permission or invitation to send those faxes, and (4) did

3   not display a proper opt-out notice."  (*Id.*¶ 21.)

4        On July 16, 2015, Plaintiffs filed their motion for class certification, seeking to certify a

5   *different* class than the one alleged in the SAC:  "All persons or entities who received faxes from

6   'McKesson' from September 2, 2009, to May 11, 2010, offering 'Medisoft,' 'Lytec,' or 'Revenue

7   Management Advanced' software or 'BillFlash Patient Statement Service,' where the faxes do not

8   inform the recipient of the right to 'opt out' of future faxes." [2]  (ECF No. 209 at 1, 15.)

9   **III.    FACTUAL BACKGROUND**

10       During 2009-2010, Physician Practice Solutions ("PPS"), a business unit of MTI, sold

11  practice management and electronic health records software, including Medisoft and Lytec.

12  PPS's primary customer base was smaller physicians' offices, and many of these small doctors'

13  offices still used fax machines as a primary way of communicating.  (Declaration of Jeffrey Paul

14  in Supp. of Defs.' Opp. to Pls.' Mot. for Class Cert. ("Paul Decl.") ¶ 3; Declaration of Tiffany

15  Cheung in Supp. of Defs.' Opp. to Pls.' Mot. for Class Cert. ("Cheung Decl.") Ex. K (Holloway

16  Dep.) at 89:10-15 ("Our existing customers oftentimes would request us to send faxes specifically

17  . . . and we would comply and send them faxes quite frequently."), *id.* at 23:21-24.)

18       **A.    Customers Invited Promotional Faxes in a Variety of Ways.**

19       The faxes at issue were sent only to existing customers who had previously purchased

20  software and all voluntarily provided their fax numbers to PPS.  (Cheung Decl. Ex. K (Holloway

21  Dep.) at 89:10-15.)  The faxes at issue provided information on available upgrades to the software

22  previously purchased by these doctors' offices.  (SAC, Exs. A-B-3.)  In addition, all customers

23  entered into End User License Agreements ("EULA") expressly agreeing that their contact

24  information may be used to offer them features and services.  (Paul Decl. ¶ 7, Ex. A at RS-

25  ───────────────

26  [2] Plaintiffs' motion references then-pending third-party subpoenas and argues that
    Plaintiffs "may seek to amend the class definition, or perhaps create subclasses, to include
    additional faxing activity."  (Mtn. at 8-9.)  On July 29, 2015, however, the Court granted

27  Defendants' motion for protective order, holding that Plaintiffs' subpoenas were "patently
    overbroad" and constituted "a classic fishing expedition."  (ECF No. 213 at 5.)

28

1   TRUEHEALTH 000442 ("This Usage Information . . . also assists McKesson in offering End
2   User other features and services.").)

3        Many, if not all, customers also provided consent through direct conversations with their
4   sales representative.  (Cheung Decl. Ex. M at 2-3, Ex. K (Holloway Dep.) at 23:21-24; 89:23-90:3
5   ("Again, generally, they would have communications with their sales representative" and "our
6   customers would request a lot of information via fax.").)  Each sales representative at PPS
7   developed a relationship with each of his or her assigned customers, and in the course of that
8   relationship, customers requested and invited fax promotions.  (*Id.* Ex. M at 2-3, Ex. K (Holloway
9   Dep.) at 89:23-90:3 ("The sales representatives had a decent handle on who their customers were.
10  It wasn't an enormous number so they knew the people and they knew the ways they would like
11  to be communicated with.").)

12       Customers specifically asked sales representatives "to fax them information on discounts,
13  promotions, and/or upgrades when available, so they could purchase upgrades or other services
14  and take advantage of discounts or promotions."  (Paul Decl. ¶ 4.)  Some customers informed
15  their sales representatives that they preferred to receive communications, including promotions,
16  exclusively by fax, instead of by alternative ways.  (Cheung Decl. Ex. M at 2-3; Paul Decl. ¶ 4 ("I
17  was instructed by certain customers that they never or rarely checked their emails, and therefore, I
18  would need to always send them information exclusively by fax, including information on
19  promotions or upgrades offered by PPS.").)  "Many customers expressed their appreciation for
20  the information on promotions and upgrades sent by PPS."  (Paul Decl. ¶ 4.)

21       **B.      No Records Identify the Recipients of Promotional Faxes.**

22       No records in this case identify the recipients of promotional materials faxed by PPS.  To
23  attempt to ascertain the class, Plaintiffs rely on fax transmission logs and Defendants'
24  interrogatory responses referring to "recipients" of the faxes.  (Mtn. at 11-12.)  But the
25  transmission logs merely show the number that a fax was sent to on a particular day, and the
26  interrogatory responses list the individual or entity customer name associated with that number in
27  PPS's *separate* customer databases.  (Cheung Decl.¶ 18.)  Defendants' interrogatory responses
28  were created for the purpose of complying with the Court's Order directing Defendants to provide

1    interrogatory responses identifying entities that had consented to the faxes at issue (ECF No. 143

2    at 4).  To prepare these responses, Defendants combined fax detail reports from third-party

3    Slingshot Technologies ("Slingshot") with customer contact information from PPS's *separate*

4    databases.  The use of the term "recipient" in Defendants' interrogatory responses simply mirrors

5    the Order's language.  (ECF No. 209-1 (Hara Decl.) ¶ 5; ECF No. 178 at 12.)  PPS's database

6    does not show who owned the fax machine, who subscribed to the fax number identified in the

7    transmission log, or who picked up the fax.  The database lists only the name that the person who

8    registered the software decided to enter as a customer name.

9         Plaintiffs' expert does not dispute that the logs do not identify this information.  (*See*

10   Cheung Decl. Ex. L (Biggerstaff Dep.) at 248:21-25, 249:1-2, 10-12 (conceding there is no

11   "feasible way to determine which entity or person picked up a fax that was sent to any fax

12   machine"), 249:10-12 (testifying that the customer name and address listed on the logs would be

13   "the place to start" the ownership inquiry), 238:16-22 (testifying that he would first start with the

14   names and addresses listed on the logs to begin identifying subscribers).)

15        **C.       Plaintiffs Cannot Identify a Feasible Way to Determine the Fax Recipients.**

16        Plaintiffs' expert, Robert Biggerstaff, did not propose any methodology in his first report

17   for identifying class members.  This failure is critical given the lack of an "available data source

18   to identify the historical subscribers associated with facsimile numbers."  (*Id.* Ex. P (Sponsler

19   Report) ¶ 9.)  Mr. Biggerstaff's second report proposes subpoenaing telecommunications carriers

20   to obtain current subscriber data and asserts, without support, that carriers "have dedicated teams

21   with automated systems that will produce the desired information automatically and efficiently."

22   (ECF No. 209-13 (Second Biggerstaff Report) ¶¶ 15-16.)  The experience of Defendants' expert,

23   Mr. Sponsler, is to the contrary:  "many carriers refuse to respond to these subpoenas without the

24   consent of each of their customers and/or object to the subpoenas on the grounds that they violate

25   various statutes and laws."  (Cheung Decl. Ex. P (Sponsler Report) ¶ 14.)

26        Mr. Biggerstaff claims that breaking down the identification of subscribers into

27   "manageable pieces demonstrates the task is both quantitatively and qualitatively manageable,"

28   but he never states how he would break down the identity of nearly 12,000 historical fax

1   subscribers and locate them today.  (ECF No. 209-13 (Second Biggerstaff Report) ¶ 19.)

2        Mr. Biggerstaff does not address the practical challenges with identifying recipients of

3   faxes that are more than five years old.  "Business telephone numbers are frequently disconnected

4   and reassigned as well, meaning that just because a particular carrier shows that a certain

5   telephone number is now assigned to it, that does not mean that said number has always been

6   assigned to that carrier."  (Cheung Decl. Ex. P (Sponsler Report) ¶ 18.)  At his deposition,

7   Mr. Biggerstaff could not identify a single TCPA case where carriers were subpoenaed for six-

8   year-old historical subscriber data.  (*Id.* Ex. L (Biggerstaff Dep.) at 134:9-12 ("Q. And do you

9   recall in any of the cases where subscriber information has been asked for going back to the last

10  six years?  A. Not that I recall.").)  He could identify only one carrier that may provide subscriber

11  information older than five years (*id.* at 135:23-25; 136:1-5), and conceded that historical

12  subscriber data may not be available if it was "several years in the past and the data had rolled

13  off."  (*Id.* at 133:13-14.)  Mr. Biggerstaff surmises it would take over 100 carrier subpoenas to

14  ascertain all of the subscribers in this case (*id.* Ex. L (Biggerstaff Dep.) at 247:13-16), but

15  Mr. Sponsler's experience shows that because of the "volatility within the telecom industry, there

16  is no way to determine with certainty which or how many carriers would need to be subpoenaed

17  in order to determine the carriers" associated with each of the nearly 12,000 fax numbers at issue.

18  (*Id.* Ex. P (Sponsler Report) ¶ 13.)  Further, Mr. Biggerstaff's claim that three-fourths of the fax

19  "recipients" in this case can be easily identified from current subscriber data (ECF No. 209-13

20  (Second Biggerstaff Report) ¶¶ 12, 13, 20) improperly conflates the terms "recipient" and

21  "current subscriber" and is based on a mathematically unsound calculation.  (Cheung Decl. Ex. Q

22  (Second Sponsler Report) ¶¶ 9, 12.)

23       **D.    Both Named Plaintiffs Consented To Be Sent Faxes.**

24       Dr. Franya Peterson, a chiropractor working in McLaughlin's office, was a Medisoft

25  customer.  She was authorized to use McLaughlin's fax machine, admitted that she voluntarily

26  provided McLaughlin's fax number while registering Medisoft, and admitted that she expected to

27  receive faxes as a result.  (Cheung Decl. Ex. G (Peterson Dep.) at 41:2-8; 51:22-52:4; 78:12-14,

28  17-19; 85:10-12; 108:14-16, 21-24; Ex. H.)  On the software registration form, "MCLAUGHLIN

1   CHIROPRACTIC CENTER" was entered as the "Practice/Registration Name," "Franya M.

2   Peterson, D.C." was entered as the "Physician/Contact Name," and McLaughlin's fax number

3   was provided.  (*Id.* Ex. H at Dep. Exs. 13, 16.)  The same information was entered on a Technical

4   Support Agreement.  (*Id.* at Dep. Ex. 18.)  Dr. Peterson admitted that she was not required to

5   provide a fax number and that she voluntarily provided the number of the fax machine she was

6   authorized to use.  (*Id*. Ex. G (Peterson Dep.) at 51:22-25; 52:1-7; 108:14-16, 21-24.)  Plaintiff

7   McLaughlin likewise admits that Dr. Peterson has had authorization to use the McLaughlin fax

8   number and to send and receive faxes at that fax number since at least 2007.  (*Id*. Ex. J

9   (McLaughlin Dep.) at 127:14-129:1.)  Joanna Fry, the receptionist at McLaughlin; Dr. Peterson;

10  Dr. McLaughlin; and two other doctors used the fax machine while they worked there (*id*. Ex. I

11  (Fry Dep.) at 66:21-67:2), and anyone working there could pick up faxes received on the fax

12  machine.  (*Id*. Ex. G (Peterson Dep.) at 76:17-23.)

13      True Health admitted in responses to requests for admission that it provided its fax

14  number when registering as a Medisoft customer.  (*Id*. Ex. D at 1-2.)  When registering Medisoft,

15  "TRUE HEALTH CHIROPRACTIC" was entered as the "Registration Name," "Jeffrey R.

16  Shope, D.C." was entered as the "Contact," and True Health's fax number was entered.  (*Id.*

17  Ex. B.)[3]  Numerous True Health employees were authorized to use its fax number and to receive

18  faxes on True Health's fax machine.  (*Id*. Ex. O (Jordan Dep.) at 16:15-17:2, 36:1-18, 89:3-13,

19  91:2-5, 94:23-95:14.)  Dr. Jeffrey Shope, Sandra Jordan (Perry), Josh Riscavage, and potentially

20  others had communications with the company selling Medisoft regarding True Health's purchase

21  or registration.  (*Id*. at 60:21-24, 76:25-77:17; *id*. Ex. F (Shope Dep.) at 43:11-20.)

22      **E.     The President of True Health Has Admitted to Fraud.**

23      Dr. Jeffrey Shope, the owner, proprietor, and President of True Health, admitted to fraud

24  and a pattern of fraudulent conduct when he entered into a Consent Agreement with the Ohio

25

26      [3] Plaintiffs have argued that the print-out version of this registration page produced by
    Defendants indicates that a "Do not Fax" box is checked.  But this assertion mischaracterizes the
27  evidence.  The electronic version shows that the box is "all grayed out, meaning no option had
    been selected by the customer."  (*Id.* Ex. E (Taylor Dep.) at 80:5 – 81:1.)

28

1   Board of Chiropractic Examiners.  *See In re Jeffrey Roman Shope, D.C., License No. 2333*, Case

2   No. 97 OBCE 121 (June 30, 1998).  His license was suspended for one year, he received at least

3   five years of probation, and he was required to complete 48 hours of instruction in ethics, risk

4   management, and billing.  *Id.*  In 2012, the FBI raided True Health's office as part of a fraud

5   investigation.  (Cheung Decl. Ex. O (Jordan Dep.) at 52:2-10.)  The FBI's inquiry goes back 10

6   years, including the time period of the alleged conduct in this case.  (*See id*. at 82:11-17;

7   71:14:18.)  A criminal docket was opened on August 12, 2015, in the U.S. District Court for the

8   Southern District of Ohio, titled *USA v. Shope*, Case No. 15-cr-00189-GLF, for an Information

9   alleging "a scheme to defraud health care benefit programs."

10  **IV.   LEGAL STANDARD**

11        Class actions are an "exception to the usual rule that litigation is conducted by and on

12  behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

13  2550 (2011) (citation omitted).  Plaintiffs seeking to maintain a class action must show that class

14  treatment is appropriate — not by relying on the pleadings but through actual proof that each of

15  the requirements of Rule 23 is met.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013);

16  *Dukes*, 131 S. Ct. at 2551-52.  Where, as here, plaintiffs seek certification under Rule 23(b)(3),

17  any common questions must predominate over the individualized ones.  *Id.*; *Amchem Prods.,*

18  *Inc. v. Windsor*, 521 U.S. 591, 624 (1997).  Plaintiffs cannot satisfy their burden with "promises,"

19  *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 506-07 (N.D. Cal. 2008), to

20  "provide solutions" to prevent the "individual issues from splintering the action."  *In re Hotel Tel.*

21  *Charges*, 500 F.2d 86, 90 (9th Cir. 1974).

22  **V.   ARGUMENT**

23        **A.   Plaintiffs Cannot Demonstrate Predominance.**

24        In *Comcast Corp.*, the Supreme Court reiterated that class certification requires "rigorous

25  analysis" and held that Rule 23(b)(3)'s predominance analysis "is even more demanding" than

26  Rule 23(a)'s analysis because Rule 23(b)(3) is an "adventuresome innovation."  133 S. Ct. at

27  1432 (quotations and citation omitted).  To certify a class under Rule 23(b)(3), a plaintiff bears

28  the heavy burden of demonstrating through "evidentiary proof" that questions "common to class

members *predominate over* any questions affecting only individual members." *Id.* (emphasis added); *see also Faulk v. Sears Roebuck & Co.*, No. 11-CV-02159 YGR, 2013 U.S. Dist. LEXIS 57430, at *23 (N.D. Cal. Apr. 19, 2013).  Where the resolution of a case "require[s] the separate adjudication of each class member's individual claim or defense," class treatment is inappropriate.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (quotations and citation omitted).  Plaintiffs cannot establish predominance here.

> **1.      Plaintiffs Must Prove Lack of Consent in Their Affirmative Case and the FCC Could Not Vary That Requirement.**

This Court has expressly held that a recipient's lack of consent is a required element of the plaintiff's affirmative case under the TCPA.  *Fields v. Mobile Messengers Am., Inc.*, No. C 12-05160 WHA, 2013 WL 6073426, at *4 (N.D. Cal. Nov. 18, 2013).  *Fields* based its conclusion on the Ninth Circuit's holding in *Meyer v. Portfolio Recovery Assocs. LLC*, 707 F.3d 1036, 1043 (2012), that one of the three elements of a TCPA claim is that the communication was sent without the recipient's prior consent.  *Fields*, 2013 WL 6073426, at *3; *see also Smith v. Microsoft Corp.*, 297 F.R.D. 464, 471 (S.D. Cal. 2014) (concluding that "the absence of express prior consent, however, is one of the three elements of a TCPA claim, which Plaintiff bears the burden of satisfactorily establishing for the Court").[4]

The relevant portions of the TCPA expressly state that proof of an "unsolicited" fax is a required element of a claim.[5]  The statute provides that it is unlawful for any person:

---

[4] In opposition to Defendants' motion to stay, Plaintiffs argued that it is Defendants' burden to prove consent.  (ECF No. 212 at 13.)  But Plaintiffs cite only out-of-circuit district court cases for this position.  This Court should follow controlling Ninth Circuit authority in *Meyer*, holding that one of the elements of a TCPA plaintiff's case is to prove that the communication was sent "without the recipient's prior express consent."  707 F.3d at 1043.  While a few courts have attempted to avoid this result, courts have consistently found that at class certification, the question of which party bears the consent burden does not matter because it is undisputed that ***plaintiffs*** bear the burden of proving that consent, or lack thereof, can be resolved through common evidence that applies to the entire class.  *See, e.g.*, *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014).

[5] Even Plaintiffs concede that determining whether PPS was a "sender" of any given fax transmission requires that it be a "'person or entity on whose behalf a facsimile ***unsolicited*** advertisement is sent or whose goods or services are advertised or promoted in the ***unsolicited*** advertisement.'"  (Mtn. at 1 (quoting 47 C.F.R. § 64.1200(f)(10)) (emphasis added).)

(C) to use any telephone facsimile machine, computer or other device to send, to a telephone facsimile machine, an *unsolicited* advertisement, unless –

    (i) the *unsolicited* advertisement is from a sender with an established business relationship with the recipient;

    (ii) the sender obtained the number of the telephone facsimile machine through –

        (I)    the voluntary communication of such number, within the context of such established business relationship, from the recipient of the *unsolicited* advertisement, . . . and

    (iii) the *unsolicited* advertisement contains a notice [the opt-out notice] meeting the requirements of paragraph (2)(D) [authorizing the FCC to promulgate regulations for opt-out notices on *unsolicited* advertisements].

47 U.S.C. § 227(b)(1)(C) (emphasis added).

The FCC had no power to ignore the express provisions of the statute or to extend a requirement to *solicited* faxes when the statute is specifically limited to ***unsolicited*** faxes.  As established in *Chevron v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984):  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Indeed, a "regulation may not serve to amend a statute, nor add to the statute 'something which is not there.'"  *Cal. Cosmetology Coalition v. Riley*, 110 F.3d 1454, 1460 (9th Cir. 1997) (citation omitted); *see Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2445 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").  While the D.C. Circuit will be the first appellate court to review the FCC's attempt to extend the opt-out notice requirement to consented-to faxes, other courts have already opined that the FCC exceeded its statutory authority in attempting to regulate solicited faxes.[6]

---

      [6] *See, e.g.*, *Kaye v. Merck & Co., Inc.*, No. 10-cv-1546, 2014 WL 2002447, at *2 (D. Conn. May 15, 2014) ("I am inclined to agree with the defendants that the FCC lacks authority to regulate solicited faxes [pursuant to Section 227(b) of the TCPA]." (quoting *Physicians Healthsource, Inc. v. Purdue Pharma L.P.*, No. 12-CV-1208, 2014 WL 518992, at *3 (D. Conn. Feb. 3, 2014)); *Raitport v. Harbour Capital Corp.*, No. 09-cv-156-SM, 2013 WL 4883765, at *1 (D.N.H. Sept. 12, 2013) ("Congress surely intended to protect citizens from the impositions associated with unwanted, unwelcome, 'unsolicited' facsimile advertisements, but likely did not

(Footnote continues on next page.)

Plaintiffs effectively concede in their motion that if the opt-out notice does not apply to "solicited" faxes, individual issues pertaining to consent defeat predominance here. Given that the plain language of the TCPA applies to only ***unsolicited*** faxes, several parties have sought review of the FCC's regulation purporting to extend the opt-out notice requirements to ***solicited*** faxes, and those consolidated appeals are pending. *See Bais Yaakov of Spring Valley v. FCC*, No. 14-1234 (D.C. Cir.). The D.C. Circuit is expected to rule that solicited faxes do not require an opt-out notice. To exclude those with no claim because they received solicited faxes, numerous individualized inquiries would be required to determine whether each of the individual 70,000+ faxes was solicited.[7]

Defendants also have petitioned the FCC for a waiver from the opt-out notice requirements to the extent they are applied to solicited faxes. (ECF No. 208-2.) Such a waiver would likewise require many individualized determinations to determine which of the 70,000+ faxes were solicited and which may have been unsolicited. Plaintiffs argue that the waiver ruling would not apply here because the separation of powers doctrine would be violated. As more fully discussed in Defendants' Motion to Stay briefing (ECF No. 208, No. 217), Plaintiffs are simply wrong. The doctrine is potentially implicated only where a legislative body impermissibly dictates findings in private litigation without changing underlying law. *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 990-91 (9th Cir. 1999) (citing *Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1568 (9th Cir. 1993)). But that is not what the FCC has done for similarly situated petitioners and would be doing if it grants Defendants' waiver petition. Rather, recognizing the significant uncertainties created when it applied its opt-out notice rule to solicited faxes, the FCC has granted waivers to numerous parties subjected to that uncertainty. *In re Rules and*

---

(Footnote continued from previous page.)

think it necessary to protect citizens from 'solicited' facsimile advertisements—ones they invited and affirmatively wished to receive.").

[7] Plaintiffs rely on two cases, *IRA Holtzman C.P.A. & Assocs. Ltd. v. Turza*, 728 F.3d 682 (7th Cir. 2013), and *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554 (C.D. Cal. 2012), in arguing that consent is irrelevant if the faxes had no opt-out notice. (Mtn. at 9.) Neither court, however, discussed or even noted the inconsistency between the statute and the FCC's rule.

*Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 29 FCC Rcd. 13998 (Oct. 30, 2014). The sole case to suggest that a separation of powers issue might arise found that the faxes at issue in that case were *unsolicited*, and accordingly, the waiver could not apply to those faxes in any event.[8]

### 2.    Individual Issues Regarding Consent Defeat Predominance.

Courts routinely hold that in TCPA cases where there is evidence that customers have consented to receive the communication, determining whether each class member has consented creates individual issues that preclude predominance. Unless there is *no* evidence of consent, or the defendant obtained consent using a single, uniform method that can be evaluated on a class-wide basis, the issue of consent defeats predominance. The *Connelly* court summarized the jurisprudence that has emerged on this issue: "Although TCPA cases are not 'per se' unsuitable for class resolution, class certification is warranted only when the 'unique facts' of a particular case indicate that individual adjudication of *the pivotal element of prior consent is unnecessary*." *Connelly v. Hilton Grand Vacations Co.*, 294 F.R.D. 574, 577 (S.D. Cal. 2013) (citing *Gene & Gene LLC v. Biopay*, 541 F.3d 318, 326 (5th Cir. 2008)) (emphasis added). *Connelly* concluded that classes had been certified only when defendants did not obtain consent at all, or did so under uniform circumstances. *Id.* at 578 (Because the list of numbers called was not "a list of homogeneously unconsenting recipients" and "express consent should be evaluated on an individual basis," common issues did not predominate.).[9]

Thus, the "rule that can be extracted from these [TCPA] cases is that issues of

---

[8] In *Physicians Healthsource, Inc. v. Stryker Sales Corp.*, 65 F. Supp. 3d 482 (W.D. Mich. 2014) (*Stryker II*), the court did not consider the pending challenge in the D.C. Circuit to the FCC's authority to promulgate the FCC rule regarding solicited faxes or the potential impact of that appeal in a case involving solicited faxes, such as this one. Indeed, the *Stryker II* court concluded that the TCPA does not apply to solicited faxes. *Id.* at 494 ("The second question for this Court to consider is whether the fax was unsolicited, which is the only kind of fax expressly regulated by the TCPA.").

[9] Plaintiffs' contention that TCPA fax cases are "routinely" certified or that certification of TCPA fax classes is common relies on cases *where it is undisputed that the faxes were unsolicited.* (Mtn. at 9-10 (*see, e.g.*, *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, No. 12-2230-CIV, 2014 WL 7366255, at *5 (S.D. Fla. Dec. 24, 2014) (defendant had "not yet presented any evidence of express invitation or permission from any recipient").) That is not this case.

1   individualized consent predominate where a defendant sets forth specific evidence showing that a

2   significant percentage of the putative class consented" to receiving the communications.

3   *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 106-07 (N.D. Ill. 2013) (denying class

4   certification); *Fields*, 2013 WL 6073426, at *4 (same).  Moreover, as *Fields* held, even if the

5   issue of consent is an affirmative defense, "individualized inquiries regarding consent remain,"

6   and plaintiffs could not prove predominance.  *Id.*; *accord Shamblin v. Obama for America*,

7   No. 13-cv-2428, 2015 U.S. Dist. LEXIS 54849, at *28-29 (M.D. Fla. April 27, 2015).

8           That case law demonstrates that certification is inappropriate here.  Even in *Jamison*,

9   where there was evidence that some numbers had been "skip-traced" such that those call

10   recipients likely did not consent, the court still denied class certification based on the evidence

11   that some percentage of the class had consented.  290 F.R.D. at 96, 110.  The evidence of consent

12   is even stronger here.  The voluntary provision of a fax number constitutes prior express consent

13   to receive faxes at that number for purposes of the TCPA.  *See, e.g.*, *Baird v. Sabre Inc.*, 995 F.

14   Supp. 2d 1100, 1106-07 (C.D. Cal. 2014) (concluding plaintiff's provision of her phone number

15   to airline constituted consent to receive texts); *Emanuel v. Los Angeles Lakers, Inc.*, No. CV-12-

16   9936-GW (SHx), 2013 WL 1719035, at *3-4 (C.D. Cal. Apr. 18, 2013) (same).

17           Defendants sent the faxes at issue *only* to existing customers who consented to receive

18   them.  Defendants obtained consent in a variety of ways, including when customers registered

19   their software products, when they entered into EULAs for the products, and in daily interactions

20   with PPS's employees.  *See supra* section III-A.  Defendants' evidence establishes that many, if

21   not all, customers consented to receive marketing faxes through direct conversations with their

22   sales representatives.  (*Id.*)  Indeed, customers expressly requested that information, including

23   about upgrades and promotions, be provided by fax rather than other means.  (*Id.*)  Here, then, it

24   is clear that Defendants have come forward with evidence of consent, and that Defendants

25   obtained consent by a variety of methods, including oral communications.  To the extent that the

26   named Plaintiffs or any purported class member disputes this evidence, individualized inquiries

27   will be required to resolve such disputes.

28           In *Jamison*, the court denied class certification because it would have been required to

1    conduct a series of mini-trials to determine liability, including scouring defendants' records to

2    determine if a particular class member's cell phone number appeared in the cell phone field, the

3    notes field, or the audit log.  290 F.R.D. at 107.  Here, the individualized investigation would

4    require even more effort — not only would the finder of fact be required to scour Defendants'

5    registration records, sales database, and any notes kept by inside sales representatives, but also

6    inquire about the recollections of numerous inside sales representatives and thousands of

7    customers regarding conversations that occurred over five years ago about fax promotions.

8         Plaintiffs' only response is to suggest that "Defendants admit that they have no evidence

9    of permission with respect to 1,829 fax numbers that received a confirmed 9,313 total

10   transmissions."  (Mtn. at 18.)  But that is a misrepresentation:  it simply ignores Defendants'

11   supplemental interrogatory responses, which provided evidence of consent for each of these fax

12   numbers.  (ECF No. 208-10.)  It also ignores Defendants' extensive evidence that consent was

13   frequently obtained during routine, oral interactions between Defendants' sales force and their

14   customers, and thus would not necessarily be reflected in written agreements or databases.

15        **3.    Individual Issues Regarding Class Membership Also Defeat
             Predominance.**

16

17        The basic question of membership in the class also presents numerous individual issues.

18   Defendants' records do not identify the individuals who received the faxes at issue.  They do not

19   show who owned the fax machines, who the subscribers were, or who actually received the faxes

20   at issue.  Because the purported class members are businesses, multiple individuals had access to

21   the fax machines; this was true, for example, in the case of both named Plaintiffs.  *See supra*

22   section III-D.  Thus, the identity of the purported class members — the "recipients" of the faxes

23   — could only be determined with extensive individual inquiries as to the details and

24   circumstances of each of the approximately 70,000 transmissions and 44 exemplar faxes at

25   issue.[10]  For this reason as well, common issues do not predominate.  *See Gannon v. Network Tel.*

26   _____

         [10] Plaintiffs overstate the number of transmissions, as at least one fax (ECF No. 209-2
27   at 4) is not covered by their new class definition.  Moreover, in the third-party transmission logs
     relied upon by Plaintiffs, there are 4,262 entries with no indication in the logs that the faxes were
28   successfully transmitted.  (Cheung Decl. Ex. Q (Second Sponsler Report) ¶ 10.)

1    *Servs., Inc.*, No. CV 12-9777-RGK (PJWx), 2013 WL 2450199, at *2-3 (C.D. Cal. June 5, 2013).

2         **B.    Plaintiffs Cannot Demonstrate an Identifiable and Ascertainable Class.**

3         As courts within this Circuit have uniformly held, "the party seeking certification must

4    demonstrate that an identifiable and ascertainable class exists." *See, e.g.*, *Xavier v. Philip Morris*

5    *USA, Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011).[11]  A class cannot be certified unless

6    plaintiffs can establish "an objective way to determine" who is a class member. *See Williams v.*

7    *Oberon Media, Inc.*, 468 F. App'x 768, 770 (9th Cir. 2012).  Plaintiffs' class definition must be

8    "precise, objective, and presently ascertainable." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D.

9    311, 319 (C.D. Cal. 1998) (citation omitted).  The "class definition must be sufficiently definite

10   so that it is administratively feasible to determine whether a particular person is a class member."

11   *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011).

12        Plaintiffs cannot meet these requirements or demonstrate the existence of an ascertainable

13   class.  The operative complaint defines the purported class as persons who were sent *unsolicited*

14   faxes, that is, persons from whom Defendants allegedly did not obtain consent.  (SAC ¶ 21.)

15   Plaintiffs now reverse course and seek to certify a different and far broader class of all fax

16   recipients, whether or not they consented to receive the faxes.  Plaintiffs' reasons for doing so are

17   apparent:  the class alleged in the SAC was an improper "failsafe" class and posed the

18   insurmountable obstacle that Plaintiffs must identify, without individual proof, those potential

19   class members who had ***not*** consented to receive Defendants' faxes.  As Plaintiffs clearly

20   recognized, such a class is not ascertainable.[12]

21        [11] Plaintiffs' suggestion that the Ninth Circuit will decide in *Jones v. ConAgra*, No. 14-
22   16327 (9th Cir. 2014), "whether" there is an ascertainability requirement (Mtn. at 10 & n.2), as
     opposed to the precise contours of that requirement, is nonsense.  As this Court has recently
23   reiterated, "while not enumerated in Rule 23, in order to maintain a class action, the class sought
     to be represented must be adequately defined and clearly ascertainable." *Hendricks v. Starkist*
24   *Co.*, No. 13-cv-00729-HSG, 2015 U.S. Dist. LEXIS 96390, at *11 (N.D. Cal. July 23, 2015)
     (internal quotations omitted, citing *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1071 n.3
25   (9th Cir. 2014) (referring in dicta to "threshold ascertainability test")).

26        [12] Because Plaintiffs should not be permitted to seek certification of a class different from
     the one alleged in the SAC, Plaintiffs' putative class cannot be certified on this ground as well.
27   *See, e.g.*, *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) (court is bound to class
     definitions provided in the complaint and, absent an amended complaint, will not consider
28   certification beyond it).  This is especially true where the new class definition is broader than that
     (Footnote continues on next page.)

Plaintiffs' attempt to remedy the ascertainability problems with a new class definition also fails. Plaintiffs now seek to certify a class of *all "recipients"* of a fax offering Medisoft or Lytec software, whether solicited or unsolicited, which did not contain an opt-out notice. But there is no possible way to identify such "recipients" without extensive individual inquiry regarding each separate fax transmission.

### 1. Plaintiffs' New Class Is Fatally Overbroad Because It Includes Purported Class Members Who Cannot Recover.

As discussed in section V-A-1 above with respect to the issue of predominance, persons or entities that consented to receive the faxes at issue do not have a claim under the TCPA. Accordingly, the proposed class definition is fatally overbroad.

Courts have repeatedly recognized that where there is evidence that at least some purported class members consented to receive the communications at issue, the class is overbroad and unascertainable. For example, in *Vigus v. Southern Illinois Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 235 (S.D. Ill. 2011), the proposed class included a substantial number of people who voluntarily provided their numbers; as a result, "the proposed class definition render[ed the class] overbroad and . . . unfit for certification." Further, the court held that if the class were modified to exclude those who had consented, that class could not be determined by "objective criteria applicable to the class as a whole" but would require specific, individual inquiries that would preclude certification. *Id.* Similarly, in *Cottle-Banks v. Cox Commc'ns, Inc.*, No. 10-CV-2133-GPC (WVG), 2013 WL 2244333, at *9-10 (S.D. Cal. May 21, 2013), the court held that the class was unascertainable because it included individuals who affirmatively accepted the challenged provisions as part of the enrollment process. *See also Gannon*, 2013 WL 2450199, at *2-3 (finding class unascertainable where members had multiple consent and disclosure interactions with defendant and thus individualized inquiries into consent were required).

Defendants here have presented evidence that all fax recipients had a pre-existing

---

(Footnote continued from previous page.)

alleged in the complaint. *See Berlowitz v. Nob Hill Masonic Mgmt., Inc.*, No. C-96-01241 MHP, 1996 WL 724776, at *2 (N.D. Cal. Dec. 6, 1996).

1  relationship with PPS and consented in various ways to receive the faxes.  To the extent that any

2  individual class members dispute the consent evidence, litigating such disputes will require

3  numerous individualized inquiries, including who had authority to use the business's fax machine

4  and whether any of those individuals invited or permitted the faxes at issue.

5        **2.**      **The New Purported Class of All Fax "Recipients" Is Unidentifiable.**

6       Even taking the class definition at face value, Plaintiffs cannot ascertain the class.

7  Plaintiffs have the burden of proving that the proposed class is readily identifiable through

8  objective criteria.  *Rader v. Teva Parenteral Meds., Inc.*, 276 F.R.D. 524, 529 (D. Nev. 2011).

9  This requirement permits the court to determine who is bound by the judgment and protects the

10  due process rights of absent class members by ensuring they receive notice and the opportunity to

11  opt out.  Fed. R. Civ. P. 23(b)(3)(c).  Similarly, the class definition must be sufficiently objective

12  and precise that notice is *meaningful* and absent class members can determine whether they are in

13  the proposed class.  *O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 367 (C.D. Cal. 1997)

14  (ascertainability requires an administratively feasible method for determining class members).

15        **a.**      **Plaintiffs' Purported "Recipient" Class Is Not Ascertainable.**

16       Plaintiffs' purported class of all fax "recipients" fails to meet the requirements for

17  ascertainability for multiple reasons.  First, it does not even attempt to define who the class

18  members are, objectively or otherwise.  The court in *Sandusky Wellness Center LLC v. Medtox*

19  *Scientific, Inc.*, No. 12-2066, 2014 WL 3846037, at *3 (D. Minn. Aug. 5, 2014), found a virtually

20  identical alleged class of persons who were "sent" faxes to be unascertainable.  Purporting to

21  define a class of "recipients" or those who "received" faxes begs the question of who the class

22  member is.  Is it the person who received the fax, the business or individual who owns the fax

23  machine, or the subscriber for the fax number?  As *Sandusky* explains:

24          In order to determine to whom each fax was sent—and thus, who
        was injured—the parties and the court *would need to delve into the*

25          *unique circumstances of each fax transmission*.  The answer may
        come more easily in some instances—for example if the person to

26          whom the fax is sent is the sole owner and user of the fax machine-
        *but that information is not ascertainable absent an individualized*

27          *inquiry.*

28  2014 WL 3846037, at *4 (emphasis added).  This problem is particularly acute where, as here, the

faxes were sent to businesses, not individuals, resulting in a high likelihood of multiple potential claimants for a single fax. *See Compressor Eng'g Corp. v. Mfrs. Fin. Corp.*, 292 F.R.D. 433, 449-50 (E.D. Mich. 2013) (criticizing *Turza*, 2009 WL 3334909; "such a ruling accomplishes nothing in terms of preventing multiple claims stemming from a single fax because it leaves it unclear as to what is meant by a person who 'was sent' a fax advertisement"). Thus, a proposed class of fax "recipients" is imprecise, amorphous, and not ascertainable.

Plaintiffs do not seriously suggest otherwise. Instead, they purport to rely on cases from the Sixth Circuit which hold that standing is not restricted to fax "owner[s]." (Mtn. at 11 (citing *Imhoff Inv., LLC v. Alfoccino, Inc.*, No. 14-1704, 2015 WL 4079438 (6th Cir. July 7, 2015); *Am. Copper & Brass, Inc. v. Lake City Indus. Prods.*, 757 F.3d 540 (6th Cir. 2014)).) But neither of those cases even addresses, let alone seeks to resolve, the issue of how the actual class members will be identified. *Imhoff* merely addressed the issue of standing, not class certification. *American Copper* relied on the fact that the defendant had waived the ascertainability issue and assumed without discussion or consideration that fax numbers could be tied to the actual claimants. As *Sandusky* holds, and as demonstrated below, that is not the case.

Plaintiffs argue that they can ascertain the identity of individual class members because they have the "target fax numbers" and transmission logs showing the date and time of each transmission. (Mtn at 11.) But that was equally true in *Sandusky*. As in *Sandusky*, Plaintiffs do *not* have what is necessary for an ascertainable class — the ability to identify the actual class members without individual inquiries regarding who received each fax.

Plaintiffs claim the fax transmission logs identify the fax recipients. (*Id.*) They do not. At best, the documents merely show the numbers to which faxes were sent on a particular day, and the individual or entity **separately** associated with that number in PPS's customer database. The logs do *not* show who subscribed to that number at the time the fax was sent, who owned the fax machine connected to that number, or who picked up the fax from the machine. Plaintiffs do not provide an "objective" means to identify class members or give them notice without an individual inquiry into the circumstances surrounding each one of the approximately 70,000 separate fax transmissions at issue.

In determining whether plaintiffs have demonstrated the existence of an ascertainable class, the court is "concerned about identifying and providing notice to the class members as individuals, not merely numbers on a list." *Smith*, 297 F.R.D. at 472-73 (Knowing which numbers were sent texts "is far different from knowing which of those numbers *received*" the texts.). A list of fax numbers does not suffice to identify class members because the "fax number is just the starting point of the analysis" and the court would be required "to delve into the unique circumstances of each fax transmission" to identify the recipients. *Sandusky*, 2014 WL 3846037, at *4. Accordingly, as in this case, the identity of class members to whom notice would be sent is "not ascertainable absent an individualized inquiry." *Id.* Nor does Plaintiffs' purported class definition of "recipients" provide objective criteria for class members to self-identify. How are class members to know whether the "recipient" of a particular fax under the class definition here is the fax machine owner, the subscriber, or the individual (if any) who picked up the fax? Plaintiffs have failed to demonstrate the existence of an ascertainable class.[13]

### b.    Plaintiffs' "Best Practical Notice" Argument Does Not Satisfy the Requirement of an Ascertainable Class.

Plaintiffs argue that the Court should permit them to ignore their burden to define an objectively ascertainable class and instead merely give the "best notice practicable." (Mtn. at 12.) Plaintiffs fail to say what that notice would be, but given the data available, it presumably means they would merely send faxed notice to the numbers to which the original fax transmissions were sent. Plaintiffs would then require the unidentified "class members" to "identify *themselves* by

_____

[13] The other cases Plaintiffs rely on to argue that it suffices to define an unidentifiable class of fax "recipients" are inapplicable and unpersuasive. In *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 651-52 (W.D. Wash. 2007), the court did not address ascertainability at all in granting the motion for class certification; defendants' ascertainability arguments in the motion for reconsideration did not address the issue of how individual class members could be identified. In *Vandervort*, the court relied on the fact that there was a database that contained "the entire universe of persons to whom a fax could have been sent." 287 F.R.D. at 557-58. That is emphatically not the case here: PPS's database simply contains a list of the customers associated with the fax number in question. It may or may not identify the owner of the fax machine, the subscriber, or the multiple employees who were authorized to, or did, actually receive the faxes.

1    filing claims."  (*Id.*)  Plaintiffs do not cite a shred of authority that would permit such an end-run

2    around the ascertainability requirement.  Nor do Plaintiffs even attempt to address the practical

3    and due process problems with their proposal.

4         Plaintiffs ignore numerous practical difficulties with identifying and providing notice to

5    potential class members simply by sending faxed notice to the list of fax numbers in the record.

6    Even the list of fax numbers Plaintiffs rely upon is more than five years old.  In the interim, the

7    businesses may have dissolved; the employees who requested or picked up the fax may have left;

8    and fax numbers may have been disconnected or changed.  (*See* Cheung Decl. Ex. P (Sponsler

9    Report) ¶¶ 17-25, 29-30 (opining that fax numbers are frequently disconnected and reissued));

10   *Smith*, 297 F.R.D. at 473 (noting the likely turnover in class members' numbers and that persons

11   who should be in the class no longer owned the number that received the text); *Compressor*

12   *Eng'g Corp.*, 292 F.R.D. at 451 (A six-year-old list was insufficient for notice "because the

13   information is likely outdated and there would be no easy way of determining the current contact

14   information for many of those entities connected to those phone numbers years ago, and many of

15   the corporate entities may no longer exist.").  Any faxed notices sent to a five-year-old list of

16   numbers will miss the class members whose fax numbers from 2009-2010 have been

17   disconnected or changed or who have had high employee turnover.

18        Even if some potential class members were actually to receive this faxed notice, it is

19   highly unlikely that the person picking up the fax would circulate it to other employees and

20   discover someone who recalls the receipt of an unremarkable fax sent over five years ago.  Courts

21   have found classes unascertainable and denied certification in precisely these circumstances

22   because class members cannot be ascertained through unreliable self-identification.  *See Brey*

23   *Corp. v. LQ Mgmt. LLC*, No. JFM-11-718, 2014 WL 943445, at *1 (D. Md. Jan. 30, 2014)

24   (denying class certification where class was not objectively defined and affidavits would require

25   class members to recall receiving faxes six or seven years ago, noting that "the recollection of a

26   putative class member that he, she, or it had received a particular unsolicited fax would be

27   somewhat suspect"); *Smith*, 297 F.R.D. at 473 (asking plaintiffs to opt in if they remembered

28   particular texts was "likely to be ineffective, because it is highly unlikely that, more than five

1   years out, an individual would remember receiving that single unsolicited text message").

2   Plaintiffs fail to meet their burden to demonstrate there is an ascertainable class.

3          c.      **Plaintiffs' Purported "Expert" Evidence Does Not Overcome Their Ascertainability Problem.**

4

5          Ultimately acknowledging that they cannot define an ascertainable class based on

6   Defendants' records, Plaintiffs turn to their expert in an effort to salvage their class.  But that

7   effort is unavailing.  As an initial matter, Mr. Biggerstaff's second expert report, filed with

8   Plaintiffs' class motion two weeks after expert discovery closed on July 2, 2015 (ECF No. 190;

9   No. 209-13 (Second Biggerstaff Report) ¶ 20), should be stricken as untimely.[14]

10         Even if the report is considered, however, it concedes that the purported class members

11  cannot be identified from Defendants' records and offers no credible methodology for identifying

12  the class members or providing them notice.  Mr. Biggerstaff instead suggests that some

13  unidentified party could undertake the laborious and uncertain task of attempting to match the fax

14  numbers and names in Defendants' records with multiple other, unspecified databases.  (ECF No.

15  209-13 ¶¶ 19-20.)  Mr. Biggerstaff criticizes Defendants' expert, Mr. Sponsler, for attempting to

16  "match" data to the 411 database, but does not indicate what other databases he would use or how

17  the process would work.[15]  (Id. ¶ 17.)

18         Mr. Biggerstaff claims that "in [his] experience" the carriers respond to subpoenas by

19  "produc[ing] the desired information automatically and efficiently" (id.; Mtn. at 12), but he never

20  says what that "experience" was or that he is aware of any specific instance where this actually

21  happened.  To the contrary, carriers have resisted production of this information sought through

22         [14] *See Allen v. Similasan Corp.*, 306 F.R.D. 635, 640-41 (S.D. Cal. 2015) (granting motion to strike plaintiffs' supplemental expert report filed with their class certification motion 11 days after class discovery closed, as plaintiffs did not offer substantial justification for not including the information in the original report); *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923, at *6-8 (N.D. Cal. Dec. 15, 2014) (excluding from consideration plaintiffs' second supplemental expert report, filed with plaintiffs' opposition to defendant's motion to decertify a month after expert discovery closed).

26         [15] Although Mr. Biggerstaff proposes serving subpoenas on the top 7 carriers, McLaughlin's carriers (Knology and later, WOW) do not appear on that list, and thus Mr. Biggerstaff's proposal would result in a class list that does not include a named Plaintiff. (Id. ¶ 15.)

1   subpoenas. (*See* Cheung Decl. Ex. N (Sponsler Dep.) at 30:16-24; *id*. Ex. P (Sponsler Report)

2   ¶¶ 12-14 (opining that carrier subpoenas are not an administratively feasible method of

3   identifying historical fax subscribers)); *see also Ades v. Omni Hotels Mgmt.*, No. 2:13-cv-02468-

4   CAS(MANx), 2015 U.S. Dist. LEXIS 65493, at *3 (C.D. Cal. May 18, 2015) (court required

5   carrier to obtain customer consent before it could release individual subscribers' information);

6   *Aranda, et al. v. Caribbean Cruise Line, Inc., et al.*, 1:12-cv-04069, Order, ECF No. 317 (N.D.

7   Ill. July 17, 2015) (same).[16] Moreover, unlike in *Ades* and *Aranda*, Plaintiffs here have made no

8   effort to subpoena the carriers; they merely note this as a theoretical possibility.

9       Even if historical subscriber data existed and the carriers produced it, there must be

10  individualized inquiries into whether the historical data matched the individuals and corporate

11  entities listed in records in this case. For example, McLaughlin's phone bills identify

12  "McLaughlin Chiropractic Clinic" as the subscriber; "McLaughlin Chiropractic Associates, Inc."

13  owns the fax machine; Dr. Wesley McLaughlin allegedly picked up at least two of the faxes; and

14  "McLaughlin Chiropractic Center" registered and consented to the faxes. (Cheung Decl. Ex. C;

15  Ex. J (McLaughlin Dep.) at 125:3-25; 126:1-25; 127:1-18.) Based on Plaintiffs' own allegations,

16  the subscriber (McLaughlin Chiropractic Center), the owner (McLaughlin Chiropractic

17  Associates, Inc.), and the person who picked up the fax (Dr. Wesley McLaughlin) are all

18  different. (*Id*. at 125:3-25; 126:1-25; 127:1-18; 164:6-7; 180:4-10; 182:7-9; 184:11-13.) It is

19  unclear which one of them would be the putative class member.

20      **C.      Both Named Plaintiffs Are Inadequate and Atypical of the Purported Class.**

21      Dr. Jeffrey Shope, the owner, proprietor, and President of True Health, admitted to fraud

22  and a pattern of fraudulent conduct as part of a Consent Agreement he entered into with the Ohio

23  Board of Chiropractic Examiners. *See supra* section III-E. Moreover, the FBI raided True

24      _____

25      [16] Indeed, carriers resist such subpoenas per state laws that require each individual
    subscriber's consent before such information can be produced. *See, e.g.*, Cal. Civ. Proc. Code
    § 1985.3(f) ("A subpoena duces tecum for personal records maintained by a telephone
26  corporation . . . shall not be valid or effective unless it includes a consent to release, signed by the
    consumer whose records are requested . . . ."); Cal. Pub. Util. Code § 2891 ("(a) No telephone or
27  telegraph corporation shall make available to any other person or corporation, without first
    obtaining the residential subscriber's consent, in writing . . . .").

28

1    Health's office in 2012 in connection with an ongoing fraud investigation, which covers activities

2    dating back at least ten years. *Id*. These facts make True Health patently *in*adequate.

3          Fraud-related offenses render a proposed class representative inadequate because they

4    detract from the claims of the class and raise doubts about the named plaintiff's credibility and

5    integrity. *See, e.g., In re Proxima Corp. Sec. Litig.*, No. 93-1139, 1994 WL 374306, at *17-18

6    (S.D. Cal. May 3, 1994) (class representative inadequate where he had admitted to allegations of

7    fraud as part of a judgment in another lawsuit); *Jamison v. First Credit Servs., Inc.*, No. 12-C-

8    4415, 2013 WL 3872171, at *2 (N.D. Ill. July 29, 2013) (TCPA plaintiff convicted of fraud was

9    inadequate because the conviction would be offered to impeach his credibility with the jury, and

10   would detract from the claims of the class). Indeed, courts have denied class certification on this

11   basis.[17] Dr. Shope's admissions of fraudulent conduct, compounded by the FBI's fraud

12   investigation, make True Health both inadequate and atypical as a class representative.

13         Both named Plaintiffs also fail to satisfy the requirements of adequacy and typicality

14   because the evidence demonstrates that they consented to receive the faxes at issue. Dr. Peterson,

15   a chiropractor working in McLaughlin's office, admitted that she provided McLaughlin's fax

16   number when registering for Medisoft and expected to receive faxes when providing that fax

17   number. *See supra* section III-D. She executed two separate agreements with PPS in which she

18   provided McLaughlin's fax number and identified "McLaughlin Chiropractic Center" as the

19   business entering into the agreement. *Id*. Similarly, True Health admits that it provided its fax

20   number when registering as a Medisoft customer. *Id*. For the reasons discussed in section V-A-1,

21   *supra*, a recipient that consented to receive the faxes at issue has no claim in this case because the

22   fax was solicited.[18] Accordingly, neither named Plaintiff can represent a purported class of

23   ───────────────

24        [17] *See Schleicher v. Wendt*, No. 02-CV-1332, 2009 WL 761157, at *3 (S.D. Ind. Mar. 20, 2009) ("This court is not willing to appoint as a class representative a person with a criminal

25   conviction for fraud. . . . Smith is not an adequate class representative."), *aff'd*, 618 F.3d 679 (7th Cir. 2010); *accord Dunford v. Am. DataBank, LLC*, 64 F. Supp. 3d 1378, 1396-97 (N.D. Cal.

26   2014) ("Ms. Dunford cannot fairly and adequately protect the interest of the proposed class."). The *Proxima* court reiterated that it "is proper for this Court to consider [a plaintiff's] integrity in assessing his adequacy as a class representative." *Proxima*, 1994 WL 374306, at *17.

27        [18] Dr. Wesley McLaughlin's contention that he was the subscriber and did not consent is

28   irrelevant in light of the multiple expressions of consent by an apparent agent and the absence of

                                                                        (Footnote continues on next page.)

recipients of unsolicited faxes, nor is either Plaintiff typical of such a class.

### D.     The Proposed Class Is Neither Manageable nor Superior.

Because the class is not ascertainable and because individual, not common, questions predominate as to both ascertainability and consent, the purported class is neither manageable nor a superior vehicle for addressing Plaintiffs' claims. *Vigus*'s holding applies here:

> Certifying this case as a class action would not achieve economies of time, effort or expense because of the numerous individual questions that would need to be answered to reach a fair and just result on the issue of liability. On the contrary, it would burden the Court and the litigants with the arduous task of sifting through each putative class member's claim to determine its merits on a case-by-case basis. This is unacceptable, particularly where putative class members who were actually aggrieved by the [defendant's] acts have a quick, adequate and superior remedy in other more speedy venues, such as, for example, a state small claims court.

274 F.R.D. at 238; *accord Smith*, 297 F.R.D. at 473 (where TCPA class was not ascertainable, court had "overwhelming concerns" about procuring necessary evidence and manageability; accordingly, plaintiff failed to demonstrate superiority); *Gannon*, 2013 WL 2450199, at *3 (where common issues did not predominate, class vehicle was not superior).

### E.     Plaintiffs' Rule 23(b)(2) Class Is Barred Because the TCPA Authorizes the Individual Recovery of Monetary Damages.

In an effort to overcome the many barriers to their (b)(3) class, Plaintiffs resort to seeking to certify a (b)(2) injunction-only class. (Mtn. at 16-17.) But that tactic has been doomed since the Supreme Court's decision in *Dukes*. 131 S. Ct. at 2557. In *Dukes*, the Court held that to certify a class under Rule 23(b)(2), plaintiffs must prove that monetary relief is merely "incidental to the[ir] injunctive or declaratory relief" claim. *Id.* Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.*; *accord Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)

---

(Footnote continued from previous page.)

anything in the records to suggest otherwise. Indeed, this internal dispute highlights McLaughlin's atypicality and further demonstrates the individualized inquiries necessary to identify the "subscriber" to each fax line and whether any authorized user of the fax machine (like Dr. Peterson) consented to receive the faxes at issue.

("individualized monetary claims belong in Rule 23(b)(3)" rather than Rule 23(b)(2)) (quoting *Dukes*, 131 S. Ct. at 2558).[19]

The TCPA authorizes statutory damages of $500 per violation of the statute.  47 U.S.C. § 227(b)(3).  Plaintiffs have vigorously pursued monetary damages in this case, specifically requesting in their motion that the Court determine on a class-wide basis whether the purported class members are entitled to $1500 for willful violation of the TCPA.  (Mtn. at 1.)

Courts have repeatedly denied certification of (b)(2) classes in TCPA cases after *Dukes* due to the statute's provision for individual monetary damages.  *See Connelly*, 294 F.R.D. at 579 (relying on *Dukes* and holding plaintiffs' TCPA claims ineligible for 23(b)(2) certification because each plaintiff was entitled to statutory damages); *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 516 (E.D. Wis. 2014) (relying on *Dukes* and denying certification of 23(b)(2) class because the TCPA authorizes statutory damages and certifying such a class "would impermissibly allow the monetary tail to wag the injunction dog") (quotations and citation omitted).

Notably, Plaintiffs ignore *Dukes* concerning this issue.  They instead purport to rely on *Kavu*, 246 F.R.D. at 649, and *Meyer v. Portfolio Recovery Assocs., LLC*, No. 11CV1008 AJB (RBB), 2011 WL 11712610, at *5 (S.D. Cal. Sept. 14, 2011).  (Mtn. at 16.)  But *Kavu* predates *Dukes*, and *Meyer* neither cites nor discusses *Dukes*.  No (b)(2) class can be certified here.

## VI.   CONCLUSION

For the above reasons, Plaintiffs' motion for class certification should be denied.

---

[19] *See McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. CV 12-cv-04457-SC, 2015 WL 4537957, at *12 (N.D. Cal. July 27, 2015) (concluding that certification under Rule 23(b)(2) was inappropriate because plaintiffs primarily sought individualized monetary damages, including "actual, compensatory, statutory, and/or exemplary damages"); *Brazil v. Dell Inc.*, No. C-07-01700-RMW, 2010 WL 8816312, at *4 (N.D. Cal. Mar. 29, 2010) (monetary damages claim was not secondary to injunctive relief claim).

1    Dated: August 13, 2015                    TIFFANY CHEUNG
                                              BEN PATTERSON
2                                             MORRISON & FOERSTER LLP

3

4                                             By:    /s/Tiffany Cheung
                                                     TIFFANY CHEUNG
5
                                              Attorneys for Defendants
6                                             MCKESSON TECHNOLOGIES, INC.
                                              AND MCKESSON CORPORATION
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28