UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TRUE HEALTH CHIROPRACTIC INC, et al.,

          Plaintiffs,

    v.

MCKESSON CORPORATION, et al.,

          Defendants.

Case No. 13-cv-02219-HSG

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND GRANTING RENEWED MOTION FOR CLASS CERTIFICATION**

Re: Dkt. Nos. 292, 325

Pending before the Court are Plaintiffs' renewed motion for class certification and Defendants McKesson Corporation and McKesson Technologies, Inc. (collectively, "McKesson")'s motion for summary judgment, briefing for which is complete. *See* Dkt. Nos. 292 ("Class Mot."), 302 ("Class Opp."), 308 ("Class Reply"), 325 ("MSJ Mot."), 326 ("MSJ Opp."), 327 ("MSJ Reply"). After carefully considering the parties' arguments, the Court **DENIES** Defendants' motion for summary judgment and **GRANTS** Plaintiffs' renewed motion for class certification.

## I. BACKGROUND

Plaintiff True Health Chiropractic, Inc. filed this putative class action on May 15, 2013, alleging that Defendant McKesson Corporation sent "unsolicited advertisements" by facsimile ("fax") in violation of the Telephone Consumer Protection Act ("TCPA"). *See* Dkt. No. 1. Plaintiff filed a First Amended Complaint on June 20, 2013, Dkt. No. 7, and a Second Amended Complaint ("SAC") on July 18, 2014, Dkt. No. 90, which added McLaughlin Chiropractic Associates, Inc. ("McLaughlin") as a Plaintiff and McKesson Technologies, Inc. as a Defendant. The operative complaint similarly alleges that Defendants violated the TCPA by sending "unsolicited advertisements" by fax. SAC ¶¶ 1–2. Plaintiffs contend that they neither invited nor

United States District Court
Northern District of California

gave permission to Defendants to send the faxes, SAC ¶¶ 14–18, but that even assuming the faxes were sent pursuant to a recipient's express permission or an "established business relationship," the required "opt-out notice" was absent, *id.* ¶¶ 33–34.

During heavily contested discovery, Defendants were ordered to identify "each type of act that Defendants believe demonstrates a recipient's express permission to receive faxes (e.g. completing a software registration), (2) explain[] how that act qualifies as express permission, and (3) identif[y] each recipient allegedly giving that type of permission by name and contact information (including, at a minimum, fax and phone number)." Dkt. No. 178 at 12.  In response, Defendants identified three groups of consent defenses that it argued relieved it of TCPA liability and produced three exhibits—Exhibits A, B, and C—corresponding to the consent-defense groups. *See* Dkt. No. 305-1 Ex. A, at 1–2.  Fax recipients identified in Exhibit A purportedly gave consent by (1) providing fax numbers when registering a product purchased from a subdivision of McKesson; and (2) entering into software-licensing agreements, or End User License Agreements ("EULA").  *Id.*  Fax recipients identified in Exhibit B purportedly gave consent by (1) checking a box during their software registration "that indicated express permission to be sent faxes as a preferred method of communication to receive promotional information;" (2) completing a written consent form "whereby they further provided their express permission to receive faxes;" or (3) confirming on phone calls "that they would like to continue to receive faxes and/or would like to change their communication method preferences."  *Id.* at 2.  Fax recipients identified in Exhibit C purportedly gave Defendants consent through individual communications and personal relationships.  *Id.*

Plaintiffs later moved to certify a single class of all putative class members.  Dkt. No. 209. The Court denied certification on the basis that Plaintiffs failed to satisfy Rule 23(b)(3)'s predominance requirement.  Dkt. No. 260.  Because the Court denied certification for failure to satisfy predominance, its order did not address other requirements for class certification.

On appeal, the Ninth Circuit affirmed in part, reversed in part, and remanded.  *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923 (9th Cir. 2018) ("*True Health*").  The Ninth Circuit ruled that this Court should have considered the certification of subclasses tracking

United States District Court
Northern District of California

1    Defendants' consent-defense groups identified in Exhibits A, B, and C.  *Id.* at 930–31.  The Ninth

2    Circuit then (1) held that putative class members only in Exhibit A satisfy Rule 23(b)(3)'s

3    predominance requirement; (2) held that putative class members in Exhibit C do not satisfy Rule

4    23(b)(3)'s predominance requirement; and (3) remanded to this Court to determine whether

5    putative class members in Exhibit B satisfy Rule 23(b)(3)'s predominance requirement.  *Id.* at 933.

6    As to Exhibit B alone, the Ninth Circuit added:

7               Given the somewhat unclear state of the record, and given that the
             district court has not had an opportunity to address class certification
8               in light of our intervening decision in *Van Patten*, we view these and
             other issues <u>related to Exhibit B</u> as best addressed in the first instance
9               by the district court on remand.

10   *Id.* (emphasis added); *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir.

11   2017).  The Ninth Circuit left it to this Court, "in its discretion, to allow supplementation of the

12   record in light of *Van Patten* and [its] opinion."  *Id.*

13          Following remand, the Court reopened fact discovery for the limited purpose of

14   supplementing the record in light of *Van Patten*, and only as to putative class members identified

15   in Exhibit B.  *See* Dkt. No. 285; *see also* Dkt. No. 309 (rejecting Defendants' attempt to reopen

16   fact discovery wholesale).  After supplemental discovery, Plaintiffs submitted a renewed motion

17   for class certification.  *See* Dkt. No. 292.  Plaintiffs no longer seek certification of putative class

18   members in Exhibit B; rather, Plaintiffs seek certification limited to the Exhibit A-only Class.  *Id.*

19   at 2.  And only Plaintiff McLaughlin now seeks appointment as a class representative.  *Id.* at 3.

20          At the hearing on the renewed motion for class certification, the Court advised the parties

21   that it was inclined to permit narrow summary judgment briefing before ruling on that motion.

22   *See* Dkt. No. 315.  Specifically, the Court expressed interest in resolving whether the provision of

23   fax numbers through the Medisoft product registration and EULA—in other words, Exhibit A

24   consent defenses—constituted prior express invitation or permission to receive the disputed faxes,

25   which is a matter of law that all parties agreed would resolve the case as to the named Plaintiff's

26   claim.  *Id.* at 7 ("**The Court**: If providing the number via the EULA or the product registration is

27   consent, the case is over because the individual plaintiff doesn't have a claim.  [**Plaintiffs'**

28   **Counsel**]: I would agree with that part."); *see also id.* at 12 ("There is also no issue, I think, that

1  that's subject to an up or down decision by me as to whether, as a matter of law, that's consent.");

2  *True Health*, 896 F.3d at 932 ("Consent, or lack thereof, is ascertainable by simply examining the

3  product registrations and the EULAs.")

4       The Court thereafter permitted summary judgment briefing on the limited issue of

5  "whether voluntarily providing a fax number on product registration and/or agreeing to the

6  [EULA] constitutes express permission."  Dkt. No. 322.

## II.   MOTION FOR SUMMARY JUDGMENT

8       The Court turns first to Defendants' motion for summary judgment, which all parties agree

9  would resolve the case and moot any need to consider Plaintiffs' renewed motion for class

10  certification.  *See* Dkt. No. 315 at 7.

### A.   Summary Judgment Legal Standard

12       A motion for summary judgment should be granted where there is no genuine issue of

13  material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56;

14  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The purpose of summary

15  judgment "is to isolate and dispose of factually unsupported claims or defenses."  *Celotex v.*

16  *Catrett*, 477 U.S. 317, 323–24 (1986).  The moving party has the initial burden of informing the

17  Court of the basis for the motion and identifying those portions of the pleadings, depositions,

18  answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable

19  issue of material fact.  *Id.* at 323.

20       If the moving party meets its initial burden, the burden shifts to the non-moving party to

21  present facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56; *Celotex*, 477

22  U.S. at 324.  The Court must view the evidence in the light most favorable to the nonmovant,

23  drawing all reasonable inferences in its favor.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

24  *Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).  Summary judgment is not appropriate if the

25  nonmoving party presents evidence from which a reasonable jury could resolve the disputed issue

26  of material fact in the nonmovant's favor.  *Anderson*, 477 U.S. at 248.  Nonetheless, "[w]here the

27  record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

28  there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587

United States District Court
Northern District of California

1    (1986) (internal quotation marks omitted).

2    **B.    Discussion**

3    As an initial matter, Defendants' motion relies on extensive material beyond the scope of

4    the summary judgment briefing authorized by the Court.  The Court only permitted summary

5    judgment briefing concerning "whether voluntarily providing a fax number on product registration

6    and/or agreeing to the [EULA] constitutes express permission."  Dkt. No. 322.  Defendants'

7    motion, however, relies on additional evidence to argue that Plaintiffs consented to receiving faxes

8    in other ways.  *See, e.g.*, MSJ Mot. at 8 (arguing McLaughlin consented by providing its fax

9    number when it "acknowledged McKesson's system requirements for Medisoft," and that "True

10   Health provided its fax number again when it requested an administrative password for access to

11   Medisoft").

12   In keeping with the scope of briefing it actually approved, the Court here only considers:

13   (1) the provision of fax numbers on the Medisoft product registration form, and (2) users'

14   agreement to the EULA's terms.

15   **i.    TCPA**

16   The TCPA's express purpose is to protect the privacy "right to seclusion," meaning the

17   right not to be bothered, or to be left alone.  *Yahoo! Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,

18   913 F.3d 923, 925 (9th Cir. 2019); *see also* 47 U.S.C. § 227(b)(2)(C) (referring to "the privacy

19   rights [the TCPA] is intended to protect").  In its current form and as construed by courts, the

20   TCPA protects the public from various forms of unwanted communications, including voice calls,

21   text messages, and even the anachronistic fax.  47 U.S.C. § 227(b)(1)(A) (making certain "call[s]"

22   unlawful); *Van Patten*, 847 F.3d at 1042–43 (explaining that the TCPA's reference to "calls"

23   encompasses text messages) (quoting *In re Rules & Regulations Implementing the Tel. Consumer*

24   *Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 (July 3, 2003)[1]; 47 U.S.C. § 227(b)(1)(C) (making

25   certain "facsimile[s]" unlawful).

26   The TCPA's protections against unwanted calls and faxes are not coextensive.  The

27

28   _____
     [1] Because the TCPA's protections against unwanted voice calls and text messages derive from the
     same provision concerning "calls," the Court includes both protections when referring to "call(s)."

United States District Court
Northern District of California

1 TCPA's fax provisions, for example, prohibit sending certain "unsolicited advertisement[s],"

2 which the statute defines as "any material advertising the commercial availability or quality of any

3 property, goods, or services which is transmitted to any person without that person's prior express

4 invitation or permission, in writing or otherwise."  47 U.S.C. § 227(a)(5), (b)(1)(C).  This is

5 different from the call provisions, which prohibit "any call" (if other conditions are met).  *Id.*

6 § 227(b)(1)(A).

7    Because the TCPA only protects consumers from unwanted communications, the statute

8 creates a complete affirmative defense for TCPA defendants where a recipient provided "prior

9 express consent" for calls, or "prior express invitation or permission" for faxed advertisements.

10 *Id.* § 227(b)(1)(A) (referring to "the prior express consent of the called party"); *id.* § 227(a)(5)

11 (referring to a fax recipient's provision of "prior express invitation or permission"); *Van Patten*,

12 947 F.3d at 1044 ("Express consent is not an element of a plaintiff's prima facie case but is an

13 affirmative defense for which the defendant bears the burden of proof."); *True Health*, 896 F.3d at

14 931 (holding in the fax context "that 'prior express invitation or permission' is an affirmative

15 defense").  And the Ninth Circuit explained in *Van Patten* that the voluntary provision of one's

16 number constitutes consent to communications related to the context in which one provides the

17 number.  847 F.3d at 1044–45.  There, the plaintiff provided his cell phone number on a gym

18 membership application, which the Court found constituted express consent "to being contacted

19 about some things, such as follow-up questions about his gym membership application" and "text

20 message[] invitation[s] to 'come back' and reactivate his gym membership."  *Id.* at 1046.  The

21 Ninth Circuit added that "effective consent is one that relates to the same subject matter as is

22 covered by the challenged calls or text messages."  *Id.* at 1044–45.  Crucially, though, "the

23 transactional context matters in determining the scope of a consumer's consent to contact."  *Id.* at

24 1046.  The court also cautioned that the plaintiff's provision of his cell phone number "did not

25 amount to consent to be contacted for all purposes."  *Id.*

26    As a preliminary matter, Plaintiffs dispute whether the Court can rely on cases analyzing

27 what constitutes "prior express consent," which renders a call solicited under the TCPA, to assess

28 what constitutes "prior express invitation or permission," which renders a faxed advertisement

United States District Court
Northern District of California

solicited under the TCPA.  MSJ Opp. at 9–12.  But each of Plaintiffs' arguments on this point

fails.  First, Plaintiffs contend that "[t]he FCC has explained that the TCPA 'uses different

language in describing facsimile transmissions and telemarketing calls,' and 'FCC rules

implementing those provisions treat voice calls and faxes differently.'"  *Id.* at 10 (quoting FCC

Amicus Br., *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, No. 13-14013 (11th Cir.), 2014 WL

3734105, at *2–5 (July 17, 2014)).  Setting aside that an FCC Amicus Brief is not binding on the

Court, the circumstance in which that brief was submitted is irrelevant to the present discussion.

That case had nothing to do with, and in no way discussed, "prior express consent" or "prior

express invitation or permission."  That case instead concerned who can be liable for

telemarketing calls and fax transmissions.  And the FCC's brief concerned distinctions between

defined TCPA terms.  *Id.* (discussing the terms "initiates," "seller," and "telemarketer" versus

"sender").  That the TCPA uses different defined language in other instances does not mean that

the slightly different language in this instance is material.

The rest of Plaintiffs' arguments on this point likewise fall short.  For instance, Plaintiffs

argue that unlike in the fax context, some sort of "implied" consent might suffice in the call

context.  MSJ Opp. at 11.  But the TCPA's plain language precludes "implied" consent even in the

call context, as it states that consent must be "express."  *See* 47 U.S.C. § 227(b)(1)(A).  And no

case cited by Plaintiffs supports this distinction.[2]  Relatedly, given that no such implied consent

---

[2] Two of the four cases Plaintiffs cite only explained that the term "consent" generally may
include implied consent, but in no way reached the unfounded conclusion that "express consent"
as used in the TCPA could include implied consent.  *See Physicians Healthsource, Inc. v.
Allscripts Health Sols., Inc.*, No. 12 C 3233, 2017 WL 2391751, at *4 (N.D. Ill. June 2, 2017)
("From the outset, the defendants speak of both consent and permission, using the terms
interchangeably.  But 'consent' isn't an issue; express permission is.  The two are very different.
Throughout the law, consent may be express or implied.  But in this instance, by definition,
'permission' must be 'expressed.'  There is no avenue for inferring or implying permission or
invitation based on circumstances or conduct.") (internal citations omitted); *Career Counseling,
Inc. v. Amsterdam Printing & Litho, Inc.*, No. 3:15-cv-05061-JMC, 2018 WL 3037106, at *4 n.10
(D.S.C. June 19, 2018) ("A party giving prior express invitation or permission is different than a
party giving consent.").  The other two cases use "express invitation or permission" and "express
consent" interchangeably.  *See Physicians Healthsource, Inc. v. A-S Medication Sols. LLC*, 324 F.
Supp. 3d 973, 978–79 (N.D. Ill. 2018) ("*A-S Medication*") (noting that because "the sender must
obtain the prior express invitation or permission from the consumer," the defendants there could
not "avail themselves of the prior express consent defense"); *Gorss Motels, Inc. v. Am. Tex-Chem
Corp.*, 323 F. Supp. 3d 330, 335 (D. Conn. 2018) (analyzing the "prior express invitation or
permission" requirement as a question of whether the plaintiff "provided prior express consent").

United States District Court
Northern District of California

1   standard applies in either the call or fax context, Plaintiffs invocation of FCC Rules that would be

2   inconsistent with an implied consent standard is beside the point. *See* MSJ Opp. at 11–12.

3         **ii.**    **Product Registration**

4        Defendants first argue that recipients' voluntary provision of their fax numbers on

5   Medisoft product registration forms constituted "express permission or invitation to receive the

6   faxes at issue" under the Ninth Circuit's reasoning in *Van Patten*.  MSJ Mot. at 7–11; MSJ Reply

7   at 14.  The Court disagrees.

8        The Medisoft product at issue "provides templates and forms for health care providers to

9   use to submit insurance claims."  *See* MSJ Mot. at 2.  When installing Medisoft, users were

10  prompted to register the software by entering their information in the following interface:



25  Dkt. No. 325-1 ("Cheung Decl.") Ex. D.  And Defendants posit that fax recipients' mere entry of

26  their fax numbers in this generic form constituted express permission or invitation to receive a

27  litany of faxed advertisements, because "[a]ll of the at-issue faxes notified (and offered discounts

28  to) customers about version upgrades or identified compatible products or add-ons to improve the

8

usability of and update the Medisoft product they had previously purchased."  MSJ Mot. at 9–10.

Thus, from Defendants' perspective, the faxed advertisements fall within *Van Patten*'s purportedly

"broadly" defined "same subject matter" test.  *Id.*

Defendants' reliance on *Van Patten* proves too much.  To start, Defendants focus

exclusively on one sentence in *Van Patten* describing "effective consent" as being "one that relates

to the same subject matter as is covered by the challenged calls or text messages."  847 F.3d at

1044–45; MSJ Mot. at 8–12; MSJ Reply at 4, 9, 11, 14.  Though relevant, Defendants ignore *Van

Patten*'s principal holding from which that statement flowed: that consent in the TCPA context

"depends on the <u>transactional context</u> in which it is given."  847 F.3d at 1040 (emphasis added);

*see also id.* at 1045–46 ("Instead, the consent must be considered to relate to the <u>type of

transaction</u> that evoked it. . . .  This supports that a consumer consents to contact for <u>transaction-

related communications</u> when the consumer provides his or her phone number to the caller . . . .

FCC orders and rulings show that the <u>transactional context</u> matters in determining the scope of a

consumer's consent to contact.") (emphasis added).  And although few cases have parsed the outer

bounds of *Van Patten*'s "transactional context" standard, those cases have construed *Van Patten*

narrowly.[3]

Defendants also fail to appreciate that *Van Patten* concerned calls, rather than faxes.  As

discussed in greater detail above, the TCPA's protections against bothersome calls and faxes are

different in scope.  While the TCPA prohibits "any call" meeting certain requirements, it only

prohibits faxed "advertisement[s]."  *Compare* 47 U.S.C. § 227(b)(1)(A), *with id.* § 227(a)(5),

(b)(1)(C).  *Van Patten* thus had no occasion to consider whether the contested communications

there constituted an "advertisement."  This is not to say that *Van Patten*'s general transaction-

context test does not apply in the fax context.  But given the TCPA's distinct protections regarding

---

[3] *See Walintukan v. SBE Entm't Grp., LLC*, No. 16-cv-01311-JST, 2018 WL 2357763, at *3 (N.D. Cal. May 24, 2018) (construing *Van Patten* narrowly and holding that the provision of a phone number to purchase tickets for one event at a venue was not express consent to receive text messages about other events at the venue); *Trenz v. On-line Adm'rs, Inc.*, No. CV 15-08356-AB (KSx), 2017 WL 6520533, at *2–3 (C.D. Cal. Sept. 25, 2017) (construing *Van Patten* narrowly and holding that the provision of a phone number in connection with having a vehicle serviced was "discrete in nature" and thus was not express consent "to being contacted regarding offers for future servicing of their vehicles").

United States District Court
Northern District of California

United States District Court
Northern District of California

1   faxes (as opposed to calls), a court must determine in the fax context whether, in view of "the

2   circumstance in which the consumer gave his or her [fax] number," the consumer's provision of

3   the fax number constituted consent to receive not just any contact, but advertisements.  847 F.3d at

4   1040.

5   　　　Turning first to the Medisoft registration form, nothing about the circumstances under

6   which a registrant filled out the form establishes that a reasonable consumer would anticipate

7   receiving advertisements.  Consumers purchased a product, installed that product, and registered

8   that product through a generic form that nowhere mentions advertisements, or any sort of contact

9   for that matter.  To be sure, entry of one's fax number in the form constitutes "consent to be

10  contacted" to some extent.  *See id.* at 1046.  And like in *Van Patten*, no one disputes here that the

11  scope of consumers' consent to contact includes "some things, such as follow-up questions about

12  [their registration]."  *See id.*  Nor could anyone reasonably dispute that consumers here consented

13  to receive ordinary fax messages about that topic in the normal course of business.  But faxes in

14  the normal course of business are not advertisements.  And the Court finds that advertisements do

15  not fit within the scope of consumers' contextualized consent, in this circumstance.

16  　　　To reach any other conclusion on this point would lead to absurd results not envisioned by

17  the Ninth Circuit in *Van Patten*.  For example, accepting Defendants' proposal—that purchasing

18  one product and entering a fax number in a generic registration form constitutes consent to receive

19  advertisements for any product that might in any way "increase the usability" of the purchased

20  product—would mean the scope of consent is effectively limitless.  There would always be a way

21  for defendants to argue that an advertised product "increase[s] the usability" of the purchased

22  product.  Even the plaintiff in *Van Patten* who provided his number on a gym membership form

23  could open himself up to advertisements for (1) new workout shoes, (2) at-home, healthy meal-

24  delivery services, (3) sleep-assist devices, or (4) a personal bicycle, all of which might "increase

25  the usability" of the consumer's gym membership.  Nothing in the TCPA or *Van Patten*

26  demonstrates that Congress or the Ninth Circuit ever intended this result.

27  　　　The Court also finds it telling that Defendants, in distinguishing some of Plaintiffs'

28  authorities cited for a different point, argue that "unlike the faxes here, the faxes in *A-S Medication*

United States District Court
Northern District of California

. . . were clearly unrelated to the original purpose for which the plaintiff provided the fax number." MSJ Reply at 8 n.5.  But *A-S Medication* involved facts quite analogous to those here.  In *A-S Medication*, the defendant argued that customers gave express permission to receive faxes by entering their fax numbers into a customer relationship management software program called Salesforce.  324 F. Supp. 3d at 980.  The Salesforce software served as an interface between the customer and company on all aspects of their relationship.  *Id.* at 975.  And the court there held that customers' provision of fax numbers in their Salesforce accounts did not amount to express permission to receive faxed advertisements.  *Id.* at 975.

Much like here, the *A-S Medication* defendants stressed that the advertised software was simply "a newer version of an existing" product and that the fax was targeted to existing customers "to get them to upgrade" from one software to a newer software.  *See* Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment at 6, *Physicians Healthsource, Inc. v. A-S Medication Sols. LLC*, No. 1:12-cv-05105 (N.D. Ill. 2018), ECF No. 282.  While the plaintiff did not refute this characterization, the court was unpersuaded by defendants' logic:

> The simple fact of adding a fax number into Salesforce does not show or even permit a reasonable inference that the customer agreed to receive faxed ads.  The customer may have simply been filling in all of the blanks or may have intended only to receive ordinary fax messages in the course of business, as opposed to advertisements.

*A-S Medication*, 324 F. Supp. 3d at 980; *see also* Plaintiff's Reply in Support of Motion for Summary Judgment, *Physicians Healthsource, Inc. v. A-S Medication Sols. LLC*, No. 1:12-cv-05105 (N.D. Ill. 2018), ECF No. 294 (plaintiff's reply brief, which did not refute defendants' characterization of the faxes).

McKesson's claim that the faxes in *A-S Medication*—which targeted existing customers, to persuade them to upgrade existing software—"were clearly unrelated" to those customers' provision of fax numbers in other aspects of the consumer-company relationship is equally applicable to the case at hand.  If anything, provision of one's fax number in a general Salesforce account ought to constitute broader consent then provision of one's fax number in registering a specific product.  And it is even more true here that "customer[s] may have simply been filling in

all of the blanks." *See A-S Medication*, 324 F. Supp. 3d at 980.

### iii. EULA

In addition to relying on consumers' provision of their fax numbers in the Medisoft product registration form as evidence of prior express invitation or permission, Defendants also rely on consumers' agreement to the Medisoft EULA. Defendants argue that by agreeing to the EULA, consumers "gave permission to McKesson to collect their Medisoft usage information (including information provided at registration), and use it to offer them other features and services." MSJ Mot. at 1.

The EULA begins with the following disclaimer:

> NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.

Cheung Decl. Ex. A-1 ("EULA"), at RS-TRUEHEALTH000438. It goes on to state:

> AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

*Id.* Later, in the "General Terms" section, the EULA provides:

> 2.1.2 <u>Software Usage Information</u>. During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also *assists McKesson in offering End User other features and services*. Usage Information sent by the Software may include the following: Customer # / serial number; software name; software version; date data was collected; total number of appointments in database; total number of visits in database; total number of transactions in database; for each item in doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage information by sending notice to McKesson in accordance with <u>Section 2.7</u> to the attention of the General Manager, Physician Practice Solutions. The notice must

12

1    include the Software serial number.

2  *Id.* at RS-TRUEHEALTH000442 (italicized emphasis added).

3         Defendants argue that these provisions collectively informed users "that—unless they

4  opted out—McKesson would utilize information about their software usage to offer them features

5  and services."  MSJ Mot. at 12.  Defendants in particular stress that Section 2.1.2 notes that

6  McKesson will collect usage information to "assist McKesson in offering End User other features

7  and services."  *Id.* (quoting EULA at RS-TRUEHEALTH000442).

8         Defendants' EULA argument fails for several reasons.  To the extent the Court has already

9  held that the transactional context of consumers' provision of their fax number in the Medisoft

10  product registration form does not constitute express invitation or permission to receive faxed

11  advertisements, nothing about the EULA transforms the overall transactional context in any

12  meaningful way so as to warrant a different result.  Reviewing the EULA as a whole, the Court

13  finds that a reasonable user would only understand that assenting to its terms meant consenting to

14  the transmission of usage information *from* the consumer *to* McKesson, not that McKesson would

15  send the user faxed advertisements.  The EULA does not once use the words "fax," "facsimile," or

16  "advertisement."  Instead, the EULA repeatedly refers to the unidirectional transfer of information

17  to McKesson.  *See* EULA at RS-TRUEHEALTH000438 (noting that use of the software operates

18  as consent to the transmission of information of the user "TO MCKESSON"), 442 (providing that

19  "the Software will send information about the Software and Your use of the Software, to

20  McKesson").

21         Defendants' efforts to shoehorn a user's fax number provided during product registration

22  into the EULA's definition of "usage information" is also inconsistent with the EULA's plain

23  language.  *See* MSJ Mot. at 1 (contending that usage information "include[es] information

24  provided at registration," such as the user's fax number).  "Usage information" is a defined term in

25  the EULA.  And the EULA lists what constitutes "usage information," nowhere mentioning fax

26  numbers.  *See* EULA at RS-TRUEHEALTH000442 ("Usage Information sent by the Software

27  may include the following:  Customer # / serial number; software name; software version; date

28  data was collected; total number of appointments in database; total number of visits in database;

13

total number of transactions in database; for each item in doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days.").

Finally, Defendants' principal authority in support of its EULA argument, *Fober*, is inapposite.  The plaintiff there provided her phone number on a general health insurance enrollment form, which included the following broad terms:

> THE USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION: I acknowledge and understand that health care providers may disclose health information about me . . . to Health Net Entities . . . *Health Net Entities . . . may disclose this information for purposes of* treatment, payment and *health plan operations*, *including* but not limited to, utilization management, *quality improvement*, disease or case management programs.

886 F.3d at 791.  Plaintiff thereafter attended doctor appointments and received follow-up "quality assurance survey calls."  *Id.* at 792.  The Ninth Circuit affirmed summary judgment in defendants' favor, explaining that the form's plain terms show that the plaintiff consented to telephone calls "for purposes of . . . quality improvement," which is "exactly what happened."  *Id.* at 793.  And critical to the Ninth Circuit's finding was that "the text in the Enrollment Form swe[pt] broadly."  *Id.*

There is no such sweeping text in the EULA.  And unlike the disclosure in *Fober*, the EULA nowhere reveals that Defendants intended to "use" and "disclose" information for purposes of sending faxed advertisements.  A generic (and somewhat cryptic) disclosure that certain information may "assist" McKesson in "offering . . . features and services" simply does not establish the required "prior express invitation or permission" to send faxed advertisements.  *See* EULA at RS-TRUEHEALTH000442.  No reasonable customer would read that language and understand it to mean that agreeing to the EULA meant he or she would receive faxed advertisements.

At the hearing on the summary judgment motion, Defendants argued that a recent decision from the Eleventh Circuit—*Gorss Motels, Inc. v. Safemark Sys., LP*, Nos. 18-12511, 18-15232, 2019 WL 3384191 (11th Cir. July 26, 2019) ("*Gorss*")—is factually and legally indistinguishable

from the present case.  As an initial matter, an out-of-circuit case obviously is not binding on this Court.  More important, *Gorss* if anything illustrates why Defendants' EULA argument fails.  There, the plaintiffs "clearly and unmistakably" gave "permission for [Defendant] to send them faxed advertisements" by providing their fax number and agreeing that Defendant "may offer optional assistance to [them] with purchasing items used at or in" plaintiffs' franchise hotels.  2019 WL 3384191, at *4–5.  As the Eleventh Circuit explained, "[a] reasonable consumer would understand that assistance with purchasing items entails receiving information about buying products," which is precisely the point of an advertisement.  *Id.* at *5.  Here, on the other hand, consumers agreeing to the EULA only "clearly and unmistakably" gave permission for Defendant to collect certain "usage information."[4]

## C.    Summary Judgment Conclusion

The Court finds that Defendants have not carried their burden to show that Plaintiffs gave "prior express invitation or permission" for faxed advertisements either through the provision of their fax numbers in the Medisoft product registration form or by agreeing to the Medisoft EULA.

## III.    RENEWED MOTION FOR CLASS CERTIFICATION

The Court turns next to Plaintiffs' renewed motion for class certification.

### A.    Class Certification Legal Standard

Plaintiffs bear the burden of showing by a preponderance of the evidence that class certification is appropriate under Federal Rule of Civil Procedure ("Rule") 23.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011).  First, the Plaintiffs must establish that each of the four requirements of Rule 23(a) are met: numerosity, commonality, typicality, and adequacy of representation.  *Id.* at 349.  Where the plaintiffs "succeed[] in establishing all four of the 23(a) elements, [they] must then satisfy one of the three requirements of Rule 23(b)."  *Civil Rights Educ.*

---

[4] Although the Eleventh Circuit did not apply *Van Patten*'s transaction-context test, *Gorss*'s transactional context is nothing like the case at hand.  In *Gorss*, the relevant permission to receive faxed advertisements fell within a franchise agreement that separately required plaintiffs to "purchase or obtain certain items only from" approved suppliers, such as the defendant.  2019 WL 3384191 at *1.  In that context, logic dictates that "assistance with purchasing items" from approved suppliers would require either the franchisor or a supplier to advertise such approved items.

1   *& Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1103 (9th Cir. 2017).

2   Rule 23(b)(3) requires a finding "that the questions of law or fact common to class

3   members predominate over any questions affecting only individual members, and that a class

4   action is superior to other available methods for fairly and efficiently adjudicating the

5   controversy."  To determine whether a putative class action satisfies the requirements of Rule

6   23(b)(3), courts consider:

7   (A) the class members' interests in individually controlling the
    prosecution or defense of separate actions;

8   (B) the extent and nature of any litigation concerning the controversy
9   already begun by or against class members;

10  (C) the desirability or undesirability of concentrating the litigation of
    the claims in the particular forum; and

11  (D) the likely difficulties in managing a class action.

12

13  Fed. R. Civ. P. 23(b)(3)(A)–(D).

14  While a court's "class-certification analysis must be rigorous and may entail some overlap

15  with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in

16  free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Tr.*

17  *Funds*, 568 U.S. 455, 465–66 (2013) (internal citations and quotation marks omitted).  "Merits

18  questions may be considered to the extent—but only to the extent—that they are relevant to

19  determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 466

20  (citation omitted).  A trial court's "broad discretion to certify a class . . . must be exercised within

21  the framework of Rule 23."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.

22  2001), *reh'g denied*, 273 F.3d 1266 (9th Cir. 2001) (citation omitted).

23  **B.    Discussion**

24  Plaintiffs' renewed motion seeks to certify the following class:

25  All persons or entities who received faxes from "McKesson" from
26  September 2, 2009, to May 11, 2010, offering "Medisoft," "Lytec,"
    "Practice Partner," or "Revenue Management Advanced" software or
27  "BillFlash Patient Statement Service," where the faxes do not inform
    the recipient of the right to "opt out" of future faxes, and whose fax
    numbers are listed in Exhibit A to McKesson's Supplemental
28  Response to Interrogatory Regarding Prior Express Invitation or

United States District Court
Northern District of California

16

1          Permission, but not in Exhibit B or Exhibit C to McKesson's
          Response to Interrogatory Regarding Prior Express Invitation or
2          Permission.

3    *See* Class Mot. at 1.

4          Defendants contend that certification is inappropriate because neither Rule 23(a) nor Rule

5    23(b)'s requirements are met.  Defendants further assert broad challenges to McLaughlin's ability

6    to advance class claims.  This order first addresses the overarching alleged defects before turning

7    to Rule 23(a) and Rule 23(b)'s requirements.

8          **i.    Standing**

9          Defendants first argue that McLaughlin lacks standing to pursue claims based on faxes it

10    did not receive.  Class Opp. at 18–19.  In their view, a TCPA plaintiff "must have received the

11    challenged text or fax to have standing to bring a claim based on that communication."  *Id.* at 19.

12    But Defendants misunderstand the relationship between Article III's standing requirement and

13    class certification.  As the Ninth Circuit has explained more than once recently, "once the named

14    plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded,

15    and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have

16    been met."  *See Kirola v. City & Cty. of S.F.*, 860 F.3d 1164, 1176 (9th Cir. 2017) (quoting

17    *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015)).  This means that "any issues regarding

18    the relationship between the class representative and the passive class members—such as

19    dissimilarity in injuries suffered—are relevant only to class certification, not to standing."

20    *Melendres*, 784 F.3d at 1262 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 2:6

21    (5th ed.) (2018)).

22          It is undisputed that McLaughlin has standing to advance TCPA claims for faxes received

23    from Defendants.  Under Ninth Circuit law, Defendants' objections regarding dissimilarities

24    between McLaughlin and absent class members must thus be resolved under the class certification

25    framework.[5]  *See id.*  Accordingly, the Court rejects Defendants' challenge to McLaughlin's

26    ─────────────────────

27    [5] For this reason, Defendants' following arguments miss the point: (1) "plaintiffs cannot establish
    standing by bootstrapping their claims to the claims of absent class members"; (2) "a class
    representative cannot assert class claims based on alleged injuries to absent class members"; and
28    (3) class representatives "must have been personally injured."  Class Opp. at 18–19.  McLaughlin

1    standing.

2        ii.    Scope of the Class Claims

3        Defendants next contend that the Supreme Court's recent decision in *China Agritech, Inc.*

4    *v. Resh*, 138 S. Ct. 1800 (2018), precludes McLaughlin from serving as a class representative for

5    faxes sent more than four years before McLaughlin intervened in the action.  Class Opp. at 16–18.

6        In *China Agritech*, the Supreme Court examined the scope of *American Pipe* tolling, which

7    suspends "the applicable statute of limitations as to all asserted members of the class who would

8    have been parties had the suit been permitted to continue as a class action."  *See Am. Pipe &*

9    *Const. Co. v. Utah*, 414 U.S. 538, 554 (1974).  As the *China Agritech* Court explained, *American*

10   *Pipe* and its progeny stand for the principle that where a court denies class action status, members

11   of the failed class may either intervene in the pending action to advance *individual* claims or bring

12   a separate *individual* suit.  *China Agritech*, 138 S. Ct. at 1804.  Before *China Agritech*, however,

13   Courts of Appeals were split "over whether otherwise-untimely <u>successive</u> class claims may be

14   salvaged by *American Pipe* tolling."  *Id.* at 1805 (underlined emphasis added).  And *China*

15   *Agritech* held that *American Pipe* tolling does not permit successive class claims.  *Id.* at 1811.

16   But—contrary to Defendants' suggestion—*China Agritech* said nothing about the question

17   presented here:  whether a plaintiff who intervenes before a class certification decision may serve

18   as a class representative for otherwise-untimely class claims based on the time of intervention.

19       The Court need not consider whether *American Pipe* tolling answers this question,

20   however, because binding Ninth Circuit authority provides that the amendment adding

21   McLaughlin as a party plaintiff related back to the original pleading under Rule 15.  "An

22   amendment adding a party plaintiff [under Rule 15(c)] relates back to the date of the original

23   pleading only when: (1) the original complaint gave the defendant adequate notice of the claims of

24   the newly proposed plaintiff; (2) the relation back does not unfairly prejudice the defendant; and

25   (3) there is an identity of interests between the original and newly proposed plaintiff."  *In re*

26   *Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935–36 (9th Cir. 1996).  "In deciding whether an

27   ─────────────────

28   need not bootstrap any claim to have standing because it has its own claims, McLaughlin's claims
     do not rest on injuries to absent class members, and McLaughlin alleges personal injury.

United States District Court
Northern District of California

amendment relates back to the original claim, notice to the opposing party of the existence and involvement of the new plaintiff is the critical element." *Avila v. INS*, 731 F.2d 616, 620 (9th Cir. 1984). Whether the defendant had adequate notice of the newly proposed plaintiff's claims often turns on "whether the original complaint clearly stated that the plaintiff sought to represent others." *Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063, 1069 (S.D. Cal. 2015) (citations omitted).

The Court first finds that the original complaint gave Defendants adequate notice of McLaughlin's claims because the original complaint sought to pursue class claims. Although courts have found that an individual complaint may not provide adequate notice that the plaintiff seeks claims on behalf of a class, *see, e.g.*, *Corns v. Laborers Int'l Union of N. Am.*, No. 09-cv-4403 YGR, 2014 WL 1319363, at *5 (N.D. Cal. Mar. 31, 2014), courts uniformly find that a class action complaint provides defendants adequate notice of other class members' claims, *see, e.g.*, *Lith v. Iheartmedia + Entm't*, No. 1:16-cv-066-LJO-SKO, 2016 WL 4000356, at *6 (E.D. Cal. July 25, 2016). And here, the original complaint unequivocally sought to bring a class action. *See* Dkt. No. 1-1 (commencing this action with a "Class Action Complaint").

The Court further finds an identity of interests between the original Plaintiff and McLaughlin. For there to be the required identity of interests the original Plaintiff and McLaughlin must be "similarly situated." *Immigrant Assistance Project of L.A. Cty. Fed'n of Labor (AFL-CIO) v. INS*, 306 F.3d 842, 858 (9th Cir. 2002). Plaintiffs are "similarly situated" when "[t]he circumstances giving rise to the[ir] claims remain[ ] the same [under the amended complaint] as under the original complaint. *Raynor Bros. v. Am. Cyanimid Co.*, 695 F.2d 383, 384 (9th Cir. 1982). Here, the same alleged TCPA violations give rise to the class claims asserted in both the original and operative complaints. *Compare, e.g.*, Dkt. No. 1-1 at 2 ("This case challenges Defendants' practice of sending unsolicited facsimiles."), *with* SAC at 2 ("This case challenges Defendants' practice of sending unsolicited facsimiles."). And because the Court finds an identity of interests between the original Plaintiff and McLaughlin, the relation back of McLaughlin's claims will not prejudice Defendants. *See Immigrant Assistance*, 305 F.3d at 858 ("The addition of new plaintiffs who are similarly situated to the original plaintiffs therefore did not cause the INS any prejudice in the present case.").

1    Because the Court finds McLaughlin's claims as alleged in the operative complaint relate

2    back to the original complaint, McLaughlin is not precluded from serving as a class representative

3    for faxes sent more than four years before McLaughlin intervened in the action.

### iii.   Rule 23(a)

#### a.   Numerosity

"[C]ourts have routinely found the numerosity requirement satisfied when the class

comprises 40 or more members." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605–06 (N.D.

Cal. 2014) (citation omitted).  Plaintiffs contend—and Defendants do not dispute—that because

"there are thousands of class members," the numerosity requirement is "easily met."  Class Mot. at

12.  The Court agrees and finds that numerosity is satisfied here because joinder of the estimated

thousands of class members would be impracticable.

#### b.   Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  A

contention is sufficiently common where "it is capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one of

the claims in one stroke." *Dukes*, 564 U.S at 350.  Commonality exists where "the circumstances

of each particular class member vary but retain a common core of factual or legal issues with the

rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008).  "What matters to

class certification . . . is not the raising of common 'questions'—even in droves—but rather the

capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the

litigation." *Dukes*, 564 U.S at 350.  Even a single common question is sufficient to meet this

requirement. *Id.* at 359.

Plaintiffs contend—and Defendants do not dispute—that there are multiple questions of

law or fact that are common to the proposed class.  Class Mot. at 12–13.  The Court agrees and

finds that commonality is satisfied.

//

//

//

c.  Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks omitted).  Under the "permissive standards" of Rule 23(a)(3), the claims need only be "reasonably co-extensive with those of absent class members," rather than "substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  In other words, typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (internal quotation marks omitted).

Plaintiffs argue that McLaughlin's claims are typical of an Exhibit A-only Class because, although McLaughlin did not receive every one of the faxes at issue here, it "received 12 of the 34 fax templates . . . . [and] received these faxes as part of the same course of conduct as the rest of the Exhibit A-only Class."  Class Mot. at 13–14.  Plaintiffs add that McLaughlin's "claims are 'reasonably co-extensive' with the entire Exhibit A-only Class," which is all that Rule 23(a)(3) requires.  *Id.*

Defendants counter that McLaughlin's claims are not typical of Exhibit-A only Class members for two reasons: (1) McLaughlin is subject to additional, unique defenses, and (2) McLaughlin's claims are atypical as to faxes it did not receive.  Class Opp. at 13–16.  The Court finds neither argument persuasive.

1.  Additional Defenses

Defendants argue that McLaughlin's claims are not typical of Exhibit-A only Class members because McLaughlin is subject to additional defenses.  Class Opp. at 13–14.  Specifically, Defendants argue that a McLaughlin employee "repeatedly and affirmatively provided McLaughlin's fax number to McKesson, communicated with McKesson via fax, and discussed the software at issue in the faxes during phone calls with Medisoft representatives."  *Id.*

21

at 14.  In other words, Defendants now argue that McLaughlin is not typical of the Exhibit A-only Class because McLaughlin is not an Exhibit A-only Class member, even though Defendants only listed McLaughlin on Exhibit A.

If Defendants believed McLaughlin was subject to defenses not applicable to Exhibit A-only Class members, then they should have included McLaughlin on either Exhibit B or Exhibit C. But they did not.  And the Court finds unjustifiable Defendants' failure to do so.  In fact, Defendants' only evidence of atypical consent cited in opposition to Plaintiffs' renewed motion for class certification is that a McLaughlin employee included a fax number on a "software registration form" and a "Technical Support Agreement."  Class Opp. at 12 (citing Cheung Decl. Ex. F, Ex. G at 14).  Both of those documents, however, are stamped to reflect that they were introduced at a February 24, 2015 deposition.  *See* Dkt. No. 305-1 Ex. F, Ex. G.  Defendants were thus fully aware of these documents when they produced the consent-defense Exhibit lists, which were provided to Plaintiffs on June 5, 2015.  *See* Dkt. No. 305-1 Ex. A.  For whatever reason, at that time, Defendants did not believe that this information warranted including McLaughlin on either the Exhibit B or Exhibit C consent-defense lists.  The Court will not permit Defendants to change their mind now, nearly six years into this litigation and after the case has been to the Ninth Circuit and back.

### 2.  McLaughlin Did Not Receive All of the Faxes

Defendants argue that McLaughlin's claims are atypical of claims based on faxes McLaughlin did not receive because "the evidence demonstrates that the circumstances around each fax campaign varied," as "faxes were sent on a variety of dates and times, regarding different products, and many different people at McKesson decided who would receive the different faxes." *Id.* at 14–15 (citations omitted).  McKesson asks too much of the typicality requirement.  A class representative's claims need only be "reasonably co-extensive with those of absent class members."  *See Hanlon*, 150 F.3d at 1020.  They need not be "substantially identical," and they certainly need not be perfectly identical, as Defendants' position suggests.  *See id.*; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n.9 (9th Cir. 2011) ("Differing factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality."); *Bee,*

*Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 626 (S.D. Cal. 2015) ("Plaintiff Bee's claims are typical of the junk fax class because she alleges that Defendants sent the same or similar unsolicited fax advertisements to putative class members.").  More important, however, the Court sees nothing—and Defendants point to nothing—in these purported variations that is at all relevant to the claims themselves.

The Court is aware of one out-of-circuit case that declined to certify a putative TCPA class to include faxes unreceived by the class representative.  *See Brodksy v. HumanaDental Ins. Co.*, No. 1:10-cv-03233, 2016 WL 5476233, at *7–8 (N.D. Ill. Sept. 29, 2016).  But there, the unreceived faxes were so unlike the faxes received by the class representative that "most of these other faxes were not even the subject of discovery in [the] (long-running) litigation."  *Id.* at *7.  That is very unlike the present case, where the faxes related to Exhibit A-only Class members have been well known to both sides for years, and where an appellate court has already ruled that there is little variation within the class's claims.  *See True Health*, 896 F.3d at 932.

For these reasons, the Court finds that McLaughlin's claims are sufficiently typical of claims based on faxes McLaughlin did not receive.

### d.   Adequacy of Representation

Rule 23(a)(4) requires that the "representative parties will fairly and adequately represent the interests of the class."  The Court must address two legal questions: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other putative class members, and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the proposed class.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).  This inquiry "tend[s] to merge" with the commonality and typicality criteria.  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).  In part, these requirements determine whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Id.*

Defendants do not challenge the adequacy of proposed class counsel.  Defendants challenge, however, the adequacy of McLaughlin as a class representative.  Class Opp. at 11–13.  Defendants in particular argue that McLaughlin is inadequate because it is not a member of the

1    putative class, given that it consented to receive promotional faxes in ways other than "just via the

2    registration form and EULA." *Id.* In other words, Defendants' adequacy challenge is duplicative

3    of their typicality challenge. Because the Court rejects Defendants' typicality challenge, the Court

4    similarly rejects Defendants' adequacy challenge.

5             **iv.    Rule 23(b)(3)**

6             To certify a class, Plaintiff must also satisfy the two requirements of Rule 23(b)(3). First,

7    "questions of law or fact common to class members [must] predominate over any questions

8    affecting only individual members." And second, "a class action [must be] superior to other

9    available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

10   23(b)(3). The Court finds both requirements satisfied in this case.

11                     a.   Predominance

12            "The predominance inquiry tests whether proposed classes are sufficiently cohesive to

13   warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045

14   (2016) (internal quotation marks omitted). The Supreme Court has defined an individual question

15   as "one where members of a proposed class will need to present evidence that varies from member

16   to member, while a common question is one where the same evidence will suffice for each

17   member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide

18   proof." *Id.* (citation and internal quotation marks omitted; brackets in original). This "inquiry

19   asks whether the common, aggregation-enabling, issues in the case are more prevalent or

20   important than the non-common, aggregation-defeating, individual issues." *Id.* (citation and

21   internal quotation marks omitted).

22            After the Court previously denied class certification, the Ninth Circuit squarely held that

23   an Exhibit A-only Class "would satisfy the predominance requirement of Rule 23(b)(3)." *True

24   Health*, 896 F.3d at 933. Defendants now ask the Court to ignore the Ninth Circuit's holding,

25   purportedly because individual issues regarding consent defeat predominance, even within the

26   Exhibit A-only Class. Class Opp. at 19–25. According to Defendants, "not just the entities on

27   Exhibit C . . . had individual relationships with their inside sales representatives" and "new

28   evidence" shows that Exhibit A-only Class members gave consent through other means. *Id.* at 22.

United States District Court
Northern District of California

1    Defendants in turn argue that this Court need not follow the Ninth Circuit's holding because "new

2    evidence refutes the central premise of [that] holding." *Id.* at 23.  Defendants further argue that if

3    the Court were to grant class certification based on the premise that Defendants "can only assert

4    consent defenses based on product registrations and EULAs[, it] would violate the Rules Enabling

5    Act," as that would limit Defendants' substantive right to litigate statutory defenses. *Id.* at 23–25.

6         Plaintiffs respond that Defendants' predominance challenge is foreclosed by the law-of-

7    the-case doctrine.  Class Reply at 8–10.  Plaintiffs add that certifying a class based on Defendants'

8    identification of which class members could be subject to which consent defenses in no way limits

9    Defendants' substantive rights. *Id.*  All Defendants seek at this point—in Plaintiffs' view—is to

10    "hit the restart button on this litigation." *Id.*

11        The Court agrees with Plaintiffs that the law-of-the-case doctrine forecloses Defendants'

12    predominance challenge.  This doctrine precludes a court "from reconsidering an issue previously

13    decided by the same court, or a higher court in the identical case." *Ingle v. Circuit City*, 408 F.3d

14    592, 594 (9th Cir. 2005).  "The doctrine has developed to 'maintain consistency and avoid

15    reconsideration of matters once decided during the course of a single continuing lawsuit.'" *Id.*

16    (citation omitted).  Critically, "[t]he issue in question must have been decided explicitly or by

17    necessary implication in the previous disposition." *Hall v. City of L.A.*, 697 F.3d 1059, 1067 (9th

18    Cir. 2012).

19        The Court here cannot ignore that the "issue in question"—whether Exhibit A-only Class

20    members satisfy the predominance requirement—was "decided explicitly" by the Ninth Circuit.

21    *See id.*; *True Health*, 896 F.3d at 933 ("We hold that the subclass of putative class members . . .

22    that would be created by taking out of Exhibit A the putative class members listed in Exhibits B

23    and C would satisfy the predominance requirement of Rule 23(b)(3).").  The Ninth Circuit could

24    not have been any clearer in its ruling.  And it is not this Court's prerogative to reconsider the

25    question.[6]

26        The Court further finds that this conclusion in no way violates the Rules Enabling Act.

27

28    ---
[6] Whether Defendants may at some point bring a motion to decertify the class is not presently
     before the Court.

1    Defendants—over four years ago—agreed to produce a supplemental interrogatory "that details

2    the categories of permission . . . [and] identif[ies] the evidentiary categories that would frame

3    discovery." *See* Dkt. No. 133 at 6.  Defendants, however, did not want to identify the recipients

4    that fell into each category of permission, fearing that Plaintiffs might contact persons on the lists

5    "to see if they provided consent," which Defendants argued was "precisely the type of individual

6    inquiry that defeats class certification." *Id.*  After raising this dispute before Magistrate Judge

7    Ryu, Defendants were ordered to identify the recipients that fell into each category of permission

8    by December 12, 2014.  *See* Dkt. No. 143 at 4.  Judge Ryu noted that she "ha[d] already ordered

9    Defendants to identify the recipients." *Id.*

10           Months later, Judge Ryu sanctioned Defendants, in part, for failing to comply with her

11   instruction.  At the sanctions hearing, Defendants repeatedly claimed they were "ready and able to

12   respond fully" on this point, but believed that Plaintiffs should have first served an interrogatory

13   for the information Judge Ryu instructed Defendants to provide.  Dkt. No. 175 at 12:8–9 ("[W]e

14   are ready and able to respond fully to an interrogatory once one is served."), 12:23–24 ("We've

15   been waiting and ready and willing."), 13:19–21 ("[W]e also said we are ready, willing and able to

16   respond to any interrogatory as soon as it's served.").  Judge Ryu found Defendants' excuse for

17   "completely ignor[ing]" her prior instruction "unreasonable[]" and "not credible." *Id.* 11:1–

18   13:13.[7]  Judge Ryu again ordered Defendants to identify which recipients fell into each category of

19   permission, and unequivocally stated the effect this information would have:  "The effect of this

20   interrogatory response should be to identify every putative class member who supposedly gave

21   permission and explain how that recipient gave permission."  Dkt. No. 178 at 12.  Defendants later

22   filed a declaration certifying that it produced this information.  Dkt. No. 179.  Defendants objected

23   neither to Judge Ryu's imposition of sanctions, nor to Judge Ryu's instruction to produce the

24   relevant information.

25           It is unreasonable for Defendants to argue now, after the Ninth Circuit held that Exhibit A-

26

27   ───────────────────────────

     [7] Defendants also contended that Judge Ryu's December order "was not actually an order, but

28   rather a *suggestion*," which Judge Ryu rightly found "flagrantly unbelievable." *See* Dkt. No. 178
     at 11.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   only Class members satisfy the predominance requirement and years after Defendants were

2   instructed to identify which class members fell into each category of permission, that to consider

3   (at the class certification stage) only those consent defenses for Exhibit A-only Class members *as*

4   *represented by Defendants* abridges their substantive rights in violation of the Rules Enabling Act.

5   This is especially true since Defendants repeatedly claimed *several years ago* that they could

6   easily produce this information.[8]

7       In keeping with the Ninth Circuit's holding in this case, the Court finds that Exhibit A-only

8   Class members satisfy the predominance requirement.

9           b.   Superiority

10      The superiority requirement tests whether "a class action is superior to other available

11  methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The

12  Court considers four non-exclusive factors:  (1) the interest of each class member in individually

13  controlling the prosecution or defense of separate actions; (2) the extent and nature of any

14  litigation concerning the controversy already commenced by or against the class; (3) the

15  desirability of concentrating the litigation of the claims in the particular forum; and (4) the

16  difficulties likely to be encountered in the management of a class action.  *Id.*  "Where classwide

17  litigation of common issues will reduce litigation costs and promote greater efficiency, a class

18  action may be superior to other methods of litigation."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d.

19  1227, 1234–35 (9th Cir. 1996).

20      Defendants argue that the purported class "is neither a manageable nor superior vehicle"

21  because "the Rules Enabling Act prohibits limitations on McKesson's ability to assert defenses

22  beyond the registration process and EULAs, and because individual inquiries will predominate as

23  to consent."  Class Opp. at 25.  In other words, Defendants argue that Rule 23(b)(3)'s superiority

24  requirement is not met because the predominance requirement is not satisfied.  Because the Court

25  rejects Defendants' predominance challenge, the Court similarly rejects Defendants' superiority

26  challenge.  This Court instead finds that "classwide litigation of common issues will reduce

27

28  [8] All of this history illustrates the ways Defendants' persistent factual and legal shape-shifting has needlessly complicated this case before, during, and after the appeal.

litigation costs and promote greater efficiency." *See Valentino*. 37 F.3d at 1234–35.

**C.    Renewed Class Certification Conclusion**

For the foregoing reasons, the Court **GRANTS** Plaintiffs' renewed motion for class certification and certifies the following class:

> All persons or entities who received faxes from "McKesson" from September 2, 2009, to May 11, 2010, offering "Medisoft," "Lytec," "Practice Partner," or "Revenue Management Advanced" software or "BillFlash Patient Statement Service," where the faxes do not inform the recipient of the right to "opt out" of future faxes, and whose fax numbers are listed in Exhibit A to McKesson's Supplemental Response to Interrogatory Regarding Prior Express Invitation or Permission, but not in Exhibit B or Exhibit C to McKesson's Response to Interrogatory Regarding Prior Express Invitation or Permission.

The Court appoints McLaughlin Chiropractic Associates, Inc. to represent the class, and appoints as class counsel its attorneys at Anderson + Wanca, Montgomery, Rennie & Jonson, and Schubert Jonckheer & Kolbe LLP.

**IV.    CONCLUSION**

The Court **DENIES** Defendants' motion for summary judgment and **GRANTS** Plaintiffs' renewed motion for class certification.  The parties are **DIRECTED** to meet and confer and e-file by August 23, 2019 a stipulation and proposed order setting forth a schedule through trial.

**IT IS SO ORDERED.**

Dated:  8/13/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge