1  TIFFANY CHEUNG (CA SBN 211497)
   TCheung@mofo.com
2  BONNIE LAU (CA SBN 246188)
   BLau@mofo.com
3  ANGELA E. KLEINE (CA SBN 255643)
   AKleine@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, California 94105-2482
   Telephone: 415.268.7000
6  Facsimile: 415.268.7522

7  ERIN P. LUPFER (CA SBN 317994)
   ELupfer@mofo.com
8  MORRISON & FOERSTER LLP
   12531 High Bluff Drive
9  San Diego, California 92130-2040
   Telephone: 858.720.5100
10 Facsimile: 858.720.5125

11 Attorneys for Defendants
   MCKESSON TECHNOLOGIES INC., and
12 MCKESSON CORPORATION

13

14                 UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                     OAKLAND DIVISION

17

| | |
|---|---|
| 18  TRUE HEALTH CHIROPRACTIC, INC., and MCLAUGHLIN CHIROPRACTIC 19  ASSOCIATES, INC., individually and as the representatives of a class of similarly-situated 20  persons, | Case No.    4:13-cv-02219-HSG (DMR) **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DECERTIFY THE CLASS** |
| 21                   Plaintiffs, | Hearing Date:  April 16, 2020 Time:          2:00 p.m. |
| 22           v. | Courtroom:     2, 4th Floor |
| 23  MCKESSON CORPORATION, MCKESSON TECHNOLOGIES INC., and 24  DOES 1-10, | The Hon. Haywood S. Gilliam, Jr. |
| 25                   Defendants. | |

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

    PLEASE TAKE NOTICE that on April 16, 2020, at 2:00 p.m., or as soon thereafter as

4

counsel may be heard, before the Honorable Haywood S. Gilliam, Jr., at the United States District

5

Court for the Northern District of California, in Courtroom 2, 4th Floor, 1301 Clay Street,

6

Oakland, California 94612, Defendants McKesson Technologies Inc. ("MTI") and McKesson

7

Corporation (collectively, "Defendants") will and do move the Court for an order decertifying the

8

class under Federal Rule of Civil Procedure 23.

9

    This motion is based on this Notice of Motion and Motion, the accompanying

10

Memorandum of Points and Authorities, the supporting Declarations of Tiffany Cheung,

11

Jeff Paul, and Lauren Denning, the exhibits and evidence, and such other matters and arguments

12

as may be presented to the Court at the time of the hearing.

13

14

Dated: March 5, 2020                    MORRISON & FOERSTER LLP

15

16

                        By:    */s/ Tiffany Cheung*

17

                               TIFFANY CHEUNG

18

                               Attorneys for Defendants
                               MCKESSON TECHNOLOGIES INC.,

19

                               and MCKESSON CORPORATION

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ....................................................................................i

TABLE OF AUTHORITIES ..............................................................................................ii

I.      INTRODUCTION ...............................................................................................1

II.     PROCEDURAL HISTORY ..................................................................................2

        A.      The Pleadings ..........................................................................................2

        B.      The Court Denied Plaintiffs' Original Motion for Class
                Certification ..........................................................................................2

        C.      The Ninth Circuit Partially Affirmed and Partially Reversed................................3

        D.      Subsequent Discovery ..............................................................................4

        E.      The Court Certified the Exhibit A Class, But Recognized That the
                Class Remained Subject to Decertification................................................4

III.    RECENT DEVELOPMENTS ..............................................................................5

        A.      The FCC Recently Issued a Declaratory Ruling That Efaxes Fall
                Outside of the TCPA's Provisions for "Telephone Facsimile
                Machines." ..............................................................................................5

        B.      Surveys Conducted by Professor Steven Nowlis Demonstrate That
                "Reasonable Persons" Understood Agreeing to the EULA as
                Consent to Receive Faxed Advertisements or Faxed Offers from
                Defendants. ..............................................................................................6

IV.     ISSUES TO BE DECIDED ..................................................................................9

V.      LEGAL STANDARD ..........................................................................................10

VI.     ARGUMENT ......................................................................................................11

        A.      The December 2019 FCC Ruling Necessitates Individualized
                Inquiries to Determine Which Class Members Received Efaxes
                That Do Not Violate the TCPA, Thus Defeating Predominance and
                Superiority.............................................................................................11

        B.      The Nowlis Surveys, in Combination with Other Evidence of
                Consent, Show that Individualized Inquiries into Consent Requires
                Decertification.......................................................................................16

VII.    CONCLUSION ....................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................................11

*Brady v. Deloitte & Touche, LLP*,
    587 F. App'x 363 (9th Cir. 2014) ......................................................................................10

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ..............................................................................................................11

*Cruz v. Dollar Tree Stores, Inc.*,
    Nos. 07-2050 SC, 07-4012 SC, 2011 WL 2682967 (N.D. Cal. July 8, 2011) ..........................10

*Gen. Tel. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982) ......................................................................................................10, 11

*Gorss Motels, Inc. v. Safemark Sys., LP*,
    931 F.3d 1094 (11th Cir. 2019) ...........................................................................................6

*Heredia v. Eddie Bauer LLC*,
    No. 16-cv-06236-BLF, 2020 WL 127489 (N.D. Cal. Jan. 10, 2020) .......................................12

*In re Hotel Tel. Charges*,
    500 F.2d 86 (9th Cir. 1974) ................................................................................................15

*In re Intuniv Antitrust Litig.*,
    No. 1:16-cv-12396-ADB, 2019 WL 3947262 (D. Mass. Aug. 21, 2019),
    *reconsideration denied sub nom. In re Intuniv Antitrust Litig. (Indirect*
    *Purchasers)*, No. 1:16-cv-12396-ADB, 2019 WL 5789837 (D. Mass. Nov. 6,
    2019) ...................................................................................................................................17

*In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*,
    934 F.3d 619 (D.C. Cir. 2019) ............................................................................................17

*In the Matter of Amerifactors Fin. Grp., LLC Petition for Expedited Declaratory*
    *Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*
    *Junk Fax Prot. Act of 2005*,
    No. 05-338, 2019 WL 6712128 (OHMSV Dec. 9, 2019) ...........................................5, 6, 11

*Johnson v. Yahoo! Inc.*,
    No. 14 CV 2028, 2018 WL 835339 (N.D. Ill. Feb. 13, 2018) .............................10, 15, 17, 19

*Marlo v. United Parcel Serv., Inc.*,
    639 F.3d 942 (9th Cir. 2011) ..............................................................................................11

*O'Connor v. Boeing N. Am., Inc.*,
    197 F.R.D. 404 (C.D. Cal. 2000) ....................................................................................10, 16

*Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil Inc.*,
    No. 14 C 2032, 2018 WL 3659349 (N.D. Ill. Aug. 2, 2018) ....................................................16

*Ries v. Ariz. Beverages USA LLC*,
    No. 10-01139 RS, 2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) ...........................................10

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ..................................................................................................10

*Scoma Chiropractic, P.A. v. Dental Equities, LLC*,
    No. 2:16-cv-41-FtM-99MRM, 2018 WL 2455301 (M.D. Fla. June 1, 2018) ...................11, 15

*True Health Chiropractic, Inc. v. McKesson Corp.*,
    896 F.3d 923 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2743 (2019) .......................................19

*Van Patten v. Vertical Fitness Group*,
    847 F.3d 1037 (9th Cir. 2017) ..................................................................................................3

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..........................................................................................................10, 11

*Wang v. Chinese Daily News, Inc.*,
    737 F.3d 538 (9th Cir. 2013) ..................................................................................................10

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001), *opinion amended on denial of reh'g*, 273 F.3d
    1266 (9th Cir. 2001) ...............................................................................................................15

**Statutes**

18 U.S.C. § 1347 ..........................................................................................................................5 n.2

47 U.S.C.
    § 227................................................................................................................................................2
    § 227(a)(5)..................................................................................................................................16
    § 227(b)(1)(C) ................................................................................................................11, 12 n.5

**Other Authorities**

Fed. R. Civ. P.
    Rule 23 ....................................................................................................................... *passim*
    Rule 23(a) ...................................................................................................................................11
    Rule 23(b)(3) ...........................................................................................................................1, 11
    Rule 23(c)(1)(C) .........................................................................................................................10
    Rule 23(f) ....................................................................................................................................3

Rule 26(e) ........................................................................................................................4

Rule 30(b)(6) ..................................................................................................................19

Yuri R. Linetsky, *Protection of "Innocent Lawbreakers": Striking the Right Balance in the Private Enforcement of the Anti "Junk Fax" Provisions of the Telephone Consumer Protection Act*, 90 NEB. L. REV. 70 (2011) ...........................................13

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.     INTRODUCTION**

3        Significant new legal developments have narrowed the scope of the TCPA.  These legal

4    developments, as well as expert testimony in this case, necessitate individualized inquiries to

5    determine whether each class member has a viable TCPA claim.  These individualized inquiries

6    will overwhelm any common questions and will render a trial unmanageable, thus defeating the

7    predominance and superiority requirements of Rule 23(b)(3) and requiring decertification here.

8        First, the FCC recently ruled in December 2019 that faxes received electronically (efaxes),

9    rather than by traditional fax analog transmission, fall outside the scope of the TCPA.  Efaxes

10   were widely available during the class period, and several class members purchased an efax

11   product called Zetafax from MTI.  There is no common proof available to show which class

12   members received the faxes at issue by efax versus by telephone facsimile machine.  Thus,

13   individualized inquiries are necessary to determine whether each class member received the faxes

14   at issue by efax, which would defeat their claim under the TCPA.

15       Second, following the Court's ruling that Defendants did not establish *as a matter of law*

16   that customers' agreement to the End User License Agreement ("EULA") constituted consent to

17   receive promotional faxes, Defendants retained a consumer survey expert to assess whether

18   reasonable persons *as a matter of fact* might interpret agreeing to the EULA to constitute consent.

19   A significant percentage of survey respondents—similarly situated to class members—understood

20   the language of the EULA to mean they had consented to receive faxed advertisements or offers

21   regarding the latest versions of the software and related products.  This expert testimony,

22   combined with the other evidence of consent in the record, shows that individualized inquiries are

23   necessary to determine whether each class member construed the EULA to constitute consent to

24   receive the faxes at issue or otherwise consented, which would defeat their claim under the

25   TCPA.

26       Because a class may be decertified at any time, these significant new developments in the

27   law and the record require the Court to reevaluate whether Plaintiffs can still satisfy their burden

28

1  to prove all Rule 23 class certification requirements, including predominance and superiority.

2  They cannot.  The class should be decertified.

3  **II.    PROCEDURAL HISTORY**

4    **A.    The Pleadings**

5     On May 15, 2013, Plaintiff True Health Chiropractic, Inc. ("True Health") filed this

6  putative class action alleging McKesson Corporation sent "unsolicited advertisements" by

7  facsimile in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

8  (ECF No. 1-1.)  The original and first amended complaints named only Defendant McKesson

9  Corporation.  But discovery established that McKesson Corporation did not send the faxes at

10  issue in this case.  Instead, discovery confirmed that McKesson Technologies, Inc. ("MTI"),

11  through a business unit called Physician Practice Solutions ("PPS"), sent the faxes at issue.

12  (Declaration of Tiffany Cheung ("Cheung Decl."), Ex. L (Holloway Depo.) at 9:12-16, 82:14-16,

13  15:8-13.)

14     The Second Amended Complaint added MTI as a Defendant (together with McKesson

15  Corporation, "Defendants") and added McLaughlin Chiropractic Associates, Inc. ("McLaughlin")

16  as a named Plaintiff.  (ECF Nos. 69, 90.)

17    **B.    The Court Denied Plaintiffs' Original Motion for Class Certification**

18     On July 16, 2015, Plaintiffs filed their original motion for class certification, seeking to

19  certify a class of:  "All persons or entities who received faxes from 'McKesson' from

20  September 2, 2009, to May 11, 2010, offering 'Medisoft,' 'Lytec,' or 'Revenue Management

21  Advanced' software or 'BillFlash Patient Statement Service,' where the faxes do not inform the

22  recipient of the right to 'opt out' of future faxes."  (ECF No. 209 at 1, 15.)

23     On August 22, 2016, the Court denied Plaintiffs' motion for class certification.  As an

24  initial matter, the Court rejected Plaintiffs' argument that evidence showing consent to the faxes

25  was irrelevant because the faxes did not include the allegedly necessary opt-out instructions.

26  (ECF No. 260 at 9:13-19.)  Because evidence of permission to receive the faxes defeats Plaintiffs'

27  claims, the Court held it "would need to make detailed factual inquiries regarding whether each

28  fax recipient granted prior express permission."  (*Id.* at 8:3-4, 9:20.)  Thus, the Court denied class

1  certification on predominance grounds and did not reach the other Rule 23 requirements.  (*Id.* at

2  9:20-22.)  Plaintiffs sought permission to appeal under Rule 23(f), and their request was granted.

3  (ECF No. 271.)

4       **C.      The Ninth Circuit Partially Affirmed and Partially Reversed**

5       On July 17, 2018, the Ninth Circuit affirmed in part and reversed in part the Court's denial

6  of class certification.  (ECF No. 274.)  Following *Van Patten v. Vertical Fitness Group*, 847 F.3d

7  1037 (9th Cir. 2017), issued after the Court's original class certification decision, the Ninth

8  Circuit held (in a text message case) for the first time that defendants, not plaintiffs, bore the

9  burden of showing consent under the TCPA.  (ECF No. 274 at 16.)

10      After addressing the impact of the intervening *Van Patten* decision, the Ninth Circuit

11 determined that consideration of subclasses would be appropriate based on Defendants' June 5,

12 2015 interrogatory responses.  (ECF No. 274 at 6-7, 10, 17-19.)  Defendants' responses identified

13 several methods by which Defendants obtained consent to send faxes, along with three exhibits

14 that listed putative class members that had consented, based on the discovery that had been

15 conducted as of June 15, 2015 ("Exhibits A, B, and C").  (*Id.*)  As to Exhibit A (minus the entities

16 listed on Exhibits B and C), the Ninth Circuit held that predominance was satisfied because it

17 believed there were two uniform consent defenses:  that all putative class members gave consent

18 to receive faxes when they (1) completed the registration form for their products; and (2) entered

19 into the EULA.  (*Id.* at 18.)  As to Exhibit C, the Ninth Circuit affirmed this Court's finding of a

20 lack of predominance because the individual and varied oral or email communications between

21 customers and PPS sales representatives raised individualized issues as to consent.  (*Id.*)  As to

22 Exhibit B, because of varied applicable consent defenses, the Ninth Circuit remanded to this

23 Court to determine whether the claims of the putative class members listed in Exhibit B could be

24 tried based on common proof.  (*Id.* at 19.)

25      The Ninth Circuit expressly based its findings "[o]n the current record" and remanded to

26 the Court to address the remaining requirements of Rule 23 and potential supplementation of the

27 record in light of the intervening *Van Patten* decision and its opinion.  (*Id.* at 20.)

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.   Subsequent Discovery

After remand, the Court permitted additional class certification discovery.  In November 2018, Defendants produced an additional 4,000 pages of documents supporting their consent defenses.  (ECF No. 292 at 9:20-22.)  As part of their continuing obligation to supplement discovery responses under Rule 26(e), Defendants produced 31 pages of documents further supporting their defenses on January 17, 2020.  In light of the December 2019 ruling of the Federal Communications Commission's ("FCC") regarding efaxes, *see infra* Section III.A., on February 20, 2020, Defendants produced 125 pages related to the use of efaxes  by class members and potential class members before and during the class period.[1]

### E.   The Court Certified the Exhibit A Class, But Recognized That the Class Remained Subject to Decertification

Plaintiffs filed a renewed motion for class certification on December 4, 2018.  (ECF No. 292.)  Before the Court ruled on Plaintiffs' renewed motion for class certification, it invited Defendants to move for summary judgment on the discrete issue of whether Plaintiffs' voluntary provision of their fax numbers on the product registration form and/or agreement to the product EULA, as a matter of law, constituted prior express permission to send the faxes at issue.  (ECF No. 322 at 1:19-22.)  Defendants did so.  (ECF No. 325.)  The Court ultimately denied Defendants' motion, finding that Defendants could not establish as a matter of law that, by agreeing to the EULA, customers understood that they were consenting to receive faxed advertisements.  (ECF No. 331 at 15:12-14.)

The Court then granted Plaintiffs' renewed motion to certify the following class:

> All persons or entities who received faxes from "McKesson" from September 2, 2009, to May 11, 2010, offering "Medisoft," "Lytec," "Practice Partner," or "Revenue Management Advanced" software or "BillFlash Patient Statement Service," where the faxes do not inform the recipient of the right to "opt out" of future faxes, and whose fax numbers are listed in Exhibit A to McKesson's Supplemental Response to Interrogatory Regarding Prior Express Invitation or Permission, but not in Exhibit B or Exhibit C to

---

[1] To correct the repetition of previously-assigned bates numbers, Defendants re-produced those same documents with updated bates numbers on March 2, 2020.

1    McKesson's Response to Interrogatory Regarding Prior Express
2    Invitation or Permission.

3    (ECF No. 331 at 28:5-10.)[2]  At the same time, the Court expressed concern about how the parties

4    could try this case on a class-wide basis.  (Cheung Decl., Ex. M (September 24, 2019 Hearing

5    Tr.) at 21:19-20 ("it's not clear to me even now how this trial is supposed to look").)  The Court

6    also specifically noted that the class is "obviously always subject to a decertification analysis."

7    (Cheung Decl., Ex. N (February 28, 2019 Hearing Tr.) at 5:21-22; *see also id.* at 5:2-3; ECF

8    No. 331 at 25, n.6.)

9    **III.    RECENT DEVELOPMENTS**

10           **A.    The FCC Recently Issued a Declaratory Ruling That Efaxes Fall Outside of
11                   the TCPA's Provisions for "Telephone Facsimile Machines."**

12           In December 2019, four months *after* the Court certified the Exhibit A class, the FCC

13   issued a declaratory ruling that an efax, "an online fax service that effectively receives faxes

14   'sent as email over the Internet,' . . . is ***not*** a 'telephone facsimile machine' and thus falls outside

15   the scope of the [TCPA's] statutory prohibition."  *In the Matter of Amerifactors Fin. Grp., LLC*

16   *Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer*

17   *Prot. Act of 1991 Junk Fax Prot. Act of 2005*, No. 05-338, 2019 WL 6712128, ¶ 3 (OHMSV

18   Dec. 9, 2019) ("2019 FCC Ruling") (emphasis added).  The FCC noted that the TCPA was passed

19   to address two issues related to faxes:  (1) the cost of ink and paper to print the fax and (2) the

20   inability to receive other messages while the fax machine is in use "so that it is unavailable for

21   legitimate business messages."  *Id.* ¶ 12 (citation omitted).  An efax, in contrast, "will convert

22   incoming and outgoing faxes to an electronic document that can be managed online via email or

23   through the Web Interface provided by the efax service provider" without using any paper or

---

24   [2] In their renewed motion to certify the class, Plaintiffs dropped True Health as a named plaintiff.
25   Dr. Jeffrey Shope, the owner and President of True Health, had pleaded guilty to healthcare fraud
     in violation of 18 U.S.C. § 1347 and was sentenced to twelve months and one day in prison.
26   (Cheung Decl., Ex. P (Judgment in S.D. Ohio Case No. 2:15-cr-00189).)  The criminal count
     related to a "scheme to defraud health care benefit programs" that encompassed the class period
27   and beyond, from January 2009 through December 2012.  (Cheung Decl., Ex. Q (Information in
     S.D. Ohio Case No. 2:15-cr-00189) ¶ 19.)  Plaintiffs requested and the Court appointed
     McLaughlin to represent the class.  (ECF No. 331 at 28:11.)

toner or tying up the recipient's fax machine.  (Cheung Decl., Ex. O (Defendants' Updated Expert Report of Ken Sponsler dated February 6, 2020 ("Sponsler Report")) ¶ 11.)  The FCC therefore concluded that efaxes "do not cause the specific harms to consumers Congress sought to address in the TCPA."  2019 FCC Ruling ¶ 12.  "Accordingly, under the plain terms of the Act, an online fax service is not a 'telephone facsimile machine' and a fax sent to one is not 'an unsolicited facsimile advertisement' prohibited by the TCPA."  *Id.* ¶ 11.

### B.    Surveys Conducted by Professor Steven Nowlis Demonstrate That "Reasonable Persons" Understood Agreeing to the EULA as Consent to Receive Faxed Advertisements or Faxed Offers from Defendants.

Following the Court's ruling on summary judgment, where it found that Defendants failed to establish *as a matter of law* that agreeing to the EULA constituted consent to receive faxed advertisements (ECF No. 331 at 15:12), Defendants retained noted consumer survey expert Dr. Steven Nowlis[3] to query whether reasonable persons, *as a matter of fact*, understood that agreeing to the EULA constituted consent to receive faxed advertisements or faxed offers.  (*See id.* at 13:13, 14:23 (evaluating how a "reasonable user" or "reasonable customer" might understand the terms of the EULA)); *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1101 (11th Cir. 2019) (granting summary judgment in favor of defendant because a "reasonable consumer" would understand that accepting the franchise agreement "entails receiving information about buying products").

All MTI customers that entered into EULAs, which provided that: "During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ('Usage Information').  This Usage Information . . . also assists McKesson in offering End User other features and services." (Declaration of Jeff Paul dated March 4, 2020 ("Paul Decl.") ¶ 10 & Ex. 1 at RS-TRUEHEALTH 000442.)

---

[3] Dr. Nowlis is the August A. Busch Jr. Distinguished Professor of Marketing in the Olin Business School at Washington University in St. Louis.  (Cheung Decl., Ex. R (Expert Report of Stephen M. Nowlis, Ph.D. dated February 7, 2020 ("Nowlis Report")) ¶ 1.)  Dr. Nowlis is an expert in consumer behavior, survey methods, and decision making, and has received several international awards for his research.  (*Id.* ¶¶ 1, 3.)

Dr. Nowlis designed two surveys to "assess whether users similarly situated to the Class interpret assenting to the terms of the EULA as consenting to receive faxed advertisements or faxed offers from Defendants about the latest versions of the purchased or leased software." (Cheung Decl., Ex. R (Nowlis Report) ¶ 8.)  The survey respondents are similarly situated to class members because they are medical professionals who work in small offices of 50 or fewer persons and would purchase or lease software similar to that purchased by class members.  (*Id.* ¶ 15; Paul Decl. ¶ 4 ("PPS's primary customer base for Medisoft and Lytec software products was smaller physicians' offices."); Declaration of Lauren Denning dated March 4, 2020 ("Denning Decl.") ¶ 2 ("Most of my customers were single-physician practices and small medical practices.").)  Respondents took either the Faxed Advertisements Survey or the Faxed Offers Survey.  (Cheung Decl., Ex. R (Nowlis Report) ¶ 17.)  After a series of screening questions,[4] respondents were instructed to assume that they had "just purchased or leased medical billing or accounting software," and then shown the full text of the EULA.  (*Id.* ¶¶ 28-29.)  Next, the survey showed respondents the entire EULA, but directed their attention to three specific provisions.  (*Id.* ¶ 30.)  Then, "respondents were shown the same three boxed segments of the EULA without the full agreement," although respondents had the option to view the entire EULA again by clicking a link.  (*Id.* ¶ 31.)

---

[4] (*See* Cheung Decl., Ex. R (Nowlis Report) ¶¶ 18-27.)

1

2
**NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.**

3

4

5
AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

6

7

8

9
2.1.2   _Software Usage Information._  During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also assists McKesson in offering End User other features and services. Usage Information sent by the Software may include the following: Customer # / serial number; software name; software version; date data was collected; total number of appointments in database; total number of visits in database; total number of transactions in database; for each item in the doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage Information by sending notice to McKesson in accordance with Section 2.7 to the attention of the General Manager, Physician Practice Solutions. The notice must include the Software serial number.

10

11

12

13

14

15

16

17  (Cheung Decl., Ex. R (Nowlis Report), Appendices C-24, F-24.)  In order to focus on the

18  language of the EULA, survey respondents were not presented with the form presented "during

19  registration or activation of the software."  (*Id.*; *id.* at ¶ 7 ("Class members also completed a

20  registration form in the process of agreeing to the EULA.  The focus of my surveys was on the

21  EULA and how respondents understood certain language in the EULA.").)  This form included a

22  box in which class members could voluntarily enter their fax numbers while registering their

23  product; it was not required.  (Cheung Decl., Ex. T (Exhibit 16 from Peterson Depo.).)  "Fax

24  numbers were never required as part of the product registration process and was completely

25  voluntary."  (Cheung Decl., Ex. W (Toney Decl.) ¶ 2.)

26         After reviewing the EULA, respondents in the Faxed Advertisements Survey were asked:

27  "Based on your understanding of the End User License Agreement you just reviewed, have you

28  consented to receive faxed advertisements about the latest versions of the software you just

purchased or leased and related products?"  (*Id.* ¶ 32.)  Respondents could select one of three possible answers:  Yes, No, or Don't know/Unsure (*id.*), and answered as follows:

**Table 1: Responses to the question (Q1):**
"Based on your understanding of the End User License
Agreement you just reviewed, have you consented
to receive faxed advertisements about the latest versions
of the software you just purchased or leased and related products?"

|  | N | % |
|---|---|---|
| Yes | 50 | 25.0% |
| No | 95 | 47.5% |
| Don't know/Unsure | 55 | 27.5% |
| Total | 200 | 100.0% |

Respondents in the Faxed Offers Survey were asked:  "Based on your understanding of the End User License Agreement you just reviewed, have you consented to receive faxed offers about the latest versions of the software you just purchased or leased and related products?"  (*Id.* ¶ 33.)  Respondents could select one of three possible answers:  Yes, No, or Don't know/Unsure (*id.*), and answered as follows:

**Table 2: Responses to the question (Q1):**
"Based on your understanding of the End User License
Agreement you just reviewed, have you consented
to receive faxed offers about the latest versions
of the software you just purchased or leased and related products?"

|  | N | % |
|---|---|---|
| Yes | 67 | 33.2% |
| No | 78 | 38.6% |
| Don't know/Unsure | 57 | 28.2% |
| Total | 202 | 100.0% |

## IV.    ISSUES TO BE DECIDED

1.    Whether the Court should decertify the class because of the individualized inquiries necessary to determine if class members received efaxes and thus fall outside scope of the TCPA pursuant to the 2019 FCC Ruling.

2.      Whether the Court should decertify the class because the Nowlis surveys, in combination with other evidence of consent in the record, demonstrate that individualized inquiries are necessary to determine whether each class member understood the EULA to constitute consent, or otherwise consented, to receiving the faxes at issue.

## V.      LEGAL STANDARD

Class treatment remains an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted).  Rule 23(c)(1)(C) expressly states that "[a]n order that grants or denies class certification may be altered or amended before final judgment."  Thus, "'[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.'"  *Ries v. Ariz. Beverages USA LLC*, No. 10-01139 RS, 2013 WL 1287416, at *3 (N.D. Cal. Mar. 28, 2013) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 546 (9th Cir. 2013) ("Rule 23 provides district courts with broad authority at various stages in the litigation to revisit class certification determinations and to redefine or decertify classes as appropriate.").

Indeed, the court may decide to "decertify a class at any time." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *accord Johnson v. Yahoo! Inc.*, No. 14 CV 2028, 2018 WL 835339, at *4 (N.D. Ill. Feb. 13, 2018) (decertifying Rule 23(b)(3) TCPA class after close of discovery based on information obtained during class notice phase).  Changes, developments, or clarifications of the facts or the applicable procedural or substantive law require reconsideration of a certification decision and, if appropriate, decertification or redefinition of the class. *See Brady v. Deloitte & Touche, LLP*, 587 F. App'x 363, 364 (9th Cir. 2014) (affirming decertification because individualized issues defeated predominance); *Cruz v. Dollar Tree Stores, Inc.*, Nos. 07-2050 SC, 07-4012 SC, 2011 WL 2682967, at *2 (N.D. Cal. July 8, 2011) (decertifying class where, based on developments in case and case law, the court determined that individualized issues would predominate); *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 410 (C.D. Cal. 2000) (noting that "developments in the litigation, such as the discovery of new facts or changes in the parties or in the substantive or procedural law, will necessitate reconsideration

1  of the earlier order and the granting or denial of certification or redefinition of the class" (citation

2  omitted)).

3      On a motion for decertification, the burden remains with **Plaintiffs** to demonstrate that all

4  of the Rule 23 requirements have been satisfied.  *Marlo v. United Parcel Serv., Inc.*, 639 F.3d

5  942, 947-48 (9th Cir. 2011).  That is, Plaintiffs must show through actual proof that "'there are

6  *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or

7  defenses, and adequacy of representation, as required by Rule 23(a)."  *Comcast Corp. v. Behrend*,

8  569 U.S. 27, 33 (2013) (quoting *Wal-Mart*, 564 U.S. at 350).  In addition, because Plaintiffs seek

9  to maintain certification under Rule 23(b)(3), they must demonstrate that any common questions

10  predominate over the individualized ones, a "criterion" that is "far more demanding" than

11  commonality under Rule 23(a).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

12  Finally, Plaintiffs must show that "a class action is superior to other available methods for fairly

13  and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Failure to prove any one

14  of the Rule 23 requirements necessitates decertifying the class.  *Gen. Tel. Co.*, 457 U.S. at 160

15  ("actual, not presumed, conformance with Rule 23(a) remains . . . indispensable").  Here,

16  significant developments in the law and the record warrant decertifying the class.

17  **VI.    ARGUMENT**

18        **A.    The December 2019 FCC Ruling Necessitates Individualized Inquiries to
            Determine Which Class Members Received Efaxes That Do Not Violate the
19            TCPA, Thus Defeating Predominance and Superiority.**

20        The 2019 FCC Ruling narrows the scope of the TCPA and requires decertification here.

21  *See Scoma Chiropractic, P.A. v. Dental Equities, LLC*, No. 2:16-cv-41-FtM-99MRM, 2018 WL

22  2455301, at *3 (M.D. Fla. June 1, 2018) ("If the FCC statutorily exonerates online fax services

23  from the TCPA, this could be a different case and at a minimum would affect the issues raised in

24  the class certification briefing.")  To establish liability under the TCPA, Plaintiffs must prove that

25  the faxes at issue were sent to a "telephone facsimile machine."  47 U.S.C. § 227(b)(1)(C).

26  Pursuant to the recent 2019 FCC Ruling, class members who received a fax from MTI via an efax

27  no longer have any claim under the TCPA because an efax is not a "telephone facsimile

28  machine."  2019 FCC Ruling ¶ 11.  As explained below, Defendants are not able to determine

1   based on common evidence whether a faxes is received on a traditional analog fax machine or an

2   efax service.  The 2019 FCC Ruling thus destroys any predominance and superiority that may

3   have previously existed because individualized inquiries are now necessary to determine whether

4   each of the 9,499 class members received the faxes at issue via a standard fax machine or online

5   through an efax.  Therefore, a fact-intensive inquiry into each class member's method of receipt

6   would be necessary to establish this essential element of Plaintiffs' claims.  *See Heredia v. Eddie*

7   *Bauer LLC*, No. 16-cv-06236-BLF, 2020 WL 127489, at *6 (N.D. Cal. Jan. 10, 2020) ("Class

8   actions are not appropriate where the resolution of the case would require numerous mini trials.").

9        Plaintiffs cannot establish through common proof which class members received faxes to

10  a "telephone facsimile machine" or through an efax.[5]  The transmission logs Plaintiffs relied on to

11  certify the class are silent as to how the fax was *received*.  (*See, e.g*., Cheung Decl., Ex. K at RS-

12  TRUEHEALTH 000404).)  Further, there is no common method by which the sender will " ***know***

13  ***whether the facsimile was received by a fax service that converts the transmission into an***

14  ***image and sends the image as an email to a recipient associated with the fax number***."

15  (Cheung Decl., Ex. O (Sponsler Report) ¶ 32 (emphasis in original); Paul Decl. ¶ 9 ("When I sent

16  a fax to a customer, I did not receive information regarding whether the customer received that

17  particular fax on a traditional fax machine or on the customer's computer through an efax

18  service."); Denning Decl. ¶ 7 ("When a customer gave me a fax number, I was not informed if the

19  fax number was connected to an efax service or a traditional fax machine.").)  That is because

20  "[e]fax and commercial fax-type services make it ***nearly impossible*** . . . to determine if faxes

21  were received by an Internet/cloud or 'commercial' fax service or traditional premise-based

22  analog fax machine, or how any such faxes might have been received."  (Cheung Decl., Ex. O

23  (Sponsler Report) ¶ 30 (emphasis added).  The only way to verify who received efaxes—and thus

---

24  [5] Plaintiffs rely on discovery responses that are silent as to *how* the 9,499 class members received
25  the faxes at issue to argue that these faxes were sent to a "telephone facsimile machine."  (ECF
    No. 360 at 11:11-23.)  This argument falls flat because statements that customers "received
26  copies of the faxes" or that faxes were "transmitted to one or more fax numbers" in no way
    address the method by which customers *received* these faxes.  Nor does the earlier statement that
27  True Health, the owner of the 614-794-1625 fax number (SAC ¶ 12, Ex. A), received a fax to a
    "telephone facsimile machine" satisfy Plaintiffs' burden to establish that all 9,499 class members
28  were sent a fax to a "telephone facsimile machine."  47 U.S.C. § 227(b)(1)(C).

1    suffered no injury recognized under the TCPA—would be through discovery of and/or testimony

2    from each class member.  As a result, "there is no way to determine which fax numbers were

3    assigned to a fax machine as opposed to an efax service" across the class without asking each

4    class member individually.  (*Id.*)

5           The 2019 FCC Ruling bears directly on this case because efaxes were widely available

6    before and during the class period and a "significant percentage of class members likely" received

7    the faxes at issue through "an Internet-based or commercial online fax service."  (Cheung Decl.,

8    Ex. O (Sponsler Report) ¶¶ 4, 21-26.)  By 2008, one company that owned various efax service

9    providers had "nearly 11.2 million Direct Inward Dial (DID) phone numbers deployed with more

10   than 900,000 paying subscribers."  (*Id.* ¶ 24.)  By the end of the class period in 2010, "traditional

11   faxing had largely disappeared" because of the prevalence of efax services.  (*Id.* ¶ 25.)  In a 2011

12   law review article, a law professor observed that "traditional facsimile machines—or at least the

13   use of traditional facsimile machines to receive faxes—have become the exception, rather than

14   the norm."  Yuri R. Linetsky, *Protection of "Innocent Lawbreakers": Striking the Right Balance*

15   *in the Private Enforcement of the Anti "Junk Fax" Provisions of the Telephone Consumer*

16   *Protection Act*, 90 NEB. L. REV. 70, 84 (2011).

17          Efaxes were specifically marketed to healthcare professionals like the class members here,

18   increasing the likelihood that a significant number of the 9,499 class members received the faxes

19   at issue through efax.  As Mr. Sponsler explained, many of these efax services "specifically

20   market to the healthcare market . . . to take advantage of efax solutions while remaining HIPAA

21   compliant."  (Cheung Decl., Ex. O (Sponsler Report) ¶ 27.)  "Because efaxes offer a layer of

22   security much greater than email, using efax services has increasingly become the standard way

23   for many health practices to send their documents quickly and securely."  (*Id.* ¶ 28.)  Efax

24   services can even be integrated into electronic health record systems.  (*Id.* ¶ 29.)

25          In fact, MTI itself offered integrated efax services as an add-on service called "Zetafax"

26   before, during, and after the class period, establishing that efax services were known to and used

27   by class members.  (Cheung Decl., Ex. X at RS TRUEHEALTH 004615-004616 (offering

28   Zetafax on May 2009 Lytec MD price list); Ex. Y at RS TRUEHEALTH 004618, 004621

(offering Zetafax on May 2009 Medisoft Clinical price list); Ex. Z at RS TRUEHEALTH
004671-004672 (offering Zetafax on December 2009 Lytec MD price list) Ex. AA at RS
TRUEHEALTH 004681, 004684 (offering Zetafax on October 2010 Medisoft Clinical price
list).)  The Zetafax add-on offered by MTI allowed class members to fax out prescriptions
electronically through PPS products.  (Cheung Decl., Ex. BB at RS TRUEHEALTH 004591
("*Sending* faxes electronically from Practice Partner is easier than ever through Zetafax's secure,
fast and cost effective fax server technology. . . . Additional features such as the ability to *receive*
incoming faxes require utilization of the Zetafax client" separate from the MTI add-on) (emphasis
added).)  Independent of the add-on offered by MTI, customers could purchase Zetafax as a
standalone product directly from Zetafax.  (*Id.* ("The Zetafax Server has a number of additional
features that are available for use outside of the [product] integration, as a standalone product to
help your office more efficiently manage fax related tasks.").)  Using Zetafax as a standalone
server allowed users to "receive incoming faxes into Zetafax—where they can be easily
electronically filed or distributed via email to the appropriate party."  (*Id.*; *see also* Cheung Decl.,
Ex. CC at RS TRUEHEALTH 004659, 004668 (Lytec MD system requirements explaining that a
"fax server allows you to fax prescriptions and other documents directly from your PC.  It also
allows you to receive faxes electronically. . . . ZetaFax and Windows Server 2003 fax server are
both integrated and supported").)

 Recent discovery has confirmed that class members, and customers who may be class
members, purchased and/or inquired about purchasing the Zetafax add-on.[6]  Because of the
prevalence of efaxes during the class period and the likelihood that class members purchased and

---

[6] (Cheung Decl., Ex. A at RS-TRUEHEALTH 004588, Rows 958, 974, 983, 4101, 4147, and
4162; Ex. B. at RS-TRUEHEALTH 004590, Row 13896; Ex. C at RS-TRUEHEALTH 004639,
Row 84; Ex. D at RS-TRUEHEALTH 004640, Rows 28-32, 84-85; Ex. E at RS-TRUEHEALTH
004641, Row 84; Ex. F at RS-TRUEHEALTH 004657, Rows 13862, 13942, and 14014; Ex. G at
RS-TRUEHEALTH 004693, Rows 397, 400, and 135; Ex. H at RS-TRUEHEALTH 004694,
Rows 373 and 1179; Ex. I at RS-TRUEHEALTH 004709, Row 13825; Ex. J at RS-
TRUEHEALTH 004712, Tab No. 2, Row 2225; Ex. DD at RS-TRUEHEALTH 004608; Ex. EE
at RS-TRUEHEALTH 004016-004017; Ex. FF at RS-TRUEHEALTH 004653; Ex. GG at RS-
TRUEHEALTH 004607; Ex. HH at RS-TRUEHEALTH 004610, RS-TRUEHEALTH 004612,
Ex. II at RS-TRUEHEALTH 004643, RS-TRUEHEALTH 004645; Ex. JJ at RS-TRUEHEALTH
004648, RS-TRUEHEALTH 004649.)

used the Zetafax add-on, individual mini-trials would be necessary to establish whether each customer received efaxes and must be excluded from the class under the 2019 FCC Ruling. Moreover, this question cannot resolved using common evidence of MTI's records, as they cannot identify which class members received efaxes versus traditional analog faxes. Instead, the only way to identify uninjured efax recipients from the class would be to conduct discovery of or obtain testimony from each class member regarding how they received faxes in 2009 and 2010, and specifically, any promotional faxes from MTI. *Scoma Chiropractic*, 2018 WL 2455301, at *3 n.4 (staying proceedings pending the FCC's ruling on the AmeriFactors Petition and noting that "MasterCard states that the faxing records in this case do not reveal what type of equipment or service was used to receive the faxes; therefore, the Court would have to engage in individual inquiries to determine whether a class member used an online fax service, defeating commonality"). Because Plaintiffs ultimately bear the burden of proving both the "telephone facsimile machine" element and that class action status is justified, the 2019 FCC Ruling is a significant legal development that "requires individualized analysis" of the efax question "such that the class does not meet the predominance requirement." *See Johnson*, 2018 WL 835339, at *4 (decertifying class because production of third-party records demonstrated that "individualized consent inquiries will predominate").

Moreover, because identifying the method of delivery for each fax will be a fact-intensive inquiry, it also renders the class unmanageable. Plaintiffs do not—and cannot—provide a mechanism to efficiently resolve the efax issue on a class-wide basis that would "prevent these individual issues from splintering the action into thousands of individual trials requiring years to litigate." *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974). Instead, each of the 9,499 class members would have to submit admissible evidence or testify at trial to resolve this issue and determine whether they have no TCPA claim under the 2019 FCC Ruling. "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001). Plaintiffs' inability to establish through common proof how class members received faxes

1    during the class period necessitates decertification based on lack of predominance and superiority.

2    *See Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil Inc.*, No. 14 C 2032, 2018 WL

3    3659349, at *2 (N.D. Ill. Aug. 2, 2018) ("When a party moves to decertify a class, 'the party

4    seeking class certification bears the burden of producing a record demonstrating the continued

5    propriety of maintaining the class action.'" (citation omitted)).

6           Neither this Court nor the Ninth Circuit had the opportunity to consider the

7    December 2019 FCC Ruling when they considered Plaintiffs' prior class certification motions.

8    The 2019 FCC Ruling narrowed the scope of the TCPA, changed the legal landscape, and now

9    requires further individualized inquiries regarding whether class members received the faxes at

10   issue through efaxing or an analog fax machine.  *See O'Connor*, 197 F.R.D. at 410.  The

11   individualized inquiries necessary to answer that question predominate and overwhelm any

12   common questions, and require the Court to now decertify the class.

**B.    The Nowlis Surveys, in Combination with Other Evidence of Consent, Show that Individualized Inquiries into Consent Requires Decertification.**

15          As this Court previously recognized, "[i]f providing the number via the EULA or the

16   production registration is consent, the case is over because the individual plaintiff doesn't have a

17   claim."  (Cheung Decl., Ex. N (February 28, 2019 Hearing Tr.) at 7:19-22.)  And as this Court is

18   aware, liability under the TCPA only attaches for "unsolicited advertisements" sent without the

19   fax recipient's "prior express invitation or permission."  47 U.S.C. § 227(a)(5).  For example,

20   any customer who understood the EULA to convey her or his consent to receive faxed

21   advertisements or faxed offers from MTI would have no TCPA claim.  Recent surveys conducted

22   by Dr. Nowlis establish that "there is significant variability in the ways that users interpret the

23   EULA."  (Cheung Decl., Ex. R (Nowlis Report) ¶¶ 11-12.)  This variability includes a significant

24   percentage of respondents, similarly situated to class members, who believed that by agreeing to

25   the EULA, they consented to receive faxed advertisements or faxed offers about the latest

26   versions of the software they just purchased or related products.  (*Id.*)  This variability shows that

27   current class members must individually testify regarding their understanding of the EULA to

28   confirm  whether they understood they had consented to receiving the faxes at issue.  The

1    individualized analysis required to identify uninjured class members based on their reading of the

2    EULA defies class treatment and requires decertification.

3         Plaintiffs bear the burden to maintain class certification under Rule 23, and Defendants

4    "do[] not need to *prove* consent to decertify the class." *Johnson*, 2018 WL 835339, at *4

5    (emphasis added).  All Defendants must show to warrant decertification is to "show that proving

6    consent requires individualized analysis such that the class does not meet the predominance

7    requirement."  *Id.* at *3-4 (decertifying class because the defendant demonstrated the need for "an

8    individual consent inquiry for a significant percentage of the class (perhaps between 20 to 25%,

9    maybe more)").  Other courts evaluating the propriety of class certification have found that

10   percentages of as little as 12.7% and 8% of uninjured class members, coupled with individualized

11   inquiries required to identify them, are enough to deny class certification.  *In re Rail Freight Fuel*

12   *Surcharge Antitrust Litig. - MDL No. 1869*, 934 F.3d 619, 624 (D.C. Cir. 2019) (affirming denial

13   of class certification because the need for individualized inquires "precluded a finding of

14   predominance"); *In re Intuniv Antitrust Litig.*, No. 1:16-cv-12396-ADB, 2019 WL 3947262, at *8

15   (D. Mass. Aug. 21, 2019) (denying class certification because uninjured consumers "likely

16   comprise at least 8% of each putative class" and identifying them "with any degree of confidence

17   would require an assessment of individual-specific facts"), *reconsideration denied sub nom. In re*

18   *Intuniv Antitrust Litig. (Indirect Purchasers)*, No. 1:16-cv-12396-ADB, 2019 WL 5789837 (D.

19   Mass. Nov. 6, 2019).

20        Here, as in *Johnson*, the Nowlis surveys demonstrate the need for "an individual consent

21   inquiry for a significant percentage of the class."  2018 WL 835339, at *3.  Even divorced from

22   the product registration form and the context of ongoing communications with MTI sales

23   representatives, ***25%*** of the Faxed Advertisements Survey respondents understood that by

24   agreeing to the EULA, they consented to receive ***faxed advertisements*** from MTI about the latest

25   versions of the software and related products.  (Cheung Decl., Ex. R (Nowlis Report ¶¶ 11, 38.)

26   Likewise, ***33%*** of the Faxed Offers Survey respondents understood that by entering into the

27   EULA, they consented to receive ***faxed offers*** from MTI about the latest versions of the software

28   and related products.  (*Id.* ¶¶ 12, 39.)  If those percentages were applied to the class, then faxes

1   sent to 2,374 to 3,134 class members could not have been "unsolicited" because the recipients

2   gave prior express permission by agreeing to the EULA (9,499 x .25 = 2,374.75; 9,400 x .33 =

3   3,134.67), and 25%-33% of the class is likely uninjured.

4          Defendants would expect an even *greater* number of class members to have understood

5   their agreement to the EULA to constitute consent to receive faxed advertisements or offers,

6   as compared to the survey respondents, because of the surrounding context that Dr. Nowlis could

7   not capture in his surveys.  Notably, focusing on the EULA language alone—even without the

8   context of viewing the registration form in which class members voluntarily entered their fax

9   numbers—still yielded a significant percentage of respondents who interpreted the EULA as

10  indicating their consent to receive faxed advertisements or offers.  (*See* Cheung Decl., Ex. R

11  (Nowlis Report) ¶ 7 ("Class members also completed a registration form in the process of

12  agreeing to the EULA.  The focus of my surveys was on the EULA and how respondents

13  understood certain language in the EULA."); Ex. W (Toney Decl.) ¶ 2 ("In connection with

14  registering their products, customers could choose to provide their fax numbers *at their option*.")

15  (emphasis added).)  Moreover, Defendants reasonably believed that many, if not all, class

16  members had given MTI prior express permission send them the faxes at issue through various

17  methods of consent, including but not limited to, by agreeing to the EULA.  For example, MTI

18  believed that it had obtained customers' prior consent to send promotional faxes based on the

19  additional context that (1) all customers voluntarily provided fax numbers during the product

20  registration process, and (2) numerous customers gave additional consent through their frequent

21  oral or written communications and ongoing relationships with their account representatives.[7]

22  (Cheung Decl., Ex. KK (Def. Fourth Supplemental Response to Interrogatory Regarding Prior

23  Express Invitation or Permission on November 12, 2019); Exs. LL-PP at RS-TRUEHEALTH

24  004557, 001163, 001339, 001644-45, 004558-73; Ex. S (Peterson Depo.) at 41:2-42:7, 51:22-

25

26  [7] As more fully discussed in Defendants' Opposition to Plaintiffs' Renewed Motion for Class
    Certification (ECF No. 302) and Defendants' Motion for Summary Judgment (ECF No. 325), the
27  record contains numerous documents that demonstrates that class members, including
    McLaughlin, often voluntarily provided their fax numbers to MTI and requested information
28  regarding the products identified in the faxes at issue.

52:4, 85:10-12, 91:13-94:14, 103:25-104:19, 108:14-24, 111:12-114:10; Ex. T (Exhibit 16 from Peterson Depo.); Ex. U (Exhibit 18 from Peterson Depo.); Ex. V (Exhibit 20 from Peterson Depo.) at Franya Peterson, D.C. 0014; Ex. QQ (McLaughlin Rule 30(b)(6) Depo.) at 127:19-129:1; Paul Decl. ¶¶ 5-8, 10; Denning Decl. ¶¶ 3-4.)

At a minimum, the Nowlis surveys demonstrate that "there is significant variability in the ways that users interpret the EULA" (Cheung Decl., Ex. R (Nowlis Report) ¶¶ 11-12), and therefore "show that proving consent requires individualized analysis such that the class does not meet the predominance requirement." *Johnson,* 2018 WL 835339, at *4; *see also True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2743 (2019) ("Defenses that must be litigated on an individual basis can defeat class certification.").  The Nowlis surveys, especially in combination with the additional evidence of consent in the record, clearly show that consent based on the EULA cannot be determined through common proof on a class-wide basis.  Instead, individual inquiries of each of the 9,499 class members are necessary to determine whether each individual class member understood that agreeing to the EULA meant consenting to receive promotional faxes from MTI. (*See* Cheung Decl., Ex. M (September 24, 2019 Hearing Tr.) at 21:7-9 ("Their defense is there was consent, and the person who can say there was consent is the person who gave consent.").)

In sum, because the Nowlis surveys demonstrate significant variability in how individuals understood the EULA—with the other evidence of consent in the record—individualized analyses of each class member's subjective understanding of the EULA and consent to the faxes warrants decertification. *Johnson*, 2018 WL 835339, at *4.

1

**VII.     CONCLUSION**

2          For the above reasons, Defendants respectfully request that the Court decertify the class.

3

4    Dated: March 5, 2020                    MORRISON & FOERSTER LLP

5

6                                            By:    _/s/ Tiffany Cheung_
                                                    TIFFANY CHEUNG
7
                                             Attorneys for Defendants
8                                            MCKESSON TECHNOLOGIES INC.,
                                             AND MCKESSON CORPORATION
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28