TIFFANY CHEUNG (CA SBN 211497)
TCheung@mofo.com
BONNIE LAU (CA SBN 246188)
BLau@mofo.com
ANGELA E. KLEINE (CA SBN 255643)
AKleine@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

ERIN P. LUPFER (CA SBN 317994)
ELupfer@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendants
MCKESSON TECHNOLOGIES, INC. and
MCKESSON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TRUE HEALTH CHIROPRACTIC INC., and MCLAUGHLIN CHIROPRACTIC ASSOCIATES, INC., individually and as the representatives of a class of similarly-situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>MCKESSON CORPORATION, MCKESSON TECHNOLOGIES, INC., and DOES 1-10,<br><br>Defendants. | Case No.   4:13-cv-02219-HSG (DMR)<br><br>**DECLARATION OF TIFFANY CHEUNG IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY THE CLASS AND MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR TREBLE DAMAGES**<br><br>The Hon. Judge Haywood S. Gilliam, Jr.<br><br>Date Action Filed:  May 15, 2013 |

CHEUNG DECLARATION ISO MOTION TO DECERTIFY CLASS AND MOTION FOR SUMMARY JUDGMENT
Case No. 4:13-cv-02219-HSG (DMR)
sf-4195538

1

1    I, TIFFANY CHEUNG, declare as follows:

2    1.    I am an attorney admitted to practice in the State of California and before this

3    Court, and I am a partner of the law firm of Morrison & Foerster LLP, counsel of record for

4    Defendants McKesson Technologies Inc. ("MTI") and McKesson Corporation (collectively,

5    "Defendants"). I make this declaration in support of Defendants' Motion to Decertify the Class

6    and Motion for Summary Judgment on Plaintiffs' Claim for Treble Damages. I have personal

7    knowledge of the facts set forth below and, if called as a witness, could testify competently about

8    them.

9    2.    Attached as **Exhibit A** is a true and correct copy of a spreadsheet produced by

10   Defendants as RS-TRUEHEALTH 004588, which includes notes about communications with

11   customers and potential customers. The cited information can be found in Rows 958, 974, 983,

12   4101, 4147, and 4162.

13   3.    Attached as **Exhibit B** is a true and correct copy of a spreadsheet produced by

14   Defendants as RS-TRUEHEALTH 004590, which includes notes about communications with

15   customers and potential customers. The cited information can be found in Row 13896.

16   4.    Attached as **Exhibit C** is a true and correct copy of a "Reference Site Survey

17   Cocument" produced by Defendants as RS-TRUEHEALTH 004639. The cited information can

18   be found in Row 84.

19   5.    Attached as **Exhibit D** is a true and correct copy of a "Reference Site Survey

20   Document" produced by Defendants as RS-TRUEHEALTH 004640. The cited information can

21   be found in Rows 28-32, 84-85.

22   6.    Attached as **Exhibit E** is a true and correct copy of a "Reference Site Survey

23   Document" produced by Defendants as RS-TRUEHEALTH 004641. The cited information can

24   be found in Row 84.

25   7.    Attached as **Exhibit F** is a true and correct copy of a spreadsheet produced by

26   Defendants as RS-TRUEHEALTH 004657, which includes notes about communications with

27   customers. The cited information can be found in Rows 13862, 13942, and 14014.

28

CHEUNG DECLARATION ISO MOTION TO DECERTIFY CLASS AND MOTION FOR SUMMARY JUDGMENT
Case No. 4:13-cv-02219-HSG (DMR)
sf-4195538

2

8.      Attached as **Exhibit G** is a true and correct copy of a spreadsheet produced by Defendants as RS-TRUEHEALTH 004693, which includes notes about communications with customers. The cited information can be found in Rows 397, 400, and 1350.

9.      Attached as **Exhibit H** is a true and correct copy of a spreadsheet produced by Defendants as RS-TRUEHEALTH 004694, which includes notes about communications with customers. The cited information can be found in Rows 373 and 1179.

10.     Attached as **Exhibit I** is a true and correct copy of a spreadsheet produced by Defendants as RS-TRUEHEALTH 004709, which includes notes about communications with customers. The cited information can be found in Row 13825.

11.     Attached as **Exhibit J** is a true and correct copy of a spreadsheet produced by Defendants as RS-TRUEHEALTH 004712, which includes notes about communications with customers. The cited information can be found in Row 2225 of the second tab.

12.     Attached as **Exhibit K** is a true and correct copy of a fax log produced by Defendants as RS-TRUEHEALTH 000404.

13.     Plaintiffs took the deposition of Kari Holloway, a former employee at Physician Practice Solutions ("PPS"), a business unit of MTI, on April 28, 2015.  Attached as **Exhibit L** are true and correct copies of excerpts from Ms. Holloway's deposition transcript.

14.     Attached as **Exhibit M** is a true and correct copy of an excerpt from the transcript of the September 24, 2019 hearing before the Honorable Haywood S. Gilliam, Jr. in the present matter.

15.     Attached as **Exhibit N** is a true and correct copy of an excerpt from the transcript of the February 28, 2019 hearing before the Honorable Haywood S. Gilliam, Jr. in the present matter.

16.     Attached as **Exhibit O** is a true and correct copy of Defendants' Updated Expert Report of Ken Sponsler, dated February 6, 2020.

17.     Attached as **Exhibit P** is a true and correct copy of a criminal judgment in *United States of America v. Jeffrey R. Shope,* Case No. 2:15-cr-00189, in the Southern District of Ohio, dated February 8, 2016.

CHEUNG DECLARATION ISO MOTION TO DECERTIFY CLASS AND MOTION FOR SUMMARY JUDGMENT
Case No. 4:13-cv-02219-HSG (DMR)
sf-4195538

3

18.    Attached as **Exhibit Q** is a true and correct copy of a charging document filed in *United States of America v. Jeffrey R. Shope,* Case No. 2:15-cr-00189, in the Southern District of Ohio, dated August 12, 2015.

19.    Attached as **Exhibit R** is a true and correct copy of Defendants' Expert Report of Stephen M. Nowlis, Ph.D., dated February 7, 2020.

20.    Defendants took the deposition of Dr. Franya Peterson, a chiropractor at McLaughlin Chiropractic Associates, Inc., on February 24, 2015. Attached as **Exhibit S** are true and correct copies of excerpts from Dr. Peterson's deposition transcript.

21.    Attached as **Exhibit T** is a true and correct copy of a document marked as deposition exhibit No. 16 at Dr. Peterson's February 24, 2015 deposition.

22.    Attached as **Exhibit U** is a is a is a true and correct copy of a document marked as deposition exhibit No. 18 at Dr. Peterson's Feburary 24, 2015 deposition.

23.    Attached as **Exhibit V** is a true and correct copy of a document marked as deposition exhibit No. 20 at Dr. Peterson's February 24, 2015 deposition.

24.    Attached as **Exhibit W** is a true and correct copy of the Declaration of Scott Toney in Support of Opposition to Renewed Motion for Class Certification, previously filed by Defendants on January 9, 2019 (ECF No. 303).

25.    Attached as **Exhibit X** is a true and correct copy of a document produced by Defendants as RS-TRUEHEALTH 004615-004616.

26.    Attached as **Exhibit Y** is a true and correct copy of a document produced by Defendants as RS-TRUEHEALTH 004618, 004621.

27.    Attached as **Exhibit Z** is a true and correct copy of a document produced by Defendants as RS-TRUEHEALTH 004671-004672.

28.    Attached as **Exhibit AA** is a true and correct copy of a document produced by Defendants as RS-TRUEHEALTH 004681, 004684.

29.    Attached as **Exhibit BB** is a true and correct copy of a document produced by Defendants as RS-TRUEHEALTH 004591.

CHEUNG DECLARATION ISO MOTION TO DECERTIFY CLASS AND MOTION FOR SUMMARY JUDGMENT
Case No. 4:13-cv-02219-HSG (DMR)
sf-4195538

4

30.     Attached as **Exhibit CC** is a true and correct copy of a document produced by Defendants as RS-TRUEHEALTH 004659, 004668.

31.     Attached as **Exhibit DD** is a true and correct copy of an email, with certain personal identifying or confidential information redacted, produced by Defendants as RS-TRUEHEALTH 004608.

32.     Attached as **Exhibit EE** is a true and correct copy of an email, with certain personal identifying information redacted, produced by Defendants as RS-TRUEHEALTH 004016-004017.

33.     Attached as **Exhibit FF** is a true and correct copy of a document, with certain personal identifying information redacted, produced by Defendants as RS-TRUEHEALTH 004653.

34.     Attached as **Exhibit GG** is a true and correct copy of an email produced by Defendants as RS-TRUEHEALTH 004607.

35.     Attached as **Exhibit HH** is a true and correct copy of a document, with certain personal identifying information redacted, produced by Defendants as RS-TRUEHEALTH 004610-004613.

36.     Attached as **Exhibit II** is a true and correct copy of a document, with certain personal identifying information redacted, produced by Defendants as RS-TRUEHEALTH 004643-004647.

37.     Attached as **Exhibit JJ** is a true and correct copy of a document, with certain personal identifying information redacted, produced by Defendants as RS-TRUEHEALTH 004648-004652.

38.     Defendants served their Fourth Supplemental Response to Interrogatory Regarding Prior Express Invitation or Permission on November 12, 2019.  Attached as **Exhibit KK** is a true and correct copy this interrogatory response without exhibits.  By publicly filing the interrogatory response, Defendants do not waive their confidentiality designations for the exhibits to the interrogatory responses not being filed with this declaration.

CHEUNG DECLARATION ISO MOTION TO DECERTIFY CLASS AND MOTION FOR SUMMARY JUDGMENT
Case No. 4:13-cv-02219-HSG (DMR)
sf-4195538

5

39. Attached as **Exhibit LL** is a true and correct copy of a document, with certain personal identifying or confidential information redacted, produced by Defendants as RS-TRUEHEALTH 004557.

40. Attached as **Exhibit MM** is a true and correct copy of an email, with certain personal identifying information redacted, produced by Defendants as RS-TRUEHEALTH 001163.

41. Attached as **Exhibit NN** is a true and correct copy of an email, with certain personal identifying information redacted, produced by Defendants as RS-TRUEHEALTH 001339.

42. Attached as **Exhibit OO** is a true and correct copy of an email, with certain personal identifying information redacted, produced by Defendants as RS-TRUEHEALTH 001644-001645.

43. Attached as **Exhibit PP** is a true and correct copy of emails, with certain personal identifying information redacted, produced by Defendants as RS-TRUEHEALTH 004558-004573.

44. Defendants took the deposition of McLaughlin's Rule 30(b)(6) designee, Dr. Wesley McLaughlin, on April 8, 2015. Attached as **Exhibit QQ** are true and correct copies of excerpts from Dr. McLaughlin's deposition transcript.

45. Plaintiffs took the deposition of Dawn Taylor, a former employee of PPS, on May 8, 2014. Attached as **Exhibit RR** are true and correct copies of excerpts from Ms. Taylor's deposition transcript.

46. Plaintiffs took the deposition of David Faupel, a former employee of PPS, on March 31, 2015. Attached as **Exhibit SS** are true and correct copies of excerpts from Mr. Faupel's deposition transcript.

47. Plaintiffs took the deposition of Holly Wilson, a former employee of PPS, on April 10, 2015. Attached as **Exhibit TT** are true and correct copies of excerpts from Ms. Wilson's deposition transcript.

CHEUNG DECLARATION ISO MOTION TO DECERTIFY CLASS AND MOTION FOR SUMMARY JUDGMENT
Case No. 4:13-cv-02219-HSG (DMR)
sf-4195538

6

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3    Executed this 5th day of March, 2020, at San Francisco, California.

4

5

6                                         */s/ Tiffany Cheung*
                                          TIFFANY CHEUNG

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TIFFANY CHEUNG (CA SBN 211497)
TCheung@mofo.com
BONNIE LAU (CA SBN 246188)
BLau@mofo.com
ANGELA E. KLEINE (CA SBN 255643)
AKleine@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

ERIN P. LUPFER (CA SBN 317994)
ELupfer@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendants
MCKESSON TECHNOLOGIES INC. and
MCKESSON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TRUE HEALTH CHIROPRACTIC, INC., and MCLAUGHLIN CHIROPRACTIC ASSOCIATES, INC., individually and as the representatives of a class of similarly-situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>MCKESSON CORPORATION, MCKESSON TECHNOLOGIES INC., and DOES 1-10,<br><br>Defendants. | Case No. 4:13-cv-02219-HSG (DMR)<br><br>**EXHIBITS A-K: THUMB DRIVE**<br><br>**FILED UNDER SEAL**<br><br>Judge:  Honorable Haywood S. Gilliam, Jr.<br><br>Date Action Filed:  May 15, 2013 |

**MANUAL FILING NOTIFICATION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MANUAL FILING NOTIFICATION**

Regarding:  EXHIBITS A-K to the DECLARATION OF TIFFANY CHEUNG.

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's

office.

If you are a participant on this case, this filing will be served in hard-copy shortly.

For information on retrieving this filing directly from the court, please see the court's main

website at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).


This filing was not efiled for the following reason(s):

__ Voluminous Document (PDF file size larger than efiling system allowances)

__ Unable to Scan Documents

__ Physical Object (description): _____

X_ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

X_ Item Under Seal

__ Conformance with the Judicial Conference Privacy Policy (General Order 53).

__ Other (description): _____


 Dated: March 5, 2020                    MORRISON & FOERSTER LLP


                                         By:  ___/s/ Tiffany Cheung_____
                                              TIFFANY CHEUNG

                                         Attorneys for Defendants
                                         MCKESSON TECHNOLOGIES, INC.,
                                         and MCKESSON CORPORATION

# Exhibits A-K

SUBMITTED UNDER SEAL

Exhibit L

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN OF CALIFORNIA

TRUE HEALTH CHIROPRACTIC,
INC., and MCLAUGHLIN
CHIROPRACTIC ASSOCIATES,
INC., individually and as
the representatives of a
class of
similarly-situated persons

      Plaintiffs,

                                CIVIL ACTION FILE
vs.                              NO. 3:13-CV-002219

MCKESSON CORPORATIONS,
MCKESSON TECHNOLOGIES,
INC., and JOHN DOES 1-10,

      Defendants.

DEPOSITION OF KARI HOLLOWAY

April 28, 2015

Tiffany Alley Global Reporting and Video

11539 Park Woods Circle

Alpharetta, Georgia

Lisa Brantly, RPR, CCR-2666

.

 1  supervisor when you were hired?

 2       **A.    Jim Roytek.**

 3       Q.    What was Jim Roytek's job title?

 4       **A.    I do not know.**

 5       Q.    Did Jim Roytek work at the Sanctuary

 6  location?

 7       **A.    He did for a time.  I believe he -- he went**

 8  **through the same transition I did from one office to**

 9  **another.**

10       Q.    Do you know what business unit you worked

11  at McKesson?

12       **A.    I worked in PPS.**

13       Q.    What does PPS stand for?

14       **A.    Physician practice solutions.  Although it**

15  **may be slightly different, but that's the gist of**

16  **it.**

17       Q.    Did Jim Roytek also work for PPS?

18       **A.    He did.**

19       Q.    When you -- in March of 2010, when you led

20  the field sales team, was that a part of PPS?

21       **A.    Yes.**

22       Q.    And then when you moved on to corporate

23  strategy, what business was that?

24       **A.    Instead of just being PPS, I was -- I**

25  **worked in the IT division of corporate strategy.**

1      Q.    Did you ever send any faxes using the

2   laptop from your house?

3      **A.    Not that I recall.**

4      Q.    Did you have a telephone line that was

5   connected to the laptop at the Sanctuary location?

6      **A.    No.   I don't recall having a telephone**

7   **line.**

8      Q.    Are you aware of any one else at McKesson

9   that had Slingshot installed on their computer?

10      **A.    I am not aware.**

11      Q.    Are you aware of anyone sending faxes using

12   their laptop using Slingshot Technologies?

13      **A.    I'm not aware.**

14      Q.    All right.   What were your day-to-day

15   activities in leading the inside sales team?

16      **A.    We would have meetings, occasionally,**

17   **talking about upcoming activities within the**

18   **business.   We'd talk about sales strategies.   So**

19   **just your general day-to-day manager-type**

20   **responsibilities.**

21      Q.    Did you meet with the inside sales team or

22   did you just meet with Jim Roytek?

23      **A.    I met with the inside sales team.**

24      Q.    Okay.   When you met with the inside sales

25   team, was there somebody documenting what was

1      Q.    Did PPS promote by direct mail?

2      **A.    It's a possibility, but I don't recall**

3   **specific direct mail campaigns.**

4      Q.    Did PPS promote by fax?

5      **A.    Yes.**

6      Q.    Any other ways in which PPS promoted

7   Medisoft and Lytec?

8      **A.    Telephone calls.**

9      Q.    Are you aware of any employee within the

10  marketing team that sent any faxes promoting

11  Medisoft or Lytec?

12     **A.    I am not aware.**

13     Q.    Other than yourself, are you aware of

14  anyone within the inside sales team sending faxes

15  promoting Medisoft and Lytec?

16     **A.    Yes.**

17         MS. CHEUNG:   Objection, lacks foundation.

18  BY MR. KELLY:

19     Q.    Who else within the inside sales team are

20  you aware?

21     **A.    Generally speaking, our customers would**

22  **request a lot of information via fax.   So whether or**

23  **not they sent it in a bulk communication or a**

24  **one-by-one fax, but yes, we communicated via fax.**

25     Q.    All right.   With respect to bulk

1  communication, did you send faxes using that method?

2      A.   Yes.

3      Q.   Anyone else within the inside sales team

4  that sent faxes in bulk?

5      A.   Not that I'm aware of.

6      Q.   Okay.  How about the marketing department?

7      A.   I'm not aware of what they did.

8      Q.   How did you send the faxes in bulk?

9      A.   Through the company we referenced earlier,

10 Slingshot Technologies.

11     Q.   And when you used Slingshot, did you use a

12 software program that was installed on the computer

13 or did you contact Slingshot to send the faxes?

14     A.   It's my recollection that it was a

15 application service.  I don't believe it was

16 installed in my laptop.  I do not recall if it was a

17 web service or a called service.  I don't have

18 recollection of that.

19     Q.   Would it have been a web portal?

20     A.   Portal is a vague term.

21     Q.   In sending faxes using Slingshot, did you

22 have to key in a login and a password?

23     A.   I don't recall.

24     Q.   Do you recall ever being provided a login

25 ID and password?

1      Q.   Can you take me through the steps that you

2   would need to undertake in order to send faxes using

3   Slingshot?

4      **A.   I will take you through what I recall which**

5   **is you would need a list of who you were sending**

6   **faxes to.  You would somehow need to upload that**

7   **list and then upload whatever it was you wanted to**

8   **send out as a communication.  And that's how the**

9   **process worked.**

10     Q.   All right.  And can you tell me

11  approximately how many times you uploaded a list

12  using Slingshot Technologies?

13     **A.   I don't have a good recollection.**

14     Q.   Do you have any estimate?

15     **A.   No.**

16     Q.   Did you use Slingshot in sending faxes in

17  2009 and 2010?

18     **A.   Yes.**

19     Q.   Was it within the scope of your employment

20  at PPS to use Slingshot to send faxes in bulk

21  promoting Medisoft and Lytec?

22        MS. CHEUNG:  Objection, calls for a legal

23  conclusion, vague, lacks foundation.

24     **A.   I'm not sure I understand the question.**

25  BY MR. KELLY:

1    A.    Not that I'm aware of.

2    Q.    All right.  Was the -- strike that.

3          Did PPS attempt to send faxes to customers

4    using Slingshot?

5    A.    PPS sent faxes to customers using

6    Slingshot, yes.

7    Q.    Did PPS send faxes to non-customers using

8    Slingshot?

9    A.    Not that I'm aware of.

10   Q.    What would be some of the reasons why a

11   particular entity would receive a fax using

12   Slingshot?

13         MS. CHEUNG:  Objection, calls for

14   speculation, vague.

15   A.    A customer might receive a customer

16   communication via fax for a number of reasons;

17   depending upon what their customer situation was,

18   what product they were on, or if there were any

19   business changes they needed to be aware of.  So

20   there could be a number of reasons why they would

21   receive a communication via fax or any other method.

22   Q.    All right.  Did PPS pay Slingshot for

23   sending the faxes?

24   A.    Yes.

25         MS. CHEUNG:  Objection -- sorry, let me

 1              (Plaintiff's Exhibit 15 was marked for

 2      identification.)

 3      BY MR. KELLY:

 4          Q.    I'm going to show you what's been marked as

 5      Exhibit 15.   I'll represent to you that this is a

 6      letter from the Federal Communications Commission,

 7      dated May 9th, 2008, addressed to McKesson

 8      Corporation, formally known as Relay Health

 9      Corporation.   This letter is just a notice regarding

10      a citation relating to sending advertisements by

11      fax.

12              My question to you is, are you familiar

13      with the company named Relay Health Corporation?

14          **A.    Yes.**

15          Q.    Did that company work at the Sanctuary

16      location?

17              MS. CHEUNG:   Objection, calls for

18      speculation, lacks foundation.

19          **A.    I do not know where their entities were**

20      **located.**

21      BY MR. KELLY:

22          Q.    How did you hear of Relay Health

23      Corporation?

24          **A.    Relay Health is a business that's part of**

25      **McKesson.   Just simply being part of McKesson, you**

1    hear of other businesses.

2        Q.    What did Relay Health do?

3        A.    Relay Health, at the time, had a whole host

4    of products and services.  I don't know the

5    specifics of all of them.

6        Q.    Did you ever speak to anyone that worked at

7    Relay Health?

8        A.    During the time I was at PPS, no.  Not --

9    not on a regular or intentional basis.

10       Q.    Do you know who was -- or strike that.

11            Were there Relay Health employees that

12   worked at the Sanctuary location?

13       A.    Yes.

14       Q.    Do you know who was head of the team at

15   Relay Health at the Sanctuary location?

16       A.    During this time frame, I'm not certain.

17       Q.    Had you seen Exhibit 15 while you worked at

18   PPS?

19       A.    No.

20       Q.    Were you made aware that McKesson

21   Corporation or Relay Health had received a FCC

22   violation?

23       A.    No.

24            MS. CHEUNG:  Objection, mischaracterizes

25   the letter.

1    **service or not, I can't answer the question.**

2    BY MR. KELLY:

3        Q.    If some medical group purchased Medisoft or

4    Lytec, do you have any knowledge as to how that

5    medical group information would be included into

6    Salesforce?

7            MS. CHEUNG:   Objection, lacks foundation.

8        **A.    I don't know what that process looked like.**

9    BY MR. KELLY:

10       Q.    Who would be responsible for data entry

11   into Salesforce for either new customers or to

12   modify customer information?

13       **A.    I don't recall.**

14       Q.    Did you use Slingshot to send faxes in

15   2009, 2010?

16       **A.    Yes.**

17       Q.    From the records that we have, the -- it

18   shows that the sending of the faxes stopped in May

19   of 2010.  Do you know why PPS decided to stop

20   sending faxes in May of 2010?

21           MS. CHEUNG:   Objection, lacks foundation.

22       **A.    I do not know.**

23   BY MR. KELLY:

24       Q.    At some point, when you were working at

25   PPS --

True Health vs. McKesson                 Kari Holloway                          04/28/2015

1    the term was used "in bulk"?

2        A.   Yes.

3        Q.   What did you mean by that?

4        A.   My definition of bulk would be sending

5    essentially more than one fax or sending them

6    essentially at the same time.

7        Q.   And when faxes were sent -- when you sent

8    faxes to more than one recipient using Slingshot,

9    were those sent only to customers of PPS?

10       A.   Yes.  It's my understanding that our

11   communications were sent to our existing customers.

12   Our existing customers oftentimes would request us

13   to send faxes specifically.  They would have these

14   communications with our sales team, and we would

15   comply and send them faxes quite frequently.

16       Q.   Now, did you send faxes using Slingshot to

17   those who had invited faxes to be sent to them with

18   promotions?

19       A.   Yes.

20       Q.   How did you know that those faxes were

21   being -- well, how did those fax recipients

22   communicate that to you or those in your group?

23       A.   Again, generally, they would have

24   communications with their sales representative.  The

25   sales representatives had a decent handle on who

1                         CERTIFICATE

2    STATE OF GEORGIA:
     COUNTY OF FULTON:

3
                I hereby certify that the foregoing
4    transcript was taken down, as stated in the caption,
     and the colloquies, questions and answers were
5    reduced to typewriting under my direction; that the
     transcript is a true and correct record of the
6    evidence given upon said proceeding.
                I further certify that I am not a
7    relative or employee or attorney of any party, nor
     am I financially interested in the outcome of this
8    action.
                I have no relationship of interest in
9    this matter which would disqualify me from
     maintaining my obligation of impartiality in
10   compliance with the Code of Professional Ethics.
                I have no direct contract with any
11   party in this action and my compensation is based
     solely on the terms of my agreement with my
12   employer.
                Nothing in the arrangements made for
13   this proceeding impacts my absolute commitment to
     serve all parties as an impartial officer of the
14   court.

15              This the 7th day of May 2015.

16

17

18   *Lisa Brantly*
     _____
19              LISA BRANTLY, CCR-No. 2666

20

21

22

23

24

25

Exhibit M

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Haywood S. Gilliam, Jr., District Judge

4

5   TRUE HEALTH CHIROPRACTIC,      )
    INC., et al.,                  )
6                                  )
              Plaintiffs,          )
7                                  )
    vs.                            )   No. C 13-02219-HSG
8                                  )
    McKESSON CORPORATION, et al., )
9                                  )
              Defendants.          )
10  _____)

11                                 Oakland, California
                                   Tuesday, September 24, 2019
12
    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13            RECORDING  2:16 - 2:43 = 27 MINUTES

14  APPEARANCES:

15  For Plaintiffs:
                               Anderson and Wanca
16                             3701 Algonquin Road
                               Suite 760
17                             Rolling Meadows, Illinois
                                 60008
18                      BY:  ROSS MICHAEL GOOD, ESQ.

19                             Schubert Jonckheer & Kolbe,
                                 LLP
20                             Three Embarcadero Center
                               Suite 1650
21                             San Francisco, California
                                 94111
22                      BY:  DUSTIN L. SCHUBERT, ESQ.

23

24            (APPEARANCES CONTINUED ON NEXT PAGE)

25

*Echo Reporting, Inc.*

21

1        THE COURT:  Why not?

2        MR. GOOD:  Because I don't think it's appropriate

3  to call absent class members as witnesses at the trial

4  when --

5        THE COURT:  Based on what?  They're people who are

6  actually -- those are the people for whom they are advancing

7  their defense.  Their defense is there was consent, and the

8  person who can say there was consent is the person who gave

9  consent.

10        MR. GOOD:  Well, respectfully, they moved for

11  summary judgment claiming they had permission based on the

12  EULAs and everything else, and your Honor denied it.

13        THE COURT:  This is a different issue.

14     What's been a problem, and I think it was poorly

15  explained at the appellate level, is that there are some

16  that are like the EULAs that are blanket based on the paper.

17  And then there are other consent defenses that are something

18  different than that.

19     And I just don't think that -- it's not clear to me

20  even now how this trial is supposed to look, given -- if

21  it's the case that they're presenting those kind of consent

22  defenses.  And I think it's a difficult question as to what

23  would be my basis for excluding that.  How would I keep them

24  from putting that on?

25        MR. GOOD:  Well, I suppose your Honor will decide

24

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3     I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9     I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16     Echo Reporting, Inc., Transcriber

17     Wednesday, October 9, 2019

18

19

20

21

22

23

24

25

# Exhibit N

Pages 1 - 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Gilliam, Judge

TRUE HEALTH CHIROPRACTIC,        )
INC.,                            )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )      **NO. CV 13-02219-HSG**
                                 )
MCKESSON CORPORATION, ET AL.,    )
                                 )
          Defendants.            )
_____  )


                        Oakland, California
                        Thursday, February 28, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    ANDERSON + WANCA
                    370 Algonquin Road - Suite 760
                    Rolling Meadows, IL  60008
               **BY:  ROSS M. GOOD, ESQUIRE**

                    SCHUBERT, JONCKHEER & KOLBE LLP
                    Three Embarcadero Center - Suite 1650
                    San Francisco, CA  94111
               **BY:  WILLEM F. JONCKHEER, ESQUIRE**

For Defendants:

                    MORRISON & FOERSTER LLP
                    425 Market Street
                    San Francisco, CA  94105
               **BY:  TIFFANY CHEUNG, ESQUIRE**
                    **SARAH DAVIS, ESQUIRE**


Reported By:        Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                    Official Reporter

1        And that's true, but what seems obvious to me is that

2    whether it's in this proceeding or in the inevitable motion for

3    decertification that will follow if I were to just say that's

4    the class because the Ninth Circuit said there's predominance

5    for the class, I've got to grapple with this question of what

6    evidence is there that the people in even that class provided

7    consent through some other means, and really that leads to the

8    question of what does it mean?

9        The Ninth Circuit has now told us they resolved the

10   question of whose burden consent defenses are by saying it's

11   the defense's burden and that's established law.  And the

12   question is what does that mean?

13       At trial or at some proceeding prior to trial, it seems to

14   me that if there are these types of people that are identified

15   on -- in the information that's listed at page 21 of the

16   opposition, one way or the other, if that were true, if we

17   could show up with fifty or a hundred or a thousand people on

18   the list -- I don't know what the quantum is -- why wouldn't

19   that be evidence that there's not predominance?

20       And so I take the Ninth Circuit's mandate seriously.  I

21   take it for what it was, but even if I had certified the class,

22   that's obviously always subject to a decertification analysis.

23   And so it's just really unclear to me where we are and how we

24   proceed on this question of consent.

25            **MR. GOOD:**  May I briefly be heard on that, Your Honor?

1  judgment is appropriate, and at that point, these issues should

2  be raised for Your Honor, but we believe we've met all of the

3  requirements necessary under Rule 23 for certification.

4          **THE COURT:**  All right.  But I wouldn't be required to

5  handle the certification question before the summary judgment

6  question.  That's a matter of my discretion; right?

7          **MR. GOOD:**  Not exactly.  There's rules on one-way

8  intervention.  I suppose it's possible the parties could waive

9  that, but there are -- there's a lot of case law about one-way

10 intervention that strongly supports deciding class

11 certification before summary judgment.

12         **THE COURT:**  I don't know about that.  I suppose that's

13 something you could brief in your summary judgment papers, but

14 I don't see any -- I've done it both ways, and certainly if the

15 individual plaintiff doesn't have a claim, then that's

16 dispositive.

17         **MR. GOOD:**  What if we win the claim, though?

18         **THE COURT:**  Then we have to get to the second level of

19 complicated questions.  So that's -- exactly.  If providing the

20 number via the EULA or the product registration is consent, the

21 case is over because the individual plaintiff doesn't have a

22 claim.

23         **MR. GOOD:**  I would agree with that part.

24         **THE COURT:**  So then if I were to say that's not

25 consent -- I'm not here forecasting which way I would come out

1

2

3                        CERTIFICATE OF REPORTER

4            I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Tuesday, March 5, 2019

8

9   *Pamela Batalo Hebel*

10  _____
    Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
    U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit O

TIFFANY CHEUNG (CA SBN 211497)
TCheung@mofo.com
BONNIE LAU (CA SBN 246188)
BLau@mofo.com
ANGELA E. KLEINE (CA SBN 255643)
AKleine@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.6511
Facsimile: 415.268.7522

ERIN P. LUPFER (CA SBN 317994)
ELupfer@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendants
MCKESSON TECHNOLOGIES INC. and
MCKESSON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TRUE HEALTH CHIROPRACTIC, INC., et al., | Case No.   4:13-CV-02219-HSG |
| Plaintiffs, | **DEFENDANTS' UPDATED EXPERT REPORT OF KEN SPONSLER** |
| v. | |
| MCKESSON CORPORATION, et al., | Hon. Haywood S. Gilliam, Jr. |
| Defendants. | |

I, Ken Sponsler, declare as follows:

1.      I am Senior Vice President of CompliancePoint Litigation Services ("CompliancePoint"), a wholly-owned subsidiary of PossibleNOW, Inc., with offices in Duluth, Georgia.

2.      I have been engaged by Morrison & Foerster LLP on behalf of McKesson Corporation and McKesson Technologies Inc. (collectively "McKesson") to re-assess the expert report and opinions of Plaintiff McLaughlin Chiropractic Associates, Inc.'s expert Robert Biggerstaff.

## SUMMARY OF OPINIONS

3.      I have reached the conclusions set forth below based on my re-review of the two Biggerstaff Reports and the materials cited by Mr. Biggerstaff, as well as other case materials made available to me, listed in Exhibit A, in addition to my expertise and experience in the telecommunications industry.  Some of the events that have transpired in the last five years that impact my opinions are a new Federal Communications Commission ("FCC") Declaratory Ruling[1] regarding efaxes adopted in December 2019, new case law, and increased churn across the class due to the passage of time.

4.      A significant percentage of class members likely did not receive the fax through a "telephone facsimile machine" as defined by the TCPA.  Instead, they used an Internet-based or commercial online fax service that converted faxes to a digital image and notified their customers of the receipt by email.  These customers did not receive a fax with a telephone facsimile machine over a regular telephone line.  The Biggerstaff Report does not identify whether any class member received the fax image by a "telephone facsimile machine" versus through an Internet-based fax service.

5.      Since I rendered my opinions in June, July, and August 2015 rebutting Mr. Biggerstaff's two 2015 reports, almost five years have passed.  This passage of time contributes

---

[1] https://docs.fcc.gov/public/attachments/DA-19-1247A1.pdf – accessed January 3, 2020.

1   to the impossibility to reliably identify the class members who received the faxes at issue between

2   2009-2010.

3   　　　　6.　　　Churn of businesses and/or their fax telephone numbers since 2009-2010 is a

4   significant factor in this case.  Churn occurs when businesses, including medical practices,

5   change their fax numbers, often in connection with going out of business, merging with others, or

6   modifying their practice areas.  Faxes received by a business at a specific fax numbers over ten

7   years ago are unlikely to be associated with the same fax number today due to numerous factors

8   described below.

9   　　　　7.　　　Sworn declarations by major U.S. telephone carriers demonstrate the futility of

10   Mr. Biggerstaff's suggestion that Plaintiffs could subpoena historical subscriber records from

11   these carriers.  Notably, it is my understanding that Plaintiffs have not served any subpoenas on

12   these carriers in the five years since Mr. Biggerstaff proposed it.

13   　　　　8.　　　Claims regarding Notice Distribution made by Dorothy Sue Merryman, Sr. Project

14   Manager of Class-Settlements.com, are unverified.

15   　　　　　　　　　　　　　　**FAX BACKGROUND**

16   　　　　9.　　　**What is an efax?**  An efax is a web-based or Internet fax service, also referred to

17   as an online fax, Internet fax, virtual fax, fax to email, digital fax, electronic fax, or vfax.  Efax

18   services convert a traditional facsimile transmission into a digital file (typically PDF or TIFF

19   files), allowing faxes to be received and sent via email or accessed via an online portal maintained

20   by the efax service provider.  It functions like a webmail (Gmail, Hotmail) service for faxes.  The

21   system can integrate with email and other software systems.  Users of efax services can usually

22   designate their old "analog" fax number as their efax number or utilize a new number provided by

23   the efax service provider during account set up.  Companies using efax services can designate

24   certain persons within their organization to send and receive email attachments of .PDF or .GIF

25   images to and from their efax service account.

26   　　　　10.　　　Efax service refers to any system of faxing where faxes travel partially or

27   completely over the Internet, including regular fax machines communicating with the T.38 fax

28   standard.  For example, an efax service can receive a fax from a traditional fax machine, then

UPDATED EXPERT REPORT OF KEN SPONSLER   Case No. 4:13-CV-02219-HSG　　　2

1    convert it to a .PDF or image file and send it via email to recipients designated by customers.

2    Compared with a traditional fax machine, an efax subscriber is not required to maintain

3    equipment, ink/toner, paper, or a landline phone line. The .PDF or image files received as

4    attachments to email may be viewed, deleted, stored, forwarded to others, or printed if needed or

5    desired. No telephone line is "tied up" and there are never busy signals with efaxing. Setting up

6    an efax service is quite easy to do – most of the technology is straightforward. In most cases, all

7    that is needed is an Internet connection, email address, and credit card.[2]

8    11.    The fax "phone number" assigned to an efax service will convert incoming and

9    outgoing faxes to an electronic document that can be managed online via email or through the

10   Web Interface provided by the efax service provider. In other words, no traditional fax machine

11   is needed by the customers of online fax services in order to receive faxes; therefore, no paper or

12   toner is used at all, unless the recipient freely decides to print rather than delete or save fax

13   images on a computer hard drive, thumb drive, or other electronic storage.

## **QUALIFICATIONS**

15   12.    I have over 20 years of operational experience in business-to-business and

16   business-to-consumer global direct marketing compliance matters. I have personally conducted

17   dozens of onsite compliance assessments, gap analyses, and risk assessment studies. I have

18   assessed numerous call center operations on behalf of potential seller-clients as a due diligence

19   measure prior to sellers entering into contractual relationships for services. I have assessed

20   several facsimile campaigns as a component of my compliance reviews. Additionally, my

21   company has performed fax-specific data analyses and historical subscriber/user research.

22   13.    I founded CompliancePoint's consulting practice, which, among other things,

23   provides historical call data compliance analysis and wireless identification services for clients.

24   These services include call data audits in support of compliance monitoring and enforcement

25   efforts. In my role at CompliancePoint, I have served as a court-appointed monitor, as well as an

26   expert witness, to perform historical call record analyses for the purpose of determining

27   ─────────────────

[2] https://faxauthority.com/online-fax/ - accessed January 3, 2020.

28

UPDATED EXPERT REPORT OF KEN SPONSLER   Case No. 4:13-CV-02219-HSG        3

1   compliance with the Telephone Consumer Protection Act ("TCPA").  As a result, I am intimately

2   familiar with the methodologies that must be used to perform call record analysis and analysis of

3   facsimile transmissions.

4         14.    Prior to taking on my role at CompliancePoint, I also served in a critical role at

5   PossibleNOW, CompliancePoint's parent company.  PossibleNOW is an industry leader in

6   telemarketing and telephone communications compliance services.  It not only performs

7   compliance suppression and analysis services for companies engaged in telephone

8   communications, it is also the federal government's contractor responsible for performing

9   hygiene on the NDNCR.

10        15.    During my compliance consultative engagements, I have routinely evaluated and

11   opined upon matters related to faxing, including third-party fax service providers.  Due to this

12   consultative work, I am familiar with the TCPA's fax-related regulations, as well as the myriad of

13   modern-day faxing technology.  I have been retained as an expert witness in approximately

14   twenty-three fax-related cases.

15        16.    Finally, as a member and previous Vice Chairman and member of the Executive

16   Committee of the National Board of Directors for the Professional Association of Customer

17   Engagement ("PACE"), formerly the American Teleservices Association, I interact with hundreds

18   of corporate compliance professionals and companies/providers involved in consumer contact

19   operations.  A copy of my CV is attached hereto as Exhibit B.

20                  **SUMMARY OF EXPERT EXPERIENCE**

21        17.    In the last four years I have been retained to provide deposition testimony as an

22   expert in the following matters:

23       *Bridge v. Credit One Bank*, 2:14-cv-01512 (D.Nev.); *Raffin v. Medicredit*, 2:15-cv-04912

24   (C.D.Cal.); *Keim v. ADF Midatlantic,* 9:12-cv-80577 (S.D.Fla.); *Marcus v. CVS Pharmacy*, 3:15-

25   cv-00259 (D.N.J.); *Tomeo v. Citigroup and CitiMortgage,* 1-13-cv-04046 (N.D.Ill.); *Tillman v.*

26   *Ally Financial*, 2:16-cv-00313 (M.D.Fla.); *Slovin v. Sunrun*, 4:15-cv-05340 (N.D.Cal.); *Gorss*

27   *Motels v. Brigadoon Fitness,* 1:16-cv-00330 (N.D.Ind.); *Larson v. Harman-Management Corp.*

28   *and 3Seventy*, 1:16-cv-00219 (E.D.Cal.); *Glasser v. Hilton Grand Vacations Co.*, 8:16-cv-00952

(M.D.Fla.); *Gorss Motels v. Otis Elevator Co.*, 3:16-cv-01781 (D.Conn.); *Bakov v. CWT,* 1:15-cv-02980 consolidated with 1:17-cv-00973 (N.D.Ill.); *Gorss Motels v. AT&T*, 3:17-cv-00403 (D.Conn.); *Knapper v. Cox Communications*, 2:17-cv-00913 (D.Ariz.); *Bennett v. GoDaddy.com*, 16-cv-03908 (D.Ariz.); *Sliwa v. Bright House Networks*, 2:16-cv-00235 (M.D.Fla.); *Gorss Motels v. Sprint*, 3:17-cv-00546 (D.Conn.); *Gorss Motels v. Lands' End*, 3:17-cv-00010 (D.Conn.); *E&G, Inc. v. Mt. Vernon Mills*, 6:17-cv-00318 (D.S.C.); *America's Health & Resource Ctr. & Affiliated Health Grp. v. Alcon*, 1:16-cv-04539 (N.D.Ill.); *Hunter v. Time Warner Cable*, 1:15-cv-06445 (S.D.N.Y.); *Morgan v. Orlando Health, Inc. et al.*, 6:17-cv-01972 (M.D.Fla.); *San Pedro-Salcedo v. The Häagen-Dazs Shoppe Company*, 5:17-cv-03504 (N.D.Cal.); *Grigorian v. FCA US*, 1:18-cv-24364 (S.D.Fla.); *Morgan v. Adventist Health System/Sunbelt, Inc.*, 6:18-cv-01342 (M.D.Fla.); *Kawa Orthodontics v. LabCorp*, 9:19-cv-80521 (S.D.Fla.); and *Clark v. FDS Bank et al*., 6:17-cv-00692 (M.D.Fla.).

I have qualified as an expert in Federal District Court and provided trial testimony in the matters of *United States of America v. DISH Network*, No. 3:09-cv-03070 (C.D.Ill.), and *ADT Security Services Inc. v. Security One International*, No. 11-cv-05149 (N.D.Cal.).

## MATERIALS REVIEWED AND RELIED UPON

18. In preparing this report and rendering my opinions in this case, I reviewed various documents made available to me by McKesson's counsel that were produced in this matter, as well as the materials considered by Mr. Biggerstaff. My opinions and conclusions are relevant to the class period in this matter: September 2, 2009, to May 11, 2010. A list of all documents I relied upon for this report is attached as Exhibit A. I also relied upon my knowledge of fax transmission systems, fax detail records, as well as operational matters related to TCPA, as amended by the Junk Fax Prevention Act ("JFPA") and the Federal Communications Commission's ("FCC") Declaratory Ruling DA19-1247 In the Matter of Amerifactors Financial Group, LLC Petition for Expedited Declaratory Ruling, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 0278, Junk Fax Protection Act of 2005, CG Docket No. 05-338, adopted and released December 9, 2019. I performed research, as noted, on various fax delivery and receipt mechanisms in common use as well as the evolution of

the technology.  My opinions are also formed by my experience with historical telephone number compliance audits and reviews of consumer contact operations including fax campaigns.  I stay current with industry developments—both in terms of technology and compliance—and this knowledge has also informed my opinions.

## OPINIONS

19.     Mr. Biggerstaff erroneously assumed that the class members – the recipients of the faxes – are identified in the documents produced in this case.  That is not the case.  The individuals and entities identified in the fax transmission logs are simply the customers separately associated with the fax numbers in Defendants' customer databases.  The three terms "recipient," "user," and "subscriber" are not synonymous but may overlap.  The term "recipient" could be any person who picked up the fax from the fax machine.  "User" encompasses anyone authorized to use the fax machine, even if they are not the owner, subscriber, or person who picked up the fax at issue.  The term "subscriber" is more limited and means the account holder (i.e., the person or business billed by the telecommunications provider for use of the fax number).  In 2015, I opined, "*In paragraph 11 of Mr. Biggerstaff's 2nd Report, Mr. Biggerstaff's assertion that 'in practice, the current subscriber is the same as the person who used the number 5 years ago in 2010 for the majority of the 11,979 phone numbers at issue' is completely baseless, and he offers no evidence to support this opinion.  Additionally, any number of employees, including administrative personnel, could have used these fax machines five years ago without necessarily being the account holder.  The subscriber may have authorized numerous individuals to give out the fax number and receive faxes at that number.  Authorized users of fax services and fax machines may also be much more transient than subscribers, due to employee turnover and movement within a company.*"  I reaffirm my opinion and emphasize that now, more than five years after my above-referenced report and approximately ten years after the faxes at issue were allegedly sent, it is even more improbable that the same entity that used a particular fax number in 2009/2010 uses that same fax number today, and even more difficult to determine who actually received the fax a decade or so ago.  The original named Plaintiff True Health Chiropractic, Inc., which is now

permanently closed,[3] is a prime example of this movement in the healthcare industry, especially of single and/or small healthcare providers going out of business and/or merging with a large healthcare organization.

**I.      The Proliferation Of Internet-Based Facsimile Technology Presents Major User Identification Issues In This Case That Are Not Addressed By The Plaintiff.**

20.      On December 9, 2019 the FCC issued an order on a petition for declaratory relief filed by Amerifactors Financial Group LLC on July 13, 2017.  The FCC held that:

> **[A]n online fax service** that effectively receives faxes 'sent as email over the Internet' and is not itself 'equipment which has the capacity ... to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper' is not a 'telephone facsimile machine' and thus **falls outside the scope of the statutory prohibition**.[4]

### a.  *History of efax services*

21.      Efax technology is a technological advancement that has completely changed faxing.  The first efax services became available in the early to mid-1990s.[5]  Since then, individuals, businesses, and other organizations have been able to choose from a wide selection of Software-as-a-Service ("SaaS"), Integration-as-a-Service ("IaaS"), Platform-as-a-Service ("PaaS"), and numerous other options that have rapidly been displacing traditional fax machines and the dial-up modem technologies of yesteryear.

22.      There are many efax service or commercial facsimile providers that offer faxing service at cheap prices.  Nearly every efax provider will provide users with a fax phone number

---

[3] https://www.google.com/search?rlz=1C1GCEU_enUS821US821&ei=E7UPXqKtDcTa-gTIw5nADQ&q=True+Health+Chiropractic%2C+Inc.+ohio&oq=True+Health+Chiropractic%2C+Inc.+ohio&gs_l=psy-ab.3...6886.6886..7125...0.0..0.124.361.0j3......0....1..gws-wiz.......33i10.Pfn5pcZAW8c&ved=0ahUKEwjigvLlsujmAhVErZ4KHchhBtgQ4dUDCAs&uact=5 – accessed January 3, 2020.

[4] FCC Dec. 9, 2019, Amerifactors Order at ¶2 (emphasis added). https://docs.fcc.gov/public/attachments/DA-19-1247A1.pdf – accessed January 20, 2020.

[5] http://umich.edu/~archive/mac/misc/documentation/internetfaxingfaq0.7.txt; https://www.fax.com/aboutus.html; https://www.efax.com.au/docs/default-source/PressReleaseDocs/jcom_news_2012_8_8_general.pdf?sfvrsn=820383b5_0

when they join as customers.  The chart below depicts some but certainly not all of the major US Efax Service Providers:

| Internet Fax Provider | Web Address | Founded |
|---|---|---|
| Fax.com | https://www.fax.com/ | 1996 |
| Metrofax | https://www.metrofax.com/home | 1997 |
| RingCentral | https://www.ringcentral.com/fax/features/how-it-works.html | 1997 |
| Vonage | https://www.vonage.com/business/business-cloud/features/paperless-fax/ | 1997 |
| eFax | https://www.efax.com/ | 2000 |
| MyFax | https://www.myfax.com/ | 2004 |
| Nextiva | https://www.nextiva.com/products/online-fax-service.html | 2006 |

Table 1

23.    Since 1996, efax service has been made available to the general public allowing users to send and receive a facsimile via a computer without fax machines.  Since then, it has been possible to fax and receive faxes online, from a computer.

24.    Research shows in 2008, j2 (an efax provider that owns efax brands including eFax, MyFax, Metrofax, and Fax.com) had nearly 11.2 million Direct Inward Dial (DID) phone numbers deployed with more than 900,000 paying subscribers.[6]

25.    By 2010, traditional faxing had largely disappeared, having fallen victim to the same technological and economic processes that had created it.[7]

---

[6] *See* Plunkett Research, Ltd., J2 Global Communications, published 2008, stating in relevant part: "j2 Global Communications, Inc. is an Internet-based global provider of messaging and communications services to individuals and businesses.  The firm's services are marketed primarily under the brand names: jConnect, jBlast, eFax, eFax Corporate, eFax Broadcast, eFax Plus, and eFax Pro.  The Fax Mail division, which represents the majority of the company's revenue."  Plunkett's Companion to the Almanac of American Employers 2008, Mid-Size Firms, Jack W. Plunkett https://books.google.com/books?id=qeZy4K_FolsC&pg=PT378&dq=efax&hl=en&newbks=1&newbks_redir=0&sa=X&ved=2ahUKEwiejaL44PnmAhU-JzQIHYDTD_AQ6AEwAHoECAUQAg#v=onepage&q=efax&f=false – accessed January 10, 2020.

[7] *See* Faxed, The Rise and Fall of the Facsimile Machine, Jonathan Coopersmith (2015) (John Hopkins' University Press).

UPDATED EXPERT REPORT OF KEN SPONSLER    Case No. 4:13-CV-02219-HSG        8

26.    Efaxes are increasing at a rate of 12 percent per year, research shows.  A 2012 market research report on computer-based faxing noted that the computer-based fax market was already $385 million in 2011, and expected to grow to $700 million in 2016, a 12.1% compound annual growth rate ("CAGR").[8, 9]    Another researcher stated that the market for virtual fax services was anticipated to grow at an estimated 15.2 percent CAGR.[10]

### b. Benefits of efaxes

27.    The development away from the traditional fax machine has resulted in many businesses in the marketplace offering non-traditional faxing solutions, including, for example, those listed in Table 1 above.  Many of these commercial facsimile services specifically market to the healthcare market, including entities such as plaintiffs in the instant matter, for example, expressly offering HIPAA-compliant fax services that enable health care professionals ("HCPs") to take advantage of efax solutions while remaining HIPAA compliant.[11]    The privacy implications of efaxes are much improved and therefore appealing to companies large and small. Confidential information, such as Social Security Numbers, salary/wages, HIPAA, HR-related matters, accounting, medical, legal, and business-proprietary information will not need to be printed out on a paper fax that will sit on a tray with open access to anyone who happens to view or even take possession of the content.

28.    Because efaxes offer a layer of security much greater than email, using efax services has increasingly become the standard way for many health practices to send their documents quickly and securely.[12]    There are many variations of equipment and software. Companies, such as Plaintiffs McLaughlin and True Health Chiropractic (when it was still in

---

[8] Compound Annual Growth Rate.

[9] https://www.businesswire.com/news/home/20121120005651/en/Research-Markets-Computer-Based-Fax-Markets---Forecasts#.Us6_zGRDsxg - accessed January 3, 2020.

[10] https://bebusinessed.com/online-fax/impressive-stats-of-online-fax/ - accessed January 3, 2020.

[11] https://enterprise.efax.com/industry/healthcare - accessed January 3, 2020.

[12] Top Ten Reviews has searched and evaluated online fax services since 2006.
https://www.toptenreviews.com/best-online-fax-services – accessed January 13, 2020.

1    business), can use efax services that host all of the equipment and software and require no phone-

2    system integration.  There are online services marketed to small businesses that require only an

3    Internet connection.  In short, the efax industry, the technology it utilizes, and the customer

4    experience have evolved.

5         29.    According to a recently released paper publishing research from International Data

6    Group ("IDC"), 90 percent of fax users have already integrated or are evaluating integrating fax

7    with other technologies or applications like email, or Enterprise Resource Planning ("ERP"),

8    Customer Relationship ("CRM") and Electronic Health Record ("EHR") systems.

9        *c.  Inability to identify which class members received efaxes*

10        30.    Efax and commercial fax-type services make it nearly impossible for a web-based

11   fax platform to determine if faxes were received by an Internet/cloud or "commercial" fax service

12   or traditional premise-based analog fax machine, or how any such faxes might have been

13   received.  As a result, while it is almost certain that some of the class members' fax numbers were

14   assigned to an efax/virtual fax/cloud-based fax number in 2009 or 2010, there is no way to

15   determine which fax numbers were assigned to a fax machine as opposed to an efax service.

16        31.    This is very much in line with the knowledge and experience I have acquired

17   during my many years of working with fax providers.  For example, in *Etter v. Allstate*, Barry

18   Clark, Owner of WestFax,[13] a major efax broadcaster in today's marketplace, testified in July

19   2017 in relevant part:

20          <u>Question</u>: "How do you know those [faxes] are successful?  How do you know
21          that number?  Where did that come from?

22          <u>Answer</u>: It came from the tone from the recipient's fax machine that says that the
            fax was received there; however, there's a significant question now as to what
23          constitutes a received fax.  Many and I previously testified that **60 percent**, even
            **as many as 60 percent**, is my estimation, **of faxes are now received via e-**
24          **mail**."[14]  (Emphasis added.)

25

26   _____

27   [13] *See* Clark, Barry deposition, *Etter v. Allstate*, No. 3:17-cv-00184-WHA (N.D. Cal.), p. 5, 4:5.

     [14] *Id*., p. 33, 24:25 and p. 34, 1:9.

28

    UPDATED EXPERT REPORT OF KEN SPONSLER   Case No. 4:13-CV-02219-HSG        10

32.    The Fax Detail Records ("FDRs") produced relevant to this case do not show which faxes were "sent" to an Internet or email-based facsimile service, and therefore potentially not subject to the TCPA.  Indeed, as Barry Clark acknowledged, ***there is no way to know whether the facsimile was received by a fax service that converts the transmission into an image and sends the image as an email to a recipient associated with the fax number***.[15]

33.    As a result, while it is certain that some class members received efaxes not subject to the TCPA, it is impossible to different such class members from other class members that received faxes through a traditional telephone facsimile machine.

## II.    Telephone Numbers, Including Fax Numbers, Experience Significant Churn Due to Changes in Fax Contact Numbers and Businesses Closing, Merging, or Consolidating.

34.    Churn is relevant in this case in two significant ways.  First, there is business churn.  Businesses, including the medical profession, experience churn when providers close, are merged with other medical entities, or modify practice specialty areas.  Business churn can impact the accuracy of previously listed fax numbers.  A second aspect of churn is when entities, including medical practices, change telephone carriers, fax numbers, cease using a traditional fax machine, and/or convert to an efax service.  In 2009-2010, continuing on to today, fax lines can be changed from analog lines connected to traditional fax machines to virtual fax numbers provided by efax service providers.

35.    In paragraph 12 of Mr. Biggerstaff's 2nd Report, he refers to FCC documents regarding landline reassignment rates or churn.  However, these rates did not then—nor do they now—distinguish residential from business landline churn.  In my experience, business churn, particularly for small businesses, is significantly higher than residential telephone number churn.

36.    Business churn in the health care industry is much higher than typical landline reassignments.  In fact, a 2013 CNN Money article noted that "Chapter 11 bankruptcy filings by physician practices have spiked."[16]  This fact is also supported by a 2014 Forbes article noting

---

[15] Mr. Clark *Etter* deposition, page 34.

[16] http://money.cnn.com/2013/04/08/smallbusiness/doctors-bankruptcy/ - accessed January 6, 2020.

that a "2014 survey of American docs that sampled 20,000 U.S. physicians found that 35% of doctors described themselves as independent, down from 49% in 2012 and 62% in 2008."[17] These facts are indicators that health care professionals of the type associated with this case are likely to have a much higher than average telephone number churn than that reported as the "average" churn in the FCC statistics cited by Mr. Biggerstaff.

37.    In paragraph 13 of Mr. Biggerstaff's 2nd Report he inexplicably states that 24% of telephone numbers would be expected to be reassigned over the 5-year class period and that only 3% of telephone numbers are connected to fax machines.  Research indicates that in 2009 there were approximately 152.87 million landlines active in the U.S.[18]  By 2010 that number dropped to about 149.65 million active landlines in the United States,[19] approximately 10 million of those were business landlines (*see* paragraph 38).  Two years later, in 2012, the number of landlines had dropped by 10.65 million to 139 million.[20]  As of December 2013, the latest date for which the FCC has records, there are 85 million landlines—a number that has suffered a 10 percent decline each year.  As of June 2010, the most recent date for which the FCC has data, over 185 million customers have ported wireless and landline numbers.  (*see* FCC, Numbering Resource Utilization in the United States 33 (Apr. 2013).  https://apps.fcc.gov/edocs_public/attachmatch/DOC-319997A1.pdf, accessed January 13, 2020).  These include over 94 million landline to landline transfers, over 4 million wireline (landline) to wireless transfers, and about 275,000 wireless to landline transfers.[21]  According to Fax Re-Brand, a fax research and statistical source,

---

[17] http://www.forbes.com/sites/scottgottlieb/2014/12/08/washingtons-plan-to-end-private-practice-medicine/ - accessed January 6, 2020.

[18] https://www.nationmaster.com/country-info/stats/Media/Telecoms/Telephone-lines#2009 – accessed January 6, 2020.

[19] http://www.nationmaster.com/country-info/stats/Media/Telecoms/Telephone-lines#2010 – accessed January 6, 2020.

[20] https://www.nationmaster.com/country-info/stats/Media/Telecoms/Telephone-lines#2012 – accessed January 6, 2020.

[21] *See* Brief of Amici Curiae EPIC and Six Consumer Privacy Organizations iso Respondents, *ACA Internat'l v. FCC*, no. 15-1222 (C.D. Cir.), pages 23 and 31, https://epic.org/amicus/tcpa/aca-international/EPIC-Amicus.pdf – accessed January 13, 2020.

1    there were over 18 million fax machines in the United States in 2010.[22]  This equates to about

2    12% of telephone lines connected to fax machines in 2010, rather than 3% as Mr. Biggerstaff

3    suggests.

4        38.    Research shows that in 2010, more than 10 million businesses were using landline

5    (aka fixed line) phones; however, by 2018 that number had fallen by more than one third to just

6    6.4 million.  Thanks to dwindling landline use, experts now predict that traditional telephone

7    systems are about to become a thing of the past.[23]

8        39.    As I stated in my June 15, 2015 report (paragraphs 18-20), business telephone

9    numbers are frequently disconnected and reassigned, meaning that just because a particular

10   carrier shows that a certain telephone number is now assigned to it, does not mean that said

11   number has always been assigned to that carrier.  Mergers, acquisitions, and other industry

12   changes redefined telecoms in recent years and continue to do so.  What this means for this case

13   is that in 2015 it was already extremely difficult to determine which carrier was assigned a

14   particular number on a given day (before we even consider the data retention and disclosure

15   practices of each and every carrier as it pertains to their historical subscribers).  Now, an

16   additional five years later, it is significantly more difficult.

17       40.    CompliancePoint's parent company PossibleNOW, has been selected to perform

18   "hygiene" on the National Do Not Call Registry.  The hygiene process was instituted by the

19   Federal Trade Commission ("FTC") after the Do-Not-Call Improvement Act of 2007 (the "Act")

20   was enacted.  Among other things, the Act eliminated the former expiration policy of telephone

21   numbers on the Registry of five years.  Telephone numbers now remain on the Registry

22   permanently.  However, the Act initiated a "hygiene" process whereby telephone numbers that

23   have been disconnected from the original subscriber and reassigned to a different subscriber are

24   removed from the Registry.  PossibleNOW maintains historical National Directory Assistance

25

26   [22] https://faxrebrand.wordpress.com/2010/06/17/facts-and-statistics-fax-machine-groups/ -
     accessed January 3, 2020.

27   [23] https://markets.businessinsider.com/news/stocks/landlines-predicted-obsolete-by-2020-ultatel-
     explains-what-this-means-for-businesses-1027370976 – accessed January 13, 2020.

28

("NDA") 411 and business listing data, enabling them to perform the hygiene service. The NDA 411 data maintained by PossibleNOW includes daily updates of residential, business, and government telephone lines. This data feed is obtained through Listing Services Solutions Inc. ("LSSi"). LSSiDATA is a Tier 1 supplier of data, compiling residential, business, and government names, addresses and phone numbers directly from (and in partnership with) the vast majority of carriers in North America. Subscribers to this NDA list service, such as PossibleNOW, receive near daily updates (6 days a week) of listing changes to the 411 data.

41. The NDA data source and historical records maintained by PossibleNOW facilitated an analysis of the 11,979 fax numbers identified by Mr. Biggerstaff in 2015 in this case to determine: (1) how many numbers can be associated with a subscriber; and (2) how many numbers have been disconnected from the original subscriber and reassigned to a different subscriber after the last date a fax was purportedly sent to that number. The 2015 analysis of the 11,979 numbers revealed:

| Data Point | Result |
|---|---|
| 11,979 telephone numbers that received faxes were compared to the 411 directory; | 2,644 telephone numbers of the 11,979 telephone numbers that received faxes have Telco history in the 411 directory. |
| 2,644 telephone numbers with Telco History in the 411 directory were queried for first issue date after May 11, 2010; | 1,208 of the 2,644 telephone numbers show a first issue date after May 11, 2010. * |
| 2,644 telephone numbers with Telco History in the 411 directory were queried for re-issue dates after May 11, 2010; | 1,009 of the 2,644 telephone numbers were re-issued after May 11, 2010—579 telephone numbers with initial issue dates prior to May 11, 2010 and 430 telephone numbers with initial issue dates after May 11, 2011. ** |
| 2,644 telephone numbers were queried for active status on June 15, 2015; | 446 of 2,644 telephone numbers are currently active in the 411 directory as a business or residential listing. |

Table 2

* Telco History data consists of Telco Issue Date, Transaction Date, Processing Date, Transaction Code, Business/Residential designator.

** A single telephone number may have multiple Telco Issue Dates. A change in Telco Issue Date indicates a major change in the account—service address, payment information, etc.

42.     The 2015 NDA data revealed that, on average four to five million business numbers were disconnected and reassigned annually.

43.     At the conclusion of our analysis of the data in this case in 2015, we identified 2,644 telephone numbers that purportedly received faxes and we could identify historically in the National Directory Assistance Database (often referred to as the 411 Database), as shown in Table 2 above.

44.     Now that the Class has been certified consisting of 9,499 telephone numbers, we compared the 2,644 telephone numbers that we identified in our 2015 analysis to find how many of those 2,644 numbers existed in the Class.  This maintained the integrity of the analysis by working with numbers that we had a known history on from our previous analysis.  This process produced a list of 2,178 of the previously identified telephone numbers that existed in the Class.

45.     Using these 2,178 records, we replicated our 2015 analysis by querying the 411 database to insure that we had historical information on those records.  As expected, we found historical information for all 2,178 numbers.

46.     We then queried the 411 database for Telephone Company Issue Dates (Telco History Dates) for the 2,178 telephone numbers to identify which numbers had an initial Telco Issue Date after May 11, 2010.  1,004 of the 2,178 telephone numbers have initial Telco Issue Dates after May 11, 2010.  This indicates that these telephone numbers were not issued by the Telco until *after* the date of the end of the class period.  Therefore, they could not have received a fax during the class period.

47.     We then queried the 411 database for any re-issue dates for the entire 2,178 record set for any re-issue activity after May 11, 2010.  We found that 1,705 of the 2,178 records had re-issue indicators after May 11, 2010.  Of those, 785 telephone numbers had initial issue dates prior to May 11, 2010, but had re-issue activity after May 11, 2010.  This indicates that these telephone numbers no longer belong to the class member who owned it prior to May 11, 2010.  920 of the records that had initial issue dates after May 11, 2010, have re-issue activity after their initial issue dates.  This is an indicator of the "churn" that takes place on these particular telephone numbers since the end of the class period.

48.    Finally, we analyzed the 2,178 records for their current status in the 411 database. This analysis is done by identifying the last action taken on the account and finding that the last action is noted as an "I" (Insert as opposed to a "D" for delete).   As of January 23, 2020, we found that 699 of the 2,178 telephone numbers have a current active status in the 411 database. The remaining 1,479 numbers are no longer active landlines.   As a result, they cannot receive faxes, and there is no clear proof that they ever could.   This is another indicator of the "churn" that has occurred in the decade since the end of the class period.

49.    These findings are graphically depicted in Table 3 below.

| Data Point | Result |
|---|---|
| We compared the 2,644 telephone numbers that purportedly received faxes and had Telco history in the 411 directory in our 2015 analysis to the sub class of 9,499 telephone numbers. | 2,178 of the 2,644 telephone numbers that purportedly received faxes are in the proposed sub class. |
| 2,178 telephone numbers in the sub class that purportedly received faxes were compared to the 411 directory. | 2,178 telephone numbers in the sub class that purportedly received faxes have Telco history in the 411 directory. |
| 2,178 telephone number with Telco history in the 411 directory were queried for first issue data after May 11, 2010. | 1,004 of the 2,178 telephone numbers show a first issue date after May 11, 2010. |
| 2,178 telephone numbers in the sub class that purportedly received faxes were queried for re-issue dates after May 11, 2010. | 1,705 of the 2,178 telephone numbers that purportedly received faxes were re issued after May 11, 2010 - 785 telephone numbers with initial issue dates prior to May 11, 2010 and 920 with initial issue dates after May 11, 2010. |
| 2,178 telephone numbers that purportedly received faxes were queried for active status in the 411 directory on January 23, 2020. | 699 of 2,178 are currently active in the 411 directory as a business or residential listing. |

Table 3

50.    Additionally, 40 telephone numbers on the class list are wireless.  Eight of those telephone numbers are on the wireless block, so they have never been fax-lines.  Thirty-two of those telephone numbers are ported wireless, which means that they cannot be fax lines anymore.

1    51.    As a result of churn over the last decade, a significant number of the fax numbers

2    on the class list may no longer belong to class members, and there is no administratively feasible

3    method to identify the actual class members.

4    <u>**REVIEW OF CLASS ADMINISTRATOR'S METHODOLOGIES**</u>

5    52.    In a letter to Counsel dated November 12, 2019, the Notice Administrator

6    describes how the 9,499 fax numbers provided were compared to Class-settlement.com's

7    *proprietary* database of fax numbers and related contact information.  This memo describes at a

8    very high level the steps supposedly taken by Class-settlement.com to identify and provide notice

9    to alleged class members.

10    53.    The Notice Administrator has not described how or if any of the sources or

11    methodologies described that involve the use of third-party reverse look-up or fax ID services

12    have been explained, audited, or verified.  In paragraph (2) the Notice Administrator explains that

13    some unknown reverse look-up process was used to determine "current ownership" of 9,499 fax

14    numbers on the Class List.  However, current owners are not necessarily class members, unless

15    they were "recipients" of the fax(es) in question back in 2009/2010, which is highly unlikely.

16    54.    Finally, the Notice Administrator did not account for efaxes or how the use of efax

17    services may affect class notice.  Efax service providers may offer "virtual" telephone numbers to

18    their customers to use as a fax number.  However, the efax service is paid directly by the

19    customer.  The efax service provider would have the relationship with the telephone service

20    provider rather than the fax recipient.  Therefore, a change of efax customer associated with a fax

21    number through an efax service provider would not necessarily be registered with the telephone

22    service.  On February 5, 2020, I confirmed this fact through a telephone call to eFax Customer

23    Service at 800-878-7151.  The Customer Service Representative confirmed that eFax has an

24    available bank of local, toll free, and international numbers that customers can select from for use

25    as their efax number.  The cost for the efax number is included in the monthly fax plan.  The eFax

26    customer has no relationship with any telephone carrier and pays no additional fees to any carrier

27    for the eFax line.  My experience with other efax service providers shows this same model is

28    often used in the industry.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUBPOENAING OF TELEPHONE CARRIERS**

55.    In paragraph 15 of Mr. Biggerstaff's 2nd Report he states that, according to his research, the top seven U.S. telephone carriers in 2015 were:

| Rating | Carrier | Market Share % per 2015 Biggerstaff Report | Market Share 2009 | Market Share % 2017[24] |
|---|---|---|---|---|
| 1 | AT&T | 39.5 | 39.5 | 40 |
| 2 | Verizon | 24.7 | 24.7 | 1 |
| 3 | CentruyLink [sic] | 9.9 | 9.9 | 2 |
| 4 | Level 3 | 6.5 | 6.5 | 0 (CenturyLink acquired Level 3 in 2017)[25] |
| 5 | Frontier | 4.9 | 4.9 | 3 |
| 6 | Paetec | 3.9 | 3.9 | 0 (Windstream acquired Paetec in 2011)[26] |
| 7 | Fairpoint | 1.7 | 1.7 | 0 (Consolidated Communications acquired Fairpoint in 2017.)[27] |
| 8 | Windstream | | | 1 |

Table 4

56.    I added the results of my research conducted to Table 5 and it is plain to see that the telephone carrier market has changed dramatically in the five years since Mr. Biggerstaff's 2015 report.  (*See* Table 4.)

---

[24] https://www.statista.com/statistics/718484/share-of-landline-subscribers-in-the-us-by-service-provider/ - accessed January 13, 2020.

[25] https://www.prnewswire.com/news-releases/centurylink-completes-acquisition-of-level-3-300547357.html – accessed January 13, 2020.

[26] https://dealbook.nytimes.com/2011/08/01/windstream-to-buy-paetec-for-891-million/ - accessed January 13, 2020.

[27] https://vtdigger.org/2016/12/05/fairpoint-sold-illinois-based-consolidated-communications/ - accessed January 13, 2020.

| Rating | Carrier | Market Share % per 2015 Biggerstaff Report | Market Share 2009 | Market Share % 2017[28] |
|---|---|---|---|---|
| 1 | AT&T | 39.5 | 39.5 | 40 |
| 2 | Verizon FIOS | Not listed | Not listed | 13 |
| 3 | Xfinity/Comcast | Not listed | Not listed | 8 |
| 4 | Charter Spectrum | Not listed | Not listed | 8 |
| 5 | T-Mobile | Not listed | Not listed | 6 |
| 6 | Frontier | 4.9 | 4.9 | 3 |
| 7 | Century Link | 9.9 | 9.9 | 2 |

Table 5

57.    The current top seven landline subscriptions carriers (*see* Table 5) only include three from Mr. Biggerstaff's 2015 list: AT&T (#1), Frontier (#6), and CenturyLink (#7).[29]

58.    Mr. Biggerstaff also opines that the top seven carriers hold over 90 percent of phone numbers. While that information may or may not have been accurate in 2015, it is no longer accurate today. Research shows that now only three of the top seven Mr. Biggerstaff listed five years ago are still in the top seven, and those three add up to 59 percent of the market.

59.    I understand that Plaintiffs have never attempted to subpoena the major carriers as Mr. Biggerstaff had proposed. Even if Plaintiff had done so, however, recent research clearly indicates that, for at least 59 percent of wireline carriers, such subpoenas would not have returned data with the historical subscriber information that Mr. Biggerstaff posited would result. Additionally, my experience reveals that some of these major carriers will only provide consumer call data information for customers who have agreed to the release of the requested information, which would be unlikely and unmanageable for the 9,499 fax numbers at issue in this case.

---

[28] https://www.statista.com/statistics/718484/share-of-landline-subscribers-in-the-us-by-service-provider/ - accessed January 13, 2020.

[29] https://www.thelsa.org/lsa/clec-information.aspx ("With the deregulation of the telephone industry, thousands of Local Exchange Carriers ("LECs") have emerged.") – accessed January21, 2020.

a. *Carrier Retention Policies Do Not Always Cover the Class Period*

60.    In paragraph 15 of Mr. Biggerstaff's 2nd Report, he claims that in his experience, larger carriers maintain historical subscriber information, but he offers no evidence of this.  In my experience, carriers have no incentive to retain volumes of data that relate to former customers.  The legal requirement for carriers is 18 months for landlines; however, my research and experience shows that retention varies from carrier to carrier and by call record type.  For example, AT&T, Verizon, and Verizon FIOS retain subscriber records for landline customers, business and private, for seven years and in some cases up to ten years.  AT&T, Verizon, and Verizon FIOS start purging subscriber records after seven years.[30]  Bill reprints for Sprint's postpaid customers are kept for a period of ten years, but its retention periods are subject to change.

61.    Frontier retains landline subscriber records, business and residential for seven years.  That means that, as of the writing of this report, Frontier records go back no further than January 2013, years after the close of the class period.

62.    CenturyLink's billing systems data generally is retained six years plus current year, however, these guidelines are subject to multiple conditions.[31]  As of the date of this report, the furthest CenturyLink's data can go back is January 2013.

b. *Carriers' Inability to Produce Records In Certain Circumstances*

63.    Verizon sold most of its California landlines to Frontier in April 2016, including all records, including archived.  Frontier purchased landline telephone services from Verizon in the states of Texas and Florida as well.[32]

---

[30] Information provided telephonically by AT&T's Global Legal Demand Center and Verizon's Law Enforcement Resource Team agents respectively, January 22, 2020.

[31] https://www.centurylink.com/aboutus/legal/privacy-policy/law-enforcement-support/law-enforcement-support-faqs-for-third-parties.html – accessed January 23, 2020.

[32] https://go.frontier.com/welcome-verizon and https://www.dallasnews.com/business/2017/06/27/a-year-later-frontier-s-verizon-fios-deal-is-a-textbook-case-of-how-not-to-do-an-acquisition/ - both accessed Januarys 22, 2020.

64.    Frontier's Communications Subpoena Compliance Team ("FCSCT") consists of three (3) people only.  Therefore, they do not have the manpower to process voluminous requests for subscriber records.  Every number for which the FCSCT has a subpoena or a court order to produce records must be entered into their system manually.  There is no automated process, there is no database through which they can just run the numbers.  The FCSCT generally only receives requests regarding one or two telephone numbers.  If the telephone numbers are not Frontier numbers, they return the request because they will only research Frontier numbers.  Once the FCSCT has determined a subpoena request in a civil matter includes Frontier numbers only, they notify all subscribers associated with the telephone numbers and provide a 21-day period for the subscriber to object (for example, file a Motion to Quash), if desired.  If a Motion to Quash is received, Frontier will not produce the record(s).  If they receive no reply, they will produce the records.  If the number was a Frontier number but was ported to another carrier during the last seven years, all their system will show is that as of the porting date, the new carrier is …[33] Frontier's response time is approximately three weeks.

65.    AT&T notifies each subscriber when a subpoena requesting subscriber information is received.  If a party objects to a subpoena on the basis that the subpoena seeks information protected by privacy laws, AT&T typically will not produce that information absent a court order.  AT&T is not able to verify with certainty the identity of a user of a particular number on a particular date or time, nor would it be able to verify with certainty whether a particular subscriber was an actual user of the number(s) at issue.

66.    AT&T does not possess subscriber information after those subscribers have ported their numbers to other carriers.  It is highly likely that historical subscribers to the fax numbers on the class list have ported their number(s) since the past decade since the faxes at issue were sent and, as a result, their subscriber information was lost.

---

[33] Information provided telephonically by a Frontier Communications Subpoena Compliance agent, January 23, 2020.

67.     After June 30, 2017 Sprint discontinued providing wireline services, citing among its reasons that the telecommunication industry is constantly changing and traditional long distance service options are declining.[34]

68.     T-Mobile announced on April 14, 2016 its entry into the landline market by introducing a device that enables Voice over IP ("VoIP") service using existing landlines.[35] Traditional faxes cannot be transmitted via VoIP lines, only efaxes can.

### c.   Subscriber Consent and Other Prohibitions on Disclosure

69.     Verizon must have customer consent to disclose subscriber information in civil matters.

70.     In a civil matter, upon receipt of a subpoena, AT&T notifies every customer associated with the numbers on the subpoena to give the customer the opportunity to file a Motion to Quash.  The amount of time AT&T allows for customers to object depends if the subpoena has a timeline (such as a court date, for example).  AT&T will produce all the records that they found to be AT&T customers UNLESS the customer has filed a formal objection with a court (e.g., a Motion to Quash) and the court ruled that AT&T cannot produce the phone record.

71.     AT&T states in a sworn declaration that before disclosing any subscriber information, AT&T may first need to obtain the consent of the subscriber or provide notice to the subscriber, depending on, among other things, the type of information that is sought and the jurisdiction in which the subscriber is located.  AT&T is, in some states, prohibited by law from directly disclosing the identity of its subscribers without notice, consent and/or a court order.[36]

72.     CenturyLink will release no subscriber information without a subpoena, court order, or other legal demand specifically requesting this information.

---

[34] https://www.sprint.com/en/support/solutions/services/faqs-about-consumer-landline-decommissioning.html – accessed January 6, 2020.

[35] https://www.rcrwireless.com/20160414/carriers/t-mobile-us-offers-service-on-landline-phones-tag4 – accessed January 23, 2020.

[36] Declaration of Lisa Likely, a Director, for AT&T Mobility LLC ("AT&T"), attached as Exhibit C.

73.     One of T-Mobile US, Inc.'s ("T-Mobile") Director, Legal Affairs stated in a sworn declaration that T-Mobile collects certain personal information from subscribers in connection with its postpaid services, such as their name and address, as of the date of account activation. Before disclosing any subscriber information, T-Mobile may first need to obtain the consent of the subscriber or provide notice to the subscriber, depending on, among other things, the type of information that is sought and the jurisdiction in which the subscriber is located.  T-Mobile is, in some states, prohibited by law from directly disclosing the identity of its subscribers without notice, consent and/or a court order.[37]

74.     Before disclosing any subscriber information, U.S. Cellular may first need to obtain the consent of the subscriber or provide notice to the subscriber, depending on, among other things, the type of information that is sought and the jurisdiction in which the subscriber is located.  U.S. Cellular is, in some states, prohibited by law from directly disclosing the identity of its subscribers without notice, consent and/or court order.  If an interested party objects to a subpoena on the basis that the subpoena seeks information protected by privacy laws, U.S. Cellular typically will not produce that information absent a court order.[38]

### d. Cost, Burden, or Inability to Respond to Massive Subpoena Requests

75.     Contrary to the impression Mr. Biggerstaff attempts to create, carriers do not have teams of compliance employees standing by to respond to civil demand subpoenas.  Responding to a subpoena requesting subscriber information for thousands of numbers during a historical timeframe would be burdensome and time consuming for most carriers.

76.     For example, AT&T has cited this burden when facing past subpoenas.[39]  AT&T charges a $45.00 one-time processing fee for each subpoena in addition to $25 per search per

---

[37] Declaration of Patricia Cauldwell, Director, Legal Affairs, for T-Mobile US, Inc. ("T-Mobile"), attached as Exhibit D.

[38] Declaration of George Kamba, Manager of Privacy and Compliance, for U.S. Cellular Corporation ("U.S. Cellular"), attached as Exhibit E.

[39] Declaration of Lisa Likely, Director, for AT&T Mobility LLC ("AT&T"), attached as Exhibit C.

phone number, no matter for how many months or years. In this case, if AT&T were to receive a spreadsheet with 9,499 telephone numbers, they would enter all 9,499 into their system and charge 9,499 * $25 + $45 = **$237,520**.

77.     A Supervisor of Subpoena Compliance for the Sprint Corporation ("Sprint"), declares that costs associated with the production of Sprint subscriber records in response to subpoena in civil litigation is determined by the overall magnitude of the request.[40]   Sprint's Subpoena Manual posted online indicates the minimum cost recovery fee is $50.00.[41]

78.     To provide such large quantities of information constitutes a substantial expense to Verizon.  In a sworn declaration, a Supervisor with the Verizon Security Assistance Team ("VSAT") describes how burdensome the demand for user information is for the carrier.[42] Verizon states it does not currently possess billing statements for 2010 or 2011 because its retention policy provides that it retains billing documents for a period of seven years. Accordingly, for Verizon to produce documents related to a period of 2009-2010, Verizon personnel would need to manually look up potentially thousands of separate billing statements (x accounts times number of billing cycles), review them, manually add them to a spreadsheet, refine that data, and then put the data into a producible format.  Verizon estimates, based on its previous sampling, 480 personnel hours would be required to perform the database queries needed to gather and produce the information in that previous case.  "Verizon cannot avoid this expense by merely shifting employees' responsibilities, **as Verizon does not have personnel simply sitting idle**. All Verizon employees are fully committed."[43]   (Emphasis added.)

---

[40] Affidavit of Calli Keep, Sprint Corporation, Supervisor of Subpoena Compliance, attached as Exhibit F.

[41] https://info.publicintelligence.net/SprintSubpoenaManual.pdf, page 10 – accessed January 6, 2020.

[42] Declaration of Donna Najar, Supervisor with the Verizon Security Assistance Team, executed June 14, 2019, attached as Exhibit G.

[43] Declaration of Donna Najar, Supervisor with the Verizon Security Assistance Team, ¶ 24, executed June 14, 2019, attached as Exhibit G.

79.    Therefore, Verizon would be compelled to hire temporary workers.    Verizon normally charges $75 per hour for subpoena compliance tasks.  Based on Verizon's normal rate and the processes required, Verizon estimated it would incur $36,000 to complete the request of that particular plaintiff.

80.    Yet another example of the burden of the subpoenas Mr. Biggerstaff proposed— yet Plaintiffs never employed—comes from Frontier.  Frontier stated that researching thousands of telephone numbers would be an immense burden for their three-person Subpoena Compliance Team.  Their fee structure is based on the type of request, some requests incur a charge, others do not.  (*See* FN 33.)

81.    CenturyLink bills for "voluminous and burdensome" requests for customer records or other information served on CenturyLink in the form of subpoenas, warrants, court orders, or associated customer consent.    Criteria considered when determining whether a request is voluminous and burdensome include, but are not limited to, the following:

    a.   30 numbers or more requesting subscriber information

    b.   The response to a subpoena amounts to 100 pages or more of print or electronic copy; or

    c.   The subpoena requires three (3) or more hours to process.

Voluminous & burdensome charges may apply to a single subpoena or multiple subpoenas from the same agency associated with the same case or cause number, as determined by CenturyLink.[44]

## CONCLUSIONS

1.    There is a strong likelihood that many of the 9,499 fax numbers on the class list received the faxes at issue via efax.  However, there is no method of which I am aware to identify which class members received efaxes as compared to faxes on a traditional facsimile machine.

---

[44] https://www.centurylink.com/asset/aboutus/downloads/legal/privacy/Law%20Enforcement%20Support%20Fee%20Schedule.pdf – accessed January 23, 2020.

1    2.    Mr. Biggerstaff's Second Report does nothing to change or impact my conclusion

2    in my original rebuttal report.  Mr. Biggerstaff is simply incorrect in his assertions that historical

3    "users" or "subscribers" can be readily and easily ascertained.  There is no administratively

4    feasible way to identify historical fax subscribers.  Mr. Biggerstaff's proposal to subpoena

5    historical records from the leading landline providers would be ineffective and has not been

6    undertaken by Plaintiffs in any event.

7    3.    The Notice Administrator's claims regarding distribution of class notice are

8    unverified and do not shed light on whether class members actually received notice.  Nor did the

9    Notice Administrator take into account how the use of efax services could affect class notice.

10    <u>**COMPENSATION**</u>

11    The hourly rate CompliancePoint receives for my services are attached as Exhibit H.  My

12    compensation is not dependent upon the outcome of this matter.

13    <u>**RESERVATION OF RIGHT TO AMEND**</u>

14    I reserve the right to amend this declaration based on information received after issuance

15    of the same.

16    I declare under penalty of perjury, under the laws of the United States of America, that the

17    foregoing is true and correct.  Executed in Beverly Hills, Florida on this 6th day of February,

18    2020.

19

20

21    By: _____

22    Ken Sponsler

23

24

25

26

27

28

**EXHIBIT A**

**<u>Materials relied upon:</u>**

1. True Health v McKesson Class Admin Letter, dated November 12, 2019.
2. McKesson Class List FINAL, Excel spreadsheet.
3. McKesson Class List with Last Change, Excel spreadsheet.
4. McKesson Notice reports, Excel spreadsheet.
5. McKesson True Health – Exhibit A-Only Class List – 4098117, Excel spreadsheet.

**EXHIBIT B**



<u>Curriculum</u> <u>Vitae</u>

**Kenneth R. Sponsler, CECP, CIPP/US**
CompliancePoint Litigation Services
Office (770) 255-1020
Mobile (770) 363-7149
www.compliancepoint.com
ksponsler@compliancepoint.com

**Current Employment:**

Senior Vice President of CompliancePoint Litigation Services, part of PossibleNOW Services, Inc., a PossibleNOW subsidiary. PossibleNOW is a global professional services firm specializing in consulting and audit services.

**Education:**

120 hours of undergraduate study; 4.0 GPA (no degree conferred) University of Maryland; Troy University; City College of Chicago; Park University.

**Registrations, Licenses, Certifications:**

- Customer Engagement Certified Professional (CECP) by the Professional Association for Customer Engagement (PACE)

- Certified Information Privacy Professional (CIPP/US) by the International Association of Privacy Professionals (IAPP)

- Certified American Teleservices Association Self-Regulatory Organization Auditor (ATASRO)

**Specialized Training:**

- U.S. Army Command Sergeant Major Course; First in Class
- Advanced Non-Commissioned Officers' Course; Distinguished Graduate

**Professional Experience:**

More than 20 years of general consultation practice concerning U.S. federal and state telemarketing operational compliance with a variety of national and global companies. Provides regulatory and operational compliance consulting services for consumer contact operations that include communication channels such as SMSs/text messages, emails, facsimiles, U.S. and international telephone calls for telemarketing, debt collection, and surveys, for example. Ken Sponsler has been designated as an *expert* in U.S. federal district court and provided *expert opinions* in numerous TCPA and TSR-related matters. CompliancePoint specializes in seller and customer-facing compliance, call center operations, compliance assessments, audits, and forensic call and call abandonment data analysis, with a focus on operational

assessments, risk identification, gap analysis, and implementation of compliance policies, procedures and strategies. The consulting practice includes seller/service provider relations, contracting, record keeping, training, monitoring, and enforcement. Ken is PACE member, a former member of the PACE Executive Committee and the PACE National Board of Directors. Ken served as the PACE Vice Chairman of the Board in 2018. Additionally, Ken has provided consulting services to government and military organizations implementing U.S. Army modularity design and organizational changes. A retired U.S. Army Command Sergeant Major, he concluded his career as the Senior Enlisted Leader of the 3rd Infantry Division, leading a 23,400-man elite combat team.

**Publications and Webinars (including CompliancePoint products)**:
- *2016 Compliance Review - 2017 Forecast, Regulatory Updates, Feb 2017*
- *Text Message Compliance Webinar – September 2016*
- *2014 Compliance Review - 2015 Forecast, Regulatory Updates, Feb 2015*
- *2013 Compliance Review - 2014 Forecast, Regulatory Updates, Feb 2014*
- *Strategies For Compliance With New TCPA Requirements, March 2012*
- *Employment Placement Verification, February 2012*
- *2011 Compliance Legislation Review & 2012 Forecast, January 2012*
- *What Impacts Will The TCPA Changes Have On Your Business? Feb 2012*
- *Monthly Compliance Article for customer distribution (2007 – 2014)*

**Awards/Honors**:
- PACE 2019 Searcy Award for Advocacy as recognition for Ken's efforts in Advocating for the Association and the Industry at large
- PACE 2016 Pioneer Award for the Difference Ken's Dedication and Support has made with PACE and the Industry
- PACE 2014 Chairman's Award for Distinguished Leadership and Service to the Industry
- Hewlett Packard Vendor of the Quarter Award (to CompliancePoint), 2007
- 18 separate personal awards by the U.S. Army, incl. the Legion of Merit

**Memberships**:
- *American Teleservices Association* (now PACE)
- *International Association of Privacy Professionals*
  - Consumer Marketing Working Group
- *Direct Marketing Association*
  - Teleservices Committee Member

**Presentations and Colloquies**:
Frequent speaker at industry events, including PACE Annual Convention; Direct Marketing Association Teleservices Conference; College of Information Assurance Professional's Governance; Risk and Compliance Summit; Noble Users' Conference; and Quarterly Compliance Focused Webinar Presentations.

**EXHIBIT C**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANGELA MORGAN,                                    CASE NO. 6:17-cv-01972-CEM-GJK

      Plaintiff,

v.

ORLANDO HEALTH, INC.,
G&G ORGANIZATION, LTD. d/b/a
PFS GROUP and RMB, INC.,

      Defendant.          /

## DECLARATION OF LISA LIKELY

1.      I, Lisa Likely, swear under penalty of perjury and declare as follows:

2.      I am a Director, for AT&T Mobility LLC ("AT&T"), and have been employed by AT&T since June 20, 1994. In my role, managing the daily compliance activities of the GLDC. All statements contained in this declaration are premised on my own personal knowledge of AT&T's systems, policies, practices, and/or AT&T's records maintained in the regular course of its business at or near the time of the event they describe.

3.      AT&T offers services under the AT&T and Cricket brands. The AT&T brand offers pre-paid and post-paid accounts. The Cricket brand offers only pre-paid accounts. Neither brand requires pre-paid customers to provide personal identification information upon activation of a pre-paid account. If personal information happens to be provided upon activation of a pre-paid account, no steps are taken to verify the completeness or accuracy of such information.

4.      Any personal information provided by an AT&T post-paid subscriber is stored and maintained for a maximum of 7 years. Any personal information provided by

[20159857.1]

an AT&T pre-paid subscriber is stored and maintained for 7 Years following termination of the account. Any personal information provided by a Cricket subscriber is stored and maintained for 7 years following termination of the account.

5.     AT&T does not require subscribers of its brands to provide personal information regarding persons who may use a phone number. AT&T will only maintain such information if voluntarily provided by the subscriber. Thus, AT&T is unable to verify with certainty the identity of the user of a subscriber's cellular phone number.

6.     AT&T collects certain personal information from subscribers in connection with its postpaid service, such as their name and address as of the date of account activation. AT&T does not require, and thus typically does not possess, personal information regarding other persons who may also use the subscriber's cellular phone number(s).

7.     A portion of post-paid numbers are assigned to group plans (i.e., plans that include multiple cellular phone numbers that are generally used by persons other than the "subscriber," such as family and business plans).

8.     While subscribers may add a person(s) to their account and authorize that person to make changes to the account, AT&T does not know whether the authorized person actually uses any of the cellular phone numbers on the underlying plan and, if so, which ones. Similarly, subscribers may label a particular number on a group plan with a name, such as "Line A" or "John." AT&T does not have any way to determine what the label means, the person who may be associated with the label, or whether any person whose name matches the label is actually using the cellular phone number.

9.     Even where A&T does have user information, it is not determinative as to the identity of the user(s) of the subscriber's numbers

10.     AT&T sometimes allows other companies, often known as Mobile Virtual Network Operators (or "MVNOs"), to resell its services to the public. AT&T does not collect any personal information for MVNO subscribers.

11.     Before disclosing any subscriber information, AT&T may first need to

{00108857;3}

OHI000257

obtain the consent of the subscriber or provide notice to the subscriber, depending on, among other things, the type of information that is sought and the jurisdiction in which the subscriber is located. AT&T is, in some states, prohibited by law from directly disclosing the identity of its subscribers without notice, consent and/or a court order. If an interested party objects to a subpoena on the basis that the subpoena seeks information protected by privacy laws, AT&T typically will not produce that information absent a court order.

12.     AT&T is not able to verify with certainty the identity of a user of a particular number on a particular date or time, nor would it be able to verify with certainty whether a particular subscriber was an actual user of the number(s) at issue.

13.     AT&T does not possess subscriber information after those subscribers have ported their numbers to other carriers.

14.     Responding to a mass subpoena requesting subscriber information for thousands of numbers during a historical timeframe would be burdensome, and time consuming for AT&T.

I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746 THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

May 23, 2019

_____
[Name]

{00104257;1}

3

OHI000258

**EXHIBIT D**

# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF FLORIDA

BRIAN KEIM, an individual, on behalf of
himself and all others similarly situated,

        Plaintiff,

      v.

ADF MIDATLANTIC LLC, *ET. AL.*

        Defendant.

Civil Action No. 9:12-cv-80577 -KAM

Judge Kenneth A. Marra
Magistrate Judge William Matthewman

## DECLARATION OF PATRICIA CAULDWELL

1.     I, Patricia Cauldwell, swear under penalty of perjury and declare as follows:

2.     I am a Director, Legal Affairs, for T-Mobile US, Inc. ("T-Mobile"), and have been

employed by T-Mobile since 2008. In my role, I provide counsel to T-Mobile's subpoena

compliance team, which responds to legal demands for subscriber information. All statements

contained in this declaration are premised on my own personal knowledge of T-Mobile's

systems, policies, practices, and/or T-Mobile's records maintained in the regular course of its

business at or near the time of the event they describe.

3.     T-Mobile does not require subscribers to provide personal information regarding persons

who may use a phone number. T-Mobile will only maintain such information if voluntarily

provided by the subscriber.

4.     T-Mobile collects certain personal information from subscribers in connection with its

postpaid service, such as their name and address, as of the date of account activation. T-Mobile

does not require, and thus typically does not possess, personal information regarding other

persons who may also use the subscriber's cellular phone number(s). Even where a subscriber

offers user information for a particular telephone number, it is not determinative as to the identity of the actual user(s) of the number.

5.      T-Mobile sometimes allows other companies, often known as Mobile Virtual Network Operators (or "MVNOs"), to resell its services to the public. T-Mobile does not collect any subscriber or user data for persons who may use its network via the MVNOs.

6.      Before disclosing any subscriber information, T-Mobile may first need to obtain the consent of the subscriber or provide notice to the subscriber, depending on, among other things, the type of information that is sought and the jurisdiction in which the subscriber is located. T-Mobile is, in some states, prohibited by law from directly disclosing the identity of its subscribers without notice, consent and/or a court order.

7.      For each of the telephone numbers listed in the instant subpoena, T-Mobile has identified and produced the name and address of the subscriber of the account, with the exception of those subscribers which reside in the States of CA, DE and PA. In addition, T-Mobile identified and produced the name of any user of each target that may have been designated by the subscriber. As requested, T-Mobile added the user information (to the extent available) in an additional spreadsheet column in the response. Accordingly, T-Mobile has fully complied with the plaintiff's subpoena request for subscriber information in jurisdictions where release with a subpoena is lawful.

8.      During discussions following the filing of the instant motion, plaintiff has suggested that he needs more information than already produced by T-Mobile. The plaintiff has indicated that he still needs "the account-holder/subscriber's phone number." At T-Mobile, the subscriber/account holder is the owner of each telephone number that may be associated with an account. Accordingly, T-Mobile is unable to identify a specific telephone number as the "the

144413276.1

account-holder/subscriber's phone number" when there are multiple telephone numbers on an account.

9.     T-Mobile does not require post-paid customers to supply an email address as a condition of service. Subscribers may provide an email address in order to participate in certain online services. Email addresses are not a required component of subscriber information, as defined by 18 USC 2703(c), and therefore, are not stored and maintained within T-Mobile's subscriber profiles and are not accessible via any automated process. If compelled to comply with the request for email addresses, T-Mobile would need to identify a resource to develop a process for extraction and delivery of this information from systems not designed for bulk search and not configured to respond to subpoena requests for subscriber information. Such a costly and time-consuming endeavor would constitute an undue burden and expense on non-party T-Mobile.

I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746 THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Dated: May 17, 2019

Patricia Cauldwell

144413276.1

**EXHIBIT E**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANGELA MORGAN,

     Plaintiff,

v.

                                    CASE NO. 6:17-cv-01972-CEM-GJK

ORLANDO HEALTH, INC.,
G&G ORGANIZATION, LTD. d/b/a
PFS GROUP and RMB, INC.,

     Defendant.

## DECLARATION OF GEORGE KAMBA

1.       I, George Kamba, swear under penalty of perjury and declare as follows:

2.       I am the Manager of Privacy and Compliance, for U.S. Cellular Corp. ("U.S. Cellular"), and have been employed by U.S. Cellular since 2004.  In my role, I lead U.S. Cellular's subpoena compliance team, which responds to legal demands for subscriber information.  All statements contained in this declaration are premised on my own personal knowledge of U.S. Cellular's systems, policies, practices, and/or U.S. Cellular's records maintained in the regular course of its business at or near the time of the event they describe.

3.       U.S. Cellular offers both offers pre-paid and post-paid accounts.  U.S. Cellular does not require pre-paid customers to provide personal identification information upon activation of a pre-paid account.  If personal information happens to be provided upon activation of a pre-paid account, no steps are taken to verify the completeness or accuracy of such information.

{00108857;1}

**OHI000264**

4.      Personal information provided by a U.S. Cellular post-paid or pre-paid subscriber is stored and maintained as long as the post-paid or pre-paid subscriber maintains their account. At a minimum, any personal information provided by a U.S. Cellular post-paid or pre-paid subscriber is stored for seven years following termination of the account.

5.      U.S. Cellular does not require subscribers of its brands to provide personal information regarding persons who may use a phone number. U.S. Cellular will only maintain such information if voluntarily provided by the subscriber. Thus, U.S. Cellular is unable to verify with certainty the identity of the user of a subscriber's cellular phone number.

6.      U.S. Cellular collects certain personal information from subscribers in connection with its postpaid service, such as their name and address as of the date of account activation. U.S. Cellular does not require, and thus typically does not possess, personal information regarding other persons who may also use the subscriber's cellular phone number(s).

7.      A portion of post-paid numbers are assigned to group plans (i.e., plans that include multiple cellular phone numbers that are generally used by persons other than the "subscriber," such as family and business plans).

8.      Even where U.S. Cellular does have user information, it is not determinative as to the identity of the user(s) of the subscriber's numbers.

9.      U.S. Cellular sometimes allows other companies, often known as Mobile Virtual Network Operators (or "MVNOs"), to resell its services to the public. U.S. Cellular does not collect any personal information for MVNO subscribers.

10.     Before disclosing any subscriber information, U.S. Cellular may first need to obtain the consent of the subscriber or provide notice to the subscriber, depending on, among other things, the type of information that is sought and the jurisdiction in which the subscriber is located. U.S. Cellular is, in some states, prohibited by law from directly disclosing the identity of its subscribers without notice, consent and/or a court order. If an

OHI000265

interested party objects to a subpoena on the basis that the subpoena seeks information protected by privacy laws, U.S. Cellular typically will not produce that information absent a court order.

11.    U.S. Cellular is not able to verify with certainty the identity of a user of a particular number on a particular date or time, nor would it be able to verify with certainty whether a particular subscriber was an actual user of the number(s) at issue.

I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746 THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

May 29, 2019

George Kamba

**OHI000266**

**EXHIBIT F**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:17-cv-01972-CEM-GJK

ANGELA MORGAN,

      Plaintiff,

v.

ORLANDO HEALTH, INC.,
G&G ORGANIZATION, LTD. d/b/a
PFS GROUP AND RMB, INC.,

      Defendant.

_____/

## AFFIDAVIT OF CALLI KEEP

STATE OF KANSAS:

COUNTY OF JOHNSON:

      BEFORE ME, the undersigned authority personally appeared CALLI KEEP,

after being duly sworn, deposes and states:

1.    I am over the age of 18, and a resident of the State of Missouri.

2.    I am employed by Sprint Corporation located in Overland Park, Kansas as a Supervisor of Subpoena Compliance.

3.    I have personal and intimate knowledge of policies and practices relating to Sprint Subpoena Compliance.

4.    In addition to other types of requests, Sprint Subpoena Compliance is responsible for complying with legal demands for customer records in civil litigation.

5.  Costs associated with the production of Sprint subscriber records in response to subpoena in civil litigation is determined by the overall magnitude of the request. In instances where IT is engaged to provide adhoc reporting (a report done for a particular purpose; i.e.: the demand) costs may be incurred. The majority of civil demands requesting subscriber records are uncomplicated and manageable without IT assistance.

6.  Retention for Sprint call records differ by type. Sprint bill reprints for postpaid customers (Sprint) are currently kept for a period of 10 years. Bill reprints are not available for prepaid customers (Boost Mobile) as they don't exist. Retention periods for bill reprints are subject to change. Call detail records (CDR) are maintained for approximately 18 months in Sprint's regularly used databases. In some instances, Sprint does maintain tape back-up of call records that fall outside of the 18 month retention. These records are not kept in any regularly used database and are not reasonably accessible. Due to the difficulty and time to pull tape back-up records, there is a cost of $312 per day of CDR requested. There is no way to know if records exist on back-up tapes until the search is conducted. Back-up tape searches are conducted by IT. While records are accurate, Sprint cannot deem records found on back-up as complete.

7.  Sprint maintains customer information (non PCI) for the time that the account is active + 3 years. Therefore, if an account was ported, the customer information would be available for 3 years after the cancellation date.

8.  Documentation regarding the "user" of a phone may or may not be provided by an account holder. It is not a requirement. In addition, there is a specific field found in our database for "authorized contact". However, this information may or may not be provided by the account holder and is not a requirement.

9.  Boost Mobile, Sprint's prepaid service, does not require any identification to open an account.

OHI000254

FURTHER AFFIANT SAYETH NAUGHT.

Signed this _3rd_ day of _May_ , 2015.

_CALLI KEEP_

STATE OF KANSAS )
                ) ss:
COUNTY OF _Johnson_ )

The foregoing instrument was acknowledged before me this _3rd_ day of _May_ , 2019, by _Calli Keep_ , who is personally known to me or who has produced _____ as identification, and who, after first being duly sworn and cautioned deposed and said that the foregoing is true and correct to the best of his knowledge and belief.

_Thomas M Koch_

NOTARY PUBLIC STATE OF

KANSAS

My commission expires:

NOTARY PUBLIC-State of Kansas
THOMAS M. KOCH
My Appt. Expires 6-27-2019

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

BRIAN KEIM, an individual, on behalf of )
himself and all others similarly situated, )
                                  )
      Plaintiff,                 )    CASE NO. 9:12-cv-80577-KAM
                                    )
v.                                     )
                                    )
ADF MIDATLANTIC, LLC, a foreign )
limited liability company, AMERICAN )
HUTS, INC., a foreign corporation, ADF )
PIZZA I, LLC, a foreign limited liability )
company, ADF PA, LLC, a foreign limited )
liability company, (known collectively as )
"ADF COMPANIES"), and PIZZA HUT, )
INC., a foreign corporation, )
                                    )
      Defendants.              )

## DECLARATION OF DONNA NAJAR IN SUPPORT OF VERIZON WIRELESS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

I, Donna Najar, declare under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. § 1746, that the following statements are true:

### BACKGROUND

1.     I am a Supervisor with the Verizon Security Assistance Team, ("VSAT"), a part of Verizon Wireless ("Verizon"). I am providing this declaration in support of Verizon's opposition to plaintiff Brain Keim's ("Plaintiff") Motion to Compel Verizon to Comply with Plaintiff's Subpoena (the "Motion") in the above captioned case.

2.     I have personal knowledge of the following facts as set forth in this declaration and, if called as a witness, could and would competently testify thereto.

3.      I have been informed that Plaintiff has asked Verizon to provide a list of "account-holding subscribers' telephone number[s]" for four hundred and forty-three (443) shared plans (the "Shared Plan Accounts")—group plans that provide service for multiple wireless devices, and thus include multiple phone numbers.

## VERIZON HAS ALREADY PROVIDED SUBSCRIBER INFORMATION
## FOR THESE 443 SHARED PLAN ACCOUNTS

4.      Verizon has already provided to Plaintiff's counsel subscriber information, consisting of the account number, as well as the account holder's name, billing address, and e-mail address if one was available, for all the mobile telephone numbers they requested that corresponded to Verizon Wireless customers, including the Shared Plan Accounts. Plaintiff's motion confirms that "Verizon has produced responsive data for over 2,000 mobile numbers" in response to the subpoena.

5.      To gather this information, Verizon performed the following steps: VSAT contacted the information technology ("IT") group within VSAT that handles record processing, and provided that team with information parameters based on Plaintiff's subpoena. Using those parameters, the IT team then had to create, and did create, a customized data query for the relevant information. The IT team then ran its customized data query in Verizon's database that stores Verizon Wireless customer information. This process took time both to develop the relevant inquiry and to process the inquiry within the database. Once this process was completed, Verizon was able to identify the account number linked with each mobile telephone number provided by Plaintiff and compile a list of the names and addresses associated with those accounts. This information was produced to Plaintiff in response to his subpoena.

6.     I understand that in addition to the information Verizon has already provided, Plaintiff is now requesting more detailed information, by seeking the specific mobile telephone numbers that are used by each "subscriber" of the Shared Plan Accounts.

7.     As an initial matter, for Shared Plan Accounts, Verizon cannot determine which mobile telephone number the account owner (which Verizon defines as the person on a Shared Plan Account whose name appears on the statement and to whom a bill is addressed), or any other specific person on a Shared Plan Account, is using.

8.     This is because the only information Verizon maintains related to the Shared Plan Accounts is the mobile telephone numbers linked with that particular account. Verizon does not require the account owner (or any other user) to use any particular phone number under the Shared Plan Account. Accordingly, over time, different people on the same account can change the phone numbers they use (for example, older children that were on a plan can come off the plan and younger siblings can take over use of the older child's former phone, and one person on the plan can temporarily borrow another person's phone).

9.     Account owners with a Shared Plan Account have the option, but are not required, to provide information identifying a name for each phone number on the account, in their MyVerizon profile through the website Verizonwireless.com or the Verizon Wireless mobile application. The profile includes a "nickname" field that allows the account owner to enter an identifier for each phone number on the account—that is, to add a name or nickname for each phone number on the plan. Account owners do not need to use proper names, or even names at all, as nicknames—for example, account owners can input names such as "Mom," "Dad," "Junior," "Grandma," and the like. Verizon has no ability to verify the accuracy of the

nicknames, or confirm if such information is current. Similarly, any nickname an account owner inputs through MyVerizon is not retrievable by VSAT from the customer database.

10.    If no information is provided in the device nickname field on a MyVerizon profile, the default is a blank. As the number of unlimited data plans has proliferated in recent years, there is less of a need for account owners to differentiate between different phone numbers on the same plan (as compared to past limited data plans, where account owners needed to track data use by each user on the plan). Thus, many Shared Plan Account owners do not associate nicknames with phone numbers on the account. Verizon similarly does not need to correlate particular phone numbers on a single Shared Plan Account to particular individuals, as which individual primarily uses a specific telephone number is irrelevant to Verizon's business needs.

11.    This is illustrated by Plaintiff's "Exhibit 1" to his motion. That exhibit consists of a screenshot from a Verizon account owner "Amy Wells," which appears to be taken from her MyVerizon page.  The exhibit references an "Account owner", but the "Account owner" information is linked to the account number, and not to a specific mobile telephone number. Although the "Account owner" is identified, that information was already provided by Verizon to Plaintiff's counsel for the Shared Plan Accounts.

**OBTAINING FURTHER DEMANDED USER INFORMATION IS BURDENSOME**

12.    As discussed in paragraphs 9-10, Verizon does not require any nickname information from its customers on Shared Plan Accounts. Verizon does not monitor or control, or attempt to monitor or control, who is the ultimate user of any particular mobile device under such an account. As a result, Verizon does not maintain any single, readily accessible database that includes any nickname information that account owners inputted in each Shared Plan Account.

13.     At the request of Verizon's counsel, I researched the feasibility of obtaining the
requested specific individual subscriber information from Verizon's electronic databases and
what work would be required to gather and provide the requested information to Plaintiff.
Providing this information would be an onerous, multistep process summarized below.

14.     First, Verizon must identify the Shared Plan Account associated with the mobile
telephone numbers provided by Plaintiff's counsel.

15.     As stated in paragraphs 5 and 6, Verizon completed this step as part of the first
production it made on April 16, 2019 for all of the numbers requested that were Verizon
Wireless customers during the time frame requested, including the 443 Shared Plan Accounts.

16.     Next, once the Shared Plan Account number is identified, a researcher must log
into Verizon's database where customer billing records reside, and manually enter each account
number in order to pull up a billing statement for a specified billing cycle for that particular
Shared Plan Account.

17.     The account billing statement is the only place accessible by Verizon where any
nickname information is located.

18.     Then, for each billing cycle during the responsive period, the researcher would
have to manually enter into a spreadsheet (or other document) all the phone numbers linked with
that shared plan and any account owner entered nickname information associated with each
mobile number. However, this would still not enable Verizon to make a determination about
which number was actually being used by the "subscriber" of a particular Shared Plan Account,
and which number actually was used by any other particular person under the account.

19.     These same steps must be repeated for every billing cycle during the time frame specified in Plaintiff's request for class certification. There is no automated process that exists for obtaining this information from the billing statement database.

20.     It is my understanding that the Class Period in this case is November 2010 through January 2013. Verizon's document retention policies provide that it retains billing documents for a period of seven years. Therefore, Verizon does not currently possess billing statements for 2010 or 2011. Accordingly, Verizon personnel would need to manually look up 5,759 separate billing statements [443 accounts x 13 billing cycles], review them, and manually add them to a spreadsheet, refine that data, and then put the data into a producible format.

21.     To provide this information constitutes a substantial expense to Verizon.

22.     I performed 23 sample iterations of this process and, on average, it took me 65 minutes to complete each inquiry. These sample iterations involved accounts with up to 5 telephone numbers. To the extent other Shared Plan Accounts included within Plaintiff's request include more telephone numbers, the time required to produce the requested information for those accounts could be substantially greater.

23.     Based on my sampling described above, I estimate that 480 personnel hours would be required to perform the database queries needed to gather and produce this information.

24.     Verizon cannot avoid this expense by merely shifting employees' responsibilities, as Verizon does not have personnel simply sitting idle. All Verizon employees are fully committed.

25.     Therefore, Verizon will be compelled to hire temporary workers. Verizon normally charges $75 per hour for subpoena compliance tasks. Based on Verizon's normal rate

and the processes required above, I estimate that Verizon will incur $36,000 to complete Plaintiff's request as set forth in its Motion.

      26.      To date, Verizon has incurred costs of $456 for providing that information to Plaintiff, allocated to 6 hours of personnel time at $75 an hour and $6 for shipping costs. Verizon has requested payment from Plaintiff's counsel for that amount, but as of the signing of this declaration Verizon has not been reimbursed for any of those costs.

      I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on this 14th day of June 2019 in San Angelo, Texas.

Dated: June 14, 2019

Donna Najar

**EXHIBIT H**



(800) 585-4888 *toll-free*
(770) 255-1094 *office - direct*
(770) 363-7149 *mobile*
ksponsler@compliancepoint.c
www.compliancepoint.com

**Ken Sponsler - Rates**

| Service | Fee |
|---|---|
| Non-testifying expert consultant | $600 per hour |
| Expert witness, consulting | $600 per hour |
| Expert report, development, preparation, and review | $600 per hour |
| Deposition preparation and testimony at deposition | $700 per hour |
| Court room testimony, arbitration or trial | $1,000 per hour |
| Travel time in support of case-related requirements | $200 per hour |
| Administrative support and regulatory research | $100 per hour |
| Reasonable and required expenses incurred during the course of retention | Due upon receipt of invoice (issued at the end of each month). |
| Other expenses | As agreed during engagement. |
| Retainer | Not required. |

Exhibit P

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

## Southern District of Ohio

| UNITED STATES OF AMERICA<br>v.<br><br>Jeffrey R. Shope | ) ) ) ) ) ) ) ) ) ) | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number: 2:15-cr-189<br>USM Number: 73358-061<br>Ralph Kohnen, Celia Kilgard, & Jeanne Cors, Esq.<br><span style="font-size:small">Defendant's Attorney</span> |

### THE DEFENDANT:

☑ pleaded guilty to count(s)    1 of the Information

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC §§ 1347 & 2 | Health Care Fraud | 12/17/2012 | 1 |

The defendant is sentenced as provided in pages 2 through    7    of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/8/2016
Date of Imposition of Judgment

Signature of Judge

Gregory L. Frost, United States District Judge
Name and Title of Judge

2/8/16
Date

AO 245B    (Rev. 09/11) Judgment in Criminal Case
           Sheet 2 — Imprisonment

DEFENDANT:    Jeffrey R. Shope
CASE NUMBER:    2:15-cr-189

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

12 months plus 1 day

☑  The court makes the following recommendations to the Bureau of Prisons:

That the defendant be placed in minimum security facility that is located as near to Central Ohio as possible

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ ☐ a.m.  ☐ p.m.  on _____ .

    ☐  as notified by the United States Marshal.

☑  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑  before 2 p.m. on    6/15/2016            .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By _____

DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
          Sheet 3 — Supervised Release

DEFENDANT:    Jeffrey R. Shope
CASE NUMBER:   2:15-cr-189

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

3 years

          The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☑ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐ The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

          If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

          The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 3C — Supervised Release

Judgment—Page    4    of    7

DEFENDANT:    Jeffrey R. Shope
CASE NUMBER:  2:15-cr-189

## SPECIAL CONDITIONS OF SUPERVISION

1) The defendant shall participate in a program of mental health counseling and treatment, as directed by the probation officer. The defendant will make a co-payment for treatment services not to exceed $25 per month, which is determined by the defendant's ability to pay.


The Court finds that the Special Conditions of Supervised Release are reasonably related to the goals rehabilitation of the defendant and protection of the public. The Court specifically finds that the restrictions will assist the defendant in the future from avoiding the conditions that led to the defendant committing the crime(s) for which he/she is being sentenced.

AO 245B   (Rev. 09/11) Judgment in a Criminal Case
         Sheet 5 — Criminal Monetary Penalties

Judgment — Page   5   of   7

DEFENDANT:   Jeffrey R. Shope
CASE NUMBER:  2:15-cr-189

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 500,000.00 |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | $696,372.52 | | |
| United Healthcare | | $415,580.03 | |
| Attn: Curtis Green | | | |
| 12125 Technology Drive | | | |
| Eden Prairie, MN 55344 | | | |
| | | | |
| Anthem | | $42,023.84 | |
| Attn: Denise Clark | | | |
| 4361 Irwin Simpson Road | | | |
| Mason, OH 45040 | | | |
| | | | |
| **TOTALS** | $   696,372.52 | $   500,000.00 | |

☐  Restitution amount ordered pursuant to plea agreement $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☑  the interest requirement is waived for the   ☐ fine  ☑ restitution.

    ☐  the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 5B — Criminal Monetary Penalties

Judgment—Page    6    of    7

DEFENDANT:    Jeffrey R. Shope
CASE NUMBER:    2:15-cr-189

## ADDITIONAL RESTITUTION PAYEES

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| Ohio Bureau of Workers Compensation | | $40,889.73 | |
| Attn: David Bentley | | | |
| 30 West Spring Street #L11 | | | |
| Columbus, OH 43215 | | | |
| | | | |
| Aetna | | $1,506.40 | |
| Attn: Sandra Miller | | | |
| PO Box 981105 | | | |
| El Paso, TX 79998 | | | |

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 6 — Schedule of Payments

DEFENDANT:    Jeffrey R. Shope
CASE NUMBER:  2:15-cr-189

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A    ☑ Lump sum payment of $   500,100.00     due immediately, balance due

        ☐ not later than _____ , or
        ☑ in accordance   ☐ C,   ☐ D,   ☑ E, or   ☑ F below; or

B    ☐ Payment to begin immediately (may be combined with    ☐ C,      ☐ D, or    ☐ F below); or

C    ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
        _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
        _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
        term of supervision; or

E    ☑ Payment during the term of supervised release will commence within    30 days    (e.g., 30 or 60 days) after release from
        imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☑ Special instructions regarding the payment of criminal monetary penalties:

        While incarcerated, if the defendant is working in a non-UNICOR or Grade 5 UNICOR job, he shall pay $25 per
        quarter toward the restitution obligation. If working in a Grade 1-4 UNICOR job, the defendant shall pay 50% of
        his monthly pay toward the restitution obligation. Any change in the schedule shall be made only by order of this
        Court.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

        Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
        and corresponding payee, if appropriate.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**IN THE UNITED STATES DISTRJCT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

**8/13/01: POLICY CHANGE RESTRICTING PUBLIC DISCLOSURE
OF THE STATEMENT OF REASONS PAGE IN THE JUDGMENT**

# DISTRIBUTION OF
# THE JUDGMENT AND COMMITMENT
# WITH THE STATEMENT OF REASONS PAGE
# AND THE DENIAL OF FEDERAL BENEFITS PAGE
# *IS LIMITIED TO:*

# DEFENSE COUNSEL
# UNITED STATES ATTORNEY
# U.S.A.'s FINANCIAL LITIGATION UNIT
# UNITED STATES PROBATION
# UNITED STATES PRETRIAL
# UNITED STATES SENTENCING COMMISSION
# (IF A TERM OF IMPRISONMENT, THEN ALSO THE
# FEDERAL BUREAU OF PRISONS)

THE CLERK OF COURTS WILL MAINTAIN THE OFFICIAL VERSION

OF

*THE STATEMENT OF REASONS PAGE*

AND

*THE DENIAL OF FEDERAL BENEFITS PAGE*

SEALED IN A SECURE LOCATION SEPARATELY FROM

THE PUBLIC CASE FILE

# Exhibit Q



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED
RICHARD W. NAGEL
CLERK OF

2015 AUG 12 PM 4:06

U. S. DISTRICT COURT
SOUTHERN DIST. OHIO

UNITED STATES OF AMERICA                    :        Case No: 2:15-cr-189

      Plaintiff                          :        JUDGE FROST

vs.                                         :        18 U.S.C. §1347
                                                     18 U.S.C. §2
JEFFREY R. SHOPE                            :

                                            :
      Defendants.
                                            :

INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

I.    INTRODUCTION

At all relevant times to this Information, unless otherwise alleged:

1. Defendant JEFFREY R. SHOPE (Defendant SHOPE) was a licensed chiropractor and owner of True Health Chiropractic (True Health) located at 2511 West Shrock Road, Westerville, Ohio 43081.

2. Between January 1, 2009 and December 2012, a majority of patients treated by Defendant SHOPE at True Health were individuals who suffered injuries as the result of work or automobile related accidents. Common chiropractic services billed for by True Health and Defendant SHOPE included spinal adjustments, electrical stimulation, neuromuscular reeducation, therapeutic exercises and myofacial release (manual manipulation).

3. In order to assist with patient care, True Health employed additional chiropractors and medical assistants and partnered with a licensed massage therapist to provide massage therapies to True Health patients. He, in turn, hired several massage therapists to assist him with providing massage related services.

4. In order to receive payment for services, Defendant SHOPE through True Health submitted claims to several federal health care benefit programs including United Health Care (UHC), Aetna and the Ohio Bureau of Workers' Compensation (BWC).

## II. VICTIM HEALTH CARE PROGRAMS

### A. The Ohio Bureau of Workers Compensation (BWC)

5. Ohio Bureau of Workers' Compensation (BWC) is a public "no fault" insurance system that compensates employees for work related injuries or illnesses. Currently BWC provides insurance to approximately two-thirds of Ohio's work force. Employees not covered directly by BWC receive coverage through their employers. These companies are part of a self-insurance program for large and financially stable employers who meet strict qualifications set by BWC.

6. BWC manages all medical and lost-time claims, initiates coverage and determines premium rates and manual classifications. BWC also collects premiums from employers, determines the initial allowance or denial on claim applications, disburses money to pay compensation, and manages the state insurance fund.

7. Providers who are certified with BWC receive a Servicing Provider Number which

allows BWC to identify the provider who rendered the billed services. In addition, each qualified BWC patient receives a claim number to identify the patient as an authorized recipient of health benefits.

8.    A provider is able to submit claims for chiropractic services provided they have been certified by BWC and that the services rendered were medically necessary and in compliance with federal and state laws, rules and regulations.

9.    BWC was a health care benefit program as the term is defined in 18 U.S.C. §24.


B.  Private Insurers

10.    In addition to BWC, several private entities, including United Healthcare and Aetna, also provided health insurance coverage to True Health patients. Individuals who received benefits offered by private insurers are referred to as "beneficiaries".

11.    To receive reimbursement from private insurers, medical service providers submit claims for payment of services either directly or through a billing company.

12.    Private insurers compensate medical service providers for medical services including chiropractic services that are actually rendered, medically necessary and in compliance with federal and state laws, rules and regulations.

13.    Private insurers provide health insurance plans that constitute health care benefit programs as defined by 18 U.S.C. §24(b).

C. Submission of Claims

14. Health care claim forms, both paper and electronic, contain certain patient information and treatment billing codes. The treatment billing codes describe various medical services in the language the providers themselves use. Health care programs have established payment schedules based on the codes billed by the provider. By designating a certain code, the provider certifies to the health care program that a given treatment was actually rendered in compliance with the code requirements and was medically necessary. These treatment billing codes are well known to the medical community, providers, and health care insurance companies

## THE HEALTH CARE FRAUD SCHEME

Beginning on or about January 1, 2009 and continuing through December 17, 2012, in the Southern District of Ohio, Defendant SHOPE, unlawfully, willfully, and knowingly made false statements in connection with the delivery of, and payment for, health care benefits, and devised a scheme and artifice to defraud Federal health care benefit programs to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

15. It was part of the scheme that Defendant SHOPE would bill, or would cause to be billed, claims for back braces, tens units, myofacial releases, therapeutic exercises and other chiropractic services that were not reimbursable, not rendered, not rendered fully, or "upcoded" to maximize insurance payments.

16. It was further part of the scheme that Defendant SHOPE through True Health would double bill health care benefit programs by billing two separate programs for identical services provided to the same patients on the same day.

17. Payments to federal health care programs as a result of SHOPE's fraudulent conduct totaled $ 696,372.52.

## COUNT 1
### [18 U.S.C.§1347]

18. Paragraphs 1 through 17 of the Information are hereby incorporated by reference as part of this count as if fully set forth herein.

19. On or about January 1, 2009, and continuing to on or about December 17, 2012, in the Southern District of Ohio, Defendant SHOPE, did knowingly and willfully, execute a scheme to defraud health care benefit programs as defined in 18 U.S.C. §24(b), that is Ohio Bureau of Workers' Compensation, United Healthcare, Aetna and other private insurers, in connection with the delivery or payment for health care benefits, items or services by billing or causing bills to be submitted for chiropractic services that were not reimbursable, not rendered not rendered fully, or upcoded to maximize insurance payments.

In violation of 18 U.S.C. §1347 and §2.

CARTER M. STEWART
UNITED STATES ATTORNEY

BRENDA S. SHOEMAKER
Deputy Branch Chief

Exhibit R

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| TRUE HEALTH CHIROPRACTIC, INC., and MCLAUGHLIN CHIROPRACTIC ASSOCIATES, INC., individually and as the representatives of a class of similarly-situated persons., | Case No. 4:13-cv-02219-HSG |
| Plaintiffs, | **EXPERT REPORT OF STEPHEN M. NOWLIS, PH.D.** |
| v. | |
| MCKESSON CORPORATION, MCKESSON TECHNOLOGIES, INC., and DOES 1 – 10, | |
| Defendants. | |

1

I, Stephen M. Nowlis, state as follows:

## **QUALIFICATIONS**

1.   I am the August A. Busch Jr. Distinguished Professor of Marketing in the Olin Business School at Washington University in St. Louis.  A copy of my curriculum vitae is attached as Appendix A, which includes a list of the cases where I have testified in the last four years.  I hold a Ph.D. in Marketing and a Master's degree in Business Administration (MBA) from the University of California at Berkeley, Haas School of Business, and a Bachelor's degree in Economics from Stanford University.  My field of expertise is marketing, consumer behavior, survey methods, and decision making.  I have acquired this expertise through my training as a doctoral student at one of the top universities in the world, my research and publications, my editorial duties, international awards that I have won, my work experience, past expert witness consulting work, and classes that I have taught.

2.   I teach marketing management to MBA and Executive MBA students and consumer behavior to Ph.D. students.  In my courses, I cover topics such as buyer behavior, developing marketing plans, advertising, sales promotions, retailing, marketing research, and product development.  I also recently taught Brand Management to MBA students.  After completing my undergraduate studies and before starting my MBA program, I worked for two years as an Assistant Buyer for a major retail chain.  In this capacity, I analyzed customer purchase patterns to determine why some products sold better than others.

3.      I have won several international awards for my research.  One of these awards was the Early Career Contribution Award from the Society for Consumer Psychology – Sheth Foundation, which is given annually to the most productive young scholar in the worldwide field of consumer behavior/marketing.  Another of these international awards was the O'Dell Award, given to the *Journal of Marketing Research* (the major journal for marketing research topics) article that has had the greatest impact on the marketing field in the previous five years.  The paper that I wrote that was given this award looked at the influence of new product features on consumer brand choice.  I also was found to be one of the top 20 most productive marketing professors in the world in terms of my publications in the top-tier marketing and consumer behavior journals.

4.      I currently serve as an Associate Editor at the *Journal of Marketing Research*.  As an Associate Editor, I review many papers and help determine whether they are acceptable for publication.  The criteria used to assess these papers include how much of a contribution a paper makes, whether the theoretical framework is sound, and whether the data were collected using a proper methodology.  I also serve on the editorial review boards of the *Journal of Consumer Research*, *Journal of Marketing*, *Journal of Consumer Psychology*, and *Marketing Letters*.  In this capacity, I act as a regular reviewer of papers submitted to these journals to determine whether the papers are fit for publication.

5.      As I continue to receive and review additional information, I reserve the right to supplement, revise, or further explain the opinions contained in this report.  I am being compensated for my work on this matter at the rate of $700 an hour and my compensation is not in any way dependent on the outcome of this case.

## BACKGROUND AND ASSIGNMENT

6.  Plaintiffs allege that Defendants sent "advertisements via facsimile transmission from telephone facsimile machines, computers, or other devices to the telephone lines and facsimile machines of Plaintiffs and member of the Class."[1]  Plaintiffs "contend that they neither invited nor gave permission to Defendants to send the faxes."[2]

7.  I understand that Class members entered into a software licensing agreement called the End User License Agreement ("EULA") when purchasing or leasing products from Defendants.  I understand that Class members also completed a registration form in the process of agreeing to the EULA.  The focus of my surveys was on the EULA and how respondents understood certain language in the EULA.

8.  I was asked by counsel for Defendants to assess whether users similarly situated to the Class interpret assenting to the terms of the EULA as consenting to receive faxed advertisements or faxed offers from Defendants about the latest versions of the purchased or leased software.  If a significant number of users believe that agreeing to the EULA means that they have consented to receive faxed advertisements or offers from McKesson, then it would be true that some users believe that the terms of the EULA allow for McKesson to send faxed advertisements or offers, and that there would be significant variability in the ways that class members interpret the EULA.

9.  The surveys I designed focused only on a respondent's understanding of whether he or she, by agreeing to the terms of the EULA, agreed to receive certain faxed advertisements or faxed offers, as further described below.

---

[1] Second Amended Class Action Complaint, ¶ 34.
[2] Order denying motion for summary judgement and granting renewed motion for class certification, pp. 1 - 2.

## SUMMARY OF OPINIONS

10.     In order to directly test whether respondents believed, after reviewing the EULA, that they had or had not consented to receive faxed advertisements and faxed offers from McKesson, I designed two surveys.

11.     In the first survey (hereafter the Faxed Advertisements Survey), I asked respondents whether they consented to receive faxed advertisements about the latest versions of the software they just purchased or leased and related products.  Based on their understanding of the EULA, 25.0% of respondents answered affirmatively.  This means that there is significant variability in the ways that users interpret the EULA, and that a significant number of users believe that they consented, through their agreement to the EULA, to allow McKesson to send them faxed advertisements.

12.     In the second survey (hereafter the Faxed Offers Survey), I asked respondents whether they consented to receive faxed offers about the latest versions of the software they just purchased or leased and related products.  I selected this language because an advertisement can also be thought of as an offer.  Based on their understanding of the EULA, 33.2% of respondents answered affirmatively.  This means that there is significant variability in the ways that users interpret the EULA, and that a significant number of users believe that they consented, through their agreement to the EULA, to allow McKesson to send them faxed offers.

## SURVEY METHODOLOGY

13.     Applied Marketing Science (AMS), a market research company with extensive experience conducting consumer litigation surveys, worked under my direction to

5

implement the surveys that I designed.  To ensure objectivity in survey responses, it is

standard practice to conduct the survey in a "double-blind" manner (i.e., withhold

information about the purpose and sponsor of the survey from both the interviewer and

the respondent).[3]  The surveys I designed satisfied these conditions.  Specifically, the

surveys were administered via a programmed Internet questionnaire, eliminating the need

for a human interviewer.  The questionnaires did not provide any information about the

actual purpose of the survey or the survey sponsor.  In addition, the screening questions

disguised the "correct" or "qualifying" answer (e.g., medical billing or accounting

software) by providing a list of other response items that disguised the purpose of the

question.  It is standard survey practice to instruct respondents not to guess.  Accordingly,

the instructions at the beginning of my survey state, "If you don't know an answer to a

question or if you are unsure, please indicate this in your response.  Please do not guess."

In addition, my surveys included an explicit "Don't know/Unsure" response option,

which reduces the likelihood that respondents will attempt to guess the answer to a

question if they are unsure or do not have an opinion.[4]

14.    When designing closed-ended questions, it is good practice to rotate or randomize the

order of the response options to control for possible order effects.  The surveys that I

conducted rotated or randomized the order of response options to the closed-ended

questions (where applicable) for this reason.  I deviated from this practice where

appropriate in order to preserve the logical flow of the questions.  Specifically, I did not

randomize the response options for questions where the answer choices have a

---

[3] Diamond, Shari S., "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011, pp. 410-411.
[4] Id, p. 390.

6

predetermined order (e.g., age).  In addition, the "Don't know/Unsure" and "None of the above" answer choices were anchored as the last answer choice.

## SURVEY UNIVERSE AND SAMPLE SELECTION

15.    Because each survey was exactly the same except for the final question, I describe both surveys together and simply note where they differ.  For both surveys, qualified respondents were medical professionals who work in small offices and purchase or lease the type of software that would generate a EULA (i.e., customers of a medical billing or accounting software).  Thus, the relevant population consists of physicians, physical or occupational therapists, and chiropractors who indicated that they worked in a practice size of 50 people or less and who indicated they or their practice has purchased or leased medical billing or accounting software. The survey began with a series of screening questions to determine if a respondent was a member of this target population.

16.    I asked respondents, in the screener, for the fax number of their practice.  Respondents who indicated that they did not know the fax number of their practice and those who provided a number that matched that of a Class member were terminated from the survey.

17.    In order to interview the relevant medical professionals, I designed two Internet surveys that screened potential respondents to determine if they were qualified to participate in the survey.  Respondents invited to the Faxed Advertisements Survey were not invited or allowed to access the Faxed Offers Survey, and vice versa.  Internet surveys are a common form of market research.  In addition, there is evidence to suggest that data collected using Internet surveys does not differ in quality from that collected using phone

or mall-intercept methodologies.[5]  My Internet surveys were conducted by contracting with a panel company that has pre-recruited potential respondents who have indicated their willingness to participate in consumer surveys.  In this case, I selected Dynata, a well-established panel company that has a pre-recruited medical panel composed of medical professionals who have indicated their willingness to participate in surveys.  The email invitation included a link to the actual survey which was hosted on a website maintained by AMS.  This link contained an embedded identification number that assured that each respondent could only complete the survey once.  Respondents who qualified and completed the survey received a small monetary incentive of $10.

## SURVEY INSTRUMENT

18.    Each survey began with a series of screening questions to determine whether a respondent was a member of the target population and qualified to participate in the survey.  The first screening question asked respondents to enter a code shown on the screen into a CAPTCHA box to ensure that the respondent was an actual person as opposed to a computer program.

19.    Next, respondents were asked to indicate the type of electronic device they were using to complete the survey (QS1).  To ensure that all respondents could properly view the survey images and questions, the survey instructed respondents who indicated that they were taking the survey on a device with a small screen (e.g., a smartphone or other mobile or electronic device) to log back into the survey using a desktop, laptop, or tablet computer.

---

[5] Poret, H. (2010). "A comparative empirical analysis of online versus mall and phone methodologies for trademark surveys", *The Trademark Reporter, 100,* 756-804.

20.     Next, respondents provided their gender and age (QS2 and QS3, respectively). Respondents younger than 18 were not permitted to continue.

21.     The next screening question asked respondents to enter the fax number for their practice (QS4). The country code (1) was provided, but subsequently respondents were asked to enter a 10-digit number or select "Don't know/Unsure." Those who selected "Don't know/Unsure" or provided a number that matched that of a Class member were terminated from the study.

22.     Next, respondents were asked if they worked in specific types of companies or in a particular industry (QS5). Respondents were terminated if they indicated that they work for a company that manufactures or sells medical billing or accounting software or for a market research or advertising agency.

23.     Screening question (QS6) asked respondents to choose, from a list, the title or role that best describes their role as a medical professional. Respondents who selected physician (all specialties), physical therapist or occupational therapist, or chiropractor continued to the next screening question.

24.     Next, respondents were asked to identify the size of their practice (QS7). Respondents continued if they selected "solo or family practice," "less than 10," or "between 11 – 50." Respondents who work in a practice larger than 50 individuals or who indicated "Don't know/Unsure" were terminated from the study.

25.     Respondents were then asked to select from a list which things, if any, they had purchased or leased for their practice (QS8). The list of other things served to mask the response answer of interest which protects against respondents answering in a particular way in order to qualify for the survey. Respondents who indicated that they or their

practice had purchased or leased medical billing or accounting software continued to the next screening question.

26.    As a quality control measure, the final screening question (QS9) asked respondents to select "NORTH," "SOUTH," "EAST," or "WEST" from a list of cardinal directions, in order to make sure respondents were paying attention and not blindly selecting response options.  Respondents who did not select the correct cardinal direction were terminated from the study.

27.    At this point, qualified respondents were asked to take the survey in one session, to not consult other websites or other electronic or written materials, to keep their browser maximized for the entire survey, to take the survey on their own without consulting other people, and to wear eyeglasses or contact lenses if normally needed when viewing a computer or tablet screen (QS10).  Respondents who understood and agreed to these instructions continued to the main questionnaire.

28.    The main questionnaire in each survey began by instructing respondents that they would be shown the End User License Agreement for medical billing or accounting software they had just purchased or leased: "Imagine you have just purchased or leased medical billing or accounting software.  On the next page, you will be shown the End User License Agreement that you must agree to before you may register or install the software.  After you view the agreement you will be asked some questions.  Please do not guess."

29.    On the next page, respondents were shown the EULA and the following instructions appeared above it: "Below is the End User License Agreement that you must agree to before you may register or install the software.  Please read this agreement as you normally would if you were considering registering or installing the medical billing or

accounting software you just purchased or leased.  Select "NEXT" when you are ready to continue."  Respondents were required to spend at least 60 seconds reviewing the EULA before they could select the "NEXT" button.

30.    On the next page, respondents were again exposed to the EULA, but were asked to direct their attention to three particular segments of the EULA that were boxed: "Next, please direct your attention to the three segments of the End User License Agreement that are boxed. Select "NEXT" when you are ready to continue."  (See Appendix C: Stimuli).[6] Respondents were again required to spend at least 60 seconds reviewing the EULA before they could select the "NEXT" button.

31.    On the next page, respondents were shown the same three boxed segments of the EULA without the full agreement; however, respondents could view the full EULA by clicking a button: "Below are the three boxed segments of the End User License Agreement you just read.  In addition, click here to see the full End User License Agreement."  (See Appendix C: Stimuli).  Respondents were required to spend at least 30 seconds reviewing the boxes before they could select the "NEXT" button.

32.    After viewing the stimuli, respondents in the Faxed Advertisements Survey were then asked question Q1: "Based on your understanding of the End User License Agreement you just reviewed, have you consented to receive faxed advertisements about the latest versions of the software you just purchased or leased and related products?  (*Select one only*)

⊙    Yes

⊙    No

_____

[6] See also: Order denying motion for summary judgement and granting renewed motion for class certification, p. 12.

11

⊙     Don't know/Unsure

33.    After viewing the stimuli, respondents in the Faxed Offers Survey were then asked question Q1: "Based on your understanding of the End User License Agreement you just reviewed, have you consented to receive faxed offers about the latest versions of the software you just purchased or leased and related products?  (*Select one only*)

⊙     Yes

⊙     No

⊙     Don't know/Unsure

34.    After answering, the survey was complete.

## OVERVIEW OF DATA COLLECTION

35.    To ensure that the survey operated properly, AMS, at my direction, extensively tested the survey links and skip logic for each survey.

36.    Data collection for the Faxed Advertisements Survey was conducted between January 17, 2020 and January 21, 2020.  Of the individuals who entered the survey, 200 qualified based on their responses to the screening questions and completed the survey.  Data collection for the Faxed Offers Survey was conducted between January 21, 2020 and January 23, 2020.  Of the individuals who entered the survey, 202 qualified based on their responses to the screening questions and completed the survey.

## SURVEY RESULTS

37.    Below I report the data for question Q1 for each survey.

38.    The results for question Q1 in the Faxed Advertisements Survey are presented in Table 1.

12

**Table 1: Responses to the question (Q1)**:
"Based on your understanding of the End User License
Agreement you just reviewed, have you consented
to receive faxed advertisements about the latest versions
of the software you just purchased or leased and related products?"

|  | N | % |
|---|---|---|
| Yes | 50 | 25.0% |
| No | 95 | 47.5% |
| Don't know/Unsure | 55 | 27.5% |
| Total | 200 | 100.0% |

39.    The results for question Q1 in the Faxed Offers Survey are presented in Table 2.

**Table 2: Responses to the question (Q1)**:
"Based on your understanding of the End User License
Agreement you just reviewed, have you consented
to receive faxed offers about the latest versions
of the software you just purchased or leased and related products?"

|  | N | % |
|---|---|---|
| Yes | 67 | 33.2% |
| No | 78 | 38.6% |
| Don't know/Unsure | 57 | 28.2% |
| Total | 202 | 100.0% |

Executed on February 7, 2020

_____

  Dr. Stephen M. Nowlis, Ph.D.


Appendices

    A.    Curriculum vitae of Dr. Steven Nowlis

    B.    Stimuli

    C.    Screenshots and questionnaire Faxed Advertisements Survey

D.      Data Glossary Faxed Advertisements Survey

E.      Data Listing Faxed Advertisements Survey

F.      Screenshots and questionnaire Faxed Offers Survey

G.      Data Glossary Faxed Offers Survey

H.      Data Listing Faxed Offers Survey

**Appendix A**
**Stephen M. Nowlis**

Olin Business School, Washington University
One Brookings Dr., Campus Box 1133
St. Louis, MO  63130
Phone:  314-935-5113
email:  nowlis@wustl.edu

---

**Education**

Ph.D.    Business Administration (Marketing concentration), Haas School of Business, University of California at Berkeley, 1994

Thesis:  Competitive Brand Strategies of High-Tier and Low-Tier Brands:  A Consumer Choice Perspective

M.B.A.    Haas School of Business, University of California at Berkeley, 1990

B.A.    Economics, with Distinction, Stanford University, 1986

**Academic employment**

August A. Busch, Jr. Distinguished Professor of Marketing, Olin Business School, Washington University, St. Louis, MO, 2010 -
Department Chair, Marketing Department, Olin Business School, Washington University, St. Louis, MO, 2014-2017
AT&T Distinguished Research Professor of Marketing, WP Carey School of Business, Arizona State University, Tempe, AZ, 2003-2009
Associate Professor, WP Carey School of Business, Arizona State University, Tempe, AZ, 2000-2003
Assistant Professor, WP Carey School of Business, Arizona State University, Tempe, AZ, 1996-2000
Assistant Professor, Washington State University, Pullman, WA, 1994-1996

**Professional service**

Guest Editor, *Journal of Consumer Research*, *Journal of Marketing Research*
Associate Editor, *Journal of Marketing Research*, 2009-
Associate Editor, *Journal of Marketing*, 2011-2014
Associate Editor, *Journal of Consumer Psychology*, 2008-2011
Associate Editor, *Journal of Consumer Research*, 2002-2008
Editorial Review Board, *Journal of Marketing*, 2005-2010, 2014-
Editorial Review Board, *Journal of Consumer Research*, 2000-2001, 2008-

Editorial Review Board, *Marketing Letters*, 2001-
Editorial Review Board, *Journal of Marketing Research*, 2001-2008
Editorial Review Board, *Journal of Consumer Psychology*, 2012-

Ad-Hoc Reviewer, *Marketing Science, Management Science, Journal of Retailing, Current Anthropology, Nonprofit & Voluntary Sector Quarterly, Industrial and Corporate Change,* Reviewer for Association for Consumer Research conferences, American Marketing Association conferences, AMA John A. Howard Doctoral Dissertation Competition, Society for Consumer Psychology conferences.  Program Committee, Association for Consumer Research conference, 2001 and 2003.  Representative of the Society for Consumer Psychology at the main meeting of the American Psychological Association, 2001.  Advisory Board for the MSI-JCP Research Competition on Product Assortment and Variety-Seeking in Consumer Choice, 2004.

## Honors and Awards

A January 2009 study in the *Journal of Marketing* (by Seggie and Griffith) found that I am the 18th most productive marketing professor in the world in terms of my publications in top-tier marketing journals.

My doctoral student, Maura Scott, won Honorable Mention (2nd place) for the 2009 Ferber Award (best paper based on a dissertation), for our paper:  Scott, Maura L., Stephen M. Nowlis, Naomi Mandel, and Andrea C. Morales (2008), "The Effects of Reduced Food Size and Package Size on the Consumption Behavior of Restrained and Unrestrained Eaters," *Journal of Consumer Research*, 35 (October), 391-405.

Winner of the 2008 Emerald Management Reviews Citation of Excellence Award for "A Bite to Whet the Reward Appetite: The Influence of Sampling on Reward-Seeking Behaviors."  This award means that this article was selected as one of the top 50 business and management articles from 15,000 published in 2008, and the only article from *Journal of Marketing Research* to receive this award.

Co-Chair of AMA doctoral consortium, 2007

Co-Chair of ACR doctoral symposium, 2006

Ferber Award Judge, 2005

Finalist for Paul Green Award, 2005

Outstanding Reviewer Award, *Journal of Consumer Research*, 2002.

Winner of the 2001 William F. O'Dell Award.  Given for the article appearing in the *Journal of Marketing Research* in 1996 that has made the most significant long-term contribution to the marketing discipline in the five year period 1996-2001.

Finalist (top 4) for the 2002 William F. O'Dell Award.  Given for the article appearing in the *Journal of Marketing Research* in 1997 that has made the most significant long-term contribution to the marketing discipline in the five year period 1997-2002.

Winner of the 2001 Early Career Contribution Award from the Society for Consumer Psychology – Sheth Foundation, Division 23, American Psychological Association.  Given annually to the most productive researcher in the field of consumer behavior/marketing who has been a faculty member for less than ten years.

Winner of Best Theoretical Paper award (Stephen M. Nowlis and Deborah B. McCabe), "Online vs. Off-line Consumer Decision Making: The Effect of the Ability to Physically Inspect Merchandise," at 2nd INFORMS "Marketing Science and the Internet:  Understanding Consumer Behavior on the Internet," conference, sponsored by Andersen Consulting and the Marshall School of Business, April 29 - 30, 2000.  Prize paid $2500.

Voted Outstanding Graduate Student Instructor, Haas School of Business, University of California at Berkeley, 1992-1993

Winner of Delbert Duncan Award for Best Marketing MBA student, 1988-1990

## Publications

Tonietto, Gabriela N., Selin A. Malkoc, and Stephen M. Nowlis (2019), "When an Hour Feels Shorter:  Future Boundary Tasks Alter Consumption by Contracting Time," *Journal of Consumer Research*, 45 (5), 1085-1102.

Scott, Maura and Stephen M. Nowlis (2013), "The Effect of Goal Specificity on Consumer Goal Reengagement," *Journal of Consumer Research*, 40 (3), 444-459.

Castro, Iana A., Andrea C. Morales, and Stephen M. Nowlis (2013), "The Influence of Disorganized Shelf Displays and Limited Product Quantity on Consumer Purchase," *Journal of Marketin*g, 77 (4), 118-133.

Nowlis, Stephen M., Ravi Dhar, and Itamar Simonson (2010), "The Effect of Decision Order on Purchase Quantity Decisions," *Journal of Marketing Research*, 47 (August), 725-737.

Griskevicius, Vladas, Michelle Shiota, and Stephen M. Nowlis (2010), "The Many Shades of Rose-Colored Glasses:  An Evolutionary Approach to the Influence of Different Positive Emotions," *Journal of Consumer Research*, 37 (2), 238-250.

Frederick, Shane, Nathan Novemsky, Jing Wang, Ravi Dhar, and Stephen M. Nowlis (2009), "Opportunity Cost Neglect," *Journal of Consumer Research*, 36 (4), 553-561.

Scott, Maura L., Stephen M. Nowlis, Naomi Mandel, and Andrea C. Morales (2008), "The Effects of Reduced Food Size and Package Size on the Consumption Behavior of Restrained

and Unrestrained Eaters," *Journal of Consumer Research*, 35 (October), 391-405.  This paper won Honorable Mention for the 2009 Ferber Award.

Wadhwa, Monica, Baba Shiv, and Stephen M. Nowlis (2008), "A Bite to Whet the Reward Appetite: The Influence of Sampling on Reward-Seeking Behaviors," *Journal of Marketing Research,* 45 (August), 403-413.  This paper won the 2008 Emerald Citation of Excellence Award.

Mandel, Naomi and Stephen M. Nowlis (2008), "The Effect of Making a Prediction about the Outcome of a Consumption Experience on the Enjoyment of that Experience," *Journal of Consumer Research*, 35 (June), 9-20.

Kahn, Barbara E., Mary Frances Luce, and Stephen M. Nowlis (2006), "Debiasing Insights from Process Tests," *Journal of Consumer Research,* 33 (June), 131-138.

Nowlis, Stephen M. and Baba Shiv (2005), "The Influence of Consumer Distractions on the Effectiveness of Food Sampling Programs," *Journal of Marketing Research*, 42 (May), 157-168.

Shiv, Baba, Alexander Fedorikhin, and Stephen M. Nowlis (2005), "Interplay of the Heart and Mind in Decision Making," in *Inside Consumption:  Frontiers of Research on Consumer Motives, Goals, and Desire*, ed. Ratti Ratneshwar and David Mick.

Nowlis, Stephen, Naomi Mandel, and Deborah Brown McCabe (2004), "The Effect of a Delay Between Choice and Consumption on Consumption Enjoyment," *Journal of Consumer Research*, 31 (December), 502-510.

Shiv, Baba and Stephen M. Nowlis (2004), "The Effect of Distractions while Tasting a Food Sample:  The Interplay of Informational and Affective Components in Subsequent Choice," *Journal of Consumer Research*, 31 (December), 599-608.

Dhar, Ravi and Stephen M. Nowlis (2004), "To Buy or Not to Buy: Response Mode Effects on Consumer Choice," *Journal of Marketing Research*, 41 (November), 423-432.

Nowlis, Stephen M. and Deborah B. McCabe (2004), "The Effect of Examining Actual Products or Product Descriptions on Consumer Preference," *Journal of Consumer Psychology*, 13 (4), 431-439.

Nowlis, Stephen M., Barbara E. Kahn, and Ravi Dhar (2002), "Coping with Ambivalence: The Effect of Removing a Neutral Option on Consumer Attitude and Preference Judgments," *Journal of Consumer Research*, 29 (December), 319-334.

Lemon, Katherine and Stephen M. Nowlis (2002), "Developing Synergies Between Promotions and Brands in Different Price-Quality Tiers," 39 (May) *Journal of Marketing Research,* 171-185.

Itamar Simonson, Ziv Carmon, Ravi Dhar, Aimee Drolet, Stephen M. Nowlis (2001), "Consumer Research:  In Search of Identity," *Annual Review of Psychology*, 52, 249-275.

Simonson, Itamar and Stephen M. Nowlis (2000), "The Role of Explanations and Need for Uniqueness in Consumer Decision Making:  Unconventional Choices Based on  Reasons," *Journal of Consumer Research*, 27 (June), 49-68.

Dhar, Ravi, Stephen M. Nowlis, and Steven J. Sherman (2000), "Trying Hard or Hardly Trying: Context Effects in Choice," *Journal of Consumer Psychology*, 9 (4), 189-200.

Nowlis, Stephen M. and Itamar Simonson (2000), "Sales Promotions and the Choice Context as Competing Influences on Consumer Decision Making," *Journal of Consumer Psychology*, 9 (1), 1-16.

Dhar, Ravi, Stephen M. Nowlis, and Steven J. Sherman (1999), "Comparison Effects On Preference Construction," *Journal of Consumer Research,* 26 (December), 293-306.

Ravi Dhar and Stephen M. Nowlis (1999), "The Effect of Time Pressure on Consumer Choice Deferral," *Journal of Consumer Research*, 25 (March), 369-384.

Nowlis, Stephen M. and Itamar Simonson (1997), "Attribute-Task Compatibility as a Determinant of Consumer Preference Reversals," *Journal of Marketing Research*, 34 (May), 205-218.  This paper was a finalist for the 2002 O'Dell Award.  A Brief of this paper is written by John T. Landry in *Harvard Business Review* (1996), 74 (November/December), 13. This article was reprinted in *The Construction of Preference* (2006), eds. Sarah Lichtenstein and Paul Slovic, Cambridge University Press:  New York, NY, p. 192-219.

Nowlis, Stephen M. and Itamar Simonson (1996), "The Effect of New Product  Features on Brand Choice," *Journal of Marketing Research*, 33 (February), 36-46.  This paper won the 2001 O'Dell Award.

Nowlis, Stephen M. (1995), "The Effect of Time Pressure on the Choice Between Brands that Differ in Quality, Price, and Product Features," *Marketing Letters*, 6(4), 287-295.

Simonson, Itamar, Stephen M. Nowlis, and Katherine Lemon (1993), "The Effect of Local Consideration Sets on Global Choice Between Lower Price and Higher Quality," *Marketing Science*, 12 (4), 357-377

Simonson, Itamar, Stephen M. Nowlis, and Yael Simonson (1993), "The Effect of Irrelevant Preference Arguments on Consumer Choice," *Journal of Consumer Psychology*, 2 (3), 287-306.

**Industry experience**

Assistant Buyer, May Company Department Stores, Los Angeles, CA, 1986-1988
Expert Witness Consulting, 2001-

**Expert Witness Consulting (deposition or trial testimony in the last 4 years)**

Global Community Monitor v. Lumber Liquidators Inc.
- Morrison & Foerster LLP, San Francisco, CA
- Deposition
- 2016

Newborn Bros. Co. Inc. v. Albion Engineering
- Caesar Rivise, Philadelphia, PA
- Deposition
- 2016

Petrageous Designs Ltd. v. Olivet International Inc.
- McGuire Woods LLP, Washington, DC
- Deposition
- 2016

McAirlaids v. Medline
- McGuireWoods LLP, Washington, DC
- Deposition
- 2016

FTC v. DIRECTV
- Sidley Austin LLP, Los Angeles, CA
- Deposition
- 2016

Shelley Pickett and Tracy Humphrey v. 99 Cents Only Stores
- Munger, Tolles, and Olson LLP, Los Angeles, CA
- Deposition
- 2017

Newborn Bros. Co. Inc. v. Albion Engineering
- Caesar Rivise, Philadelphia, PA
- Trial testimony
- 2017

Velocity Patent LLC v. FCA US LLC
- Venable LLP
- Deposition
- 2018

Colorado Seasons v. Art Brand Studios, LLC, et al.
- Davis Wright Tremaine
- Deposition

- 2018

Dicamba Herbicides Litigation, MDL No. 2820
- Thompson Coburn
- Deposition
- 2019

State of Washington v. TVI, Inc.
- Davis Wright Tremaine
- Deposition and Trial
- 2019

Eidelman v. The Sun Products Corporation and Costco Wholesale Corporation
- Manatt, Phelps, and Phillips
- Deposition
- 2019

Stimuli: EULA 1

**END USER LICENSE AGREEMENT**

**NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.**

This End-User License Agreement (**"EULA"**) is a legal agreement between you, either an individual or a single entity (**"End User"** or **"You"**) and McKesson Information Solutions LLC, on behalf of itself and the McKesson Affiliates (**"McKesson"**) for the Software and Clinical Content, as those terms are defined in Section 1.1.1 below, that McKesson provides to End User. By installing, copying, or otherwise using the Software or Clinical Content, You agree to be bound by the terms of this EULA. If You do not agree to the terms of this EULA, You may not install or use the Software.

AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

If You have previously entered into a written license agreement directly with McKesson or any of its predecessors, including but not limited to Physicians Micro Systems, Inc., for license of the Software, then this EULA does not apply to You, even if You click "accept" to continue installation.

If You did not obtain the Software either directly from McKesson or from an authorized McKesson reseller, or if You have not paid either McKesson or an authorized McKesson reseller in full for this license, then this EULA offer is rescinded and You are not authorized to install or use this Software. The term of this EULA (**"Term"**) commences on the date the End User first installs the Software and continues until terminated pursuant to Section 2.5.1.

**SECTION 1: SOFTWARE**
1.1      Software and Clinical Content.
1.1.1    Definitions
(a)      "Clinical Content" means medical or clinical information such as terminology, vocabularies, decision support rules, alerts, drug interaction knowledge, care pathway knowledge, standard ranges of normal or expected result values, and any other clinical content or rules provided to End User for use with the Software, together with any related Documentation. Clinical Content may be either (a) owned by McKesson or (b) owned by a third party and sublicensed to End User under this EULA.
(b)      "Concurrent User" means a Permitted User identified by a unique user ID issued by End User that is one user out of a maximum number of users permitted to access the Software simultaneously.
(c)      "Confidential Information" means any information or material, other than Trade Secrets, that is of value to McKesson and is not generally known to third parties, or that McKesson obtains from any third party that McKesson treats as confidential whether or not owned by McKesson. Confidential Information shall not include information that You can show is: (1) known by You at the time of receipt from McKesson and not subject to any other nondisclosure agreement between the parties; (2) now, or which hereafter becomes, generally known to the public through no fault of You; (3) otherwise lawfully and independently developed by You without reference to Confidential Information; or (4) lawfully acquired by You from a third party without any obligation of confidentiality.
(d)      "Data Center" means one data center located in the United States only and operated by End User.

(e)       "Documentation" means user guides or operating manuals containing the functional specifications for the McKesson owned software and Clinical Content, as may be reasonably modified from time to time, provided to End User.

(f)       "Facility" means one discrete location, in the United States only, where healthcare services are administered by a Provider or Providers or operated by End User as applicable.

(g)       "McKesson Affiliates" means NDCHealth Corporation (but specifically excluding PST Services, Inc.) and any U.S. entities that, now or in the future, are controlled by either McKesson Information Solutions LLC or NDC Health Corporation.

(h)       "Permitted User" means any individual (a) End User employee, (b) consultant or independent contractor who has need to use the Software based upon a contractual relationship with End User, so long as (i) such consultant or independent contractor is not a McKesson competitor, (ii) End User remains responsible for use of the Software by such consultant or independent contractor, and (iii) such consultant or independent contractor is subject to confidentiality and use restrictions at least as strict as those contained in this EULA, (c) physician with admitting privileges at a Facility, (d) employee of such physician, and (e) medical professional authorized to perform services at a Facility.

(i)       "Provider" means specially trained and licensed personnel (e.g., medical doctor, doctor of osteopathy, physician assistant, physical therapist, dietician, and advanced registered nurse practitioner) directly billing for patient care services either (i) under his or her name, (ii) the name of the practice, or (iii) under the name of a supervisory Provider. "Full-time Providers" are Providers working 20 hours a week or greater. "Part-time Providers" are Providers working less than 20 hours a week or a doctor in residency training.

(j)       "Software" means (i) software in object code form only that accompanies this EULA, and (ii) related Documentation (collectively, "Software").

(k)       "Term" has the meaning set forth in the fifth paragraph of the Introductory Section.

(l)       "Trade Secret" means any information of McKesson or that McKesson has acquired from a third party which is not commonly known by or available to the public, which (1) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secret shall include, but not be limited to, Software, Documentation, Clinical Content and the terms and conditions of this EULA.

1.1.2    License Grant.

(a)       Perpetual License. Subject to the terms of this EULA, McKesson grants to End User, and End User accepts, a limited, nonexclusive, nontransferable, non-sublicensable, perpetual license to use the Software and Clinical Content for End User's internal purposes. Depending on the intended usage, Clinical Content may be provided in either paper or electronic formats.

(b)       The license grant in this Section is expressly subject to the following conditions: (i) the Software may be installed only on equipment at Facilities and Data Centers as specified in Section I.I.3(c) below, (ii) the Software and Clinical Content may be accessed or used only by Permitted Users in the U.S., (iii) use of the Software and Clinical Content is limited by the usage-based variable(s) as specified in Section l.l.3(c) below, and (iv) the Software and Clinical Content may be used to provide service bureau or other similar services, or hosted by a third party (e.g. outsourcing or facility management service provider), only if expressly permitted in a separate writing by McKesson.

(c)       Third Party Software. Any software that is owned by a third party and provided to End User with the Software is subject to that license and terms and conditions accompanying such Third Party Software. McKesson may substitute different software for any Third Party Software, if McKesson reasonably demonstrates the need to do so.

1.1.3    Software License Restrictions.

(a)       Copying and Modification. End User shall not to duplicate the Software, except as required for its use in accordance with this Agreement, provided that End User may make one (1) back-up copy of the Software solely for archival purposes. Such back-up copy shall include

McKesson's copyright and other proprietary notices, and shall be subject to all the terms and conditions of this EULA. End User will not alter any trademark, copyright notice, or other proprietary notice on the Software or Documentation, and will duplicate each such trademark or notice on each copy of the Software and Documentation.

(b)     Facility Limitation. The Software will be installed only at Facilities and Data Centers as set forth in Section I.I.3(c) below, except that the Software may be installed on a temporary basis at an alternate location in the U.S. if End User is unable to use the Software at such Facility or Data Center due to equipment malfunction or force majeure event. End User will promptly notify McKesson of the alternate location if such temporary use continues for longer than 30 days.

(c)     The following additional restrictions apply to the Software as set forth below:

i.      Lytec SU (single user): Single machine; unlimited named users; no Concurrent Users; No remote access.

ii.     Lytec MU (multiple user): Up to 3 Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iii.    Lytec Professional: Up to five Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iv.     Lytec Client Server: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

v.      Lytec MD: Available to the number of Providers and Concurrent Users purchased from McKesson or the McKesson reseller; One Provider license includes 5 concurrent users; additional Providers or Concurrent Users must be licensed.

vi.     Medisoft Basic or Medisoft Original: Single machine; unlimited named users; no concurrent users; No remote access.

vii.    Medisoft Advanced: Single machine; unlimited named users; no concurrent users; No remote access.

viii.   Medisoft Network Professional: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

ix.     Practice Partner: Available to the number of Providers purchased from McKesson or the McKesson reseller; add-on licenses for some End Users may be licensed on Concurrent User basis if original license was Concurrent User based- please check with Your McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

(d)     Current Procedural Terminology (CPT). The Software may include the Current Procedural Terminology (CPT) code set, maintained by the American Medical Association through the CPT Editorial Panel, describing medical, surgical, and diagnostic services and designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes (the "CPT"). End User may only use the CPT code set consistent with these terms and conditions set forth on Exhibit A.

1.2     Export Law Assurances. End User may not use or otherwise export or re-export the Software or Documentation except as authorized by United States law and the laws of the jurisdiction in which the Software or Documentation was obtained. In particular, the Software or Documentation may not be exported, transshipped or re-exported (1) into (or to a national or resident of) those countries subject to a comprehensive economic sanctions program administered by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") (Countries subject to OFAC embargo or sanctions can change at any time and can be reviewed by consulting materials available at http://www.treas.gov/ofac/index.html and

http://www.bis.doc.gov); or (2) to anyone on the U.S. Treasury Department list of Specially Designated Nationals or the U.S. Department of Commerce Denied Persons List or Entity List, each as they may be amended from time to time and which may be found at http://www.treas.gov/ofac/index.html and http://www.bis.doc.gov.

1.3     Warranty. McKesson warrants to End User that the computer media on which the original Software is recorded will be free of defects in material and workmanship for a period of 30 days from the date of purchase under normal conditions of use and service. If the media becomes defective within 30 days from the date of purchase, if proof of original purchase can be verified, as End User's sole remedy and McKesson's sole obligation McKesson will replace the Software or at its option, McKesson may refund to End User the original McKesson purchase price.

1.4     Disclaimer. EXCEPT AS STATED IN THE WARRANTY OF SECTION 1.3, THE MCKESSON SOFTWARE AND CLINICAL CONTENT IS PROVIDED "AS IS WITH ALL FAULTS" AND IN ITS PRESENT STATE AND CONDITION. NO WARRANTY, REPRESENTATION, GUARANTEE, CONDITION, UNDERTAKING OR TERM, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO THE CONDITION, QUALITY, DURABILITY, ACCURACY, COMPLETENESS, PERFORMANCE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, QUIET ENJOYMENT, OR FITNESS FOR A PARTICULAR PURPOSE OR USE OF THE MCKESSON SOFTWARE OR CLINICAL CONTENT IS GIVEN OR ASSUMED BY MCKESSON AND ALL SUCH WARRANTIES, REPRESENTATIONS, CONDITIONS, UNDERTAKINGS AND TERMS ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW, AS ARE ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE. MCKESSON DOES NOT WARRANT THAT DEFECTS IN THE MCKESSON SOFTWARE OR CLINICAL CONTENT WILL BE CORRECTED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY MCKESSON OR ANY MCKESSON REPRESENTATIVE OR RESELLER SHALL CREATE A WARRANTY. MCKESSON DOES NOT WARRANT THAT THE SOFTWARE OR CLINICAL CONTENT WILL YIELD ANY PARTICULAR BUSINESS OR FINANCIAL RESULT. TO THE EXTENT THAT UPDATED VERSIONS OF THE SOFTWARE OR CLINICAL CONTENT ARE DEVELOPED AND RELEASED BY MCKESSON, END USER ASSUMES ALL RISKS ASSOCIATED WITH USING OLDER VERSIONS OF THE SOFTWARE, INCLUDING BUT NOT LIMITED TO THE RISK OF USING OUTDATED CLINICAL CONTENT.

1.5     Audit. Upon reasonable advance notice and no more than twice per calendar year, McKesson may conduct an audit to ensure that End User is in compliance with this EULA. Such audit will be conducted during regular business hours, and End User will provide McKesson with reasonable access to all relevant equipment and records. If an audit reveals that End User's use of any Software or Clinical Content during the period being audited exceeds the usage-based variable(s) licensed by End User, then McKesson may invoice End User for all such excess use based on McKesson's prevailing rate(s) in effect at the time the audit is completed, and End User will pay any such invoice. If such excess use exceeds five percent of the licensed use, then End User will also pay McKesson's reasonable costs of conducting the audit.

## SECTION 2: GENERAL TERMS

2.1.1     Confidential Information, Trade Secrets. You shall not use (except as permitted in connection with Your performance hereunder), disclose or permit any person access to any Trade Secrets (including, without limitation, the Software, Clinical Content and Documentation) while such information retains its status as a Trade Secret. During the Term and for a period of five (5) years thereafter, except as otherwise mandated by law, You shall not use, disclose, or permit any person access to any Confidential Information, except as permitted in connection with Your performance hereunder. You acknowledge that if You breach this Section 2.1.1, McKesson may have no adequate remedy at law available to it, may suffer irreparable harm, and will be entitled to seek equitable relief. You agree to protect such Confidential Information and Trade Secrets with no less diligence than You protect Your own confidential or proprietary information. If disclosure of Confidential Information is required under provisions of any law or court order, You will notify McKesson sufficiently in advance so McKesson will have a reasonable opportunity to

object.

2.1.2   Software Usage Information.  During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also assists McKesson in offering End User other features and services. Usage Information sent by the Software may include the following: Customer # / serial number; software name; software version; date data was collected; total number of appointments in database; total number of visits in database; total number of transactions in database; for each item in the doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage information by sending notice to McKesson in accordance with Section 2.7 to the attention of the General Manager, Physician Practice Solutions. The notice must include the Software serial number.

2.1.3   Retained Rights. End User's rights in the Software will be limited to those expressly granted in this EULA. McKesson and its suppliers reserve all intellectual property rights not expressly granted to End User. All changes, modifications, improvements or new modules made or developed with regard to the Software, whether or not (a) made or developed at End User's request, (b) made or developed in cooperation with End User, or (c) made or developed by End User, will be solely owned by McKesson or its suppliers. End User acknowledges that the Software contains trade secrets of McKesson, and End User agrees not to take any step to derive a source code equivalent of the Software (e.g., disassemble, decompile, or reverse engineer the Software) or to permit any third party to do so. McKesson retains title to all material, originated or prepared for the End User under this EULA. End User is granted a license to use such materials in accordance with this EULA.

2.1.4   Maintenance Fees. Subject to payment of applicable fees, McKesson provides software maintenance services for Practice Partner Software and Lytec MD Software through an authorized McKesson reseller, or from McKesson, if You obtained the Software directly from McKesson. The scope and fees for such software maintenance services are set forth in a separate written agreement between You, and either the McKesson reseller or McKesson, as applicable.

2.2   Limitation of Liability.

2.2.1   Total Damages. MCKESSON'S TOTAL CUMULATIVE LIABILITY UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA WILL BE LIMITED TO (A) THE TOTAL FEES PAID (LESS ANY REFUNDS OR CREDITS) BY END USER FOR THE SOFTWARE GIVING RISE TO THE CLAIM, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE.

2.2.2   Exclusion of Damages. IN NO EVENT WILL MCKESSON BE LIABLE TO END USER UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOSS OF GOODWILL, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT MCKESSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

2.2.3   Material Consideration. THE PARTIES ACKNOWLEDGE THAT THE FOREGOING LIMITATIONS ARE A MATERIAL CONDITION FOR THEIR ENTRY INTO THIS EULA.

2.3   Professional Responsibility and Clinical Content Disclaimer. END USER ACKNOWLEDGES AND AGREES THAT ANY CLINICAL CONTENT FURNISHED BY MCKESSON HEREUNDER (WHETHER SEPARATELY OR INCLUDED WITHIN THE SOFTWARE) IS AN INFORMATION MANAGEMENT AND DIAGNOSTIC TOOL ONLY AND THAT ITS USE CONTEMPLATES AND REQUIRES THE INVOLVEMENT OF TRAINED INDIVIDUALS. END USER FURTHER ACKNOWLEDGES AND AGREES THAT MCKESSON HAS NOT REPRESENTED ITS SOFTWARE AS HAVING THE ABILITY TO DIAGNOSE DISEASE, PRESCRIBE TREATMENT, OR PERFORM ANY OTHER TASKS THAT CONSTITUTE THE PRACTICE OF MEDICINE.

2.4    Internet Disclaimer. CERTAIN SOFTWARE PROVIDED BY MCKESSON UTILIZES THE INTERNET. MCKESSON DOES NOT WARRANT THAT SUCH SOFTWARE WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE. MCKESSON DOES NOT AND CANNOT CONTROL THE FLOW OF DATA TO OR FROM MCKESSON'S OR END USER'S NETWORK AND OTHER PORTIONS OF THE INTERNET. SUCH FLOW DEPENDS IN LARGE PART ON THE INTERNET SERVICES PROVIDED OR CONTROLLED BY THIRD PARTIES. ACTIONS OR INACTIONS OF SUCH THIRD PARTIES CAN IMPAIR OR DISRUPT END USER'S CONNECTIONS TO THE INTERNET (OR PORTIONS THEREOF). ACCORDINGLY, MCKESSON DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.

2.5    Termination.

2.5.1    Termination. McKesson may terminate the EULA immediately upon notice to End User if End User: (a) materially breaches the EULA and fails to remedy such breach within 60 days after receiving notice of the breach from the terminating party, (b) materially breaches any other contract End User has entered into with McKesson, (c) infringes McKesson's intellectual property rights and fails to remedy such breach within ten (10) days after receiving notice of the breach from the terminating party, (d) materially breaches the EULA in a manner that cannot be remedied, or (e) commences dissolution proceedings or ceases to operate in the ordinary course of business.

2.5.2    Obligations upon Termination or Expiration. Upon the termination or expiration of this EULA, End User will promptly (a) cease using all Software and Clinical Content, (b) purge all Software and Clinical Content from all computer systems (including servers and personal computers), (c) return to McKesson or destroy all copies (including partial copies) of the Software and Clinical Content, and (d) deliver to McKesson written certification of an officer of End User that End User has complied with its obligations in this Section.

2.6    Discount Reporting. An order form or quote may contain a discount that End User is required to report in its cost reports or another appropriate manner under applicable federal and state anti-kickback laws, including 42 U.S.C. Sec. 1320a-7b(b)(3)(A) and the regulations found at 42 C.F.R. Sec. 1001.952(h). End User will be responsible for reporting, disclosing and maintaining appropriate records with respect to the discount and making those records available under Medicare, Medicaid or other applicable government health care programs.

2.7    General.    This EULA is governed by and will be construed in accordance with the laws of the State of Georgia, exclusive of its rules governing choice of law and conflict of laws and any version of the Uniform Commercial Code; each party agrees that exclusive venue for all actions, relating in any manner to this EULA will be in a federal or state court of competent jurisdiction located in Fulton County, Georgia. End User will not assign this EULA without the written consent of McKesson; McKesson may, upon notice to End User, assign this EULA to any McKesson Affiliate or to any entity resulting from reorganization, merger, or sale, and may subcontract its obligations. Failure to exercise or enforce any right under this EULA is not a waiver of such right. Neither party is liable for failing to fulfill its obligations due to acts of God or other causes beyond it reasonable control, except for End User's obligation to make payment. All notices relating to the parties' legal rights and remedies under this EULA must be provided in writing and delivered by: (a) postage prepaid registered or certified U.S. Post mail; or (b) commercial courier. All notices to McKesson will be sent to the following address with a copy to McKesson's General Counsel: 5995 Windward Parkway, Alpharetta, GA 30005. This EULA is the complete and exclusive agreement between the parties with respect to the subject matter hereof and may be may be modified, or any rights under it waived, only in a mutually-signed written agreement

2.8    Government Customer Rights. If this Software is provided under a federal government contract, then McKesson intends that any Software provided under this EULA constitute "commercial item(s)" as defined in Federal Acquisition Regulation ("**FAR**") 2.101, including any Software, Clinical Content, Documentation or technical data. Additionally, all Software, Clinical Content, Documentation, or technical data provided by McKesson under this EULA will be considered related to such "commercial item(s)". If End User seeks rights in Software, Clinical

Content, Documentation, or technical data provided by McKesson under this EULA, then McKesson grants only those rights established under any FAR or FAR Supplement clauses which are flowed down to McKesson under this EULA consistent with the delivery of "commercial item(s)." If End User contends that any Software, Clinical Content, Documentation, or technical data provided under this EULA does not constitute "commercial item(s)" as defined in FAR 2.101, then End User promptly will notify McKesson of the same, and identify what rights End User contends exist in such Software, Clinical Content, Documentation, or technical data. No rights in any such Software, Clinical Content, Documentation, or technical data will attach other than rights related to "commercial item(s)" unless End User provides such notice to McKesson, and McKesson expressly agrees in writing that such rights are granted under this EULA.

## EXHIBIT A
CPT CODES AND TERMINOLOGY
SECTION 1: USER IS AN INDIVIDUAL WHO:
1.1     accesses, uses, and/or manipulates CPT codes and/or descriptions contained in the Software either at the input (the point at which data is entered into the Software), the output (the point at which data, reports, or the like are received from the Software), or both phases of using the Software; or
1.2     accesses, uses, and/or manipulates the Software to produce or enable an output that could not have been created without CPT embedded in the Software even though CPT may not be visible or directly accessible; or
1.3     makes use of an output of the Software that relies on or could not have been created without the CPT embedded in the Software even though CPT may not be visible or directly accessible (excepting that which would constitute fair use, internal reports, and claim forms for specific patients).
SECTION 2:
2.1     The Clinical Content and/or Software may incorporate the CPT terminology developed and copyrighted by the American Medical Association ("AMA"). The CPT codes and terminology are provided pursuant to a license agreement between McKesson and the AMA. If End User requires additional User licenses, End User may purchase additional licenses from McKesson and the parties will negotiate in good faith the terms and conditions under which McKesson will make available such additional User licenses.
2.1.1   End User acknowledges that the AMA reserves all rights, whether statutory or common-law, in the CPT terminology and that no rights therein are hereby conveyed to End User except to the extent that End User has been granted a license to the Software. THE AMA MAKES NO REPRESENTATIONS OR WARRANTIES EXPRESS OR IMPLIED, WITH RESPECT TO CPT, INCLUDING, WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. END USER FURTHER ACKNOWLEDGES THAT THE AMA SHALL NOT BE LIABLE TO END USER FOR ANY DAMAGES OF ANY NATURE WHETHER DIRECT, INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL, ARISING FROM THIS AGREEMENT. The AMA shall not by reason of the incorporation of the CPT terminology in the Software or by any other reason be deemed a party to this Agreement and End User shall look solely to McKesson for the performance of any obligations due End User hereunder.
2.2     In the event that one or more of the provisions contained in the Agreement shall for any reason be held invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity or enforceability of this Exhibit.
2.3     CPT only © 2000, 2001 etc. American Medical Association. All Rights Reserved. No fees schedules, basic units, relative values or related listings are included in CPT. AMA does not directly or indirectly practice medicine or dispense medical services. AMA assumes no liability for data contained or not contained herein.
2.4     CPT is commercial technical data and/or computer data bases and/or commercial computer software and/or commercial computer software documentation, as applicable which were developed exclusively at private expense by the American Medical Association, 515 North

State Street, Chicago, Illinois, 60610. U.S. Government rights to use, modify, reproduce, release, perform, display, or disclose these technical data and/or computer data bases and/or computer software and/or computer software documentation are subject to the limited rights restrictions of DFARS 252.227-7015(b)(2) (June 1995) and/or subject to the restrictions of DFARS 227.7202-1(a)(June 1995) and DFARS 227.7202-3(a)(June 1995), as applicable for U.S. Department of Defense procurements and the limited rights restrictions of FAR 52.227-14 (June 1987) and/or subject to the restricted rights provisions of FAR 52.227-14 (1987) and FAR 52.227-19 (June 1987), as applicable, and any applicable agency FAR Supplements, for non-Department of Defense Federal procurements.

Stimuli: EULA 2

**END USER LICENSE AGREEMENT**

> **NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.**

This End-User License Agreement (**"EULA"**) is a legal agreement between you, either an individual or a single entity (**"End User"** or **"You"**) and McKesson Information Solutions LLC, on behalf of itself and the McKesson Affiliates (**"McKesson"**) for the Software and Clinical Content, as those terms are defined in Section 1.1.1 below, that McKesson provides to End User. By installing, copying, or otherwise using the Software or Clinical Content, You agree to be bound by the terms of this EULA. If You do not agree to the terms of this EULA, You may not install or use the Software.

> AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

If You have previously entered into a written license agreement directly with McKesson or any of its predecessors, including but not limited to Physicians Micro Systems, Inc., for license of the Software, then this EULA does not apply to You, even if You click "accept" to continue installation.

If You did not obtain the Software either directly from McKesson or from an authorized McKesson reseller, or if You have not paid either McKesson or an authorized McKesson reseller in full for this license, then this EULA offer is rescinded and You are not authorized to install or use this Software. The term of this EULA (**"Term"**) commences on the date the End User first installs the Software and continues until terminated pursuant to Section 2.5.1.

**SECTION 1: SOFTWARE**
1.1      Software and Clinical Content.
1.1.1    Definitions
(a)      "Clinical Content" means medical or clinical information such as terminology, vocabularies, decision support rules, alerts, drug interaction knowledge, care pathway knowledge, standard ranges of normal or expected result values, and any other clinical content or rules provided to End User for use with the Software, together with any related Documentation. Clinical Content may be either (a) owned by McKesson or (b) owned by a third party and sublicensed to End User under this EULA.
(b)      "Concurrent User" means a Permitted User identified by a unique user ID issued by End User that is one user out of a maximum number of users permitted to access the Software simultaneously.
(c)      "Confidential Information" means any information or material, other than Trade Secrets, that is of value to McKesson and is not generally known to third parties, or that McKesson obtains from any third party that McKesson treats as confidential whether or not owned by McKesson. Confidential Information shall not include information that You can show is: (1) known by You at the time of receipt from McKesson and not subject to any other nondisclosure agreement between the parties; (2) now, or which hereafter becomes, generally known to the public through no fault of You; (3) otherwise lawfully and independently developed by You without reference to Confidential Information; or (4) lawfully acquired by You from a third party without any obligation of confidentiality.
(d)      "Data Center" means one data center located in the United States only and operated by End User.

(e)      "Documentation" means user guides or operating manuals containing the functional specifications for the McKesson owned software and Clinical Content, as may be reasonably modified from time to time, provided to End User.

(f)      "Facility" means one discrete location, in the United States only, where healthcare services are administered by a Provider or Providers or operated by End User as applicable.

(g)      "McKesson Affiliates" means NDCHealth Corporation (but specifically excluding PST Services, Inc.) and any U.S. entities that, now or in the future, are controlled by either McKesson Information Solutions LLC or NDC Health Corporation.

(h)      "Permitted User" means any individual (a) End User employee, (b) consultant or independent contractor who has need to use the Software based upon a contractual relationship with End User, so long as (i) such consultant or independent contractor is not a McKesson competitor, (ii) End User remains responsible for use of the Software by such consultant or independent contractor, and (iii) such consultant or independent contractor is subject to confidentiality and use restrictions at least as strict as those contained in this EULA, (c) physician with admitting privileges at a Facility, (d) employee of such physician, and (e) medical professional authorized to perform services at a Facility.

(i)      "Provider" means specially trained and licensed personnel (e.g., medical doctor, doctor of osteopathy, physician assistant, physical therapist, dietician, and advanced registered nurse practitioner) directly billing for patient care services either (i) under his or her name, (ii) the name of the practice, or (iii) under the name of a supervisory Provider. "Full-time Providers" are Providers working 20 hours a week or greater. "Part-time Providers" are Providers working less than 20 hours a week or a doctor in residency training.

(j)      "Software" means (i) software in object code form only that accompanies this EULA, and (ii) related Documentation (collectively, "Software").

(k)      "Term" has the meaning set forth in the fifth paragraph of the Introductory Section.

(l)      "Trade Secret" means any information of McKesson or that McKesson has acquired from a third party which is not commonly known by or available to the public, which (1) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secret shall include, but not be limited to, Software, Documentation, Clinical Content and the terms and conditions of this EULA.

1.1.2   License Grant.

(a)      Perpetual License. Subject to the terms of this EULA, McKesson grants to End User, and End User accepts, a limited, nonexclusive, nontransferable, non-sublicensable, perpetual license to use the Software and Clinical Content for End User's internal purposes. Depending on the intended usage, Clinical Content may be provided in either paper or electronic formats.

(b)      The license grant in this Section is expressly subject to the following conditions: (i) the Software may be installed only on equipment at Facilities and Data Centers as specified in Section I.I.3(c) below, (ii) the Software and Clinical Content may be accessed or used only by Permitted Users in the U.S., (iii) use of the Software and Clinical Content is limited by the usage-based variable(s) as specified in Section l.l.3(c) below, and (iv) the Software and Clinical Content may be used to provide service bureau or other similar services, or hosted by a third party (e.g. outsourcing or facility management service provider), only if expressly permitted in a separate writing by McKesson.

(c)      Third Party Software. Any software that is owned by a third party and provided to End User with the Software is subject to that license and terms and conditions accompanying such Third Party Software. McKesson may substitute different software for any Third Party Software, if McKesson reasonably demonstrates the need to do so.

1.1.3   Software License Restrictions.

(a)      Copying and Modification. End User shall not to duplicate the Software, except as required for its use in accordance with this Agreement, provided that End User may make one (1) back-up copy of the Software solely for archival purposes. Such back-up copy shall include

McKesson's copyright and other proprietary notices, and shall be subject to all the terms and conditions of this EULA. End User will not alter any trademark, copyright notice, or other proprietary notice on the Software or Documentation, and will duplicate each such trademark or notice on each copy of the Software and Documentation.

(b)     Facility Limitation. The Software will be installed only at Facilities and Data Centers as set forth in Section I.I.3(c) below, except that the Software may be installed on a temporary basis at an alternate location in the U.S. if End User is unable to use the Software at such Facility or Data Center due to equipment malfunction or force majeure event. End User will promptly notify McKesson of the alternate location if such temporary use continues for longer than 30 days.

(c)     The following additional restrictions apply to the Software as set forth below:

i.     Lytec SU (single user): Single machine; unlimited named users; no Concurrent Users; No remote access.

ii.     Lytec MU (multiple user): Up to 3 Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iii.     Lytec Professional: Up to five Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iv.     Lytec Client Server: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

v.     Lytec MD: Available to the number of Providers and Concurrent Users purchased from McKesson or the McKesson reseller; One Provider license includes 5 concurrent users; additional Providers or Concurrent Users must be licensed.

vi.     Medisoft Basic or Medisoft Original: Single machine; unlimited named users; no concurrent users; No remote access.

vii.     Medisoft Advanced: Single machine; unlimited named users; no concurrent users; No remote access.

viii.     Medisoft Network Professional: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

ix.     Practice Partner: Available to the number of Providers purchased from McKesson or the McKesson reseller; add-on licenses for some End Users may be licensed on Concurrent User basis if original license was Concurrent User based- please check with Your McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

(d)     Current Procedural Terminology (CPT). The Software may include the Current Procedural Terminology (CPT) code set, maintained by the American Medical Association through the CPT Editorial Panel, describing medical, surgical, and diagnostic services and designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes (the "CPT"). End User may only use the CPT code set consistent with these terms and conditions set forth on Exhibit A.

1.2     Export Law Assurances. End User may not use or otherwise export or re-export the Software or Documentation except as authorized by United States law and the laws of the jurisdiction in which the Software or Documentation was obtained. In particular, the Software or Documentation may not be exported, transshipped or re-exported (1) into (or to a national or resident of) those countries subject to a comprehensive economic sanctions program administered by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") (Countries subject to OFAC embargo or sanctions can change at any time and can be reviewed by consulting materials available at http://www.treas.gov/ofac/index.html and

http://www.bis.doc.gov); or (2) to anyone on the U.S. Treasury Department list of Specially Designated Nationals or the U.S. Department of Commerce Denied Persons List or Entity List, each as they may be amended from time to time and which may be found at http://www.treas.gov/ofac/index.html and http://www.bis.doc.gov.

1.3    Warranty. McKesson warrants to End User that the computer media on which the original Software is recorded will be free of defects in material and workmanship for a period of 30 days from the date of purchase under normal conditions of use and service. If the media becomes defective within 30 days from the date of purchase, if proof of original purchase can be verified, as End User's sole remedy and McKesson's sole obligation McKesson will replace the Software or at its option, McKesson may refund to End User the original McKesson purchase price.

1.4    Disclaimer. EXCEPT AS STATED IN THE WARRANTY OF SECTION 1.3, THE MCKESSON SOFTWARE AND CLINICAL CONTENT IS PROVIDED "AS IS WITH ALL FAULTS" AND IN ITS PRESENT STATE AND CONDITION. NO WARRANTY, REPRESENTATION, GUARANTEE, CONDITION, UNDERTAKING OR TERM, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO THE CONDITION, QUALITY, DURABILITY, ACCURACY, COMPLETENESS, PERFORMANCE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, QUIET ENJOYMENT, OR FITNESS FOR A PARTICULAR PURPOSE OR USE OF THE MCKESSON SOFTWARE OR CLINICAL CONTENT IS GIVEN OR ASSUMED BY MCKESSON AND ALL SUCH WARRANTIES, REPRESENTATIONS, CONDITIONS, UNDERTAKINGS AND TERMS ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW, AS ARE ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE. MCKESSON DOES NOT WARRANT THAT DEFECTS IN THE MCKESSON SOFTWARE OR CLINICAL CONTENT WILL BE CORRECTED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY MCKESSON OR ANY MCKESSON REPRESENTATIVE OR RESELLER SHALL CREATE A WARRANTY. MCKESSON DOES NOT WARRANT THAT THE SOFTWARE OR CLINICAL CONTENT WILL YIELD ANY PARTICULAR BUSINESS OR FINANCIAL RESULT. TO THE EXTENT THAT UPDATED VERSIONS OF THE SOFTWARE OR CLINICAL CONTENT ARE DEVELOPED AND RELEASED BY MCKESSON, END USER ASSUMES ALL RISKS ASSOCIATED WITH USING OLDER VERSIONS OF THE SOFTWARE, INCLUDING BUT NOT LIMITED TO THE RISK OF USING OUTDATED CLINICAL CONTENT.

1.5    Audit. Upon reasonable advance notice and no more than twice per calendar year, McKesson may conduct an audit to ensure that End User is in compliance with this EULA. Such audit will be conducted during regular business hours, and End User will provide McKesson with reasonable access to all relevant equipment and records. If an audit reveals that End User's use of any Software or Clinical Content during the period being audited exceeds the usage-based variable(s) licensed by End User, then McKesson may invoice End User for all such excess use based on McKesson's prevailing rate(s) in effect at the time the audit is completed, and End User will pay any such invoice. If such excess use exceeds five percent of the licensed use, then End User will also pay McKesson's reasonable costs of conducting the audit.

## SECTION 2: GENERAL TERMS

2.1.1    Confidential Information, Trade Secrets. You shall not use (except as permitted in connection with Your performance hereunder), disclose or permit any person access to any Trade Secrets (including, without limitation, the Software, Clinical Content and Documentation) while such information retains its status as a Trade Secret. During the Term and for a period of five (5) years thereafter, except as otherwise mandated by law, You shall not use, disclose, or permit any person access to any Confidential Information, except as permitted in connection with Your performance hereunder. You acknowledge that if You breach this Section 2.1.1, McKesson may have no adequate remedy at law available to it, may suffer irreparable harm, and will be entitled to seek equitable relief. You agree to protect such Confidential Information and Trade Secrets with no less diligence than You protect Your own confidential or proprietary information. If disclosure of Confidential Information is required under provisions of any law or court order, You will notify McKesson sufficiently in advance so McKesson will have a reasonable opportunity to

object.

2.1.2  Software Usage Information.  During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also assists McKesson in offering End User other features and services. Usage Information sent by the Software may include the following: Customer # / serial number; software name; software version; date data was collected; total number of appointments in database;  total number of visits in database;  total number of transactions in database; for each item in the doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days;  for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage information by sending notice to McKesson in accordance with Section 2.7 to the attention of the General Manager, Physician Practice Solutions. The notice must include the Software serial number.

2.1.3  Retained Rights. End User's rights in the Software will be limited to those expressly granted in this EULA. McKesson and its suppliers reserve all intellectual property rights not expressly granted to End User. All changes, modifications, improvements or new modules made or developed with regard to the Software, whether or not (a) made or developed at End User's request, (b) made or developed in cooperation with End User, or (c) made or developed by End User, will be solely owned by McKesson or its suppliers. End User acknowledges that the Software contains trade secrets of McKesson, and End User agrees not to take any step to derive a source code equivalent of the Software (e.g., disassemble, decompile, or reverse engineer the Software) or to permit any third party to do so. McKesson retains title to all material, originated or prepared for the End User under this EULA. End User is granted a license to use such materials in accordance with this EULA.

2.1.4  Maintenance Fees. Subject to payment of applicable fees, McKesson provides software maintenance services for Practice Partner Software and Lytec MD Software through an authorized McKesson reseller, or from McKesson, if You obtained the Software directly from McKesson. The scope and fees for such software maintenance services are set forth in a separate written agreement between You, and either the McKesson reseller or McKesson, as applicable.

2.2  Limitation of Liability.

2.2.1  Total Damages. MCKESSON'S TOTAL CUMULATIVE LIABILITY UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA WILL BE LIMITED TO (A) THE TOTAL FEES PAID (LESS ANY REFUNDS OR CREDITS) BY END USER FOR THE SOFTWARE GIVING RISE TO THE CLAIM, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE.

2.2.2  Exclusion of Damages. IN NO EVENT WILL MCKESSON BE LIABLE TO END USER UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOSS OF GOODWILL, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT MCKESSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

2.2.3  Material Consideration. THE PARTIES ACKNOWLEDGE THAT THE FOREGOING LIMITATIONS ARE A MATERIAL CONDITION FOR THEIR ENTRY INTO THIS EULA.

2.3  Professional Responsibility and Clinical Content Disclaimer. END USER ACKNOWLEDGES AND AGREES THAT ANY CLINICAL CONTENT FURNISHED BY MCKESSON HEREUNDER (WHETHER SEPARATELY OR INCLUDED WITHIN THE SOFTWARE) IS AN INFORMATION MANAGEMENT AND DIAGNOSTIC TOOL ONLY AND THAT ITS USE CONTEMPLATES AND REQUIRES THE INVOLVEMENT OF TRAINED INDIVIDUALS. END USER FURTHER ACKNOWLEDGES AND AGREES THAT MCKESSON HAS NOT REPRESENTED ITS SOFTWARE AS HAVING THE ABILITY TO DIAGNOSE DISEASE, PRESCRIBE TREATMENT, OR PERFORM ANY OTHER TASKS THAT CONSTITUTE THE PRACTICE OF MEDICINE.

2.4    Internet Disclaimer. CERTAIN SOFTWARE PROVIDED BY MCKESSON UTILIZES THE INTERNET. MCKESSON DOES NOT WARRANT THAT SUCH SOFTWARE WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE. MCKESSON DOES NOT AND CANNOT CONTROL THE FLOW OF DATA TO OR FROM MCKESSON'S OR END USER'S NETWORK AND OTHER PORTIONS OF THE INTERNET. SUCH FLOW DEPENDS IN LARGE PART ON THE INTERNET SERVICES PROVIDED OR CONTROLLED BY THIRD PARTIES. ACTIONS OR INACTIONS OF SUCH THIRD PARTIES CAN IMPAIR OR DISRUPT END USER'S CONNECTIONS TO THE INTERNET (OR PORTIONS THEREOF). ACCORDINGLY, MCKESSON DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.

2.5    Termination.

2.5.1    Termination. McKesson may terminate the EULA immediately upon notice to End User if End User: (a) materially breaches the EULA and fails to remedy such breach within 60 days after receiving notice of the breach from the terminating party, (b) materially breaches any other contract End User has entered into with McKesson, (c) infringes McKesson's intellectual property rights and fails to remedy such breach within ten (10) days after receiving notice of the breach from the terminating party, (d) materially breaches the EULA in a manner that cannot be remedied, or (e) commences dissolution proceedings or ceases to operate in the ordinary course of business.

2.5.2    Obligations upon Termination or Expiration. Upon the termination or expiration of this EULA, End User will promptly (a) cease using all Software and Clinical Content, (b) purge all Software and Clinical Content from all computer systems (including servers and personal computers), (c) return to McKesson or destroy all copies (including partial copies) of the Software and Clinical Content, and (d) deliver to McKesson written certification of an officer of End User that End User has complied with its obligations in this Section.

2.6    Discount Reporting. An order form or quote may contain a discount that End User is required to report in its cost reports or another appropriate manner under applicable federal and state anti-kickback laws, including 42 U.S.C. Sec. 1320a-7b(b)(3)(A) and the regulations found at 42 C.F.R. Sec. 1001.952(h). End User will be responsible for reporting, disclosing and maintaining appropriate records with respect to the discount and making those records available under Medicare, Medicaid or other applicable government health care programs.

2.7    General.    This EULA is governed by and will be construed in accordance with the laws of the State of Georgia, exclusive of its rules governing choice of law and conflict of laws and any version of the Uniform Commercial Code; each party agrees that exclusive venue for all actions, relating in any manner to this EULA will be in a federal or state court of competent jurisdiction located in Fulton County, Georgia. End User will not assign this EULA without the written consent of McKesson; McKesson may, upon notice to End User, assign this EULA to any McKesson Affiliate or to any entity resulting from reorganization, merger, or sale, and may subcontract its obligations. Failure to exercise or enforce any right under this EULA is not a waiver of such right. Neither party is liable for failing to fulfill its obligations due to acts of God or other causes beyond it reasonable control, except for End User's obligation to make payment. All notices relating to the parties' legal rights and remedies under this EULA must be provided in writing and delivered by: (a) postage prepaid registered or certified U.S. Post mail; or (b) commercial courier. All notices to McKesson will be sent to the following address with a copy to McKesson's General Counsel: 5995 Windward Parkway, Alpharetta, GA 30005. This EULA is the complete and exclusive agreement between the parties with respect to the subject matter hereof and may be may be modified, or any rights under it waived, only in a mutually-signed written agreement

2.8    Government Customer Rights. If this Software is provided under a federal government contract, then McKesson intends that any Software provided under this EULA constitute "commercial item(s)" as defined in Federal Acquisition Regulation ("**FAR**") 2.101, including any Software, Clinical Content, Documentation or technical data. Additionally, all Software, Clinical Content, Documentation, or technical data provided by McKesson under this EULA will be considered related to such "commercial item(s)". If End User seeks rights in Software, Clinical

Content, Documentation, or technical data provided by McKesson under this EULA, then McKesson grants only those rights established under any FAR or FAR Supplement clauses which are flowed down to McKesson under this EULA consistent with the delivery of "commercial item(s)." If End User contends that any Software, Clinical Content, Documentation, or technical data provided under this EULA does not constitute "commercial item(s)" as defined in FAR 2.101, then End User promptly will notify McKesson of the same, and identify what rights End User contends exist in such Software, Clinical Content, Documentation, or technical data. No rights in any such Software, Clinical Content, Documentation, or technical data will attach other than rights related to "commercial item(s)" unless End User provides such notice to McKesson, and McKesson expressly agrees in writing that such rights are granted under this EULA.

## EXHIBIT A
CPT CODES AND TERMINOLOGY
SECTION 1: USER IS AN INDIVIDUAL WHO:
1.1     accesses, uses, and/or manipulates CPT codes and/or descriptions contained in the Software either at the input (the point at which data is entered into the Software), the output (the point at which data, reports, or the like are received from the Software), or both phases of using the Software; or
1.2     accesses, uses, and/or manipulates the Software to produce or enable an output that could not have been created without CPT embedded in the Software even though CPT may not be visible or directly accessible; or
1.3     makes use of an output of the Software that relies on or could not have been created without the CPT embedded in the Software even though CPT may not be visible or directly accessible (excepting that which would constitute fair use, internal reports, and claim forms for specific patients).
SECTION 2:
2.1     The Clinical Content and/or Software may incorporate the CPT terminology developed and copyrighted by the American Medical Association ("AMA"). The CPT codes and terminology are provided pursuant to a license agreement between McKesson and the AMA. If End User requires additional User licenses, End User may purchase additional licenses from McKesson and the parties will negotiate in good faith the terms and conditions under which McKesson will make available such additional User licenses.
2.1.1   End User acknowledges that the AMA reserves all rights, whether statutory or common-law, in the CPT terminology and that no rights therein are hereby conveyed to End User except to the extent that End User has been granted a license to the Software. THE AMA MAKES NO REPRESENTATIONS OR WARRANTIES EXPRESS OR IMPLIED, WITH RESPECT TO CPT, INCLUDING, WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. END USER FURTHER ACKNOWLEDGES THAT THE AMA SHALL NOT BE LIABLE TO END USER FOR ANY DAMAGES OF ANY NATURE WHETHER DIRECT, INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL, ARISING FROM THIS AGREEMENT. The AMA shall not by reason of the incorporation of the CPT terminology in the Software or by any other reason be deemed a party to this Agreement and End User shall look solely to McKesson for the performance of any obligations due End User hereunder.
2.2     In the event that one or more of the provisions contained in the Agreement shall for any reason be held invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity or enforceability of this Exhibit.
2.3     CPT only © 2000, 2001 etc. American Medical Association. All Rights Reserved. No fees schedules, basic units, relative values or related listings are included in CPT. AMA does not directly or indirectly practice medicine or dispense medical services. AMA assumes no liability for data contained or not contained herein.
2.4     CPT is commercial technical data and/or computer data bases and/or commercial computer software and/or commercial computer software documentation, as applicable which were developed exclusively at private expense by the American Medical Association, 515 North

State Street, Chicago, Illinois, 60610. U.S. Government rights to use, modify, reproduce, release, perform, display, or disclose these technical data and/or computer data bases and/or computer software and/or computer software documentation are subject to the limited rights restrictions of DFARS 252.227-7015(b)(2) (June 1995) and/or subject to the restrictions of DFARS 227.7202-1(a)(June 1995) and DFARS 227.7202-3(a)(June 1995), as applicable for U.S. Department of Defense procurements and the limited rights restrictions of FAR 52.227-14 (June 1987) and/or subject to the restricted rights provisions of FAR 52.227-14 (1987) and FAR 52.227-19 (June 1987), as applicable, and any applicable agency FAR Supplements, for non-Department of Defense Federal procurements.

Stimuli: EULA 3

**NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.**

AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

2.1.2  Software Usage Information.  During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also assists McKesson in offering End User other features and services. Usage Information sent by the Software may include the following: Customer # / serial number; software name; software version; date data was collected; total number of appointments in database; total number of visits in database; total number of transactions in database; for each item in the doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage information by sending notice to McKesson in accordance with Section 2.7 to the attention of the General Manager, Physician Practice Solutions. The notice must include the Software serial number.

**Appendix C: Screenshots and Questionnaire**
**Faxed Advertisements Survey**

INTRO



QS0

**Appendix C: Screenshots and Questionnaire**
**Faxed Advertisements Survey**

INTRO



QS0

QS1



What type of electronic device are you using to complete this survey?

*(Select one only)*

- ○ Laptop computer
- ○ Tablet computer
- ○ Smartphone
- ○ Desktop computer
- ○ Other mobile or electronic device

**NEXT**

Copyright © 2020, Applied Marketing Science, Inc.

QS2

Are you...?

*(Select one only)*

- ○ Male
- ○ Female

**NEXT**

Copyright © 2020, Applied Marketing Science, Inc.

QS3

0%  100%

Into which of the following categories does your age fall?

*(Select one only)*

○ Under 18
○ 18 - 34
○ 35 - 49
○ 50 - 64
○ 65+

NEXT

Copyright © 2020, Applied Marketing Science, Inc.

QS4

0%  100%

Please enter the fax number for your practice.

*(Please note that this information will never be used to contact you.)*

1 [      ] - [      ] - [      ]

☐ Don't know/Unsure

NEXT

Copyright © 2020, Applied Marketing Science, Inc.

QS5



0%  ━━━━━  100%

Do you work for any of the following types of companies or in any of the following industries?

*(Select all that apply)*

☐ A market research or advertising agency
☐ A company that manufactures or sells medical billing or accounting software
☐ A company that manufactures or sells landline or cellular telephones
☐ A company that manufactures or sells school or office supplies
☐ A company that manufactures or sells athletic or high-end fashion footwear
☐ A company that manufactures or sells free weights or cardio equipment
☐ None of the above

**NEXT**

Copyright © 2020, Applied Marketing Science, Inc.

QS6

0%  ━━━━━  100%

Which of the following best describes your current title or role as a medical professional?

*(Select one only)*

○ Nurse
○ Office administrator or staff
○ Physician (All Specialties)
○ Chiropractor
○ Physical Therapist or Occupational Therapist
○ Other. Please specify: [                    ]
○ None of the above

**NEXT**

Copyright © 2020, Applied Marketing Science, Inc.

C-4

QS7



QS8



QS9



QS10



INTRO 1



Imagine you have just purchased or leased medical billing or accounting software. On the next page, you will be shown the End User License Agreement that you must agree to before you may register or install the software.

After you view the agreement you will be asked some questions. Please do not guess.

NEXT

Copyright © 2020, Applied Marketing Science, Inc.

INTRO 2



Below is the End User License Agreement that you must agree to before you may register or install the software. Please read this agreement as you normally would if you were considering registering or installing the medical billing or accounting software you just purchased or leased.

Select "NEXT" when you are ready to continue.

**END USER LICENSE AGREEMENT**

**NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.**

This End-User License Agreement (**"EULA"**) is a legal agreement between you, either an individual or a single entity (**"End User"** or **"You"**) and McKesson Information Solutions LLC, on behalf of itself and the McKesson Affiliates (**"McKesson"**) for the Software and Clinical Content, as those terms are defined in Section 1.1.1 below, that McKesson provides to End User. By installing, copying, or otherwise using the Software or Clinical Content, You agree to be bound by the terms of this EULA. If You do not agree to the terms of this EULA, You may not install or use the Software.

AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

If You have previously entered into a written license agreement directly with McKesson or any of its predecessors, including but not limited to Physicians Micro Systems, Inc., for license of the Software, then this EULA does not apply to You, even if You click "accept" to continue installation.

If You did not obtain the Software either directly from McKesson or from an authorized McKesson reseller, or if You have not paid either McKesson or an authorized McKesson reseller in full for this license, then this EULA offer is rescinded and You are not authorized to install or use this Software. The term of this EULA (**"Term"**) commences on the date the End User first installs the Software and continues until terminated pursuant to Section 2.5.1.

**SECTION 1: SOFTWARE**
1.1     Software and Clinical Content.
1.1.1   Definitions
(a)     "Clinical Content" means medical or clinical information such as terminology, vocabularies, decision support rules, alerts, drug interaction knowledge, care pathway knowledge, standard ranges of normal or expected result values, and any other clinical content or rules provided to End User for use with the Software, together with any related Documentation. Clinical Content may be either (a) owned by McKesson or (b) owned by a third party and sublicensed to End User under this EULA.
(b)     "Concurrent User" means a Permitted User identified by a unique user ID issued by End User that is one user out of a maximum number of users permitted to access the Software simultaneously.
(c)     "Confidential Information" means any information or material, other than Trade Secrets, that is of value to McKesson and is not generally known to third parties, or that McKesson obtains from any third party that McKesson treats as confidential whether or not owned by McKesson. Confidential Information shall not include information that You can show is: (1) known by You at the time of receipt from McKesson and not subject to any other nondisclosure agreement between the parties; (2) now, or which hereafter becomes, generally known to the public through no fault of You; (3) otherwise lawfully and independently developed by You without reference to Confidential Information; or (4) lawfully acquired by You from a third party without any obligation of confidentiality.
(d)     "Data Center" means one data center located in the United States only and operated by End User.

INTRO 2 (Continued)

(e)    "Documentation" means user guides or operating manuals containing the functional specifications for the McKesson owned software and Clinical Content, as may be reasonably modified from time to time, provided to End User.

(f)    "Facility" means one discrete location, in the United States only, where healthcare services are administered by a Provider or Providers or operated by End User as applicable.

(g)    "McKesson Affiliates" means NDCHealth Corporation (but specifically excluding PST Services, Inc.) and any U.S. entities that, now or in the future, are controlled by either McKesson Information Solutions LLC or NDC Health Corporation.

(h)    "Permitted User" means any individual (a) End User employee, (b) consultant or independent contractor who has need to use the Software based upon a contractual relationship with End User, so long as (i) such consultant or independent contractor is not a McKesson competitor, (ii) End User remains responsible for use of the Software by such consultant or independent contractor, and (iii) such consultant or independent contractor is subject to confidentiality and use restrictions at least as strict as those contained in this EULA, (c) physician with admitting privileges at a Facility, (d) employee of such physician, and (e) medical professional authorized to perform services at a Facility.

(i)    "Provider" means specially trained and licensed personnel (e.g., medical doctor, doctor of osteopathy, physician assistant, physical therapist, dietician, and advanced registered nurse practitioner) directly billing for patient care services either (i) under his or her name, (ii) the name of the practice, or (iii) under the name of a supervisory Provider. "Full-time Providers" are Providers working 20 hours a week or greater. "Part-time Providers" are Providers working less than 20 hours a week or a doctor in residency training.

(j)    "Software" means (i) software in object code form only that accompanies this EULA, and (ii) related Documentation (collectively, "Software").

(k)    "Term" has the meaning set forth in the fifth paragraph of the Introductory Section.

(l)    "Trade Secret" means any information of McKesson or that McKesson has acquired from a third party which is not commonly known by or available to the public, which (1) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secret shall include, but not be limited to, Software, Documentation, Clinical Content and the terms and conditions of this EULA.

1.1.2    License Grant.

(a)    Perpetual License. Subject to the terms of this EULA, McKesson grants to End User, and End User accepts, a limited, nonexclusive, nontransferable, non-sublicensable, perpetual license to use the Software and Clinical Content for End User's internal purposes. Depending on the intended usage, Clinical Content may be provided in either paper or electronic formats.

(b)    The license grant in this Section is expressly subject to the following conditions: (i) the Software may be installed only on equipment at Facilities and Data Centers as specified in Section l.l.3(c) below, (ii) the Software and Clinical Content may be accessed or used only by Permitted Users in the U.S., (iii) use of the Software and Clinical Content is limited by the usage-based variable(s) as specified in Section l.l.3(c) below, and (iv) the Software and Clinical Content may be used to provide service bureau or other similar services, or hosted by a third party (e.g. outsourcing or facility management service provider), only if expressly permitted in a separate writing by McKesson.

(c)    Third Party Software. Any software that is owned by a third party and provided to End User with the Software is subject to that license and terms and conditions accompanying such Third Party Software. McKesson may substitute different software for any Third Party Software, if McKesson reasonably demonstrates the need to do so.

1.1.3    Software License Restrictions.

(a)    Copying and Modification. End User shall not to duplicate the Software, except as required for its use in accordance with this Agreement, provided that End User may make one (1) back-up copy of the Software solely for archival purposes. Such back-up copy shall include

INTRO 2 (Continued)

McKesson's copyright and other proprietary notices, and shall be subject to all the terms and conditions of this EULA. End User will not alter any trademark, copyright notice, or other proprietary notice on the Software or Documentation, and will duplicate each such trademark or notice on each copy of the Software and Documentation.

(b)      Facility Limitation. The Software will be installed only at Facilities and Data Centers as set forth in Section I.I.3(c) below, except that the Software may be installed on a temporary basis at an alternate location in the U.S. if End User is unable to use the Software at such Facility or Data Center due to equipment malfunction or force majeure event. End User will promptly notify McKesson of the alternate location if such temporary use continues for longer than 30 days.

(c)      The following additional restrictions apply to the Software as set forth below:

i.      Lytec SU (single user): Single machine; unlimited named users; no Concurrent Users; No remote access.

ii.      Lytec MU (multiple user): Up to 3 Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iii.      Lytec Professional: Up to five Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iv.      Lytec Client Server: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

v.      Lytec MD: Available to the number of Providers and Concurrent Users purchased from McKesson or the McKesson reseller; One Provider license includes 5 concurrent users; additional Providers or Concurrent Users must be licensed.

vi.      Medisoft Basic or Medisoft Original: Single machine; unlimited named users; no concurrent users; No remote access.

vii.      Medisoft Advanced: Single machine; unlimited named users; no concurrent users; No remote access.

viii.      Medisoft Network Professional: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

ix.      Practice Partner: Available to the number of Providers purchased from McKesson or the McKesson reseller; add-on licenses for some End Users may be licensed on Concurrent User basis if original license was Concurrent User based- please check with Your McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

(d)      Current Procedural Terminology (CPT). The Software may include the Current Procedural Terminology (CPT) code set, maintained by the American Medical Association through the CPT Editorial Panel, describing medical, surgical, and diagnostic services and designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes (the "CPT"). End User may only use the CPT code set consistent with these terms and conditions set forth on Exhibit A.

1.2      Export Law Assurances. End User may not use or otherwise export or re-export the Software or Documentation except as authorized by United States law and the laws of the jurisdiction in which the Software or Documentation was obtained. In particular, the Software or Documentation may not be exported, transshipped or re-exported (1) into (or to a national or resident of) those countries subject to a comprehensive economic sanctions program administered by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") (Countries subject to OFAC embargo or sanctions can change at any time and can be reviewed by consulting materials available at http://www.treas.gov/ofac/index.html and

INTRO 2 (Continued)

http://www.bis.doc.gov); or (2) to anyone on the U.S. Treasury Department list of Specially Designated Nationals or the U.S. Department of Commerce Denied Persons List or Entity List, each as they may be amended from time to time and which may be found at http://www.treas.gov/ofac/index.html and http://www.bis.doc.gov.

1.3     Warranty. McKesson warrants to End User that the computer media on which the original Software is recorded will be free of defects in material and workmanship for a period of 30 days from the date of purchase under normal conditions of use and service. If the media becomes defective within 30 days from the date of purchase, if proof of original purchase can be verified, as End User's sole remedy and McKesson's sole obligation McKesson will replace the Software or at its option, McKesson may refund to End User the original McKesson purchase price.

1.4     Disclaimer. EXCEPT AS STATED IN THE WARRANTY OF SECTION 1.3, THE MCKESSON SOFTWARE AND CLINICAL CONTENT IS PROVIDED "AS IS WITH ALL FAULTS" AND IN ITS PRESENT STATE AND CONDITION. NO WARRANTY, REPRESENTATION, GUARANTEE, CONDITION, UNDERTAKING OR TERM, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO THE CONDITION, QUALITY, DURABILITY, ACCURACY, COMPLETENESS, PERFORMANCE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, QUIET ENJOYMENT, OR FITNESS FOR A PARTICULAR PURPOSE OR USE OF THE MCKESSON SOFTWARE OR CLINICAL CONTENT IS GIVEN OR ASSUMED BY MCKESSON AND ALL SUCH WARRANTIES, REPRESENTATIONS, CONDITIONS, UNDERTAKINGS AND TERMS ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW, AS ARE ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE. MCKESSON DOES NOT WARRANT THAT DEFECTS IN THE MCKESSON SOFTWARE OR CLINICAL CONTENT WILL BE CORRECTED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY MCKESSON OR ANY MCKESSON REPRESENTATIVE OR RESELLER SHALL CREATE A WARRANTY. MCKESSON DOES NOT WARRANT THAT THE SOFTWARE OR CLINICAL CONTENT WILL YIELD ANY PARTICULAR BUSINESS OR FINANCIAL RESULT. TO THE EXTENT THAT UPDATED VERSIONS OF THE SOFTWARE OR CLINICAL CONTENT ARE DEVELOPED AND RELEASED BY MCKESSON, END USER ASSUMES ALL RISKS ASSOCIATED WITH USING OLDER VERSIONS OF THE SOFTWARE, INCLUDING BUT NOT LIMITED TO THE RISK OF USING OUTDATED CLINICAL CONTENT.

1.5     Audit. Upon reasonable advance notice and no more than twice per calendar year, McKesson may conduct an audit to ensure that End User is in compliance with this EULA. Such audit will be conducted during regular business hours, and End User will provide McKesson with reasonable access to all relevant equipment and records. If an audit reveals that End User's use of any Software or Clinical Content during the period being audited exceeds the usage-based variable(s) licensed by End User, then McKesson may invoice End User for all such excess use based on McKesson's prevailing rate(s) in effect at the time the audit is completed, and End User will pay any such invoice. If such excess use exceeds five percent of the licensed use, then End User will also pay McKesson's reasonable costs of conducting the audit.

**SECTION 2: GENERAL TERMS**

2.1.1     Confidential Information, Trade Secrets. You shall not use (except as permitted in connection with Your performance hereunder), disclose or permit any person access to any Trade Secrets (including, without limitation, the Software, Clinical Content and Documentation) while such information retains its status as a Trade Secret. During the Term and for a period of five (5) years thereafter, except as otherwise mandated by law, You shall not use, disclose, or permit any person access to any Confidential Information, except as permitted in connection with Your performance hereunder. You acknowledge that if You breach this Section 2.1.1, McKesson may have no adequate remedy at law available to it, may suffer irreparable harm, and will be entitled to seek equitable relief. You agree to protect such Confidential Information and Trade Secrets with no less diligence than You protect Your own confidential or proprietary information. If disclosure of Confidential Information is required under provisions of any law or court order, You will notify McKesson sufficiently in advance so McKesson will have a reasonable opportunity to

INTRO 2 (Continued)

object.

2.1.2  <u>Software Usage Information</u>.  During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also assists McKesson in offering End User other features and services. Usage Information sent by the Software may include the following: Customer # / serial number; software name; date data was collected; total number of appointments in database; total number of visits in database; total number of transactions in database; for each item in the doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage information by sending notice to McKesson in accordance with <u>Section 2.7</u> to the attention of the General Manager, Physician Practice Solutions. The notice must include the Software serial number.

2.1.3  <u>Retained Rights</u>. End User's rights in the Software will be limited to those expressly granted in this EULA. McKesson and its suppliers reserve all intellectual property rights not expressly granted to End User. All changes, modifications, improvements or new modules made or developed with regard to the Software, whether or not (a) made or developed at End User's request, (b) made or developed in cooperation with End User, or (c) made or developed by End User, will be solely owned by McKesson or its suppliers. End User acknowledges that the Software contains trade secrets of McKesson, and End User agrees not to take any step to derive a source code equivalent of the Software (e.g., disassemble, decompile, or reverse engineer the Software) or to permit any third party to do so. McKesson retains title to all material, originated or prepared for the End User under this EULA. End User is granted a license to use such materials in accordance with this EULA.

2.1.4  <u>Maintenance Fees</u>. Subject to payment of applicable fees, McKesson provides software maintenance services for Practice Partner Software and Lytec MD Software through an authorized McKesson reseller, or from McKesson, if You obtained the Software directly from McKesson. The scope and fees for such software maintenance services are set forth in a separate written agreement between You, and either the McKesson reseller or McKesson, as applicable.

2.2  <u>Limitation of Liability</u>.

2.2.1  Total Damages. MCKESSON'S TOTAL CUMULATIVE LIABILITY UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA WILL BE LIMITED TO (A) THE TOTAL FEES PAID (LESS ANY REFUNDS OR CREDITS) BY END USER FOR THE SOFTWARE GIVING RISE TO THE CLAIM, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE.

2.2.2  Exclusion of Damages. IN NO EVENT WILL MCKESSON BE LIABLE TO END USER UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOSS OF GOODWILL, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT MCKESSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

2.2.3  Material Consideration. THE PARTIES ACKNOWLEDGE THAT THE FOREGOING LIMITATIONS ARE A MATERIAL CONDITION FOR THEIR ENTRY INTO THIS EULA.

2.3  <u>Professional Responsibility and Clinical Content Disclaimer</u>. END USER ACKNOWLEDGES AND AGREES THAT ANY CLINICAL CONTENT FURNISHED BY MCKESSON HEREUNDER (WHETHER SEPARATELY OR INCLUDED WITHIN THE SOFTWARE) IS AN INFORMATION MANAGEMENT AND DIAGNOSTIC TOOL ONLY AND THAT ITS USE CONTEMPLATES AND REQUIRES THE INVOLVEMENT OF TRAINED INDIVIDUALS. END USER FURTHER ACKNOWLEDGES AND AGREES THAT MCKESSON HAS NOT REPRESENTED ITS SOFTWARE AS HAVING THE ABILITY TO DIAGNOSE DISEASE, PRESCRIBE TREATMENT, OR PERFORM ANY OTHER TASKS THAT CONSTITUTE THE PRACTICE OF MEDICINE.

INTRO 2 (Continued)

2.4   Internet Disclaimer. CERTAIN SOFTWARE PROVIDED BY MCKESSON UTILIZES THE INTERNET. MCKESSON DOES NOT WARRANT THAT SUCH SOFTWARE WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE. MCKESSON DOES NOT AND CANNOT CONTROL THE FLOW OF DATA TO OR FROM MCKESSON'S OR END USER'S NETWORK AND OTHER PORTIONS OF THE INTERNET. SUCH FLOW DEPENDS IN LARGE PART ON THE INTERNET SERVICES PROVIDED OR CONTROLLED BY THIRD PARTIES. ACTIONS OR INACTIONS OF SUCH THIRD PARTIES CAN IMPAIR OR DISRUPT END USER'S CONNECTIONS TO THE INTERNET (OR PORTIONS THEREOF). ACCORDINGLY, MCKESSON DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.

2.5   Termination.

2.5.1   Termination. McKesson may terminate the EULA immediately upon notice to End User if End User: (a) materially breaches the EULA and fails to remedy such breach within 60 days after receiving notice of the breach from the terminating party, (b) materially breaches any other contract End User has entered into with McKesson, (c) infringes McKesson's intellectual property rights and fails to remedy such breach within ten (10) days after receiving notice of the breach from the terminating party, (d) materially breaches the EULA in a manner that cannot be remedied, or (e) commences dissolution proceedings or ceases to operate in the ordinary course of business.

2.5.2   Obligations upon Termination or Expiration. Upon the termination or expiration of this EULA, End User will promptly (a) cease using all Software and Clinical Content, (b) purge all Software and Clinical Content from all computer systems (including servers and personal computers), (c) return to McKesson or destroy all copies (including partial copies) of the Software and Clinical Content, and (d) deliver to McKesson written certification of an officer of End User that End User has complied with its obligations in this Section.

2.6   Discount Reporting. An order form or quote may contain a discount that End User is required to report in its cost reports or another appropriate manner under applicable federal and state anti-kickback laws, including 42 U.S.C. Sec. 1320a-7b(b)(3)(A) and the regulations found at 42 C.F.R. Sec. 1001.952(h). End User will be responsible for reporting, disclosing and maintaining appropriate records with respect to the discount and making those records available under Medicare, Medicaid or other applicable government health care programs.

2.7   General.       This EULA is governed by and will be construed in accordance with the laws of the State of Georgia, exclusive of its rules governing choice of law and conflict of laws and any version of the Uniform Commercial Code; each party agrees that exclusive venue for all actions, relating in any manner to this EULA will be in a federal or state court of competent jurisdiction located in Fulton County, Georgia. End User will not assign this EULA without the written consent of McKesson; McKesson may, upon notice to End User, assign this EULA to any McKesson Affiliate or to any entity resulting from reorganization, merger, or sale, and may subcontract its obligations. Failure to exercise or enforce any right under this EULA is not a waiver of such right. Neither party is liable for failing to fulfill its obligations due to acts of God or other causes beyond it reasonable control, except for End User's obligation to make payment. All notices relating to the parties' legal rights and remedies under this EULA must be provided in writing and delivered by: (a) postage prepaid registered or certified U.S. Post mail; or (b) commercial courier. All notices to McKesson will be sent to the following address with a copy to McKesson's General Counsel: 5995 Windward Parkway, Alpharetta, GA 30005. This EULA is the complete and exclusive agreement between the parties with respect to the subject matter hereof and may be may be modified, or any rights under it waived; only in a mutually-signed written agreement

2.8   Government Customer Rights. If this Software is provided under a federal government contract, then McKesson intends that any Software provided under this EULA constitute "commercial item(s)" as defined in Federal Acquisition Regulation ("**FAR**") 2.101, including any Software, Clinical Content, Documentation or technical data. Additionally, all Software, Clinical Content, Documentation, or technical data provided by McKesson under this EULA will be considered related to such "commercial item(s)". If End User seeks rights in Software, Clinical

INTRO 2 (Continued)

Content, Documentation, or technical data provided by McKesson under this EULA, then McKesson grants only those rights established under any FAR or FAR Supplement clauses which are flowed down to McKesson under this EULA consistent with the delivery of "commercial item(s)." If End User contends that any Software, Clinical Content, Documentation, or technical data provided under this EULA does not constitute "commercial item(s)" as defined in FAR 2.101, then End User promptly will notify McKesson of the same, and identify what rights End User contends exist in such Software, Clinical Content, Documentation, or technical data. No rights in any such Software, Clinical Content, Documentation, or technical data will attach other than rights related to "commercial item(s)" unless End User provides such notice to McKesson, and McKesson expressly agrees in writing that such rights are granted under this EULA.

**EXHIBIT A**
CPT CODES AND TERMINOLOGY
SECTION 1: USER IS AN INDIVIDUAL WHO:
1.1     accesses, uses, and/or manipulates CPT codes and/or descriptions contained in the Software either at the input (the point at which data is entered into the Software), the output (the point at which data, reports, or the like are received from the Software), or both phases of using the Software; or
1.2     accesses, uses, and/or manipulates the Software to produce or enable an output that could not have been created without CPT embedded in the Software even though CPT may not be visible or directly accessible; or
1.3     makes use of an output of the Software that relies on or could not have been created without the CPT embedded in the Software even though CPT may not be visible or directly accessible (excepting that which would constitute fair use, internal reports, and claim forms for specific patients).
SECTION 2:
2.1     The Clinical Content and/or Software may incorporate the CPT terminology developed and copyrighted by the American Medical Association ("AMA"). The CPT codes and terminology are provided pursuant to a license agreement between McKesson and the AMA. If End User requires additional User licenses, End User may purchase additional licenses from McKesson and the parties will negotiate in good faith the terms and conditions under which McKesson will make available such additional User licenses.
2.1.1    End User acknowledges that the AMA reserves all rights, whether statutory or common-law, in the CPT terminology and that no rights therein are hereby conveyed to End User except to the extent that End User has been granted a license to the Software. THE AMA MAKES NO REPRESENTATIONS OR WARRANTIES EXPRESS OR IMPLIED, WITH RESPECT TO CPT, INCLUDING, WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. END USER FURTHER ACKNOWLEDGES THAT THE AMA SHALL NOT BE LIABLE TO END USER FOR ANY DAMAGES OF ANY NATURE WHETHER DIRECT, INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL, ARISING FROM THIS AGREEMENT. The AMA shall not by reason of the incorporation of the CPT terminology in the Software or by any other reason be deemed a party to this Agreement and End User shall look solely to McKesson for the performance of any obligations due End User hereunder.
2.2     In the event that one or more of the provisions contained in the Agreement shall for any reason be held invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity or enforceability of this Exhibit.
2.3     CPT only © 2000, 2001 etc. American Medical Association. All Rights Reserved. No fees schedules, basic units, relative values or related listings are included in CPT. AMA does not directly or indirectly practice medicine or dispense medical services. AMA assumes no liability for data contained or not contained herein.
2.4     CPT is commercial technical data and/or computer data bases and/or commercial computer software and/or commercial computer software documentation, as applicable which were developed exclusively at private expense by the American Medical Association, 515 North

INTRO 2 (Continued)

State Street, Chicago, Illinois, 60610. U.S. Government rights to use, modify, reproduce, release, perform, display, or disclose these technical data and/or computer data bases and/or computer software and/or computer software documentation are subject to the limited rights restrictions of DFARS 252.227-7015(b)(2) (June 1995) and/or subject to the restrictions of DFARS 227.7202-1(a)(June 1995) and DFARS 227.7202-3(a)(June 1995), as applicable for U.S. Department of Defense procurements and the limited rights restrictions of FAR 52.227-14 (June 1987) and/or subject to the restricted rights provisions of FAR 52.227-14 (1987) and FAR 52.227-19 (June 1987), as applicable, and any applicable agency FAR Supplements, for non-Department of Defense Federal procurements.

NEXT

C-15

INTRO 3



Next, please direct your attention to the three segments of the End User License Agreement that are boxed.

Select "NEXT" when you are ready to continue.

**END USER LICENSE AGREEMENT**

**NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.**

This End-User License Agreement (**"EULA"**) is a legal agreement between you, either an individual or a single entity (**"End User"** or **"You"**) and McKesson Information Solutions LLC, on behalf of itself and the McKesson Affiliates (**"McKesson"**) for the Software and Clinical Content, as those terms are defined in Section 1.1.1 below, that McKesson provides to End User. By installing, copying, or otherwise using the Software or Clinical Content, You agree to be bound by the terms of this EULA. If You do not agree to the terms of this EULA, You may not install or use the Software.

AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

If You have previously entered into a written license agreement directly with McKesson or any of its predecessors, including but not limited to Physicians Micro Systems, Inc., for license of the Software, then this EULA does not apply to You, even if You click "accept" to continue installation.

If You did not obtain the Software either directly from McKesson or from an authorized McKesson reseller, or if You have not paid either McKesson or an authorized McKesson reseller in full for this license, then this EULA offer is rescinded and You are not authorized to install or use this Software. The term of this EULA (**"Term"**) commences on the date the End User first installs the Software and continues until terminated pursuant to Section 2.5.1.

**SECTION 1: SOFTWARE**
1.1     Software and Clinical Content.
1.1.1   Definitions
(a)     "Clinical Content" means medical or clinical information such as terminology, vocabularies, decision support rules, alerts, drug interaction knowledge, care pathway knowledge, standard ranges of normal or expected result values, and any other clinical content or rules provided to End User for use with the Software, together with any related Documentation. Clinical Content may be either (a) owned by McKesson or (b) owned by a third party and sublicensed to End User under this EULA.
(b)     "Concurrent User" means a Permitted User identified by a unique user ID issued by End User that is one user out of a maximum number of users permitted to access the Software simultaneously.
(c)     "Confidential Information" means any information or material, other than Trade Secrets, that is of value to McKesson and is not generally known to third parties, or that McKesson obtains from any third party that McKesson treats as confidential whether or not owned by McKesson. Confidential Information shall not include information that You can show is: (1) known by You at the time of receipt from McKesson and not subject to any other nondisclosure agreement between the parties; (2) now, or which hereafter becomes, generally known to the public through no fault of You; (3) otherwise lawfully and independently developed by You without reference to Confidential Information; or (4) lawfully acquired by You from a third party without any obligation of confidentiality.
(d)     "Data Center" means one data center located in the United States only and operated by End User.

C-16

INTRO 3 (Continued)

(e)     "Documentation" means user guides or operating manuals containing the functional specifications for the McKesson owned software and Clinical Content, as may be reasonably modified from time to time, provided to End User.

(f)     "Facility" means one discrete location, in the United States only, where healthcare services are administered by a Provider or Providers or operated by End User as applicable.

(g)     "McKesson Affiliates" means NDCHealth Corporation (but specifically excluding PST Services, Inc.) and any U.S. entities that, now or in the future, are controlled by either McKesson Information Solutions LLC or NDC Health Corporation.

(h)     "Permitted User" means any individual (a) End User employee, (b) consultant or independent contractor who has need to use the Software based upon a contractual relationship with End User, so long as (i) such consultant or independent contractor is not a McKesson competitor, (ii) End User remains responsible for use of the Software by such consultant or independent contractor, and (iii) such consultant or independent contractor is subject to confidentiality and use restrictions at least as strict as those contained in this EULA, (c) physician with admitting privileges at a Facility, (d) employee of such physician, and (e) medical professional authorized to perform services at a Facility.

(i)     "Provider" means specially trained and licensed personnel (e.g., medical doctor, doctor of osteopathy, physician assistant, physical therapist, dietician, and advanced registered nurse practitioner) directly billing for patient care services either (i) under his or her name, (ii) the name of the practice, or (iii) under the name of a supervisory Provider. "Full-time Providers" are Providers working 20 hours a week or greater. "Part-time Providers" are Providers working less than 20 hours a week or a doctor in residency training.

(j)     "Software" means (i) software in object code form only that accompanies this EULA, and (ii) related Documentation (collectively, "Software").

(k)     "Term" has the meaning set forth in the fifth paragraph of the Introductory Section.

(l)     "Trade Secret" means any information of McKesson or that McKesson has acquired from a third party which is not commonly known by or available to the public, which (1) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secret shall include, but not be limited to, Software, Documentation, Clinical Content and the terms and conditions of this EULA.

1.1.2   License Grant.

(a)     Perpetual License. Subject to the terms of this EULA, McKesson grants to End User, and End User accepts, a limited, nonexclusive, nontransferable, non-sublicensable, perpetual license to use the Software and Clinical Content for End User's internal purposes. Depending on the intended usage, Clinical Content may be provided in either paper or electronic formats.

(b)     The license grant in this Section is expressly subject to the following conditions: (i) the Software may be installed only on equipment at Facilities and Data Centers as specified in Section I.I.3(c) below, (ii) the Software and Clinical Content may be accessed or used only by Permitted Users in the U.S., (iii) use of the Software and Clinical Content is limited by the usage-based variable(s) as specified in Section I.I.3(c) below, and (iv) the Software and Clinical Content may be used to provide service bureau or other similar services, or hosted by a third party (e.g. outsourcing or facility management service provider), only if expressly permitted in a separate writing by McKesson.

(c)     Third Party Software. Any software that is owned by a third party and provided to End User with the Software is subject to that license and terms and conditions accompanying such Third Party Software. McKesson may substitute different software for any Third Party Software, if McKesson reasonably demonstrates the need to do so.

1.1.3   Software License Restrictions.

(a)     Copying and Modification. End User shall not to duplicate the Software, except as required for its use in accordance with this Agreement, provided that End User may make one (1) back-up copy of the Software solely for archival purposes. Such back-up copy shall include

INTRO 3 (Continued)

McKesson's copyright and other proprietary notices, and shall be subject to all the terms and conditions of this EULA. End User will not alter any trademark, copyright notice, or other proprietary notice on the Software or Documentation, and will duplicate each such trademark or notice on each copy of the Software and Documentation.

(b)     Facility Limitation. The Software will be installed only at Facilities and Data Centers as set forth in Section I.I.3(c) below, except that the Software may be installed on a temporary basis at an alternate location in the U.S. if End User is unable to use the Software at such Facility or Data Center due to equipment malfunction or force majeure event. End User will promptly notify McKesson of the alternate location if such temporary use continues for longer than 30 days.

(c)     The following additional restrictions apply to the Software as set forth below:

i.     Lytec SU (single user): Single machine; unlimited named users; no Concurrent Users; No remote access.

ii.     Lytec MU (multiple user): Up to 3 Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iii.     Lytec Professional: Up to five Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iv.     Lytec Client Server: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

v.     Lytec MD: Available to the number of Providers and Concurrent Users purchased from McKesson or the McKesson reseller; One Provider license includes 5 concurrent users; additional Providers or Concurrent Users must be licensed.

vi.     Medisoft Basic or Medisoft Original: Single machine; unlimited named users; no concurrent users; No remote access.

vii.     Medisoft Advanced: Single machine; unlimited named users; no concurrent users; No remote access.

viii.     Medisoft Network Professional: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

ix.     Practice Partner: Available to the number of Providers purchased from McKesson or the McKesson reseller; add-on licenses for some End Users may be licensed on Concurrent User basis if original license was Concurrent User based- please check with Your McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

(d)     Current Procedural Terminology (CPT). The Software may include the Current Procedural Terminology (CPT) code set, maintained by the American Medical Association through the CPT Editorial Panel, describing medical, surgical, and diagnostic services and designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes (the "CPT"). End User may only use the CPT code set consistent with these terms and conditions set forth on Exhibit A.

1.2     Export Law Assurances. End User may not use or otherwise export or re-export the Software or Documentation except as authorized by United States law and the laws of the jurisdiction in which the Software or Documentation was obtained. In particular, the Software or Documentation may not be exported, transshipped or re-exported (1) into (or to a national or resident of) those countries subject to a comprehensive economic sanctions program administered by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") (Countries subject to OFAC embargo or sanctions can change at any time and can be reviewed by consulting materials available at http://www.treas.gov/ofac/index.html and

INTRO 3 (Continued)

http://www.bis.doc.gov); or (2) to anyone on the U.S. Treasury Department list of Specially Designated Nationals or the U.S. Department of Commerce Denied Persons List or Entity List, each as they may be amended from time to time and which may be found at http://www.treas.gov/ofac/index.html and http://www.bis.doc.gov.

1.3      Warranty. McKesson warrants to End User that the computer media on which the original Software is recorded will be free of defects in material and workmanship for a period of 30 days from the date of purchase under normal conditions of use and service. If the media becomes defective within 30 days from the date of purchase, if proof of original purchase can be verified, as End User's sole remedy and McKesson's sole obligation McKesson will replace the Software or at its option, McKesson may refund to End User the original McKesson purchase price.

1.4      Disclaimer. EXCEPT AS STATED IN THE WARRANTY OF SECTION 1.3, THE MCKESSON SOFTWARE AND CLINICAL CONTENT IS PROVIDED "AS IS WITH ALL FAULTS" AND IN ITS PRESENT STATE AND CONDITION. NO WARRANTY, REPRESENTATION, GUARANTEE, CONDITION, UNDERTAKING OR TERM, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO THE CONDITION, QUALITY, DURABILITY, ACCURACY, COMPLETENESS, PERFORMANCE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, QUIET ENJOYMENT, OR FITNESS FOR A PARTICULAR PURPOSE OR USE OF THE MCKESSON SOFTWARE OR CLINICAL CONTENT IS GIVEN OR ASSUMED BY MCKESSON AND ALL SUCH WARRANTIES, REPRESENTATIONS, CONDITIONS, UNDERTAKINGS AND TERMS ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW, AS ARE ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE. MCKESSON DOES NOT WARRANT THAT DEFECTS IN THE MCKESSON SOFTWARE OR CLINICAL CONTENT WILL BE CORRECTED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY MCKESSON OR ANY MCKESSON REPRESENTATIVE OR RESELLER SHALL CREATE A WARRANTY. MCKESSON DOES NOT WARRANT THAT THE SOFTWARE OR CLINICAL CONTENT WILL YIELD ANY PARTICULAR BUSINESS OR FINANCIAL RESULT. TO THE EXTENT THAT UPDATED VERSIONS OF THE SOFTWARE OR CLINICAL CONTENT ARE DEVELOPED AND RELEASED BY MCKESSON, END USER ASSUMES ALL RISKS ASSOCIATED WITH USING OLDER VERSIONS OF THE SOFTWARE, INCLUDING BUT NOT LIMITED TO THE RISK OF USING OUTDATED CLINICAL CONTENT.

1.5      Audit. Upon reasonable advance notice and no more than twice per calendar year, McKesson may conduct an audit to ensure that End User is in compliance with this EULA. Such audit will be conducted during regular business hours, and End User will provide McKesson with reasonable access to all relevant equipment and records. If an audit reveals that End User's use of any Software or Clinical Content during the period being audited exceeds the usage-based variable(s) licensed by End User, then McKesson may invoice End User for all such excess use based on McKesson's prevailing rate(s) in effect at the time the audit is completed, and End User will pay any such invoice. If such excess use exceeds five percent of the licensed use, then End User will also pay McKesson's reasonable costs of conducting the audit.

**SECTION 2: GENERAL TERMS**

2.1.1      Confidential Information, Trade Secrets. You shall not use (except as permitted in connection with Your performance hereunder), disclose or permit any person access to any Trade Secrets (including, without limitation, the Software, Clinical Content and Documentation) while such information retains its status as a Trade Secret. During the Term and for a period of five (5) years thereafter, except as otherwise mandated by law, You shall not use, disclose, or permit any person access to any Confidential Information, except as permitted in connection with Your performance hereunder. You acknowledge that if You breach this Section 2.1.1, McKesson may have no adequate remedy at law available to it, may suffer irreparable harm, and will be entitled to seek equitable relief. You agree to protect such Confidential Information and Trade Secrets with no less diligence than You protect Your own confidential or proprietary information. If disclosure of Confidential Information is required under provisions of any law or court order, You will notify McKesson sufficiently in advance so McKesson will have a reasonable opportunity to

INTRO 3 (Continued)

object.

2.1.2   Software Usage Information.  During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also assists McKesson in offering End User other features and services. Usage Information sent by the Software may include the following: Customer # / serial number; software name; software version; date data was collected; total number of appointments in database; total number of visits in database; total number of transactions in database; for each item in the doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage Information by sending notice to McKesson in accordance with Section 2.7 to the attention of the General Manager, Physician Practice Solutions. The notice must include the Software serial number.

2.1.3   Retained Rights. End User's rights in the Software will be limited to those expressly granted in this EULA. McKesson and its suppliers reserve all intellectual property rights not expressly granted to End User. All changes, modifications, improvements or new modules made or developed with regard to the Software, whether or not (a) made or developed at End User's request, (b) made or developed in cooperation with End User, or (c) made or developed by End User, will be solely owned by McKesson or its suppliers. End User acknowledges that the Software contains trade secrets of McKesson, and End User agrees not to take any step to derive a source code equivalent of the Software (e.g., disassemble, decompile, or reverse engineer the Software) or to permit any third party to do so. McKesson retains title to all material, originated or prepared for the End User under this EULA. End User is granted a license to use such materials in accordance with this EULA.

2.1.4   Maintenance Fees. Subject to payment of applicable fees, McKesson provides software maintenance services for Practice Partner Software and Lytec MD Software through an authorized McKesson reseller, or from McKesson, if You obtained the Software directly from McKesson. The scope and fees for such software maintenance services are set forth in a separate written agreement between You, and either the McKesson reseller or McKesson, as applicable.

2.2   Limitation of Liability.

2.2.1   Total Damages. MCKESSON'S TOTAL CUMULATIVE LIABILITY UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA WILL BE LIMITED TO (A) THE TOTAL FEES PAID (LESS ANY REFUNDS OR CREDITS) BY END USER FOR THE SOFTWARE GIVING RISE TO THE CLAIM, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE.

2.2.2   Exclusion of Damages. IN NO EVENT WILL MCKESSON BE LIABLE TO END USER UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOSS OF GOODWILL, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT MCKESSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

2.2.3   Material Consideration. THE PARTIES ACKNOWLEDGE THAT THE FOREGOING LIMITATIONS ARE A MATERIAL CONDITION FOR THEIR ENTRY INTO THIS EULA.

2.3   Professional Responsibility and Clinical Content Disclaimer. END USER ACKNOWLEDGES AND AGREES THAT ANY CLINICAL CONTENT FURNISHED BY MCKESSON HEREUNDER (WHETHER SEPARATELY OR INCLUDED WITHIN THE SOFTWARE) IS AN INFORMATION MANAGEMENT AND DIAGNOSTIC TOOL ONLY AND THAT ITS USE CONTEMPLATES AND REQUIRES THE INVOLVEMENT OF TRAINED INDIVIDUALS. END USER FURTHER ACKNOWLEDGES AND AGREES THAT MCKESSON HAS NOT REPRESENTED ITS SOFTWARE AS HAVING THE ABILITY TO DIAGNOSE DISEASE, PRESCRIBE TREATMENT, OR PERFORM ANY OTHER TASKS THAT CONSTITUTE THE PRACTICE OF MEDICINE.

INTRO 3 (Continued)

2.4   Internet Disclaimer. CERTAIN SOFTWARE PROVIDED BY MCKESSON UTILIZES THE INTERNET. MCKESSON DOES NOT WARRANT THAT SUCH SOFTWARE WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE. MCKESSON DOES NOT AND CANNOT CONTROL THE FLOW OF DATA TO OR FROM MCKESSON'S OR END USER'S NETWORK AND OTHER PORTIONS OF THE INTERNET. SUCH FLOW DEPENDS IN LARGE PART ON THE INTERNET SERVICES PROVIDED OR CONTROLLED BY THIRD PARTIES. ACTIONS OR INACTIONS OF SUCH THIRD PARTIES CAN IMPAIR OR DISRUPT END USER'S CONNECTIONS TO THE INTERNET (OR PORTIONS THEREOF). ACCORDINGLY, MCKESSON DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.

2.5   Termination.

2.5.1   Termination. McKesson may terminate the EULA immediately upon notice to End User if End User: (a) materially breaches the EULA and fails to remedy such breach within 60 days after receiving notice of the breach from the terminating party, (b) materially breaches any other contract End User has entered into with McKesson, (c) infringes McKesson's intellectual property rights and fails to remedy such breach within ten (10) days after receiving notice of the breach from the terminating party, (d) materially breaches the EULA in a manner that cannot be remedied, or (e) commences dissolution proceedings or ceases to operate in the ordinary course of business.

2.5.2   Obligations upon Termination or Expiration. Upon the termination or expiration of this EULA, End User will promptly (a) cease using all Software and Clinical Content, (b) purge all Software and Clinical Content from all computer systems (including servers and personal computers), (c) return to McKesson or destroy all copies (including partial copies) of the Software and Clinical Content, and (d) deliver to McKesson written certification of an officer of End User that End User has complied with its obligations in this Section.

2.6   Discount Reporting. An order form or quote may contain a discount that End User is required to report in its cost reports or another appropriate manner under applicable federal and state anti-kickback laws, including 42 U.S.C. Sec. 1320a-7b(b)(3)(A) and the regulations found at 42 C.F.R. Sec. 1001.952(h). End User will be responsible for reporting, disclosing and maintaining appropriate records with respect to the discount and making those records available under Medicare, Medicaid or other applicable government health care programs.

2.7   General.       This EULA is governed by and will be construed in accordance with the laws of the State of Georgia, exclusive of its rules governing choice of law and conflict of laws and any version of the Uniform Commercial Code; each party agrees that exclusive venue for all actions, relating in any manner to this EULA will be in a federal or state court of competent jurisdiction located in Fulton County, Georgia. End User will not assign this EULA without the written consent of McKesson; McKesson may, upon notice to End User, assign this EULA to any McKesson Affiliate or to any entity resulting from reorganization, merger, or sale, and may subcontract its obligations. Failure to exercise or enforce any right under this EULA is not a waiver of such right. Neither party is liable for failing to fulfill its obligations due to acts of God or other causes beyond it reasonable control, except for End User's obligation to make payment. All notices relating to the parties' legal rights and remedies under this EULA must be provided in writing and delivered by: (a) postage prepaid registered or certified U.S. Post mail; or (b) commercial courier. All notices to McKesson will be sent to the following address with a copy to McKesson's General Counsel: 5995 Windward Parkway, Alpharetta, GA 30005. This EULA is the complete and exclusive agreement between the parties with respect to the subject matter hereof and may be may be modified, or any rights under it waived, only in a mutually-signed written agreement

2.8   Government Customer Rights. If this Software is provided under a federal government contract, then McKesson intends that any Software provided under this EULA constitute "commercial item(s)" as defined in Federal Acquisition Regulation ("**FAR**") 2.101, including any Software, Clinical Content, Documentation or technical data. Additionally, all Software, Clinical Content, Documentation, or technical data provided by McKesson under this EULA will be considered related to such "commercial item(s)". If End User seeks rights in Software, Clinical

INTRO 3 (Continued)

Content, Documentation, or technical data provided by McKesson under this EULA, then McKesson grants only those rights established under any FAR or FAR Supplement clauses which are flowed down to McKesson under this EULA consistent with the delivery of "commercial item(s)." If End User contends that any Software, Clinical Content, Documentation, or technical data provided under this EULA does not constitute "commercial item(s)" as defined in FAR 2.101, then End User promptly will notify McKesson of the same, and identify what rights End User contends exist in such Software, Clinical Content, Documentation, or technical data. No rights in any such Software, Clinical Content, Documentation, or technical data will attach other than rights related to "commercial item(s)" unless End User provides such notice to McKesson, and McKesson expressly agrees in writing that such rights are granted under this EULA.

**EXHIBIT A**

CPT CODES AND TERMINOLOGY

SECTION 1: USER IS AN INDIVIDUAL WHO:

1.1    accesses, uses, and/or manipulates CPT codes and/or descriptions contained in the Software either at the input (the point at which data is entered into the Software), the output (the point at which data, reports, or the like are received from the Software), or both phases of using the Software; or

1.2    accesses, uses, and/or manipulates the Software to produce or enable an output that could not have been created without CPT embedded in the Software even though CPT may not be visible or directly accessible; or

1.3    makes use of an output of the Software that relies on or could not have been created without the CPT embedded in the Software even though CPT may not be visible or directly accessible (excepting that which would constitute fair use, internal reports, and claim forms for specific patients).

SECTION 2:

2.1    The Clinical Content and/or Software may incorporate the CPT terminology developed and copyrighted by the American Medical Association ("AMA"). The CPT codes and terminology are provided pursuant to a license agreement between McKesson and the AMA. If End User requires additional User licenses, End User may purchase additional licenses from McKesson and the parties will negotiate in good faith the terms and conditions under which McKesson will make available such additional User licenses.

2.1.1    End User acknowledges that the AMA reserves all rights, whether statutory or common-law, in the CPT terminology and that no rights therein are hereby conveyed to End User except to the extent that End User has been granted a license to the Software. THE AMA MAKES NO REPRESENTATIONS OR WARRANTIES EXPRESS OR IMPLIED, WITH RESPECT TO CPT, INCLUDING, WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. END USER FURTHER ACKNOWLEDGES THAT THE AMA SHALL NOT BE LIABLE TO END USER FOR ANY DAMAGES OF ANY NATURE WHETHER DIRECT, INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL, ARISING FROM THIS AGREEMENT. The AMA shall not by reason of the incorporation of the CPT terminology in the Software or by any other reason be deemed a party to this Agreement and End User shall look solely to McKesson for the performance of any obligations due End User hereunder.

2.2    In the event that one or more of the provisions contained in the Agreement shall for any reason be held invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity or enforceability of this Exhibit.

2.3    CPT only © 2000, 2001 etc. American Medical Association. All Rights Reserved. No fees schedules, basic units, relative values or related listings are included in CPT. AMA does not directly or indirectly practice medicine or dispense medical services. AMA assumes no liability for data contained or not contained herein.

2.4    CPT is commercial technical data and/or computer data bases and/or commercial computer software and/or commercial computer software documentation, as applicable which were developed exclusively at private expense by the American Medical Association, 515 North

INTRO 3 (Continued)

State Street, Chicago, Illinois, 60610. U.S. Government rights to use, modify, reproduce, release, perform, display, or disclose these technical data and/or computer data bases and/or computer software and/or computer software documentation are subject to the limited rights restrictions of DFARS 252.227-7015(b)(2) (June 1995) and/or subject to the restrictions of DFARS 227.7202-1(a)(June 1995) and DFARS 227.7202-3(a)(June 1995), as applicable for U.S. Department of Defense procurements and the limited rights restrictions of FAR 52.227-14 (June 1987) and/or subject to the restricted rights provisions of FAR 52.227-14 (1987) and FAR 52.227-19 (June 1987), as applicable, and any applicable agency FAR Supplements, for non-Department of Defense Federal procurements.

NEXT

INTRO 4



Below are the three boxed segments of the End User License Agreement you just read.
In addition, click here to see the full End User License Agreement.

NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT
WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF
THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY
MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.

AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT
TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE
USAGE INFORMATION TO MCKESSON.

2.1.2    Software Usage Information.  During registration or activation of software, and then
on a regular basis, the Software will send information about the Software and Your use of the
Software, to McKesson ("Usage Information"). This Usage Information helps prevent the
unlicensed or prohibited use of the Software and also assists McKesson in offering End User other
features and services. Usage Information sent by the Software may include the following:
Customer # / serial number; software name; software version; date data was collected; total
number of appointments in database; total number of visits in database; total number of
transactions in database; for each item in the doctor list: number of appointments in last n days,
number of visits in last n days, number of charges in last n days; for each clearinghouse in the
system: number of claims submitted in last n days, number of eligibility queries submitted in last
n days. Usage Information transmitted shall not include any individually identifiable information
or any protected health information. End User may opt out of the collection of Usage Information
by sending notice to McKesson in accordance with Section 2.7 to the attention of the General
Manager, Physician Practice Solutions. The notice must include the Software serial number.

NEXT

Copyright © 2010, Applied Marketing Science, Inc.

C-24

Q1



**Medical Billing or Accounting Software**
**Faxed Advertisement Survey**

**[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]**

*Notes to respondent in italics*

**Overview**

**Sample:**
- ⊙ Targeted Physicians (All Specialties), Chiropractors, and Physical Therapists/Occupational Therapists
- ⊙ N = 200

**[NO SURVEY TITLE WILL BE DISPLAYED TO RESPONDENTS]**

**Introduction and Screening**

Thank you for your willingness to participate in our study. The responses you give to our questions are very important to us. If you don't know an answer to a question or if you are unsure, please indicate this in your response. Please do not guess.

Your answers will be kept in confidence. The results of this study will not be used to try to sell you anything.

When you are ready to get started, please select the "NEXT" button.

**["NEXT" BUTTON TAKES RESPONDENT TO QUESTION QS0]**

**[TEXT FOR TERMINATES "Thank you for your interest in our study. We are no longer looking for people who match your characteristics. We appreciate your time."]**

**[NEXT PAGE]**

QS0. Please enter the code exactly as it appears in the image above, and then select "NEXT" to continue.

**[INSERT CAPTCHA]**

**[NEXT PAGE]**

QS1. What type of electronic device are you using to complete this survey? *(Select one only)* **[RANDOMIZE LIST; OTHER MOBILE OR ELECTRONIC DEVICE SHOULD REMAIN LAST]**
- ⊙ Desktop computer **[CONTINUE]**
- ⊙ Laptop computer **[CONTINUE]**
- ⊙ Tablet computer **[CONTINUE]**
- ⊙ Smartphone **[ON HOLD]**
- ⊙ Other mobile or electronic device **[ON HOLD]**

**[ON HOLD MESSAGE: IF "SMARTPHONE" OR "OTHER MOBILE" SELECTED IN QS1, DISPLAY: "This survey is not formatted for viewing on a smartphone or other mobile device. Please return to the survey, using the same link, from a desktop, laptop or tablet computer."]**

**[NEXT PAGE]**

QS2. Are you…? *(Select one only)*
- ⊙ Male **[CONTINUE]**
- ⊙ Female **[CONTINUE]**

**[NEXT PAGE]**

QS3. Into which of the following categories does your age fall? *(Select one only)*
- ⊙ Under 18 **[TERMINATE]**
- ⊙ 18 - 34 **[CONTINUE]**
- ⊙ 35 - 49 **[CONTINUE]**
- ⊙ 50 - 64 **[CONTINUE]**
- ⊙ 65+ **[CONTINUE]**

**[NEXT PAGE]**

QS4. Please enter the fax number for your practice. (*Please note that this information will never be used to contact you.*) **[FORCE RESPONSE; COUNTRY CODE = 1; REQUIRE 10 DIGIT NUMBER SPLIT INTO CHUNK OF 3, 3, 4 DIGITS; CHECK BOX FOR DK/UNSURE; IF DK/UNSURE CHECKED, TERMINATE; IF NUMBER MATCHES LIST PROVIDED, TERMINATE]**

**[NEXT PAGE]**

QS5. Do you work for any of the following types of companies or in any of the following industries? *(Select all that apply)* **[RANDOMIZE; NONE OF THE ABOVE LAST]**
- ❒ A company that manufactures or sells medical billing or accounting software **[TERMINATE]**
- ❒ A company that manufactures or sells school or office supplies
- ❒ A company that manufactures or sells athletic or high-end fashion footwear
- ❒ A company that manufactures or sells free weights or cardio equipment
- ❒ A company that manufactures or sells landline or cellular telephones
- ❒ A market research or advertising agency **[TERMINATE]**
- ❒ None of the above **[EXCLUSIVE]**

**[NEXT PAGE]**

QS6. Which of the following best describes your current title or role as a medical professional? *(Select one only)* **[RANDOMIZE]**
- ⊙ Physician (All Specialties)
- ⊙ Physical Therapist or Occupational Therapist
- ⊙ Chiropractor
- ⊙ Nurse **[TERMINATE]**
- ⊙ Office administrator or staff **[TERMINATE]**
- ⊙ Other. Please specify: **[DO NOT ALLOW BLANK; ANCHOR; TERMINATE]**
- ⊙ None of the above **[TERMINATE; ANCHOR]**

**[NEXT PAGE]**

QS7. Which of the following best describes the size of your practice? (*Select one only*)
- ⊙ Solo or family practice
- ⊙ Less than 10
- ⊙ Between 11 - 50
- ⊙ Between 51 – 100 **[TERMINATE]**
- ⊙ More than 100 **[TERMINATE]**
- ⊙ Don't know/Unsure **[TERMINATE]**

**[NEXT PAGE]**

QS8. Which, if any, of the following have you or your practice ever purchased or leased? *(Select all that apply)* **[RANDOMIZE; NONE OF THE ABOVE LAST]**
- ❒ Medical billing or accounting software **[CONTINUE]**
- ❒ Furniture or equipment
- ❒ Credit card machine
- ❒ Telephone equipment
- ❒ Indoor or outdoor signage
- ❒ Malpractice insurance
- ❒ None of the above **[EXCLUSIVE]**

**[IF "MEDICAL RECORDS AND/OR BILLING SOFTWARE" NOT SELECTED, TERMINATE]**

**[NEXT PAGE]**

QS9. Please select **[**"NORTH"**] [**"SOUTH"**] [**"EAST"**] [**"WEST"**]** from the following list in order to continue with this survey. *(Select one only)* **[RANDOMIZE THE FOUR QUESTION VERSIONS, CORRECT RESPONSE OPTION SHOULD MATCH THAT OF QUESTION; RANDOMIZE ANSWER OPTIONS]**

- ⊙ NORTH
- ⊙ SOUTH
- ⊙ EAST
- ⊙ WEST

**[NEXT PAGE]**

QS10. You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.

- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please keep your browser maximized for the entire survey.

- Please answer all questions on your own without consulting any other person.

- If you normally wear eyeglasses or contact lenses when viewing a computer or tablet screen, please wear them for the survey.

*(Select one only)*

- ⊙ I understand and agree to the above instructions **[CONTINUE]**
- ⊙ I do not understand or do not agree to the above instructions **[TERMINATE]**

**[NEXT PAGE]**

**Main Questionnaire**
**[INTRODUCTION 1]**

Imagine you have just purchased or leased medical billing or accounting software. On the next page, you will be shown the End User License Agreement that you must agree to before you may register or install the software.

After you view the agreement you will be asked some questions. Please do not guess.

**[NEXT PAGE]**

C-29

**[INTRODUCTION 2]**

Below is the End User License Agreement that you must agree to before you may register or install the software. Please read this agreement as you normally would if you were considering registering or installing the medical billing or accounting software you just purchased or leased.

Select "NEXT" when you are ready to continue.

**[INSERT EULA 1]**

**[DO NOT DISPLAY NEXT BUTTON FOR 60 SECONDS]**

**[NEXT PAGE]**

**[INTRODUCTION 3]**

Next, please direct your attention to the three segments of the End User License Agreement that are boxed.

Select "NEXT" when you are ready to continue.

**[INSERT EULA 2]**

**[DO NOT DISPLAY NEXT BUTTON FOR 60 SECONDS]**

**[NEXT PAGE]**

**[INTRODUCTION 4]**

Below are the three boxed segments of the End User License Agreement you just read. In addition, click here to see the full End User License Agreement.

**[INSERT EULA 3; USE EULA 2 FOR HYPERLINK]**

**[DO NOT DISPLAY NEXT BUTTON FOR 30 SECONDS]**

**[NEXT PAGE]**

Click here to see the full End User License Agreement.

Q1. Based on your understanding of the End User License Agreement you just reviewed, have you consented to receive faxed advertisements about the latest versions of the software you just purchased or leased and related products? (*Select one only*) **[ROTATE RESPONSE OPTIONS]**
- ⊙ Yes
- ⊙ No
- ⊙ Don't know/Unsure **[ANCHOR]**

**[END OF SURVEY]**

C-30

**Appendix D: Data Glossary Faxed Advertisements Survey**

| Variable | Description | Code |
|---|---|---|
| ID | Respondent ID | |
| Qs1 | What type of electronic device are you using to complete this survey? | 1 = Desktop Computer<br>2 = Laptop Computer<br>3 = Tablet Computer<br>4 = Smartphone<br>5 = Other mobile or electronic device |
| Qs2 | Are you…? | 1 = Male<br>2 = Female |
| Qs3 | Into which of the following categories does your age fall? | 1 = Under 18<br>2 = 18-34<br>3 = 35-49<br>4 = 50-64<br>5 = 65+ |
| Qs4 | Please enter the fax number for your practice. | |
| Qs5_1 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells medical billing or accounting software |
| Qs5_2 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells school or office supplies |
| Qs5_3 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells athletic or high-end fashion footwear |
| Qs5_4 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells free weights or cardio equipment |
| Qs5_5 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells landline or cellular telephones |
| Qs5_6 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A market research or advertising agency |
| Qs5_7 | Do you work for any of the following types of companies or in any of the following industries? | 1 = None of the above |
| Qs6 | Which of the following best describes your current title or role as a medical professional? | 1 = Physician (All Specialties)<br>2 = Physical Therapist or Occupational Therapist<br>3 = Chiropractor<br>4 = Nurse |

D-1

| | | 5 = Office administrator or staff<br>6 = Other. Please specify:<br>7 = None of the above |
|---|---|---|
| Qs6X | Which of the following best describes your current title or role as a medical professional? | Specified response to "Other. Please specify:" in Qs6 |
| Qs7 | Which of the following best describes the size of your practice? | 1 = Solo or family practice<br>2 = Less than 10<br>3 = Between 11 - 50<br>4 = Between 51 – 100<br>5 = More than 100<br>6 = Don't know/Unsure |
| Qs8_1 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Medical billing or accounting software |
| Qs8_2 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Furniture or equipment |
| Qs8_3 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Credit card machine |
| Qs8_4 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Telephone equipment |
| Qs8_5 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Indoor or outdoor signage |
| Qs8_6 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Malpractice insurance |
| Qs8_7 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = None of the above |
| Qs9 | Please select ["NORTH"] ["SOUTH"] ["EAST"] ["WEST"] from the following list in order to continue with this survey. | 1 = North<br>2 = South<br>3 = East<br>4 = West |
| Qs9Index | The correct response to Qs9 | 1 = North<br>2 = South<br>3 = East<br>4 = West |
| Qs10 | You have qualified to take this survey. Before continuing, please carefully read these instructions:<br>• Please take the survey in <u>one</u> session without interruption.<br>• While taking the survey, please do not consult any other websites or other electronic or written materials.<br>• Please keep your browser maximized for the entire survey.<br>• Please answer all questions on your own without consulting any other person. | 1 = I understand and agree to the above instructions<br>2 = I do not understand or do not agree to the above instructions |

D-2

| | | |
|---|---|---|
| | • If you normally wear eyeglasses or contact lenses when viewing a computer or tablet screen, please wear them for the survey. | |
| Q1 | Based on your understanding of the End User License Agreement you just reviewed, have you consented to receive faxed advertisements about the latest versions of the software you just purchased or leased and related products? | 1 = Yes<br>2 = No<br>3 = Don't know/Unsure |
| StartTime | Date and time the survey was started | |
| EndTime | Date and time the survey was completed | |

D-3

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 2 | 4 | 12069842564 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 2 | 2 | 1 | 4 | 14027179505 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 3 | 2 | 2 | 2 | 14045751301 | | | | | | | 1 | 2 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 4 | 2 | 1 | 4 | 16013942593 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | 1 |
| 5 | 2 | 1 | 4 | 14192387768 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 6 | 1 | 1 | 4 | 13015303666 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 7 | 2 | 1 | 5 | 13026563310 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | |
| 8 | 1 | 1 | 4 | 15596252610 | | | | | | | 1 | 1 | | 3 | 1 | | 1 | 1 | 1 |
| 9 | 2 | 1 | 3 | 18017047001 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 10 | 1 | 1 | 4 | 14105802971 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 11 | 2 | 1 | 4 | 14076140169 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 12 | 3 | 1 | 4 | 19732091201 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 13 | 1 | 1 | 4 | 13154716760 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 3 | 19738315142 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 15 | 1 | 1 | 3 | 12167786818 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 16 | 1 | 1 | 4 | 16313684891 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 17 | 3 | 1 | 3 | 15738827144 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 18 | 2 | 1 | 5 | 14404490803 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 19 | 1 | 2 | 3 | 17168983219 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 20 | 1 | 2 | 4 | 18475701577 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | | |
| 21 | 1 | 1 | 3 | 17326882644 | | | | | | | 1 | 1 | | 2 | 1 | | 1 | 1 | 1 |
| 22 | 2 | 1 | 3 | 18063550834 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 23 | 1 | 1 | 3 | 12813945568 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 24 | 1 | 2 | 4 | 19524281333 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 25 | 1 | 1 | 3 | 12164764069 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 26 | 2 | 1 | 4 | 15088452777 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 27 | 1 | 1 | 4 | 16306468942 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | 1 |
| 28 | 1 | 2 | 4 | 15613912970 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 29 | 1 | 1 | 4 | 12056649907 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 30 | 2 | 1 | 4 | 15136810252 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 31 | 2 | 2 | 3 | 13376026446 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|----|-------|-------|-----|----------|------|----|-----------|---------|
| 1 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 10:33 | 1/17/2020 10:42 |
| 2 | 1 | | 4 | 4 | 1 | 2 | 1/17/2020 10:38 | 1/17/2020 11:00 |
| 3 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 10:40 | 1/17/2020 12:54 |
| 4 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 10:44 | 1/17/2020 10:51 |
| 5 | 1 | | 4 | 4 | 1 | 3 | 1/17/2020 10:49 | 1/17/2020 10:55 |
| 6 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 10:52 | 1/17/2020 10:59 |
| 7 | 1 | | 2 | 2 | 1 | 2 | 1/17/2020 10:52 | 1/17/2020 11:07 |
| 8 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 11:03 | 1/17/2020 11:13 |
| 9 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 11:14 | 1/17/2020 11:22 |
| 10 | 1 | | 2 | 2 | 1 | 2 | 1/17/2020 11:15 | 1/17/2020 11:20 |
| 11 | 1 | | 2 | 2 | 1 | 1 | 1/17/2020 11:17 | 1/17/2020 11:53 |
| 12 | 1 | | 2 | 2 | 1 | 1 | 1/17/2020 11:22 | 1/17/2020 11:43 |
| 13 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 11:26 | 1/17/2020 11:35 |
| 14 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 11:33 | 1/17/2020 11:40 |
| 15 | 1 | | 2 | 2 | 1 | 2 | 1/17/2020 11:59 | 1/17/2020 12:05 |
| 16 | 1 | | 2 | 2 | 1 | 3 | 1/17/2020 12:21 | 1/17/2020 12:32 |
| 17 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 12:37 | 1/17/2020 12:42 |
| 18 | 1 | | 4 | 4 | 1 | 2 | 1/17/2020 12:49 | 1/17/2020 12:59 |
| 19 | | | 3 | 3 | 1 | 1 | 1/17/2020 13:06 | 1/17/2020 13:10 |
| 20 | | | 1 | 1 | 1 | 2 | 1/17/2020 13:15 | 1/17/2020 13:20 |
| 21 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 13:15 | 1/17/2020 13:19 |
| 22 | 1 | | 4 | 4 | 1 | 3 | 1/17/2020 13:17 | 1/17/2020 13:28 |
| 23 | 1 | | 4 | 4 | 1 | 2 | 1/17/2020 13:21 | 1/17/2020 17:59 |
| 24 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 13:27 | 1/17/2020 13:39 |
| 25 | 1 | | 4 | 4 | 1 | 1 | 1/17/2020 13:31 | 1/17/2020 13:43 |
| 26 | 1 | | 3 | 3 | 1 | 2 | 1/17/2020 13:40 | 1/17/2020 13:59 |
| 27 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 13:42 | 1/17/2020 13:47 |
| 28 | 1 | | 3 | 3 | 1 | 2 | 1/17/2020 13:46 | 1/17/2020 13:51 |
| 29 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 13:59 | 1/17/2020 14:04 |
| 30 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 14:07 | 1/17/2020 16:20 |
| 31 | 1 | | 4 | 4 | 1 | 1 | 1/17/2020 14:08 | 1/17/2020 14:14 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | 1 | 1 | 3 | 18145360963 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 33 | 1 | 1 | 3 | 16507629886 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 34 | 2 | 1 | 5 | 19203802755 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 35 | 1 | 1 | 4 | 15163336160 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 36 | 2 | 2 | 3 | 15862816001 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 37 | 1 | 1 | 3 | 13027340391 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 38 | 1 | 1 | 4 | 12017678838 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 39 | 2 | 2 | 3 | 16176365031 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 40 | 1 | 1 | 4 | 15742431411 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 41 | 1 | 2 | 3 | 15854537771 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 42 | 2 | 1 | 4 | 18189523312 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 43 | 2 | 1 | 3 | 14528219362 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 44 | 1 | 1 | 4 | 17138629769 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | |
| 45 | 2 | 1 | 3 | 15742292531 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 46 | 2 | 1 | 3 | 14103585062 | | | | | | | 1 | 2 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 47 | 1 | 1 | 5 | 13863250365 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 48 | 1 | 2 | 4 | 15022235016 | | | | | | | 1 | 2 | | 3 | 1 | 1 | | | |
| 49 | 1 | 1 | 3 | 18476346282 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 50 | 1 | 1 | 3 | 17325684565 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 51 | 2 | 1 | 3 | 12152141425 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 52 | 1 | 1 | 3 | 18438819662 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 53 | 1 | 1 | 3 | 18283238322 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 54 | 3 | 1 | 4 | 12812186649 | | | | | | | 1 | 1 | | 2 | 1 | | | | |
| 55 | 2 | 1 | 4 | 17037763020 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 56 | 1 | 1 | 4 | 18479319072 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 57 | 1 | 1 | 4 | 16314442499 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 58 | 1 | 1 | 4 | 18885519896 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 59 | 1 | 1 | 5 | 13366590272 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 60 | 2 | 1 | 3 | 15137015979 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 61 | 3 | 2 | 4 | 19524327019 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 62 | 2 | 1 | 3 | 12106147892 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|----|-------|-------|-----|----------|------|----|-----------|---------|
| 32 | 1 | | 4 | 4 | 1 | 3 | 1/17/2020 14:28 | 1/17/2020 14:33 |
| 33 | 1 | | 2 | 2 | 1 | 2 | 1/17/2020 14:31 | 1/17/2020 15:00 |
| 34 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 14:39 | 1/17/2020 14:44 |
| 35 | 1 | | 2 | 2 | 1 | 2 | 1/17/2020 14:46 | 1/17/2020 14:51 |
| 36 | 1 | | 3 | 3 | 1 | 3 | 1/17/2020 14:47 | 1/17/2020 15:04 |
| 37 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 14:48 | 1/17/2020 14:53 |
| 38 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 14:49 | 1/17/2020 14:59 |
| 39 | 1 | | 1 | 1 | 1 | 3 | 1/17/2020 14:53 | 1/17/2020 14:59 |
| 40 | 1 | | 2 | 2 | 1 | 1 | 1/17/2020 14:58 | 1/17/2020 15:05 |
| 41 | 1 | | 4 | 4 | 1 | 2 | 1/17/2020 15:01 | 1/17/2020 15:06 |
| 42 | 1 | | 3 | 3 | 1 | 1 | 1/17/2020 15:12 | 1/17/2020 15:19 |
| 43 | | | 4 | 4 | 1 | 2 | 1/17/2020 15:16 | 1/17/2020 15:23 |
| 44 | 1 | | 1 | 1 | 1 | 3 | 1/17/2020 15:55 | 1/17/2020 16:01 |
| 45 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 16:10 | 1/17/2020 16:17 |
| 46 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 16:30 | 1/17/2020 16:37 |
| 47 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 16:45 | 1/17/2020 17:02 |
| 48 | 1 | | 2 | 2 | 1 | 1 | 1/17/2020 16:51 | 1/18/2020 12:51 |
| 49 | 1 | | 4 | 4 | 1 | 1 | 1/17/2020 17:00 | 1/19/2020 22:09 |
| 50 | 1 | | 1 | 1 | 1 | 1 | 1/17/2020 18:54 | 1/17/2020 19:00 |
| 51 | 1 | | 1 | 1 | 1 | 3 | 1/17/2020 19:50 | 1/17/2020 19:58 |
| 52 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 20:08 | 1/17/2020 20:13 |
| 53 | 1 | | 1 | 1 | 1 | 2 | 1/17/2020 20:11 | 1/17/2020 20:16 |
| 54 | 1 | | 1 | 1 | 1 | 1 | 1/18/2020 3:12 | 1/18/2020 3:20 |
| 55 | 1 | | 4 | 4 | 1 | 1 | 1/18/2020 5:48 | 1/18/2020 5:54 |
| 56 | 1 | | 3 | 3 | 1 | 3 | 1/18/2020 6:26 | 1/18/2020 6:32 |
| 57 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 6:28 | 1/18/2020 6:37 |
| 58 | 1 | | 4 | 4 | 1 | 2 | 1/18/2020 8:14 | 1/18/2020 8:21 |
| 59 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 8:16 | 1/18/2020 8:20 |
| 60 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 8:27 | 1/18/2020 8:48 |
| 61 | 1 | | 1 | 1 | 1 | 1 | 1/18/2020 8:39 | 1/18/2020 17:01 |
| 62 | 1 | | 3 | 3 | 1 | 2 | 1/18/2020 8:42 | 1/18/2020 8:48 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|----|-----|-----|-----|-----|-------|-------|-------|-------|-------|-------|-------|-----|------|-----|-------|-------|-------|-------|-------|
| 63 | 2 | 2 | 3 | 17034040286 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 64 | 2 | 1 | 3 | 13015451814 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 65 | 1 | 1 | 4 | 18286975738 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 66 | 2 | 1 | 4 | 17327368811 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 67 | 3 | 1 | 4 | 16317230003 | | | | | | | 1 | 1 | | 1 | 1 | | 1 | 1 | |
| 68 | 1 | 1 | 4 | 19738829539 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 69 | 1 | 1 | 4 | 14233147006 | | | | | | | 1 | 2 | | 3 | 1 | 1 | | 1 | 1 |
| 70 | 3 | 1 | 5 | 18606758798 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 71 | 2 | 1 | 4 | 19087827195 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 72 | 3 | 1 | 4 | 17153559794 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 73 | 1 | 2 | 4 | 13523794021 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | 1 |
| 74 | 3 | 1 | 4 | 12154561749 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | 1 |
| 75 | 1 | 1 | 3 | 15853683119 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | 1 |
| 76 | 1 | 1 | 4 | 18655462618 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 77 | 3 | 1 | 4 | 15184340806 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 78 | 1 | 1 | 4 | 16785340201 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 79 | 1 | 1 | 5 | 13603579485 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 80 | 1 | 1 | 5 | 12154814317 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | | |
| 81 | 2 | 1 | 4 | 18043205191 | | | | | | | 1 | 1 | | 2 | 1 | | 1 | 1 | |
| 82 | 1 | 1 | 4 | 17126233755 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 83 | 2 | 1 | 4 | 16095861579 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 84 | 1 | 2 | 4 | 19726209635 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 85 | 1 | 1 | 4 | 15106442099 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | |
| 86 | 1 | 1 | 4 | 15164873494 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 87 | 3 | 2 | 3 | 19096250903 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 88 | 1 | 1 | 4 | 14242938647 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 89 | 2 | 1 | 4 | 16306548392 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 90 | 1 | 1 | 4 | 16106233861 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 91 | 1 | 1 | 4 | 16077340614 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 92 | 1 | 1 | 4 | 12154419288 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 93 | 2 | 1 | 5 | 16206241501 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|----|-------|-------|-----|----------|------|----|-----------| --------|
| 63 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 9:23 | 1/18/2020 9:37 |
| 64 | 1 | | 3 | 3 | 1 | 3 | 1/18/2020 9:27 | 1/18/2020 9:32 |
| 65 | 1 | | 2 | 2 | 1 | 2 | 1/18/2020 9:35 | 1/18/2020 9:43 |
| 66 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 9:38 | 1/18/2020 9:48 |
| 67 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 9:45 | 1/18/2020 9:54 |
| 68 | 1 | | 2 | 2 | 1 | 2 | 1/18/2020 10:00 | 1/18/2020 10:08 |
| 69 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 10:13 | 1/18/2020 10:24 |
| 70 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 10:20 | 1/18/2020 10:29 |
| 71 | 1 | | 2 | 2 | 1 | 3 | 1/18/2020 10:23 | 1/18/2020 10:31 |
| 72 | 1 | | 1 | 1 | 1 | 1 | 1/18/2020 10:27 | 1/18/2020 10:32 |
| 73 | | | 1 | 1 | 1 | 2 | 1/18/2020 10:39 | 1/18/2020 10:46 |
| 74 | 1 | | 2 | 2 | 1 | 2 | 1/18/2020 11:07 | 1/18/2020 11:14 |
| 75 | 1 | | 2 | 2 | 1 | 3 | 1/18/2020 11:38 | 1/18/2020 11:45 |
| 76 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 11:40 | 1/18/2020 11:47 |
| 77 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 11:43 | 1/18/2020 11:50 |
| 78 | 1 | | 3 | 3 | 1 | 2 | 1/18/2020 11:47 | 1/18/2020 15:01 |
| 79 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 11:48 | 1/18/2020 11:53 |
| 80 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 11:53 | 1/18/2020 12:09 |
| 81 | 1 | | 4 | 4 | 1 | 3 | 1/18/2020 11:57 | 1/18/2020 12:03 |
| 82 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 12:01 | 1/18/2020 12:22 |
| 83 | 1 | | 3 | 3 | 1 | 1 | 1/18/2020 12:05 | 1/18/2020 12:14 |
| 84 | 1 | | 4 | 4 | 1 | 3 | 1/18/2020 12:22 | 1/18/2020 12:31 |
| 85 | 1 | | 2 | 2 | 1 | 1 | 1/18/2020 12:23 | 1/18/2020 12:28 |
| 86 | 1 | | 3 | 3 | 1 | 3 | 1/18/2020 12:32 | 1/18/2020 12:40 |
| 87 | 1 | | 3 | 3 | 1 | 2 | 1/18/2020 12:33 | 1/18/2020 12:39 |
| 88 | 1 | | 2 | 2 | 1 | 1 | 1/18/2020 12:33 | 1/18/2020 12:38 |
| 89 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 12:41 | 1/18/2020 12:46 |
| 90 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 12:52 | 1/18/2020 12:57 |
| 91 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 12:55 | 1/18/2020 13:08 |
| 92 | 1 | | 2 | 2 | 1 | 3 | 1/18/2020 12:58 | 1/18/2020 13:03 |
| 93 | 1 | | 3 | 3 | 1 | 3 | 1/18/2020 13:03 | 1/18/2020 13:12 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|----|-----|-----|-----|-----|-------|-------|-------|-------|-------|-------|-------|-----|------|-----|-------|-------|-------|-------|-------|
| 94 | 3 | 1 | 4 | 14848210826 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 95 | 1 | 2 | 3 | 17034517219 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | | 1 |
| 96 | 1 | 1 | 5 | 12512465111 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 97 | 1 | 1 | 4 | 15736355240 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 98 | 1 | 1 | 3 | 15414515538 | | | | | | | 1 | 3 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 99 | 3 | 1 | 4 | 17049833236 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 100 | 2 | 1 | 4 | 18456735720 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 101 | 1 | 1 | 4 | 13475777306 | | | | | | | 1 | 1 | | 2 | 1 | | | 1 | |
| 102 | 1 | 1 | 4 | 18478130797 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 103 | 3 | 1 | 4 | 14017851191 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 104 | 1 | 1 | 4 | 13053652892 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 105 | 1 | 1 | 4 | 18085994300 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 106 | 1 | 1 | 5 | 16104341078 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 107 | 2 | 2 | 3 | 19498295522 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 108 | 2 | 2 | 2 | 14326402493 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 109 | 1 | 1 | 4 | 18607148080 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | 1 |
| 110 | 3 | 2 | 4 | 18109841886 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 111 | 1 | 2 | 4 | 16509887552 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 112 | 2 | 1 | 4 | 12563926151 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 113 | 1 | 2 | 4 | 12526349915 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 114 | 2 | 1 | 3 | 13307774414 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 115 | 2 | 1 | 3 | 13017144356 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 116 | 2 | 1 | 3 | 16159428659 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 117 | 2 | 1 | 4 | 16192943429 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 118 | 2 | 2 | 3 | 16318282290 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 119 | 2 | 2 | 4 | 17852298447 | | | | | | | 1 | 1 | | 2 | 1 | | | | |
| 120 | 2 | 1 | 3 | 18135586405 | | | | | | | 1 | 2 | | 3 | 1 | 1 | 1 | 1 | |
| 121 | 2 | 1 | 4 | 19733769616 | | | | | | | 1 | 3 | | 1 | 1 | 1 | | 1 | 1 |
| 122 | 2 | 2 | 3 | 17817926540 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 123 | 1 | 1 | 4 | 16416821158 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 124 | 2 | 1 | 4 | 12012430446 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|---|---|---|---|---|---|---|---|---|
| 94 | 1 | | 4 | 4 | 1 | 3 | 1/18/2020 13:05 | 1/18/2020 13:13 |
| 95 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 13:06 | 1/18/2020 13:53 |
| 96 | 1 | | 2 | 2 | 1 | 1 | 1/18/2020 13:16 | 1/18/2020 13:20 |
| 97 | 1 | | 2 | 2 | 1 | 2 | 1/18/2020 13:17 | 1/18/2020 13:35 |
| 98 | 1 | | 4 | 4 | 1 | 2 | 1/18/2020 13:27 | 1/18/2020 13:32 |
| 99 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 13:27 | 1/18/2020 13:37 |
| 100 | 1 | | 4 | 4 | 1 | 3 | 1/18/2020 13:36 | 1/18/2020 13:40 |
| 101 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 14:03 | 1/18/2020 14:07 |
| 102 | 1 | | 4 | 4 | 1 | 3 | 1/18/2020 14:07 | 1/18/2020 14:18 |
| 103 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 14:10 | 1/18/2020 14:15 |
| 104 | 1 | | 4 | 4 | 1 | 3 | 1/18/2020 14:11 | 1/18/2020 14:17 |
| 105 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 14:23 | 1/18/2020 14:29 |
| 106 | 1 | | 4 | 4 | 1 | 2 | 1/18/2020 14:28 | 1/18/2020 14:38 |
| 107 | 1 | | 3 | 3 | 1 | 2 | 1/18/2020 14:29 | 1/18/2020 14:52 |
| 108 | 1 | | 2 | 2 | 1 | 1 | 1/18/2020 14:39 | 1/18/2020 14:43 |
| 109 | | | 1 | 1 | 1 | 3 | 1/18/2020 14:44 | 1/18/2020 14:49 |
| 110 | 1 | | 1 | 1 | 1 | 2 | 1/18/2020 14:59 | 1/18/2020 15:32 |
| 111 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 15:02 | 1/18/2020 15:07 |
| 112 | 1 | | 4 | 4 | 1 | 2 | 1/18/2020 15:08 | 1/18/2020 15:33 |
| 113 | 1 | | 1 | 1 | 1 | 3 | 1/18/2020 16:41 | 1/18/2020 16:51 |
| 114 | 1 | | 1 | 1 | 1 | 1 | 1/18/2020 16:46 | 1/18/2020 16:55 |
| 115 | 1 | | 2 | 2 | 1 | 2 | 1/19/2020 21:47 | 1/19/2020 21:52 |
| 116 | 1 | | 3 | 3 | 1 | 2 | 1/19/2020 22:13 | 1/19/2020 22:19 |
| 117 | 1 | | 1 | 1 | 1 | 2 | 1/19/2020 22:18 | 1/19/2020 22:39 |
| 118 | 1 | | 4 | 4 | 1 | 1 | 1/19/2020 22:35 | 1/19/2020 22:41 |
| 119 | | | 4 | 4 | 1 | 2 | 1/19/2020 22:41 | 1/19/2020 22:53 |
| 120 | 1 | | 1 | 1 | 1 | 3 | 1/19/2020 23:11 | 1/19/2020 23:19 |
| 121 | 1 | | 2 | 2 | 1 | 2 | 1/20/2020 9:57 | 1/20/2020 10:03 |
| 122 | 1 | | 2 | 2 | 1 | 2 | 1/20/2020 10:01 | 1/20/2020 10:06 |
| 123 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 10:01 | 1/20/2020 10:23 |
| 124 | 1 | | 3 | 3 | 1 | 2 | 1/20/2020 10:02 | 1/20/2020 10:06 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 125 | 1 | 1 | 4 | 15205758033 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 126 | 1 | 2 | 4 | 17067773860 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 127 | 3 | 1 | 4 | 12067446240 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 128 | 1 | 1 | 5 | 13135575220 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 129 | 2 | 2 | 3 | 16268580858 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | 1 |
| 130 | 2 | 1 | 3 | 12085527521 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 131 | 1 | 1 | 4 | 17188757864 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 132 | 1 | 1 | 5 | 14804830127 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 133 | 2 | 1 | 4 | 13362991762 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 134 | 1 | 1 | 4 | 12155041910 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 135 | 2 | 1 | 4 | 17635815151 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | | 1 |
| 136 | 2 | 1 | 3 | 15734710810 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 137 | 2 | 1 | 3 | 16234635149 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 138 | 2 | 1 | 5 | 16262051941 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 139 | 1 | 1 | 4 | 18086765736 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 140 | 3 | 2 | 3 | 15108144652 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | 1 |
| 141 | 2 | 1 | 4 | 14098422878 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 142 | 1 | 1 | 4 | 18604770720 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | |
| 143 | 2 | 1 | 4 | 19722397021 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 144 | 2 | 2 | 4 | 15152254427 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 145 | 1 | 1 | 5 | 12815970015 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 146 | 3 | 1 | 3 | 18552797911 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 147 | 2 | 1 | 4 | 14045017466 | | | | | | | 1 | 1 | | 2 | 1 | | | | |
| 148 | 2 | 2 | 4 | 15036656404 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 149 | 1 | 2 | 4 | 14102872819 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 150 | 1 | 1 | 3 | 12814822231 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 151 | 1 | 1 | 4 | 13232993278 | | | | | | | 1 | 1 | | 2 | 1 | | 1 | 1 | |
| 152 | 2 | 1 | 4 | 12178766606 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 153 | 3 | 1 | 4 | 18052107290 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 154 | 1 | 1 | 4 | 14105735311 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 155 | 2 | 1 | 4 | 18453378326 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |

E-9

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|---|---|---|---|---|---|---|---|---|
| 125 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 10:03 | 1/20/2020 10:09 |
| 126 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 10:07 | 1/20/2020 10:20 |
| 127 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 10:15 | 1/20/2020 10:20 |
| 128 | 1 | | 2 | 2 | 1 | 1 | 1/20/2020 10:19 | 1/20/2020 10:26 |
| 129 | | | 1 | 1 | 1 | 2 | 1/20/2020 10:22 | 1/20/2020 10:35 |
| 130 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 10:36 | 1/20/2020 10:43 |
| 131 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 10:41 | 1/20/2020 10:44 |
| 132 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 10:45 | 1/20/2020 10:54 |
| 133 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 10:46 | 1/20/2020 10:52 |
| 134 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 10:50 | 1/20/2020 10:57 |
| 135 | 1 | | 3 | 3 | 1 | 2 | 1/20/2020 10:53 | 1/20/2020 11:03 |
| 136 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 10:58 | 1/20/2020 11:04 |
| 137 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 11:08 | 1/20/2020 11:16 |
| 138 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 11:17 | 1/20/2020 11:30 |
| 139 | 1 | | 4 | 4 | 1 | 1 | 1/20/2020 11:20 | 1/20/2020 11:26 |
| 140 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 11:26 | 1/20/2020 11:36 |
| 141 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 11:31 | 1/20/2020 11:36 |
| 142 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 11:36 | 1/20/2020 11:44 |
| 143 | 1 | | 2 | 2 | 1 | 3 | 1/20/2020 11:37 | 1/20/2020 13:31 |
| 144 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 11:48 | 1/20/2020 11:53 |
| 145 | 1 | | 2 | 2 | 1 | 3 | 1/20/2020 11:48 | 1/20/2020 11:56 |
| 146 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 11:59 | 1/20/2020 12:15 |
| 147 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 12:01 | 1/20/2020 12:08 |
| 148 | 1 | | 4 | 4 | 1 | 1 | 1/20/2020 13:21 | 1/20/2020 13:31 |
| 149 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 13:46 | 1/20/2020 13:54 |
| 150 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 14:01 | 1/20/2020 14:06 |
| 151 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 14:23 | 1/20/2020 14:31 |
| 152 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 15:26 | 1/20/2020 15:32 |
| 153 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 15:36 | 1/20/2020 15:42 |
| 154 | 1 | | 3 | 3 | 1 | 3 | 1/20/2020 15:47 | 1/20/2020 15:51 |
| 155 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 15:56 | 1/20/2020 16:09 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 156 | 1 | 1 | 4 | 19858719796 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 157 | 2 | 2 | 4 | 12692739711 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 158 | 1 | 1 | 4 | 16108634273 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 159 | 1 | 1 | 5 | 15625958822 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 160 | 2 | 2 | 4 | 14356881901 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 161 | 2 | 1 | 5 | 17327800142 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 162 | 2 | 1 | 4 | 12539683410 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 163 | 1 | 2 | 4 | 14043146686 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 164 | 1 | 1 | 4 | 13193738369 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 165 | 1 | 1 | 4 | 15123469601 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 166 | 1 | 2 | 4 | 13106576020 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 167 | 2 | 1 | 3 | 15743725800 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 168 | 1 | 1 | 4 | 15012239462 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 169 | 2 | 1 | 4 | 19083220018 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | |
| 170 | 2 | 1 | 3 | 19094752708 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 171 | 1 | 1 | 4 | 13037901989 | | | | | | | 1 | 1 | | 3 | 1 | | | | |
| 172 | 3 | 1 | 3 | 18593911720 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 173 | 2 | 2 | 3 | 16034342525 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 174 | 2 | 1 | 4 | 13374306979 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 175 | 2 | 1 | 4 | 15163678205 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 176 | 2 | 2 | 4 | 19786640689 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 177 | 1 | 1 | 4 | 15072844612 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 178 | 2 | 2 | 4 | 17169720273 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 179 | 2 | 1 | 4 | 15085803332 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 180 | 1 | 1 | 5 | 13108550438 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 181 | 2 | 2 | 5 | 16233862830 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 182 | 2 | 1 | 3 | 19082374136 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 183 | 2 | 2 | 3 | 16232824642 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 184 | 3 | 1 | 3 | 12173261188 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 185 | 1 | 1 | 4 | 13157810281 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | 1 |
| 186 | 1 | 1 | 4 | 18584570028 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|-----|-------|-------|-----|----------|------|-----|-----------------|-----------------|
| 156 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 15:59 | 1/20/2020 16:05 |
| 157 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 16:24 | 1/20/2020 16:34 |
| 158 | 1 | | 3 | 3 | 1 | 1 | 1/20/2020 16:47 | 1/20/2020 16:57 |
| 159 | 1 | | 3 | 3 | 1 | 3 | 1/20/2020 17:22 | 1/20/2020 18:58 |
| 160 | 1 | | 2 | 2 | 1 | 2 | 1/20/2020 17:30 | 1/20/2020 17:36 |
| 161 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 17:33 | 1/20/2020 17:39 |
| 162 | | | 2 | 2 | 1 | 1 | 1/20/2020 17:48 | 1/20/2020 17:54 |
| 163 | 1 | | 2 | 2 | 1 | 3 | 1/20/2020 17:51 | 1/20/2020 18:02 |
| 164 | 1 | | 2 | 2 | 1 | 1 | 1/20/2020 18:01 | 1/20/2020 18:14 |
| 165 | 1 | | 3 | 3 | 1 | 1 | 1/20/2020 18:04 | 1/20/2020 18:10 |
| 166 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 18:13 | 1/20/2020 18:19 |
| 167 | 1 | | 2 | 2 | 1 | 2 | 1/20/2020 18:23 | 1/20/2020 18:33 |
| 168 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 18:34 | 1/20/2020 18:38 |
| 169 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 18:46 | 1/20/2020 18:52 |
| 170 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 18:57 | 1/20/2020 19:06 |
| 171 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 19:23 | 1/20/2020 19:29 |
| 172 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 19:27 | 1/20/2020 19:34 |
| 173 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 19:52 | 1/20/2020 19:59 |
| 174 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 19:53 | 1/20/2020 20:08 |
| 175 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 19:53 | 1/20/2020 19:57 |
| 176 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 19:54 | 1/20/2020 20:00 |
| 177 | | | 1 | 1 | 1 | 2 | 1/20/2020 19:55 | 1/20/2020 20:03 |
| 178 | 1 | | 3 | 3 | 1 | 3 | 1/20/2020 19:59 | 1/20/2020 20:05 |
| 179 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 20:01 | 1/20/2020 20:13 |
| 180 | 1 | | 3 | 3 | 1 | 1 | 1/20/2020 20:13 | 1/20/2020 20:18 |
| 181 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 20:23 | 1/20/2020 20:32 |
| 182 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 20:27 | 1/20/2020 20:32 |
| 183 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 20:29 | 1/20/2020 20:45 |
| 184 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 20:31 | 1/20/2020 20:37 |
| 185 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 20:38 | 1/20/2020 20:43 |
| 186 | 1 | | 3 | 3 | 1 | 2 | 1/20/2020 20:39 | 1/20/2020 20:47 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 187 | 2 | 1 | 4 | 18124779797 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 188 | 2 | 1 | 4 | 19124349690 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 189 | 2 | 1 | 4 | 18478238009 | | | | | | | 1 | 1 | | 2 | 1 | | 1 | 1 | |
| 190 | 1 | 1 | 4 | 15613471785 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 191 | 2 | 2 | 3 | 17273761539 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 192 | 2 | 1 | 4 | 17242384102 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 193 | 2 | 1 | 5 | 19549618401 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 194 | 1 | 1 | 5 | 17033915659 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 195 | 2 | 1 | 3 | 18552877901 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 196 | 2 | 2 | 4 | 12134068056 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 197 | 1 | 1 | 4 | 12155792816 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 198 | 2 | 1 | 3 | 14088417567 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | | 1 |
| 199 | 2 | 1 | 3 | 18596672277 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 200 | 3 | 2 | 4 | 18592654233 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |

Appendix E: Data Listing Faxed Advertisements Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|----|-------|-------|-----|----------|------|-----|-----------|---------|
| 187 | 1 | | 1 | 1 | 1 | 3 | 1/20/2020 20:44 | 1/20/2020 20:51 |
| 188 | 1 | | 3 | 3 | 1 | 2 | 1/20/2020 20:45 | 1/20/2020 20:52 |
| 189 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 20:45 | 1/20/2020 20:53 |
| 190 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 20:48 | 1/20/2020 20:53 |
| 191 | 1 | | 1 | 1 | 1 | 1 | 1/20/2020 20:54 | 1/20/2020 21:00 |
| 192 | 1 | | 3 | 3 | 1 | 2 | 1/20/2020 20:58 | 1/20/2020 21:03 |
| 193 | 1 | | 2 | 2 | 1 | 2 | 1/20/2020 20:58 | 1/20/2020 21:08 |
| 194 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 20:58 | 1/20/2020 21:11 |
| 195 | 1 | | 1 | 1 | 1 | 2 | 1/20/2020 21:05 | 1/20/2020 21:15 |
| 196 | 1 | | 4 | 4 | 1 | 2 | 1/20/2020 21:43 | 1/20/2020 21:47 |
| 197 | 1 | | 3 | 3 | 1 | 2 | 1/20/2020 22:13 | 1/20/2020 22:23 |
| 198 | 1 | | 2 | 2 | 1 | 3 | 1/20/2020 23:23 | 1/20/2020 23:28 |
| 199 | 1 | | 1 | 1 | 1 | 1 | 1/21/2020 4:09 | 1/21/2020 5:24 |
| 200 | 1 | | 2 | 2 | 1 | 2 | 1/21/2020 7:55 | 1/21/2020 8:04 |

**Appendix F: Screenshots and Questionnaire**
**Faxed Offers Survey**

INTRO



QS1



QS2



QS3



QS4



QS5



Do you work for any of the following types of companies or in any of the following industries?

*(Select all that apply)*

- A market research or advertising agency
- A company that manufactures or sells medical billing or accounting software
- A company that manufactures or sells landline or cellular telephones
- A company that manufactures or sells school or office supplies
- A company that manufactures or sells athletic or high-end fashion footwear
- A company that manufactures or sells free weights or cardio equipment
- None of the above

**NEXT**

Copyright © 2020, Applied Marketing Science, Inc.

QS6

Which of the following best describes your current title or role as a medical professional?

*(Select one only)*

- Nurse
- Office administrator or staff
- Physician (All Specialties)
- Chiropractor
- Physical Therapist or Occupational Therapist
- Other. Please specify:
- None of the above

**NEXT**

Copyright © 2020, Applied Marketing Science, Inc.

QS7



QS8



QS9



QS10



INTRO 1



Imagine you have just purchased or leased medical billing or accounting software. On the next page, you will be shown the End User License Agreement that you must agree to before you may register or install the software.

After you view the agreement you will be asked some questions. Please do not guess.

NEXT

Copyright © 2020, Applied Marketing Science, Inc.

INTRO 2



Below is the End User License Agreement that you must agree to before you may register or install the software. Please read this agreement as you normally would if you were considering registering or installing the medical billing or accounting software you just purchased or leased.

Select "NEXT" when you are ready to continue.

**END USER LICENSE AGREEMENT**

**NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.**

This End-User License Agreement (**"EULA"**) is a legal agreement between you, either an individual or a single entity (**"End User"** or **"You"**) and McKesson Information Solutions LLC, on behalf of itself and the McKesson Affiliates (**"McKesson"**) for the Software and Clinical Content, as those terms are defined in Section 1.1.1 below, that McKesson provides to End User. By installing, copying, or otherwise using the Software or Clinical Content, You agree to be bound by the terms of this EULA. If You do not agree to the terms of this EULA, You may not install or use the Software.

AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

If You have previously entered into a written license agreement directly with McKesson or any of its predecessors, including but not limited to Physicians Micro Systems, Inc., for license of the Software, then this EULA does not apply to You, even if You click "accept" to continue installation.

If You did not obtain the Software either directly from McKesson or from an authorized McKesson reseller, or if You have not paid either McKesson or an authorized McKesson reseller in full for this license, then this EULA offer is rescinded and You are not authorized to install or use this Software. The term of this EULA (**"Term"**) commences on the date the End User first installs the Software and continues until terminated pursuant to Section 2.5.1.

**SECTION 1: SOFTWARE**
1.1    Software and Clinical Content.
1.1.1    Definitions
(a)    "Clinical Content" means medical or clinical information such as terminology, vocabularies, decision support rules, alerts, drug interaction knowledge, care pathway knowledge, standard ranges of normal or expected result values, and any other clinical content or rules provided to End User for use with the Software, together with any related Documentation. Clinical Content may be either (a) owned by McKesson or (b) owned by a third party and sublicensed to End User under this EULA.
(b)    "Concurrent User" means a Permitted User identified by a unique user ID issued by End User that is one user out of a maximum number of users permitted to access the Software simultaneously.
(c)    "Confidential Information" means any information or material, other than Trade Secrets, that is of value to McKesson and is not generally known to third parties, or that McKesson obtains from any third party that McKesson treats as confidential whether or not owned by McKesson. Confidential Information shall not include information that You can show is: (1) known by You at the time of receipt from McKesson and not subject to any other nondisclosure agreement between the parties; (2) now, or which hereafter becomes, generally known to the public through no fault of You; (3) otherwise lawfully and independently developed by You without reference to Confidential Information; or (4) lawfully acquired by You from a third party without any obligation of confidentiality.
(d)    "Data Center" means one data center located in the United States only and operated by End User.

F-8

INTRO 2 (Continued)

(e)     "Documentation" means user guides or operating manuals containing the functional specifications for the McKesson owned software and Clinical Content, as may be reasonably modified from time to time, provided to End User.

(f)     "Facility" means one discrete location, in the United States only, where healthcare services are administered by a Provider or Providers or operated by End User as applicable.

(g)     "McKesson Affiliates" means NDCHealth Corporation (but specifically excluding PST Services, Inc.) and any U.S. entities that, now or in the future, are controlled by either McKesson Information Solutions LLC or NDC Health Corporation.

(h)     "Permitted User" means any individual (a) End User employee, (b) consultant or independent contractor who has need to use the Software based upon a contractual relationship with End User, so long as (i) such consultant or independent contractor is not a McKesson competitor, (ii) End User remains responsible for use of the Software by such consultant or independent contractor, and (iii) such consultant or independent contractor is subject to confidentiality and use restrictions at least as strict as those contained in this EULA, (c) physician with admitting privileges at a Facility, (d) employee of such physician, and (e) medical professional authorized to perform services at a Facility.

(i)     "Provider" means specially trained and licensed personnel (e.g., medical doctor, doctor of osteopathy, physician assistant, physical therapist, dietician, and advanced registered nurse practitioner) directly billing for patient care services either (i) under his or her name, (ii) the name of the practice, or (iii) under the name of a supervisory Provider. "Full-time Providers" are Providers working 20 hours a week or greater. "Part-time Providers" are Providers working less than 20 hours a week or a doctor in residency training.

(j)     "Software" means (i) software in object code form only that accompanies this EULA, and (ii) related Documentation (collectively, "Software").

(k)     "Term" has the meaning set forth in the fifth paragraph of the Introductory Section.

(l)     "Trade Secret" means any information of McKesson or that McKesson has acquired from a third party which is not commonly known by or available to the public, which (1) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secret shall include, but not be limited to, Software, Documentation, Clinical Content and the terms and conditions of this EULA.

1.1.2    License Grant.

(a)     Perpetual License. Subject to the terms of this EULA, McKesson grants to End User, and End User accepts, a limited, nonexclusive, nontransferable, non-sublicensable, perpetual license to use the Software and Clinical Content for End User's internal purposes. Depending on the intended usage, Clinical Content may be provided in either paper or electronic formats.

(b)     The license grant in this Section is expressly subject to the following conditions: (i) the Software may be installed only on equipment at Facilities and Data Centers as specified in Section l.l.3(c) below, (ii) the Software and Clinical Content may be accessed or used only by Permitted Users in the U.S., (iii) use of the Software and Clinical Content is limited by the usage-based variable(s) as specified in Section l.l.3(c) below, and (iv) the Software and Clinical Content may be used to provide service bureau or other similar services, or hosted by a third party (e.g. outsourcing or facility management service provider), only if expressly permitted in a separate writing by McKesson.

(c)     Third Party Software. Any software that is owned by a third party and provided to End User with the Software is subject to that license and terms and conditions accompanying such Third Party Software. McKesson may substitute different software for any Third Party Software, if McKesson reasonably demonstrates the need to do so.

1.1.3    Software License Restrictions.

(a)     Copying and Modification. End User shall not to duplicate the Software, except as required for its use in accordance with this Agreement, provided that End User may make one (1) back-up copy of the Software solely for archival purposes. Such back-up copy shall include

INTRO 2 (Continued)

McKesson's copyright and other proprietary notices, and shall be subject to all the terms and conditions of this EULA. End User will not alter any trademark, copyright notice, or other proprietary notice on the Software or Documentation, and will duplicate each such trademark or notice on each copy of the Software and Documentation.

(b)     Facility Limitation. The Software will be installed only at Facilities and Data Centers as set forth in Section I.I.3(c) below, except that the Software may be installed on a temporary basis at an alternate location in the U.S. if End User is unable to use the Software at such Facility or Data Center due to equipment malfunction or force majeure event. End User will promptly notify McKesson of the alternate location if such temporary use continues for longer than 30 days.

(c)     The following additional restrictions apply to the Software as set forth below:

i.     Lytec SU (single user): Single machine; unlimited named users; no Concurrent Users; No remote access.

ii.     Lytec MU (multiple user): Up to 3 Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iii.     Lytec Professional: Up to five Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iv.     Lytec Client Server: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

v.     Lytec MD: Available to the number of Providers and Concurrent Users purchased from McKesson or the McKesson reseller; One Provider license includes 5 concurrent users; additional Providers or Concurrent Users must be licensed.

vi.     Medisoft Basic or Medisoft Original: Single machine; unlimited named users; no concurrent users; No remote access.

vii.     Medisoft Advanced: Single machine; unlimited named users; no concurrent users; No remote access.

viii.     Medisoft Network Professional: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

ix.     Practice Partner: Available to the number of Providers purchased from McKesson or the McKesson reseller; add-on licenses for some End Users may be licensed on Concurrent User basis if original license was Concurrent User based- please check with Your McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

(d)     Current Procedural Terminology (CPT). The Software may include the Current Procedural Terminology (CPT) code set, maintained by the American Medical Association through the CPT Editorial Panel, describing medical, surgical, and diagnostic services and designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes (the "CPT"). End User may only use the CPT code set consistent with these terms and conditions set forth on Exhibit A.

1.2     Export Law Assurances. End User may not use or otherwise export or re-export the Software or Documentation except as authorized by United States law and the laws of the jurisdiction in which the Software or Documentation was obtained. In particular, the Software or Documentation may not be exported, transshipped or re-exported (1) into (or to a national or resident of) those countries subject to a comprehensive economic sanctions program administered by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") (Countries subject to OFAC embargo or sanctions can change at any time and can be reviewed by consulting materials available at http://www.treas.gov/ofac/index.html and

INTRO 2 (Continued)

http://www.bis.doc.gov); or (2) to anyone on the U.S. Treasury Department list of Specially Designated Nationals or the U.S. Department of Commerce Denied Persons List or Entity List, each as they may be amended from time to time and which may be found at http://www.treas.gov/ofac/index.html and http://www.bis.doc.gov.

1.3     Warranty. McKesson warrants to End User that the computer media on which the original Software is recorded will be free of defects in material and workmanship for a period of 30 days from the date of purchase under normal conditions of use and service. If the media becomes defective within 30 days from the date of purchase, if proof of original purchase can be verified, as End User's sole remedy and McKesson's sole obligation McKesson will replace the Software or at its option, McKesson may refund to End User the original McKesson purchase price.

1.4     Disclaimer. EXCEPT AS STATED IN THE WARRANTY OF SECTION 1.3, THE MCKESSON SOFTWARE AND CLINICAL CONTENT IS PROVIDED "AS IS WITH ALL FAULTS" AND IN ITS PRESENT STATE AND CONDITION. NO WARRANTY, REPRESENTATION, GUARANTEE, CONDITION, UNDERTAKING OR TERM, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO THE CONDITION, QUALITY, DURABILITY, ACCURACY, COMPLETENESS, PERFORMANCE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, QUIET ENJOYMENT, OR FITNESS FOR A PARTICULAR PURPOSE OR USE OF THE MCKESSON SOFTWARE OR CLINICAL CONTENT IS GIVEN OR ASSUMED BY MCKESSON AND ALL SUCH WARRANTIES, REPRESENTATIONS, CONDITIONS, UNDERTAKINGS AND TERMS ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW, AS ARE ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE. MCKESSON DOES NOT WARRANT THAT DEFECTS IN THE MCKESSON SOFTWARE OR CLINICAL CONTENT WILL BE CORRECTED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY MCKESSON OR ANY MCKESSON REPRESENTATIVE OR RESELLER SHALL CREATE A WARRANTY. MCKESSON DOES NOT WARRANT THAT THE SOFTWARE OR CLINICAL CONTENT WILL YIELD ANY PARTICULAR BUSINESS OR FINANCIAL RESULT. TO THE EXTENT THAT UPDATED VERSIONS OF THE SOFTWARE OR CLINICAL CONTENT ARE DEVELOPED AND RELEASED BY MCKESSON, END USER ASSUMES ALL RISKS ASSOCIATED WITH USING OLDER VERSIONS OF THE SOFTWARE, INCLUDING BUT NOT LIMITED TO THE RISK OF USING OUTDATED CLINICAL CONTENT.

1.5     Audit. Upon reasonable advance notice and no more than twice per calendar year, McKesson may conduct an audit to ensure that End User is in compliance with this EULA. Such audit will be conducted during regular business hours, and End User will provide McKesson with reasonable access to all relevant equipment and records. If an audit reveals that End User's use of any Software or Clinical Content during the period being audited exceeds the usage-based variable(s) licensed by End User, then McKesson may invoice End User for all such excess use based on McKesson's prevailing rate(s) in effect at the time the audit is completed, and End User will pay any such invoice. If such excess use exceeds five percent of the licensed use, then End User will also pay McKesson's reasonable costs of conducting the audit.

**SECTION 2: GENERAL TERMS**

2.1.1     Confidential Information, Trade Secrets. You shall not use (except as permitted in connection with Your performance hereunder), disclose or permit any person access to any Trade Secrets (including, without limitation, the Software, Clinical Content and Documentation) while such information retains its status as a Trade Secret. During the Term and for a period of five (5) years thereafter, except as otherwise mandated by law, You shall not use, disclose, or permit any person access to any Confidential Information, except as permitted in connection with Your performance hereunder. You acknowledge that if You breach this Section 2.1.1, McKesson may have no adequate remedy at law available to it, may suffer irreparable harm, and will be entitled to seek equitable relief. You agree to protect such Confidential Information and Trade Secrets with no less diligence than You protect Your own confidential or proprietary information. If disclosure of Confidential Information is required under provisions of any law or court order, You will notify McKesson sufficiently in advance so McKesson will have a reasonable opportunity to

INTRO 2 (Continued)

object.

2.1.2  Software Usage Information.  During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also assists McKesson in offering End User other features and services. Usage Information sent by the Software may include the following: Customer # / serial number; software name; date data was collected; total number of appointments in database; total number of visits in database; total number of transactions in database; for each item in the doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage Information by sending notice to McKesson in accordance with Section 2.7 to the attention of the General Manager, Physician Practice Solutions. The notice must include the Software serial number.

2.1.3  Retained Rights. End User's rights in the Software will be limited to those expressly granted in this EULA. McKesson and its suppliers reserve all intellectual property rights not expressly granted to End User. All changes, modifications, improvements or new modules made or developed with regard to the Software, whether or not (a) made or developed at End User's request, (b) made or developed in cooperation with End User, or (c) made or developed by End User, will be solely owned by McKesson or its suppliers. End User acknowledges that the Software contains trade secrets of McKesson, and End User agrees not to take any step to derive a source code equivalent of the Software (e.g., disassemble, decompile, or reverse engineer the Software) or to permit any third party to do so. McKesson retains title to all material, originated or prepared for the End User under this EULA. End User is granted a license to use such materials in accordance with this EULA.

2.1.4  Maintenance Fees. Subject to payment of applicable fees, McKesson provides software maintenance services for Practice Partner Software and Lytec MD Software through an authorized McKesson reseller, or from McKesson, if You obtained the Software directly from McKesson. The scope and fees for such software maintenance services are set forth in a separate written agreement between You, and either the McKesson reseller or McKesson, as applicable.

2.2    Limitation of Liability.

2.2.1  Total Damages. MCKESSON'S TOTAL CUMULATIVE LIABILITY UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA WILL BE LIMITED TO (A) THE TOTAL FEES PAID (LESS ANY REFUNDS OR CREDITS) BY END USER FOR THE SOFTWARE GIVING RISE TO THE CLAIM, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE.

2.2.2  Exclusion of Damages. IN NO EVENT WILL MCKESSON BE LIABLE TO END USER UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOSS OF GOODWILL, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT MCKESSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

2.2.3  Material Consideration. THE PARTIES ACKNOWLEDGE THAT THE FOREGOING LIMITATIONS ARE A MATERIAL CONDITION FOR THEIR ENTRY INTO THIS EULA.

2.3    Professional Responsibility and Clinical Content Disclaimer. END USER ACKNOWLEDGES AND AGREES THAT ANY CLINICAL CONTENT FURNISHED BY MCKESSON HEREUNDER (WHETHER SEPARATELY OR INCLUDED WITHIN THE SOFTWARE) IS AN INFORMATION MANAGEMENT AND DIAGNOSTIC TOOL ONLY AND THAT ITS USE CONTEMPLATES AND REQUIRES THE INVOLVEMENT OF TRAINED INDIVIDUALS. END USER FURTHER ACKNOWLEDGES AND AGREES THAT MCKESSON HAS NOT REPRESENTED ITS SOFTWARE AS HAVING THE ABILITY TO DIAGNOSE DISEASE, PRESCRIBE TREATMENT, OR PERFORM ANY OTHER TASKS THAT CONSTITUTE THE PRACTICE OF MEDICINE.

INTRO 2 (Continued)

2.4   Internet Disclaimer. CERTAIN SOFTWARE PROVIDED BY MCKESSON UTILIZES THE INTERNET. MCKESSON DOES NOT WARRANT THAT SUCH SOFTWARE WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE. MCKESSON DOES NOT AND CANNOT CONTROL THE FLOW OF DATA TO OR FROM MCKESSON'S OR END USER'S NETWORK AND OTHER PORTIONS OF THE INTERNET. SUCH FLOW DEPENDS IN LARGE PART ON THE INTERNET SERVICES PROVIDED OR CONTROLLED BY THIRD PARTIES. ACTIONS OR INACTIONS OF SUCH THIRD PARTIES CAN IMPAIR OR DISRUPT END USER'S CONNECTIONS TO THE INTERNET (OR PORTIONS THEREOF). ACCORDINGLY, MCKESSON DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.

2.5   Termination.

2.5.1   Termination. McKesson may terminate the EULA immediately upon notice to End User if End User: (a) materially breaches the EULA and fails to remedy such breach within 60 days after receiving notice of the breach from the terminating party, (b) materially breaches any other contract End User has entered into with McKesson, (c) infringes McKesson's intellectual property rights and fails to remedy such breach within ten (10) days after receiving notice of the breach from the terminating party, (d) materially breaches the EULA in a manner that cannot be remedied, or (e) commences dissolution proceedings or ceases to operate in the ordinary course of business.

2.5.2   Obligations upon Termination or Expiration. Upon the termination or expiration of this EULA, End User will promptly (a) cease using all Software and Clinical Content, (b) purge all Software and Clinical Content from all computer systems (including servers and personal computers), (c) return to McKesson or destroy all copies (including partial copies) of the Software and Clinical Content, and (d) deliver to McKesson written certification of an officer of End User that End User has complied with its obligations in this Section.

2.6   Discount Reporting. An order form or quote may contain a discount that End User is required to report in its cost reports or another appropriate manner under applicable federal and state anti-kickback laws, including 42 U.S.C. Sec. 1320a-7b(b)(3)(A) and the regulations found at 42 C.F.R. Sec. 1001.952(h). End User will be responsible for reporting, disclosing and maintaining appropriate records with respect to the discount and making those records available under Medicare, Medicaid or other applicable government health care programs.

2.7   General.       This EULA is governed by and will be construed in accordance with the laws of the State of Georgia, exclusive of its rules governing choice of law and conflict of laws and any version of the Uniform Commercial Code; each party agrees that exclusive venue for all actions, relating in any manner to this EULA will be in a federal or state court of competent jurisdiction located in Fulton County, Georgia. End User will not assign this EULA without the written consent of McKesson; McKesson may, upon notice to End User, assign this EULA to any McKesson Affiliate or to any entity resulting from reorganization, merger, or sale, and may subcontract its obligations. Failure to exercise or enforce any right under this EULA is not a waiver of such right. Neither party is liable for failing to fulfill its obligations due to acts of God or other causes beyond it reasonable control, except for End User's obligation to make payment. All notices relating to the parties' legal rights and remedies under this EULA must be provided in writing and delivered by: (a) postage prepaid registered or certified U.S. Post mail; or (b) commercial courier. All notices to McKesson will be sent to the following address with a copy to McKesson's General Counsel: 5995 Windward Parkway, Alpharetta, GA 30005. This EULA is the complete and exclusive agreement between the parties with respect to the subject matter hereof and may be may be modified, or any rights under it waived, only in a mutually-signed written agreement

2.8   Government Customer Rights. If this Software is provided under a federal government contract, then McKesson intends that any Software provided under this EULA constitute "commercial item(s)" as defined in Federal Acquisition Regulation ("**FAR**") 2.101, including any Software, Clinical Content, Documentation or technical data. Additionally, all Software, Clinical Content, Documentation, or technical data provided by McKesson under this EULA will be considered related to such "commercial item(s)". If End User seeks rights in Software, Clinical

INTRO 2 (Continued)

Content, Documentation, or technical data provided by McKesson under this EULA, then McKesson grants only those rights established under any FAR or FAR Supplement clauses which are flowed down to McKesson under this EULA consistent with the delivery of "commercial item(s)." If End User contends that any Software, Clinical Content, Documentation, or technical data provided under this EULA does not constitute "commercial item(s)" as defined in FAR 2.101, then End User promptly will notify McKesson of the same, and identify what rights End User contends exist in such Software, Clinical Content, Documentation, or technical data. No rights in any such Software, Clinical Content, Documentation, or technical data will attach other than rights related to "commercial item(s)" unless End User provides such notice to McKesson, and McKesson expressly agrees in writing that such rights are granted under this EULA.

**EXHIBIT A**
CPT CODES AND TERMINOLOGY
SECTION 1: USER IS AN INDIVIDUAL WHO:
1.1    accesses, uses, and/or manipulates CPT codes and/or descriptions contained in the Software either at the input (the point at which data is entered into the Software), the output (the point at which data, reports, or the like are received from the Software), or both phases of using the Software; or
1.2    accesses, uses, and/or manipulates the Software to produce or enable an output that could not have been created without CPT embedded in the Software even though CPT may not be visible or directly accessible; or
1.3    makes use of an output of the Software that relies on or could not have been created without the CPT embedded in the Software even though CPT may not be visible or directly accessible (excepting that which would constitute fair use, internal reports, and claim forms for specific patients).
SECTION 2:
2.1    The Clinical Content and/or Software may incorporate the CPT terminology developed and copyrighted by the American Medical Association ("AMA"). The CPT codes and terminology are provided pursuant to a license agreement between McKesson and the AMA. If End User requires additional User licenses, End User may purchase additional licenses from McKesson and the parties will negotiate in good faith the terms and conditions under which McKesson will make available such additional User licenses.
2.1.1    End User acknowledges that the AMA reserves all rights, whether statutory or common-law, in the CPT terminology and that no rights therein are hereby conveyed to End User except to the extent that End User has been granted a license to the Software. THE AMA MAKES NO REPRESENTATIONS OR WARRANTIES EXPRESS OR IMPLIED, WITH RESPECT TO CPT, INCLUDING, WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. END USER FURTHER ACKNOWLEDGES THAT THE AMA SHALL NOT BE LIABLE TO END USER FOR ANY DAMAGES OF ANY NATURE WHETHER DIRECT, INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL, ARISING FROM THIS AGREEMENT. The AMA shall not by reason of the incorporation of the CPT terminology in the Software or by any other reason be deemed a party to this Agreement and End User shall look solely to McKesson for the performance of any obligations due End User hereunder.
2.2    In the event that one or more of the provisions contained in the Agreement shall for any reason be held invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity or enforceability of this Exhibit.
2.3    CPT only © 2000, 2001 etc. American Medical Association. All Rights Reserved. No fees schedules, basic units, relative values or related listings are included in CPT. AMA does not directly or indirectly practice medicine or dispense medical services. AMA assumes no liability for data contained or not contained herein.
2.4    CPT is commercial technical data and/or computer data bases and/or commercial computer software and/or commercial computer software documentation, as applicable which were developed exclusively at private expense by the American Medical Association, 515 North

INTRO 2 (Continued)

State Street, Chicago, Illinois, 60610. U.S. Government rights to use, modify, reproduce, release, perform, display, or disclose these technical data and/or computer data bases and/or computer software and/or computer software documentation are subject to the limited rights restrictions of DFARS 252.227-7015(b)(2) (June 1995) and/or subject to the restrictions of DFARS 227.7202-1(a)(June 1995) and DFARS 227.7202-3(a)(June 1995), as applicable for U.S. Department of Defense procurements and the limited rights restrictions of FAR 52.227-14 (June 1987) and/or subject to the restricted rights provisions of FAR 52.227-14 (1987) and FAR 52.227-19 (June 1987), as applicable, and any applicable agency FAR Supplements, for non-Department of Defense Federal procurements.

NEXT

INTRO 3



Next, please direct your attention to the three segments of the End User License Agreement that are boxed.

Select "NEXT" when you are ready to continue.

---

**END USER LICENSE AGREEMENT**

> **NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.**

This End-User License Agreement (**"EULA"**) is a legal agreement between you, either an individual or a single entity (**"End User"** or **"You"**) and McKesson Information Solutions LLC, on behalf of itself and the McKesson Affiliates (**"McKesson"**) for the Software and Clinical Content, as those terms are defined in Section 1.1.1 below, that McKesson provides to End User. By installing, copying, or otherwise using the Software or Clinical Content, You agree to be bound by the terms of this EULA. If You do not agree to the terms of this EULA, You may not install or use the Software.

> AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

If You have previously entered into a written license agreement directly with McKesson or any of its predecessors, including but not limited to Physicians Micro Systems, Inc., for license of the Software, then this EULA does not apply to You, even if You click "accept" to continue installation.

If You did not obtain the Software either directly from McKesson or from an authorized McKesson reseller, or if You have not paid either McKesson or an authorized McKesson reseller in full for this license, then this EULA offer is rescinded and You are not authorized to install or use this Software. The term of this EULA (**"Term"**) commences on the date the End User first installs the Software and continues until terminated pursuant to Section 2.5.1.

**SECTION 1: SOFTWARE**
1.1     Software and Clinical Content.
1.1.1   Definitions
(a)     "Clinical Content" means medical or clinical information such as terminology, vocabularies, decision support rules, alerts, drug interaction knowledge, care pathway knowledge, standard ranges of normal or expected result values, and any other clinical content or rules provided to End User for use with the Software, together with any related Documentation. Clinical Content may be either (a) owned by McKesson or (b) owned by a third party and sublicensed to End User under this EULA.
(b)     "Concurrent User" means a Permitted User identified by a unique user ID issued by End User that is one user out of a maximum number of users permitted to access the Software simultaneously.
(c)     "Confidential Information" means any information or material, other than Trade Secrets, that is of value to McKesson and is not generally known to third parties, or that McKesson obtains from any third party that McKesson treats as confidential whether or not owned by McKesson. Confidential Information shall not include information that You can show is: (1) known by You at the time of receipt from McKesson and not subject to any other nondisclosure agreement between the parties; (2) now, or which hereafter becomes, generally known to the public through no fault of You; (3) otherwise lawfully and independently developed by You without reference to Confidential Information; or (4) lawfully acquired by You from a third party without any obligation of confidentiality.
(d)     "Data Center" means one data center located in the United States only and operated by End User.

F-16

INTRO 3 (Continued)

(e)     "Documentation" means user guides or operating manuals containing the functional specifications for the McKesson owned software and Clinical Content, as may be reasonably modified from time to time, provided to End User.

(f)     "Facility" means one discrete location, in the United States only, where healthcare services are administered by a Provider or Providers or operated by End User as applicable.

(g)     "McKesson Affiliates" means NDCHealth Corporation (but specifically excluding PST Services, Inc.) and any U.S. entities that, now or in the future, are controlled by either McKesson Information Solutions LLC or NDC Health Corporation.

(h)     "Permitted User" means any individual (a) End User employee, (b) consultant or independent contractor who has need to use the Software based upon a contractual relationship with End User, so long as (i) such consultant or independent contractor is not a McKesson competitor, (ii) End User remains responsible for use of the Software by such consultant or independent contractor, and (iii) such consultant or independent contractor is subject to confidentiality and use restrictions at least as strict as those contained in this EULA, (c) physician with admitting privileges at a Facility, (d) employee of such physician, and (e) medical professional authorized to perform services at a Facility.

(i)     "Provider" means specially trained and licensed personnel (e.g., medical doctor, doctor of osteopathy, physician assistant, physical therapist, dietician, and advanced registered nurse practitioner) directly billing for patient care services either (i) under his or her name, (ii) the name of the practice, or (iii) under the name of a supervisory Provider. "Full-time Providers" are Providers working 20 hours a week or greater. "Part-time Providers" are Providers working less than 20 hours a week or a doctor in residency training.

(j)     "Software" means (i) software in object code form only that accompanies this EULA, and (ii) related Documentation (collectively, "Software").

(k)     "Term" has the meaning set forth in the fifth paragraph of the Introductory Section.

(l)     "Trade Secret" means any information of McKesson or that McKesson has acquired from a third party which is not commonly known by or available to the public, which (1) derives economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secret shall include, but not be limited to, Software, Documentation, Clinical Content and the terms and conditions of this EULA.

1.1.2   License Grant.

(a)     Perpetual License. Subject to the terms of this EULA, McKesson grants to End User, and End User accepts, a limited, nonexclusive, nontransferable, non-sublicensable, perpetual license to use the Software and Clinical Content for End User's internal purposes. Depending on the intended usage, Clinical Content may be provided in either paper or electronic formats.

(b)     The license grant in this Section is expressly subject to the following conditions: (i) the Software may be installed only on equipment at Facilities and Data Centers as specified in Section l.l.3(c) below, (ii) the Software and Clinical Content may be accessed or used only by Permitted Users in the U.S., (iii) use of the Software and Clinical Content is limited by the usage-based variable(s) as specified in Section l.l.3(c) below, and (iv) the Software and Clinical Content may be used to provide service bureau or other similar services, or hosted by a third party (e.g. outsourcing or facility management service provider), only if expressly permitted in a separate writing by McKesson.

(c)     Third Party Software. Any software that is owned by a third party and provided to End User with the Software is subject to that license and terms and conditions accompanying such Third Party Software. McKesson may substitute different software for any Third Party Software, if McKesson reasonably demonstrates the need to do so.

1.1.3   Software License Restrictions.

(a)     Copying and Modification. End User shall not to duplicate the Software, except as required for its use in accordance with this Agreement, provided that End User may make one (1) back-up copy of the Software solely for archival purposes. Such back-up copy shall include

INTRO 3 (Continued)

McKesson's copyright and other proprietary notices, and shall be subject to all the terms and conditions of this EULA. End User will not alter any trademark, copyright notice, or other proprietary notice on the Software or Documentation, and will duplicate each such trademark or notice on each copy of the Software and Documentation.

(b)    Facility Limitation. The Software will be installed only at Facilities and Data Centers as set forth in Section I.I.3(c) below, except that the Software may be installed on a temporary basis at an alternate location in the U.S. if End User is unable to use the Software at such Facility or Data Center due to equipment malfunction or force majeure event. End User will promptly notify McKesson of the alternate location if such temporary use continues for longer than 30 days.

(c)    The following additional restrictions apply to the Software as set forth below:

i.    Lytec SU (single user): Single machine; unlimited named users; no Concurrent Users; No remote access.

ii.    Lytec MU (multiple user): Up to 3 Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iii.    Lytec Professional: Up to five Concurrent Users; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

iv.    Lytec Client Server: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

v.    Lytec MD: Available to the number of Providers and Concurrent Users purchased from McKesson or the McKesson reseller; One Provider license includes 5 concurrent users; additional Providers or Concurrent Users must be licensed.

vi.    Medisoft Basic or Medisoft Original: Single machine; unlimited named users; no concurrent users; No remote access.

vii.    Medisoft Advanced: Single machine; unlimited named users; no concurrent users; No remote access.

viii.    Medisoft Network Professional: Available to the number of Concurrent Users purchased from McKesson or the McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

ix.    Practice Partner: Available to the number of Providers purchased from McKesson or the McKesson reseller; add-on licenses for some End Users may be licensed on Concurrent User basis if original license was Concurrent User based- please check with Your McKesson reseller; Installation on a networked system (i.e., no limits on number of machines) present at one or more Facilities or Data Centers, all directly controlled by End User.

(d)    Current Procedural Terminology (CPT). The Software may include the Current Procedural Terminology (CPT) code set, maintained by the American Medical Association through the CPT Editorial Panel, describing medical, surgical, and diagnostic services and designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes (the "CPT"). End User may only use the CPT code set consistent with these terms and conditions set forth on Exhibit A.

1.2    Export Law Assurances. End User may not use or otherwise export or re-export the Software or Documentation except as authorized by United States law and the laws of the jurisdiction in which the Software or Documentation was obtained. In particular, the Software or Documentation may not be exported, transshipped or re-exported (1) into (or to a national or resident of) those countries subject to a comprehensive economic sanctions program administered by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") (Countries subject to OFAC embargo or sanctions can change at any time and can be reviewed by consulting materials available at http://www.treas.gov/ofac/index.html and

INTRO 3 (Continued)

http://www.bis.doc.gov); or (2) to anyone on the U.S. Treasury Department list of Specially Designated Nationals or the U.S. Department of Commerce Denied Persons List or Entity List, each as they may be amended from time to time and which may be found at http://www.treas.gov/ofac/index.html and http://www.bis.doc.gov.

1.3     Warranty. McKesson warrants to End User that the computer media on which the original Software is recorded will be free of defects in material and workmanship for a period of 30 days from date of purchase under normal conditions of use and service. If the media becomes defective within 30 days from the date of purchase, if proof of original purchase can be verified, as End User's sole remedy and McKesson's sole obligation McKesson will replace the Software or at its option, McKesson may refund to End User the original McKesson purchase price.

1.4     Disclaimer. EXCEPT AS STATED IN THE WARRANTY OF SECTION 1.3, THE MCKESSON SOFTWARE AND CLINICAL CONTENT IS PROVIDED "AS IS WITH ALL FAULTS" AND IN ITS PRESENT STATE AND CONDITION. NO WARRANTY, REPRESENTATION, GUARANTEE, CONDITION, UNDERTAKING OR TERM, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO THE CONDITION, QUALITY, DURABILITY, ACCURACY, COMPLETENESS, PERFORMANCE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, QUIET ENJOYMENT, OR FITNESS FOR A PARTICULAR PURPOSE OR USE OF THE MCKESSON SOFTWARE OR CLINICAL CONTENT IS GIVEN OR ASSUMED BY MCKESSON AND ALL SUCH WARRANTIES, REPRESENTATIONS, CONDITIONS, UNDERTAKINGS AND TERMS ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW, AS ARE ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE. MCKESSON DOES NOT WARRANT THAT DEFECTS IN THE MCKESSON SOFTWARE OR CLINICAL CONTENT WILL BE CORRECTED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY MCKESSON OR ANY MCKESSON REPRESENTATIVE OR RESELLER SHALL CREATE A WARRANTY. MCKESSON DOES NOT WARRANT THAT THE SOFTWARE OR CLINICAL CONTENT WILL YIELD ANY PARTICULAR BUSINESS OR FINANCIAL RESULT. TO THE EXTENT THAT UPDATED VERSIONS OF THE SOFTWARE OR CLINICAL CONTENT ARE DEVELOPED AND RELEASED BY MCKESSON, END USER ASSUMES ALL RISKS ASSOCIATED WITH USING OLDER VERSIONS OF THE SOFTWARE, INCLUDING BUT NOT LIMITED TO THE RISK OF USING OUTDATED CLINICAL CONTENT.

1.5     Audit. Upon reasonable advance notice and no more than twice per calendar year, McKesson may conduct an audit to ensure that End User is in compliance with this EULA. Such audit will be conducted during regular business hours, and End User will provide McKesson with reasonable access to all relevant equipment and records. If an audit reveals that End User's use of any Software or Clinical Content during the period being audited exceeds the usage-based variable(s) licensed by End User, then McKesson may invoice End User for all such excess use based on McKesson's prevailing rate(s) in effect at the time the audit is completed, and End User will pay any such invoice. If such excess use exceeds five percent of the licensed use, then End User will also pay McKesson's reasonable costs of conducting the audit.

**SECTION 2: GENERAL TERMS**

2.1.1     Confidential Information, Trade Secrets. You shall not use (except as permitted in connection with Your performance hereunder), disclose or permit any person access to any Trade Secrets (including, without limitation, the Software, Clinical Content and Documentation) while such information retains its status as a Trade Secret. During the Term and for a period of five (5) years thereafter, except as otherwise mandated by law, You shall not use, disclose, or permit any person access to any Confidential Information, except as permitted in connection with Your performance hereunder. You acknowledge that if You breach this Section 2.1.1, McKesson may have no adequate remedy at law available to it, may suffer irreparable harm, and will be entitled to seek equitable relief. You agree to protect such Confidential Information and Trade Secrets with no less diligence than You protect Your own confidential or proprietary information. If disclosure of Confidential Information is required under provisions of any law or court order, You will notify McKesson sufficiently in advance so McKesson will have a reasonable opportunity to

INTRO 3 (Continued)

object.

2.1.2   Software Usage Information.  During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also assists McKesson in offering End User other features and services. Usage Information sent by the Software may include the following: Customer # / serial number; software name; software version; date data was collected; total number of appointments in database; total number of visits in database; total number of transactions in database; for each item in the doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage Information by sending notice to McKesson in accordance with Section 2.7 to the attention of the General Manager, Physician Practice Solutions. The notice must include the Software serial number.

2.1.3   Retained Rights. End User's rights in the Software will be limited to those expressly granted in this EULA. McKesson and its suppliers reserve all intellectual property rights not expressly granted to End User. All changes, modifications, improvements or new modules made or developed with regard to the Software, whether or not (a) made or developed at End User's request, (b) made or developed in cooperation with End User, or (c) made or developed by End User, will be solely owned by McKesson or its suppliers. End User acknowledges that the Software contains trade secrets of McKesson, and End User agrees not to take any step to derive a source code equivalent of the Software (e.g., disassemble, decompile, or reverse engineer the Software) or to permit any third party to do so. McKesson retains title to all material, originated or prepared for the End User under this EULA. End User is granted a license to use such materials in accordance with this EULA.

2.1.4   Maintenance Fees. Subject to payment of applicable fees, McKesson provides software maintenance services for Practice Partner Software and Lytec MD Software through an authorized McKesson reseller, or from McKesson, if You obtained the Software directly from McKesson. The scope and fees for such software maintenance services are set forth in a separate written agreement between You, and either the McKesson reseller or McKesson, as applicable.

2.2   Limitation of Liability.

2.2.1   Total Damages. MCKESSON'S TOTAL CUMULATIVE LIABILITY UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA WILL BE LIMITED TO (A) THE TOTAL FEES PAID (LESS ANY REFUNDS OR CREDITS) BY END USER FOR THE SOFTWARE GIVING RISE TO THE CLAIM, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE.

2.2.2   Exclusion of Damages. IN NO EVENT WILL MCKESSON BE LIABLE TO END USER UNDER, IN CONNECTION WITH, OR RELATED TO THIS EULA FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOSS OF GOODWILL, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT MCKESSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

2.2.3   Material Consideration. THE PARTIES ACKNOWLEDGE THAT THE FOREGOING LIMITATIONS ARE A MATERIAL CONDITION FOR THEIR ENTRY INTO THIS EULA.

2.3   Professional Responsibility and Clinical Content Disclaimer. END USER ACKNOWLEDGES AND AGREES THAT ANY CLINICAL CONTENT FURNISHED BY MCKESSON HEREUNDER (WHETHER SEPARATELY OR INCLUDED WITHIN THE SOFTWARE) IS AN INFORMATION MANAGEMENT AND DIAGNOSTIC TOOL ONLY AND THAT ITS USE CONTEMPLATES AND REQUIRES THE INVOLVEMENT OF TRAINED INDIVIDUALS. END USER FURTHER ACKNOWLEDGES AND AGREES THAT MCKESSON HAS NOT REPRESENTED ITS SOFTWARE AS HAVING THE ABILITY TO DIAGNOSE DISEASE, PRESCRIBE TREATMENT, OR PERFORM ANY OTHER TASKS THAT CONSTITUTE THE PRACTICE OF MEDICINE.

INTRO 3 (Continued)

2.4   Internet Disclaimer. CERTAIN SOFTWARE PROVIDED BY MCKESSON UTILIZES THE INTERNET. MCKESSON DOES NOT WARRANT THAT SUCH SOFTWARE WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE. MCKESSON DOES NOT AND CANNOT CONTROL THE FLOW OF DATA TO OR FROM MCKESSON'S OR END USER'S NETWORK AND OTHER PORTIONS OF THE INTERNET. SUCH FLOW DEPENDS IN LARGE PART ON THE INTERNET SERVICES PROVIDED OR CONTROLLED BY THIRD PARTIES. ACTIONS OR INACTIONS OF SUCH THIRD PARTIES CAN IMPAIR OR DISRUPT END USER'S CONNECTIONS TO THE INTERNET (OR PORTIONS THEREOF). ACCORDINGLY, MCKESSON DISCLAIMS ANY AND ALL LIABILITY RESULTING FROM OR RELATED TO SUCH EVENTS.

2.5   Termination.

2.5.1   Termination. McKesson may terminate the EULA immediately upon notice to End User if End User: (a) materially breaches the EULA and fails to remedy such breach within 60 days after receiving notice of the breach from the terminating party, (b) materially breaches any other contract End User has entered into with McKesson, (c) infringes McKesson's intellectual property rights and fails to remedy such breach within ten (10) days after receiving notice of the breach from the terminating party, (d) materially breaches the EULA in a manner that cannot be remedied, or (e) commences dissolution proceedings or ceases to operate in the ordinary course of business.

2.5.2   Obligations upon Termination or Expiration. Upon the termination or expiration of this EULA, End User will promptly (a) cease using all Software and Clinical Content, (b) purge all Software and Clinical Content from all computer systems (including servers and personal computers), (c) return to McKesson or destroy all copies (including partial copies) of the Software and Clinical Content, and (d) deliver to McKesson written certification of an officer of End User that End User has complied with its obligations in this Section.

2.6   Discount Reporting. An order form or quote may contain a discount that End User is required to report in its cost reports or another appropriate manner under applicable federal and state anti-kickback laws, including 42 U.S.C. Sec. 1320a-7b(b)(3)(A) and the regulations found at 42 C.F.R. Sec. 1001.952(h). End User will be responsible for reporting, disclosing and maintaining appropriate records with respect to the discount and making those records available under Medicare, Medicaid or other applicable government health care programs.

2.7   General.         This EULA is governed by and will be construed in accordance with the laws of the State of Georgia, exclusive of its rules governing choice of law and conflict of laws and any version of the Uniform Commercial Code; each party agrees that exclusive venue for all actions, relating in any manner to this EULA will be in a federal or state court of competent jurisdiction located in Fulton County, Georgia. End User will not assign this EULA without the written consent of McKesson; McKesson may, upon notice to End User, assign this EULA to any McKesson Affiliate or to any entity resulting from reorganization, merger, or sale, and may subcontract its obligations. Failure to exercise or enforce any right under this EULA is not a waiver of such right. Neither party is liable for failing to fulfill its obligations due to acts of God or other causes beyond it reasonable control, except for End User's obligation to make payment. All notices relating to the parties' legal rights and remedies under this EULA must be provided in writing and delivered by: (a) postage prepaid registered or certified U.S. Post mail; or (b) commercial courier. All notices to McKesson will be sent to the following address with a copy to McKesson's General Counsel: 5995 Windward Parkway, Alpharetta, GA 30005. This EULA is the complete and exclusive agreement between the parties with respect to the subject matter hereof and may be may be modified, or any rights under it waived, only in a mutually-signed written agreement

2.8   Government Customer Rights. If this Software is provided under a federal government contract, then McKesson intends that any Software provided under this EULA constitute "commercial item(s)" as defined in Federal Acquisition Regulation (**FAR**) 2.101, including any Software, Clinical Content, Documentation or technical data. Additionally, all Software, Clinical Content, Documentation, or technical data provided by McKesson under this EULA will be considered related to such "commercial item(s)". If End User seeks rights in Software, Clinical

INTRO 3 (Continued)

Content, Documentation, or technical data provided by McKesson under this EULA, then McKesson grants only those rights established under any FAR or FAR Supplement clauses which are flowed down to McKesson under this EULA consistent with the delivery of "commercial item(s)." If End User contends that any Software, Clinical Content, Documentation, or technical data provided under this EULA does not constitute "commercial item(s)" as defined in FAR 2.101, then End User promptly will notify McKesson of the same, and identify what rights End User contends exist in such Software, Clinical Content, Documentation, or technical data. No rights in any such Software, Clinical Content, Documentation, or technical data will attach other than rights related to "commercial item(s)" unless End User provides such notice to McKesson, and McKesson expressly agrees in writing that such rights are granted under this EULA.

**EXHIBIT A**

CPT CODES AND TERMINOLOGY

SECTION 1: USER IS AN INDIVIDUAL WHO:

1.1     accesses, uses, and/or manipulates CPT codes and/or descriptions contained in the Software either at the input (the point at which data is entered into the Software), the output (the point at which data, reports, or the like are received from the Software), or both phases of using the Software; or

1.2     accesses, uses, and/or manipulates the Software to produce or enable an output that could not have been created without CPT embedded in the Software even though CPT may not be visible or directly accessible; or

1.3     makes use of an output of the Software that relies on or could not have been created without the CPT embedded in the Software even though CPT may not be visible or directly accessible (excepting that which would constitute fair use, internal reports, and claim forms for specific patients).

SECTION 2:

2.1     The Clinical Content and/or Software may incorporate the CPT terminology developed and copyrighted by the American Medical Association ("AMA"). The CPT codes and terminology are provided pursuant to a license agreement between McKesson and the AMA. If End User requires additional User licenses, End User may purchase additional licenses from McKesson and the parties will negotiate in good faith the terms and conditions under which McKesson will make available such additional User licenses.

2.1.1   End User acknowledges that the AMA reserves all rights, whether statutory or common-law, in the CPT terminology and that no rights therein are hereby conveyed to End User except to the extent that End User has been granted a license to the Software. THE AMA MAKES NO REPRESENTATIONS OR WARRANTIES EXPRESS OR IMPLIED, WITH RESPECT TO CPT, INCLUDING, WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. END USER FURTHER ACKNOWLEDGES THAT THE AMA SHALL NOT BE LIABLE TO END USER FOR ANY DAMAGES OF ANY NATURE WHETHER DIRECT, INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL, ARISING FROM THIS AGREEMENT. The AMA shall not by reason of the incorporation of the CPT terminology in the Software or by any other reason be deemed a party to this Agreement and End User shall look solely to McKesson for the performance of any obligations due End User hereunder.

2.2     In the event that one or more of the provisions contained in the Agreement shall for any reason be held invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity or enforceability of this Exhibit.

2.3     CPT only © 2000, 2001 etc. American Medical Association. All Rights Reserved. No fees schedules, basic units, relative values or related listings are included in CPT. AMA does not directly or indirectly practice medicine or dispense medical services. AMA assumes no liability for data contained or not contained herein.

2.4     CPT is commercial technical data and/or computer data bases and/or commercial computer software and/or commercial computer software documentation, as applicable which were developed exclusively at private expense by the American Medical Association, 515 North

INTRO 3 (Continued)

State Street, Chicago, Illinois, 60610. U.S. Government rights to use, modify, reproduce, release, perform, display, or disclose these technical data and/or computer data bases and/or computer software and/or computer software documentation are subject to the limited rights restrictions of DFARS 252.227-7015(b)(2) (June 1995) and/or subject to the restrictions of DFARS 227.7202-1(a)(June 1995) and DFARS 227.7202-3(a)(June 1995), as applicable for U.S. Department of Defense procurements and the limited rights restrictions of FAR 52.227-14 (June 1987) and/or subject to the restricted rights provisions of FAR 52.227-14 (1987) and FAR 52.227-19 (June 1987), as applicable, and any applicable agency FAR Supplements, for non-Department of Defense Federal procurements.

NEXT

INTRO 4



Below are the three boxed segments of the End User License Agreement you just read. In addition, click here to see the full End User License Agreement.

NOTICE: BEFORE PROCEEDING, PLEASE READ THE FOLLOWING LEGAL AGREEMENT WHICH CONTAINS RIGHTS AND RESTRICTIONS ASSOCIATED WITH YOUR USE OF THE MCKESSON SOFTWARE AND ANY DOCUMENTATION PROVIDED TO YOU BY MCKESSON INFORMATION SOLUTIONS, LLC OR ITS AFFILIATES.

AS FURTHER DESCRIBED BELOW, USE OF THE SOFTWARE ALSO OPERATES AS YOUR CONSENT TO THE TRANSMISSION, FROM TIME TO TIME, OF CERTAIN COMPUTER AND SOFTWARE USAGE INFORMATION TO MCKESSON.

2.1.2   Software Usage Information.  During registration or activation of software, and then on a regular basis, the Software will send information about the Software and Your use of the Software, to McKesson ("Usage Information"). This Usage Information helps prevent the unlicensed or prohibited use of the Software and also assists McKesson in offering End User other features and services. Usage Information sent by the Software may include the following: Customer # / serial number; software name; software version; date data was collected; total number of appointments in database; total number of visits in database; total number of transactions in database; for each item in the doctor list: number of appointments in last n days, number of visits in last n days, number of charges in last n days; for each clearinghouse in the system: number of claims submitted in last n days, number of eligibility queries submitted in last n days. Usage Information transmitted shall not include any individually identifiable information or any protected health information. End User may opt out of the collection of Usage Information by sending notice to McKesson in accordance with Section 2.7 to the attention of the General Manager, Physician Practice Solutions. The notice must include the Software serial number.

NEXT

Copyright © 2010, Applied Marketing Sciences, Inc.

F-24

Q1



Click here to see the full End User License Agreement.

Based on your understanding of the End User License Agreement you just reviewed, have you consented to receive faxed offers about the latest versions of the software you just purchased or leased and related products?

*(Select one only)*

- No
- Yes
- Don't know/Unsure

NEXT

Copyright © 2020, Applied Marketing Science, Inc.

**Medical Billing or Accounting Software**
**Faxed Offers Survey**

**[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]**

*Notes to respondent in italics*

**Overview**

**Sample:**
- ⊙ Targeted Physicians (All Specialties), Chiropractors, and Physical Therapists/Occupational Therapists
- ⊙ N = 200

**[NO SURVEY TITLE WILL BE DISPLAYED TO RESPONDENTS]**

**Introduction and Screening**

Thank you for your willingness to participate in our study. The responses you give to our questions are very important to us. If you don't know an answer to a question or if you are unsure, please indicate this in your response. Please do not guess.

Your answers will be kept in confidence. The results of this study will not be used to try to sell you anything.

When you are ready to get started, please select the "NEXT" button.

**["NEXT" BUTTON TAKES RESPONDENT TO QUESTION QS0]**

**[TEXT FOR TERMINATES "Thank you for your interest in our study. We are no longer looking for people who match your characteristics. We appreciate your time."]**

**[NEXT PAGE]**

QS0. Please enter the code exactly as it appears in the image above, and then select "NEXT" to continue.

**[INSERT CAPTCHA]**

**[NEXT PAGE]**

QS1. What type of electronic device are you using to complete this survey? *(Select one only)* **[RANDOMIZE LIST; OTHER MOBILE OR ELECTRONIC DEVICE SHOULD REMAIN LAST]**
- ⊙ Desktop computer **[CONTINUE]**
- ⊙ Laptop computer **[CONTINUE]**
- ⊙ Tablet computer **[CONTINUE]**
- ⊙ Smartphone **[ON HOLD]**
- ⊙ Other mobile or electronic device **[ON HOLD]**

**[ON HOLD MESSAGE: IF "SMARTPHONE" OR "OTHER MOBILE" SELECTED IN QS1, DISPLAY: "This survey is not formatted for viewing on a smartphone or other mobile device. Please return to the survey, using the same link, from a desktop, laptop or tablet computer."]**

**[NEXT PAGE]**

QS2. Are you…? *(Select one only)*
- ⊙ Male **[CONTINUE]**
- ⊙ Female **[CONTINUE]**

**[NEXT PAGE]**

QS3. Into which of the following categories does your age fall? *(Select one only)*
- ⊙ Under 18 **[TERMINATE]**
- ⊙ 18 - 34 **[CONTINUE]**
- ⊙ 35 - 49 **[CONTINUE]**
- ⊙ 50 - 64 **[CONTINUE]**
- ⊙ 65+ **[CONTINUE]**

**[NEXT PAGE]**

QS4. Please enter the fax number for your practice. (*Please note that this information will never be used to contact you.*) **[FORCE RESPONSE; COUNTRY CODE = 1; REQUIRE 10 DIGIT NUMBER SPLIT INTO CHUNK OF 3, 3, 4 DIGITS; CHECK BOX FOR DK/UNSURE; IF DK/UNSURE CHECKED, TERMINATE; IF NUMBER MATCHES LIST PROVIDED, TERMINATE]**

**[NEXT PAGE]**

QS5. Do you work for any of the following types of companies or in any of the following industries? *(Select all that apply)* **[RANDOMIZE; NONE OF THE ABOVE LAST]**
- ❒ A company that manufactures or sells medical billing or accounting software **[TERMINATE]**
- ❒ A company that manufactures or sells school or office supplies
- ❒ A company that manufactures or sells athletic or high-end fashion footwear
- ❒ A company that manufactures or sells free weights or cardio equipment
- ❒ A company that manufactures or sells landline or cellular telephones
- ❒ A market research or advertising agency **[TERMINATE]**
- ❒ None of the above **[EXCLUSIVE]**

**[NEXT PAGE]**

QS6. Which of the following best describes your current title or role as a medical professional? *(Select one only)* **[RANDOMIZE]**
- ⊙ Physician (All Specialties)
- ⊙ Physical Therapist or Occupational Therapist
- ⊙ Chiropractor
- ⊙ Nurse **[TERMINATE]**
- ⊙ Office administrator or staff **[TERMINATE]**
- ⊙ Other. Please specify: **[DO NOT ALLOW BLANK; ANCHOR; TERMINATE]**
- ⊙ None of the above **[TERMINATE; ANCHOR]**

**[NEXT PAGE]**

QS7. Which of the following best describes the size of your practice? (*Select one only*)
- ⊙ Solo or family practice
- ⊙ Less than 10
- ⊙ Between 11 - 50
- ⊙ Between 51 – 100 **[TERMINATE]**
- ⊙ More than 100 **[TERMINATE]**
- ⊙ Don't know/Unsure **[TERMINATE]**

**[NEXT PAGE]**

QS8. Which, if any, of the following have you or your practice ever purchased or leased? *(Select all that apply)* **[RANDOMIZE; NONE OF THE ABOVE LAST]**
- ❒ Medical billing or accounting software **[CONTINUE]**
- ❒ Furniture or equipment
- ❒ Credit card machine
- ❒ Telephone equipment
- ❒ Indoor or outdoor signage
- ❒ Malpractice insurance
- ❒ None of the above **[EXCLUSIVE]**

**[IF "MEDICAL RECORDS AND/OR BILLING SOFTWARE" NOT SELECTED, TERMINATE]**

**[NEXT PAGE]**

QS9. Please select **[**"NORTH"**] [**"SOUTH"**] [**"EAST"**] [**"WEST"**]** from the following list in order to continue with this survey. *(Select one only)* **[RANDOMIZE THE FOUR QUESTION VERSIONS, CORRECT RESPONSE OPTION SHOULD MATCH THAT OF QUESTION; RANDOMIZE ANSWER OPTIONS]**
- ⊙ NORTH
- ⊙ SOUTH
- ⊙ EAST
- ⊙ WEST

**[NEXT PAGE]**

QS10. You have qualified to take this survey. Before continuing, please carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.

- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please keep your browser maximized for the entire survey.

- Please answer all questions on your own without consulting any other person.

- If you normally wear eyeglasses or contact lenses when viewing a computer or tablet screen, please wear them for the survey.

*(Select one only)*

- ⊙ I understand and agree to the above instructions **[CONTINUE]**
- ⊙ I do not understand or do not agree to the above instructions **[TERMINATE]**

**[NEXT PAGE]**

**Main Questionnaire**
**[INTRODUCTION 1]**

Imagine you have just purchased or leased medical billing or accounting software. On the next page, you will be shown the End User License Agreement that you must agree to before you may register or install the software.

After you view the agreement you will be asked some questions. Please do not guess.

**[NEXT PAGE]**

F-29

**[INTRODUCTION 2]**

Below is the End User License Agreement that you must agree to before you may register or install the software. Please read this agreement as you normally would if you were considering registering or installing the medical billing or accounting software you just purchased or leased.

Select "NEXT" when you are ready to continue.

**[INSERT EULA 1]**

**[DO NOT DISPLAY NEXT BUTTON FOR 60 SECONDS]**

**[NEXT PAGE]**

**[INTRODUCTION 3]**

Next, please direct your attention to the three segments of the End User License Agreement that are boxed.

Select "NEXT" when you are ready to continue.

**[INSERT EULA 2]**

**[DO NOT DISPLAY NEXT BUTTON FOR 60 SECONDS]**

**[NEXT PAGE]**

**[INTRODUCTION 4]**

Below are the three boxed segments of the End User License Agreement you just read. In addition, click here to see the full End User License Agreement.

**[INSERT EULA 3; USE EULA 2 FOR HYPERLINK]**

**[DO NOT DISPLAY NEXT BUTTON FOR 30 SECONDS]**

**[NEXT PAGE]**

Click here to see the full End User License Agreement.

Q1. Based on your understanding of the End User License Agreement you just reviewed, have you consented to receive faxed offers about the latest versions of the software you just purchased or leased and related products? (*Select one only*)
**[ROTATE RESPONSE OPTIONS]**
⊙ Yes
⊙ No
⊙ Don't know/Unsure **[ANCHOR]**

**[END OF SURVEY]**

F-30

**Appendix G: Data Glossary Faxed Offers Survey**

| Variable | Description | Code |
|---|---|---|
| ID | Respondent ID | |
| Qs1 | What type of electronic device are you using to complete this survey? | 1 = Desktop Computer<br>2 = Laptop Computer<br>3 = Tablet Computer<br>4 = Smartphone<br>5 = Other mobile or electronic device |
| Qs2 | Are you…? | 1 = Male<br>2 = Female |
| Qs3 | Into which of the following categories does your age fall? | 1 = Under 18<br>2 = 18-34<br>3 = 35-49<br>4 = 50-64<br>5 = 65+ |
| Qs4 | Please enter the fax number for your practice. | |
| Qs5_1 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells medical billing or accounting software |
| Qs5_2 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells school or office supplies |
| Qs5_3 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells athletic or high-end fashion footwear |
| Qs5_4 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells free weights or cardio equipment |
| Qs5_5 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A company that manufactures or sells landline or cellular telephones |
| Qs5_6 | Do you work for any of the following types of companies or in any of the following industries? | 1 = A market research or advertising agency |
| Qs5_7 | Do you work for any of the following types of companies or in any of the following industries? | 1 = None of the above |
| Qs6 | Which of the following best describes your current title or role as a medical professional? | 1 = Physician (All Specialties)<br>2 = Physical Therapist or Occupational Therapist<br>3 = Chiropractor<br>4 = Nurse |

| | | 5 = Office administrator or staff<br>6 = Other. Please specify:<br>7 = None of the above |
|---|---|---|
| Qs6X | Which of the following best describes your current title or role as a medical professional? | Specified response to "Other. Please specify:" in Qs6 |
| Qs7 | Which of the following best describes the size of your practice? | 1 = Solo or family practice<br>2 = Less than 10<br>3 = Between 11 - 50<br>4 = Between 51 – 100<br>5 = More than 100<br>6 = Don't know/Unsure |
| Qs8_1 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Medical billing or accounting software |
| Qs8_2 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Furniture or equipment |
| Qs8_3 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Credit card machine |
| Qs8_4 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Telephone equipment |
| Qs8_5 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Indoor or outdoor signage |
| Qs8_6 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = Malpractice insurance |
| Qs8_7 | Which, if any, of the following have you or your practice ever purchased or leased? | 1 = None of the above |
| Qs9 | Please select ["NORTH"] ["SOUTH"] ["EAST"] ["WEST"] from the following list in order to continue with this survey. | 1 = North<br>2 = South<br>3 = East<br>4 = West |
| Qs9Index | The correct response to Qs9 | 1 = North<br>2 = South<br>3 = East<br>4 = West |
| Qs10 | You have qualified to take this survey. Before continuing, please carefully read these instructions:<br>• Please take the survey in <u>one</u> session without interruption.<br>• While taking the survey, please do not consult any other websites or other electronic or written materials.<br>• Please keep your browser maximized for the entire survey.<br>• Please answer all questions on your own without consulting any other person. | 1 = I understand and agree to the above instructions<br>2 = I do not understand or do not agree to the above instructions |

G-2

|  | • If you normally wear eyeglasses or contact lenses when viewing a computer or tablet screen, please wear them for the survey. |  |
| Q1 | Based on your understanding of the End User License Agreement you just reviewed, have you consented to receive faxed offers about the latest versions of the software you just purchased or leased and related products? | 1 = Yes<br>2 = No<br>3 = Don't know/Unsure |
| StartTime | Date and time the survey was started |  |
| EndTime | Date and time the survey was completed |  |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | 1 | 19014485940 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 2 | 2 | 2 | 4 | 18037797522 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 3 | 1 | 1 | 4 | 12153455955 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 4 | 2 | 1 | 4 | 15168254282 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 5 | 2 | 2 | 3 | 17048665236 | | | | | | | 1 | 2 | | 2 | 1 | 1 | | 1 | 1 |
| 6 | 2 | 1 | 5 | 14083587521 | | | | | | | 1 | 1 | | 3 | 1 | | | | 1 |
| 7 | 1 | 1 | 2 | 13302394584 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | | 1 |
| 8 | 2 | 2 | 3 | 17085386903 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 9 | 2 | 1 | 5 | 16068656828 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | 1 |
| 10 | 2 | 1 | 4 | 13153146411 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 11 | 2 | 2 | 4 | 19798495705 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 12 | 1 | 1 | 5 | 15403716978 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 13 | 1 | 1 | 5 | 13239871335 | | | | | | | 1 | 1 | | 3 | 1 | | | | |
| 14 | 3 | 1 | 4 | 13058535218 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 15 | 1 | 1 | 5 | 17724032230 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 16 | 1 | 1 | 4 | 13129424168 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 17 | 1 | 2 | 4 | 16036596767 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 18 | 1 | 1 | 5 | 18316493660 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 19 | 3 | 1 | 5 | 13208392851 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 20 | 1 | 1 | 4 | 13106529156 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 21 | 2 | 1 | 4 | 18604442015 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 22 | 2 | 2 | 3 | 15802301003 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 23 | 1 | 1 | 5 | 16315672814 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 24 | 1 | 1 | 4 | 17864172003 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 25 | 2 | 2 | 4 | 18563657773 | | | | | | | 1 | 1 | | 2 | 1 | | | | |
| 26 | 2 | 1 | 4 | 13522595731 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 27 | 1 | 2 | 3 | 12567051156 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 28 | 1 | 1 | 3 | 18034227376 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 29 | 1 | 1 | 4 | 14805855358 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 30 | 1 | 1 | 4 | 19494554215 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 31 | 3 | 1 | 4 | 13205897638 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | 1 | 1 | 1 | 3 | 1/21/2020 11:10 | 1/21/2020 11:18 |
| 2 | 1 | | 2 | 2 | 1 | 1 | 1/21/2020 11:32 | 1/21/2020 11:41 |
| 3 | 1 | | 4 | 4 | 1 | 2 | 1/21/2020 12:54 | 1/21/2020 13:00 |
| 4 | 1 | | 2 | 2 | 1 | 1 | 1/21/2020 13:09 | 1/21/2020 13:16 |
| 5 | 1 | | 1 | 1 | 1 | 1 | 1/21/2020 13:14 | 1/21/2020 13:19 |
| 6 | 1 | | 1 | 1 | 1 | 2 | 1/21/2020 13:28 | 1/21/2020 13:43 |
| 7 | | | 1 | 1 | 1 | 1 | 1/21/2020 13:33 | 1/21/2020 13:49 |
| 8 | 1 | | 1 | 1 | 1 | 2 | 1/21/2020 14:04 | 1/21/2020 14:11 |
| 9 | 1 | | 1 | 1 | 1 | 3 | 1/21/2020 15:52 | 1/21/2020 15:58 |
| 10 | 1 | | 4 | 4 | 1 | 1 | 1/21/2020 16:16 | 1/21/2020 16:21 |
| 11 | 1 | | 1 | 1 | 1 | 2 | 1/21/2020 16:34 | 1/21/2020 16:58 |
| 12 | 1 | | 1 | 1 | 1 | 1 | 1/21/2020 16:38 | 1/21/2020 16:45 |
| 13 | 1 | | 4 | 4 | 1 | 1 | 1/21/2020 16:39 | 1/21/2020 16:47 |
| 14 | 1 | | 1 | 1 | 1 | 2 | 1/21/2020 17:03 | 1/21/2020 17:13 |
| 15 | 1 | | 4 | 4 | 1 | 1 | 1/21/2020 17:08 | 1/21/2020 17:13 |
| 16 | 1 | | 1 | 1 | 1 | 2 | 1/21/2020 17:13 | 1/21/2020 17:19 |
| 17 | 1 | | 2 | 2 | 1 | 3 | 1/21/2020 18:05 | 1/21/2020 18:12 |
| 18 | 1 | | 1 | 1 | 1 | 1 | 1/21/2020 18:13 | 1/21/2020 18:19 |
| 19 | 1 | | 1 | 1 | 1 | 3 | 1/21/2020 18:27 | 1/21/2020 18:31 |
| 20 | 1 | | 3 | 3 | 1 | 3 | 1/21/2020 18:33 | 1/21/2020 18:39 |
| 21 | 1 | | 4 | 4 | 1 | 2 | 1/21/2020 18:40 | 1/21/2020 18:45 |
| 22 | 1 | | 1 | 1 | 1 | 1 | 1/21/2020 18:41 | 1/21/2020 18:48 |
| 23 | 1 | | 2 | 2 | 1 | 1 | 1/21/2020 18:57 | 1/21/2020 19:02 |
| 24 | 1 | | 1 | 1 | 1 | 1 | 1/21/2020 18:57 | 1/21/2020 19:02 |
| 25 | 1 | | 3 | 3 | 1 | 1 | 1/21/2020 19:09 | 1/21/2020 19:14 |
| 26 | 1 | | 1 | 1 | 1 | 1 | 1/21/2020 19:20 | 1/21/2020 19:39 |
| 27 | 1 | | 1 | 1 | 1 | 3 | 1/21/2020 19:35 | 1/21/2020 19:40 |
| 28 | 1 | | 4 | 4 | 1 | 2 | 1/21/2020 19:35 | 1/21/2020 19:41 |
| 29 | 1 | | 3 | 3 | 1 | 1 | 1/21/2020 19:46 | 1/21/2020 19:51 |
| 30 | 1 | | 1 | 1 | 1 | 2 | 1/21/2020 19:47 | 1/21/2020 19:53 |
| 31 | 1 | | 1 | 1 | 1 | 2 | 1/21/2020 20:12 | 1/21/2020 20:24 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | 2 | 1 | 4 | 15854733098 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 33 | 1 | 1 | 3 | 17146022225 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 34 | 1 | 1 | 4 | 15853345581 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 35 | 1 | 1 | 3 | 18085487302 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 36 | 1 | 2 | 3 | 17277878170 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 37 | 3 | 1 | 5 | 12524925685 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 38 | 2 | 2 | 3 | 18433643035 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 39 | 2 | 1 | 4 | 16105151942 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 40 | 1 | 2 | 3 | 17024536374 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 41 | 1 | 1 | 4 | 12153573211 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 42 | 2 | 1 | 4 | 12707988595 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 43 | 1 | 1 | 3 | 13127660966 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 44 | 1 | 1 | 4 | 17183327246 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 45 | 1 | 1 | 4 | 14198438816 | | | | | | | 1 | 1 | | 1 | 1 | | 1 | 1 | |
| 46 | 3 | 1 | 4 | 16182834446 | | | | | | | 1 | 1 | | 1 | 1 | | 1 | | |
| 47 | 2 | 1 | 4 | 15084312296 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 48 | 1 | 1 | 4 | 18044491710 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 49 | 2 | 1 | 4 | 18039853929 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 50 | 2 | 1 | 4 | 12085237272 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 51 | 1 | 1 | 3 | 14698009730 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 52 | 1 | 1 | 3 | 12568473469 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 53 | 1 | 1 | 5 | 17066188538 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 54 | 2 | 2 | 5 | 13107929048 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 55 | 1 | 1 | 4 | 16617410930 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 56 | 1 | 1 | 5 | 13024281163 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 57 | 2 | 2 | 3 | 15168887156 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 58 | 1 | 1 | 3 | 18102030715 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 59 | 3 | 1 | 4 | 17036708435 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 60 | 2 | 1 | 3 | 17038760291 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 61 | 1 | 1 | 3 | 18653055105 | | | | | | | 1 | 1 | | 2 | 1 | | 1 | 1 | |
| 62 | 2 | 1 | 4 | 14806596922 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|----|-------|-------|-----|----------|------|----|-----------|---------|
| 32 | 1 | | 3 | 3 | 1 | 3 | 1/21/2020 20:27 | 1/21/2020 20:35 |
| 33 | 1 | | 4 | 4 | 1 | 1 | 1/21/2020 20:33 | 1/21/2020 20:43 |
| 34 | 1 | | 1 | 1 | 1 | 1 | 1/21/2020 20:34 | 1/21/2020 20:38 |
| 35 | 1 | | 3 | 3 | 1 | 3 | 1/21/2020 20:34 | 1/21/2020 20:39 |
| 36 | 1 | | 1 | 1 | 1 | 1 | 1/21/2020 20:35 | 1/21/2020 20:41 |
| 37 | 1 | | 2 | 2 | 1 | 1 | 1/21/2020 20:38 | 1/21/2020 20:43 |
| 38 | 1 | | 3 | 3 | 1 | 1 | 1/21/2020 20:40 | 1/21/2020 20:45 |
| 39 | 1 | | 3 | 3 | 1 | 1 | 1/21/2020 20:43 | 1/21/2020 20:48 |
| 40 | 1 | | 1 | 1 | 1 | 3 | 1/21/2020 21:33 | 1/21/2020 22:15 |
| 41 | 1 | | 2 | 2 | 1 | 2 | 1/21/2020 21:39 | 1/21/2020 21:46 |
| 42 | 1 | | 1 | 1 | 1 | 3 | 1/21/2020 21:54 | 1/21/2020 22:07 |
| 43 | 1 | | 1 | 1 | 1 | 2 | 1/21/2020 22:40 | 1/21/2020 22:45 |
| 44 | 1 | | 1 | 1 | 1 | 3 | 1/21/2020 23:08 | 1/21/2020 23:13 |
| 45 | 1 | | 3 | 3 | 1 | 3 | 1/21/2020 23:09 | 1/21/2020 23:15 |
| 46 | 1 | | 1 | 1 | 1 | 2 | 1/21/2020 23:38 | 1/21/2020 23:44 |
| 47 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 7:07 | 1/22/2020 7:17 |
| 48 | 1 | | 4 | 4 | 1 | 1 | 1/22/2020 7:25 | 1/22/2020 7:33 |
| 49 | 1 | | 2 | 2 | 1 | 2 | 1/22/2020 8:52 | 1/22/2020 8:59 |
| 50 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 10:00 | 1/22/2020 10:16 |
| 51 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 10:20 | 1/22/2020 10:56 |
| 52 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 10:20 | 1/22/2020 10:27 |
| 53 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 10:33 | 1/22/2020 11:09 |
| 54 | 1 | | 4 | 4 | 1 | 1 | 1/22/2020 10:41 | 1/22/2020 10:47 |
| 55 | 1 | | 3 | 3 | 1 | 1 | 1/22/2020 11:41 | 1/22/2020 11:51 |
| 56 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 11:51 | 1/22/2020 11:59 |
| 57 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 11:54 | 1/22/2020 12:05 |
| 58 | 1 | | 3 | 3 | 1 | 3 | 1/22/2020 12:00 | 1/22/2020 12:07 |
| 59 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 12:08 | 1/22/2020 12:27 |
| 60 | 1 | | 4 | 4 | 1 | 1 | 1/22/2020 12:10 | 1/22/2020 12:17 |
| 61 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 12:21 | 1/22/2020 12:25 |
| 62 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 12:30 | 1/22/2020 12:40 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|----|-----|-----|-----|-----|-------|-------|-------|-------|-------|-------|-------|-----|------|-----|-------|-------|-------|-------|-------|
| 63 | 3 | 2 | 4 | 18474758778 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | |
| 64 | 2 | 1 | 3 | 14234999552 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 65 | 2 | 1 | 3 | 13166344040 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 66 | 1 | 2 | 4 | 12018252622 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 67 | 1 | 2 | 5 | 19492518945 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 68 | 1 | 1 | 5 | 13107848399 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 69 | 2 | 1 | 4 | 12109444720 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 70 | 1 | 1 | 5 | 13106522688 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 71 | 2 | 1 | 4 | 19049978080 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 72 | 2 | 1 | 3 | 16235869666 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 73 | 1 | 1 | 4 | 17575915240 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 74 | 2 | 1 | 5 | 15088203093 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 75 | 2 | 1 | 4 | 14018454340 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | 1 |
| 76 | 2 | 1 | 4 | 18143759980 | | | | | | | 1 | 1 | | 2 | 1 | | | 1 | |
| 77 | 3 | 1 | 4 | 18883133613 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 78 | 3 | 1 | 4 | 16023857389 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 79 | 2 | 2 | 3 | 14105500182 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 80 | 1 | 1 | 4 | 18106644462 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 81 | 2 | 1 | 4 | 19497649399 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 82 | 1 | 1 | 3 | 12547247791 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 83 | 1 | 1 | 3 | 19373820504 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 84 | 3 | 2 | 4 | 17039226067 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 85 | 1 | 1 | 4 | 17139703957 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 86 | 1 | 1 | 3 | 12812652101 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 87 | 1 | 1 | 5 | 12062442133 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 88 | 2 | 1 | 3 | 13052432981 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | | |
| 89 | 1 | 1 | 3 | 15613720998 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 90 | 3 | 2 | 4 | 14405529830 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 91 | 1 | 2 | 5 | 14107513874 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 92 | 1 | 1 | 4 | 18085371594 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 93 | 3 | 1 | 4 | 15616597423 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|----|-------|-------|-----|----------|------|----|-----------|---------|
| 63 | 1 | | 3 | 3 | 1 | 2 | 1/22/2020 12:34 | 1/22/2020 12:41 |
| 64 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 12:44 | 1/22/2020 12:48 |
| 65 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 12:45 | 1/22/2020 13:01 |
| 66 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 13:38 | 1/22/2020 13:44 |
| 67 | 1 | | 4 | 4 | 1 | 2 | 1/22/2020 14:18 | 1/22/2020 14:33 |
| 68 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 15:04 | 1/22/2020 15:12 |
| 69 | 1 | | 3 | 3 | 1 | 1 | 1/22/2020 15:12 | 1/22/2020 15:28 |
| 70 | 1 | | 4 | 4 | 1 | 1 | 1/22/2020 15:16 | 1/22/2020 15:21 |
| 71 | 1 | | 3 | 3 | 1 | 1 | 1/22/2020 15:16 | 1/22/2020 16:14 |
| 72 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 15:43 | 1/22/2020 15:50 |
| 73 | 1 | | 3 | 3 | 1 | 2 | 1/22/2020 15:44 | 1/22/2020 15:50 |
| 74 | 1 | | 3 | 3 | 1 | 2 | 1/22/2020 16:08 | 1/22/2020 16:31 |
| 75 | 1 | | 4 | 4 | 1 | 3 | 1/22/2020 16:27 | 1/22/2020 16:33 |
| 76 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 16:31 | 1/22/2020 17:01 |
| 77 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 16:39 | 1/22/2020 16:58 |
| 78 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 16:51 | 1/22/2020 16:57 |
| 79 | 1 | | 3 | 3 | 1 | 2 | 1/22/2020 16:53 | 1/22/2020 17:02 |
| 80 | 1 | | 3 | 3 | 1 | 3 | 1/22/2020 17:00 | 1/22/2020 17:09 |
| 81 | 1 | | 3 | 3 | 1 | 2 | 1/22/2020 17:03 | 1/22/2020 18:42 |
| 82 | 1 | | 2 | 2 | 1 | 1 | 1/22/2020 17:05 | 1/22/2020 17:15 |
| 83 | 1 | | 3 | 3 | 1 | 1 | 1/22/2020 17:07 | 1/22/2020 17:14 |
| 84 | 1 | | 4 | 4 | 1 | 2 | 1/22/2020 17:13 | 1/22/2020 17:26 |
| 85 | 1 | | 4 | 4 | 1 | 1 | 1/22/2020 17:15 | 1/22/2020 17:21 |
| 86 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 17:42 | 1/22/2020 17:47 |
| 87 | 1 | | 4 | 4 | 1 | 3 | 1/22/2020 17:43 | 1/22/2020 17:56 |
| 88 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 18:00 | 1/22/2020 18:06 |
| 89 | 1 | | 2 | 2 | 1 | 2 | 1/22/2020 18:03 | 1/22/2020 18:10 |
| 90 | 1 | | 4 | 4 | 1 | 1 | 1/22/2020 18:10 | 1/22/2020 18:17 |
| 91 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 18:20 | 1/22/2020 18:25 |
| 92 | 1 | | 2 | 2 | 1 | 3 | 1/22/2020 18:25 | 1/22/2020 18:31 |
| 93 | 1 | | 2 | 2 | 1 | 3 | 1/22/2020 18:27 | 1/22/2020 18:31 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|----|-----|-----|-----|-----|-------|-------|-------|-------|-------|-------|-------|-----|------|-----|-------|-------|-------|-------|-------|
| 94 | 3 | 1 | 4 | 15165693183 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 95 | 3 | 2 | 4 | 15184340806 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 96 | 1 | 1 | 4 | 17322208595 | | | | | | | 1 | 1 | | 2 | 1 | | | | |
| 97 | 2 | 1 | 4 | 15169333838 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 98 | 1 | 1 | 4 | 14137833100 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 99 | 3 | 2 | 4 | 19417445682 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 100 | 3 | 1 | 3 | 12483322716 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 101 | 1 | 1 | 4 | 19375696072 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 102 | 1 | 1 | 4 | 19164897444 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 103 | 1 | 1 | 4 | 16189611356 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 104 | 3 | 2 | 4 | 15853851710 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 105 | 2 | 2 | 3 | 15038089214 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 106 | 2 | 1 | 5 | 12106907405 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 107 | 2 | 1 | 5 | 19783458014 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 108 | 2 | 2 | 5 | 13104532154 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | |
| 109 | 3 | 1 | 4 | 15015377412 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 110 | 1 | 1 | 4 | 17706670206 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 111 | 2 | 1 | 3 | 13345679996 | | | | | | | 1 | 1 | | 3 | 1 | | | | |
| 112 | 3 | 2 | 4 | 14072480445 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 113 | 3 | 1 | 5 | 14139677777 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 114 | 2 | 2 | 4 | 19733865701 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 115 | 1 | 1 | 4 | 15185878749 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 116 | 3 | 1 | 4 | 19739040404 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 117 | 1 | 1 | 3 | 15049881909 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | 1 |
| 118 | 2 | 1 | 4 | 17186010965 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 119 | 1 | 1 | 4 | 17166899695 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | | |
| 120 | 2 | 1 | 4 | 17322358234 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 121 | 1 | 1 | 4 | 13108028150 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 122 | 2 | 2 | 3 | 16053225700 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | 1 |
| 123 | 2 | 2 | 3 | 18457354815 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 124 | 3 | 1 | 4 | 17149975222 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|---|---|---|---|---|---|---|---|---|
| 94 | 1 | | 4 | 4 | 1 | 3 | 1/22/2020 18:30 | 1/22/2020 18:39 |
| 95 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 18:35 | 1/22/2020 18:52 |
| 96 | 1 | | 4 | 4 | 1 | 2 | 1/22/2020 18:52 | 1/22/2020 18:57 |
| 97 | 1 | | 3 | 3 | 1 | 3 | 1/22/2020 18:53 | 1/22/2020 19:10 |
| 98 | 1 | | 2 | 2 | 1 | 1 | 1/22/2020 18:56 | 1/22/2020 19:03 |
| 99 | 1 | | 3 | 3 | 1 | 1 | 1/22/2020 18:58 | 1/22/2020 19:02 |
| 100 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 19:06 | 1/22/2020 19:11 |
| 101 | 1 | | 3 | 3 | 1 | 3 | 1/22/2020 19:09 | 1/22/2020 19:14 |
| 102 | 1 | | 2 | 2 | 1 | 2 | 1/22/2020 19:10 | 1/22/2020 19:18 |
| 103 | 1 | | 4 | 4 | 1 | 1 | 1/22/2020 19:33 | 1/22/2020 19:53 |
| 104 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 19:35 | 1/22/2020 19:40 |
| 105 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 19:42 | 1/22/2020 19:48 |
| 106 | 1 | | 2 | 2 | 1 | 3 | 1/22/2020 19:51 | 1/22/2020 19:58 |
| 107 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 20:00 | 1/22/2020 20:09 |
| 108 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 20:00 | 1/22/2020 20:35 |
| 109 | 1 | | 4 | 4 | 1 | 1 | 1/22/2020 20:03 | 1/22/2020 20:10 |
| 110 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 20:03 | 1/22/2020 20:26 |
| 111 | 1 | | 4 | 4 | 1 | 3 | 1/22/2020 20:04 | 1/22/2020 21:47 |
| 112 | 1 | | 2 | 2 | 1 | 2 | 1/22/2020 20:09 | 1/22/2020 20:16 |
| 113 | 1 | | 2 | 2 | 1 | 2 | 1/22/2020 20:13 | 1/22/2020 20:18 |
| 114 | 1 | | 4 | 4 | 1 | 2 | 1/22/2020 20:17 | 1/22/2020 20:25 |
| 115 | 1 | | 2 | 2 | 1 | 2 | 1/22/2020 20:19 | 1/22/2020 20:28 |
| 116 | 1 | | 3 | 3 | 1 | 2 | 1/22/2020 20:23 | 1/22/2020 20:35 |
| 117 | | | 1 | 1 | 1 | 2 | 1/22/2020 20:23 | 1/22/2020 20:31 |
| 118 | 1 | | 2 | 2 | 1 | 1 | 1/22/2020 20:30 | 1/22/2020 20:43 |
| 119 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 20:49 | 1/22/2020 20:53 |
| 120 | 1 | | 2 | 2 | 1 | 2 | 1/22/2020 20:51 | 1/22/2020 20:57 |
| 121 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 20:55 | 1/22/2020 21:01 |
| 122 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 20:58 | 1/22/2020 21:03 |
| 123 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 21:03 | 1/22/2020 21:08 |
| 124 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 21:06 | 1/22/2020 21:34 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|----|-----|-----|-----|-----|-------|-------|-------|-------|-------|-------|-------|-----|------|-----|-------|-------|-------|-------|-------|
| 125 | 1 | 1 | 5 | 13308361775 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 126 | 2 | 1 | 4 | 18042649683 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 127 | 3 | 1 | 5 | 12022232818 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 128 | 1 | 1 | 4 | 12122521811 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 129 | 2 | 2 | 3 | 12548312101 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 130 | 2 | 1 | 3 | 18889594304 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 131 | 2 | 1 | 4 | 18644553875 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 132 | 1 | 1 | 4 | 13105536962 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 133 | 2 | 2 | 4 | 16364492595 | | | | | | | 1 | 1 | | 2 | 1 | | 1 | 1 | |
| 134 | 1 | 1 | 5 | 14808543707 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 135 | 1 | 1 | 3 | 18883229981 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 136 | 2 | 1 | 4 | 12022239130 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 137 | 2 | 2 | 3 | 16463800164 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 138 | 1 | 1 | 3 | 18322802789 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | |
| 139 | 2 | 1 | 4 | 14809008883 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 140 | 1 | 1 | 5 | 17148862154 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 141 | 2 | 1 | 4 | 19497167982 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 142 | 1 | 1 | 3 | 16316652716 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 143 | 2 | 2 | 3 | 12156744246 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 144 | 1 | 1 | 4 | 18636871434 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 145 | 2 | 2 | 4 | 17182563811 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 146 | 1 | 2 | 4 | 14196688861 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 147 | 1 | 1 | 5 | 13174151010 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 148 | 2 | 2 | 3 | 19199682575 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 149 | 2 | 2 | 4 | 12052512004 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | 1 |
| 150 | 1 | 1 | 5 | 12105955309 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 151 | 1 | 1 | 4 | 19737782268 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 152 | 2 | 1 | 4 | 16104541367 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 153 | 2 | 1 | 4 | 15156439406 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 154 | 2 | 1 | 3 | 19196769946 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 155 | 1 | 1 | 4 | 15614951164 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | | |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|---|---|---|---|---|---|---|---|---|
| 125 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 21:10 | 1/22/2020 21:23 |
| 126 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 21:30 | 1/22/2020 21:40 |
| 127 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 21:32 | 1/22/2020 21:46 |
| 128 | 1 | | 3 | 3 | 1 | 2 | 1/22/2020 21:47 | 1/22/2020 22:56 |
| 129 | 1 | | 4 | 4 | 1 | 2 | 1/22/2020 21:48 | 1/22/2020 21:56 |
| 130 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 21:52 | 1/22/2020 21:58 |
| 131 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 22:04 | 1/22/2020 22:08 |
| 132 | 1 | | 1 | 1 | 1 | 1 | 1/22/2020 22:08 | 1/22/2020 22:20 |
| 133 | 1 | | 3 | 3 | 1 | 1 | 1/22/2020 22:09 | 1/22/2020 22:16 |
| 134 | | | 4 | 4 | 1 | 3 | 1/22/2020 22:22 | 1/22/2020 22:30 |
| 135 | 1 | | 4 | 4 | 1 | 3 | 1/22/2020 23:11 | 1/22/2020 23:16 |
| 136 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 23:12 | 1/22/2020 23:17 |
| 137 | 1 | | 1 | 1 | 1 | 2 | 1/22/2020 23:12 | 1/22/2020 23:19 |
| 138 | 1 | | 1 | 1 | 1 | 3 | 1/22/2020 23:26 | 1/22/2020 23:30 |
| 139 | 1 | | 4 | 4 | 1 | 3 | 1/22/2020 23:29 | 1/22/2020 23:44 |
| 140 | 1 | | 4 | 4 | 1 | 1 | 1/22/2020 23:35 | 1/23/2020 0:10 |
| 141 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 0:04 | 1/23/2020 0:09 |
| 142 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 0:23 | 1/23/2020 0:41 |
| 143 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 5:29 | 1/23/2020 5:39 |
| 144 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 5:38 | 1/23/2020 5:48 |
| 145 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 5:42 | 1/23/2020 5:49 |
| 146 | 1 | | 4 | 4 | 1 | 3 | 1/23/2020 5:57 | 1/23/2020 6:02 |
| 147 | 1 | | 3 | 3 | 1 | 3 | 1/23/2020 6:41 | 1/23/2020 6:49 |
| 148 | 1 | | 2 | 2 | 1 | 3 | 1/23/2020 7:05 | 1/23/2020 7:11 |
| 149 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 7:24 | 1/23/2020 7:31 |
| 150 | 1 | | 4 | 4 | 1 | 2 | 1/23/2020 8:25 | 1/23/2020 8:33 |
| 151 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 8:33 | 1/23/2020 8:42 |
| 152 | 1 | | 1 | 1 | 1 | 3 | 1/23/2020 10:14 | 1/23/2020 10:22 |
| 153 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 10:16 | 1/23/2020 10:22 |
| 154 | 1 | | 2 | 2 | 1 | 2 | 1/23/2020 10:35 | 1/23/2020 10:45 |
| 155 | 1 | | 3 | 3 | 1 | 3 | 1/23/2020 10:44 | 1/23/2020 10:53 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 156 | 1 | 2 | 3 | 13013409100 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 157 | 1 | 1 | 3 | 13076321989 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 158 | 1 | 2 | 4 | 14014556222 | | | | | | | 1 | 1 | | 3 | 1 | | | 1 | |
| 159 | 2 | 1 | 4 | 17188530953 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 160 | 2 | 2 | 4 | 18884939285 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 161 | 1 | 1 | 3 | 12018941956 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 162 | 2 | 2 | 3 | 13176201234 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | | 1 |
| 163 | 1 | 1 | 4 | 15088948742 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 164 | 1 | 1 | 5 | 16066380039 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 165 | 1 | 1 | 4 | 15138474491 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 166 | 1 | 1 | 5 | 12158098761 | | | | | | | 1 | 1 | | 3 | 1 | | | 1 | |
| 167 | 2 | 1 | 4 | 18607633244 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 168 | 1 | 1 | 4 | 14125058147 | | | | | | | 1 | 1 | | 1 | 1 | | | 1 | 1 |
| 169 | 1 | 1 | 4 | 18085457236 | | | | | | | 1 | 1 | | 3 | 1 | | | 1 | 1 |
| 170 | 2 | 1 | 5 | 19706259336 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 171 | 1 | 2 | 4 | 15164846649 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | |
| 172 | 1 | 1 | 4 | 17186689177 | | | | | | | 1 | 1 | | 1 | 1 | 1 | | 1 | 1 |
| 173 | 1 | 1 | 4 | 16105652715 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | 1 |
| 174 | 1 | 1 | 4 | 16128137362 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 175 | 2 | 2 | 3 | 19294975892 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 176 | 2 | 1 | 4 | 14409744173 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 177 | 1 | 1 | 4 | 16033545411 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 178 | 1 | 2 | 4 | 13236609723 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 179 | 2 | 1 | 3 | 13312213996 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 180 | 1 | 2 | 4 | 17175443233 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 181 | 2 | 1 | 4 | 12153489711 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 182 | 1 | 1 | 4 | 18165871354 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 183 | 1 | 1 | 4 | 19374361468 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 184 | 1 | 1 | 3 | 18183668181 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 185 | 2 | 1 | 3 | 13366216322 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | |
| 186 | 2 | 2 | 4 | 18884190054 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|-----|-------|-------|-----|----------|------|----|-----------|---------|
| 156 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 10:44 | 1/23/2020 10:57 |
| 157 | 1 | | 2 | 2 | 1 | 1 | 1/23/2020 10:51 | 1/23/2020 11:01 |
| 158 | 1 | | 3 | 3 | 1 | 3 | 1/23/2020 11:01 | 1/23/2020 11:06 |
| 159 | 1 | | 3 | 3 | 1 | 1 | 1/23/2020 11:17 | 1/23/2020 22:08 |
| 160 | 1 | | 3 | 3 | 1 | 2 | 1/23/2020 11:21 | 1/23/2020 11:28 |
| 161 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 11:24 | 1/23/2020 12:26 |
| 162 | 1 | | 1 | 1 | 1 | 3 | 1/23/2020 11:29 | 1/23/2020 11:36 |
| 163 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 11:33 | 1/23/2020 11:39 |
| 164 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 11:37 | 1/23/2020 11:43 |
| 165 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 11:42 | 1/23/2020 12:38 |
| 166 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 11:56 | 1/23/2020 12:13 |
| 167 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 12:02 | 1/23/2020 12:07 |
| 168 | 1 | | 3 | 3 | 1 | 2 | 1/23/2020 12:05 | 1/23/2020 12:10 |
| 169 | 1 | | 4 | 4 | 1 | 3 | 1/23/2020 12:09 | 1/23/2020 12:13 |
| 170 | 1 | | 3 | 3 | 1 | 2 | 1/23/2020 12:14 | 1/23/2020 12:40 |
| 171 | 1 | | 4 | 4 | 1 | 2 | 1/23/2020 12:16 | 1/23/2020 12:26 |
| 172 | 1 | | 4 | 4 | 1 | 3 | 1/23/2020 12:17 | 1/23/2020 12:22 |
| 173 | 1 | | 1 | 1 | 1 | 3 | 1/23/2020 12:27 | 1/23/2020 12:32 |
| 174 | 1 | | 1 | 1 | 1 | 3 | 1/23/2020 12:37 | 1/23/2020 12:43 |
| 175 | 1 | | 2 | 2 | 1 | 2 | 1/23/2020 12:41 | 1/23/2020 12:52 |
| 176 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 12:56 | 1/23/2020 13:20 |
| 177 | 1 | | 1 | 1 | 1 | 3 | 1/23/2020 12:56 | 1/23/2020 13:01 |
| 178 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 13:06 | 1/23/2020 13:11 |
| 179 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 13:11 | 1/23/2020 13:33 |
| 180 | 1 | | 4 | 4 | 1 | 2 | 1/23/2020 13:17 | 1/23/2020 13:25 |
| 181 | 1 | | 3 | 3 | 1 | 2 | 1/23/2020 13:24 | 1/23/2020 13:29 |
| 182 | 1 | | 2 | 2 | 1 | 1 | 1/23/2020 13:33 | 1/23/2020 13:40 |
| 183 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 13:40 | 1/23/2020 13:45 |
| 184 | 1 | | 3 | 3 | 1 | 3 | 1/23/2020 13:41 | 1/23/2020 13:50 |
| 185 | 1 | | 2 | 2 | 1 | 2 | 1/23/2020 13:45 | 1/23/2020 13:50 |
| 186 | 1 | | 1 | 1 | 1 | 3 | 1/23/2020 13:47 | 1/23/2020 13:58 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs1 | Qs2 | Qs3 | Qs4 | Qs5_1 | Qs5_2 | Qs5_3 | Qs5_4 | Qs5_5 | Qs5_6 | Qs5_7 | Qs6 | Qs6X | Qs7 | Qs8_1 | Qs8_2 | Qs8_3 | Qs8_4 | Qs8_5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 187 | 1 | 1 | 4 | 16306465858 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | | 1 |
| 188 | 1 | 1 | 4 | 16265699346 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 189 | 2 | 2 | 4 | 13107739876 | | | | | | | 1 | 2 | | 1 | 1 | 1 | 1 | | 1 |
| 190 | 2 | 2 | 3 | 14157993301 | | | | | | | 1 | 2 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 191 | 1 | 1 | 5 | 17188545607 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 192 | 1 | 1 | 4 | 13183612613 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |
| 193 | 2 | 2 | 3 | 18889806071 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | 1 |
| 194 | 2 | 1 | 4 | 19147224501 | | | | | | | 1 | 1 | | 2 | 1 | 1 | | 1 | 1 |
| 195 | 2 | 2 | 4 | 17044461760 | | | | | | | 1 | 1 | | 2 | 1 | 1 | 1 | 1 | |
| 196 | 2 | 2 | 4 | 19496615662 | | | | | | | 1 | 2 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 197 | 2 | 2 | 4 | 14326847049 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 198 | 1 | 1 | 4 | 19108262228 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 |
| 199 | 1 | 1 | 3 | 13125503272 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | |
| 200 | 1 | 1 | 4 | 18584545253 | | | | | | | 1 | 1 | | 3 | 1 | 1 | | 1 | |
| 201 | 1 | 1 | 4 | 19543897147 | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | |
| 202 | 2 | 2 | 4 | 19123309403 | | | | | | | 1 | 1 | | 3 | 1 | 1 | 1 | 1 | 1 |

Appendix H: Data Listing Faxed Offers Survey

| ID | Qs8_6 | Qs8_7 | Qs9 | Qs9Index | Qs10 | Q1 | StartTime | EndTime |
|----|-------|-------|-----|----------|------|-----|-----------|---------|
| 187 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 13:59 | 1/23/2020 14:04 |
| 188 | 1 | | 4 | 4 | 1 | 3 | 1/23/2020 14:09 | 1/23/2020 14:19 |
| 189 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 14:16 | 1/23/2020 14:29 |
| 190 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 14:42 | 1/23/2020 14:59 |
| 191 | 1 | | 3 | 3 | 1 | 3 | 1/23/2020 14:43 | 1/23/2020 14:49 |
| 192 | 1 | | 1 | 1 | 1 | 3 | 1/23/2020 15:07 | 1/23/2020 15:13 |
| 193 | 1 | | 2 | 2 | 1 | 2 | 1/23/2020 15:34 | 1/23/2020 15:43 |
| 194 | 1 | | 4 | 4 | 1 | 3 | 1/23/2020 16:11 | 1/23/2020 16:17 |
| 195 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 16:39 | 1/23/2020 20:18 |
| 196 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 16:43 | 1/23/2020 16:57 |
| 197 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 17:11 | 1/23/2020 17:19 |
| 198 | 1 | | 3 | 3 | 1 | 1 | 1/23/2020 17:29 | 1/23/2020 17:40 |
| 199 | 1 | | 2 | 2 | 1 | 2 | 1/23/2020 17:44 | 1/23/2020 17:56 |
| 200 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 18:11 | 1/23/2020 18:19 |
| 201 | 1 | | 1 | 1 | 1 | 2 | 1/23/2020 18:15 | 1/23/2020 18:21 |
| 202 | 1 | | 1 | 1 | 1 | 1 | 1/23/2020 18:26 | 1/23/2020 18:32 |

Exhibit S

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4

5    - - - - - - - - - - - - - - - - - -

6    TRUE HEALTH CHIROPRACTIC, INC.,        )

7    MCLAUGHLIN CHIROPRACTIC ASSOCIATES,  )

8    INC.,                                  )

9          Plaintiffs,                      )

10   V.                                     )  CASE NO.

11   MCKESSON CORPORATION,                  )  3:13-CV-02219

12   MCKESSON TECHNOLOGIES, INC.,           )

13         Defendants.                      )

14   - - - - - - - - - - - - - - - - - -

15

16     VIDEOTAPED DEPOSITION OF FRANYA M. PETERSON, D.C.

17             TUESDAY, FEBRUARY 24, 2015

18

19

20

21              BEHMKE REPORTING AND VIDEO SERVICES, INC.

22   BY:  RHONDA S. SANSOM, RPR, CRR, TENNESSEE LCR NO. 685

23                    160 SPEAR STREET, SUITE 300

24                    SAN FRANCISCO, CALIFORNIA 94105

25                    (415) 597-5600

1       A.   No.   Purely my brother's company.

2       Q.   When you are asked for a business name, do you

3  always use the name Franya M. Peterson, D.C.?

4       A.   Yes.  If they ask the location of where I work,

5  I say "McLaughlin Chiropractic."

6       Q.   Okay.  So when asked for your location, you say

7  "McLaughlin Chiropractic?"

8       A.   Correct.

9       Q.   So you do use that as a business that you're

10  affiliated with?

11      A.   It's the building's name.

12      Q.   And who came up with the building's name?

13      A.   My dad.

14      Q.   You also use that name?

15      A.   Yes.  It is the sign on the road.

16      Q.   Has the building always been called that since

17  2003?

18      A.   Yes.  The building was built in I believe 1983,

19  and it's always been called that.

20      Q.   Did your dad ever practice anywhere else?

21      A.   Prior to building that building, he was down

22  the street.  He was leasing a space.  And then prior to

23  that, when he first graduated from school in 1963, he

24  worked in Clinton for a doctor as an associate.

25      Q.   How long has your brother been practicing as a

1    chiropractor?

2         A.   I believe he graduated in 1996.

3         Q.   And your brother practices out of the same

4    building?

5         A.   Correct.

6         Q.   Has he practiced in the same building since

7    1996?

8         A.   Yes.

9         Q.   So all three of you practice out of the same

10   location?

11        A.   We did.  My father is now retired.

12        Q.   But before your father retired, all three of

13   you practiced in the same location?

14        A.   Correct.

15        Q.   And you and your brother currently practice out

16   of the same location?

17        A.   Correct.

18        Q.   And you've never practiced at a different

19   location?

20        A.   I have not.

21        Q.   You mentioned that you looked for documents in

22   connection with this case; is that correct?

23        A.   I was asked if I ever -- when I looked at

24   McKesson, to see if there was ever any affiliation that

25   I had with it.  And when I looked back to see if there

1        A.    I couldn't tell you for sure.  I -- I -- I just

2   know when we don't have one currently and he says he'll

3   go get another one.  So I don't -- I couldn't tell you

4   for sure.

5        Q.    Does your brother -- has your brother purchased

6   all the fax machines that have been in the office?

7        A.    When my father was in practice, my father was

8   the one that provided -- that bought them.

9        Q.    And who purchases the supplies that are used

10  with the fax machine?

11       A.    He purchases the supplies with regards to the

12  fax machine; the paper, as well as the toner.  It's a

13  copier-fax machine.  So he purchases all of that.

14       MR. KELLY:  When you say "he," who?

15       THE WITNESS:  My -- Wes McLaughlin purchases that.

16  Sorry.

17  BY MS. CHEUNG:

18       Q.    And when your father was in practice?

19       A.    He did.

20       Q.    Your father did?

21       A.    My father did, uh-huh.

22       Q.    Are you authorized to use that fax machine?

23       A.    Yes.

24       Q.    And you're authorized to give out the phone

25  number for that fax machine?

1      A.   I am.

2      Q.   And you're authorized to accept faxes on that

3  fax machine?

4      A.   I am.

5      Q.   You're authorized to send faxes on that fax

6  machine?

7      A.   Yes, ma'am.

8      Q.   Are there supplies that you need to buy in

9  connection with your business?

10      A.   There are.

11      Q.   What types of supplies do you buy?

12      A.   I buy face paper, head roll paper for my

13  tables.  I buy my adjusting table.  I buy some of the

14  equipment that I use for the modalities in my office.  I

15  buy paper towels.  I buy toilet paper.

16      Q.   Do you share any of these supplies with your

17  brother?

18      A.   I do.

19      Q.   And when you buy these supplies, you buy them

20  under your own business?

21      A.   I do.

22      Q.   Under your own account?

23      A.   Correct.

24      Q.   And you generously share them with your

25  brother?

1      Q.   To the fax number you're authorized to use,

2  correct?

3      A.   Correct.

4      Q.   So the question is:  Do you give your fax

5  number out to people to send you faxes?

6      A.   Yes.

7      Q.   When do you do that?

8      A.   When there's a document that needs to be sent

9  to me by fax.

10     Q.   Okay.  So when you give out your fax number, do

11 you expect to receive faxes at that number?

12     A.   Yes.

13     Q.   Is your fax number publicly available?

14     A.   It is on my business card.

15     Q.   Okay.  Is it publicly available anywhere else?

16     A.   It is on my letterhead.

17     Q.   Anywhere else?

18     A.   I don't know.  I don't think that it would be

19 in the phone book because it is not a call-in line.  You

20 can call in on it, but nobody ever answers it because

21 it's directly related to the fax, so we assume that

22 anything that comes in on it is going to be a fax.  So

23 to my knowledge it is not any -- you know, advertised in

24 any other public fashion.

25     Q.   Does your brother give out the same fax number?

1    believe I was the initial one that would have installed

2    it.

3        Q.    And again, which computer did you install it

4    on?

5        A.    The computer that we're referring to as Joanna

6    Fry's computer.

7        Q.    Did you install it on any other computers?

8        A.    No.

9        VIDEOTAPE OPERATOR:  I need to change in five

10    minutes.

11        MS. CHEUNG:  Okay.  Why don't we just do one more

12    exhibit, and then....

13            (Defendants' Exhibit No. 13 was marked for

14            identification.)

15    BY MS. CHEUNG:

16        Q.    When you have had a chance to review it, let me

17    know if you have seen this document before.

18        A.    Yes, I have.

19        Q.    What is it?

20        A.    This one says "Software Registration."

21        Q.    And this was the registration that you were the

22    one who input the information?

23        A.    Yes, that's correct.

24        Q.    And you see -- so you were the one who typed in

25    "McLaughlin Chiropractic Center" into the practice name?

1      A.    Yes.

2      Q.    And you typed in your name and your specialty.

3   And the street address that's listed is the street

4   address of the office that you share with McLaughlin

5   Chiropractic Associates?

6      A.    Correct.

7      Q.    And the phone number that you listed here, is

8   that the phone number --

9      A.    That is my phone number.

10     Q.    865-405-0655?

11     A.    Yes, that is my office phone number.

12     Q.    Is that the phone number that rings into your

13   cellphone?

14     A.    Yes.

15     Q.    And the fax number here is 865-687-0279?

16     A.    Correct.

17     Q.    That's the fax number that you share with

18   McLaughlin Chiropractic Associates?

19     A.    Correct.

20     Q.    FPeterson06@comcast.net; that's the email

21   address that you used --

22     A.    At that time?

23     Q.    -- at that time?

24     A.    Yes.

25     Q.    And do you know whether you entered any of this

1    other information under the line?

2        A.    The number of users is one, because it was -- I

3    was the only one that was going to be using it.

4    However, because they asked me what providers are in

5    your office, and I believe that was so that if we at any

6    later time wanted to add someone in they could have been

7    added in.

8            But they were never users on it, because you

9    can see that the number of users was one.  I was the

10   only one at that time that was going to be using it.

11       Q.    Although when you say "Users, 1," you used it

12   as well as Ms. Fry, correct?

13       A.    Providers is what they're referring to, which

14   providers are going to be billing claims off of the

15   software.  That's the reference that they're -- they're

16   making on that.

17       Q.    Is that something that you just understood or

18   is that something they told you?

19       A.    That's how electronic health records work.

20   When you have -- when you are purchasing software, it is

21   based on how many providers are going to be billing --

22   billing claims in that office.  Because they have to

23   enter different information on that, like our tax ID

24   number has to change because we all have different ones.

25           So when you purchase it, you have to tell them

1    how many provider users are going to be using that

2    software so that it's set up for you in order to be able

3    to change the format of it.

4        Q.   Why did you list three provider names, then?

5        A.   They're in the office, and so if they ever

6    wanted to be added on to the software at a later date,

7    they could have been.  But they -- they weren't.  They

8    weren't using it at that time.

9        Q.   Are you the one who typed in all three provider

10   names?

11       A.   Yes.

12       Q.   So you provided all three provider names into

13   the software registration for MediSoft?

14       A.   Correct.

15            MS. CHEUNG:  Why don't we go off the record.

16            VIDEOTAPE OPERATOR:  Okay, we're going off.  The

17   time is 12:07 p.m.

18                 (At 12:07 P.M., a lunch recess was

19                 taken until 12:34 P.M. of the same

20                 day.)

21       (Nothing omitted nor deleted.  See next page.)

22

23

24

25

BY MS. CHEUNG:

    Q.   Did you pay the total that is due on this document?

    A.   As far as I know, yes.

    Q.   How did you pay for it?

    A.   I believe with a credit card.

    Q.   Do you have credit card statements that reflect that payment?

    A.   There might be some in my tax documents from that year.  I would have to look back and see.

    Q.   Is this a credit card that is associated with your personal account or with your sole proprietorship?

    A.   During that time, it probably was with a personal account.  I don't believe that I had set up a business credit card account at that point, but I can't remember for sure.

    Q.   At some point after you started your practice, you set up a business credit card account?

    A.   My American Express, yes.

    Q.   Do you remember approximately what time you set up that account?

    A.   I don't.  I don't have any recollection of it. I've had it for a while, I know that.

    Q.   All right.  Go ahead and put that one aside.

    MS. CHEUNG:  Let's mark Exhibit 16.

1              (Defendants' Exhibit No. 16 was marked for

2              identification.)

3    BY MS. CHEUNG:

4        Q.   Let me know when you've had a chance to review

5    this document.

6        A.   Yes, I have reviewed it.

7        Q.   Do you recognize this document, marked as

8    Exhibit 16?

9        A.   I do.  I recognize it.

10       Q.   And this is a document that you produced from

11   your files?

12       A.   Correct.

13       Q.   What is this document?

14       A.   It looks like this is the registration for the

15   MediSoft software.

16       Q.   Okay.  And in the blank spaces -- well, in the

17   boxes that appear on this form, did you type in the

18   information that is -- that appears in the boxes?

19       A.   Yes, I did.

20       Q.   So under "Registration practice name," you

21   typed in "McLaughlin Chiropractic Center?"

22       A.   Correct.

23       Q.   And is that the practice name that you always

24   use when you are providing a practice name?

25       A.   Yes.

1    Q.    And they also were confused?

2    A.    Uh-huh, correct.

3    Q.    All right.  So then you typed in "Franya" as

4    your contact name and your last name, "Peterson, D.C.,"

5    correct?

6    A.    Correct.

7    Q.    You typed in the address of the office where

8    McLaughlin Chiropractic Associates also practices,

9    correct?

10    A.    Correct.

11    Q.    And you also typed in your phone number, which

12    is your personal phone number?

13    A.    That is my office phone number, yes.

14    Q.    And you also voluntarily provided the fax

15    number that you're authorized to use, correct?

16    A.    Correct.

17    Q.    You weren't required to provide a fax number in

18    connection with this software registration, correct?

19    A.    As far as being required, no, there wasn't a

20    star next to it.  The phone number had the star.

21    Q.    Okay.  So you were not required to provide a

22    fax number in connection with registering MediSoft,

23    correct?

24    A.    Correct.

25    Q.    Go ahead and put that aside.

1    I'm not sure.

2        Q.   Do you know if anyone else at -- working at

3    your offices would have called that phone number?

4        A.   I don't believe that anyone else would have

5    because no one else dealt with the software.

6        Q.   But you don't know?

7        A.   But I don't know.

8        Q.   Okay.  Go ahead and put that aside.

9            (Defendants' Exhibit No. 19 was marked for

10           identification.)

11   BY MS. CHEUNG:

12       Q.   When you've had a chance to look at Exhibit 18,

13   would you let me know if you recognize this document?

14       A.   I do recognize it.

15       Q.   Is this a document that you produced from your

16   files?

17       A.   Yes.

18       Q.   What is this document?

19       A.   This is the technical support agreement.

20       Q.   Okay.  And this is the agreement that you

21   signed after you purchased the MediSoft project --

22   product?

23       A.   Correct.

24       Q.   Do you see on the front page where it says

25   "Attention, Brandon?"

1      A.    Yes.

2      Q.    Who is Brandon?

3      A.    It was apparently someone that I contacted

4   particularly there with the technical support.  That is

5   my handwriting.

6      Q.    Okay.  Do you remember Brandon's last name?

7      A.    Nope.

8      Q.    And is it your handwriting, the --

9      A.    Yes.

10      Q.    -- the text that says "Customer number?"

11      A.    The customer number and the ticket number.

12      Q.    And the ticket number?

13      A.    Those are my handwriting.

14      Q.    And what about the phone number on the

15   left-hand side:  800-354-4006?

16      A.    I believe that's my handwriting, as well.

17      Q.    Do you know what phone number that is?

18      A.    No, I don't.

19      Q.    Or whether it is a phone number, as opposed to

20   a fax number?

21      A.    I don't know what that refers to.

22      Q.    Do you remember speaking with Brandon?

23      A.    No, I don't.

24      Q.    Okay.  And you see on this form you again

25   provided the practice name, McLaughlin Chiropractic

1    Center, consistent with the other documents.  Correct?

2        A.    Correct.

3        Q.    And you provided the office address where you

4    practice, correct?

5        A.    Correct.

6        Q.    And you also provided your personal phone

7    number?

8        A.    That is my business line number.

9        Q.    Okay.  And you also provided your fax number,

10    865-687-0279, correct?

11        A.    Correct, that is the office fax number.

12        Q.    And you were not required to provide a fax

13    number on this form?

14        A.    I don't see a star next to it.

15        Q.    So you were not required to provide your fax

16    number, correct?

17        A.    As far as I know.  There are no stars on any of

18    these, so I guess I could have left any of these blank.

19        Q.    And specifically with respect to the fax

20    number, you were not required to provide a fax number?

21        MR. KELLY:  I will make an objection, objection to

22    form, what was required.  She could have left the whole

23    thing blank, but I don't think she has knowledge as to

24    what's required.

25    BY MS. CHEUNG:

1    Q.   Go ahead and answer the question:  Were you

2  required to provide -- did you understand you were

3  required to provide a fax number in connection with

4  filling out this form?

5    A.   The form asked for a fax number; however, I'm

6  sure that if I had left the fax number off that would

7  have been fine.

8    Q.   So you were not required to provide your fax

9  number on this form, correct?

10   A.   Correct.

11   Q.   Go ahead and put that aside.

12   MS. CHEUNG:  Let's mark Exhibit 19.

13        (Defendants' Exhibit No. 19 was marked for

14        identification.)

15  BY MS. CHEUNG:

16   Q.   Do you recognize this document?

17   A.   I do.

18   Q.   Was it produced from your files?

19   A.   Yes.

20   Q.   It wasn't clear to me what this fax sheet was

21  attached to.  Do you remember?

22   A.   My understanding, as far as my recollection

23  serves me --

24   Q.   Uh-huh.

25   A.   -- is this had to do with the information that

True Health Chiropractic, Inc., et al. v.
McKesson Corporation, et al.

Franya M. Peterson, D.C.
February 24, 2015

Page 159

```
 1   STATE OF  TENNESSEE              )
 2                                    ) ss
 3   COUNTY OF FAYETTE                )
 4
```

I hereby certify that the witness in the

```
 5   foregoing deposition, FRANYA M. PETERSON, D.C., was
 6   by me duly sworn to testify to the truth, the whole
 7   truth and nothing but the truth, in the within-entitled
 8   cause; that said deposition was taken at the time and
 9   place herein named; and that the deposition is a true
10   record of the witness's testimony as reported by me, a
11   duly certified shorthand reporter and a disinterested
12   person, and was thereafter transcribed into typewriting
13   by computer.
14           I further certify that I am not interested in
15   the outcome of the said action, nor connected with nor
16   related to any of the parties in said action, nor to
17   their respective counsel.
18           IN WITNESS WHEREOF, I have hereunto set my
19   hand this 25th day of February, 2015.
20   Reading and Signing was:
21   ___ requested   _X_ waived   ___ not requested
22
23
24
25           RHONDA S. SANSOM, LCR NO. 685
```

# Exhibit T

NDCHealth Online Registration                                    Page 1 of 1



**You have successfully registered your NDCMedisoft.**
Please print this page now. We recommend that you save the printout for future reference.

Your activation key is **5953616B9530**

*Registration/Practice Name McLaughlin Chiropractic Center

*Contact First Name Franya        *Last Name Peterson, D.C.

*Street Address 2330 Merchants Drive

*City Knoxville

*State TN        *Zip 37912

Practice Specialty Chiropractor

*E-mail Address FPeterson06@comcast.net

*Phone 8654050655        Fax 8656870279
(No Punctuation)                  (No Punctuation)

VAR (reseller) Name _____        VAR# _____

Number of Users 1

*Serial Number 10100121391257

*Version 12

*Provider First Name Franya        Middle M *Last Name Peterson

*Required fields

[ Submit Another Product ]   [ Print Screen ]        Close

PLTF.
DEFT.
EXHIBIT 16
WITNESS Peterson
CONSISTING OF 1 PAGES
DATE 2-24-15
BEHMKE REPORTING AND VIDEO SERVICES, INC.

# Exhibit U

*400*
*35¢*
*4006*

Attn: Brandon

**MCKESSON**

*Empowering Healthcare*

Customer # 139530
Ticket #106464161

**mediacft™**

### Technical Support Agreement

Fax:   888-833-4763
Mail:  5222 E. Baseline Road
       Suite 101
       Gilbert, AZ 85234

This Technical Support Agreement ("Agreement") is entered into by and between NDCHealth Corporation dba McKesson Provider Technologies ("McKesson") and the customer identified below ("Customer"). This Agreement shall be effective upon the date accepted by McKesson, as evidenced by McKesson's receipt of an executed unmodified Agreement. This Agreement cannot be deferred or post dated for a later start date under any circumstances.

**Customer Information:**

PRACTICE NAME: McLaughlin Chiropractic Center CUSTOMER No.: 66464

STREET ADDRESS: 2330 Merchants CITY: Knoxville STATE: TN  ZIP: 37912

SHIPPING ADDRESS: 2330 Merchants Dr.  CITY: Knoxville STATE: TN  ZIP: 37912

PRIMARY CONTACT: Franya Peterson

PHONE: (813) 405-0655  FAX: (813) 687-0273 EMAIL: FPeterson06@comcast.net

MEDISOFT VERSION #:  12

**Contract Information:**

Please circle Agreement period chosen:

MEDISOFT    1 YEAR–$899    6 MONTH–$599    3 MONTH–$299    (1 MONTH–$129)

McKesson shall provide technical support services to Customer by answering questions and providing assistance specifically regarding the operation of Customer's registered copy of Medisoft and applicable add-on products such as Office Hours, Direct Modules, Lab Connect, Medical Connect, and Data Runner or Communications Manager. Technical support is limited to providing assistance for the current version and one previous version of all related products. Technical support provided may include, but is not limited to, troubleshooting of an issue and providing resolution when available. It does not include network configuration, operating systems issues or, computer hardware problems. Technical support personnel may recommend Customer contact an independent specialist in computers or networking outside McKesson *if* the issue warrants. If it is determined that data corruption is causing the problem, a technical support personnel may suggest that file repair be done at an additional charge beyond the normal pricing listed above. Data conversion also is available for an additional charge.

Training for the Medisoft application *is not* covered under this Agreement, but is available from independent vendors outside McKesson. McKesson does offer Interactive Training CD's which are available for a fee of $499. To have this product charged to the credit card below, please check this box

☐ APPROVED;

and McKesson will ship to the address above.

Customer understands that McKesson's sole obligation under this Agreement is to provide the technical support services described above. McKesson shall use commercially reasonable efforts to correct the problem Customer may be experiencing, but does not guarantee that any support provided under this Agreement will be sufficient to do so. McKesson cannot guarantee that any call will be answered or that any

v060107

PLTF.
EXHIBIT _____18_____   DEFT.
WITNESS _Peterson_
CONSISTING OF ___4___   PAGES
DATE _2-24-15_
BEHMKE REPORTING AND VIDEO SERVICES, INC.

Franya Peterson, D.C. 0002

# MCKESSON

*Empowering Healthcare*



problem resolution will be completed in a set amount of time. Customer understands that McKesson will keep Customer's data, to which it has access during problem resolution, secure and confidential in accordance with McKesson's obligations under the Health Insurance Portability & Accountability Act. By signing this Agreement, the parties agree to comply with the terms and conditions of the Business Associate Amendment attached hereto. McKesson's technical support staff will provide services consistent with the standard of care generally accepted within the industry for such services. ·IN NO. EVENT SHALL MCKESSON BE RESPONSIBLE FOR DAMAGES OF ANY NATURE, EXCLUDING THOSE CAUSED BY MCKESSON'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT, ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, ANY DIRECT, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES.

It is understood that this Agreement is non-refundable and non-transferable, and any disputes relating to the services provided herein must be sent in writing to McKesson within 30 days from the date of the alleged breach by McKesson. McKesson will have 30 days from receipt of any dispute letter to investigate and reply to Customer with its findings. All such findings and/or conclusions will be considered final.

McKesson shall have the right to immediately terminate this Agreement if Customer breaches any of the terms or conditions of this Agreement, including but not limited to non-payment of any fees owed to McKesson by Customer under this Agreement, or any other agreement between the parties. Customer must remain in good ·standing at all times, with all outstanding invoices paid in full in a timely fashion. Upon termination, Customer shall not be entitled to any refund for the remaining period of the Agreement.

By signing below Customer acknowledges and agrees ·to these conditions and authorizes McKesson to charge Customer's credit card for the services described above, including the purchase of Interactive Training CD's if Customer has checked the "Approved" box above.

SIGNATURE: *Aranya Peterson, D.C.*  DATE: 7/11/07

| | | | |
|---|---|---|---|
| CREDIT CARD NUMBER: | REDACTED | EXPIRATION DATE: (MM/YYYY) | REDACTED |
| TYPE: ☑ VISA ☐ MASTERCARD ☐ AMEX | | | |

CARDHOLDER SIGNATURE:

*Aranya Peterson*

CARDHOLDER NAME: (PRINTED)
(AS IT APPEARS ON CARD)

Franya M. Peterson

---

To be filled out by McKesson
Date received: _____
Time received: _____
Customer Number: _____

Received by: _____
Information Verified: ☐

Franya Peterson, D.C. 0003

# MᶜKESSON

*Empowering Healthcare*



## BUSINESS ASSOCIATE AMENDMENT

If Customer is a Covered Entity subject to the Health Insurance Portability and Accountability Act of 1996, as amended (the "Act"), including the federal privacy regulations (the "Privacy Rule") and the security regulations (the "Security Rule") promulgated pursuant to the Act and codified at 45 C.F.R. parts 160 and 164, (collectively, "HIPAA"), then the Parties agree as follows:

1.    **Definitions.** Unless otherwise defined in the Agreement or this Amendment, capitalized terms shall have the meanings set forth in HIPAA.

2.    **Disclosure or Use of Protected Health Information ("PHI").** McKesson shall use and/or disclose PHI received from Customer or its authorized submitters only as permitted or required by this Amendment or as Required by Law. McKesson shall be entitled to disclose and use PHI received from Customer or its authorized submitters (i) for the purpose of providing the Services or as otherwise directed or requested by Customer, (ii) for the proper management and administration of McKesson's business, (iii) to carry out McKesson's legal responsibilities, or (iv) as otherwise permitted or Required By Law. Without limiting the generality of the foregoing, McKesson reserves the right at its sole discretion to disclose an Individuals PHI in response to and in accordance with a valid authorization executed by the Individual that meets the requirements set forth in the Privacy Rule. Customer authorizes McKesson to de-identify PHI created or received by McKesson on behalf of Customer, provided that the de-identification conforms to the requirements of the Privacy Rule. The resulting de-identified information may be used and disclosed by McKesson to the extent permitted under applicable law, for consideration or otherwise.

3.    **Safeguards Against Misuse of PHI.** McKesson agrees that it will implement appropriate safeguards to prevent the use or disclosure of PHI received from Customer or its authorized submitters other than pursuant to the terms and conditions of this Amendment.

4.    **Safeguards Related to Integrity of Electronic PHI.** McKesson agrees to implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic PHI that it creates, receives, maintains, or transmits on behalf of Customer.

5.    **Security of Electronic PHI.** McKesson shall report to Customer any Security Incident with respect to Electronic PHI of which it becomes aware and which has compromised the protections set forth in the Security Rule. This reporting obligation does not include trivial occurrences, such as scans, "pings" or unsuccessful attempts to penetrate computer networks or servers containing PHI maintained by McKesson; provided that, upon Customer's written request, McKesson will provide an aggregate report of the number of such trivial occurrences.

6.    **Reporting of Disclosures of PHI.** McKesson shall report to Customer any use or disclosure of PHI in violation of this Amendment as soon as reasonably possible after becoming aware of the disclosure.

7.    **Agents and Subcontractors.** McKesson shall enter into an agreement with any of its subcontractors or agents that will have access to any PHI that is subject to this Amendment, pursuant to which the agent or subcontractor agrees to be bound by the same restrictions, terms, and conditions on the use of PHI that apply to McKesson pursuant to this Amendment. In addition, McKesson shall enter into an agreement with any of its subcontractors or agents to whom it provides Electronic PHI, pursuant to which the agent or subcontractor agrees to implement reasonable and appropriate safeguards to protect the Electronic PHI.

v060107

Franya Peterson, D.C. 0004

# MCKESSON
*Empowering Healthcare*



8.    **Availability of Books and Records.** McKesson hereby agrees to make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by McKesson on behalf of, the Customer reasonably available to the Secretary of the United States Department of Health and Human Services for purposes of determining Customer's compliance with the Privacy Rule and/or the Security Rule.

9.    **Liability.** McKesson shall indemnify Customer for any costs or expenses incurred in connection with claims asserted against Customer that arise as a result of McKesson's gross negligence or willful misconduct in handling Customer's PHI.

10.    **Assisting with Patients' Rights.** McKesson agrees to make available to Customer information necessary for Customer to make an accounting of disclosures of PHI about an individual in accordance with 45 C.F.R. 164.528, as amended. In addition, to the extent McKesson possesses PHI that constitutes a Designated Record Set, McKesson agrees, at Customers sole cost and expense, (i) to make available PHI necessary for Customer to respond to individuals requests for access to their PHI in accordance with 45 C.F.R. 164.524, and (2) make available PHI for amendment and to incorporate any amendments or corrections to the PHI in accordance with 45 C.F.R. 164.526. Notwithstanding the preceding sentence, the Parties agree that McKesson does not, and shall have no obligation to, maintain any Designated Record Sets on Customer's behalf. In the event any individual requests access to PHI in Customer's Designated Record Sets directly from McKesson, McKesson shall, within thirty (30) business days, forward such request to the Customer. Any response to such requests, denials of access to or amendment of Customer's PHI shall be the responsibility of Customer. Notwithstanding the above, nothing in this Section 10 is intended to prevent McKesson from releasing PHI in response to an individual's valid authorization.

11.    **Customer Obligations.** Customer agrees to obtain any consent or authorization that may be required by the Privacy Rule or any other applicable law and/or regulation prior to furnishing McKesson with PHI. Customer also agrees to inform McKesson of any PHI that is subject to any arrangements permitted or required of Customer under the Privacy Rule that may materially impact in any manner the use and/or disclosure of PHI by McKesson under this Amendment, including, but not limited to, restrictions on the use and/or disclosure of PHI as provided for in 45 C.F.R. 164.522 and agreed to by Customer. Customer shall not request McKesson to make any use or disclosure of PHI that would not be permitted under the Privacy Rule if made by Customer directly.

12. **No Third Party Beneficiaries.** Nothing expressed or implied in this Amendment or the Agreement is intended to confer, nor shall it confer, upon any person any rights, remedies, obligations or liabilities other than those explicitly detailed in this Amendment or the underlying Agreement.

13. **Termination.** Failure of McKesson to comply with any of the provisions contained in this Amendment shall be deemed a breach under the Agreement, and Customer shall be entitled to exercise all available rights, including termination, as provided in the Agreement. Upon termination or expiration of the Agreement, McKesson shall return, destroy or de-identify all PHI received from, or created or received by McKesson on behalf of, Customer, that remains in McKesson's possession or control and retain no copies of that PHI, or if the return or destruction is not feasible in McKesson's determination, extend the protections of this Amendment to the retained PHI and limit further uses and disclosures to those purposes that make the return or destruction infeasible.

14. **Effective Date.** The effective date of this Amendment is the later of the effective date of the Agreement or April 14, 2003, except that such terms or conditions related to Electronic PHI only shall be effective the later of the applicable Security Rule compliance date for the Customer or the effective date of the Agreement.

v060107

Exhibit V



**Support Agreement Confirmation**

Date: **07/13/07**
To: **MCLAUGHLIN CHIROPRACTIC CENTER**
Attn: **DR. PETERSON**
RE:  Confirmation of Technical Support Contract request

Dear Valued Customer,

We have received your request and credit card authorization to sign up for a **1 MONTH** Technical Support Agreement.   The total amount billed to your credit card was **$129.00**. This Agreement is effective as of the date noted on this letter and will expire **08/13/07.**

This letter is your confirmation that your contract has been processed successfully and is now active.  **Please keep this letter for your records.**

Your confirmation number for your payment is **154099** and your customer number is **139530.**  Your technical support Ticket Number is **10668461.**

**Please reference this customer number and/or the Call ID when you contact the Technical Support Department for assistance.  Providing these numbers will expedite the process of accessing your records. Please keep your customer number available to provide to technical support for any future assistance you may need.**

To reach our Technical Support department please call, 800-334-4006 and follow the appropriate prompts for your specific software.

We thank you for your business and look forward to assisting your technical support needs.

Welcome to the Per-Se family!

**Customer Support**
800-334-4006

EXHIBIT _____20_____        PLTF.
                                                      DEFT.
WITNESS _Peterson_____
CONSISTING OF __48_____ PAGES
DATE _2-24-15_____
BEHMKE REPORTING AND VIDEO SERVICES, INC.

Franya Peterson, D.C. 0001

Medisoft – Lytec – Concept
5222 E Baseline Rd Ste 101
Gilbert, AZ 85234

March 22, 2007

Customer Name: Franya M. Peterson, D.C.

Phone (865) 405-0055 Fax: (865) 687-0279    Email: FPeterson Dla@Comcast.net

Thank you for spending time with me today. I appreciate your questions and feel confident the solutions we offer will meet your current and future needs. The information below is for review and ensure you understand and meet our requirements.

- **System requirements:** Our Products function properly with the following operating system platforms: **Windows Server 2003 Standard Edition; Windows Server 2003 Enterprise Edition; Windows XP Professional; Windows 2000 Professional; Windows 2000 Server**
- **Workstation System Requirements (Minimum):** Pentium 4 2.8Ghz processor or higher, 1GB of available hard disk space, 512MB of RAM, Windows 2000 Professional or Windows XP Professional.
- **Server System Requirements (Minimum):** Pentium 4 2.8Ghz processor or higher, 2GB of available hard disk space, 1GB of RAM, Windows 2000 Server or Windows 2003 Server.
- Wireless Networks are not recommended, due to timing issues with new computers. Fast Ethernet (also known as 100mbps or 100baseTX) is highly recommended for use in this capacity. Wireless networks generally do not have the speed capacity necessary to run our Network Practice Management Platforms.


- **Software Return Policy:** ALL SALES ARE FINAL. Our company does not accept returns of software, and all sales are final. If your product is damaged, we will replace that product within 30-days of purchase at no charge.
- **Software Training/Implementation:** I understand that any training and implementation of this software is fee-based and NOT part of the software purchase. Pricing is available upon request. Purchase of a Training and Implementation package is required in order to have training questions answered. (Please call me for directly for pricing.)
- **Telephone Support** is an added cost and no free support is included with software purchases. If you elected not to purchase a "**Technical Support Agreement**" (TSA) at the time of your software purchase and require technical assistance, you will need to have a (TSA) in place before our Support Department can assist you. You can download a (TSA) from our websites, www.medisoft.com or www.lytec.com, or you can also contact us at 800-333-4747 and request a (TSA) to be faxed. These websites have a valuable online support tool that provide an extensive support articles from our Technical Knowledge Base.
- **Data Conversion:** I understand that Medisoft Version 7 (and prior), and Lytec 2001 (and prior) have been tested, and that data conversions can be effected by environmental factors within an office and that can cause data corruption. These factors can also affect the conversion process. I also understand that if I experience problems with this conversion, I will need to purchase a support agreement before our Support Department can address my issue. There is a conversion and or data repair service fee in addition to a support agreement.
- **Software purchase:** I understand that I have purchased the practice management software for my office directly from the manufacture rather than a local reseller.

I acknowledge that I have reviewed these statements and understand the content of this page.

Please sign and fax back to 480-924-3501: Franya M Peterson, D.C.

Thank you again for your business! I am excited that I have chosen our software for your billing needs. I will remain in contact as we move forward. Contact me directly at 800-333-4747 ext 2501 with any questions.

Best regards,
Cari Cagey
Inside Sale Rep

Franya Peterson, D.C. 0014

Exhibit W

1   TIFFANY CHEUNG (CA SBN 211497)
    TCheung@mofo.com
2   ANGELA E. KLEINE (CA SBN 255643)
    AKleine@mofo.com
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California 94105-2482
    Telephone: 415.268.7000
5   Facsimile: 415.268.7522

6   Attorneys for Defendants
    MCKESSON TECHNOLOGIES, INC., AND MCKESSON
7   CORPORATION

8

9                     UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12

13  TRUE HEALTH CHIROPRACTIC INC, and        Case No.  4:13-cv-02219-HSG (DMR)
    MCLAUGHLIN CHIROPRACTIC
14  ASSOCIATES, INC., individually and as the  **DECLARATION OF SCOTT TONEY**
    representatives of a class of similarly-situated  **IN SUPPORT OF OPPOSITION TO**
15  persons,                                  **RENEWED MOTION FOR CLASS**
                                              **CERTIFICATION**
16              Plaintiffs,
                                              The Hon. Judge Haywood S. Gilliam, Jr.
17       v.

18  MCKESSON CORPORATION,
    MCKESSON TECHNOLOGIES, INC., and
19  DOES 1-10,

20              Defendants.

21

22

23

24

25

26

27

28

1    I, Scott Toney, declare as follows:

2        1.    From 2009 to 2016, I was employed as a software developer for Physician Practice

3    Solutions ("PPS"), a business unit of McKesson Technologies Inc. ("MTI").  I submit this

4    declaration based upon matters within my own personal knowledge, or based on my review of

5    company records and conversations with other employees.  If called as a witness, I could and

6    would competently testify to the matters set forth herein.

7        2.    In or about 2010, I was responsible for "RegHost," the database that stored the

8    information provided by PPS customers when they registered their products, including

9    registration for Medisoft and Lytec.  In connection with registering their products, customers

10   could choose to provide their fax numbers at their option.  Fax numbers were never required as

11   part of the product registration process and was completely voluntary.

12       3.    The RegHost database is separate from the Salesforce database, a database that

13   was used by PPS account representatives to manage their relationships with customers.  Any fax

14   number that appeared in the Salesforce database was manually entered.  The RegHost database

15   did not automatically populate into the Salesforce database.

16

17       I declare under penalty of perjury under the laws of the United States of America that the

18   foregoing is true and correct.  Executed this 7th day of January, 2019 in Alpharetta, Georgia.

19                                    _Scott Toney_____
                                      Scott Toney
20

21

22

23

24

25

26

27

28

Exhibit X



## Lytec® MD Price List*

Effective June 1, 2009

Updated May 20, 2009

*all prices subject to change; see separate document for Lytec MD pricing rules

Confidential

## Lytec MD Licenses

| | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|

### Lytec MD Pricing

**New Lytec MD**

| | | | | |
|---|---|---|---|---|
| CNR | LYTMDNEW | Lytec MD - Per Provider (Includes 5 users per provider)** | | |
| CR | LYMNTADD5 | Lytec PM CS 5-User Add-on pack** | | |

**Lytec MD Crossgrade from Any Lytec 2009 Version**

| | | | | |
|---|---|---|---|---|
| CNR | LYTMDCGCV | Lytec MD - Per Provider (Includes 5 users per provider)** | | |
| CR | LYMNTADD5 | Lytec PM CS 5 User Add-on pack** | | |

**Lytec MD Crossgrade from Any Lytec 2008 Version**

| | | | | |
|---|---|---|---|---|
| CNR | LYTMDCG1VO | Lytec MD - Per Provider (Includes 5 users per provider)** | | |
| CR | LYMNTADD51VO | Lytec PM CS 5 User Add-on pack** | | |

**Lytec MD Crossgrade from Any Lytec 2007 Version**

| | | | | |
|---|---|---|---|---|
| CNR | LYTMDCG2VO | Lytec MD - Per Provider (Includes 5 users per provider)** | | |
| CR | LYMNTADD52VO | Lytec PM CS 5 User Add-on pack** | | |

**Software Assurance required with all Lytec MD purchases

## Lytec MD Add-on Licenses

| | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|

### Add-On Practice Management Products

Compatable with

**Advanced Reporting**

| | | | | |
|---|---|---|---|---|
| CR | LYMAR | Advanced Reporting** | | Lytec 2009 |
| CR | LYMARUPG | Advanced Reporting Upgrade** | | Lytec 2009 |

**Software Assurance required with all Lytec MD purchases

**Lytec Code Import 2009**

| | | | | |
|---|---|---|---|---|
| CR | LYCPTALLH | Lytec CPT All Codes (CPT-4 ICD-9 HCPCS) | | Lytec 2009 |

### Add-On EMR Products

**Lab Interfaces**

| | | | | |
|---|---|---|---|---|
| CR | LMDLABQUE | Quest Lab Interface (Inbound)** | | |
| CR | LMDLABCOR | Lab Corp Interface (Inbound)** | | |

**Software Assurance required with all Lytec MD purchases

**Voice Recognition Software**

| | | | | |
|---|---|---|---|---|
| CR | LMDDNS | Dragon Naturally Speaking v9.5 (Price per user)** | | |

**Software Assurance required with all Lytec MD purchases

**Specialty Templates**

| | | | | |
|---|---|---|---|---|
| CR | LMDSTUROL | Urology (Price per provider)** | | |
| CR | LMDSTORTH | Orthopedics (Price per provider)** | | |
| CR | LMDSTGYN | Gynecology (Price per provider)** | | |

**Software Assurance required with all Lytec MD purchases

**Device Interfaces**

| | | | | |
|---|---|---|---|---|
| CR | LMDDIMS | Midmark Spirometry (Price per user)** | | |
| CR | LMDDIEKG | Midmark EKG Interface (Price per user)** | | |

**Software Assurance required with all Lytec MD purchases

**ZOOM Document Scanning: 1 per provider included in Bundle**

| | | | | |
|---|---|---|---|---|
| CR | LMDZOOM | Additional Zoom Licenses** | | |

**Software Assurance required with all Lytec MD purchases

**Advanced Faxing**

| | | | | |
|---|---|---|---|---|
| CR | LMDZETAF | ZetaFax (1-5 Users)*** | | |

***Software Assurance Purchased through ZetaFax

Lytec MD Price List
Effective 6/1/2009
Updated 5/20/2009

Confidential

RS-TRUEHEALTH 004616

# Exhibit Y



# Medisoft® Clinical  Price List*

Effective June 1, 2009

Updated May 20, 2009

*all prices subject to change; see separate document for Medisoft Clinical pricing rules

Confidential

## Medisoft Clinical Add-on Licenses

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|

### Add-On Practice Management Products

**Medisoft Reports Professional for Medisoft v15**

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|
| NR | MSRPTSPRO | Medisoft Reports Professional for Medisoft Clinical** | | Compatible with v15 |
| NR | MSRPTSPRO2VO | Medisoft Reports Professional for Medisoft Clinical - 1VO Upgrade** | | Compatible with v15 |
| NR | MSRPTSPRO1VO | Medisoft Reports Professional for Medisoft Clinical - 2VO Upgrade** | | Compatible with v15 |

**Software Assurance required with all Clinical purchases

**Encoder Pro 2009**

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|
| R | MEDENCODE | Encoder Pro** | | Compatible with v15 |
| R | MEDENCODEUPG | Encoder Pro Upgrade** | | Compatible with v15 |

**Software Assurance required with all Clinical purchases

**Medisoft Codes on Disk - 2009**

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|
| R | CDALLW | Medisoft CPT All Codes (CPT-4 ICD-9 HCPCS) | | Compatible with v15 |

### Add-On EMR Products

**Lab Interfaces**

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|
| C | MSCLABQUE | Quest Lab Interface (Inbound)** | | |
| C | MSCLABCOR | Lab Corp Interface (Inbound)** | | |
| C | MSCLABDAQ | LABDaq Interface ** | | |

**Software Assurance required with all Clinical purchases

**Voice Recognition Software**

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|
| R | MSCDNS | Dragon Naturally Speaking v9.5 (Price per user)** | | |

**Software Assurance required with all Clinical purchases

**Specialty Templates**

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|
| R | MSCSTUROL | Urology (Price per provider)** | | |
| R | MSCSTORTH | Orthopedics (Price per provider)** | | |
| R | MSCSTGYN | Gynecology (Price per provider)** | | |

**Software Assurance required with all Clinical purchases

**Device Interfaces**

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|
| C | MSCDIMS | Midmark Spirometry (Price per user)** | | |
| C | MSCDIEKG | Midmark EKG Interface (Price per user)** | | |

**Software Assurance required with all Clinical purchases

**ZOOM Document Scanning: 1 per provider included in Bundle**

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|
| C | MSCZOOM | Additional Zoom Licenses** | | |

**Software Assurance required with all Clinical purchases

**Advanced Faxing**

| Royalty Status | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|
| R | MSCZETAF | ZetaFax (1-5 Users)** | | |

-software Assurance Purchased through ZetaFax

Medisoft Clinical Price List
Effective 6/1/2009
Updated 5/20/2009

Confidential

RS-TRUEHEAL TH 004621

# Exhibit Z



# Lytec® MD Price List*

Effective December 11, 2009

Updated December 18, 2009

*all prices subject to change; see separate document for Lytec MD pricing rules

Confidential

## Lytec MD Licenses

| | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|

### Lytec MD Pricing

**New Lytec MD**

| | | | | |
|---|---|---|---|---|
| CNR | LYTMDNEW | Lytec MD - First 5 Users | | |
| CNR | LYTMDSUBNEW | Lytec MD - Additional 5 User Packs | | |

**Lytec MD Crossgrade from Any Lytec 2010 Version or from current PM Assurance**

| | | | | |
|---|---|---|---|---|
| CNR | LYTMDCGCV | Lytec MD - Per 5 user pack** | | |
| CNR | LYTMDSUBCGCV | Lytec MD - Additional 5 User Packs | | |

**Lytec MD Crossgrade from Any Lytec 2009 Version**

| | | | | |
|---|---|---|---|---|
| CNR | LYTMDCG1VO | Lytec MD - Per 5 user pack** | | |
| CNR | LYTMDSUBCG1VO | Lytec MD - Additional 5 User Packs | | |

**Lytec MD Crossgrade from Any Lytec 2008 Version**

| | | | | |
|---|---|---|---|---|
| CNR | LYTMDCG2VO | Lytec MD - Per 5 user pack** | | |
| CNR | LYTMDSUBCG2VO | Lytec MD - Additional 5 User Packs | | |

**Software Assurance required with all Lytec MD purchases

## Lytec MD Add-on Licenses

| | Item Code | Product Description | MSRP | Notes |
|---|---|---|---|---|

### Add-On Practice Management Products

| | | | | Compatable with |
|---|---|---|---|---|

**Advanced Reporting**

| | | | | |
|---|---|---|---|---|
| CR | LYMAR | Advanced Reporting** | | Lytec 2010 |
| CR | LYMARUPG | Advanced Reporting Upgrade** | | Lytec 2010 |

**Software Assurance required with all Lytec MD purchases

**Lytec Code Import 2010**

| | | | | |
|---|---|---|---|---|
| CR | LYCPTALLH | Lytec CPT All Codes (CPT-4 ICD-9 HCPCS) | | Lytec 2010 |

### Add-On EMR Products

**Lab Interfaces**

| | | | | |
|---|---|---|---|---|
| CNR | LMDLABQUE | Quest Lab Interface (Inbound)** | | |
| CNR | LMDLABCOR | Lab Corp Interface (Inbound)** | | |

**Software Assurance required with all Lytec MD purchases

**Voice Recognition Software**

| | | | | |
|---|---|---|---|---|
| CR | LMDDNS | Dragon Naturally Speaking v9.5 (Price per user)** | | |

**Software Assurance required with all Lytec MD purchases

**Specialty Templates**

| | | | | |
|---|---|---|---|---|
| CR | LMDSTCARDI | Cardiology (Price per provider) | | |
| CR | LMDSTUROL | Urology (Price per provider) | | |
| CR | LMDSTORTH | Orthopedics (Price per provider) | | |
| CR | LMDSTGYN | Gynecology (Price per provider) | | |
| CR | LMDSTNEURO | Neurosurgery (Price per provider) | | |
| CR | LMDSTGASTR | Gastroenterology (Price per provider) | | |
| CR | LMDSTDERM | Dermatology (Price per provider) | | |
| CR | LMDSTENDO | Endocrinology (Price per provider) | | |

**Device Interfaces**

| | | | | |
|---|---|---|---|---|
| CR | LMDDIMS | Midmark Spirometry (Price per user)** | | |
| CR | LMDDIEKG | Midmark EKG Interface (Price per user)** | | |

**Software Assurance required with all Lytec MD purchases

**ZOOM Document Scanning: 1 per provider included in Bundle**

| | | | | |
|---|---|---|---|---|
| CR | LMDZOOM | Additional Zoom Licenses** | | |

**Software Assurance required with all Lytec MD purchases

**Advanced Faxing**

| | | | | |
|---|---|---|---|---|
| CR | LMDZETAF | ZetaFax (1-5 Users)*** | | |

***Software Assurance Purchased through ZetaFax

Confidential

RS-TRUEHEALTH 004672

Exhibit AA



# Medisoft Clinical Price List*

Effective November 26, 2010

Created October 15, 2010

*all prices subject to change; see separate document for Medisoft Clinical pricing rules

Confidential

RS-TRUEHEALTH 004681

| Royalty Status | Item Code | Product Description | | MSRP |
|---|---|---|---|---|

## Ctree Expansion Licenses

| | | Ctree Expansion Licenses | |
|---|---|---|---|
| CR | CT16TO32DB | CTREE 16 to 32 CONNECTION EXPANSION | |
| CR | CT16TO64DB | CTREE 16 to 64 CONNECTION EXPANSION | |
| CR | CT32TO64DB | CTREE 32 to 64 CONNECTION EXPANSION | |
| CR | CT32TO128DB | CTREE 32 to 128 CONNECTION EXPANSION | |
| CR | CT64TO128DB | CTREE 64 to 128 CONNECTION EXPANSION | |

## Add-On Practice Management Products

| | | Medisoft Reports Professional for Medisoft v16 | | |
|---|---|---|---|---|
| CNR | MSRPTSPRO | Medisoft Reports Professional for Medisoft Clinical** | | Compatible with v16 |
| CNR | MSRPTSPRO2VO | Medisoft Reports Professional for Medisoft Clinical - 1VO Upgrade** | | Compatible with v16 |
| CNR | MSRPTSPRO1VO | Medisoft Reports Professional for Medisoft Clinical - 2VO Upgrade** | | Compatible with v16 |

**Software Assurance required with all Clinical purchases

| | | Encoder Pro | | |
|---|---|---|---|---|
| CR | MEDENCODE | Encoder Pro** | | Compatible with v16 |
| CR | MEDENCODEUPG | Encoder Pro Upgrade** | | Compatible with v16 |

**Software Assurance required with all Clinical purchases

| | | Medisoft Codes on Disk | | |
|---|---|---|---|---|
| CR | CDALLW | Medisoft CPT All Codes (CPT-4 ICD-9 HCPCS) | | Compatible with v16 |

**Software Assurance required with all Clinical purchases

## Add-On EMR Products

| | | Voice Recognition Software | |
|---|---|---|---|
| CR | MSCDNS | Dragon Naturally Speaking v9.5 (Price per user)** | |

**Software Assurance required with all Clinical purchases

| | | Specialty Templates | |
|---|---|---|---|
| CR | MSCSTCARDI | Cardiology (Price per provider) | |
| CR | MSCSTUROL | Urology (Price per provider) | |
| CR | MSCSTORTH | Orthopedics (Price per provider) | |
| CR | MSCSTGYN | Gynecology (Price per provider) | |
| CR | MSCSTNEURO | Neurosurgery (Price per provider) | |
| CR | MSCSTGASTR | Gastroenterology (Price per provider) | |
| CR | MSCSTDERM | Dermatology (Price per provider) | |
| CR | MSCSTENDO | Endocrinology (Price per provider) | |
| CR | MSCSTCHIRO | Chiropractic (Price per provider) | |
| CR | MSCSTPODI | Podiatry (Price per provider) | |

**These templates are not E & M coded.

| | | Device Interfaces | |
|---|---|---|---|
| CR | MSCDIMS | Midmark Spirometry (Price per user)** | |
| CR | MSCDIEKG | Midmark EKG Interface (Price per user)** | |
| CR | MSCDIWAEKG | Welch Allyn EKG Interface (Price per user)** | |

**Software Assurance required with all Clinical purchases

| | | ZOOM Document Scanning: 1 per provider included in Bundle | |
|---|---|---|---|
| CR | MSCZOOM | Additional Zoom Licenses** | |

**Software Assurance required with all Clinical purchases

| | | Advanced Faxing | |
|---|---|---|---|
| CR | MSCZETAF | ZetaFax (1-5 Users)*** | |

***Software Assurance Purchased through ZetaFax

Medisoft Clinical Price List
Effective 11/26/10
Created 10/15/10

Confidential

RS-TRUEHEALTH 004684

# Exhibit BB



**M<sup>c</sup>KESSON**
Empowering Healthcare

# PRACTICE PARTNER®

## Product Bulletin

## Product Bulletin: Fax Server Integration

Practice Partner offers two integrated faxing options: Zetafax and Windows 2003 Server. This bulletin will discuss the advantages of each option to help you determine which integrated faxing solution is best for you.

Zetafax Integration

Zetafax Version 11 is an integrated part of Practice Partner Patient Records 9.2. and higher. Sending faxes electronically from Practice Partner is easier than ever through Zetafax's secure, fast and cost effective fax server technology. Zetafax has numerous uses for the office above and beyond what it is capable of doing within Practice Partner, so we are offering it as a full, feature-rich fax server solution. It can be used *within* Practice Partner for specific integrated functions, and also outside of Practice Partner to help more effectively manage the sending and receiving of faxes.

What are the key benefits of the Zetafax/Practice Partner integration?

▶ **Easy to use -** The Zetafax/Practice Partner integration makes it easy to fax prescriptions, progress notes, letters, and charts directly from Practice Partner—without the hassle of printing and feeding traditional fax machines.
▶ **Saves time –** Practice Partner integration allows for quick, efficient, automated, paperless faxing and is up to 80% faster than sending faxes conventionally. Zetafax also speeds up the faxing process by eliminating delays due to missing paper, jams, or machine errors.
▶ **Easy to set up -** Zetafax is simple to install, easy to manage and reliable. Complete documentation is available to optimize the Zetafax integration within Practice Partner to help you get the most out of your fax server investment.

Are all the Zetafax features enabled within Practice Partner?

No. The Practice Partner/Zetafax integration is primarily designed to make it easy for providers to fax outgoing prescriptions, progress notes, letters, and charts directly from Practice Partner. Additional features such as the ability to receive incoming faxes require utilization of the Zetafax client as described below.

What are the Zetafax features that can be utilized outside of the Practice Partner integration?

The Zetafax Server has a number of additional features that are available for use outside of the Practice Partner integration, as a standalone product to help your office more efficiently manage fax related tasks. Some of the key benefits and features of Zetafax are noted below.

Key Benefits of Zetafax as a stand-alone fax server:

▶ **Versatile –** Faxes can be generated from any commonly used applications such as Word, Excel, Power Point, and Outlook from any workstation with the Zetafax client. Additionally, users can receive incoming faxes into Zetafax—where they can be easily electronically filed or distributed via email to the appropriate party.
▶ **Improved efficiency -** A range of keyboard shortcuts and drag/drop features in Zetafax make it quick and easy to use. The intuitive fax client also includes an address book, an incoming fax alert, a fax preview pane and full-feature tool bar for easy access to fax server functions.
▶ **Better fax management -** Zetafax offers a rich range of management features including complete records of both faxes sent and received. Inbound faxes can be reviewed either within the Zetafax client or to the

RS-TRUEHEALTH 004591

Exhibit CC



# LytecMD®

## System Requirements

# Peripherals

## Printers

**LytecMD does not support USB printers.**

LytecMD highly recommends using all Hewlett Packard LaserJet networked printers (LaserJet 1300 or higher) with JetDirect connection. You must have a printer that has an available PCL5, 5e or 6 driver.

**Reports, Charts and General Use Printers**

LytecMD recommends TCP/IP (networked) HP LaserJet printers.

**Prescription Printers**

You will need at least one dedicated prescription printer, More may be required depending on the physical layout of your office. LytecMD recommends 1 prescription printer per physician. Prescription printers should be located where physicians can access them easily. We recommend HP LaserJet printers.

## Fax Servers

A fax server allows you to fax prescriptions and other documents directly from your PC. It also allows you to receive faxes electronically and print only those necessary or attach them to your electronic medical records as linked files (instead of scanning them then linking).

LytecMD recommends ZetaFax used with a Brooktrout fax board. ZetaFax and Windows Server 2003 fax server are both integrated and supported.

## Scanners

You will need scanners to incorporate paper documents into your electronic medical records. Documents can be attached to electronic medical records in two different ways; as an image file or by using optical character recognition (OCR) software. Image files are actual pictures of the original document. Both methods of scanning documents require a third-party software solution. For OCR, LytecMD recommends ScanSoft OmniPage Pro (up to version 14).

## Networks and Infrastructure

Robust networks and infrastructure are a critical component of any modern software implementation. LytecMD has developed the following requirements and recommendations to ensure a suitable environment for your LytecMD implementation.

☐ 1000 Mbps (gigabit) **fully switched** network or higher

☐ 802.11/g/n wireless networks with good signal strength in areas where wireless will be used (Windows Terminal Services or Citrix is required when using a wireless solution)

Exhibit DD

**From:**    Holloway, Kari </O=MCKESSON/OU=NORTH AMERICA/CN=RECIPIENTS/CN=EK584XF>
**Sent:**    Friday, September 11, 2009 11:22 AM
**To:**    Reihing, Todd M <Todd.Reihing@McKesson.com>
**Subject:**    Re: Practice Partner August Bookings - Comp Review

Ok please send the setails to christine welch

---

**From:** Reihing, Todd M
**To:** Holloway, Kari
**Sent:** Fri Sep 11 10:24:29 2009
**Subject:** RE: Practice Partner August Bookings - Comp Review
Kari-

I checked over the spreadsheet that you forwarded and I am missing a few items that were sold in August.

Below are the details of each:

| | |
|---|---|
| Carmen McKeever | Paper |
| Wichita Falls | Proj. Mgmt |
| Wichita Falls | RelayHealth |
| Columbus Family | ZetaFax |
| Columbus Family | Premium Support |
| Columbus Family | Annual Support |
| Dr. Cavazos | Clinical Tools |

**From:** Holloway, Kari
**Sent:** Friday, September 11, 2009 4:59 AM
**To:** Neiger, Daniel; Bollinger, Bill; George, Charles; Montoya, Lawrence R; Reihing, Todd M; Hultgren, Todd W; Delaney, Sean
**Cc:** Tuttle, Ken
**Subject:** FW: Practice Partner August Bookings - Comp Review

Good morning,
I'm not sure if Ken normally asks you to review these, but in his absence, please take a look at the attached to make sure your August deals are accurate.  Let Christine know if you have any questions.  Whose deal is Longmont Hospital- was that an add on?

---

**From:** Welch, Christine
**Sent:** Thursday, September 10, 2009 1:29 PM
**To:** Host, Angela; Freeman, Scott; Holloway, Kari; Cook, Trey; Tuttle, Ken; Bence, Steve; Mathis, Darren; DeMarchi, Carrie
**Cc:** Roytek, Jim; Lechleiter, Dino; Hayes, LaDetric; Ingham, Cara
**Subject:** Practice Partner August Bookings - Comp Review

All –

RS-TRUEHEALTH 004608

Exhibit EE

| | |
|---|---|
| **From:** | Edgar ▓, T▓▓▓, M.D. <▓▓▓▓@gmail.com> |
| **Sent:** | Wednesday, April 28, 2010 8:04 PM |
| **To:** | Holloway, Kari <kari.holloway@mckesson.com> |
| **Subject:** | Fwd: Packing Slip! |
| **Attach:** | McKessan PP_inventory.pdf |

---------- Forwarded message ----------
From: **Edgar ▓, T▓▓▓, M.D.** <▓▓▓▓@gmail.com>
Date: Wed, Apr 28, 2010 at 6:17 PM
Subject: Packing Slip!
To: Victor T▓▓▓ <▓▓▓▓@gmail.com>, Todd Riehing <triehing@practicepartner.com>, Judy.Duncan@mckesson.com, "Salamon, Ray" <Ray.Salamon@mckesson.com>

This is the inventory on the package slip I have so far. Please see attachments. I also would like to know if I will need updates for these outdated software that is dated 2008??

-3 CD's Dragon software
-2 CD's Mckessan ambulatory practice partners software
-2 CD's patient education software
-1 CD Clinical tools with formulary
-2 CD's C-tree server companion
-2 CD's Practice Partner zoom
-1 CD code wizard
-2 CD's webview
-1 CD faircom C-tree server

** Circled items I have not received** (PP CPT/ICD-9 update service, Zetafax system with integration, Express bill patient statement services).

--
Edgar ▓, T▓▓▓, M.D.
Board Certified Family Medicine
▓▓▓▓▓▓▓▓
▓▓▓▓▓▓
▓▓▓, TX ▓▓▓
P: 956-727-▓▓▓
F: 956-717-3630

--
Edgar ▓, T▓▓▓, M.D.
Board Certified Family Medicine

RS-TRUEHEALTH 004016



, TX

P: 956-727-

F: 956-717-3630

Exhibit FF

# M⊆KESSON
*Empowering Healthcare*

**Order Number:** 38595PMSI
**Process Date:** 9/30/2008
**Page:** 1 of 1

2401 4th Avenue, Suite 700, Seattle, WA 98121
206-441-8490 FAX: 206-441-8915

## Packing Slip
**NEW** Total Practice Partner**

**Ship to:** Edgar ▮▮▮▮ M.D.

TX ▮▮▮
USA

**Bill to:** Accounts Payable

TX ▮▮▮
USA

| Item | Qty | Unit | Part Number | Description |
|------|-----|------|-------------|-------------|
| **Software** | | | | |
| 1 | 1 | PRV | PP-TPP | Total Practice Partner |
| **Options** | | | | |
| 2 | 1 | Ea | MB-PPCW | CodeWizard Base Subscription (MBWin - includes 2 users) |
| 3 | 1 | PRV | MB-CPT-UPDAT | Practice Partner CPT/ICD-9 Update Service |
| 4 | 1 | Ea | PRO-EQZFN07- | 5-User Zetafax System w Integration |
| 5 | 1 | Ea | MB-EXPRESS | ExpressBill Patient Statement Services |
| 6 | 1 | Ea | PRO-DRAGON | Dragon NaturallySpeaking Speech Recognition Software |
| 7 | 1 | MD | PRO-FT | Formulary Tracking - One Year Subscription |
| 8 | 1 | PRV | PRO-WV | Web View - One Year Subscription |
| **Annual Support Fees** | | | | |
| 9 | 1 | Ea | S-PP-Y1 | First-Year Support and Maintenance for Software |
| 10 | 1 | Ea | S-PRO-DRAGO | Annual Support for Dragon Naturally Speaking |
| 11 | 1 | Ea | PRO-EQZFN07- | 5 User Premium Support Pack |
| **Interfaces and Utilities** | | | | |
| 12 | 1 | PRV | INT-ECS-OUT-R | RelayHealth Clearinghouse Enrollment Fee |
| **Training and Implementation** | | | | |
| 13 | 81 | Hrs | CON-PPE-PLUS | Practice Partner Essential Plus Imp. & Training Package |
| 14 | 1 | Ea | CON-SURE-SET | Enrollment fee, Set-up, and Training for ePrescribing |
| **Other Charges** | | | | |
| 15 | 1 | Ea | OTH-Ship | Shipping and handling charges |

RS-TRUEHEALTH 004653

Exhibit GG

| **From:** | Holloway, Kari </O=MCKESSON/OU=NORTH AMERICA/CN=RECIPIENTS/CN=EK584XF> |
| **Sent:** | Monday, September 14, 2009 11:04 AM |
| **To:** | Miles, Stefanie <Stefanie.Miles@McKesson.com> |
| **Subject:** | Re: Medisoft |

Ok will do in a bit

----- Original Message -----
From: Miles, Stefanie
To: Holloway, Kari
Sent: Mon Sep 14 11:02:53 2009
Subject: Medisoft

Hi Kari,

Is there any way you could send me a quote with the zetafax and zoom writtin in on Dr. Sheikh's MS Clinical quote? I am planning on calling him later today to follow up with the discounts made.

Thanks,
Stefanie

Confidential

# Exhibit HH

# MCKESSON
## Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | |
|---|---|
| **Quote Number:** | **67090PMSI** |
| Quote Date: | 7/27/2009 |
| Expiration Date: | 9/22/2009 |
| Agreement Number: | 67090PMSI |
| SAPID: | TBD |

# Quote

***MCK MedSurg Lead***7/24/2009

**Quote prepared by:**
Linsey Franklin

**To:**

Dr Bui                     Phone: 910-644-█████

████████ NC

USA

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| **Software** | | | | | |
| 1 | 2 | PRV | PP2-TPP - Total Practice Partner - Full-time doctor provider (71004290) | | |
| | | | This package includes: | | |
| | | | - Patient Records, Computerized Physician Order Entry, Medical Billing, Appointment Scheduler, and Document Management software<br>- First-year support and maintenance service (See support information below.) | | |
| 2 | 1 | Ea | PRO-SPIROUG - Midmark Spirometry Integration (72018805) | | |
| | | | Midmark Spirometry Integration.  Price includes 90 minutes for training and installation. | | |
| 3 | 2 | Ea | PRO-DRAGON - Dragon NaturallySpeaking Speech Recognition Software (72018756) | | |
| | | | Dragon Naturally Speaking Medical Edition voice recognition software is fully integrated in Practice Partner Patient Records 8.1.x and higher. One license is required for each voice profile.  Please note that this does not include a microphone or headset; one will need to be purchased separately. | | |
| 4 | 1 | Ea | PRO-EQZFN07-201 - 5-User Zetafax System w Integration (72018759) | | |
| | | | Includes Practice Partner integration. Support is required for the first year and is valid for one year from date of sale. | | |
| | | | Users are defined as those using the Zetafax client outside of Practice Partner (for normal faxing duties) plus one for the entire Practice Partner Patient Records application (for faxing within Practice Partner). | | |
| 5 | 1 | Ea | PRO-ECG-INT - Midmark ECG Integration (74026261) | | |
| | | | Midmark ECG integration.  Price includes 90 minutes for training and installation. | | |
| | | | **Software Subtotal** | | |
| **Recurring Fees** | | | | | |
| 6 | 2 | PRV | MB-CPT-UPDATE - CPT/ICD-9 Updates - Annual Recurring Fee (72018721) | | |
| 7 | 2 | PRV | PRO-SURE - Practice Partner ePrescribing Module - Annual Recurring Fee (73018198) | | |
| 8 | 2 | PRV | PRO-IMH - Instant Medical History - Annual Recurring Fee (73018202) | | |
| 9 | 2 | PRV | PRO-WV - Web View - Annual Recurring Fee (73018199) | | |
| 10 | 2 | PRV | PRO-CIToolPP - Clinical Tools - Annual Recurring Fee (72019181) | | |

67090PMSI                                                                                                       1 of 4

# McKESSON
### Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

**Quote Number:** **67090PMSI**
**Quote Date:** 7/27/2009
**Expiration Date:** 9/22/2009
**Agreement Number:** 67090PMSI
**SAPID:** TBD

| Item | Qty | Unit | Description | List Price | Extended Price |
|------|-----|------|-------------|------------|----------------|
| 11 | 2 | PRV | PRO-PE-PP - Patient Education - Annual Recurring Fee (72019204) | ███████ | ███████ |
| | | | | **Recurring Fees Subtotal** | ███████ |

## Implementation Services

| Item | Qty | Unit | Description | | |
|------|-----|------|-------------|---|---|
| 12 | 1 | Ea | INT-DEM-IN-OT-PR - Initial load of patient demographics - per database (72018683) | | |

A one-time transfer of patient demographics from third party practice management system and creates blank patient charts for each individual in Practice Partner Patient Records. Requires that the practice management system is capable of providing an output of ASCII comma delimited file. This version of PP Connect is intended as a single-use utility.

Please note that your 3rd party vendor may charge a fee for their involvement in the interface process.

| Item | Qty | Unit | Description |
|------|-----|------|-------------|
| 13 | 72 | Hrs | CON-PPE - Practice Partner Essential Imp. Package (74026224) |

Practice Partner Essential is our lowest cost training and implementation package. The package is a mix of off-site and on-site assistance. All installation, configuration, and project management activities are conducted remotely via telephone and web. Training and Go Live assistance is provided on-site. Follow-up assistance is provided remotely.

The Essential package includes all of the project management, installation, configuration, and training activities as outlined in the Practice Partner Essential Configuration and Training Curriculum. Additional services are available with the purchase of additional time.

On-site training and assistance is delivered in 4-5 hour blocks during normal business hours and must be used contiguously. To expedite the implementation process, this package requires the use of Data Loading Services when technically possible. Hours allocated are non-refundable and can be used within 90 days after Go Live.

\*\*Related travel expenses including airfare, hotel, rental car, and meals are billed separately.

This proposal includes the following services:

Remote Installation, Configuration, Project Management and Training: 4 hours
Remote Installation, Configuration, and Project Management: 24 hours
On Site Training and Go Live Assistance: 32 hours
Remote Follow-Up Assistance: 12 hours

| Item | Qty | Unit | Description | | |
|------|-----|------|-------------|---|---|
| 14 | 1 | Ea | CON-RH-EDI-IMP - RelayHealth EDI Processing Services Implementation (75004360) | | |
| | | | | **Implementation Services Subtotal** | ███████ |



## Maintenance

| Item | Qty | Unit | Description | | |
|------|-----|------|-------------|---|---|
| 15 | 2 | Ea | S-PP-Y1 - First-Year Support and Maintenance for Software (73018293) | | |
| 16 | 2 | Ea | S-PRO-DRAGON - Annual Support for Dragon Naturally Speaking (73018307) | | |
| 17 | 1 | Ea | S-PRO-SPIRO-INT - Annual Support: Spirometry Integration (73018334) | | |
| 18 | 1 | Ea | S-PRO-ECG-INT - Annual Support: Midmark ECG Integration (73018310) | | |



67090PMSI

Confidential

RS-TRUEHEALTH 004611

# McKESSON
## Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | Quote Number: | **67090PMSI** |
|---|---|---|
| | Quote Date: | 7/27/2009 |
| | Expiration Date: | 9/22/2009 |
| | Agreement Number: | 67090PMSI |
| | SAPID: | TBD |

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| 19 | 1 | Ea | PRO-EQZFN07-810 - 5 User Premium Support Pack (72018890) | ████████ | ████████ |
| | | | Support for the Zetafax client directly from Equisys (manufacturer of Zetafax). | | |
| | | | **Annual Support for the above quoted items:** | | ████ |

**RelayHealth**

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| 20 | - | PRV | MB-RH-EDI-Bundle - EDI Bundled Services-$90 per Provider per month (74026757) | - | - |
| | | | □- Electronic Claims (unlimited) | | |
| | | | □- Electronic Remittance (unlimited) | | |
| | | | □- Eligibility Verification (unlimited) | | |
| 21 | - | Tx | MB-RH-EDI-PC-T - RelayHealth Paper Claims-$0.55 per transaction (74026764) | - | - |
| | | | RelayHealth will process any claim submitted by Customer that cannot be processed electronically to the designated payor for the fee set forth herein, regardless of pricing option selected. | | |

67090PMSI

3 of 4

# McKESSON
## Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | | | | | |
|---|---|---|---|---|---|
| **Quote Number:** | **67090PMSI** | | | | |

**Quote Number:** **67090PMSI**
**Quote Date:** 7/27/2009
**Expiration Date:** 9/22/2009
**Agreement Number:** 67090PMSI
**SAPID:** TBD

| Item | Qty | Unit | Description | List Price | Extended Price |
|------|-----|------|-------------|-----------|----------------|

**Quote Summary**

Software:
Recurring Fees:
Service:
Maintenance:

**TotalList:**

**Quote Total:**

This quoted amount does not include state and local sales taxes, which are the responsibility of the customer.

**To Order:** To place your order, please sign the quote and fax a copy of the quote to the attention of Accounting at 206-441-8915.  If you have been asked to sign a contract, please fax a copy of the signed contract as well.  The signed originals should be sent via overnight delivery to the following address:

Practice Partner
Attn:  Accounting
2401 4th Avenue, Suite 700
Seattle, WA  98121

By signing below, Customer agrees that this order is subject to the terms and conditions of McKesson Master Agreement or Purchase & Standard License Agreement, Software Support Agreement and HIPAA Business Associate Agreement between the parties.  Any handwritten changes are null and void unless initialed and agreed to by both parties.

**Terms:** Due on order:                                                                                       100%

Bill me

☐ ACH on file (last four digits): ___ ___ ___ ___
**or**
☐ CC on file (last four digits): ___ ___ ___ ___

_____                    _____
**Customer Approval**                                                                              **Date**

67090PMSI                                                                                                              4 of 4

Confidential                                                                                              RS-TRUEHEALTH 004613

Exhibit II

# McKESSON

## Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | |
|---|---|
| **Quote Number:** | **78178PMSI** |
| **Quote Date:** | 4/28/2010 |
| **Expiration Date:** | 5/7/2010 |
| **Agreement Number:** | 78178PMSI |
| **SAPID:** | TBD |

# Quote

1 FT PR/AS JEM

**Quote prepared by:**
Julie Mann

**To:**  Ingrid D▮▮▮

Ingrid D▮▮▮ MD
▮▮▮▮▮▮FL
USA

Phone: 407-453-▮▮▮

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| **Software** | | | | | |
| 1 | 1 | PRV | PP2-PRAS - Patient Records & Appt. Scheduler - Full-time doctor provide (71004296) | | |
| | | | This package includes: | | |
| | | | - Patient Records, Appointment Scheduler, Computerized Physician Order Entry, and Document Management software | | |
| 2 | 1 | PRV | PRO-TEMPLATE-GYN - Gynecology Specialty Content  (72018786) | | |
| 3 | 1 | Ea | PRO-EQZFN07-201 - 5-User Zetafax System w Integration (72018759) | | |
| | | | Includes Practice Partner integration. Support is required for the first year and is valid for one year from date of sale. | | |
| | | | Users are defined as those using the Zetafax client outside of Practice Partner (for normal faxing duties) plus one for the entire Practice Partner Patient Records application (for faxing within Practice Partner). | | |
| 4 | 1 | Ea | PRO-DRAGON - Dragon NaturallySpeaking Speech Recognition Software (72018756) | | |
| | | | Dragon Naturally Speaking Medical Edition voice recognition software is fully integrated in Practice Partner Patient Records 8.1.x and higher. One license is required for each voice profile.  Please note that this does not include a microphone or headset; one will need to be purchased separately. | | |
| | | | **Software Subtotal** | | |
| **Recurring Fees** | | | | | |
| 5 | 1 | PRV | MB-CPT-UPDATE - CPT/ICD-9 Updates - Annual Recurring Fee (72018721) | | |
| 6 | 1 | PRV | PRO-PPCW - CodeWizard Base (Includes 1 Provider) - Annual Recurring Fee (73018200) | | |
| 7 | 1 | PRV | PRO-CIToolPP - Clinical Tools - Annual Recurring Fee (72019181) | | |
| 8 | 1 | PRV | PRO-SURE - Practice Partner ePrescribing Module - Annual Recurring Fee (73018198) | | |
| 9 | 1 | PRV | PRO-FT - Formulary Tracking - Annual Recurring Fee (73018194) | | |
| 10 | 1 | PRV | PRO-WV - Web View - Annual Recurring Fee (73018199) | | |

78178PMSI

1 of 5

RS-TRUEHEALTH 004643

# MCKESSON
## Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | | | | Quote Number: | **78178PMSI** |
|---|---|---|---|---|---|
| | | | | Quote Date: | 4/28/2010 |
| | | | | Expiration Date: | 5/7/2010 |
| | | | | Agreement Number: | 78178PMSI |
| | | | | SAPID: | TBD |

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| 11 | 1 | PRV | PRO-IMH - Instant Medical History - Annual Recurring Fee (73018202) | ███████ | ███████ |
| 12 | 1 | PRV | PRO-PE-PP - Patient Education - Annual Recurring Fee (72019204) | | |
| | | | **Recurring Fees Subtotal** | | ███████ |

**Implementation Services**

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| 13 | 1 | Ea | CON-IMP-PKG - Practice Partner Implementation Package (74028082) | | ███████ |

The Practice Partner Implementation Package is customized for the number of providers, locations and specialties within the customer's organization.

The Practice Partner Service Path for this quote assumes the following scope:

Implementation Services from McKesson
☐1.☐Pre-Implementation services to ensure implementation readiness
☐2.☐Load of all software on the customer's hardware
☐3.☐Remote training and support on how to configure the system
☐4.☐On site end user training and go live support conducted by your
☐5.☐Remote follow assistance for  30 days after Go Live
☐6.☐Transition to McKesson's Technical Support

Customer Implementation Responsibilities
☐1.☐Procure appropriate hardware based on McKesson's recommendations
☐2.☐Configure the Practice Partner system to meet the customer's requirements
☐3.☐Starting with McKesson's pre-defined templates, customize progress note content to meet practice or provider specific requirements
☐4.☐Make appropriate resources available for configuration, end user training and Go Live

Not included in the Scope of Service; additional fees apply:

*☐Documentation of Customer specific policy and procedures
*☐Development of Customer-specific end-user training materials
*☐Services related to any equipment not meeting McKesson's specifications.
*☐Specialty specific content including specialty specific note templates
*☐Back-loading of patient past medical history
*☐Services to install updated versions of the Practice Partner application ("Upgrade Services") after Go Live
*☐Post  Go Live on site follow up visits

The hours listed on this quote are based on the PR/AS package, 1 total providers of which 1 are specialist.  The providers are practicing at 1 locations.  Implementation hours are divided into the following categories:

Pre-Implementation (Remote) : 2
Software Installation (Remote): 2
Configuration Training (Remote): 30
Configuration Support (Remote): 8
End User Training (On Site): 18
Go Live Support (On Site): 12
Follow Up (Remote): 12

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| 14 | 1 | Ea | CON-WV - Web View Implementation (74026209) | ███████ | ███████ |
| | | | Up to three hours of remote training and  implementation for the Web View patient portal. | | |
| 15 | 1 | Ea | CON-RH-EDI-IMP - RelayHealth EDI Processing Services Implementation (75004360) | | |
| | | | **Implementation Services Subtotal** | | ███████ |

78178PMSI

Confidential

RS-TRUEHEALTH 004644

# McKESSON
## Empowering Healthcare

| | |
|---|---|
| **Quote Number:** | **78178PMSI** |
| **Quote Date:** | 4/28/2010 |
| **Expiration Date:** | 5/7/2010 |
| **Agreement Number:** | 78178PMSI |
| **SAPID:** | TBD |

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| **Maintenance** | | | | | |
| 16 | 1 | PRV | S-PP2-PRAS - Annual Support: PR & AS - Full-time doctor provider (73018287) | | |
| 17 | 1 | Ea | S-PRO-DRAGON - Annual Support for Dragon Naturally Speaking (73018307) | | |
| 18 | 1 | PRV | S-PRO-TEMPLATE-GYN - Annual Maint: Gynecology Specialty Content (73018314) | | |
| 19 | 1 | Ea | PRO-EQZFN07-810 - 5 User Premium Support Pack (72018890) | | |
| | | | Support for the Zetafax client directly from Equisys (manufacturer of Zetafax). | | |
| | | | **Maintenance Subtotal** | | |

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| **Processing Services** | | | | | |
| 20 | 0 | Tx | MB-RH-EDI-EV-T - Electronic Eligibility Verification-$0.20 per transaction (74026760) | | |
| | | | **Processing Services Subtotal** | | |

Confidential                                                                                         RS-TRUEHEALTH 004645

# McKESSON
## Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | | | Quote Number: | **78178PMSI** |
| :-- | :-- | :-- | :-- | :-- |
| | | | Quote Date: | 4/28/2010 |
| | | | Expiration Date: | 5/7/2010 |
| | | | Agreement Number: | 78178PMSI |
| | | | SAPID: | TBD |

| Item | Qty | Unit | Description | | List Price | Extended Price |
| :-- | :-- | :-- | :-- | :-- | :-- | :-- |

**Quote Summary**

| | | |
| :-- | :-- | :-- |
| Software: | | |
| Recurring Fees: | | |
| Implementation Service: | | |
| Maintenance: | | |
| **TotalList:** | | |

| Quote Total: | |
| :-- | :-- |

This quoted amount does not include state and local sales taxes, which are the responsibility of the customer.

**To Order:**

To place your order, please sign the quote and fax a copy of the quote to the attention of Accounting at 206-441-8915.  If you have been asked to sign a contract, please fax a copy of the signed contract as well.  The signed originals should be sent via overnight delivery to the following address:

Practice Partner
Attn:  Accounting
2401 4th Avenue, Suite 700
Seattle, WA  98121

By signing below, Customer agrees that this order is subject to the terms and conditions of McKesson Master Agreement or Purchase & Standard License Agreement, Software Support Agreement and HIPAA Business Associate Agreement between the parties.

**Bill me**   ☐ ACH on file (last four digits): _____  _____  _____  _____

78178PMSI

4 of 5

RS-TRUEHEALTH 004646

# McKESSON
## Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | Quote Number: | **78178PMSI** |
|---|---|---|
| | Quote Date: | 4/28/2010 |
| | Expiration Date: | 5/7/2010 |
| | Agreement Number: | 78178PMSI |
| | SAPID: | TBD |

| Item | Qty | Unit | Description | | | List Price | Extended Price |
|---|---|---|---|---|---|---|---|

**Payment Terms:**

| Software | Software | 100% is due on the Quote Effective Date |
|---|---|---|
| Recurring Fees | Software/Subscription Services | The first annual Recurring Fees will be due on the Quote Effective Date and will be prorated based on a 365 day calendar year.  Subsequent annual Recurring Fees will be due on January 1 of each year during the Initial Term and any Renewal Term. |
| Implementation Services | Fixed Fee | 100% is due on the Quote Effective Date. |
| Software Maintenance | Software Maintenance | The first annual Software Maintenance Services fee is due 12 months after the Quote Effective Date and will be prorated based on a 365 day calendar year. |
| Processing Services | Monthly Fees | Fees are due monthly in arrears commencing on the earlier of the Live Date or 6 months after the Quote Effective Date. |
| Processing Services | One Time Fees | 100% is due on the Quote Effective Date. |

_____        _____

**Customer Approval**                                                    **Date**

78178PMSI

Confidential                                                    RS-TRUEHEALTH 004647

Exhibit JJ



**McKESSON**

*Empowering Healthcare*

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | |
|---|---|
| **Quote Number:** | **77817PMSI** |
| **Quote Date:** | 4/30/2010 |
| **Expiration Date:** | 5/10/2010 |
| **Agreement Number:** | 77817PMSI |
| **SAPID:** | TBD |

# Quote

1FT EMR & Appointment Scheduling JEM

**To:** John R████ M.D.

████████████
██████████
████████
████ FL ████

Phone: 561-391-███

**Quote prepared by:**
Julie Mann

████████████████

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| **Software** | | | | | |
| 1 | 1 | PRV | PP2-PRAS - Patient Records & Appt. Scheduler - Full-time doctor provide (71004296) | | |
| | | | This package includes: | | |
| | | | - Patient Records, Appointment Scheduler, Computerized Physician Order Entry, and Document Management software | | |
| 2 | 1 | Ea | PRO-EQZFN07-201 - 5-User Zetafax System w Integration (72018759) Includes Practice Partner integration. Support is required for the first year and is valid for one year from date of sale. Users are defined as those using the Zetafax client outside of Practice Partner (for normal faxing duties) plus one for the entire Practice Partner Patient Records application (for faxing within Practice Partner). | | |
| 3 | 1 | Ea | PRO-DRAGON - Dragon NaturallySpeaking Speech Recognition Software (72018756) Dragon Naturally Speaking Medical Edition voice recognition software is fully integrated in Practice Partner Patient Records 8.1.x and higher. One license is required for each voice profile.  Please note that this does not include a microphone or headset; one will need to be purchased separately. | | |
| | | | **Software Subtotal** | | ██████ |

**Recurring Fees**



| Item | Qty | Unit | Description |
|---|---|---|---|
| 4 | 1 | PRV | MB-CPT-UPDATE - CPT/ICD-9 Updates - Annual Recurring Fee (72018721) |
| 5 | 1 | PRV | PRO-FT - Formulary Tracking - Annual Recurring Fee (73018194) |
| 6 | 1 | PRV | PRO-CIToolPP - Clinical Tools - Annual Recurring Fee (72019181) |
| 7 | 1 | PRV | PRO-PPCW - CodeWizard Base (Includes 1 Provider) - Annual Recurring Fee (73018200) |
| 8 | 1 | PRV | PRO-SURE - Practice Partner ePrescribing Module - Annual Recurring Fee (73018198) |
| 9 | 1 | PRV | PRO-PE-PP - Patient Education - Annual Recurring Fee (72019204) |

77817PMSI

Confidential

RS-TRUEHEALTH 004648

# McKESSON
## Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

**Quote Number:** 77817PMSI
**Quote Date:** 4/30/2010
**Expiration Date:** 5/10/2010
**Agreement Number:** 77817PMSI
**SAPID:** TBD

| Item | Qty | Unit | Description | List Price | Extended Price |
|------|-----|------|-------------|-----------|----------------|
| | | | | Recurring Fees Subtotal | ██████████ |

**Implementation Services**

| Item | Qty | Unit | Description | |
|------|-----|------|-------------|---|
| 10 | 1 | Ea | CON-IMP-PKG - Practice Partner Implementation Package (74028082) | ████████ |

The Practice Partner Implementation Package is customized for the number of providers, locations and specialties within the customer's organization.

The Practice Partner Service Path for this quote assumes the following scope:

Implementation Services from McKesson
☐1.☐Pre-Implementation services to ensure implementation readiness
☐2.☐Load of all software on the customer's hardware
☐3.☐Remote training and support on how to configure the system
☐4.☐On site end user training and go live support conducted by your
☐5.☐Remote follow assistance for 30 days after Go Live
☐6.☐Transition to McKesson's Technical Support

Customer Implementation Responsibilities
☐1.☐Procure appropriate hardware based on McKesson's recommendations
☐2.☐Configure the Practice Partner system to meet the customer's requirements
☐3.☐Starting with McKesson's pre-defined templates, customize progress note content to meet practice or provider specific requirements
☐4.☐Make appropriate resources available for configuration, end user training and Go Live

Not included in the Scope of Service; additional fees apply:

*☐Documentation of Customer specific policy and procedures
*☐Development of Customer-specific end-user training materials
*☐Services related to any equipment not meeting McKesson's specifications.
*☐Specialty specific content including specialty specific note templates
*☐Back-loading of patient past medical history
*☐Services to install updated versions of the Practice Partner application ("Upgrade Services") after Go Live
*☐Post Go Live on site follow up visits

The hours listed on this quote are based on the PR/AS package, 1 total providers of which 1 are specialist. The providers are practicing at 1 locations. Implementation hours are divided into the following categories:

Pre-Implementation (Remote) : 2
Software Installation (Remote): 2
Configuration Training (Remote): 30
Configuration Support (Remote): 8
End User Training (On Site): 18
Go Live Support (On Site): 12
Follow Up (Remote): 12

| | | | **Implementation Services Subtotal** | ████████ |
|---|---|---|---|---|

**Maintenance**

| Item | Qty | Unit | Description | |
|------|-----|------|-------------|---|
| 11 | 1 | PRV | S-PP2-PRAS - Annual Support: PR & AS - Full-time doctor provider (73018287) | ████████ |
| 12 | 1 | Ea | S-PRO-DRAGON - Annual Support for Dragon Naturally Speaking (73018307) | |
| 13 | 1 | Ea | PRO-EQZFN07-810 - 5 User Premium Support Pack (72018890) | |
| | | | Support for the Zetafax client directly from Equisys (manufacturer of Zetafax). | |

77817PMSI

Confidential

# M<sup>c</sup>KESSON
*Empowering Healthcare*

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | |
|---|---|
| Quote Number: | **77817PMSI** |
| Quote Date: | 4/30/2010 |
| Expiration Date: | 5/10/2010 |
| Agreement Number: | 77817PMSI |
| SAPID: | TBD |

| Item | Qty | Unit | Description | List Price | Extended Price |
|---|---|---|---|---|---|
| | | | | **Maintenance Subtotal** | ████ |

Confidential                                                                          RS-TRUEHEALTH 004650

# McKESSON
## Empowering Healthcare

| | |
|---|---|
| **Quote Number:** | **77817PMSI** |
| **Quote Date:** | 4/30/2010 |
| **Expiration Date:** | 5/10/2010 |
| **Agreement Number:** | 77817PMSI |
| **SAPID:** | TBD |

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| Item | Qty | Unit | Description | | List Price | Extended Price |
|------|-----|------|-------------|--|-----------|----------------|

**Quote Summary**

| | |
|---|---|
| Software: | |
| Recurring Fees: | |
| Implementation Service: | |
| Maintenance: | |
| **TotalList:** | |
| Software Discount: | |
| Implementation Service Discount: | |
| **Quote Total:** | |

This quoted amount does not include state and local sales taxes, which are the
responsibility of the customer.

| | |
|---|---|
| **Discount Note:** | This negotiated discount is confidential and applies to this quote only. The discount will expire immediately if Customer communicates the discount to a third party outside of those required to complete the proposed software and or services purchase. Additional pricing confidentiality provisions will be included in the Software Licensing Agreement. |
| **To Order:** | To place your order, please sign the quote and fax a copy of the quote to the attention of Accounting at 206-441-8915. If you have been asked to sign a contract, please fax a copy of the signed contract as well. The signed originals should be sent via overnight delivery to the following address:<br><br>Practice Partner<br>Attn: Accounting<br>2401 4th Avenue, Suite 700<br>Seattle, WA 98121<br><br>By signing below, Customer agrees that this order is subject to the terms and conditions of McKesson Master Agreement or Purchase & Standard License Agreement, Software Support Agreement and HIPAA Business Associate Agreement between the parties. |
| **Bill me** | ☐ ACH on file (last four digits): ____ ____ ____ ____ |

77817PMSI

4 of 5

# McKESSON
## Empowering Healthcare

2401 4th Avenue, Suite 700, Seattle, WA 98121
TEL: 206-441-8490 FAX: 206-441-8915

| | |
|---|---|
| **Quote Number:** | **77817PMSI** |
| **Quote Date:** | 4/30/2010 |
| **Expiration Date:** | 5/10/2010 |
| **Agreement Number:** | 77817PMSI |
| **SAPID:** | TBD |

| Item | Qty | Unit | Description | | | List Price | Extended Price |
|---|---|---|---|---|---|---|---|

**Payment Terms:**

| Software | Software | 100% is due on the Quote Effective Date |
|---|---|---|
| Recurring Fees | Software/Subscription Services | The first annual Recurring Fees will be due on the Quote Effective Date and will be prorated based on a 365 day calendar year.  Subsequent annual Recurring Fees will be due on January 1 of each year during the Initial Term and any Renewal Term. |
| Implementation Services | Fixed Fee | 100% is due on the Quote Effective Date. |
| Software Maintenance | Software Maintenance | The first annual Software Maintenance Services fee is due 12 months after the Quote Effective Date and will be prorated based on a 365 day calendar year. |

_____          _____

**Customer Approval**                                                **Date**

Confidential                                                    RS-TRUEHEALTH 004652

Exhibit KK

1  TIFFANY CHEUNG (CA SBN 211497)
   TCheung@mofo.com
2  ANGELA E. KLEINE (CA SBN 255643)
   AKleine@mofo.com
3  MORRISON & FOERSTER LLP
   425 Market Street
4  San Francisco, California 94105-2482
   Telephone: 415.268.7000
5  Facsimile: 415.268.7522

6  Attorneys for Defendants
   MCKESSON TECHNOLOGIES, INC., and
7  MCKESSON CORPORATION

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                         OAKLAND DIVISION

11

12

13

14  TRUE HEALTH CHIROPRACTIC INC., and          Case No. 4:13-cv-02219-HSG
    MCLAUGHLIN CHIROPRACTIC
15  ASSOCIATES, INC., individually and as the   **DEFENDANTS MCKESSON**
    representatives of a class of similarly-situated   **CORPORATION & MCKESSON**
16  persons,                                     **TECHNOLOGIES, INC.'S FOURTH**
                                                 **SUPPLEMENTAL RESPONSE TO**
17              Plaintiffs,                      **INTERROGATORY REGARDING**
                                                 **PRIOR EXPRESS INVITATION OR**
18         v.                                    **PERMISSION**

19  MCKESSON CORPORATION,                        **CONFIDENTIAL – SUBJECT TO**
    MCKESSON TECHNOLOGIES, INC.,                 **PROTECTIVE ORDER**
20  and DOES 1-10,
                                                 The Hon. Judge Haywood S. Gilliam, Jr.
21              Defendants.
                                                 Date Action Filed: May 15, 2013

22

23

24

25

26

27

28

Pursuant to the Court's April 1, 2015 Order (Docket No. 178), and based on its continuing investigation and ongoing discovery, Defendants McKesson Corporation and McKesson Technologies, Inc. submit the following supplemental interrogatory response pursuant to Federal Rule of Civil Procedure 26(e).  This response and the exhibits being produced are designated as Confidential under the Protective Order.

**INTERROGATORY:**

"Defendants shall produce an interrogatory response that (1) identifies each type of act that Defendants believe demonstrates a recipient's express permission to receive faxes (e.g. completing a software registration), (2) explains how that act qualifies as express permission, and (3) identifies each recipient allegedly giving that type of permission by name and contact information (including, at a minimum, fax and phone number)."  (Docket No. 178 at 12.)

**SUPPLEMENTAL RESPONSE TO INTERROGATORY:**

Physician Practice Solutions ("PPS"), a business unit under McKesson Technologies Inc., obtained prior express invitation or permission, 47 U.S.C. § 227(a)(5), from recipients to receive faxes concerning PPS's Electronic Health Records ("EHR") products (e.g., Medisoft and Lytec) in several different ways.  Such faxes were sent to individuals or companies with whom PPS already had a preexisting business relationship (i.e., a preexisting customer).

(1) Express permission to receive faxes was obtained from customers by the customer's voluntary provision of their fax number when registering their EHR product.  Customers that registered their products were not required to provide a fax number to complete the registration process.  Customers voluntarily offered their fax numbers as part of the registration process, thereby inviting or consenting to fax advertisements.  PPS only fax marketed to preexisting customers.

In addition, customers entered into software licensing agreements, End User License Agreements ("EULA"), which contained provisions whereby customers consented to receiving future offers for features and services.  Defendants refer Plaintiffs to its production of these licensing agreements, including, for example, RS-TRUEHEALTH 000442: "This Usage

DEFENDANTS' FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY RE PRIOR EXPRESS INVITATION
CASE NO.  4:13-CV-02219-HSG
sf-4103113                                                        CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1

Information . . . also assists McKesson in offering End User other features and services."

After further investigation, Defendants have attached as Exhibit A a supplemented list, which includes the name and contact information (where available), of customers that received copies of the faxes that have been produced in this matter. This list is based on information reasonably available to Defendants at the present time.

(2) In addition to providing prior express invitation or permission to be sent faxes by voluntarily offering their fax numbers to PPS, customers also expressed consent to receive faxes through other methods. At certain times, customers were able to check a box during their software registration that indicated their express permission to be sent faxes as a preferred method of communication to receive promotional information.

At certain times, PPS also asked customers to complete a written consent form whereby they further provided their express permission to receive faxes.

In 2010-2011, there was an outreach program to update contact information of certain preexisting customers. During the course of phone calls with customers, certain preexisting customers would be asked, among other things, to confirm that they would like to continue to receive faxes and/or would like to change their communication method preferences.

For the consent methods explained above for category 2, information regarding whether a customer consented to receiving faxes was generally updated on PPS's internal database. It is a dynamic SalesForce database, which is updated in real time.

Attached as Exhibit B is a list, including the name and contact information, for the recipients of the faxes produced in this case who, based on the information currently residing in this internal SalesForce database, have indicated their consent to receive such faxes. Other recipients of those faxes may have also indicated consent through one or more of the methods described above before receiving such faxes, but the limitations of the database do not allow Defendants to identify those specific customers without individualized inquiries.

(3) As part of PPS's ongoing relationship and communications with customers, it would also receive oral or email permission to send faxes to customers. Often, because of these long-

DEFENDANTS' FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY RE PRIOR EXPRESS INVITATION
CASE NO. 4:13-CV-02219-HSG
sf-4103113
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2

standing and well developed relationships, PPS sales representatives would learn and know that a particular customer exclusively preferred to receive faxes over, for example, emails. Other times, PPS sales representatives would notate that customer's preference for faxes by making a note that might be linked to the SalesForce database. And sometimes, PPS would indicate that the customer had requested to receive information by fax directly in the internal database's comment fields. These comment fields were not strictly used all of the time, and PPS representatives were not required to record a customer's consent in the comment fields, including situations in which long-standing relationships and dealings clearly established that a customer had invited or requested information on offers, promotions, or upgrades to be sent by fax. In some instances, customers specifically requested that they receive promotional information exclusively via fax.

Attached as Exhibit C is a list, including the name and contact information, for the recipients of the faxes produced in this case for which the internal database includes a comment indicating that the customer requested to receive faxes or otherwise consented to receiving faxes. Other recipients of those faxes may have also indicated invitation or permission through oral communications with their PPS representatives, and individualized inquiries must be conducted to specifically identify those customers.

(4) In addition, EHR products Medisoft and Lytec were sold through Value Added Resellers ("VARs") to their own customers. The VARs had business relationships with these customers, and those customers would invite information on offers and upgrades to be sent to them by fax. This express permission included the customer voluntarily providing its fax numbers to its VAR, and/or communicating orally or otherwise to its VAR that it would like to receive information on promotions, offers, or upgrades by fax. Recipients of the faxes produced in this case which indicated their invitation or permission to receive such faxes may include those listed in Exhibit A, to the extent that the faxes produced in this case were sent to a VAR customer.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY:**

Subject to and without waiver of the foregoing objections, pursuant to Federal Rule of

Civil Procedure 33(d), Defendants supplement their response to this interrogatory by reference to the documents they produced at RS-TRUEHEALTH 000558 – RS-TRUEHEALTH 004555. These documents further evidence the relationships and dealings with customers through which customers would invite or consent to receiving faxes from PPS representatives, including through phone calls with customers, or through consent forms or other written communications.

Defendants' investigation is ongoing and Defendants reserve the right to supplement this response.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY:**

Subject to and without waiver of the foregoing objections, pursuant to Federal Rule of Civil Procedure 33(d), Defendants supplement their response to this interrogatory by reference to the documents they produced at RS-TRUEHEALTH 000558 – RS-TRUEHEALTH 004556. These documents further evidence the relationships and dealings with customers through which customers would invite or consent to receiving faxes from PPS representatives, including through phone calls with customers, or through consent forms or other written communications.

Defendants' investigation is ongoing and Defendants reserve the right to supplement this response.

**FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY:**

Subject to and without waiver of the foregoing objections, Defendants respond that Physician Practice Solutions ("PPS"), a business unit under McKesson Technologies Inc., obtained prior express invitation or permission, 47 U.S.C. § 227(a)(5), from recipients to receive faxes concerning PPS's Electronic Health Records ("EHR") products (e.g., Medisoft and Lytec) in several different ways, many of which were not recorded in a single format or single location, or recorded in writing at all. Because these faxes were sent only to preexisting customers, all recipients had previously provided their fax number when registering their EHR product and had also entered into software licensing agreements, End User License Agreements ("EULA"). The EULA contained provisions whereby customers consented to receive future offers for other features and services. (E.g., RS-TRUEHEALTH 000442 ("This Usage Information . . . also

DEFENDANTS' FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY RE PRIOR EXPRESS INVITATION
CASE NO. 4:13-CV-02219-HSG
sf-4103113                                                        CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

4

assists McKesson in offering End User other features and services.").) Defendants previously identified these customers on supplemental Exhibit A to McKesson's Supplemental Response to Interrogatory Regarding Prior Express Invitation or Permission. This list, Exhibit A, was based on information reasonably available to Defendants at the time of production in 2015. This list showed just one of the multiple ways in which preexisting customers gave prior express permission or invitation to Defendants to send them promotional faxes.

Indeed, customers, including those listed on Exhibit A, consented to receive promotional faxes in a variety of ways based on their relationships with their account representatives and the customer's individual preferences. Some customers could and did check a box during their software registration that indicated their express permission to be sent faxes as a preferred method of communication to receive promotional information. At certain times, PPS also asked customers to complete a written consent form to further evidence their express permission to receive faxes, as was done during an outreach program to update contact information of certain preexisting customers. These particular methods of consent were generally recorded on PPS's internal database called SalesForce, from which Defendants compiled Exhibit B in 2015. The preexisting customer fax numbers in Exhibit B also appeared in Exhibit A because these customers also registered their product and signed the EULA. At the time of production, Defendants specifically disclosed that Exhibit B was based on the information currently residing in this internal SalesForce database, but that other fax recipients may have also indicated consent through one or more of the methods described here before receiving such faxes. However, the limitations of the SalesForce database do not allow Defendants to identify those specific customers without individualized inquiries.

Because of the nature of PPS's business and the practices during 2009-2010, a significant portion of fax recipients gave oral and/or email permission to Defendants to send promotional faxes as part of the account representative's ongoing relationship with these preexisting customers. Account representatives, which included both PPS sales representatives and other account representatives called Value Added Resellers ("VARs"), cultivated ongoing relationships

DEFENDANTS' FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY RE PRIOR EXPRESS INVITATION
CASE NO. 4:13-CV-02219-HSG
sf-4103113                                                                              CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

5

with their own customers, including through phone conversations. Throughout the course of these business relationships, customers would share their preferred methods of communication, including a preference to receive information about promotions and product upgrades by fax. PPS sales representatives were not required to record a customer's consent, but some PPS sales representatives would note that a customer had requested to receive promotional information by fax in a note linked to the SalesForce database or directly in the internal database's comment fields. In 2015, Defendants produced Exhibit C, which consisted of a list of customers for whom PPS sales representatives had manually entered into SalesForce a customer request to receive faxes. Exhibit C was created based on the information reasonably available through SalesForce, but does not capture all oral or written communications account representatives had with customers during which a customer provided permission or invited Defendants to send the faxes at issue. PPS sales representatives were not required to record a customer's consent in the SalesForce comment fields and did not use the SalesForce comment fields all of the time, including where long-standing relationships and dealings clearly established that a customer had invited or requested information about offers, promotions, or upgrades to be sent by fax. VARs did not have access to SalesForce, and thus could not use it to record that customers had requested or agreed to receive promotional or product faxes related to Medisoft, Lytec, BillFlash, or Practice Partner. As a result, Exhibit C is a non-exhaustive list and other recipients of the faxes at issue likely also indicated consent, invitation or permission through oral communications with their account representatives, and individualized inquiries are required to identify those specific customers.

On August 13, 2019, the Court certified a class that includes the following persons:

> All persons or entities who received faxes from "McKesson" from September 2, 2009, to May 11, 2010, offering "Medisoft," "Lytec," "Practice Partner," or "Revenue Management Advanced" software or "BillFlash Patient Statement Service," where the faxes do not inform the recipient of the right to "opt out" of future faxes, and whose fax numbers are listed in Exhibit A to McKesson's Supplemental Response to Interrogatory Regarding Prior Express Invitation or Permission, but not in Exhibit B or C to McKesson's Response to Interrogatory Regarding Prior Express Invitation or

1     Permission.

2 (ECF No. 331 at 28:5-10.)  These persons or entities comprise the Class List.

3    Pursuant to Federal Rule of Civil Procedure 26(e), Defendants supplement their response

4 to this interrogatory to identify the various ways in which preexisting customers on the Class List

5 provided Defendants prior express permission or invitation to send them faxes about offers,

6 discounts, and upgrades for EHR products.  From this case's inception in 2013, Defendants have

7 disclosed in discovery responses, deposition testimony, and written declarations that oral and

8 written consent defenses apply across a significant portion of the Class List.  Defendants have

9 since confirmed through written and oral evidence that different forms of consent apply across the

10 Class List that were not reflected in the SalesForce database and instead require individualized

11 inquiries.  Account representatives frequently communicated orally and in writing with their

12 preexisting customers, and understood their customers' particular needs and preferences for both

13 products and promotional communications.  Defendants anticipate that testimony will show that

14 account representatives generally would only send a customer a fax about a discount or product

15 upgrade if the customer specifically requested or agreed to receive that information by fax.  Such

16 interactions between customers and account representatives were documented in SalesForce only

17 to the extent that individual account representatives decided to manually create an entry

18 describing such interactions.  VARs did not have access to SalesForce and thus would not have

19 documented such customer interactions in the database from which the Class List was created.

20 PPS sales representatives were not required to record all customer interactions in SalesForce.

21 Some PPS sales representatives did not record a customer's request or agreement to receive faxes

22 anywhere in Defendants' internal systems.  Moreover, the substance of any SalesForce comment

23 was left to the discretion of the PPS sales representative inputting the comment.  Defendants

24 anticipate that evidence, such as RS-TRUEHEALTH 001163, will show that customers on the

25 Class List would ask their account representative to please send them information about discounts

26 and other offers by fax.  This specific interaction, and others during which account representatives

27 obtained consent from customers through individual oral or written communications, were not

28 recorded in SalesForce.  Because the method of documenting this consent, if at all, varied by

account representative, no single repository contains this information and individualized inquiries of sales representatives and customers are necessary to determine whether consent was given.

Taken together, Defendants expect the evidence will show that account representatives would receive express permission to send faxes to customers across the entire Class List, orally and in writing, as part of their ongoing relationship with those customers, and that Defendants did not have a uniform practice of recording consent. Because the Class List was generated based on only information available on Defendants' internal database, SalesForce, it does not encompass all, or even most, of the individualized instances where customers provided consent to account representatives to send them promotional or product faxes. Defendants disclosed these limitations at the time of production in 2015. Thus, the only way to determine which customers on the Class List provided prior express permission or invitation to receive the faxes at issue is through an individualized inquiry for each customer based on that customer's oral and written communications with account representatives throughout the course of their business relationship.

Defendants' investigation is ongoing and Defendants reserve the right to supplement this response.

Dated: November 12, 2019

TIFFANY CHEUNG
ANGELA E. KLEINE
MORRISON & FOERSTER LLP


By:  _/s/ Tiffany Cheung_____
     TIFFANY CHEUNG

     Attorneys for Defendants
     MCKESSON TECHNOLOGIES, INC.,
     AND MCKESSON CORPORATION

1

## <u>VERIFICATION</u>

2

3

4

5                              VERIFICATION TO FOLLOW

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

    I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 425 Market St., San Francisco, California 94105.  I am not a party to the within cause, and I am over the age of eighteen years.

3

4

    I further declare that on November 12, 2019, I served a copy of:

5

        **DEFENDANTS MCKESSON CORPORATION & MCKESSON TECHNOLOGIES, INC.'S FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY REGARDING PRIOR EXPRESS INVITATION OR PERMISSION**

6

7

8

☒  **BY U.S. MAIL [Fed. Rule Civ. Proc. rule 5(b)]** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, addressed as follows, for collection and mailing at Morrison & Foerster LLP, 425 Market St., San Francisco, California 94105 in accordance with Morrison & Foerster LLP's ordinary business practices.

9

10

11

12

    I am readily familiar with Morrison & Foerster LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service, and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be deposited with the United States Postal Service on the same date that it (they) is (are) placed at Morrison & Foerster LLP with postage thereon fully prepaid for collection and mailing.

13

14

15

16

☒  **BY ELECTRONIC SERVICE [Fed. Rule Civ. Proc. rule 5(b)]** by electronically mailing a true and correct copy  through Morrison & Foerster LLP's electronic mail system to the e-mail address(es) set forth below, or as stated on the attached service list per agreement in accordance with Federal Rules of Civil Procedure rule 5(b).

17

18

19

    <u>**BY U.S. MAIL and COURTESY COPY BY E-MAIL**</u>
Brian J. Wanca (admitted *pro hac vice*)
Ryan M. Kelly (admitted *pro hac vice*)
Ross M. Good (admitted *pro hac vice*)
**ANDERSON + WANCA**
3701 Algonqiun Road, Suite 500
Rolling Meadows, IL  60008
Tel:  847-368-1500
Fax:  847-368-1501
Email:  bwanca@andersonwanca.com
Email:  rkelly@andersonwanca.com
Email:  rgood@andersonwanca.com

20

21

22

23

24

25

26

    *Counsel for Plaintiffs*

27

28

1

**COURTESY COPY BY E-MAIL**
Robert C. Schubert

2

Willem F. Jonckheer

3

**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650

4

San Francisco, CA  94111
Tel:  415-788-4220

5

Fax:  415-788-0161
Email:  rschubert@schubertlawfirm.com

6

Email:  wjonckheer@schubertlawfirm.com

7

*Local Counsel for Plaintiffs*

8

**COURTESY COPY BY E-MAIL**

9

George D. Jonson (admitted *pro hac vice*)
Matthew E. Stubbs (admitted *pro hac vice*)

10

**MONTGOMERY, RENNIE & JONSON**
36 East Seventh Street, Suite 2100

11

Cincinnati, OH  45202
Tel:  513-241-4722

12

Fax:  513-241-8775

13

Email:  gjonson@mrjlaw.com
Email:  mstubbs@mrjlaw.com

14

15

*Counsel for Plaintiffs*

16

I declare under penalty of perjury that the foregoing is true and correct.

17

Executed at San Francisco, California, this 12th day of November, 2019.

18

19

20

21

_____          _____

22

David Ridnell                                              (signature)

(typed)

23

24

25

26

27

28

Exhibit LL

## **Lead Sheet**

**Practice Name:** ████████████████████

**Contact Name:** Nicole H██████

**Contact Title:** Practice Manager, Wife of Dr. H████(Influencer)

**Contact Phone:** (831)462-████

 **FAX**: 831-462-5585

**Address:** ████████████████████████████████

**Date:** **Thursday, May 14th**

**Time:** **1:30 PM PST**

**Project Name:** Upgrade

**Project Phase:** Research phase

**Project Time Frame:** 6-12 months

**Notes:**  We spoke with Mrs. H████. She could not recall which version of Lytec she is using, But estimates it is at least 2000 (notes specify she is using XE). Mrs. H████ informed me that she is currently using EMR for some functions via a program called "Amazing Reports," and is somewhat skeptical that Lytec MD could provide the system value to her practice as she has been receiving. However, she would like to learn more about the system, it's benefits and of primary concern, how she could potentially be reimbursed for implementing the system under the current administration's stimulus package.


Set up an appointment for Thursday May 14th when Ms. O████could best be reached over the phone. Requesting a fax in the meantime with any relevant information regarding Lytec MD and the stimulus plan: Fax Number: 831-462-5585

RS-TRUEHEALTH 004557

# Exhibit MM

**From:**      Holloway, Kari
**Sent:**      Tuesday, March 16, 2010 9:10 AM
**To:**        Parrott, Glenn <Glenn.Parrott@McKesson.com>
**Subject:**   FW: version 16 20% discount

---

**From:** Yvonne P███████ [mailto:yp████@██████.net]
**Sent:** Tuesday, March 16, 2010 8:42 AM
**To:** Holloway, Kari
**Subject:** version 16 20% discount

 Kari,
Can you please tell me the copst of the program. I am interested in finding more
information. What version windows does this work on. Please send me the information
via e-mail or fax at 607-538-1505
Thank you
Yvonne

CONFIDENTIAL

Exhibit NN

**From:** Holloway, Kari
**Sent:** Friday, January 22, 2010 3:43 PM
**To:** Nellis, Rory <Rory.Nellis@McKesson.com>
**Subject:** FW: version 16

---

**From:** ███████@comcast.net [mailto:████████@comcast.net]
**Sent:** Friday, January 22, 2010 3:41 PM
**To:** Holloway, Kari
**Subject:** version 16

Dear Kari,

I received a fax re: 40% discount on Version 16 for Medisoft.  Please let me know what the cost is for the update so I can get an approval from my providers.

Peggy T████
Practice Manager
520-219-████
fax 520-531-0128

Exhibit OO

| | |
|---|---|
| **From:** | Holloway, Kari |
| **Sent:** | Monday, March 30, 2009 2:14 PM |
| **To:** | Parrott, Glenn <Glenn.Parrott@McKesson.com> |
| **Subject:** | FW: Request to view Medisoft Demo from Medisoft Web Site |

**From:** ███████████@yahoo.com [mailto:█████████████@yahoo.com]
**Sent:** Monday, March 30, 2009 12:17 PM
**To:** Sweet, Meghan
**Subject:** Request to view Medisoft Demo from Medisoft Web Site

# Request to view Medisoft Demo from Medisoft Web Site
## Submitted 3/30/2009 12:17:18 PM

⌐
Send a Brochre

⌐
View a Demo

⌐
Contact a Rep.

○
Dr.    ○ Mr.    ○ Ms.

| | |
|---|---|
| **First Name:** | dannielle |
| **Last Name:** | n█████ |
| **Title/Position:** | medical biller |
| **Organization Name:** | █████████████ |
| **Address1:** | █████████████ |
| **Address2:** | |
| **City:** | ██████████ |
| **State:** | NY |
| **Zip Code:** | ██████ |
| **Country:** | U.S. |

CONFIDENTIAL

| | |
|---|---|
| **E-mail Address:** | ████████████@yahoo.com |
| **Phone:** | (516)-221-████ |
| **Fax:** | 516-221-2507 |
| **Specialty:** | plastic surgery |
| **Number Of Physicians:** | 1 |

## What Medisoft Product are you interested in?

☑
Medisoft V15

☐
Medisoft Clinical

## How did you hear about us?

Friend/Colleague

## What is your decision making timeframe?

◉
Immediate

○
3-6 Months

○
6-12+ Months

○
None

## Are you currently using Medisoft solutions?

○
Yes

◉
No

## Comments

Exhibit PP

| | |
|---|---|
| **From:** | Holloway, Kari |
| **Sent:** | Friday, April 3, 2009 11:33 AM |
| **To:** | Parrott, Glenn <Glenn.Parrott@McKesson.com> |
| **Subject:** | FW: Request to view Medisoft Demo from Medisoft Web Site |

**From:** ██████@hotmail.com [mailto:██████@hotmail.com]
**Sent:** Thursday, April 02, 2009 11:22 PM
**To:** Sweet, Meghan
**Subject:** Request to view Medisoft Demo from Medisoft Web Site

# Request to view Medisoft Demo from Medisoft Web Site
## Submitted 4/2/2009 11:21:39 PM

☐
Send a Brochre

☐
View a Demo

☐
Contact a Rep.

◉
Dr.   ○ Mr.   ○ Ms.

| | |
|---|---|
| **First Name:** | wan |
| **Last Name:** | l████ |
| **Title/Position:** | md |
| **Organization Name:** | |
| **Address1:** | ████████ |
| **Address2:** | ████ |
| **City:** | ██████ |
| **State:** | NY |
| **Zip Code:** | █████ |
| **Country:** | U.S. |

RS-TRUEHEALTH 004558

**E-mail Address:**          ██████@hotmail.com
**Phone:**                  (718)961-████
**Fax:**                    (718)961-6266
**Specialty:**              pediatric
**Number Of Physicians:**   1

## What Medisoft Product are you interested in?

☐
Medisoft V15
☑
Medisoft Clinical

## How did you hear about us?

Internet

## What is your decision making timeframe?

○
Immediate
◉
3-6 Months
○
6-12+ Months
○
None

## Are you currently using Medisoft solutions?

○
Yes
◉
No

## Comments

| | |
|---|---|
| **From:** | Holloway, Kari |
| **Sent:** | Friday, April 3, 2009 7:57 AM |
| **To:** | Parrott, Glenn <Glenn.Parrott@McKesson.com> |
| **Subject:** | FW: Request to view Medisoft Demo from Medisoft Web Site |

**From:** ██████@hotmail.com [mailto:██████@hotmail.com]
**Sent:** Wednesday, April 01, 2009 10:22 AM
**To:** Sweet, Meghan
**Subject:** Request to view Medisoft Demo from Medisoft Web Site

# Request to view Medisoft Demo from Medisoft Web Site
## Submitted 4/1/2009 10:21:57 AM

Send a Brochre

View a Demo

Contact a Rep.

Dr.    Mr.    Ms.

| | |
|---|---|
| **First Name:** | Wan |
| **Last Name:** | L██ |
| **Title/Position:** | |
| **Organization Name:** | |
| **Address1:** | ████████ |
| **Address2:** | ████ |
| **City:** | █████ |
| **State:** | NY |
| **Zip Code:** | ████ |
| **Country:** | U.S. |

**E-mail Address:** ██████@hotmail.com
**Phone:** (718)961-████
**Fax:** (718)961-6266
**Specialty:** pediatric
**Number Of Physicians:** 1

## What Medisoft Product are you interested in?

☐
Medisoft V15

☑
Medisoft Clinical

## How did you hear about us?

Internet

## What is your decision making timeframe?

○
Immediate

◉
3-6 Months

○
6-12+ Months

○
None

## Are you currently using Medisoft solutions?

○
Yes

◉
No

## Comments

RS-TRUEHEALTH 004561

| | |
|---|---|
| **From:** | Holloway, Kari |
| **Sent:** | Friday, April 3, 2009 7:56 AM |
| **To:** | Matthews-Johnson, Ahren <Ahren.Johnson@McKesson.com> |
| **Subject:** | FW: Request to view Medisoft Demo from Medisoft Web Site |

**From:** leslie.w█████@█████.com [mailto:leslie.w█████@█████.com]
**Sent:** Wednesday, April 01, 2009 11:15 AM
**To:** Sweet, Meghan
**Subject:** Request to view Medisoft Demo from Medisoft Web Site

# Request to view Medisoft Demo from Medisoft Web Site

## Submitted 4/1/2009 11:14:33 AM

Send a Brochre

View a Demo

Contact a Rep.

Dr.  Mr.  Ms.

**First Name:**            leslie

**Last Name:**            w███████

**Title/Position:**        office manager

**Organization Name:**   ███████████████

**Address1:**            ████████████

**Address2:**

**City:**                ████████

**State:**               AL

**Zip Code:**            ██████

**Country:**             U.S.

Confidential

**E-mail Address:**    leslie.w...

**Phone:**    (256)232-██████

**Fax:**    (256)232-7528

**Specialty:**    chiropractic

**Number Of Physicians:**    1

## What Medisoft Product are you interested in?

Medisoft V15

Medisoft Clinical

## How did you hear about us?

Internet

## What is your decision making timeframe?

Immediate

3-6 Months

6-12+ Months

None

## Are you currently using Medisoft solutions?

Yes

No

## Comments

Confidential

| | |
|---|---|
| **From:** | Holloway, Kari |
| **Sent:** | Friday, April 3, 2009 7:55 AM |
| **To:** | Konstanzer, Kathryn <Kathryn.Konstanzer@McKesson.com> |
| **Subject:** | FW: Request to view Medisoft Demo from Medisoft Web Site |

**From:** ███████@hotmail.com [mailto:███████@hotmail.com]
**Sent:** Wednesday, April 01, 2009 12:18 PM
**To:** Sweet, Meghan
**Subject:** Request to view Medisoft Demo from Medisoft Web Site

# Request to view Medisoft Demo from Medisoft Web Site

## Submitted 4/1/2009 12:17:38 PM

Send a Brochre

View a Demo

Contact a Rep.

Dr.  Mr.  Ms.

**First Name:**          Vincent

**Last Name:**           H███████

**Title/Position:**

**Organization Name:**

**Address1:**            ███████████████

**Address2:**

**City:**                ████████

**State:**               IA

**Zip Code:**            ████████

**Country:**             U.S.

Confidential                                                 RS-TRUEHEALTH 004564

**E-mail Address:**                                    @hotmail.com

**Phone:**                    515-270-

**Fax:**                      515-270-0323

**Specialty:**                chiropractic

**Number Of Physicians:**

## What Medisoft Product are you interested in?

Medisoft V15

Medisoft Clinical

## How did you hear about us?

Select One

## What is your decision making timeframe?

Immediate

3-6 Months

6-12+ Months

None

## Are you currently using Medisoft solutions?

Yes

No

## Comments

Confidential                                    RS-TRUEHEALTH 004565

| | |
|---|---|
| **From:** | Holloway, Kari |
| **Sent:** | Wednesday, April 1, 2009 9:11 AM |
| **To:** | Konstanzer, Kathryn <Kathryn.Konstanzer@McKesson.com> |
| **Subject:** | FW: Request to view Medisoft Demo from Medisoft Web Site |

**From:** ███████@yahoo.com [mailto:███████@yahoo.com]
**Sent:** Tuesday, March 31, 2009 3:32 PM
**To:** Sweet, Meghan
**Subject:** Request to view Medisoft Demo from Medisoft Web Site

# Request to view Medisoft Demo from Medisoft Web Site

## Submitted 3/31/2009 3:32:12 PM

Send a Brochre

View a Demo

Contact a Rep.

Dr.  Mr.  Ms.

| | |
|---|---|
| **First Name:** | Collin |
| **Last Name:** | M███ |
| **Title/Position:** | Director |
| **Organization Name:** | ████████ |
| **Address1:** | ████████ |
| **Address2:** | |
| **City:** | ████████ |
| **State:** | OH |
| **Zip Code:** | ████ |
| **Country:** | U.S. |

Confidential

**E-mail Address:**                              @yahoo.com

**Phone:**                    330-940-█████

**Fax:**                       330-940-3366

**Specialty:**                Counseling

**Number Of Physicians:**     4

## What Medisoft Product are you interested in?

Medisoft V15

Medisoft Clinical

## How did you hear about us?

Internet

## What is your decision making timeframe?

Immediate

3-6 Months

6-12+ Months

None

## Are you currently using Medisoft solutions?

Yes

No

## Comments

RS-TRUEHEALTH 004567

| | |
|---|---|
| **From:** | Holloway, Kari |
| **Sent:** | Tuesday, March 31, 2009 7:43 AM |
| **To:** | Paul, Jeffery <Jeff.Paul@mckesson.com> |
| **Subject:** | FW: Request to view Medisoft Demo from Medisoft Web Site |

---

**From:** ███████@sbcglobal.net [mailto:███████@sbcglobal.net]
**Sent:** Monday, March 30, 2009 4:16 PM
**To:** Sweet, Meghan
**Subject:** Request to view Medisoft Demo from Medisoft Web Site

# Request to view Medisoft Demo from Medisoft Web Site

## Submitted 3/30/2009 4:15:54 PM

Send a Brochre

View a Demo

Contact a Rep.

Dr.  Mr.  Ms.

**First Name:**            amy

**Last Name:**            w███

**Title/Position:**            manager

**Organization Name:**            ████████

**Address1:**            ████████

**Address2:**

**City:**            ██████

**State:**            TX

**Zip Code:**            █████

**Country:**            U.S.

Confidential

**E-mail Address:**                                    @sbcglobal.net

**Phone:**              817-267-▮▮▮▮

**Fax:**                (817)-545-9748

**Specialty:**          chiropractic

**Number Of Physicians:**    1

## What Medisoft Product are you interested in?

Medisoft V15

Medisoft Clinical

## How did you hear about us?

Article

## What is your decision making timeframe?

Immediate

3-6 Months

6-12+ Months

None

## Are you currently using Medisoft solutions?

Yes

No

## Comments

Confidential                                    RS-TRUEHEALTH 004569

| | |
|---|---|
| **From:** | Holloway, Kari |
| **Sent:** | Monday, March 30, 2009 2:16 PM |
| **To:** | Konstanzer, Kathryn <Kathryn.Konstanzer@McKesson.com> |
| **Subject:** | FW: Request to view Medisoft Demo from Medisoft Web Site |

**From:** ████████@yahoo.com [mailto: ████████@yahoo.com]
**Sent:** Monday, March 30, 2009 10:52 AM
**To:** Sweet, Meghan
**Subject:** Request to view Medisoft Demo from Medisoft Web Site

# Request to view Medisoft Demo from Medisoft Web Site

## Submitted 3/30/2009 10:51:45 AM

Send a Brochre

View a Demo

Contact a Rep.

Dr.  Mr.  Ms.

| | |
|---|---|
| **First Name:** | Gwen |
| **Last Name:** | K████ |
| **Title/Position:** | Clinic Coordinator |
| **Organization Name:** | ████████████ |
| **Address1:** | ████████████ |
| **Address2:** | |
| **City:** | ████████ |
| **State:** | WI |
| **Zip Code:** | ██████ |
| **Country:** | U.S. |

Confidential

**E-mail Address:** @yahoo.com

**Phone:** 608-756-

**Fax:** 608-755-7652

**Specialty:** obesity/metabolic disorders

**Number Of Physicians:** 1

## What Medisoft Product are you interested in?

Medisoft V15

Medisoft Clinical

## How did you hear about us?

Select One

## What is your decision making timeframe?

Immediate

3-6 Months

6-12+ Months

None

## Are you currently using Medisoft solutions?

Yes

No

## Comments

Confidential

| | |
|---|---|
| **From:** | Holloway, Kari |
| **Sent:** | Monday, March 23, 2009 11:30 AM |
| **To:** | Konstanzer, Kathryn <Kathryn.Konstanzer@McKesson.com> |
| **Subject:** | FW: Request to view Medisoft Demo from Medisoft Web Site |

---

**From:** bb█████@██.net [mailto:bb█████@██net]
**Sent:** Friday, March 20, 2009 11:38 AM
**To:** Sweet, Meghan
**Subject:** Request to view Medisoft Demo from Medisoft Web Site

# Request to view Medisoft Demo from Medisoft Web Site

## Submitted 3/20/2009 11:38:29 AM

Send a Brochre

View a Demo

Contact a Rep.

Dr.  Mr.  Ms.

| | |
|---|---|
| **First Name:** | Brenda |
| **Last Name:** | B█████ |
| **Title/Position:** | Billing & Insurance Representative |
| **Organization Name:** | ███████████ |
| **Address1:** | ████████ |
| **Address2:** | █████ |
| **City:** | █████ |
| **State:** | IL |
| **Zip Code:** | ████ |
| **Country:** | U.S. |

Confidential

**E-mail Address:**      bb_____@_____

**Phone:**               630-257-███

**Fax:**                 630-257-1376

**Specialty:**           Chiropractic

**Number Of Physicians:**   1

## What Medisoft Product are you interested in?

Medisoft V15

Medisoft Clinical

## How did you hear about us?

Brochure

## What is your decision making timeframe?

Immediate

3-6 Months

6-12+ Months

None

## Are you currently using Medisoft solutions?

Yes

No

## Comments

Exhibit QQ

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4   - - - - - - - - - - - - - - - - - -

 5   TRUE HEALTH CHIROPRACTIC, INC.,      )

 6   MCLAUGHLIN CHIROPRACTIC ASSOCIATES, )

 7   INC.,                                )

 8   Plaintiffs,                          ) CASE NO.

 9   V.                                   ) 3:13-CV-02219

10   MCKESSON CORPORATION,                )

11   MCKESSON TECHNOLOGIES, INC.,         )

12   Defendants.                          )

13   - - - - - - - - - - - - - - - - - -

14            30(b)(6) VIDEOTAPED DEPOSITION OF

15         McLAUGHLIN CHIROPRACTIC ASSOCIATES, INC.

16        THROUGH ITS DESIGNATED REPRESENTATIVE

17             WESLEY BRUCE MCLAUGHLIN, D.C.

18             WEDNESDAY, APRIL 8, 2015

19             PAGES 1 - 264; VOLUME 1

20

21            BEHMKE REPORTING AND VIDEO SERVICES, INC.

22      BY:  RHONDA S. SANSOM, RPR, CRR, TENNESSEE LCR NO. 685

23                        160 SPEAR STREET, SUITE 300

24                        SAN FRANCISCO, CALIFORNIA 94105

25                        (415) 597-5600
```

1    A.   No, I never do.  I intentionally made mine a

2  different name because that's what my father always

3  used.

4    Q.   Do people ever refer to you as McLaughlin

5  Chiropractic Center?

6    A.   No, never.

7    Q.   No one's ever referred to you as McLaughlin

8  Chiropractic Center?

9    A.   No.  In fact, if they do -- which they never

10  do, but I think it may have happened once or twice.  If

11  they asked for McLaughlin Chiropractic Center I always

12  knew it was for my father and it wasn't for me, so....

13    Q.   When did that happen?

14    A.   Years ago, when my father was still there.

15  Because no one really uses it much, other than my sister

16  uses it some just to describe the location.

17    Q.   How do you describe the location?

18    A.   McLaughlin Chiropractic.

19    Q.   How often does your sister work at the

20  Knoxville location?

21    A.   She works Monday, Wednesday, and Friday.

22    Q.   Does she work in any other location?

23    A.   No.

24    Q.   What is her phone number for her business?

25    A.   865-405-0655.

1      Q.    What fax number does she use?

2      A.    865-687-0279.

3      Q.    Is that the same fax number you use?

4      A.    Correct.

5      Q.    And she's authorized to use that fax number?

6      A.    Correct.

7      Q.    She's authorized to receive faxes at that

8   number?

9      A.    Correct.

10     Q.    And she's authorized to send faxes at that

11   number?

12     A.    Correct.

13     Q.    And has she always been authorized to send and

14   receive faxes at that number since 2009?

15     A.    Correct.

16     Q.    What about earlier than that?  Has she been

17   authorized to receive --

18     A.    Yes, it was my father's before then or -- or

19   somewhere in that neighborhood; 2007, 2008, somewhere

20   around there.

21     Q.    Okay.  So since at least 2007, she's been

22   authorized to send and receive faxes at that number?

23     A.    Yes, she's -- she's been sending and receiving

24   faxes since she started practicing there using that

25   number.  That's the only number we've ever had for

1    faxes.

2        Q.    Is anyone else authorized to send or receive

3    faxes at that number?

4        A.    Just JoAnna Fry, and that's it.

5        Q.    What about since 2007?  Has anyone else been

6    authorized to send and receive faxes at that number?

7        A.    Not that I can think of.

8        Q.    No one else who's worked at McLaughlin

9    Chiropractic Center?

10        A.    I wouldn't know.  I don't think she's had any

11    other employees, other than JoAnna.

12        Q.    If she had any other employees working for her,

13    would they have been authorized to send and receive

14    faxes at that number?

15        MR. KELLY:  Objection.

16        THE WITNESS:  I don't know.

17        MR. KELLY:  Objection, calls for speculation.

18    BY MS. CHEUNG:

19        Q.    Did you ever tell her that she couldn't

20    authorize other people to use that fax number?

21        A.    No.

22        Q.    Did you ever tell JoAnna Fry that she couldn't

23    authorize other people to use that fax number?

24        A.    There are no other people, so -- I've never

25    told her that, no, but there are no other people to --

1    STATE OF TENNESSEE          )

2    COUNTY OF FAYETTE           )

3          I hereby certify that the witness in the

4    foregoing deposition, WESLEY B. MCLAUGHLIN, D.C., was by

5    me duly sworn to testify to the truth, the whole truth,

6    and nothing but the truth, in the within-entitled cause;

7    that said deposition was taken at the time and place

8    herein named; that the deposition is a true record of

9    the witness's testimony as reported by me, a duly

10   certified shorthand reporter and a disinterested person,

11   and was thereafter transcribed into typewriting by

12   computer.

13         I further certify that I am not interested in

14   the outcome of the said action, nor connected with, nor

15   related to any of the parties in said action, nor to

16   their respective counsel.

17         IN WITNESS WHEREOF, I have hereunto set my hand

18   this 12th day of April, 2015.

19   Reading and Signing was:

20    _X_ requested    ___ waived    ___ not requested

21

22

23

24         RHONDA S. SANSOM, LCR NO. 685

25         STATE OF TENNESSEE

Exhibit RR

DAWN TAYLOR  Non-Confidential                                    May 08, 2014
TRUE HEALTH vs. MCKESSON CORPORATION                                      1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   TRUE HEALTH CHIROPRACTIC, INC.,
    an Ohio corporation, individually
5   and as the representative of a
    class of similarly situated
6   persons,

7               Plaintiff,

8          vs.                    No. 3:13-CV-02219-JST

9   MCKESSON CORPORATION and JOHN
    DOES 1-10,
10
                Defendants.
11  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13

14              DEPOSITION OF

15              DAWN TAYLOR

16          NON-CONFIDENTIAL PORTIONS

17          Thursday, May 8, 2014

18              10:01 a.m.

19

20      Three Embarcadero Center, Suite 1650

21          San Francisco, California

22

23

24      Tracy L. Perry, RPR, CCRR, CSR No. 9577

25



1  have any personal knowledge of any of the items.

2      Q   Were you aware that McKesson was sent an FCC

3  complaint for the sending of unsolicited faxes back in

4  2008?

5      A   Was I aware in 2008 that McKesson was sent --

6      Q   Well, I guess, let me -- let me ask you this.

7          (Deposition Exhibit 6 was marked.)

8  BY MR. KELLY:

9      Q   I'll show you what's been marked as Exhibit 6.

10  This is an FCC letter to McKesson dated May 9th, 2008.

11  Have you seen this document before?

12      A   No.

13      Q   Is this the first time, as you sit here today,

14  that you became aware that there was an FCC letter sent

15  to McKesson claiming that it sent unsolicited

16  advertisements by fax?

17      MR. JONES:  You're asking her is this the first time

18  she's seen this document?

19      MR. KELLY:  Well, I think her answer --

20      Q   This is the first time you've seen Exhibit 6,

21  correct?

22      MR. JONES:  Right.

23  BY MR. KELLY:

24      Q   Correct?

25      A   That is correct.



Case 4:13-cv-02219-HSG    Document 364    Filed 03/05/20    Page 365 of 375

DAWN TAYLOR  Non-Confidential                           May 08, 2014
TRUE HEALTH vs. MCKESSON CORPORATION                           87

```
 1                STATE OF CALIFORNIA    )
                                    :  ss
 2                COUNTY OF CONTRA COSTA)

 3

 4            I, the undersigned, a Certified Shorthand

 5   Reporter of the State of California, do hereby certify:

 6              That the foregoing proceedings were taken

 7   before me at the time and place herein set forth; that

 8   any witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14              I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17              IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20            Dated: May 16, 2014

21

22            Tracy L. Perry

23            _____
              TRACY L. PERRY
              CSR No. 9577

24

25
```



Exhibit SS

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


TRUE HEALTH CHIROPRACTIC,
INC., and MCLAUGHLIN
CHIROPRACTIC ASSOCIATES,
INC., individually and as the
representatives of a class of
similarly-situated persons,
                                        NO.
        Plaintiffs,                     3:13-CV-0022119-JST
vs.

MCKESSON CORPORATION,
MCKESSON TECHNOLOGIES, INC.,
and JOHN DOES 1-10,

        Defendants.



DEPOSITION OF DAVID FAUPEL

March 31, 2015 - 10:00 a.m.

Tiffany Alley Global

11539 Park Woods Circle

Suite 301

Alpharetta, Georgia

Lynette L. Mueller, CRR, RDR, FAPR, CCR-2887
.

```
 1   program to get paid back?
 2        A.    I don't remember.
 3        Q.    Okay.
 4              MR. KELLY:  Let's mark this as Exhibit 1.
 5              (EXHIBIT NO. 1 MARKED.)
 6   BY MR. KELLY:
 7        Q.    I'm showing you what's been marked as
 8   Exhibit 1.  I'll represent to you that this is a
 9   copy of a letter from the Federal Communications
10   Commission to McKesson Corporation, formerly known
11   as Relay Health Corporation.  It's dated May 9,
12   2008.
13              So in May of 2008, you were working as a
14   consultant at Haystack; correct?
15        A.    Yes, I was.
16        Q.    Have you ever heard of a company called
17   Relay Health Corporation?
18        A.    Yes.
19        Q.    What is your understanding of the work or
20   the business that Relay Health Corporation was
21   involved in?
22        A.    They were -- the best way to describe it
23   is -- a technology connector.  They connected
24   disparate EHR and other hospital systems for
25   physicians and hospitals.
```

1      Q.    All right.  Did McKesson purchase
2  Relay Health?
3      **A.    Yes, they did.**
4      Q.    Do you know when McKesson purchased
5  Relay Health?
6      **A.    I don't.**
7      Q.    Okay.  Had you had any contact, while you
8  worked at McKesson or as the consultant for
9  Haystack, with anyone at Relay Health?
10     **A.    Yes.**
11     Q.    Okay.  Have you ever heard of the name
12 Giovani Colella, C-O-L-E-L-L-A?
13     **A.    I don't.**
14     Q.    Do you recognize the address, 1 Post
15 Street, in San Francisco, California?
16     **A.    I'm speculating that it's the McKesson**
17 **headquarter address.**
18     Q.    All right.  Have you ever seen Exhibit 1
19 prior to today?
20     **A.    I have not.**
21     Q.    Okay.  All right.
22           Had you had any conversations with anyone
23 at McKesson regarding the legality of sending
24 advertisements by fax?
25     **A.    No.**

```
 1                      CERTIFICATE

 2    STATE OF GEORGIA:
      COUNTY OF FULTON:
 3
              I hereby certify that the foregoing
 4    transcript, consisting of Pages 1-65, was taken
      down, as stated in the caption, and the colloquies,
 5    questions and answers were reduced to typewriting
      under my direction; that the transcript is a true
 6    and correct record of the evidence given upon said
      proceeding.
 7            I further certify that I am not a relative
      or employee or attorney of any party, nor am I
 8    financially interested in the outcome of this
      action.
 9            I have no relationship of interest in this
      matter which would disqualify me from maintaining
10    my obligation of impartiality in compliance with
      the Code of Professional Ethics.
11            I have no direct contract with any party
      in this action and my compensation is based solely
12    on the terms of my agreement with my employer.
              Nothing in the arrangements made for this
13    proceeding impacts my absolute commitment to serve
      all parties as an impartial officer of the court.

14
              Dated April 6, 2015.
15

16

17    _____

18            Lynette L. Mueller, RDR, CRR, FAPR,
              CCR-No. 2887
19

20

21

22

23

24

25
```

Exhibit TT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


TRUE HEALTH CHIROPRACTIC,
INC., and MCLAUGHLIN
CHIROPRACTIC ASSOCIATES,
INC., individually and as
the representatives of a
class of similarly-situated
persons,

       Plaintiff,

                  NO.  3:13-CV-002219-JST
vs.

MCKESSON CORPORATION,
MCKESSON TECHNOLOGIES,
INC., and JOHN DOES 1-10

       Defendants.



DEPOSITION OF

HOLLY WILSON

April 10, 2015

9:58 a.m.

Tiffany Alley Global

11539 Park Woods Circle

Suite 301

Alpharetta, Georgia

Laura M. MacKay, RPR, CCR-B-1736

.

1    Q.  Were the RelayHealth employees located in

2  the Sanctuary office?

3    **A.  They were.**

4    Q.  And how many employees were there for the

5  RelayHealth?

6    **A.  I don't know.**

7    Q.  Do you have an approximation?

8    **A.  I don't.  Different business unit.**

9    Q.  Do you know if they had any offices outside

10  of the Sanctuary drive location?

11    **A.  They did.**

12    Q.  Do you know where?

13    **A.  North Druid Hills.**

14    Q.  I'm sorry?

15    **A.  Sorry.  North Druid Hills, in Atlanta.**

16    Q.  Okay.  Is that it?

17    **A.  That I'm aware of.**

18       (Deposition Exhibit 14 marked.)

19  BY MR. GOOD:

20    Q.  I'm showing you what's been marked as

21  Deposition Exhibit 14.  This is sent certified mail

22  from the Federal Communications Commission to

23  McKesson Corporation formerly known as RelayHealth

24  Corporation.  Do you see that on the first page?

25    **A.  I do.**

1      Q.  Have you ever seen this document before?

2      **A.  Only as part of the current complaint.**

3      Q.  Okay.  So prior to receiving the complaint,

4  you had never seen --

5      **A.  I had not seen it, no.**

6      Q.  Were you ever made aware that McKesson had

7  been told that the fax advertising was a violation

8  of Federal Communications Commission's rules?

9      **A.  No.**

10     Q.  Was there ever any directive that you were

11 aware of not to use faxing to send advertisements?

12     **A.  From whom?**

13     Q.  From anybody at McKesson.

14         MS. CHEUNG:  Objection as to which McKesson

15 entity you are talking about.

16     **A.  And no is the answer.**

17 BY MR. GOOD:

18     Q.  Were you ever told that any form of

19 marketing was not to be used?

20     **A.  No.**

21     Q.  So there was no type of marketing that was

22 forbidden --

23     **A.  No.**

24     Q.  -- by any policy that you are aware of?

25         That's correct?

```
 1                        CERTIFICATE

 2   STATE OF GEORGIA:
     COUNTY OF FULTON:
 3
             I hereby certify that the foregoing
 4   transcript was taken down, as stated in the caption,
     and the colloquies, questions and answers were
 5   reduced to typewriting under my direction; that the
     transcript is a true and correct record of the
 6   evidence given upon said proceeding.
             I further certify that I am not a relative
 7   or employee or attorney of any party, nor am I
     financially interested in the outcome of this
 8   action.
             I have no relationship of interest in this
 9   matter which would disqualify me from maintaining my
     obligation of impartiality in compliance with the
10   Code of Professional Ethics.
             I have no direct contract with any party in
11   This action and my compensation is based solely on
     the terms of my agreement with my employer.
12           Nothing in the arrangements made for this
     proceeding impacts my absolute commitment to serve
13   all parties as an impartial officer of the court.

14           This the 23rd of April, 2015.

15

16
                              Laura M. Mackay
17   _____
     LAURA M. MACKAY, CCR-B-1736
18

19

20

21

22

23

24

25
```