ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone:  (415) 788-4220
rschubert@schubertlawfirm.com
wjonckheer@schubertlawfirm.com

BRIAN J. WANCA (admitted *pro hac vice*)
GLENN L. HARA (admitted *pro hac vice*)
RYAN M. KELLY (admitted *pro hac vice*)
ROSS M. GOOD (admitted *pro hac vice*)
**ANDERSON & WANCA**
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone:  (847) 368-1500
bwanca@andersonwanca.com
ghara@andersonwanca.com
rkelly@andersonwanca.com
rgood@andersonwanca.com

*Class Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| TRUE HEALTH CHIROPRACTIC, INC., and MCLAUGHLIN CHIROPRACTIC ASSOCIATES, INC., individually and as the representative of a class of similarly-situated persons, | No. 4:13-cv-02219-HSG |
| Plaintiffs, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DECERTIFY THE CLASS** |
| v. | Hon. Judge Haywood S. Gilliam, Jr. |
| MCKESSON CORPORATION, MCKESSON TECHNOLOGIES, INC., and JOHN DOES 1-10, | Hearing Date: May 21, 2020 |
| Defendants. | Time: 2:00 p.m. Courtroom: 2, 4th Floor |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

Table of Authorities ............................................................................................................. ii

I.    Neither the "Updated" Sponsler Report nor the Amerifactors Bureau Order supports
      decertification................................................................................................................ 1

      A.    Expert discovery closed nearly five years ago, and the "Updated" Sponsler
            Report is untimely.............................................................................................. 1

      B.    The Amerifactors Bureau Order is irrelevant and does not "narrow[] the
            scope of the TCPA," as Defendants claim .......................................................... 2

      C.    If the Ameirfactors Bureau Order truly "narrows the scope of the TCPA," as
            Defendants claim, then it cannot be applied retroactively ..................................... 8

      D.    In the alternative, the Court should modify the class definition to create a
            "Stand-Alone Fax Machine Class" and on "Online Fax Services Class." ............ 10

II.   Neither the untimely Nowlis Report nor Defendants' untimely claimed "other
      evidence of consent" warrants decertification ................................................................ 12

      A.    The Nowlis Report is untimely ........................................................................... 12

      B.    Even if it were timely, the Nowlis Report does not create any individualized
            issue on whether the EULA constitutes "prior express invitation or
            permission." ..................................................................................................... 13

      C.    Defendants' claimed "other evidence of consent" is untimely ............................ 15

Conclusion ........................................................................................................................... 16

1

## **TABLE OF AUTHORITIES**

2

3
<u>**Cases**</u>

4
*American Copper & Brass, Inc. v. Lake City Indus. Prods.*,
    757 F.3d 540 (6th Cir. 2014)..................................................................................7

5

6
*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013)............................................................................................11

7

8
*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)..............................................................................................8

9

10
*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013)..............................................................................11

11

12
*Comcast Corp. v. FCC*,
    526 F.3d 763 (D.C. Cir. 2008)..............................................................................7

13

14
*Covey v. Hollydale Mobilehome Estates*,
    116 F.3d 830 (9th Cir. 1997)................................................................................9

15

16
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)............................................................................................15

17
*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)..............................................................................10

18

19
*Gorss Motels, Inc. v. Safemark Sys., LP*,
    931 F.3d 1094 (11th Cir. 2019)..........................................................................14

20

21
*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992)................................................................................9

22

23
*Holtzman v. Turza*,
    728 F.3d 682 (7th Cir. 2013)................................................................................7

24

25
*Imhoff Inv., LLC v. Alfoccino, Inc.*,
    792 F.3d 627 (6th Cir. 2015)................................................................................7

26
*In re NOS Commc'ns, MDL No. 1357*,
    495 F.3d 1052 (9th Cir. 2007)..............................................................................9

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013)····················································································11

4

5

*Ind. Bell Tel. Co., Inc. v. McCarty*,
    362 F.3d 378 (7th Cir. 2004)······················································································5

6

7

*J2 Glob. Commc'ns, Inc. v. Protus IP Sols.*,
    2010 WL 9446806 (C.D. Cal. Oct. 1, 2010)································································6

8

9

*Jamison v. First Credit Servs., Inc.*,
    290 F.R.D. 92 (N.D. Ill. 2013)····················································································9

10

11

*Johnson v. Mammoth Recreations, Inc.*,
    975 F.2d 604 (9th Cir. 1992)····················································································13

12

13

*Johnson v. Yahoo! Inc.*,
    2018 WL 835339 (N.D. Ill. Feb. 13, 2018)································································16

14

15

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)································································································15

16

17

*Marks v. Crunch San Diego, LLC*,
    904 F.3d 1041 (9th Cir. 2018)····················································································8

18

19

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1036 (9th Cir. 2012)····················································································8

20

*Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*,
    323 F.3d 649 (8th Cir. 2003)······················································································7

21

22

*MPower Commc'ns Corp. v. Ill. Bell Tel. Co.*,
    457 F.3d 625 (7th Cir. 2006)······················································································7

23

24

*Physicians Healthsource, Inc. v. Stryker Sales Corp.*,
    2014 WL 11429029 (W.D. Mich. Feb. 20, 2014)······················································12

25

26

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009)······················································································8

27

28

# TABLE OF AUTHORITIES

## Cases

*Schramm v. JPMorgan Chase Bank, N.A.*,
  2013 WL 7869379 (C.D. Cal. Dec. 13, 2013) ...................................................................13

*Tel. Co. of the Sw. v. Falcon*,
  457 U.S. 147 (1982) ..........................................................................................................10

*Torres v. City of Los Angeles*,
  548 F. 3d 1197 (9th Cir. 2008) ........................................................................................ 13

*True Health Chiropractic, Inc. v. McKesson Corp.*,
  896 F.3d 923 (9th Cir. 2018) .......................................................................................1, 10

*U.S. West Commc'ns, Inc. v. Hamilton*,
  224 F.3d 1049 (9th Cir. 2000) ............................................................................................7

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*,
  593 F.3d 802 (9th Cir. 2010) ...........................................................................................10

*Van Patten v. Vertical Fitness Grp., LLC*,
  847 F.3d 1037 (9th Cir. 2017)............................................................................................3

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..........................................................................................................11

*Werdeaugh v. Blue Diamond Growers*,
  2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ..................................................................13

*Whiteamire Clinic, P.A., Inc. v. Cartridge World N. Am., LLC*,
  2017 WL 561832 (N.D. Ohio Feb. 13, 2017) .....................................................................6

*Yeti by Molly Ltd v. Deckers Outdoor Corp.*,
  259 F.3d 1101 (9th Cir. 2001) .........................................................................................13

## Statutes

28 U.S.C. § 2342(1) ...............................................................................................................7, 3

47 U.S.C. § 155(c)(7)..................................................................................................................3

47 U.S.C. § 227(a)(3) ............................................................................................................ 2, 7

# TABLE OF AUTHORITIES

## Statutes

47 U.S.C. § 227(b)(1)(C) ........................................................................... 2, 11
47 U.S.C. § 227(b)(1)(C)(iii) ..........................................................................11
47 U.S.C. § 227(b)(2) ..................................................................................... 9
47 U.S.C. § 227(b)(3) ................................................................................... 11

## Rules & Regulations

47 C.F.R. § 1.102(b)) ...................................................................................... 5
47 C.F.R. § 1.115 ........................................................................................... 3
Fed. R. Civ. P. 16(b) ....................................................................................... 1
Fed. R. Civ. P. 26 ......................................................................................... 13
Fed. R. Civ. P. 37(c) ..................................................................................... 12
Fed. R. Evid. 401 .......................................................................................... 15
Fed. R. Evid. 402 .......................................................................................... 15
Fed. R. Evid. 702 .......................................................................................... 15

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
 10 FCC Rcd. 12391 (FCC Aug. 7, 1995)····················································3

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
 18 FCC Rcd. 14014 (FCC July 3, 2003) ........................................................3

*In re WestFax, Inc. Petition for Consideration & Clarification*,
 30 FCC Rcd. 8620 (CGAB Aug. 28, 2015)················································5

*In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling*,....................................3
 CG Docket Nos. 02-278, 05-338, Declaratory Ruling, 2019 WL 6712128
 (CGAB Dec. 9, 2019)

## Other Authorities

S. Rep. 102-178, 1991 U.S.C.C.A.N. 1968 .......................................................7

Plaintiff and representative of the Class, McLaughlin Chiropractic Associates, Inc. ("McLaughlin" or "Plaintiff"), respectfully states as follows in opposition to the Motion to Decertify the Class filed by Defendants, McKesson Corporation ("McKesson Corp.") and McKesson Technologies, Inc. ("MTI") (collectively, "Defendants"). (Doc. 362). As argued below, the Court should deny the motion to decertify and proceed to rule on Plaintiff's pending Motion for Summary Judgment in favor of the class. (Doc. 360). Doing so will not cause further delay in this case, since an order denying a motion to decertify a class is not appealable under Rule 23(f). *See Gary v. Sheahan*, 188 F.3d 891, 892 (7th Cir. 1999).

## I.   Neither the "Updated" Sponsler Report nor the Amerifactors Bureau Order supports decertification.

### A.   Expert discovery closed nearly five years ago, and the "Updated" Sponsler Report is untimely.

Defendants' Motion to Decertify relies upon the "Updated Expert Report of Ken Sponsler," dated February 6, 2020. (Defs.' Mot. at 6). The Court should not consider the "Updated" Sponsler Report because (1) the "expert discovery cut-off" passed nearly five years ago under the operative Case Management Order (Doc. 190); and (2) McKesson did not seek leave to modify the Case Management Order, and does not even attempt to demonstrate the "good cause" necessary to do so under Fed. R. Civ. P. 16(b).

On May 13, 2015, the Court entered an order on the parties' agreed stipulation stating that "[t]he expert discovery cut-off is July 2, 2015," and entering the parties' proposed schedule for class-certification briefing. (Doc. 190, Stipulation & Order to Extend Case Management Schedule). Plaintiffs' expert, Robert Biggerstaff, served his expert report on April 22, 2015, and Defendants' expert, Ken Sponsler, served his expert report on June 18, 2015. Pursuant to the Case Management Order, expert discovery closed July 2, 2015, and Plaintiffs timely filed their motion for class certification on July 16, 2015. (Doc. 209, Pls.' Mot. Class Certification).

This Court subsequently denied Plaintiff's initial motion for class certification, which was vacated in large part by the Ninth Circuit and remanded on July 17, 2018. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923 (9th Cir. 2018). In the nearly two years that have followed the remand, Defendants have not obtained a Court order reopening expert discovery, nor attempted to

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DECERTIFY

show the "good cause" required for such a reopening under Rule 16(b). The Court should not even consider the "Updated" Sponsler Report.

**B.**   **The Amerifactors Bureau Order is irrelevant and does not "narrow[] the scope of the TCPA," as Defendants claim.**

The TCPA prohibits using a "telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless certain conditions are met. 47 U.S.C. § 227(b)(1)(C). The statute defines "telephone facsimile machine" as any "equipment which has the *capacity* (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." 47 U.S.C. § 227(a)(3) (emphasis added).

Plaintiffs' expert, Robert Biggerstaff, explained in connection with Plaintiff's Motion for Class Certification that telephone facsimile machines use the "T.30 standard," which "employs a positive confirmation protocol, whereby a fax transmission is positively confirmed by the receiving machine before the sending machine will record the transmission as successful." (Doc. 209-3, Expert Report of Robert Biggerstaff ("Biggerstaff Report") ¶ 29). Biggerstaff stated that "a record of a 'successful' transmission by computer based facsimile transmission systems reflects the successful completion of all the necessary phases of the T.30 fax transmission to a device with a fax-modem and appropriate software," and "[t]his is true regardless of the type of fax machine (i.e., a 'stand-alone' fax machine or a computer with a fax-modem) which received the T.30 fax transmission." (*Id.* ¶ 46). Biggerstaff states "categorically" that "without exception, every device of which I am aware that can receive a T.30 fax transmission, has the capacity to use a regular telephone line for the receipt of a T.30 fax transmission and to print the contents of the T.30 fax transmission," and that "a record of a successful transmission by a computer based facsimile transmission system is a record that such a transmission was sent to and received by equipment which has the capacity to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." (*Id.* ¶¶ 49–50).

Defendants argue the Court should adopt a narrow interpretation of the terms "telephone facsimile machine" and "capacity" under an order issued by the FCC's Consumer & Governmental

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DECERTIFY

Affairs Bureau on December 9, 2019, opining that an "online fax service" is not a "telephone facsimile machine." *In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling*, CG Docket Nos. 02-278, 05-338, Declaratory Ruling, 2019 WL 6712128 (CGAB Dec. 9, 2019) ("Amerifactors Bureau Order").[1] The Court should decline to do so because the TCPA "is a remedial statute intended to protect consumers," and its terms must "be construed in accordance with that purpose." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1047 (9th Cir. 2017).

Accordingly, the FCC and the courts have rejected every attempt over the years by fax advertisers to construe the term "telephone facsimile machine" or "capacity" narrowly in favor of fax advertisers. In 1995, the FCC ruled that "telephone facsimile machine" includes "computer fax modem boards," which "enable personal computers to transmit messages to or receive messages from conventional telephone facsimile machines or other computer fax modem boards," holding such devices are "telephone facsimile machines." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12405, ¶ 28 (FCC Aug. 7, 1995) ("1995 Order").

In 2002, the FCC initiated a rulemaking proceeding to update its regulations, seeking public comment on, among other issues, whether the development of "computerized fax servers" might "warrant revisiting the rules on unsolicited faxes." *In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991*, 17 FCC Rcd. 17459, 17482 (Pub. Notice Sept. 18, 2002). Several "industry representatives" urged the FCC to rule that faxes sent to "fax servers" and then forwarded to the end-user's email "inbox" are not sent to a "telephone facsimile machine" because they "do not implicate the harms Congress sought to redress in the TCPA, as they are not reduced to paper and can be deleted from one's inbox without being opened or examined." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14133 ¶ 199 (FCC July 3, 2003) ("2003 Order").

---

[1] The Amerifactors Bureau Order is currently on appeal to the full Commission pursuant to 47 C.F.R. § 1.115, which is a "condition precedent to judicial review" under 47 U.S.C. § 155(c)(7). *See* Declaration of Glenn L. Hara ("Hara Decl."), Ex. A, *In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling*, CG Docket Nos. 02-278, 05-338, Application for Review (Jan. 8, 2020). The order is not a "final order" of the FCC covered by the Hobbs Act, 28 U.S.C. § 2342(1).

1    In the 2003 Order, the FCC rejected these arguments, ruling that when a fax is sent to a "fax

2   server" and then forwarded to the end-user by email, the "fax server" is a "telephone facsimile

3   machine." *Id.* ¶ 200. The FCC reasoned that the TCPA "broadly applies to any equipment that has

4   the *capacity* to send or receive text or images," and that the focus on the "capacity to transcribe text

5   or images" is designed to "ensure that the prohibition on unsolicited faxing not be circumvented." *Id.*

6   ¶ 201. The FCC ruled that "unsolicited faxes impose costs on consumers, result in substantial

7   inconvenience and disruption, and also may have serious implications for public safety." *Id.* ¶ 199.

8   The FCC ruled that "Congress could not have intended to allow easy circumvention of its

9   prohibition when faxes are (intentionally or not) transmitted to personal computers and fax servers,

10   rather than to traditional stand-alone facsimile machines." *Id.* The FCC ruled that, although a fax

11   may not automatically print when it is received by a fax server and forwarded to the user by email,

12   such faxes may nevertheless "shift the advertising costs of paper and toner to the recipient, if they

13   are printed," and they "may also tie up lines and printers so that the recipients' requested faxes are

14   not timely received." *Id.* ¶ 202.

15    Apart from the harms of lost paper or toner or tying up of lines, the FCC ruled that Congress

16   was also concerned with the "interference, interruptions, and expense" to businesses and interstate

17   commerce in general caused by junk faxes, and ruled that faxes sent to a fax server and forwarded to

18   the user's email "inbox" "may increase labor costs for businesses, whose employees must monitor

19   faxes to determine which ones are junk faxes and which are related to their company's business." *Id.*

20   ¶¶ 199–202. The FCC ruled that "because a sender of a facsimile message has no way to determine

21   whether it is being sent to a number associated with a stand-alone fax machine or to one associated

22   with a personal computer or fax server, it would make little sense to apply different rules based on

23   the device that ultimately received it." *Id.* ¶ 202. The FCC also addressed the concerns of

24   commenters regarding "commercial facsimile services," that "transmit faxes to the recipients as

25   email attachments," ruling that those "commercial facsimile services" do not violate the TCPA by

26   forwarding faxes to the recipients because "any rules the Commission adopts with respect to

27   unsolicited facsimile advertisements would not extend to facsimile messages transmitted as email

28   over the Internet." *Id.* ¶ 199 & n.736.

On September 25, 2009, WestFax, Inc., one of the largest "fax broadcasters" in the world, filed a petition asking the FCC to "clarify" the 2003 Order to rule that an "efax"—in which "[a] facsimile transmission is received on a fax server," and then "the fax server converts the message into a digital image file that is then sent as an email attachment via the Internet to the recipient"—is not sent to a "telephone facsimile machine." (Hara Decl., Ex. B, *WestFax, Inc. Petition for Consideration & Clarification*, CG Docket Nos. 02-278, 05-338 (Sept. 25, 2009) at 2)). WestFax argued that the evils Congress sought to remedy in the TCPA do not "make[] any sense" when applied to efaxes, and that "the House Report findings" cited in the 2003 Order "are terribly dated." *Id.* at 4. WestFax argued that Congress's findings regarding lost paper, toner, as well as its findings regarding time wasted "monitoring" unwanted faxes by employees, and "inability to process actual business communications or lines or printers tied up," were "not accurate with respect to faxes sent to fax servers." *Id.*

On August 28, 2015, the Bureau denied the WestFax Petition, relying largely on the 2003 Order. *In re WestFax, Inc. Petition for Consideration & Clarification*, 30 FCC Rcd. 8620, 8623, ¶ 9 (CGAB Aug. 28, 2015) ("WestFax Order"). The Bureau recognized that WestFax provided an "efax service" to customers called "FaxForward," which WestFax described as "a service that 'automatically converts received faxes into electronic images that are delivered directly to your email inbox.'" *Id.* ¶ 4. However, the Bureau rejected "the contention that efaxes do not implicate the TCPA's consumer protection concerns" because they "may shift the advertising costs of paper and toner to the recipient if they are printed" and they cause "interference, interruptions, and expense" the same as any junk fax. *Id.* ¶ 11. The Bureau ruled that efaxes "just like paper faxes, can increase labor costs for businesses, whose employees must monitor faxes to separate unwanted from desired faxes." *Id.* The Bureau applied the 2003 Order, ruling that "it would make little sense to apply a different set of rules (or, in this case, no rule at all) to faxes sent to one type of device (a standalone fax machine) versus another (a computer and its attachments) when the sender generally does not know what device will receive the fax." *Id.* No party sought reconsideration of the WestFax Order or filed an application for review with the full Commission, and so it carries "the FCC's imprimatur," as if it was issued by the full Commission. *Ind. Bell Tel. Co., Inc. v. McCarty*, 362 F.3d 378, 387 (7th Cir. 2004) (citing 47 C.F.R. § 1.102(b)).

Similarly, the courts have rejected fax advertisers' attempts to evade liability by arguing that faxes received by the end-user via an online fax service or "e-fax" are not sent to a "telephone facsimile machine." As the district court explained in *Am. Copper & Brass, Inc. v. Lake City Indus. Prods, Inc.*, 2013 WL 3654550, at *5 (W.D. Mich. July 12, 2013), although the 2003 Order "exempted from the TCPA the act of forwarding a fax by email," "the first step—the transmission of the original fax—still falls within the confines of the TCPA."

In *J2 Glob. Commc'ns, Inc. v. Protus IP Sols.*, 2010 WL 9446806, at *8 (C.D. Cal. Oct. 1, 2010), two providers of "online fax services" argued that, by intercepting and converting faxes to emails to their end-user clients, they were the "recipients" and had standing to assert TCPA claims. The district court rejected this argument, holding that "[g]iven the plain language, purpose, and statutory scheme of the TCPA, the Court concludes that 'the recipient' of an unsolicited fax is the person to whom the fax is directed and not an unknown intermediary, like j2 [or Protus], who intercepts the transmission." *Id.* The district court held that under the FCC rules, end-users who receive faxes on a computer as opposed to a stand-alone fax machine have no less right to sue for TCPA violations:

> [T]he FCC has concluded that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes.  However, a facsimile machine does not have standing under the TCPA; rather, "the recipient" has standing, "the recipient" being the person to whom the . . . unsolicited fax advertisement is directed.

*Id.* at *7 (citing 2003 Order).

In *Whiteamire Clinic, P.A., Inc. v. Cartridge World N. Am., LLC*, 2017 WL 561832, at *3 (N.D. Ohio Feb. 13, 2017), the plaintiff received the subject fax via an online fax service, which then converted it to email. The defendant argued that the plaintiff lacked standing to sue, and the district court rejected the argument, holding that, despite the lack of wasted paper or ink toner, the fax nevertheless "wasted [plaintiff's] time reviewing the junk emails that could have been spent on other business activities," and "impede[d] Plaintiff's ability to engage in the free flow of commerce," and that "Plaintiff suffered damages to his business in lost time and in diversion of resources and can be made whole by injunctive and monetary relief through this Court." *Id.*

1   Thus, the courts recognize, as the FCC recognized in the 2003 Order and the WestFax Order,

2   that "[e]ven a recipient who gets the fax on a computer and deletes it without printing suffers *some*

3   loss: the value of the time necessary to realize that the inbox has been cluttered by junk," and "[t]hat

4   loss, and the statutory remedy, are the same for all recipients." *Holtzman v. Turza*, 728 F.3d 682, 684

5   (7th Cir. 2013); *see also Imhoff Inv., LLC v. Alfoccino, Inc.*, 792 F.3d 627, 632 (6th Cir. 2015)

6   (quoting *Holtzman* with approval). The Sixth Circuit recognized in *American Copper & Brass, Inc.*

7   *v. Lake City Indus. Prods*., 757 F.3d 540, 544 (6th Cir. 2014), that "Congress was generally

8   concerned with the costs associated with unsolicited fax advertisements. But unsolicited fax

9   advertisements impose costs on all recipients, irrespective of ownership and the cost of paper and

10  ink, because such advertisements waste the recipients' time *and impede the free flow of commerce*."

11  The Eighth Circuit held in *Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 655 (8th Cir.

12  2003), that "unsolicited fax advertising interferes with company switchboard operations and burdens

13  the computer networks of those recipients who route incoming faxes into their electronic mail

14  systems." These case authorities are consistent with the congressional "purpose" in passing the

15  TCPA: to "facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and

16  automatic dialers." S. Rep. 102-178 at 1, 1991 U.S.C.C.A.N. 1968, 1968.

17      On December 9, 2019, the Consumer & Governmental Affairs Bureau issued the Bureau

18  Order stating that an "online fax service" is not a "telephone facsimile machine." *Amerifactors*

19  *Bureau Order*, 2019 WL 6712128, at *1. Unlike the 2003 Order, the Amerifactors Bureau Order is

20  not a "final order" of the FCC covered by the Hobbs Act, 28 U.S.C. § 2342(1), and this Court should

21  decline to follow it. *See Comcast Corp. v. FCC*, 526 F.3d 763, 770 (D.C. Cir. 2008) ("unchallenged

22  staff decisions are not Commission precedent"); *MPower Commc'ns Corp. v. Ill. Bell Tel. Co.*, 457

23  F.3d 625, 631 (7th Cir. 2006) (order by FCC bureau was mere "action by subordinate employees"

24  where "not appealed to, or passed on, by the Commission"). In contrast, *U.S. West Commc'ns, Inc. v.*

25  *Hamilton*, 224 F.3d 1049, 1054 (9th Cir. 2000), involved a "final order" by the full FCC.

26      The Amerifactors Bureau Order is also irrelevant because Plaintiff does not assert that an

27  "online fax service" is "equipment" with the requisite "capacity" to be a "telephone facsimile

28  machine" under 47 U.S.C. § 227(a)(3). A "service" is not "equipment." The Bureau's reasoning is

akin to stating that a ride-sharing "service" like Uber is not "equipment" with the capacity to move

people from one location to another (i.e., an automobile). No one claims that Uber is an automobile, and no one claims that an online fax service, such as the "commercial facsimile services" considered in the 2003 Order or the WestFax "Faxforward" service considered in the WestFax Order, is a "telephone facsimile machine." But the "fax server" that the online fax service uses to receive the fax transmission before it is forwarded to the end-user is "equipment" with the relevant "capacity." (*See* 2003 Order ¶¶ 199–201; Biggerstaff Report ¶¶ 49–50).

Moreover, to the extent the Bureau Order can be read to mean that a "fax server" has the "capacity" to print only if it is *not* used as part of an "online fax service" to forward the fax to the end-user by email, rather than to print, it is contrary to Ninth Circuit authority. The Ninth Circuit has held in the TCPA "autodialer" context that "a system need not *actually* store, produce, or call randomly or sequentially generated telephone numbers, it need only have the *capacity* to do it." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) (emphasis added) (quoting *Satterfield v. Simon & Schuster, Inc.*, 569 U.S. 946, 951 (9th Cir. 2009). The Ninth Circuit recently "decline[d]" to revisit "whether the device needs to have the current capacity to perform the required functions or just the potential capacity to do so" in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1053 (9th Cir. 2018). The notion that a device has the "capacity" to perform a task (such as print to paper) only if it is "actually" configured to do so contradicts *Meyer*.

### C.   If the Amerifactors Bureau Order truly "narrows the scope of the TCPA," as Defendants claim, then it cannot be applied retroactively.

Even if the Amerifactors Bureau Order was a relevant "final order" of the FCC and not contrary to Ninth Circuit precedent, it would still not "have retroactive effect" because it represents a radical change in policy from the 2003 Order—which ruled a fax sent to a "fax server" maintained by a "commercial facsimile service" and then forwarded to the end-user's email "inbox" is sent to a "telephone facsimile machine" (2003 Order ¶¶ 200–01)—and the WestFax Order—which ruled a fax is sent to a "telephone facsimile machine," even if received by a fax server that "converts received faxes into electronic images that are delivered directly to your email inbox" (WestFax Order ¶ 4). *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208–09 (1988).

The Supreme Court held in *Bowen* that "[r]etroactivity is not favored in the law," and so "administrative rules will not be construed to have retroactive effect unless" two conditions are met:

(1) the "language" of the administrative rule "requires this [retroactive] result"; and (2) Congress has granted the agency "the power to promulgate retroactive rules" in "express terms." *Id.* The Court held that "[e]ven where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." *Id.* The rule issued by the Secretary of Health & Human Services in *Bowen* was expressly intended to be "retroactive to July 1, 1981," so the first condition for retroactive effect—that the "language" of the rule requires retroactive application—was met. *Id.* at 207. Nevertheless, the Supreme Court held the rule could not be applied retroactively because Congress had not "expressly" granted HHS the power to make such a retroactive rule—either in the "specific grant of authority to promulgate regulations" for "retroactive corrective adjustments," or in the "general grant of authority to promulgate cost limit rules." *Id.* at 209.

Here, neither of the *Bowen* factors is met. There is no clear statement in the Amerifactors Bureau Order that it is intended to apply "retroactively." Even if there were, nothing in the TCPA expressly authorizes the FCC (let alone a subordinate Bureau acting on delegated authority) to issue retroactive rules. To the contrary, it directs the FCC to "implement" the statute. 47 U.S.C. § 227(b)(2). The word "implement" is inherently prospective, meaning "to begin to do or use (something, such as a plan): to make (something) active or effective." *See* http://www.merriam-webster.com/ dictionary/implement. Thus, the Amerifactors Bureau Order, even if it were treated as a "final order" of the FCC, cannot have retroactive effect under *Bowen. See also Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 102 (N.D. Ill. 2013) (holding the TCPA does not empower the FCC to issue retroactive rulings); *In re NOS Commc'ns, MDL No. 1357*, 495 F.3d 1052, 1062 (9th Cir. 2007) (refusing to give retroactive application to FCC regulations, where new rules would impose "new duties" on transactions already completed) (citing *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 835 (9th Cir. 1997) (holding "the courts disfavor retroactivity," and "administrative rules will not be construed to have retroactive effect unless their language requires this result")).

In sum, the Court should hold that the Amerifactors Bureau Order does not require reconsideration of the class definition, and deny Defendants' motion.

**D.     In the alternative, the Court should modify the class definition to create a "Stand-Alone Fax Machine Class" and an "Online Fax Services Class."**

In the alternative, if the Court finds it necessary to distinguish between faxes received on a "stand-alone" fax machine and faxes received via "online fax service" following the Amerifactors Bureau Order, then the Court "remains free to modify" the class definition. *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *True Health*, 896 F.3d at 932 (holding certification of Exhibit A-only subclass was appropriate, rather than outright denial of class certification). Here, the Court could modify the class definition to cover two separate classes, with modifications from the current class definition in underline:

**<u>Stand-Alone Fax Machine Class</u>**

All persons or entities who received faxes from "McKesson" <u>via a "stand-alone" fax machine</u> from September 2, 2009, to May 11, 2010, offering "Medisoft," "Lytec," "Practice Partner," or "Revenue Management Advanced" software or "BillFlash Patient Statement Service," where the faxes do not inform the recipient of the right to "opt out" of future faxes, and whose fax numbers are listed in Exhibit A to McKesson's Supplemental Response to Interrogatory Regarding Prior Express Invitation or Permission, but not in Exhibit B or Exhibit C to McKesson's Response to Interrogatory Regarding Prior Express Invitation or Permission.

**<u>Online Fax Services Class</u>**

All persons or entities who received faxes from "McKesson" <u>via an "online fax service"</u> from September 2, 2009, to May 11, 2010, offering "Medisoft," "Lytec," "Practice Partner," or "Revenue Management Advanced" software or "BillFlash Patient Statement Service," where the faxes do not inform the recipient of the right to "opt out" of future faxes, and whose fax numbers are listed in Exhibit A to McKesson's Supplemental Response to Interrogatory Regarding Prior Express Invitation or Permission, but not in Exhibit B or Exhibit C to McKesson's Response to Interrogatory Regarding Prior Express Invitation or Permission.

Plaintiff McLaughlin received Defendants' faxes on a "stand-alone" fax machine (Hara Decl., Ex. C), but that should not preclude McLaughlin from representing the Online Fax Services Class as well. As the Ninth Circuit held in *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011), "[d]iffering factual scenarios resulting in a claim of the same nature as other class

members does not defeat typicality." (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)); *see also In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 854 (6th Cir. 2013) (holding named plaintiffs' claims were "typical" of the class, even though they purchased only two of "twenty-one different models" of allegedly defective washing machines); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 797–98 (7th Cir. 2013) (holding commonality met where plaintiff purchased only one model of allegedly defective washing machines, but the class covered multiple models).[2] The claims need only be "reasonably co-extensive," and need not be "substantively identical," the same reason the Court allowed McLaughlin to represent recipients of faxes other than the twelve received by McLaughlin. (Doc. 331 at 22).

The common classwide questions for the current class are also common to each of the proposed alternative classes, including (1) whether the faxes are "advertisements," (2) whether each Defendant is a "sender," (3) whether the act of providing a fax number at product registration or agreeing to the EULA constitutes prior express permission (which the Court has already held it does not), (4) whether Defendants' faxes contain a compliant opt-out notice for purposes of their "established business relationship" defense under 47 U.S.C. § 227(b)(1)(C)(iii); and (5) whether the violations were "willful or knowing" for purposes of enhanced statutory damages under 47 U.S.C. § 227(b)(3). The additional question common to the Online Fax Services Class is whether a fax that is sent to a "fax server" maintained by an "online fax service" that is then converted to another format and sent to the end-user via email or made available via an online "portal" is sent to a "telephone facsimile machine" as defined by 47 U.S.C. § 227(a)(3), including the effect (if any) of the Amerifactors Bureau Order. The Court need not decide that question at this stage. It need only identify it as one of the "common questions" to be decided on the merits *after* class certification. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013) ("Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.").

---

[2] *Butler* discussed this issue in terms of Rule 23(a)(2) commonality, but commonality "tend[s] to merge" with typicality. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, n.5 (2011).

If the Court modifies the class definition, Class Counsel can use a three-step process to distinguish class members between the Stand-Alone Fax Machine Class and the Online Fax Services Class:

(1) Plaintiff's counsel will subpoena the Local Number Portability Administrator ("LNPA") of the Number Portability Administrative Center ("NPAC") to identify phone carriers for all phone numbers in the certified class for the date range included in the class definition;

(2) Plaintiff's counsel will use the NPAC subpoena response to subpoena each identified phone carrier to identify the subscriber of each phone number; and

(3) Plaintiff's counsel will designate for the "Online Fax Services Class" all numbers where the subscriber is an "online fax service" provider, such as Vonage, j2 Global, RingCentral, etc., and designate for the "Stand-Alone Fax Machine Class" all other subscribers.

(*See* Declaration of Ross M. Good ("Good Decl.") ¶¶ 3–5). Plaintiff's counsel have used this process to identify subscribers in other TCPA cases. (*Id.* ¶ 2 (citing *Physicians Healthsource, Inc. v. Stryker Sales Corp.*, 2014 WL 11429029, at *1 (W.D. Mich. Feb. 20, 2014)).

In sum, although the Amerifactors Bureau Order does not *require* the Court to alter the current class definition, if the Court deems it appropriate, it could modify the class definition to create a Stand-Alone Fax Machine Class and an Online Fax Services Class. If the Court does so, Plaintiff requests a period of 120 days in which to subpoena the third-parties necessary to separate class members into each class.

## II. Neither the untimely Nowlis Report nor Defendants' untimely claimed "other evidence of consent" warrants decertification.

### A. The Nowlis Report is untimely.

Defendants argue the class should be decertified based on the expert report of Steven Nowlis. (Defs.' Mot. at 16). As argued above with respect to the "updated" Sponsler Report, the Court ordered nearly five years ago that "[t]he expert discovery cut-off is July 2, 2015," and entered the parties' agreed schedule for class-certification briefing. (Doc. 190, Stipulation & Order to Extend Case Management Schedule). Defendants have neither obtained an Order reopening expert discovery, nor shown the "good cause" required to do so.

"Untimely disclosures under Rule 26 are subject to exclusion under Rule 37(c) unless the failure to disclose is substantially justified or harmless," and such exclusion is "automatic" unless the disclosing party shows "why Rule 37(c)'s sanction should not apply." *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *7 (N.D. Cal. Dec. 15, 2014) (citing *Yeti by Molly Ltd v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *Torres v. City of Los Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008)). Here, Defendants have "offered no reason or argument why admitting" Nowlis's untimely report "would be substantially justified or harmless" nearly five years after the expert discovery cut-off. *Id.* Similarly, Defendants do not provide any explanation, let alone a "sufficient explanation" for "their failure to seek any modification of the deadline," and Plaintiff will suffer prejudice by allowing the Nowlis Report, since Plaintiff did not have "the opportunity to depose him or to consider whether to proffer an opinion of a competing expert." *Schramm v. JPMorgan Chase Bank, N.A.*, 2013 WL 7869379, at *3 (C.D. Cal. Dec. 13, 2013).

Ultimately, the "good cause" standard for modifying a schedule "primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). If Defendants desired to submit a "survey" expert regarding whether the EULA constituted prior express permission, nothing stopped them from doing so five years ago. Defendants were not "diligent," and the Court should not consider the Nowlis Report.

**B.    Even if it were timely, the Nowlis Report does not create any individualized issue on whether the EULA constitutes "prior express invitation or permission."**

The Ninth Circuit held in this case that "[c]onsent, or lack thereof, is ascertainable by simply examining the product registrations and the EULAs" as to the Exhibit A-only Class. *True Health*, 896 F.3d at 932. This Court has already answered that question, ruling that "[r]eviewing the EULA as a whole, the Court finds that a reasonable user would only understand that assenting to its terms meant consenting to the transmission of usage information *from* the consumer *to* McKesson, not that McKesson would send the user faxed advertisements." (Doc. 331 at 13). The Court held that there is no "sweeping text" in the EULA, as there was in the disclosure in *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 791 (9th Cir. 2018), and that "unlike the disclosure in *Fober*, the EULA nowhere reveals that Defendants intended to 'use' and 'disclose' information for purposes of sending faxed advertisements." (*Id.* at 14). The Court held that "[a] generic (and somewhat cryptic)

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DECERTIFY

13

disclosure that certain information may 'assist' McKesson in 'offering . . . features and services' simply does not establish the required 'prior express invitation or permission' to send faxed advertisements." (*Id.*) The Court concluded that "[n]o reasonable customer would read that language and understand it to mean that agreeing to the EULA meant he or she would receive faxed advertisements." (*Id.*)

Notwithstanding the Court's unequivocal ruling that the EULA does not, as a matter of law, constitute prior express invitation or permission to send Plaintiff fax advertisements, Defendants now seek another bite at the apple through the Nowlis Report, arguing that prior express permission *cannot* be determined "by simply examining" the EULA, as the Ninth Circuit held, and, instead, an inquiry of each individual class member is required to determine whether a "reasonable consumer" would understand the EULA as granting express permission to send fax advertisements, citing *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1101 (11th Cir. 2019). (Defs.' Mot. at 6). Defendants argue that, since there was "significant variability" in how a group of non-class-member survey-takers interpreted the EULA in the Nowlis surveys, "current class members must individually testify regarding their understanding of the EULA to confirm whether they understood they had consented to receiving the faxes at issue." (*Id.* at 16). Defendants are mistaken.

First, Defendants' argument is nothing more than a dressed-up, unsupported motion to reconsider. Defendants have already lost on this issue at summary judgment as a matter of law, and they cannot pretend that loss did not happen. Defendants do not set forth the standards for a motion to reconsider, nor do they (or can they) claim that the Nowlis Report is somehow newly discovered evidence. On the contrary, in the face of the Court's ruling that the EULA does not constitute prior express permission to receive fax advertisements, Defendants repackage arguments already made through the Nowlis Report, which Defendants argue creates individual issues. Defendants are wrong. The Court has already addressed whether the EULA constitutes permission, finding it does not. Defendants' post-hoc survey does not somehow operate to undue the Court's prior ruling, and it should be disregarded.

Second, the premise of Nowlis Report is fundamentally flawed. As the Court has recognized, the "reasonable consumer" standard is an *objective* standard, which asks how a hypothetical reasonable consumer would understand the EULA. (Doc. 331 at 10). The Court applied that

standard, finding "a reasonable user" would "understand that assenting to [the EULA] meant consenting to the transmission of usage information *from* the consumer *to* McKesson, not that McKesson would send the user faxed advertisements," and that "[n]o reasonable customer would read that language and understand it to mean that agreeing to the EULA meant he or she would receive faxed advertisements." (*Id.* at 13–14). Even in the *Safemark* decision relied on by Defendants, the Eleventh Circuit found the defendant was entitled to summary judgment on its defense of prior express permission because "[a] reasonable consumer" would understand the specific contract language at issue in that case to constitute express permission to send fax advertisements, and held that the plaintiff's "subjective[]" understanding was "immaterial." 931 F.3d at 1101–02.

Here, putting to one side that the Court has already ruled on the issue, the subjective beliefs of any particular person, including the non-class members surveyed in the Nowlis Report, have no bearing on how a hypothetical "reasonable consumer" would understand the EULA. The Nowlis Report is irrelevant, and "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence is "relevant" if (1) "it has any tendency to make a fact more or less probable" and (2) "the fact is of consequence in determining the action." Fed. R. Evid. 401. Expert testimony in particular is allowed only if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580 (1993) (district court has "the task of ensuring that an expert's testimony both rests on a reliable foundation *and is relevant to the task at hand*") (emphasis added); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (applying rule to all expert testimony, not only scientific testimony).

In sum, Defendants made the strategic decision to move for summary judgment on the issue of prior express invitation or permission regarding the EULA. They lost, and they cannot relitigate that issue under the guise of a motion to decertify based on an untimely expert "survey" of non-class members.

**C.  Defendants' claimed "other evidence of consent" is untimely.**

In its Order granting class certification, this Court ruled that the Ninth Circuit already held the Exhibit A-only Class satisfies Rule 23(b)(3) predominance, and that McKesson's attempt to concoct new "consent defenses" as to this class, years after submitting a declaration identifying

1    which class members fell into which category of permission—after being sanctioned by the

2    magistrate judge for failure to provide that information—was contrary to the "law of the case." (Doc.

3    331 at 25–27). The Court held that McKesson's attempt to bring new consent evidence into the case

4    "illustrates the ways Defendants' persistent factual and legal shape-shifting has needlessly

5    complicated this case before, during, and after the appeal." (*Id.* at 27, n.8).

6    　　　　Defendants' latest attempt to interject new claimed "consent" evidence into this case years

7    after their deadline to provide that evidence fares no better. Defendants' reliance on *Johnson v.*

8    *Yahoo! Inc.*, 2018 WL 835339 (N.D. Ill. Feb. 13, 2018), is also misplaced. In that TCPA "text-

9    message" case, following the close of discovery and class certification, *a third party*, Sprint,

10   produced records showing that 20–25% of the class agreed to a contractual provision that Yahoo

11   "may provide you with notices . . . by but not limited to email, regular mail, SMS, MMS, text

12   message, postings on the Service, or other reasonable means now known or hereinafter developed."

13   *Id.* at *3. The delay was "not attributable to some discovery misconduct by defendant," and the

14   analysis simply could not have been done until the third party produced the information. *Id.*

15   　　　　This case is the opposite of *Johnson*. Defendants in this case were ordered to "identify every

16   putative class member who supposedly gave permission and explain how that recipient gave

17   permission" after "completely ignor[ing]" Magistrate Judge Ryu's prior discovery orders, and

18   "Defendants later filed a declaration certifying that [they] produced this information," and "objected

19   neither to Judge Ryu's imposition of sanctions, nor to Judge Ryu's instruction to produce the

20   relevant information." (Doc. 331 at 26 (quoting Doc. 178 at 12)). It was "unreasonable" for

21   Defendants to attempt to interject new evidence in opposition to Plaintiff's Motion for Class

22   Certification (*id.*), and it remains unreasonable today.

23   　　　　　　　　　　　　　　　　　　　**Conclusion**

24   　　　　For the foregoing reasons, the Court should deny Defendants' Motion to Decertify the Class

25   and grant any other relief the Court deems appropriate.

26

27

28   DATED: April 23, 2020　　　　　　　　McLaughlin Chiropractic Associates, Inc.
　　　　　　　　　　　　　　　　　　　individually and on behalf of the Class

1

2                                    By: s/ Glenn L. Hara

3                                    GLENN L. HARA (admitted *pro hac vice*)
                                     ROSS M. GOOD *(pro hac admitted)*
4                                    BRIAN J. WANCA *(pro hac admitted)*
                                     RYAN M. KELLY *(pro hac admitted)*
5                                    ANDERSON + WANCA
                                     3701 Algonquin Road, Suite 500
6                                    Rolling Meadows, IL 60008
                                     Telephone:  (847) 368-1500
7                                    Facsimile:  (847) 368-1501
                                     bwanca@andersonwanca.com
8                                    rmkelly@andersonwanca.com
                                     *Lead Counsel*
9

10                                   ROBERT C. SCHUBERT
                                     WILLEM F. JONCKHEER
11                                   SCHUBERT JONCKHEER & KOLBE LLP
                                     Three Embarcadero Center, Suite 1650
12                                   San Francisco, CA 94111
                                     Telephone: (415) 788-4220
13                                   Facsimile:  (415) 788-0161
                                     rschubert@schubertlawfirm.com
14                                   wjonckheer@schubertlawfirm.com
                                     *Class Counsel*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on April 23, 2020, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to all counsel of

4  record.

5

6                                                          /s/ Glenn L. Hara

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28