ROBERT C. SCHUBERT (SBN 62684)
WILLEM F. JONCKHEER (SBN 178748)
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: (415) 788-4220
rschubert@sjk.law
wjonckheer@sjk.law

BRIAN J. WANCA (*pro hac vice*)
RYAN M. KELLY (*pro hac vice*)
ROSS M. GOOD (*pro hac vice*)
GLENN L. HARA (*pro hac vice*)
ANDERSON & WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
bwanca@andersonwanca.com
rkelly@andersonwanca.com
rgood@andersonwanca.com
ghara@andersonwanca.com

*Counsel for Plaintiffs True Health Chiropractic, Inc. and McLaughlin Chiropractic Associates, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| TRUE HEALTH CHIROPRACTIC, INC., and MCLAUGHLIN CHIROPRACTIC ASSOCIATES, INC., individually and as the representative of a class of similarly-situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>MCKESSON CORPORATION, MCKESSON TECHNOLOGIES, INC., and JOHN DOES 1-10,<br><br>Defendants. | No. 4:13-cv-02219-HSG<br><br>**PLAINTIFFS' BRIEF ON TREBLE DAMAGES**<br><br>District Judge: Hon. Haywood S. Gilliam, Jr.<br><br>Trial Date: January 10, 2021<br>Time: 10:00 a.m. |

1

In compliance with the Scheduling Order (Doc. No. 493), Plaintiffs McLaughlin Chiropractic Associates, Inc. ("McLaughlin") and True Health Chiropractic, Inc. ("True Health") (collectively, "Plaintiffs") submit the following as their Brief on Treble Damages.

### A.    The TCPA Grants this Court Discretion to Award Treble Damages upon Finding the Defendant Acted Willfully or Knowingly.

The Telephone Consumer Protection Act ("TCPA") allows private rights of action and provides statutory damages of $500.00 for each violation. 47 U.S.C. § 227(b)(3)("Private right of action. A person or entity may . . . bring . . . (B) an action to recover for actual monetary loss from such a violation [of the TCPA] or to receive $500 in damages for each such violation"). The TCPA also grants courts discretion to award treble damages upon finding the defendant acted "willfully or knowingly":

> If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of damages to not more than 3 times the amount available under subparagraph (B) of this subsection.

47 U.S.C. 227(b)(3).

Although the Ninth Circuit Court of Appeals has not definitively determined what must be proven to establish the defendant acted willfully or knowingly, "most courts have interpreted the willful or knowing standard to require only that a party's actions were intentional, not that it was aware that it was violating the statute." *Davis v. Diversified Consultants, Inc.*, 36 F. Supp.3d 217, 226 (D. Mass. 2014). This includes the Eleventh Circuit Court of Appeals[1] and multiple district

---

[1] *Alea London Ltd. v. Am. Home Servs.*, 638 F.3d 768, 776 (11th Cir. 2011)("The TCPA does not require any intent for liability except when awarding treble damages. Importantly though, the intent for treble damages does not require any malicious or wanton conduct, but rather is satisfied by merely 'knowing' conduct."); *see also Charvat v. Ryan*, 879 N.E.2d 765, ¶ 18 (Ohio 2007)("to establish a knowing

courts in the Ninth Circuit. *E.g. Roylance v. ALG Real Estate Servs.*, 2015 U.S. Dist. LEXIS 44930, *31 (N.D. Cal. 2015)("The case law supports [the plaintiff's] position that a person need not have intent to commit an unlawful act in order to act willfully or knowingly under the TPCA."); *see also Wakefield v. ViSalus, Inc.*, 2019 U.S. Dist. LEXIS 104862, *3 (D. Or. 2019)("the Court adopts the more common interpretation that 'willfully' or 'knowingly' requires only that an unlawful act be done intentionally or volitionally, as opposed to inadvertently, and not that Defendant must have known that its conduct would violate the statute.")

**B.     The Court Should Find that McKesson Corporation Acted Willfully or Knowingly by Sending the Subject Fax Advertisements to True Health and McLaughlin.**

---

violation of the [TCPA] for an award of treble damages, a plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of law."); *Bridgeview Health Care Ctr., Ltd. v. Clark*, 2013 U.S. Dist. LEXIS 37310, at *22 (N.D. Ill. 2013)("a plaintiff need not prove that defendant had knowledge of the TCPA's provisions in order to establish that the defendant willfully or knowingly violated the TCPA.")(*internal quotation and citations omitted); Stewart v. Regent Asset Mgmt. Sols.,* 2011 U.S. Dist. LEXIS 50046, *19 (N.D. Ga. 2011)("a plaintiff need not prove that the defendant had knowledge of the TCPA's provisions in order to establish that the defendant willfully or knowingly violated the TCPA. The undersigned agrees with the *Charvat* court that 'to establish a *knowing* violation of the TCPA for an award of treble damages, a plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of the law.'"); *Neurocare Inst. of Cent. Fla., P.A. v. US Capital Access, Inc.*, 2014 U.S. Dist. LEXIS 73909, *15 (M.D. Fla. 2014)(awarding treble damages for TCPA violation while recognizing that "courts have held that a plaintiff need not prove that the defendant had knowledge of the TCPA's provisions in order to establish that the defendant willfully or knowingly violated the TCPA, but only that the defendant knew that it acted or failed to act in a manner that violated the statute."); *McCaskill v. Navient Sols., Inc.*, 178 F. Supp.3d 1281, 1293 (M.D. Fla. 2016)("The TCPA does not require malicious or wanton conduct, but rather is satisfied by merely knowing conduct. . . . the violator must know he was performing the conduct that violates the statute.")(*internal quotations and citation omitted*).

3

On April 20, 2010, True Health received an advertisement on its office fax machine touting "Medisoft," a software product of Defendant McKesson Corporation ("McKesson").[2] Over the course of several months in 2010, McLaughlin received numerous faxes on its office fax machine touting either "Medisoft" or "Lytec," another software product of McKesson.[3] These faxes were part of a marketing campaign conducted by Kari Holloway, a McKesson employee:

> Q. Where did you work prior to August of 2013?
> 
> A. McKesson.
> 
> Q. What is the corporate entity that you worked for?
> 
> A. I do not know all their corporate structures, so that would be difficult for me to answer other than McKesson.
> 
> Q. All right. When did you start working at McKesson?
> 
> A. My recollection is February of '09.
> 
> Q. And did you work there until August of 2013?
> 
> A. Yes.[4]
> 
> \*          \*          \*
> 
> Q. Do you know what business unit you worked at McKesson?
> 
> A. I worked in PPS.
> 
> Q. What does PPS stand for?

---

[2] The fax received by True Health has been designated as Exhibit No. 7 on the Joint Exhibit List (Doc. No. 432-3).

[3] The faxes received by McLaughlin have been designated as Exhibit Nos. 1, 4, 5, 6, 9. 11, 13, 16, 18, 22, 29, and 31 on the Joint Exhibit List (Doc. No. 432-3).

[4] Deposition of Kari Holloway, p. 6. For the Court's convenience, the quoted excerpts of Ms. Holloway's deposition testimony are attached hereto as Exhibit A.

4

|   |   |   |
|---|---|---|
| A. | | Physician practice solutions.[5] |

\*      \*      \*

Q. Was it within the scope of your employment at PPS to use Slingshot [a third-party fax broadcaster] to send faxes in bulk promoting Medisoft and Lytec?

MS. CHEUNG: Objection, calls for a legal conclusion, vague, lacks foundation.

A. I'm not sure I understand the question.

Q. One of your job duties and responsibilities was to promote Medisoft and Lytec, correct?

A. Correct.

Q. Was one way in which you were promoting Medisoft and Lytec would be to use Slingshot to send faxes promoting these products, correct?

MS. CHEUNG: Objection, lacks foundation.

A. That's correct.[6]

McKesson plainly acted "intentionally or volitionally, as opposed to inadvertently" when a McKesson employee, acting on McKesson's behalf, sent unsolicited advertisements for Medisoft and Lytec to the fax machines of True Health and McLaughlin. *See Wakefield v. ViSalus, Inc.*, 2019 U.S. Dist. LEXIS 104862, \*3 (D. Or. 2019)("the Court adopts the more common interpretation that 'willfully' or 'knowingly' requires only that an unlawful act be done intentionally or volitionally, as opposed to inadvertently, and not that Defendant must have known that its conduct would violate the statute.")

---

[5] Deposition of Kari Holloway, p. 9.

[6] Deposition of Kari Holloway, pp. 27-28.

In addition, in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007), the Supreme Court considered the meaning of a "willful" violation in a statutory-damages case under the Fair Credit Reporting Act. The Supreme Court concluded that a "willful" violation does not require that the defendant have actual knowledge it is violating the law as "willful" covers "not only knowing violations of a standard, but reckless ones as well." *Safeco,* 551 U.S. 56–57. The Supreme Court then held that conduct is "reckless" for purposes of a "willful" violation if the defendant's conduct is based on a reading of the law that is "objectively unreasonable." *Safeco*, 551 U.S. at 69; *see also Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp.2d 1030, 1044 (D. Minn. 2010)(holding the *Safeco* standard for "willfulness" applicable to the TCPA's "willful or knowing" standard).

Importantly, McKesson had recently been warned by the Federal Communications Commission ("FCC") that its practice of sending unsolicited advertisements via facsimile violated federal law. By certified letter dated May 9, 2008 ("the FCC Citation Letter"[7]), the FCC sent "McKesson Corporation f/k/a Relay Health Corporation" an "official **CITATION**" stating as follows: "It has come to our attention that your company, acting under your direction, apparently sent one or more unsolicited advertisements to telephone facsimile machines in violation of Section 227(b)(1) of the [TCPA]." FCC Citation Letter, p. 1 (*emphasis in original)*. This letter attached a copy of the TCPA, the regulation that implements the TCPA, as well as "one complaint at issue in this citation. The complaint addresses a facsimile advertisement [from] the telephone number 516-491-1891, which your business utilized during the time period at issue." FCC Citation Letter, p. 1 at

---

[7] The FCC Citation Letter has been designated as Exhibit No. 35 on the Joint Exhibit List for the Court's Determination of Treble Damages (Doc. No. 433-4).

6

fn. 1, 2. Although the FCC Citation Letter imposed no fines or other penalties on McKesson, it did include the following warning:

> **If, after receipt of this citation, you or your company violate the [TCPA] in any manner described herein, the Commission may impose monetary forfeitures not to exceed $11,000 for each such violation or each day of a continuing violation.**

FCC Citation Letter, p. 3 (*emphasis in original*).

The receipt of the FCC Citation Letter appears to have had little effect on McKesson's advertising operations as the fax advertising campaign that is the subject of this case began about a year later. As Ms. Holloway explained, she contracted with a "fax broadcasting company" to transmit the faxes at issue in this case on behalf of McKesson:

> Q. To your knowledge, did you ever send any faxes through your computer?
>
> A. Yes.
>
> Q. What software program did you use?
>
> A. We used a vendor called -- I'm not sure if the product was called Slingshot or the vendor was called Slingshot. But Slingshot is the name that comes to mind.
>
> Q. When you say 'the vendor,' you're referring to the company name?
>
> A. That's right.[8]
>
> &ast; &ast; &ast;
>
> Q. Were you the person that sought Slingshot out to send faxes?

---

[8] Deposition of Kari Holloway, pp. 13-14.

|   |    |   |
|---|----|---|
| 1 | A. | Yes.[9] |
| 2 |  | \*   \*   \* |
| 3 | Q. | Are you aware that Slingshot is a fax broadcasting company? |
| 4 |  | MS. CHEUNG: Objection, lacks foundation, vague. |
| 5 | A. | I used their technology to send faxes, so it's fair to say I'm aware of what they do or did.[10] |

Ms. Holloway then testified she had been using Slingshot to send out faxes in both 2009 and 2010:

Q. Can you take me through the steps that you would need to undertake in order to send faxes using Slingshot?

A. I will take you through what I recall which is you would need a list of who you were sending faxes to. You would somehow need to upload that list and then upload whatever it was you wanted to send out as a communication. And that's how the process worked.

Q. All right. And can you tell me approximately how many times you uploaded a list using Slingshot Technologies?

A. I don't have a good recollection.

Q. Do you have any estimate?

A. No.

Q. Did you use Slingshot in sending faxes in 2009 and 2010?

A. Yes.[11]

---

[9] Deposition of Kari Holloway, p. 25.

[10] Deposition of Kari Holloway, p. 26.

[11] Deposition of Kari Holloway, p. 27.

8

Ms. Holloway signed contracts for the fax broadcasting services of Slingshot. The first contract between McKesson and Slingshot was captioned "Customer Service Agreement" (hereinafter the "McKesson-Slingshot Service Agreement"[12]) and was signed by Ms. Holloway on "7-24-09". The first page contained five bullet points, the last of which stated as follows:

> Customer will manage removal requests as required and is responsible for assuring that all broadcast activity is compliant with the TCPA (Telephone Consumer Protection Act) and JFPA (Junk Fax Prevention Act) standards.

McKesson-Slingshot Service Agreement (Joint Exhibit No. 75), p. Slng 01366. The second page, which was also signed by Ms. Holloway, consisted of eight "Terms and Conditions," which included the following:

> **1. Description of Services:** Slingshot ("SST") will provide information delivery services via facsimile broadcasting . . . services ("Services") for Customer as an independent services bureau. Customer authorizes SST to deliver and/or transmit information via facsimile . . . on SST's equipment.
>
> **4. Indemnification: Limitation of Liability:** . . . Customer acknowledges that the Services are regulated by the TELEPHONE CONSUMER PROTECTION ACT ("TCPA") and customer represents that Customer is familiar with and in compliance with the TCPA.

McKesson-Slingshot Service Agreement (Joint Exhibit No. 75), p. Slng 01367 (*emphasis in original*). Five months later, Ms. Holloway signed a second contract with Slingshot, which then identified itself as "Accelero Communications, Inc." for additional fax broadcasting services. This

---

[12] The McKesson-Slingshot Service Agreement consists of two pages, the entirety of which has been designated as Exhibit No. 75 of the Joint Exhibit List for the Court's Determination of Treble Damages (Doc. No. 432-4). The McKesson-Slingshot Service Agreement consists of the pages designated as "Slng 01366" and "Slng 01367."

9

contract ("the McKesson-Accelero Service Agreement"[13]) contained the same disclosures and language relative to the TCPA as the McKesson-Slingshot Service Agreement from five months earlier.

McKesson Corporation is one of the largest and most sophisticated commercial enterprises in the United States, if not the entire world. *See* Declaration of Minh T. Hoang Regarding Document Production (Doc. No. 179-1), ¶ 3 ("McKesson Corporation is a parent company with over 200 subsidiaries or affiliated companies that span a wide range of businesses, from the sale of pharmaceuticals to behavioral coaching and information technology.") McKesson has in-house counsel sufficiently sophisticated to have layers of management. *See* Declaration of Minh T. Hoang Regarding Document Production (Doc. No. 181-1), ¶ 1 ("I am employed at McKesson Corporation as a Lead Counsel, and am the in-house counsel with primary responsibility for the above-entitled action on behalf of Defendants.") Yet, none of the employees involved in the marketing of Medisoft and Lytec were informed of the FCC Citation Letter, instructed to take any action based on it, advised about the TCPA in general, or advised about the legality of fax advertising in particular. For example, Holly Wilson, who described herself as "the marketing manager for Medisoft and Lytec"[14], and functioned as Ms. Holloway's supervisor, testified as follows:

---

[13] The McKesson-Accelero Service Agreement consists of two pages, the entirety of which has been designated as Exhibit No. 75 of the Joint Exhibit List for the Court's Determination of Treble Damages (Doc. No. 432-4). The McKesson-Accelero Service Agreement consists of the pages designated as "Slng 01362" and "Slng 01363."

[14] Deposition of Holly Wilson, p. 56 ("I was the marketing manager for Medisoft and Lytec."); Deposition of Kari Holloway, p. 18 ("Q. When you were leading the inside sales team, who was the head of the marketing team? A. Holly Wilson was for a time, but I do not know if I would classify her as the head. There were other people in marketing.")

| | | |
|---|---|---|
| 1 | Q. | What knowledge do you have that advertisements were sent fax to lists? |
| 2 | A. | I do know that advertisements were sent via fax. |
| 3 | Q. | How do you know that? |
| 4 | A. | I – just from working with the inside sales team. I knew that that they did use fax as a distribution method among other distribution methods.[15] |

\*           \*           \*

| | | |
|---|---|---|
| | Q. | I'm showing you what's been marked as Deposition Exhibit 14. This is sent certified mail from the Federal Communication Commission to McKesson Corporation formerly known as RelayHealth Corporation. Do you see that on the first page? |
| | A. | I do. |
| | Q. | Have you ever seen this document before? |
| | A. | Only as part of the current complaint [that initiated the lawsuit]. |
| | Q. | Okay. So prior to receiving the complaint, you had never seen . . . |
| | A. | I had not seen it, no. |
| | Q. | Were you ever made aware that McKesson had been told that fax advertising was a violation of the Federal Communication Commission's rules? |
| | A. | No. |
| | Q. | Was there any directive that you were aware of not to use faxing to send advertisements? |
| | A. | From whom? |

---

[15]     Deposition of Holly Wilson, pp. 55-56. For the Court's convenience, the quoted excerpts of Ms. Wilson's deposition testimony are attached hereto as Exhibit B.

11

| | | |
|---|---|---|
| Q. | | From anybody at McKesson. |
| | MS. CHEUNG: | Objection as to which McKesson entity you are talking about. |
| A. | | And no is the answer.[16] |

David Faupel, who worked alongside Ms. Wilson and Ms. Holloway, provided similar testimony:

| | | |
|---|---|---|
| Q. | | All right. What was your job title when you were first hired at McKesson? |
| A. | | Director of Marketing for Practice Partner. |
| Q. | | What is Practice Partner? |
| A. | | Practice Partner is an electronic health record product. |
| Q. | | And is that – is that product created by McKesson? |
| A. | | Yes.[17] |

*          *          *

| | | |
|---|---|---|
| Q. | | Is Medisoft an electronic health record [product]? |
| A. | | Yes, it is. |
| Q. | | Is Lytec an electronic health record [product]? |
| A. | | Yes, it is. |
| Q. | | What's the difference between Practice Partner and Medisoft? |

---

[16] Deposition of Holly Wilson, pp. 68-69.

[17] Deposition of David Faupel, p. 8. For the Court's convenience, the quoted excerpts of Mr. Faupel's deposition testimony are attached hereto as Exhibit C.

12

A. The differences were, Practice Partner was positioned for larger physician offices. So to McKesson, they position it at doctor's offices somewhere between 5 and 15 physicians.

Q. Okay.

A. And Medisoft was positioned at smaller physician offices.[18]

* * *

Q. All right. And were you the – you were the Director of Marketing for Practice Partner; correct?

A. Correct.

Q. Who was the Director of Marketing for Medisoft?

A. Holly Wilson.

Q. Who was the Director of Marketing for Lytec?

A. Holly Wilson had both of those products.

Q. Do you know over what period of time Holly Wilson worked for McKesson?

A. I don't. She worked there as long as I did.[19]

* * *

Q. All right. Have you ever seen Exhibit 1 [the FCC Citation Letter] prior to today?

A. I have not.

Q. Okay. All right. Had you had any conversations with anyone at McKesson regarding the legality of sending advertisements by fax?

---

[18] Deposition of David Faupel, p. 11.

[19] Deposition of David Faupel, p. 15.

A. No.[20]

Ms. Holloway provided similar testimony:

Q. Had you seen Exhibit 15 [referring to the FCC Citation Letter] while you worked at PPS?

A. No.

Q. Were you made aware that McKesson Corporation or Relay Health had received an FCC violation?

A. No.[21]

\*       \*       \*

Q. In 2009 and 2010, were you aware that there was a law prohibiting the sending of advertisement by fax?

MS. CHEUNG: Objection, calls for a legal conclusion, vague, lacks foundation.

A. No, I was not.[22]

In summary, the FCC put McKesson on notice of the illegality of sending unsolicited fax advertisements via an "official CITATION" in 2008. Yet, in 2009 and 2010, the employees responsible for marketing two of McKesson's software products, Medisoft and Lytec, were routinely doing so by sending unsolicited advertisements via facsimile. None of these employees had been notified of the FCC's Citation Letter nor advised of the illegality of sending unsolicited advertisements via facsimile. McKesson, which is literally in the business of information

---

[20] Deposition of David Faupel, p. 25.

[21] Deposition of Kari Holloway, p. 43.

[22] Deposition of Kari Holloway, p. 40.

14

technology, could easily have transmitted this information to such employees with a simple email or other internal communication tool. As such, it is apparent that McKesson did nothing of any substance upon its receipt of the FCC Citation Letter.

This cavalier disregard for the TCPA was not limited to McKesson's upper management. Kari Holloway signed two contracts for facsimile broadcasting services that included multiple disclosures as to the TCPA, including the following:

> Customer acknowledges that the Services are regulated by the TELEPHONE CONSUMER PROTECTION ACT ("TCPA") and customer represents that Customer is familiar with and in compliance with the TCPA.

*See* McKesson-Slingshot Service Agreement (Joint Exhibit No. 75), p. Slng 01366 *and* McKesson-Accelero Service Agreement (Joint Exhibit No. 75), p. Slng 01363. Taken literally, these contractual representations by McKesson conclusively establish its knowledge and familiarity with the TCPA relative to the specific faxes and marketing campaign at issue in this case. However, much like the FCC Citation Letter, these contractual terms and disclosures concerning the TCPA appear to have been ignored by Ms. Holloway, her immediate superiors, and everyone else at McKesson.

Consequently, this Court should find that McKesson Corporation acted "knowingly or willfully" when – little more than a year after the FCC warned McKesson to stop sending unsolicited advertisements via facsimile – its employees sent multiple such advertisements to True Health and McLaughlin in clear violation of the TCPA.

### C. This Court Should Exercise is Discretion to Treble the Damages for both True Health and McLaughlin's Individual Claims.

This Court should exercise its discretion to treble the damages for True Health and McLaughlin for two reasons. First, as the TCPA contains no provision for attorney fees, the prospect of treble damages serves an incentive for claimants to pursue claims for which the damages are, at

15

most, $500 per violation. While awards of treble damages to True Health and McLaughlin will not likely discourage McKesson from sending unsolicited advertisements via facsimile any more than the FCC Citation Letter did, they will at least provide more than token compensation for the time, effort, and expenses incurred by McLaughlin and True Health in prosecuting their respective claims.

Second, McKesson's conduct throughout this case has been deceptive, unprincipled, and undeserving of any lenience. From the outset of the case, McKesson has been incredibly resistant to providing truthful or complete discovery responses or Rule 26 disclosures. This suit was filed on May 15, 2013. McKesson did not provide its initial Rule 26 disclosures until February 5, 2014; McKesson Technologies, Inc. ("MTI") did not provide its initial Rule 26 disclosures until February 28, 2015 – despite having formally participated in the case for well over a year at that point.

True Health served its first set of discovery requests on McKesson Corporation on October 1, 2013. McKesson's initial responses consisted of little more than boilerplate objections and evasions. When informal efforts to resolve issues regarding the adequacy of these responses were unsuccessful, True Health facilitated the filing of a series of joint discovery letters. This Court granted, in part, four of these and ordered McKesson and MTI to provide certain information by December 12, 2014. *See* Order re: Joint Discovery Letters [Docket Nos. 79, 110, 111] (Doc. No. 127) *and* Order re: Joint Discovery Letters [Docket No. 133] (Doc. No. 143), pp. 3, 4, 5 ("by **December 12, 2014,** Defendants must product exemplar documents meeting the definition in Plaintiffs' proposal. . . . Defendants shall respond to the discovery request at issue in Docket No. 110 . . . by **December 12, 2014**. . . . by **December 12, 2014**, Defendants must produce documents responsive to the discovery request at issue in Docket No. 111)(*emphasis in original).*

McKesson Corporation and MTI failed to do so, prompting True Health to file a Motion for Sanctions (Doc No. 162) and a Motion for Attorney Fees (Doc No. 182). This Court granted both

16

and ordered McKesson to pay $55,147.28 to counsel for True Health. *See* Order Re: Plaintiffs' Motion for Sanctions (Doc No. 198), p. 7 ("Plaintiffs' Motion for fees is granted . . . for a total award of **$55,147.28. Defendants shall pay this amount to Plaintiffs' Counsel within 14 days of this order**")(*emphasis in original).*

McKesson did not change its stripes. Even while the initial Joint Letters and Motion for Sanctions were being litigated, McKesson was continuing to hide the existence of Kari Holloway (by not identifying her as having discoverable information in its Rule 26 disclosures or discovery responses) and Slingshot (by falsely claiming it had not hired a fax broadcaster and, instead, had sent the subject faxes internally). This deception is particularly relevant as, in part, it attempted to conceal McKesson's written notice (and professed knowledge) of the TCPA in its contracts with Slingshot/Accelero. When Plaintiffs uncovered this deception, they filed a second Motion for Sanctions (Doc. 207). This was also granted, for which the Court imposed another $15,000 in sanctions against McKesson and explained it decision as follows:

> McKesson knew of Holloway's identity at least as of July 2014, but failed to supplement its initial disclosures or identify her in its discovery responses; to date, McKesson still has not identified Holloway as a potential witness in its Rule 26(a) disclosures. With respect to Slingshot, McKesson's January 2014 and MTI's August 2014 discovery responses both explicitly stated and implied that no third parties had been involved in sending the faxes, but at least by September 5, 2014, Defendants were aware that Slingshot played a significant role in sending the faxes. Yet, Defendants did not correct their earlier discovery responses . . . . Holloway and Slingshot were not bit players; they were directly involved in the transmission of the faxes at issue in this case. . . . Defendants' failure to timely supplement their discovery responses to disclose Holloway and Slingshot was without good cause, and is therefore subject to sanctions.

*See* Order Granting in Part and Denying in Part Motion for Sanctions; Granting Motion for Leave to Reply (Doc. No. 229), p. 9 (*internal parenthetical omitted).*

17

While much of this conduct occurred before the re-assignment of this case from Judge Tigar, Your Honor has also observed and remarked on the "persistent factual and legal shape-shifting"[23] of McKesson in this matter. Under these circumstances, this Court should not hesitate to exercise its discretion to treble the damages for both True Health and McLaughlin on their individual claims.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs McLaughlin Chiropractic Associates, Inc. and True Health Chiropractic, Inc. respectfully request that this Court (1) find Defendant McKesson Corporation willfully or knowingly acted in violation of the TCPA by sending unsolicited advertisements to the telephone fax machines of True Health and McLaughlin despite having been recently cited and warned about such conduct by the FCC; and (2) exercise its discretion to treble the award of damages to True Health and McLaughlin on their respective individual claims.

By: s/ *Ross M. Good*
ROSS M. GOOD *(pro hac admitted)*
GLENN L. HARA *(pro hac admitted)*
BRIAN J. WANCA *(pro hac admitted)*
RYAN M. KELLY *(pro hac admitted)*
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
rgood@andersonwanca.com

---

[23] *See* Order Denying Motion for Summary Judgment and Granting Renewed Motion for Summary Judgment (Doc. No. 331), p. 27, fn. 8 ("All of this history illustrates the ways Defendants' persistent factual and legal shape shifting has needlessly complicated this case before, during, and after this appeal.") *and* Order Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment and Denying Defendants' Motion for Partial Summary Judgment (Doc. No. 403), p. 6, ("Defendants attempted to make a similar argument in connection with the renewed motion for class certification and motion for summary judgment, and the Court noted Defendants' persistent factual and legal shape-shifting. Defendants' current position is another example of that phenomenon.")(*internal quotation and citation omitted*).

ghara@andersonwanca.com
bwanca@andersonwanca.com
rkelly@andersonwanca.com

*Lead Counsel*

MATTHEW E. STUBBS *(pro hac admitted)*
GEORGE D. JONSON *(pro hac admitted)*
MONTGOMERY JONSON LLP
600 Vine Street, Ste. 2650
Cincinnati, OH 45202
mstubbs@mojolaw.com
gjonson@mojolaw.com

ROBERT C. SCHUBERT
WILLEM F. JONCKHEER
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
rschubert@sjk.law
wjonckheer@sjk.law

*Counsel for Plaintiffs True Health Chiropractic, Inc. and McLaughlin Chiropractic Associates, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically on all counsel of record via the Court's CM/ECF electronic noticing system on this 12th day of November 2021.

s/ *Matthew E. Stubbs*
One of Plaintiffs' Attorneys