# EXHIBIT A

1  TIFFANY CHEUNG (CA SBN 211497)
   TCheung@mofo.com
2  BONNIE LAU (CA SBN 246188)
   BLau@mofo.com
3  JESSICA GRANT (CA SBN 178138)
   JGrant@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, California 94105-2482
   Telephone: 415.268.7000
6  Facsimile: 415.268.7522

7  LYNDSEY H. CAIN (admitted *pro hac vice*)
   LCain@mofo.com
8  MORRISON & FOERSTER LLP
   4200 Republic Plaza
9  Denver, Colorado 80202-5638
   Telephone: 303.592.1500
10 Facsimile: 303.592.1510

11 ERIN P. LUPFER (CA SBN 317994)
   ELupfer@mofo.com
12 MORRISON & FOERSTER LLP
   12531 High Bluff Drive
13 San Diego, California 92130-2040
   Telephone: 858.720.5100
14 Facsimile: 858.720.5125

15 Attorneys for Defendants
   MCKESSON TECHNOLOGIES INC. and
16 MCKESSON CORPORATION

17            UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
18              OAKLAND DIVISION

19 TRUE HEALTH CHIROPRACTIC, INC., and       Case No. 4:13-cv-02219-HSG
   MCLAUGHLIN CHIROPRACTIC
20 ASSOCIATES, INC., individually and as the
   representatives of a class of similarly situated
21 persons,                                   **DEFENDANTS' THIRD UPDATED
                                              EXPERT REPORT OF
22              Plaintiffs,                   KEN SPONSLER**

23       v.

24 MCKESSON CORPORATION,
   MCKESSON TECHNOLOGIES INC.,
25 and DOES 1-10,

26              Defendants.

27

28

I, Ken Sponsler, declare as follows:

1.     I am Senior Vice President of PossibleNOW, Inc. dba CompliancePoint Litigation Services ("CompliancePoint"), a wholly owned subsidiary of PossibleNOW, Inc., with offices in Duluth, Georgia.

2.     I have been engaged by Morrison & Foerster LLP on behalf of Defendants McKesson Technologies Inc. and McKesson Corporation (collectively, "Defendants") to supplement my prior opinions in this matter based on certain recent developments.  Those developments include:  (1) Plaintiffs' Step 2 subpoenas and the responses and declarations received thus far, all of which were issued after my last updated report, and (2) the new opinions offered by Plaintiffs' expert, Robert Biggerstaff, in his September 10, 2021 declaration ("Biggerstaff 2021 Declaration") (ECF No. 455-2).

3.     I previously submitted Expert Reports in the above-referenced action dated July 16, 2015, August 13, 2015, February 6, 2020, and July 20, 2021 ("Reports"), each of which is incorporated by reference into this Third Updated Report.  My curriculum vitae has not changed materially since I provided my last Report and is attached as Exhibit B to my February 2020 Report.

## SUMMARY OF OPINIONS

4.     The results received to date in response to Step 2 of Plaintiffs' subpoena process demonstrate that this process cannot reliably determine class membership because the phone carriers associated with the majority of class members have submitted declarations attesting or responses confirming that they cannot determine how a class member received the faxes at issue. Plaintiffs' subpoena process ignores the myriad of other ways a class member could receive online fax services and is thus an incomplete and unreliable process to assign class members to the Stand-Alone Fax Machine Class or the Online Fax Services Class.

5.     In his 2021 Declaration, Mr. Biggerstaff incorrectly assumes that class members can be placed in the Stand-Alone Fax Machine Class based on an "[a]bsence of data" to confirm whether or not online fax services were used.  (Biggerstaff 2021 Decl. ¶ 26.)  His description of how to identify class membership also depends on knowing the identity of the historical

1   subscriber to the fax number, which is not available. As such, Mr. Biggerstaff's assumptions and

2   attempt to draw conclusions about class membership based on the absence of data are

3   unreasonable and unreliable.

4        6.      Mr. Biggerstaff's opinion that class members could receive online fax services

5   from sources other than their phone carrier necessarily supports the conclusion that Plaintiffs'

6   subpoena process—which seeks only information about the phone carrier's direct provision of

7   online fax services—is an incomplete and unreliable process to determine class membership.

8        7.      Mr. Biggerstaff's opinion that every device that can receive a fax transmission has

9   the capacity to print is incorrect. The online fax technology used by many major online fax

10  service providers does not have the capacity to print.

11                         **SUMMARY OF EXPERT EXPERIENCE**

12       8.      In the last four years, I have been retained to provide deposition testimony as an

13  expert in the following matters: *Bridge v. Credit One Bank*, 2:14-cv-01512 (D.Nev.); *Raffin v.*

14  *Medicredit*, 2:15-cv-04912 (C.D.Cal.); *Keim v. ADF Midatlantic,* 9:12-cv-80577 (S.D.Fla.);

15  *Marcus v. CVS Pharmacy*, 3:15-cv-00259 (D.N.J.); *Tomeo v. Citigroup and CitiMortgage,*

16  1-13-cv-04046 (N.D.Ill.); *Tillman v. Ally Financial*, 2:16-cv-00313 (M.D.Fla.); *Slovin v. Sunrun*,

17  4:15-cv-05340 (N.D.Cal.); *Gorss Motels v. Brigadoon Fitness,* 1:16-cv-00330 (N.D.Ind.); *Larson*

18  *v. Harman-Management Corp. and 3Seventy*, 1:16-cv-00219 (E.D.Cal.); *Glasser v. Hilton Grand*

19  *Vacations Co.*, 8:16-cv-00952 (M.D.Fla.); *Gorss Motels v. Otis Elevator Co.*, 3:16-cv-01781

20  (D.Conn.); *Bakov v. CWT,* 1:15-cv-02980 consolidated with 1:17-cv-00973 (N.D.Ill.); *Gorss*

21  *Motels v. AT&T*, 3:17-cv-00403 (D.Conn.); *Knapper v. Cox Communications*, 2:17-cv-00913

22  (D.Ariz.); *Bennett v. GoDaddy.com*, 16-cv-03908 (D.Ariz.); *Sliwa v. Bright House Networks*,

23  2:16-cv-00235 (M.D.Fla.); *Gorss Motels v. Sprint*, 3:17-cv-00546 (D.Conn.); *Gorss Motels v.*

24  *Lands' End*, 3:17-cv-00010 (D.Conn.); *E&G, Inc. v. Mt. Vernon Mills*, 6:17-cv-00318 (D.S.C.);

25  *America's Health & Resource Ctr. & Affiliated Health Grp. v. Alcon*, 1:16-cv-04539 (N.D.Ill.);

26  *Hunter v. Time Warner Cable*, 1:15-cv-06445 (S.D.N.Y.); *Morgan v. Orlando Health, Inc. et al.*,

27  6:17-cv-01972 (M.D.Fla.); *San Pedro-Salcedo v. The Häagen-Dazs Shoppe Company*, 5:17-cv-

28  03504 (N.D.Cal.); *Grigorian v. FCA US*, 1:18-cv-24364 (S.D.Fla.); *Morgan v. Adventist Health*

1    *System/Sunbelt, Inc.*, 6:18-cv-01342 (M.D.Fla.); *Kawa Orthodontics v. LabCorp*, 9:19-cv-80521

2    (S.D.Fla.); *Clark v. FDS Bank et al.*, 6:17-cv-00692 (M.D.Fla.); *Career Counseling, Inc. d/b/a*

3    *Snelling Staffing Services v. Amerifactors Financial Group, LLC*, 3:16-cv-3013 (D.S.C.); *Chinitz*

4    *v. Intero Real Estate Services*, 5:18-cv- 05623 (N.D. Cal.); *Jenkins et al. v. National Grid USA*

5    *Service Company, Inc.*, 2:15-cv-001219 (E.D.N.Y.); *LaGuardia et al. v. Designer Brands Inc.*

6    *and DSW Shoe Warehouse, Inc.*, 2:20-cv-02311 (S.D. Ohio); *Pascal v. Concentra, Inc.*, 3:19-cv-

7    02559 (N.D. Cal.); and *Watson et al. v. Lexus of Manhattan*, 1:20-cv-04572 consolidated with

8    1:21-cv-01588 (S.D. N.Y.).

9        9.    I have qualified as an expert in Federal District Court and provided trial testimony

10   in the matters of *United States of America v. DISH Network*, No. 3:09-cv-03070 (C.D.Ill.), and

11   *ADT Security Services Inc. v. Security One International*, No. 11-cv-05149 (N.D.Cal.).

12                        **MATERIALS REVIEWED AND RELIED UPON**

13       10.    In preparing this report and rendering my supplemental opinions in this case,

14   I reviewed sections of Plaintiffs' opposition to Defendants' motion to decertify the class that

15   outlined the original subpoena process (ECF No. 372); responses to Step 2 of Plaintiffs' subpoena

16   process produced to Defendants as of September 17, 2021; a spreadsheet summarizing the

17   responses to Step 2 of Plaintiffs' subpoena process; declarations provided by AT&T, Verizon,

18   Frontier, and Comcast; and Robert Biggerstaff's September 10, 2021 Declaration.

19                                    **OPINIONS**

20   **A.    Step 2 of Plaintiffs' Subpoena Process Cannot Reliably Identify How Each Class
          Member Received the Faxes at Issue.**

21

22       11.    My review of the responses to Step 2 of Plaintiffs' subpoena process to date

23   confirms and supports my previous opinion that this subpoena process will not allow Plaintiffs to

24   identify which class members were using online fax services or stand-alone fax machines during

25   the September 2, 2009, to May 11, 2010, class period.

26

27

28

1.    **Phone Carriers Cannot Identify Whether a Subscriber Was Receiving Faxes Via Online Fax Services or on a Stand-Alone Fax Machine.**

12.    The stated goal of Plaintiffs' three-step subpoena process is to identify which class members belong in the Online Fax Services Class or the Stand-Alone Fax Machine Class.[1]  As shown in Table 1, however, the phone carriers that Plaintiffs identified as servicing 62.7% of class members during the class period have attested under oath or otherwise confirmed that they cannot determine whether their subscribers received faxes on a stand-alone fax machine or via online fax services.

**Table 1**

| Phone Carrier | Number of Phone Nos. | Percentage of Class | Response About Ability to Identify How Subscriber Received Faxes |
|---|---|---|---|
| AT&T | 3,265 | 34% | "AT&T does not have a mechanism to determine if any of the subscribers whose telephone numbers are among the class procured online fax service from a third party and/or were using a stand-alone fax machine or any other technology to receive faxes."[2] |
| Verizon | 1,357 | 14% | "Verizon does not have information available to allow it to determine whether the customer associated with the Telephone Numbers used a standalone fax machine or online fax service."[3] |

---

[1] ECF No. 372 at 12:1-3 ("If the Court modifies the class definition, Class Counsel can use a three-step subpoena process to distinguish class members between the Stand-Alone Fax Machine Class and the Online Fax Services Class.").

[2] Exhibit A, Declaration of Lisa Likely ("AT&T Decl.") ¶ 7.

[3] Exhibit B, Declaration of Tami Ware ("Verizon Decl.") ¶ 8.

| Phone Carrier | Number of Phone Nos. | Percentage of Class | Response About Ability to Identify How Subscriber Received Faxes |
|---|---|---|---|
| Frontier | 763 | 8% | "Frontier is unable to identify how a subscriber is using its service, including whether a subscriber procured online fax service from a third-party or was using a stand-alone fax machine or any other technology to receive faxes."[4] |
| Comcast | 437 | 4% | "During the relevant time period through and including the present, Comcast has no mechanism to determine whether its subscribers received faxes on a standalone fax machine or via online fax service."[5] |
| Charter | 108 | 1% | "Charter . . . is unable to determine whether a number assigned to a customer account is utilized for voice calls or fax transmissions."[6] |
| TPx Communications | 12 | <1% | ". . . it is impossible for us to determine if these lines were utilized for fax services during the time frame in question . . ."[7] |
| Telapex aka Callis Communications | 2 | <1% | ". . . there are no records available to determine whether Callis provided online fax services to the subscribers for the following numbers during the date range requested."[8] |

---

[4] Exhibit C, Declaration of Jack Hansen ("Frontier Decl.") ¶ 10.

[5] Exhibit D, Declaration of Carol Siderio ("Comcast Decl.") ¶ 3.

[6] Exhibit E, Declaration of ShaRayne Jackson ("Charter Decl.") ¶ 6.

[7] TCSR000481.

[8] TCSR000283.

| Phone Carrier | Number of Phone Nos. | Percentage of Class | Response About Ability to Identify How Subscriber Received Faxes |
|---|---|---|---|
| Mountain View Telephone Co. / Yelcot Telephone Co. | 1 | <1% | ". . . due to the time frame/nature of the request, we would have no way of determining if any telephone number was used for online fax service . . . any line in service, with the appropriate connection to the internet could feasibly be used to connect to a third party online fax service."[9] |
| **TOTAL** | **5,945** | **62.7%** | |

13.     For example, AT&T Director Lisa Likely stated that, "AT&T does not have a mechanism to determine if any of the subscribers whose telephone numbers are among the class procured online fax service from a third party and/or were using a stand-alone fax machine or any other technology to receive faxes."[10]  As a result, "AT&T cannot confirm whether a subscriber received or sent a fax or used a fax machine or online fax service to receive or send faxes electronically."[11]  According to Plaintiffs' subpoena, AT&T serviced 3,265 class member phone numbers, which represents 34% of the class.[12]  Therefore, Plaintiffs' subpoena process cannot identify whether at least 34% of the class belongs in the Online Fax Services Class or the Stand-Alone Fax Machine Class.

14.     Similarly, a declaration from a member of Verizon's Security Assistance Team stated, "Verizon does not have information available to allow it to determine whether the customer associated with the Telephone Numbers used a standalone fax machine or online fax

---

[9] TCSR000487.

[10] Exhibit A, AT&T Decl. ¶ 7.

[11] *Id.* ¶ 8.

[12] I understand that, since Plaintiffs issued the Step 2 subpoenas in August, counsel have stipulated that one of the faxes at issue is not an advertisement, which would bring down the total phone numbers in the class to 9,412.  For my analysis, however, I have calculated percentages of the class based on the original 9,484 phone numbers Plaintiffs sought information about through their subpoena process.  Here, 3,265 divided by 9,484 is 0.344, or 34% of the class.

service."[13]  Thus, Plaintiffs cannot place the 1,357 class members using Verizon into either the Online Fax Services Class or the Stand-Alone Fax Machine Class through the subpoena process.

15.    Frontier likewise "does not know whether a subscriber used another provider's online fax service product, or whether its subscribers otherwise used their Frontier service to receive faxes by electronic delivery over the subscriber's internet connection."[14]  As a result, "Frontier is unable to identify how a subscriber is using its service, including whether a subscriber procured online fax service from a third-party or was using a stand-alone fax machine or any other technology to receive faxes."[15]  Plaintiffs asked to Frontier to provide information about 763 phone numbers in the class (8% of the class).

16.    The other phone carriers in Table 1, which in total cover *over 60% of the class*, likewise cannot determine whether a customer was using online fax services or some other method to receive faxes during the relevant period.

17.    Therefore, the subpoena process has confirmed that Plaintiffs cannot determine how a large majority of the class (at a minimum) received the faxes at issue using their three-step subpoena process.

**2.    Carriers Cannot Reliably Identify Whether Phone Numbers Are Used for Online Fax Services.**

19.    By design, Plaintiffs' subpoena process ignored different methods by which a class member could obtain online fax services.  In Step 2 of their subpoena process, Plaintiffs asked only if the phone carrier itself provided online fax services:  "For each telephone number on the list below, from September 2, 2009 to May 11, 2010, identify whether or not you provided online fax service to the subscriber of that telephone number."[16]  But the carrier responses to that narrow

---

[13] Exhibit B, Verizon Decl. ¶ 8.

[14] Exhibit C, Frontier Decl. ¶ 10.

[15] *Id.*

[16] TCSR000021 (emphasis in original).

1    question do not establish or answer whether the phone subscriber received an online fax service

2    through alternate means, as discussed in my July 2021 Report.

3         20.    In addition, Plaintiffs' subpoena process is unreliable because based on responses

4    received to date, phone carriers for approximately 17% of the class do not have responsive

5    records.  As shown in Table 2 below, several phone carriers did not service some or all of the

6    phone numbers sought by Plaintiffs.  For example, four of the eight phone numbers Plaintiffs sent

7    to Buckeye Broadband were "Not a Buckeye Number."[17]

8         21.    Other phone carriers have no responsive records because their retention policies do

9    not require them to maintain records from 2009-2010.  I discussed how carrier retention policies

10   do not always cover the class period in my February 2020 Report and incorporate those opinions

11   by reference here.  These phone carrier responses support my earlier opinions.  For example,

12   Frontier, which Plaintiff believes serviced approximately 8% of the class, has a seven-year

13   document retention policy, and thus "does not have records for subscribers between September 2,

14   2009, to May 11, 2010."[18]  Similarly, North State Telephone Company stated that, "the dates of

15   September 2, 2009 to May 11, 2010 exceed the data retention rules in place for the company,

16   therefore North State Telephone has No Data Response."[19]  Likewise, Cincinnati Bell, which

17   Plaintiffs believe serviced 45 class members' phone numbers, "is only required to keep records

18   for 7 years, then they are purged out of our system."[20]  Cincinnati Bell, like the rest of the phone

19   carriers in Table 2, thus has "no way to tell if we provided online fax service to these numbers

20   during that time."[21]  These results are non-responsive and thus cannot be used to assign class

21   members to the Stand-Alone Fax Machine Class.

22

23   _____

24   [17] TCSR000220.

25   [18] Exhibit C, Frontier Decl. ¶ 8.

26   [19] TCSR000424.

27   [20] Exhibit F, TCSR00080.

28   [21] *Id.*

**Table 2**

| Phone Carrier | Number of Phone Nos. | Percentage of Class | Response About Lack of Responsive Records |
|---|---|---|---|
| Frontier | 763 | 8% | "[T]he records Plaintiff requests fall outside Frontier's retention period.  Frontier retains customer account information for seven years, after which such records are deleted from the system.  Thus, Frontier does not have records for subscribers between September 2, 2009, to May 11, 2010."[22] |
| Windstream Communications LLC | 567 | 6% | "Unknown if online fax service was provided due to Windstream's record retention policy"[23]  "Any records older than this time frame are automatically purged and are no longer available."[24] |
| T-Mobile | 123 | 1.3% | "Unable to retrieve the information requested. No records available to retrieve."[25] |
| Northwest Fiber LLC dba Ziply Fiber ("Ziply Fiber") | 103 | 1% | "There are no records in Ziply Fiber's possession pursuant to the terms of the subpoena.  The time frame in which you requested records (September 2, 2009, to May 11, 2010) is prior to Ziply Fiber's purchase of the service areas . . . ."[26] |

---

[22] Exhibit C, Frontier Decl. ¶ 8.

[23]  TCSR000656.

[24] *Id.*

[25] TCSR000595.

[26] TCSR000070.

| Phone Carrier | Number of Phone Nos. | Percentage of Class | Response About Lack of Responsive Records |
|---|---|---|---|
| Cincinnati Bell Company | 45 | 0.5% | ". . . is only required to keep records for 7 years, then they are purged out of our system. We have no way to tell if we provided online fax service to these numbers during that time."[27] |
| Global Telecom Brokers | 2 | 0.02% | ". . . GTB does not feel that the customer information held in our system for those phone numbers from such a long time ago is accurate."[28] |
| Service Plus South Inc. | 2 | 0.02% | "Service Plus South Inc. is not a service provider of any type of telephone services."[29] |
| North State Telephone Company | 1 | 0.01% | ". . . the dates of September 2, 2009, to May 11, 2010 exceed the data retention rules in place for the company, therefore North State Telephone has No Data Response . . ."[30] |
| Plateau Communications | 1 | 0.01% | ". . . does not have any records . . ."[31] |
| Sparklight fka Cable One Inc. | 10 | 0.1% | ". . . unable to find any of these telephone numbers on our Cable One services . . ."[32] |
| Buckeye Broadband | 8 | 0.08% | "Not a Buckeye Number . . . ██ █-. . . ██-██ . . . ██ ██-. . ."[33] |

---

[27] Exhibit F, TCSR00080.

[28] TCSR000306.

[29] TCSR000095.

[30] TCSR000424.

[31] TCSR000141.

[32] TCSR000222.

[33] TCSR000220.

| Phone Carrier | Number of Phone Nos. | Percentage of Class | Response About Lack of Responsive Records |
|---|---|---|---|
| Nuvera Communications Inc. | 5 | 0.05% | ". . . does not have records for the telephone numbers below from September 2, 2009, to May 11, 2010."[34] |
| POPP Communications | 4 | 0.04% | "None of these numbers are listed as fax lines in our database between 9/2/2009 and 5/11/2010."[35] |
| AcenTek | 4 | 0.04% | "Target #1 is/was not assigned to AcenTek during the target time frame."[36] |
| South Central Communications | 2 | 0.02% | ". . . does not provide service to the telephone numbers (█-█-█, █-█-█) . . ."[37] |
| Freedom Ring Communications | 3 | 0.03% | "█ - Not one of our lines."[38] |
| Citynet | 1 | 0.01% | "The number in question . . . has not been in our number pool."[39] |
| CommuniGroup | 1 | 0.01% | ". . . did not own the phone number █-█-█ for the time period . . ."[40] |
| Hood Canal Communications | 1 | 0.01% | ". . . we were not the provider of this telephone line during this time frame."[41] |

---

[34] TCSR000608.

[35] TCSR000443.

[36] TCSR000501.

[37] TCSR000163.

[38] TCSR000634.

[39] TCSR000094.

[40] TCSR000252.

[41] TCSR000381.

| Phone Carrier | Number of Phone Nos. | Percentage of Class | Response About Lack of Responsive Records |
|---|---|---|---|
| Climax Telephone Company | 2 | 0.02% | "Target is/was not active on any Climax Telephone Company (dba CTS Telecom, Inc) account during the target time frame."[42] |
| **TOTAL** | **1648** | **17%** | |

3.    **Plaintiffs' Subpoenas to Certain Online Fax Providers Will Not Conclusively Identify All Class Members Who Received Online Fax Services.**

22.    As discussed in my July 2021 Report, class members could have engaged a separate online fax service provider, which might itself be the subscriber to the phone number. Plaintiffs agree, as they issued subpoenas to 15 online fax providers with the entire class list, asking if those entities provided online fax services to class members during the class period.[43] This is Plaintiffs' apparent attempt to address situations where the phone subscriber receives services from a third-party online fax provider, rather than the phone carrier. These subpoenas, however, also fail to reliably identify whether class members were using an online fax service.

23.    First, Plaintiffs' subpoenas to 15 online fax service providers fail to capture data from the many other online fax providers that existed during the 2009-2010 class period. While Plaintiffs subpoenaed the examples of online fax providers that I listed in my July 2021 Report, that was not an exhaustive list of all online fax providers in operation during the 2009-2010 class period. Many other online fax service providers were in business during that period. For example, RightFax/OpenText has offered online fax service since 1997. FaxTalk Center Pro operated from 1992-2016. Other examples include OneSuite, Fenestrae/Faxination, GoldFax,

---

[42] TCSR000551.

[43] Global Inc. Subpoena, Aug. 5, 2021; Mitel Subpoena, Aug. 5, 2021; WestFax Subpoena, Aug. 5, 2021; Snappy Fax Subpoena, Aug. 5, 2021; RingCentral Subpoena, Aug. 5, 2021; HelloFax Subpoena, Aug. 5, 2021; ClickFax Subpoena, Aug. 5, 2021; Faxaway Subpoena, Aug. 5, 2021; FaxitFast Subpoena, Aug. 5, 2021; FaxBetter Subpoena, Aug. 5, 2021; AirComUSA Subpoena, Aug. 5, 2021; Genifax Subpoena, Aug. 5, 2021; Nextiva Subpoena, Aug. 5, 2021; FAXAGE Subpoena, Aug. 5, 2021; and Vonage Subpoena, Aug. 5, 2021.

FaxCore/FaxFinder, etherFax, MyFax, TrustFax, Send2Fax, JConnect, SmartFax, RapidFax, eFax, and MetroFax.  These are just some examples of other online fax service providers that operated in 2009-2010.  Because more than a decade has passed since the class period, many of the online fax service providers available in 2009-2010 may have changed their name, gone out of business, or merged with or acquired another company.  Therefore, it would be virtually impossible to identify all online fax service providers in business during the class period.

24.    Second, as of the date of this Report, Plaintiffs have received responses from only two of these 15 entities, and neither response sheds any light on whether the class members received the faxes at issue via online fax service or on a stand-alone fax machine.  Faxage did not provide online fax services to any of the class members during the class period, but the class members could have received online fax services from the countless other third-party online fax service providers.  The response from FaxitFast is even less conclusive.  The current owner of FaxitFast "acquired FaxitFast on June 14, 2014," "do[es] not have any records for any fax numbers owned or serviced prior to that date," and therefore is "unable to provide any information surrounding any of the fax numbers in question between the dates of September 2, 2009 – May 11, 2010."[44]  It is thus possible that some class members used FaxitFast's online fax services during the class period, but no records exist to confirm.

**4.    Plaintiffs' Subpoena Process Does Not Capture When a Class Member Forwarded Their Calls to an Online Fax Service.**

25.    Plaintiffs' subpoena process cannot identify instances in which a class member obtained online fax services by call forwarding.  Several online fax service providers permit their customers to use their carrier's call forwarding feature to forward incoming "calls" to the online fax service.  For example, if a consumer wanted to maintain their historical fax number, they could forward incoming faxes to an online fax service-provided number.  In this case, the phone carrier's records would reflect that the customer was a regular subscriber of telephone services

---

[44] TCSR000301.

and would have no record that the telephone number was actually used for online fax services. The phone carrier would not be able to determine that the subscriber was using a call-forwarding type of online fax service.

**B.    Robert Biggerstaff's 2021 Declaration Contains Unsupported Assumptions.**

       **1.    Mr. Biggerstaff Incorrectly Assumes That the <u>Absence</u> of Information About Whether a Subscriber Used a Carrier's Online Fax Service Means Those Class Members Belong in the Stand-Alone Fax Machine Class.**

26.    I agree with Mr. Biggerstaff's statement in Paragraph 23 of his 2021 Declaration that if a subscriber used the online fax services offered by a phone carrier, that subscriber belongs in the Online Fax Services Class.[45]

27.    Mr. Biggerstaff assumes that the "[a]bsence of data regarding whether a subscriber used the carriers [sic] [online fax services] results in a default of not in the [online fax services] class."[46]  That assumption is speculative, erroneous, and would result in highly unreliable results. As discussed earlier in this Report, phone carriers that Plaintiffs believe cover roughly 17% of the class have no responsive records.  Those phone carriers that no longer have records for the 2009-2010 class period have no way to determine whether they provided online fax services to class members.  Based on this "absence of data," Mr. Biggerstaff's "default" assumption would unreliably assign about 17% of the class to the Stand-Alone Fax Machine Class—e.g., "not in the OFS [online fax services] class."  Such a conclusion would be absurd because it purports to determine how a class member received faxes in 2009-2010 ***without any affirmative data*** and thus, without any evidence to support the assignment.

28.    Mr. Biggerstaff attempts to justify this erroneous "default" assumption based on his unsupported belief that "few subscribers know of such services and few of those used them in

---

[45] Biggerstaff 2021 Decl. ¶ 23.

[46] *Id.* ¶ 26(a).

the time frame of the faxes at issue (2009-10)."[47]  He cites no evidence to support his belief.  And

his belief is incorrect.  As I explained in my February 2020 Report, online fax services have been

available to the general public since 1996 and were prevalent during the class period.  Research

shows in 2008, j2 (an efax provider that owns efax brands including eFax, MyFax, Metrofax, and

Fax.com) had nearly 11.2 million Direct Inward Dial ("DID") phone numbers deployed with

more than 900,000 paying subscribers.[48]  By 2010, traditional faxing had largely disappeared,

having fallen victim to the same technological and economic processes that had created it.[49]

29.    Likewise, Mr. Biggerstaff claims without basis or citation that the "plaintiff class

being medical providers . . . militates against significant usage of an [online fax service]" during

the 2009-2010 class period because of an apparent "lacking [sic] of HIPAA-compliant OFS in the

2009-2010 time frame."[50]  To the contrary, online fax services would appeal specifically to the

healthcare market, including entities such as the class members in this case, because the faxed

information would go to a specific person via email rather than sit in the tray of a stand-alone fax

machine where anyone could see it as they walked by.  In a September 2010 publication from the

U.S. Department of Health and Human Resources, the agency reported on HIPAA Privacy Rule

related complaints, investigations, and outcomes.[51]  The top two ranked complaints were:

---

[47] *Id.* ¶ 27.

[48] *See* Plunkett Research, Ltd., J2 Global Communications, published 2008, stating in relevant part:  "j2 Global Communications, Inc. is an Internet-based global provider of messaging and communications services to individuals and businesses. . . .  The firm's services are marketed primarily under the brand names:  jConnect, jBlast, eFax, eFax Corporate, eFax Broadcast, eFax Plus, and eFax Pro. . . . The Fax Mail division, which represents the majority of the company's revenue[.]"  Plunkett's Companion to the Almanac of American Employers 2008, Mid-Size Firms, Jack W. Plunkett https://books.google.com/books?id=qeZy4K_FolsC&pg=PT378&dq=efax&hl=en&newbks=1&n ewbks_redir=0&sa=X&ved=2ahUKEwiejaL44PnmAhUJzQIHYDTD_AQ6AEwAHoECAUQAg #v=onepage&q=efax&f=false – accessed January 10, 2020.

[49] *See* Faxed, The Rise and Fall of the Facsimile Machine, Jonathan Coopersmith (2015) (John Hopkins' University Press).

[50] Biggerstaff 2021 Decl. ¶ 27.

[51] https://www.hhs.gov/hipaa/for-professionals/compliance-enforcement/data/enforcement-highlights/2010-september/index.html

(1) impermissible uses and disclosures of protected health information and (2) lack of safeguards of protected health information.  The use of online fax services would have reduced the likelihood of Privacy Rule violations such as these.  This is because online fax services would have greatly reduced access and the potential for impermissible uses and disclosures of protected health information as well as increased safeguards of the information through much more secure delivery of HIPAA Privacy information within the organization.

            **2.**      **Mr. Biggerstaff Incorrectly Assumes That the <u>Absence</u> of Information About Whether a Subscriber Used Call Forwarding to Obtain Online Fax Service Means Those Class Members Belong in the Stand-Alone Fax Machine Class.**

30.     Mr. Biggerstaff's other highly unreliable and incorrect assumption is that the "[a]bsence of data regarding whether a subscriber forwarded their fax number to an [online fax service] results in a default of not in the [online fax services] class."[52]  Once again, Mr. Biggerstaff attempts to assign class members to the Stand-Alone Fax Machine Class based on the ***absence of data***.

31.     Here, however, Plaintiffs have not attempted to subpoena any information about call forwarding, thus guaranteeing an "absence of data."  As discussed above, phone carriers have no way to tell if a customer forwarded its number to an online fax service, so Plaintiffs' subpoena process will not produce any data about this scenario.  To find out if a class member had call forwarding to an online fax service provider during the class period would require asking each of the individual class members.

32.     Mr. Biggerstaff again tries to justify this erroneous "default" assumption based on his belief that "few subscribers know of such services and few of those used them in the time frame of the faxes at issue (2009-2010)."[53]  He offers no support for this position.  In fact, call forwarding was invented in 1963 by Ernest J. Bonanno, a Public Utilities Specialist with the FCC.

---

[52] *Id.* ¶ 26(b).

[53] *Id.* ¶ 28.

By 2009, the ability to forward telephone numbers, including fax numbers, had been in existence for nearly 50 years.  It was obviously a popular and useful feature, otherwise it would not have continued to be offered even up to this day.

33.    When a medical practice or any other business decides to use an online fax service, forwarding an existing fax number is a viable option.  This allows the business or practice to continue to use their traditional, previously published fax number that many patients, customers, suppliers, pharmacies, and others would have on record.  Forwarding the existing fax number to an online fax service provides numerous other cost savings, security, and efficiency benefits.  These include no more busy signals, fax contents can be directed to a specific staff member or medical professional via email attachment, fax contents are no longer sitting on a print tray for anyone to view, and no more costs to repair or replace the old stand-alone fax machine.  While statistical information regarding how widely spread forwarding was in 2009-2010 is difficult to find because phone carriers do not typically publish data on the issue, it is very likely that the fax forwarding feature was used by a number of class members.

### 3.    Mr. Biggerstaff Incorrectly Assumes That the Identity of the Phone Number Subscribers Is a "Known Fact," Yet Plaintiffs Have Not Tried to Obtain That Information.

34.    In his 2021 Declaration, Mr. Biggerstaff offers a flowchart to "determine whether a phone number belongs in the online fax service ("OFS") class, or the standalone class."[54]  This flowchart assumes that there are three "known facts," one of which is the "phone number subscriber."[55]

35.    This assumption is flawed because the identity of the phone number subscribers in this case is not a "known fact."  Plaintiffs have not attempted to obtain this data.  I understand that Plaintiffs originally proposed asking phone carriers to identify the phone number subscriber.  The Step 2 subpoenas, however, do not seek this information.  Even if Plaintiffs had done so, a

---

[54] *Id.* ¶ 21.

[55] *Id.* ¶ 21(c).

significant portion of phone carriers likely would not be able to identify the historical subscriber because many record retention policies do not cover 2009-2010, as confirmed by the phone carrier responses summarized in Table 2 above.  My February 2020 Report provides more details about why subpoenaing phone carriers for historical subscriber records would fail.

## C.    Analysis of Mr. Biggerstaff's Opinions

### 1.    Mr. Biggerstaff Accepts That Online Fax Services Can Be Provided Through Sources Other Than Phone Carriers.

36.    In his 2021 Declaration, Mr. Biggerstaff agrees that there are ways by which a class member could have received online fax services other than directly through a phone carrier. First, Mr. Biggerstaff acknowledges that a class member could receive online fax services through a third-party online fax service provider that might itself be the subscriber to the phone number, which Mr. Biggerstaff calls "Block 1."[56]  Second, Mr. Biggerstaff agrees with my earlier Reports that a class member could receive online faxes by forwarding their fax number to an online fax service provider, which he calls "Block 5."[57]

37.    It follows that, because Mr. Biggerstaff agrees that phone carriers are not the sole source of online fax services, Plaintiffs' subpoena process is insufficient to identify how class members received faxes.  Mr. Biggerstaff attempts to avoid this concession by relying on assumptions about the "absence of data" and claiming that the identity of the historical phone number subscriber is a "known fact," but as discussed, his assumptions are not reasonable or reliable.

### 2.    Mr. Biggerstaff Is Wrong About the Printing Capacity of Online Fax Service Providers.

38.    In Paragraph 31 of Mr. Biggerstaff's 2021 Declaration, he claims that "any device employed by the subscriber to receive fax transmissions in this context has the capacity to print."

---

[56] See id. ¶ 22.

[57] See id. ¶ 24.

Similarly, in Paragraph 50 of his April 2015 Report, Mr. Biggerstaff claims that "every device with a fax-modem capable of receiving a T.30 fax transmission has the capacity . . . to print the contents of that transmission."

39.     Mr. Biggerstaff is wrong.  I have personally spoken with representatives from major online fax service providers to ask if their online fax technology is capable of printing the incoming fax that is normally converted to a PDF or TIFF file and emailed to the end user or viewed on an online portal.  None of the online fax service providers I spoke to have online fax technology that is capable of printing the faxes, including eFax, MetroFax, SRFax, Biscom 123, and RingCentral Fax.  In addition, I know of no online fax service that offers a service relating to printed faxes.  To my knowledge, the online fax service providers universally convert the facsimile into an image file and email it to the appropriate client of the service.

### 3.     Mr. Biggerstaff's Focus on the First Part of a Fax Transmission Does Not Answer the Critical Question of How a Fax Was Received.

40.     One can divide the process of sending and receiving a fax to a user of online fax services into three parts:  Point A (sending machine), Point B (online fax service), and Point C (ultimate recipient who either receives an email image of the fax or can view the fax through an online portal).  While Mr. Biggerstaff focuses only on the initial part of the transmission from Point A to B, this initial part does not answer the critical question of how the content of the fax (the fax image) was received by each class member at Point C.  Based on my understanding that the classes are defined by who "received" faxes from Defendants on stand-alone fax machine or via an online fax service, Point C is the critical part of the fax transmission.  For users of online fax services, the content of the fax is ultimately received at Point C as an image attachment via email or viewable on an online portal.

### CONCLUSIONS

41.     It is therefore my opinion that Plaintiffs' subpoena process cannot be used to distinguish members of the Online Fax Services Class and the Stand-Alone Fax Machine Class because phone carriers do not have the information necessary to determine how class members received the faxes at issue during the 2009-2010 class period.

1    42.    It is also my opinion that Mr. Biggerstaff uses unreliable assumptions to try to

2    draw conclusions about the class members based on a lack of data.

3    43.    In addition, Mr. Biggerstaff is wrong that every fax-receiving device and

4    technology has the capacity to print because the online fax technology used by many major online

5    fax service providers does not have the capacity to print.

6    **COMPENSATION**

7    44.    My hourly rate has not changed since my last Report, and my rates are attached as

8    Exhibit H to my February 2020 Report.  My compensation is not dependent on the outcome of

9    this matter.

10   **RESERVATION OF RIGHT TO AMEND**

11   45.    I reserve the right to offer additional opinions or amend this Report based on

12   information received after issuance of the same.

13

14   I declare under penalty of perjury under the laws of the United States that the foregoing is

15   true and correct.  Executed in Beverly Hills, Florida, and this 17th day of September, 2021.

16

17

18   By: _____
     Ken Sponsler

19

20

21

22

23

24

25

26

27

28