# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

ALAN PRESSWOOD, D.C., P.C., individually and on behalf of all other similarly-situated persons,
PLAINTIFF,
v.
OPENSIDED MRI OF ST. LOUIS, L.L.C., et al.,
DEFENDANTS.

(Portions of this transcript are designated as confidential)

DEPOSITION OF KENNETH SPONSLER

TAKEN ON BEHALF OF PLAINTIFF

MAY 4, 2022

TINA M. STUMPF, RPR, CSR
MISSOURI CCR # 623

INDEX OF EXAMINATION

PAGE
EXAMINATION BY MR. SOLBERG 6

INDEX OF EXHIBITS MARKED

PAGE
Exhibit 1 (Report by Mr. Sponsler dated March 4, 2022) 8
Exhibit 22 (Kokinadis Declaration) 18
Exhibit 23 (Fax Broadcast Template Summary) 31
Exhibit 2 (Amerifactors Ruling) 39

(The original exhibits were retained by the court reporter and will be copied and attached to copies of the transcript.)

INDEX OF CONFIDENTIAL PAGES

Pages 36-39



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

ALAN PRESSWOOD, D.C., P.C., individually and on behalf of all other similarly-situated persons,
PLAINTIFF,
v.
OPENSIDED MRI OF ST. LOUIS, L.L.C., et al.,
DEFENDANTS.

Deposition of KENNETH SPONSLER, taken on behalf of the PLAINTIFF, via Zoom videoconference, on the 4th day of May, 2022, before Tina M. Stumpf, RPR, CCR, CSR (MO, IL) and Notary Public.



APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:
Mr. Wallace Solberg
Mr. Ross M. Good
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
rgood@andersonwanca.com

Mr. Max G. Margulis
MARGULIS LAW GROUP
28 Old Belle Monte Road
Chesterfield, MO 63017
636-536-7022 Residential
maxmargulis@margulislaw.com

FOR THE DEFENDANT:
Dormie Ko
Carmody MacDonald
120 South Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600



THE COURT REPORTER:
Ms. Tina Stumpf
Veritext Legal Solutions
701 Market Street, Suite 310
St. Louis, MO 63101
(314) 621-2571

ALSO PRESENT: Mr. Robert Biggerstaff

Page 6

IT IS HEREBY STIPULATED AND AGREED by and between Counsel for the Plaintiff and Counsel for the Defendant, that this deposition may be taken in shorthand by before Tina M. Stumpf, Registered Professional Reporter, Missouri Certified Court Reporter, CCR #623, Notary Public, and afterwards transcribed into typewriting and signature of the witness is not waived by agreement and consent.

KENNETH SPONSLER,

of lawful age, having been first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the case aforesaid, deposes and says:

THE WITNESS: I do.

EXAMINATION

QUESTIONS BY MR. SOLBERG:

(Deposition commenced at 9:02 a.m.)

Q Let the record reflect that this is the deposition of Kenneth Sponsler, taken pursuant to notice, the Federal Rules of Civil Procedure, and the local rules of the Eastern District of Missouri.

Good morning, Mr. Sponsler. As you know, we've met a couple of times. I'm one of the attorneys representing the Plaintiff in this matter.

I know you've been deposed numerous times,

Page 7

and I know you know the drill, so I'll leave it at this. If you need a break, let me know, but not if there's a question pending. In that circumstance, I'd ask that you answer the question, then we'll take a break.

If you don't understand a question, please tell me, and I will attempt to clarify the question so that you do. As you know, this deposition is being conducted remotely. Can you tell me where you are?

A I'm at my home office in Crystal River, Florida.

Q And there's no one in the room with you?

A No, sir.

Q All right. Let me hand you -- or let's put on the screen, I should say, what's been marked Plaintiff's Exhibit 1, and this is your report.

MR. SOLBERG: And before we went on the record, I informed Mr. Sponsler that I have no objection to him viewing a hard copy of his expert report. I just want to make sure that we're in agreement that what's on the screen in front of him is the same report that he's viewing.

Q My first question is, do you recognize this document?

Page 8

(Exhibit 1 marked for identification.)

A Yes, sir. Can you just scroll down to the signature page?

MR. SOLBERG: Page 40, Ross.

A Yes, sir. It's the same.

Q And the date of this report is March 4, 2022?

A Correct, sir.

Q And above your signature you state, quote, "I declare under penalty of perjury under the laws of the United States of America, the foregoing is true and correct." Closed quote.

Do you see that?

A Yes, sir.

Q Were you assisted in preparing this report?

A I'm always assisted by my assistant who helps to format this and review it, preview it, check it for errors, things like that.

Q How many assistants do you have?

A Well, I had one, but she -- she's no longer with the company as of today, but she was at this time. So right now I'm without an assistant.

Q Okay. On paragraph 20 of your report you

Page 9

list, I believe, 80 cases, or thereabouts, in which you've been retained as an expert witness. I'll let you get to paragraph 20.

A My understanding, sir, of paragraph 20 is that I'm required to list the cases in which I was deposed within the past four years. That's my understanding of what 20 is.

Q Yeah, that's fine.

My question for you is, in any those of listed cases were you retained as an expert on Plaintiff behalf of a Plaintiff in a TCPA case?

A Yes, sir. Not very many, but --

Q Can you remember which one, off the top of your head?

A Well, if I look at it here, if you want me to take the time to look at it, I'll do that.

Q Yeah. Go ahead.

A Bennett versus GoDaddy, I was retained by the Plaintiff in that case. The rest of them I've had fallen off of this four-year period.

Q Okay. Next question. You've reviewed the Complaint in this case?

A Yes, sir.

Q And you know what the -- you're aware of the two Plaintiffs in this case? You're aware of

Page 10

what they do?
A Yes, sir. I believe they're in the medical field, medical professional of some sort.
Q All right. Do you consider yourself, Mr. Sponsler, an expert in facts and technology?
A Not necessarily the technology. I am an expert in the operational aspects of faxing, the compliance aspects of it, as well as the, you know, how the TCPA applies, and the ascertainability of online fax services, or the identification of online versus standalone fax technology.
Q What's the difference -- you used the term "operational." What's the difference between operational and technology?
A Well, technology has to do with, you know, all of the protocols, the -- you know, the various elements of T.30, T.38, T.39, group 3 faxing. That's, to me, is the technological part of it.
My expertise has been focused on the operational aspects of faxing and faxing compliance for everyday companies that implement faxing and have to comply with the rules.
Q You're not a licensed attorney, correct?
A Of course not. No, sir.
Q Yeah. And you don't offer these companies

Page 11

legal opinions, I assume?
A My offerings to these companies has been consultative. It's been a very successful business that I ran for 20 years; and on occasion, I include -- I work with attorneys in matters of legal question that I included in my work-products to my customers.
Q All right. If you go to paragraph 9 of your report, your opinions in this case are listed there, and this is on pages 4 and 5.
And as you look at that, my question for you is going to be, are there any opinions you're offering in this case besides the five opinions listed on those pages 4 and 5?
A Not unless any come up today during this deposition that I haven't provided here.
Q If you could turn, Mr. Sponsler, to Exhibit A of your report. Exhibit A is titled "The Materials Reviewed and Relied Upon."
Do you see that?
A Yes, sir.
Q Is that list complete?
A To the best of my knowledge it is, sir.
Q When you're retained in a case, do you customarily ask for materials to review or are they

Page 12

provided to you by the -- the person or party that retains you?
A Both. Um, I quite often ask for materials to review if I have to perform an analysis on a -- a certain subject. I'll want to talk to -- interview people. I'll want to see training materials in some cases, um, recordkeeping procedures. If it's a Safe Harbor case, I want to see the written policies and procedures that they have in place to comply, things like that.
Q You know, when I -- when I asked you if you were an expert in faxing technology, I didn't ask the second question.
You're familiar with Robert Biggerstaff, correct?
A Yes, sir.
Q And you've read probably more expert reports from Mr. Biggerstaff than you can remember. Am I correct?
A Yes, sir.
Q Do you consider Mr. Biggerstaff an expert in faxing technology?
A I do.
Q Okay. Now, other than Mr. Biggerstaff's deposition transcript in this case, have you

Page 13

reviewed any other depositions in rendering your opinion?
A There was another deposition from a Dr. Wisen, or Wise, or something like that, that was in the case file.
Q For the court reporter's benefit, it's -- I think the name you're after is Ruyle, R-U-Y-L-E; is that correct?
A That's correct, yes.
Q And you reviewed that deposition transcript or you're just aware that the deposition was taken?
A I -- I reviewed it partially. I was finding that there wasn't much in there that would be helpful to my opinions, so I did not read the complete transcript.
Q Did you review the exhibits attached to that deposition transcript?
A I don't remember that answer to that question explicitly, but I do know that I reviewed just about all of the exhibits that were in this case.
Q Have you ever heard of a person by the name of Cheryl, C-H-E-R-Y-L, Castelberg, C-A-S-T-E-L-B-E-R-G?

Page 14

A Um, I -- it jogs my memory, yes, sir, but I'm not sure exactly what the association is.
MR. SOLBERG: Ross, could you put up Exhibit 22? No. Strike that. Sorry.
A Yes.
Q Mr. Sponsler, in paragraph 22 of your report, you state that your opinions are relevant to the proposed class period from January 22nd, 2017 to January 22, 2021.
Do you see that?
A Yes, sir.
Q And then in paragraph 68, you state, "Obtaining information about the identity of each recipient on a historical basis more than five years ago is extremely difficult."
A Yes, sir.
Q Now, according to Exhibit A of your report, you reviewed the fax logs, correct?
A Would you repeat the question, sir?
Q Sure. In your report in Exhibit A, beginning on paragraph 12 through 17, those appear to me to be fax logs.
And my question for you is, you did review the fax logs in this case before you generated your report?

Page 15

A Yes, sir.
Q Okay. Are you aware of the date range of the faxes in this case?
A Um, I'm not -- I'm not sure I looked at the specific date range of those five fax logs. They may have been limited, um, perhaps. I don't know. But I know the alleged class period.
Q Okay. Are you aware of any faxing that was done by Defendants outside of the dates of April to June 2020?
A Um, not something I was asked to look at so I'm not aware.
Q So if the entire breadth of the faxing in this case goes from April of 2020 to June 2020, would that have an effect on any of your opinions offered in this case?
A None of my opinions really would be affected by that. Although there is one opinion that I think I talk about, the churn, business churn and phone churn that is prevalent in the industry. So if the -- if we're only talking about a 2020 period, then obviously it would be a two-year period of churn.
Q Okay. Now, I'm going to move to paragraph 69 of your report and I'll let you get there if

Page 16

you -- if you can.
What you say here is -- is it there?
A I'm getting there, sir.
Q Okay.
A Okay.
Q And you say, for example, in this action, "OPENFAX produced six transaction logs that allegedly contain the fax numbers to which Opensided MRI allegedly transmitted the faxes at issue," parenthesis, "(fax logs)," closed parenthesis.
Then it states, "These fax logs did not provide the content of the fax, the name of the intended fax recipient nor any other identifying information. Only one field each for date, phone, reference, pages, duration, status."
Do you see that?
A I do, sir.
Q And then moving on to paragraph 74 of your report, you state, quote, "Simply put, the Biggerstaff report contains no information regarding the identities of the subscribers or intended recipients of the allegedly 'sent' faxes."
One more. Paragraph 75. In your report, you state, "There are no names of companies associated with the telephone fax numbers included

Page 17

in the six docs CSV logs," and then you say, "See paragraph 8 above."
Do you see all of those remarks in your report?
A Yes, sir.
Q You're aware that OPENFAX is the fax broadcaster in this case?
A Yes, sir.
Q And have you previously had a case where OPENFAX was the fax broadcaster that you can recall?
A It doesn't -- I -- I can't be certain, sir. I've done a lot of fax cases. I can't remember.
Q All right. Are you familiar with a person named Brett Kokinadis? And I'll spell the last name. K-O-K-I-N-A-D-I-S.
A No, sir.
Q I'll represent to you that he's an employee of OPENFAX.
Are you aware that Mr. Kokinadis submitted a declaration in this case?
A I believe I am aware. I don't remember -- remember it, though.
MR. SOLBERG: Now, can we pull up Plaintiff's Exhibit 22.

(Exhibit 22 marked for identification.)
MR. GOOD: Are you able to see Plaintiff's Exhibit 22?
THE WITNESS: No, sir.
MR. GOOD: Is it visible now?
THE WITNESS: Yes, but it's really small. It's in the center of the screen only about that much.
MR. GOOD: Is that any better?
THE WITNESS: It's still real narrow. I mean, I might -- if you can show me what you're looking at, I might be able to look closely at it.
Q Actually, we're going to -- we're going to look at the whole thing.
A Oh, that's going to be tough.
Q Well, I can ask you this. Did this declaration play a part in the expert report and the opinions that you offered in this case?
A I don't believe so, sir.
Q And this is not listed on the documents that you reviewed in your report, correct?
A Yes, sir.
MR. SOLBERG: Ross, yeah, I was going to direct Mr. Sponsler to paragraphs 4 and 5 of this report. Let's say what we can do here as far as make it a little bigger for him to read.



THE WITNESS: Oh, that's better.
MR. GOOD: Is that better? Okay.
THE WITNESS: Oh, yeah. That's better. Yeah.
MR. GOOD: All right. So I can only show at this size, paragraph 4, and then when you're done we'll go to paragraph 5.
Q You know, the visuals are blocking the view. Is anyone else experiencing that or is that just me? The video. If it's just me, that's fine.
A What I have is a separate screen with this on it and it's -- it's not on the same screen as everybody's images.
Q Okay. If -- if you look to paragraph 4, Mr. Sponsler, and if you could read that to yourself?
A Okay. Go down. Okay. I've read 4.
Q And I'll ask you to do the same as to paragraph 5.
A I see 5. Yes, sir.
Q Okay. In -- in paragraphs 4 or 5, Mr. Kokinadis identifies the fax template, identifies the fax templates and -- and connects them to the related logs in paragraph 5. Four, he identifies templates. Five, he -- he ties the templates to the -- the fax logs for each broadcast.



Do you see that?
A Yes, sir.
Q And you were not aware of that when you generated your expert report in this case?
A I was certainly aware of the existence of these logs. Um, I have not specifically reviewed a fax template, but I am familiar with these logs. And it appears that the log number matches the template of at least the beginning of the naming convention of the template.
Q So in other words, we have a -- we have a factual situation here where the -- in -- in short version, the fax is tied to the broadcast log.
Would you agree to that?
A I have no reason not to -- not to believe it.
Q Okay. In paragraph 6, Mr. Kokinadis describes the various categories of the -- the fax logs. We'll just do what -- column A designates the date. So as you look at these fax logs, you can tell the date that each fax represented in the fax log, the date it was sent, correct?



A I'm assuming so, yes.
Q And in paragraph -- if you look to paragraphs 10 to 13, I'd ask you to -- to review those to yourself.
A Okay.
Q Do you have any reason to doubt any assertion contained in paragraph number 13?
A The only thing I'll say is that in 13, um, him saying that the records are reliable and relied upon by OPENFAX in its regular business practices, um, that may be fine, if, you know, I'm aware that customers of online fax services, or fax broadcasters, um, have -- many times they will define what they want to see at the end of the campaign, what kind of information they want to see because they're being charged.
Um, for this case, the information that is contained in those fax logs are not complete enough to do a valid analysis of the success of those faxes.
Q Why is that?
A It is because they're missing any kind of confirming information. We have a word that says successful. We don't have the number of pages, the number of pages sent and the number of pages

Page 22

received, so we can compare the two.
We don't have the Baud rate, the Baud rate, to make sure that we know that by the Baud rate we can determine if there was a connection. Because I have been in cases where we had that information and we had a status. In that case, the status was zero, which meant success, yet there were no pages sent, even though it -- there were two pages in the fax, there were zero pages sent and there was zero Baud rate, which resulted in false reporting of a successful fax.
So somehow that log was produced with the zero indicator of success without supporting -- any supporting evidence that it was successful. I don't have that in this case to analyze.
Q You're using a term, if I'm understanding correctly, Baud rate?
A Baud. Yes, sir.
Q Can you spell that for -- for me?
A B-A-U-D.
Q B-A-U-D. And what is a Baud rate?
A The Baud rate is the connection, um, speed between the sending and receiving. The receiving machine will be the determining factor on how fast it can accept the fax transmission.

Page 23

Q In the case that you're referencing, where there was a problem, first of all, did that involve OPENFAX?
A I don't remember, sir. I don't know for sure.
Q Do you know what case you're referring to?
A I believe the case is under protective order. It is a fairly recent case.
Q And is that a case where subsequent -- where logs were subsequently produced that cured the problem? Are you aware of that?
A No. The issue that I'm talking about was never resolved.
Q And what --
THE REPORTER: Pardon me? Pardon me? What was the question?
MR. SOLBERG: Oh, I'm sorry. I said Mr. Sponsler said the issue in the case he's referencing was never resolved, and I asked Mr. Sponsler, and I'll ask him again, what issue was that?
A The miscounting as successful faxes that obviously were not successful.
Q But you don't know what case you're referring to?
A No, sir, I -- I -- I don't. It's a fairly

Page 24

recent case, but I -- I can't remember the name of it.
Q So is your testimony here, so -- so we're clear, and I'm -- I'm looking at a -- a fax log. You're saying that as you read the fax logs that were provided in this case, you can't tell whether they were successfully sent?
A No, sir. The only thing there it says is successful, um, in that -- in that field, or in that row of data, column of data. And there's no supporting data. You know, customers at OPENFAX may be happy with just seeing that in terms of -- or that may be something they normally produce.
But I know from my own experience that an indicator of success is not always correct. And without this other supporting information about the transmission, we're left to just saying, okay, if it says success, it's success. But that's -- I disagree with that.
Q You see -- or I'm sure as you reviewed these fax logs, you see a column, duration, correct? Do you remember that?
A Yes, sir.
Q What does "duration" mean?
A It can mean different things. It depends

Page 25

on when it starts. I mean, it could be -- probably the majority of the time, it is the duration of time from the, um -- I would probably say Phase III, uh, after the -- the Phase II, when they actually begin the transmission process. Or they communicate with each other initially until the -- there is a indication from the receiving machine that they -- that it's received all of the information.
Q Do you think OPENFAX is in a better position to determine whether their fax transmissions were successful than you are?
A Certainly they're in a different position. They're paid by the number of faxes that were successful, so they're in a different position than I am in.
Q Do you dispute that OPEN -- is it your contention that OPENFAX cannot determine how many faxes were successfully sent?
A Sir, my -- my position is that with this limited amount of information, and my experience has shown when the information is available, we have found errors in this success column. And I don't have that information. We're relying completely on what the fax provider is saying. That's my own report.

Q Is the -- the case that you're -- you're referencing that you can't remember, and this isn't -- this isn't going to be covered by protective order, is the case Scoma versus National Spine?
A Sir, I -- I don't remember.
Q Okay.
A I was certainly in that case. I don't remember if that is the case that I'm referring to.
Q Let's take about a two-minute break. Is that okay with everyone?
A Yes, sir.
MR. SOLBERG: Okay. You know what, make it five. So we'll be back at 9:36.
(Whereupon, a short break was taken.)
Q Mr. Sponsler, if I can bring you back to the Brett Kokinadis declaration.
MR. SOLBERG: Ross, can you set it so that Mr. Sponsler can see paragraph 6?
Q Looking at paragraph 6, Mr. Sponsler, it says, "Column E designates duration of attempted fax."
Do you see that?
A Yes. You mean the seconds that we were talking about earlier?



Q Yeah, yeah. Paragraph 6 and --
A Yes, sir.
Q Okay. And the duration, and we also talked about that that was reflected on the fax logs, duration, correct?
A Yes, sir. It was in the fax log.
Q And by duration, does that contain all five pages on the fax transmission in that time frame?
A Um, I believe that it likely does. It starts when there -- when the receiving fax machine acknowledges it that -- that another fax machine is attempting to communicate. So that would open the duration.
Q It goes all the way through until the call is ended, correct?
A Yes, sir.
Q All right. Now, you had mentioned OPENFAX being paid, or words to that effect.
Is there any other reason that you can think of that OPENFAX wouldn't be in the -- the best position to know if faxes were sent?
A Sir, I'm sure they're in a great position and I'm not -- I'm not saying that anything was done here, you know, purposely or anything like that.



I do know that it's an understanding that these logs are computer generated so there should not be errors. Yet I have seen this -- these very computer -- the very same computer-generated logs also have errors in them.
And it's just like he says here in column E, "The duration of an attempted fax." And all I'm saying is, is that without the additional information that could have been in this log that was available to verify this, you know, in other words, to line this all up and make sure it all makes sense, we're just missing enough information to do that. That's all I'm saying.
Q Are you aware, in your review of these fax logs, any incorrect computer-generated fax log records?
A Yes, in the other case I talked to you about. It -- it had an indication of success, but the accompanying information about those faxes indicated it clearly wasn't. So there was some computer issue that I -- I don't know what caused it, it read the wrong column, I don't know, based it on something that didn't make sense. I don't know. But it was incorrect and it was computer-generated.
Q I'm talking about the computer-generated



fax logs in this case.
Are you aware of a single, I'll call it glitch, a single failure to accurately record a transmitted fax in this case? Not in another case. This case.
A Sir, I don't have enough information here to -- in order to answer that. I don't know.
Q And --
A I don't have that information.
Q -- in the case that you're referencing, and I believe -- which you don't know the name of, are you aware of whether there was a subsequent expert report clarifying the -- the misalignment you're referring to?
A Sir, there were two issues in that case. One was a misalignment, but the other was clearly this -- this problem with the -- the fax success column being indicated that it was, um, successful, but it was not.
Q And what I'm asking you is, were fax logs subsequently -- subsequently produced in that case that cleaned up that particular issue?
A Did not clean up this issue. It cleaned up the misalignment. And the subsequent report said that they -- Mr. Biggerstaff had eliminated this

second issue we were talking about and didn't count them as successful. However, we went back through the data after that and those faulty successes were still in the count. They were still being counted in the -- in the total of.

Q And these are -- the fax logs, are you aware of the fax broadcaster in that case -- or strike that.

Are you aware of the Defendant in that case subsequently producing fax logs that were sent straight to the Defendant by the fax broadcaster that cleared up any problem with the fax log accuracy?

A Sir, they have been after my report or -- I -- I'm not sure after. I'm not aware of that.

I'm just saying, sir, my point is these things can be corrected. I'm sure somebody can go back through and rerun it and correct things.

My point is that I know that these things are -- are -- they can fail. They can be wrong. And my whole point about this is I don't have enough information in that log in order to do my own analysis of whether I think they were successful or not. I only have the word "successful." That's it.

Q Okay. So as you sit here now, you don't



know -- you're not aware of anything that needs to be corrected. You just -- you just want to test their fax logs?

A Sir, I don't have enough information in the fax log in order to make a determination of whether I agree they were successful or not. That's -- that's it.

MR. SOLBERG: Okay. If we can show the witness Plaintiff's Exhibit 23.

(Exhibit 23 marked for identification.)

MR. SOLBERG: Can we make that a little bigger or can you see that Mr. Sponsler?

A I can see it, sir.

Q Okay. Have you ever seen Plaintiff's Exhibit 23 before?

A I believe so, sir.

Q And when do you recall seeing this?

A I can't name the time, sir. I looked at a lot of material in this case. I don't remember exactly when.

Q If you look at the categories across the top, you'll see job date, invoice number, invoice amount, fax template by name, fax template by Bates stamp, fax log, fax log by Bates stamp, total



successful and total unsuccessful.

Do you see that?

A Yes, sir, I do.

Q Now, again, do you agree with me that this matches the fax template to the fax log for the broadcast?

A It appears to, yes.

Q So when you say in paragraph 69, "These logs did not provide the content of the fax, the name of the intended fax recipients nor any other identifying information," other documents in this case do provide that information, don't they, regarding the content of the fax and the fax log tied to it, correct?

A Yes. I -- I don't dispute that. I'm disputing, you know, primarily that there's no identification of who the intended recipient was, their name, their address, that kind of -- that kind thing.

The fax template, that's -- that's not an issue, as far as I'm concerned. And the fax logs, I have reviewed all of those. That's not a concern, except how the logs are developed and presented. The information missing in them.

Q Now -- okay. I'll represent to you that



also attached to Dr. Ruyle, and again, R-U-Y-L-E, apostrophe S, attached to Dr. Ruyle's deposition, Exhibit 9, is a list of the targets of the faxes sent by Defendants. It's Bates stamped Opensided 558 to Opensided 577.

Have you ever seen that document before or that list before?

A I don't recall it by that name. I don't recall that specific number.

Q Well, where you're saying that the targets of the faxes can't be identified, and there's a target list here, I would expect you would recall such a document; would you not?

A If I -- if I -- I don't know what you're saying when you say "target list." I'd have to see it to see if -- if I agree it's a target list. I don't know.

Q We'll have to talk about whether we're going to include this as an exhibit. The reason I have not is because it's confidential. It's been declared confidential by -- by the Defendants.

But I can represent to you that this list contains the names of -- of what my understanding is the targets are. The names, their phone numbers and their fax numbers.

Assuming that to be the case, is that the kind of document you'd want to see before you generated your expert report and said, uh, the targets can't be identified?
A What I was referring to in my commentary was the lack of information in the fax log, you know, 32621, all the way down to 33993, the lack of information in there.
Q But other evidence in the case, particularly this target list I'm referring to, includes the fax numbers. So those fax numbers could be matched to the fax numbers on the logs; could they not?
A Well, if they could be, I'm not sure why they weren't in this case.
Q But they -- again, you were unaware of this document; is that correct?
A I'm not saying that, sir. What I am saying is I reviewed a lot of material in this case. You're -- you're giving a document name, or number, that I would not recall by number.
Q Now, are you aware, Mr. Sponsler, that some of the fax numbers in this case were -- were from a purchase list?
A That's not something that I was asked to



form an opinion on.
Q Let me see here. In your report on paragraph 26, you state that "An online search indicates that Plaintiff Brust office is permanently closed." Closed quote.
Do you see that?
A What paragraph is that, sir?
Q 26.
A Yes, sir.
Q Did you do that search?
A Um, I asked my assistant to do this search.
Q Okay. And did you read a -- a paper document that contained the results of that search?
A Um, I'm not sure that there was a paper document. There was the results of the search, which indicated that it was permanently closed.
Q And as you sit here now, do you know whether that's true or not?
A I certainly implicitly trust that this is true.
Q But you don't know?
A I implicitly trust that this is true.
Q Okay. You know what, let's -- and I'm sorry, but we're going to take five here. I'm going



to take a look at this. Let's just take five, all right? Everybody good with that?
A All right.
(Whereupon, a short break was taken.)
MR. SOLBERG: We're about -- we're about to present a document that's been designated confidential. It's not going to be sent to the court reporter as an exhibit, and apparently this -- this deposition is going to have to be designated confidential in accordance with the terms of a protective order by counsel. I'd ask that you take a look at this document quickly before we go forward.
MR. GOOD: And counsel, while you're looking at this deposition exhibit, I'll represent for the record this is deposition Exhibit 9 to the deposition of Matt Ruyle, R-U-Y-L-E, and it is Bates labeled Opensided 558 through 577, and it is designated confidential and no contact per agreement. And there's one Ruyle highlighted on the first page, and one Ruyle highlighted on Bates label Opensided 000574.
As Mr. Solberg just stated, the deposition itself, the transcript, will have to be temporarily designated confidential.



It is our intention to only designate the portion of the deposition confidential as it relates to this exhibit which we are not marking, or not remarking for this deposition because it's previously marked in the deposition of Matt Ruyle, who I believe is the corporate representative for the Defendant. With that said, Mr. Solberg has some questions.
Q Mr. Sponsler, have you ever seen this document before?
A I can't be certain, sir. I don't remember. I don't remember this.
Q Is it your understanding that -- then it's not your understanding one way or the other whether this document is part of the target list for the faxes at issue in this case?
A Yeah. I'm -- I'm not sure, sir.
Q Have you ever seen any of the fax -- any of the names and fax numbers from the list that Defendant purchased from a data provider for this fax broadcast, or fax broadcasts, I should say?
A I'm not sure that's something I was provided. I'm not sure, um, I was asked to opine on anything about that.
Q When I use the term "target," do you have

an understanding of what that means in the TCPA context?
A Well, I'm not sure target is a TCPA term, but it -- I mean, my lay understanding would be that it would be the intended recipients of whatever communications, the target list.
Q And the -- those recipients can be tied to a fax number, correct?
A They can be tied to a fax number, the intended recipient, yes.
Q And again, just so we can identify it for the record, exhibit -- or this particular document we're looking at has a first name, last name, and then the name of the practice, a phone number and a fax number. And beneath it, there's pages that begin at Opensided 558 and end at Opensided 577.
Do you agree with all that, Mr. Sponsler?
A I -- I'm not sure I agree with the name of the practice.
Q I'll say it, the column says RP name. Can you agree that it says that?
A Okay, yes. There's a column -- there's a column that says that as a header, yes.
Q Okay. And then after going to the right, then you have a phone and then a fax.



Do you see that?
A I do.
Q And these -- and these items of information are contained at every page, beginning Bates stamp 558 to 577.
Can we agree on that?
A We agree on that. Yes.
Q And this particular document did not come into play in drafting your -- your report in this case, correct?
A Not to my memory. If it's not listed on my materials reviewed, then probably.
MR. SOLBERG: I -- I think we're through with that one, so, again, we'll take that down.
MR. GOOD: For the record, the document which was previously labeled confidential has been removed and this will be the end of the confidential portion of this deposition transcript.
(Exhibit 2 marked for identification.)
Q Mr. Sponsler, let me hand you what's been marked Plaintiff's Exhibit 2. Can you take a look at that?
MR. SOLBERG: And for the court reporter, as Mr. Sponsler's reviewing this, the formal title



of this document is In Re: Amerifactors Financial F-I-N. Group, LLC. Petition, P-E-T. for expedited declaratory ruling. And I'll let the rest of the exhibit speak for itself, but that's what Exhibit 2 is.
And as I go forward asking Mr. Sponsler questions, I'm going to refer to this either as the Amerifactors ruling or just Amerifactors.
Q Mr. Sponsler, do you recognize this?
A It's real -- it's kind of small, Ross. Can you make it any larger? Yeah, thank you. That's better. Yes.
Q And this is the Amerifactors' ruling I was referring to, correct?
A Yes, sir.
Q Mr. Sponsler, have you ever reviewed the administrative record of the Amerifactors' Petition that preceded this ruling?
A I have. Yes, sir.
Q What did you -- what do you recall reviewing?
A I don't have a recollection of exactly what I reviewed. I -- I followed this, as I do all of these kinds of -- of requests for declaratory rulings.



Q Now, you've seen Mr. Biggerstaff's expert reports regarding faxing technology related -- related topics, correct?
A Related what, sir?
Q Related topics of information. And I'm just looking at his report. But I have his report now from this case. Facsimile technology standards, and we're going to get to this report later. But again, you see facsimile technology standards and fax technology and printing capacity, among other categories.
Do you recall ever reviewing any such materials in the Amerifactors' ruling record?
A Yes. There were, um, comments, I'll call it comments, that were provided, including one from Mr. Biggerstaff. He wrote a lengthy opinion, and I remember reading it.
Q And I sort of excluded Mr. Biggerstaff's comments from that -- from that question.
Other than Mr. Biggerstaff's comments, can you recall reading any what I'll call technical comments from anybody else?
A I'm not sure what you mean by "technical comments."
Q The way I was just describing Mr.

Page 42

Biggerstaff's comments. Faxing technology, facsimile standard.
Do you recall seeing any of that in the administrative record?
A Um, sir, it's been a long time, but I -- I know that I read all of the comments that were made, and some of them did include, you know, what you're terming as technical information, yes.
Q But you can't recall specifics?
A No, sir.
Q Okay. Do you see at the top of the Amerifactors' ruling where it says, "By the Chief Consumer and Governmental Affairs Bureau"?
A I do, sir.
Q Do you have an understanding as to what that is?
A I think it is a -- a bureau within the commission that deals with Consumer and Governmental Affairs.
Q Do you know how many members there are in the Bureau?
A I don't.
Q Do you know when the Amerifactors' ruling was issued by the full FCC or the Bureau as what we'll refer to it as?

Page 43

A By the Bureau, sir.
Q Are you aware of whether the Amerifactors' ruling is currently on appeal to the full FCC?
A I believe I have read that it is.
Q Have you ever had any discussions with or been present at discussions with the Bureau or FCC staff regarding the Petition that preceded the Amerifactors' ruling?
A No, sir.
Q Did you review any documents including any white papers that were submitted to the Bureau as part of the administrative record in the Amerifactors' Petition?
A If it was made public, I reviewed it.
Q And I -- I guess I'll -- let me ask a follow-up to that then.
Did you review any such documents prior to them being submitted to the FCC or the Bureau?
A I -- I -- I potentially could have, but I don't recall specifically.
Q All right. Let's, if we can, Mr. Sponsler, let's go to paragraph 2. And the news for you is I'm going to read this part rather than have you try to find it. And -- and here's what Amerifactors' ruling, paragraph 2, states.

Page 44

An online fax service is quote, "a cloud-based service consisting of a fax server or similar device that is used to send and receive documents, images and electronic files in digital format over telecommunications facilities."
That's part of the definition. Do you see that?
A Yes, sir.
Q All right. And so a fax server, that's -- that's a computerized fax server; is that correct?
A Yes, sir.
Q What -- what other equipment goes into an online fax service? So you have a computerized fax server and -- and you and me have talked before about gateways, correct?
A Yes, sir.
Q So if you could, now that I've read that, can you tell me what equipment does an online fax server have in order to receive a -- a fax transmission and convert it to a PDF?
A Well, it's similar to any other fax server. It has to have some sort of modem like capacity to be able to transcribe faxes, receive and transcribe them. It's going to have to have the ability to convert the faxed information into a

Page 45

digital image. It's going to have to be able to allocate space on a server in order to store that fax, that image, into the customer's spot. And then it will have to have the ability to e-mail the designated recipient who is their customer, that their customer designated the attached file, either TIFF or PDF.
Q Okay. And are you aware of an online fax service that does not require the use of a computerized fax server?
A Not that I'm aware of, no.
Q And if I'm a subscriber to an online fax service, I need a way in order to access the Internet; is that correct?
A That's correct, yes.
Q And that's customarily done with a computer. Is that also correct?
A Yes, sir.
Q Are you familiar with Group 3, the Group 3 standards that relates to faxing?
A Yes, sir.
Q And Group 3 standard employs the T.30 protocol; is that right?
A Yes, sir.
Q Is it your understanding that the fax at

Page 46

issue in this case were sent from a computer -- well, a telephone facsimile machine, computer, or other device, to 10 digit telephone numbers over telephone lines to equipment, namely computerized fax servers, that can perform the T.30 protocol?
A Yes, sir.
Q In paragraph 37 of your report, you used the term "conventional fax machine."
Can you find that in your report?
A Thirty-seven you said?
Q Yeah. And again, as you read 37, my question is, what do you mean by the term "conventional fax machine"?
A Um, not a -- you know, a standalone fax machine, a conventional fax machine.
Q Okay. From the sendings -- all right. strike that. Okay. Let me ask you this.
In paragraph 42 of your report, you said that online fax services include access to their fax portal. And my question is, what is a fax portal?
A Customers of online fax services have the ability to have an account, so they get log-in credentials, they can log in to their account, provided a GUI graphical user interface of the online fax service and log In with their credentials

Page 47

and they can, you know, set up their account, they can identify which fax numbers should be e-mailed to which employee provided that e-mail address. They can also view any faxes in their box, in their space, while they're there. They can potentially delete them or do whatever they want to them.
Q All right. You also say in paragraph 42, and I quote, "The portal facilitates a user's ability to view or delete received faxes by clicking on the PDF or TIFF," T-I-F-F, "file. This opens the image and presents to the user the actual fax image. From that point, users can delete/e-mail/save/print/the image as desired."
Do you see that?
A Yes.
Q Well, is it correct to say that when an online fax service drivers log into the portal of the online fax service, the subscriber is logged into a computer fax server or servers belonging to the online fax service that are rented or leased by the subscriber?
A I'm not sure I would classify it as rented or leased.
Q How would you classify it?
A You're saying the online fax services

Page 48

equipment is rented or leased?
Q Or used. They're -- it's not the subscriber's equipment. It's the online fax services equipment. Correct?
A Correct. But the account holder is not renting or leasing any equipment. They are subscribing to a service.
Q Okay. Fair enough.
And that service provides the equipment we're talking about, correct?
A No. Well, the service provides the service. The service provides the online fax service to the subscriber.
Q And in order to provide that service, the online fax service needs the equipment we've been talking about, correct?
A Yes, sir. But that's got nothing to do with the subscriber. I mean, it's up to the online fax service to -- to build, to buy, to manage, to update, to handle this equipment side of the delivery process in a way that they deem fit, the way they see fit. The subscriber doesn't have anything to do with any of that.
Q Let me ask you this. The online fax service, when it receives a fax, the fax arrives.

Page 49

And you've always talked about point A to point B to point C. Do you remember that description of what goes on with faxing?
A Yes. Robert and I both talk about A, B, and C.
Q Yes, you do. So here's the question.
When a fax goes -- is transmitted from point A and arrives at the online fax service at point B, the online fax service doesn't receive something that's essentially an e-mail. It receives a fax, correct?
A Yes, sir.
Q Now, let's assume a situation where a subscriber is logged into an online fax services portal and they're viewing -- they're viewing a fax. That subscriber is not viewing an e-mail, but using their computer to view the fax on the server maintained by the online fax service, correct?
A Correct.
Q And let's see if we can make it through this next one, Mr. Sponsler, a little cleaner than the last one, which is this.
The online fax service provides equipment, namely the computer fax server and telephone lines that employ the Group 3 standard and T.30 protocol

Page 50

to convert what is received over the 10-digit telephone number and telephone line into a PDF. Is that right?

A Or TIFF, yes.

THE REPORTER: Pardon me?

Q Yeah, the fax lines --

THE REPORTER: I'm sorry. I'm sorry. I didn't understand his answer.

Q Go ahead, Mr. Sponsler, if you can --

A A PDF or a TIFF. T-I-F-F.

Q And the combination of this equipment, the online fax services equipment and the computer that the online fax service subscriber needs allows the subscribers to, as you say, delete, e-mail, save, or print the image as desired; is that correct?

A I'm not sure that this discussion goes all the way back to the equipment that is necessary to receive the fax. This spot that a subscriber has is on a different server that is set up and managed for the purpose of allowing customers access to their files. It's downstream from everything else.

Q So the fax is sitting on the portal, it's been received by a computerized fax server, and now I think what you just said is it's sitting possibly in another server at the online fax service.

Page 51

Did I state what you said correctly?

A Or in the cloud. Yes. It's -- yes.

Q And when the subscriber goes on to that portal to view that fax that's sitting there, as you say, he has the option to delete, e-mail, save, or print that image as desired, correct?

A Yes, sir.

Q Are you aware, Mr. Sponsler, of the profession of the targets of these faxes? You know, strike that. You've already answered that. Let me ask you this.

Are you aware of any medical or chiropractor services offices that do not have a computer that could access the Internet?

A I can't categorically answer that, but it doesn't make sense that they wouldn't.

Q I agree. I can't imagine a medical office that does not have a computer that could access the Internet.

Let me ask you this. In addition to the portal, you can also have a setup with an online fax service whereby, you know, the fax comes into the online fax service, the computerized fax server receives it, it's converted to a PDF, and then it's automatically e-mailed to the online fax server --

Page 52

service subscriber.

You're aware of that scenario as well?

A Not necessarily the subscriber, sir. The subscriber is the entity that is, I will say, the admin, the entity that pays for the service. They -- The e-mail may go to any number of departments or different employees, depending on the fax number association that the fax came in on.

Q Well, the fax -- the fax is e-mailed to a particular address by the online fax service; is that right?

A That is -- that is right.

Q Okay. And once that fax service is e-mailed, it arrives at the e-mail address to which it was sent.

Is that your understanding?

A That's my understanding.

Q And again, just like the portal, the subscriber viewing the fax attached to an e-mail, after he opens the e-mail to look at the fax, also has the option to view, delete, or print the fax, correct?

A Or store it, or forward it.

Q Yes.

A A number of things, yes.

Page 53

Q Okay. Go to paragraph 38 of your report if you could, Mr. Sponsler.

A Okay, sir.

Q In this paragraph, you talk about conversations you've had with representatives of online fax service providers. Correct?

A That's correct. Yes, sir.

Q How did you obtain the numbers to talk to these online fax service providers?

A Well, simple. I looked them up on the Internet and got their -- their sales line telephone number.

Q Okay. Do you recall the names of any of those people that you talked to with those online fax service providers?

A I could potentially have the -- all of that written somewhere. To me, the name wasn't important. I was asking as a customer. I presented myself as someone who really needed a fax service provider that could print my faxes instead of e-mailing them. I wanted my faxes printed instead and sent to me. So that was what I presented myself as seeking a company that could do that.

Q Did you take notes regarding these discussions? I thought you just said you might

Page 54

have.

A Say it again, sir?

Q Did -- you took notes of these discussions?

A I might have taken notes. Yes, sir. It's -- it's been a while. This -- this does not happen just for this case. It happened a while back.

Q And let me ask you this, Mr. Sponsler. When was the last time you were deposed in a TCPA case, prior to this deposition?

A It's been a month or two, I guess.

Q Do you recall the case?

A I don't. It's probably in this -- in my report. It's probably the last case that's listed, um, wherever I've listed all of the cases I've been deposed in over the past four years. It should be the last one down there.

Q No, that's not the case actually. The last case listed is Career Counseling, and I know that was not the last dep you gave in a TCPA case. But in any event, let's move on.

Did you ask any of these providers that you talked to -- you know, strike that.

Did you ask any of these online fax

Page 55

service providers whether they had the capacity to access a printer over the Internet?

A No.

Q It's your understanding that if they can send an e-mail, they can access a printer over the Internet; isn't that right?

A Yeah. I don't know why they would, but I -- I guess you could, yeah.

Q And that would give them the capacity to print; would it not?

A It would give them the needless, worthless capacity to print, which they would never use. But with computers just about all things are possible.

Q Okay. Well, whether they would want to use it or not, they have that capacity, correct?

A If -- if they have access to the Internet, then they would obviously be able to access a printer via the Internet obviously. Yes.

Q Okay. Mr. Sponsler, do you know if the TCPA requires that an unsolicited fax advertisement be printed to constitute a violation of the act?

A Printing was one of the harms. Automatic printing, use of the ink, tying up phone lines, that sort of thing were the harms that were listed as the reason for the restrictions on faxing.

Page 56

Q There were numerous -- numerous harms listed, and including invasion of privacy, invasion of interest in seclusion and nuisance.

But my question for you is, are you aware of whether the TCPA itself requires that a fax be printed to violate the act?

A I don't recall specifically that that element, that one element, is a -- is requirement to violate the act.

Q Okay. Um, let's again take five here. How you doing, Mr. Sponsler, you all right?

A Yes, sir.

Q Okay. Let's take five and we'll be back, okay?

A All right.

(Whereupon, a short break was taken.)

Q The next category of questions I'm going to ask you about is the subpoena process. And when I say that, you know what I'm talking about, correct?

A Yes, sir.

Q And in your opinion one, you say -- and this is paragraph 9A of your report, "A significant percentage of the ultimate fax recipients included within the proposed class likely used an online fax

Page 57

service, Internet or cloud-based fax service, (which I will refer to as 'Online Fax Service' in this report)", there's parenthesis -- and there's a parentheses in front of which and after report, "to receive the faxes in question."

Do you see that?

A Yes, sir.

Q What do you mean by "significant percentage"?

A Exactly that, sir. There's likely a significant percentage you receive the fax with an online fax server.

Q Well, I understand that. But what do you consider, on a hundred percent basis, what do you consider a significant percentage to be?

A Uh, probably better than 50. I mean, just kind of an open-ended term, but enough to, you know, make a difference in -- in this case.

Q All right. Going to your opinion at paragraph 9B, Opinion Two, uh, you state at the end of that particular opinion, quote, "Furthermore, the names and addresses of businesses or individuals who allegedly received the faxes at issue in this case cannot reliably be identified through objective or administratively feasible means." Close quote.

Page 58

Do you see that?
A Yes, sir.
Q What do you mean by "administratively feasible means"?
A In other words, through some administrative process that would be reliable and accurate.
Q In your opinion, would the names, fax numbers, telephone numbers and fax logs constitute an administratively feasible means to identify a class consisting of those that received --
THE REPORTER: I'm sorry, sir. I'm sorry, sir. You're holding your hands over your face and I can't -- I couldn't hear you.
MR. SOLBERG: I'll ask the question again.
Q In your opinion, would the names, fax numbers, telephone numbers and fax logs constitute an administratively feasible means to identify a class consisting of those that received the Defendant's faxes?
A No, sir.
Q And why not?
A Well, I've already mentioned the problems with the fax logs themselves. In addition, we don't actually know if the ultimate recipients of

Page 59

subscribers of online fax services actually received the fax e-mailed to them, or access through a portal. We have no record of that, as well as we don't know who that individual was that received, allegedly, the e-mail, whether they received it, whether they're still employees, whether the e-mail bounced, um, and whether it was successfully received at all. We don't have any record of that.
Q You started out your answer with the problems with the fax logs. I'm not aware of any problems that you have identified with the fax logs. Can you tell me what problems, in this case, have you identified with the fax logs?
A Yes, sir. It is missing enough information to perform an analysis on whether or not the successful field is accurate.
Q Okay. You're familiar with Plaintiff's three-step process to distinguish standalone fax recipients from online fax service recipients, correct? You may not agree with it, but you're familiar with it, correct?
A Yes, sir.
Q All right. The first step is a subpoena goes to the local number portability administrator to identify all phone carriers for all phone numbers

Page 60

in a punitive class on the date of the faxing.
You understand that to be the first step?
A I do, sir.
Q Second step is to use the subpoena response to subpoena each identified phone carrier to identify whether the subscriber of each phone number was utilizing online fax services on the date of the faxing included in the class definition, correct?
A Yes, sir.
Q And the third -- the third part of that process is to provide the court an option to exclude from the punitive class to all telephone numbers where the subscriber is an online fax service.
That's your understanding as well as to part three, correct?
A It is, sir.
Q Now, in your report at paragraph 66, you agree that carriers can identify numbers associated with their online fax services; is that right?
A Can I get there, sir?
Q Absolutely.
A Yes, sir. What I'm referring to here is, if carriers offer an online fax service as a part of their service, they may be able to identify those

Page 61

numbers. However, they cannot identify numbers associated with other online fax services provided by other entities. They can't determine that.
Q Well, one of the ways, I believe you said that they can't determine that, is through call forwarding, correct?
A Well, no, sir. I'm -- I'm talking very basic here, is that the first problem is they can't identify telephone numbers associated with online fax services, other than their own. And then there are other issues that I talked about as well, including what you're talking about, not necessarily call -- yes, call forwarding. Yes.
Q Yes. One of the ways you say that -- and strike that. Let me use this example.
You've got a hundred fax numbers, or a hundred telephone numbers from a provider. You know that 10 of those numbers are to an online fax that utilized the online fax service provided by that carrier, so that leaves 90 numbers. You with me so far?
A Yes, sir.
Q And of those 90 numbers, I believe you would say you can't tell -- a person can't tell if those numbers were call forwarded to an online fax

Page 62

service, correct?
A Well, that's only one issue. But --
Q Well, let's deal with that one first. And when I say a phone number, I'm talking about fax numbers. So you've got -- I'll start again.
You've got a hundred fax numbers. Ten -- 10 of them are to an online fax service, so we know that those are online fax service numbers. The other 90 are just fax numbers. And what you've said is we can't tell, we, being the Plaintiff, we can't tell if those were call forwarded to an online fax service.
Am I -- am I right about that?
A Yes, sir.
Q Okay. As to your position anyway.
Now, when you call forward your fax number to an online fax service, the subscribed number remains working with your current provider but is programmed to forward all incoming calls to the online fax service; is that right?
A Yes, sir.
Q And that process, it goes through an extra switch; isn't that right?
A Yes, sir.
Q Now, in paragraph 61 of your report, and

Page 63

before I go forward, I'll let you get there and then I'll ask a question. So paragraph 61, Mr. Sponsler.
A Okay. Yes, sir.
Q Okay. And you state in that paragraph, among other things, that call forwarding an existing fax number to an online fax service provides cost savings, security, and there are no more busy signals.
I'll let you find that in the paragraph.
Do you see that, Mr. Sponsler?
A Yes, sir, I see it. Yes.
Q Okay. First, when you -- you call forward your fax number, you're paying the current provider for the fax line and you're also paying for the online fax service that the fax number is forwarded to; is that right?
A Not necessarily, sir.
Q Why? Is the online -- why not?
A Well, because similar to the -- you know, the mobile phone carrier industry today, online fax providers are very competitive and their bundling of services may include automatically that they -- they get a fax number.
Now, it may not even be a separate line item charge for the fax number. They may get up to

Page 64

so many fax numbers depending on the -- the bundle that they select.
Q But the -- the number is call forwarded from your current subscriber. So there's a particular fax number, correct?
A Yes.
Q And that fax number is call forwarded to an online fax service?
A Correct.
Q And whatever bundle you're talking about, is the online fax service, to your knowledge, going to provide that bundle of services for free?
A Oh, certainly not. No.
Q Okay. So you incur another cost. You incur the cost of your subscribed to fax line, and you also incur the cost of the online fax service, however they bundle it or present it to you; is that correct?
A Well, sir, for some companies, that cost is minimal and it is well worth forwarding rather than porting their phone number. There are benefits to forwarding.
Q But there's also a cost, correct?
A Well, if you think the benefit of doing it outweighs the cost, then that's a conscious decision

Page 65

that companies make knowing that, yeah, I'm going to pay for my analogue line in addition to my fax service.
Q In your experience, do online fax service providers charge more on a monthly or yearly basis for online fax services that address HIPAA?
A I think now -- In the beginning, I -- I would agree. But I think now it's becoming more commonplace. It's a competitive feature that is built into many of these fax provider services.
Q What do you consider more secure, Mr. Sponsler, a standalone fax machine to a standalone fax machine transmission or a transmission through an online fax service that receives the fax, converts it to a PDF and then forwards it to the online fax service customer?
A By far, it is the online fax service is much more secure than a standalone fax machine.
Q And what's your basis for saying that?
A Because a standalone fax machine is typically sitting in a publicly accessible area of the company where the faxes are automatically printed and laying on the tray for anyone to walk by and view, or pick up, with really no record of who did or who saw what. There could be HIPAA

Page 66

information. There could be HR information, pay information, all kinds of things, that if you received that communications directly to the designated person's e-mail account, then only that person is receiving it and deciding what to do with it from that point.
Q Well, can a -- is it your understanding that a standalone fax to a standalone fax transmission can that be hacked?
A I don't know specifically. I've never read of a fax transmission being hacked, but it wouldn't -- in today's world, it wouldn't be unheard of. But I --
Q You can't provide an example?
A No, I cannot provide an example.
Q Have you ever heard of a data breach regarding medical information?
A A data breach? Sure. I --
Q Go ahead.
A I've heard of clinics closing and taking patient records and throwing them in the dumpster un-shredded. All kinds of --
Q That's not what I'm -- that's not what I'm asking you. I'm asking you, is it easier -- let me ask you this question.

Page 67

E-mail, things that go over the Internet, could be subject to being hacked or subject to having malware introduced into them; is that correct?
A Yes. But these are -- you know, the source of that malware, the phishing and all of that, is not the source from where a fax would emanate.
If you have -- if you have an entity whose job it is to infiltrate an organization, to send e-mails that look like they're from the president of the company or whatever, um, with these malicious attachments and so on to 'em, but they don't emanate from within an organization that has a secure network, secure firewall, secure intrusion. They don't emanate from a place like that.
Q But those things you're describing, those cannot happen from a standalone fax to a standalone fax transmission; can they?
A I'm not certain it can't happen. I've never heard of it happening, but my biggest concern is what I said before. It's having it publicly accessible is the worst -- is the worst part of it to me. It makes it insecure or unsecure.
Q So that's it. Your -- your concern -- and

Page 68

again, you know the targets of these faxes are medical providers and so forth. Your concern is that they may receive a -- a fax of a medical record that may be sitting on a fax machine in their office and the wrong person may pick that up?
Is that -- is that your position?
A Well, you don't know who picks it up. It could be a visitor in the office. It could be a patient in the office. You don't know who. It's -- it's -- it is not a secure environment.
Q You don't know who has access to your own fax machine in your own medical office?
A That's correct.
Q What about the scenario where you put the fax machine in a separate room?
A Well, you could, but rooms have doors, doorways.
Q Okay. When you call forward with a fax number, it's possible to receive a busy signal; isn't it?
For instance, if you -- you have your number call forwarded to an online fax service and you get back-to-back faxes, isn't it correct that the second call will draw a busy signal?
A It could, yes.

Page 69

Q And so when you say there's no busy signals in that paragraph, that's not -- as far as call forwarding, that's not correct; is it?
A What I meant was no busy signals to the online fax service number. You're not going to get a busy signal when you're forwarding.
Q But you are going to get a busy signal. When I call here -- when I try to fax two documents in a row to your fax number that's call forwarded, the second call is getting a busy signal, correct?
A I'm describing no busy signal at the online fax number that you're forwarding to.
Q And that's after you've worked your way through the busy signal that you're getting at the switch from the call forwarding, correct?
A Sir, that's a hypothetical that, you know, that could happen. But, you know, people that do this take all that into account, and they still see the benefits of forwarding rather than porting their number or losing control of it.
Q And now you just said "porting your number and losing control over it."
Is it your understanding that if you port your number to a new online fax service and you're not happy with it, you can't get your number back?

Page 70

A I'm not saying you can't, but that number now belongs to the online fax service. They are the subscriber. Not you. You might be able to negotiate and get it back, but certainly there's no guarantee that that would happen.
Q Are you aware of any law that requires the online fax server to give your number back?
A I'm not.
Q Now, you've addressed the subpoena process and this and other TCPA cases in which you've rendered expert reports, correct?
A Yes, sir.
Q How many times have you done that? Do you know?
A Half a dozen. Ten times, maybe.
Q In any of those reports, have you identified a single telephone subscriber who used call forwarding to forward a fax number to an online fax service?
A No. And neither can anyone else.
Q So all of your statements regarding call forwarding and the -- the likelihood that a number was call forwarded are not based -- they're not based on actual instances of call forwarding; isn't that correct?

Page 71

A Sir, it's the same problem with identifying online fax services that carriers can't do either. I mean, it's, um -- it is a -- it is a feature that has been around 50 years that people use. It is a means by which they can obtain online fax services while maintaining control of their fax number. It certainly stands to reason that people would call forward.
Q Again, it stands to reason but you have no examples of it, correct?
MS. KO: Objection. Asked and answered.
A It's not something that is -- that phone companies are generally aware of. And that's the only source that I would know unless you do individual inquiries and ask, you know, conduct discoveries to see if anyone forwarded their number.
Q So other than call forwarding, and again, let's go back to the 90 remaining numbers we're talking about.
A Yeah.
Q What other way do you believe -- well, strike that.
Tell me your position regarding the other 90 numbers. You've got call forwarding and -- and what else do you claim would preclude you from

Page 72

knowing who was using an online fax service?
A Because no one knows. The carrier does not know. Online fax services get their numbers from carriers. So because you don't -- your carrier doesn't provide online fax services doesn't mean that your other customers may provide online fax services as part of -- of what they do as a business, and that is unknown by the carriers. What their business is, whether they provide online fax services or not. I've seen dozens of subpoena responses that make it clear that they cannot -- they don't have the business records to answer that question.
Q Are some of these online fax services, are they their own phone providers as well? They have their own numbers?
A Well, yeah, they get 'em from somewhere. I mean, they're the subscribers. But yes, they get those numbers from a carrier.
Q No, no. They're the phone company. They have the numbers themselves.
A Oh, yes. Yes, sir. That's the question you asked. Do you provide an online fax service. That's the question you ask in the subpoena. There are some, but they're -- they're typically smaller

Page 73

carriers.
Q Have you identified in any of the cases you've worked on instances where the online fax service was a subscriber to a -- a phone line from another service?
A I'm not sure I understand your question. So you're saying am I aware of an online fax service that is a subscriber to a carrier's services?
Q If an online fax service needs to obtain numbers from another carrier, the online fax service is listed as the subscriber; is that correct, in your understanding?
A Yes, sir.
Q Now, if the online fax service has their own numbers, they don't -- they don't need to go to another phone carrier to get those numbers, correct?
A Someone provisions those numbers. But I think we're confusing -- they're not necessarily carriers, because they're not -- they're not provisioning those numbers to their customers to use as -- well, some do. I mean, in fact, there are wholesalers out there that sell numbers to other middle tier carriers who then sell those numbers to online fax services, or whomever. But they're typically 800 numbers type of situation.

Page 74

Q So you have access to all the fax numbers in this case for which faxes were successfully sent, correct?
A I have access to all the numbers. I don't know if they were successfully sent.
Q Well, you can look at the fax logs and find that out, correct?
A No, sir.
Q And that's based on your prior discussion regarding the fax logs?
A Yes, sir. And my other point, that any number that is associated with an online fax service, we only know that it went from point A to B potentially. We do not know if the recipient actually received the fax and who that person was. We don't have any information about that.
Q I think the target list would disagree with you, but that's not what I'm asking.
A Okay.
Q Let's take five here and I think we're getting close to the end, but five minutes, all right?
A Okay. Sir.
(Whereupon, a short break was taken.)
Q Mr. Sponsler, we were talking about call

Page 75

forwarding before the break.
And now when you call forward a number, does that process degrade the fax quality and results in more failed faxes or can it do so?
A It might. I mean, it depends on a lot of things. But, I mean, I'm not saying it's not possible.
Q Okay. Let me ask you this. AT&T provides online fax services.
Is that your understanding?
A Um, I have read that they provide VoIP-based fax services. I think I've read something about that on their website.
Q How about -- are you familiar with the phone carrier Vonage?
A Yes, sir.
Q They provide online fax services; do they not?
A I'm not certain about Vonage.
Q How about Ring Central? Do they provide online fax service?
A I think so, sir, but I'm not certain.
Q All right. Let me give you this fact scenario. Let's say I'm a subscriber to -- I have a fax number with AT&T, not an online fax service

Page 76

account but a fax number, and I decide I want to take that number to Ring Central. I want their online fax service.
What happens to -- under that circumstance, what happens to my fax number with AT&T?
A Well, you fill out a request, you port the number, you give the information to where you want it ported to, and it may take some time, but eventually that number would be ported to whoever the carrier is associated with the new online fax service.
Q And if Ring Central is its own carrier, that number would go to Ring Central, correct?
A In -- in that scenario, yes.
Q Are you aware of any online fax service provider that recommends call forwarding?
A I'm not sure anyone would necessarily recommend it. I'm sure that they would offer it -- that they're able to perform services by forwarded numbers.
Q We had talked about security for online -- online fax services accounts, I'll say, versus going from a fax machine to fax machine.
Do you recall that discussion?

Page 77

A Yes, sir.
Q Now, if I'm a -- a medical provider and I -- I fax my -- I fax medical records to you, and you're a -- you're an online fax service provider of the doctor that's going to receive these medical records, and that process, in fact, happens. Medical records go from my standalone fax machine to the online fax service, then they get converted to a PDF and then they're sent -- attached to an e-mail to the point C, the doctor.
You with me on the fact scenario?
A Yes, sir.
Q Now, point B, doesn't that center have access to those medical records?
A Yes, sir. And that's why more and more online fax services, nearly all the major ones market themselves as HIPAA complaint, because they take additional measures for security and access protocols to any HIPAA related fax communications.
Q There's a lot that goes into online fax service security as it relates to HIPAA, correct?
A Yes, sir.
Q And if you're a doctor, wouldn't you think the easier thing to do is just go fax machine to fax machine?

A No, sir.
Q Okay. So are there procedures that you have to learn in order to be an online fax service subscriber regarding HIPAA?
A Well, within your own environment, you would want to designate employees, the correct employees, to receive HIPAA related fax information.
Q Any other requirements? I'm sorry if I cut you off. Any other requirements besides designating an employee?
A Well, yes. I mean, once the employee has possession of the -- of the fax, there obviously would be protocols involved in whether or not to print, which printer to print from/to, storage in a secure folder structure. They would have access protocols within the organization to prevent unauthorized access to those kinds of files.
Q Well, what about your relationship with your online fax service provider? Are there particular matters that go back and forth between -- between the subscriber and the provider regarding protocols?
A Well, certainly, it would be a point of discovery if someone was interested in using a particular online fax service, they might spend time



questioning, investigating, what -- how they handle their HIPAA related information.
Q Mr. Sponsler, I believe we're -- we're done, if not just about done. I'm going to take a quick break here, and when I come back, I'll either have a question or two for you, or I will inform you that we're through with our questioning, okay?
A Yes, sir. Thank you.
MR. SOLBERG: Okay. I'll be back in five.
(Whereupon, a short break was taken.)
MR. SOLBERG: Mr. Sponsler, that's all the questions I have today. Thank you very much.
THE WITNESS: Thank you, Mr. Solberg. Robert, nice to meet you by name there.
MR. SOLBERG: All right. I don't know if there's any cross or are we done here?
MS. KO: I have no questions.
MR. SOLBERG: Okay. That concludes the deposition, as far as I know. So thank you very much again.
THE REPORTER: Did you want to explain signature?
MS. KO: Ken, will you read and sign?
THE WITNESS: Me?
MS. KO: Yes.



THE WITNESS: Yes.
MR. MARGULIS: The billing goes to our office, Margulis Law Group.
THE REPORTER: Are e-trans okay for everyone?
MR. SOLBERG:
MR. GOOD: Yes. And I will e-mail the exhibits to you now.
MS. KO: Yes.
(Deposition adjourned at 11:26 a.m.)



CERTIFICATE OF REPORTER

I, Tina M. Stumpf, Certified Court Reporter and Registered Professional Reporter, Notary Public within and for the State of Missouri, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Tina M. Stumpf

Notary Public within and for
the State of Missouri

My commission expires March 28, 2026.

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

May 18, 2022

To: Ms. Dormie Ko

Case Name: Presswood, Alan Et Al. v. Opensided MRI Of St. Louis LLC Et Al

Veritext Reference Number: 5202149

Witness: Kenneth Sponsler Deposition Date: 5/4/2022

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5202149
CASE NAME: Presswood, Alan Et Al. v. Opensided MRI Of St. Louis LLC Et Al
DATE OF DEPOSITION: 5/4/2022
WITNESS' NAME: Kenneth Sponsler

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

______________ ______________________
Date Kenneth Sponsler

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

_________________________________
Notary Public

_________________________________
Commission Expiration Date



DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5202149
CASE NAME: Presswood, Alan Et Al. v. Opensided MRI Of St. Louis LLC Et Al
DATE OF DEPOSITION: 5/4/2022
WITNESS' NAME: Kenneth Sponsler

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

______________ ______________________
Date Kenneth Sponsler

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

_________________________________
Notary Public

_________________________________
Commission Expiration Date



ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 5202149

PAGE/LINE(S) / CHANGE /REASON

______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________

________________ __________________________
Date Kenneth Sponsler

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF __________________________, 20______ .

______________________________________
Notary Public

______________________________________
Commission Expiration Date

**0**

**000574** 36:22

**1**

**1** 2:7 7:17 8:1
**10** 21:3 46:3 50:1 61:18 62:7
**1100** 82:1
**11:26** 80:10
**12** 14:21
**120** 4:22
**13** 21:3,7,8
**15358** 81:18
**17** 14:21
**18** 2:9 82:4
**1800** 4:22
**1820** 82:2

**2**

**2** 2:12 39:19,22 40:4 43:22,25
**20** 8:25 9:3,4,7 11:4 83:16 84:22 85:22
**2017** 14:8
**2020** 15:10,14,14 15:21
**2021** 14:9
**2022** 1:17 2:8 3:15 8:8 82:4
**2026** 81:21
**216-523-1313** 82:3
**22** 2:9 14:4,6,9 17:25 18:1,4
**22nd** 14:8
**23** 2:10 31:9,10,16
**26** 35:3,8
**28** 4:14 81:21

**3**

**3** 10:17 45:19,19 45:22 49:25
**31** 2:10
**310** 5:4
**314** 4:24 5:6
**32621** 34:7
**33993** 34:7
**36-39** 2:21
**368-1500** 4:9
**37** 46:7,11
**3701** 4:7
**38** 53:1
**39** 2:12

**4**

**4** 1:17 2:8 8:7 11:10,14 18:25 19:8,16,19,23
**40** 8:5
**42** 46:18 47:7
**44114** 82:2
**4th** 3:15

**5**

**5** 11:10,14 18:25 19:9,21,22,23 20:1
**5/4/2022** 82:8 83:3 84:3
**50** 57:16 71:4
**500** 4:7
**5202149** 82:7 83:2 84:2 85:2
**558** 33:5 36:18 38:16 39:5
**577** 33:5 36:18 38:16 39:5

**6**

**6** 2:3 20:20 26:19 26:20 27:1
**60008** 4:8
**61** 62:25 63:2
**621-2571** 5:6
**623** 1:20 6:6
**63017** 4:15
**63101** 5:5
**63105** 4:23
**636-536-7022** 4:16
**66** 60:18
**68** 14:12
**69** 15:25 32:8

**7**

**701** 5:4
**74** 16:18
**75** 16:23

**8**

**8** 2:7 17:2
**80** 9:1
**800** 73:25
**847** 4:9
**854-8600** 4:24

**9**

**9** 11:8 33:3 36:16
**90** 61:20,23 62:9 71:18,24
**9:02** 6:17
**9:36** 26:14
**9a** 56:23
**9b** 57:20

**a**

**a.m.** 6:17 80:10
**ability** 44:25 45:4 46:22 47:9 81:8
**able** 18:3,13 44:23 45:1 55:17 60:25 70:3 76:20
**absolutely** 60:22
**accept** 22:25
**access** 45:13 46:19 50:20 51:14,18 55:2,5,16,17 59:2 68:11 74:1,4 77:14,18 78:15,17
**accessible** 65:21 67:23
**accompanying** 28:19
**account** 46:22,23 47:1 48:5 66:4 69:18 76:1
**accounts** 76:23
**accuracy** 30:13
**accurate** 58:7 59:16
**accurately** 29:3
**acknowledge** 83:11 84:16
**acknowledges** 27:12
**act** 55:21 56:6,9 83:14 84:20
**action** 16:6 81:11 81:15
**actual** 47:11 70:24
**addition** 51:20 58:24 65:2
**additional** 28:8 77:18
**address** 32:18 47:3 52:10,14 65:6 82:15
**addressed** 70:9
**addresses** 57:22
**adjourned** 80:10
**admin** 52:5
**administrative** 40:17 42:4 43:12 58:6
**administratively** 57:25 58:3,10,18
**administrator** 59:24
**advertisement** 55:20

**affairs** 42:13,19
**affixed** 83:15 84:21
**aforesaid** 6:12
**age** 6:10
**ago** 14:15
**agree** 20:17 31:6 32:4 33:16 38:17 38:18,21 39:6,7 51:17 59:20 60:19 65:8
**agreed** 6:1
**agreement** 6:8 7:22 36:20
**ahead** 9:17 50:9 66:19
**al** 1:8 3:8 82:6,6 83:3,3 84:3,3
**alan** 1:4 3:4 82:6 83:3 84:3
**algonquin** 4:7
**alleged** 15:7
**allegedly** 16:8,9 16:22 57:23 59:5
**allocate** 45:2
**allowing** 50:20
**allows** 50:13
**america** 8:12
**amerifactors** 2:12 40:1,8,8,13,17 41:13 42:12,23 43:2,8,13,25
**amount** 25:20 31:24
**analogue** 65:2
**analysis** 12:4 21:19 30:23 59:15
**analyze** 22:15
**anderson** 4:6
**andersonwanca....** 4:10
**answer** 7:4 13:19 29:7 50:8 51:15 59:9 72:12
**answered** 51:10 71:11
**anybody** 41:22
**anyway** 62:15
**apostrophe** 33:2
**apparently** 36:8
**appeal** 43:3
**appear** 14:21 83:11 84:15
**appearances** 4:1
**appears** 20:11 32:7 81:6
**appended** 84:11 84:18
**applies** 10:9
**april** 15:9,14
**area** 65:21
**arrives** 48:25 49:8 52:14
**ascertainability** 10:9
**asked** 12:11 15:11 23:19 34:25 35:11 37:23 71:11 72:23
**asking** 29:20 40:6 53:18 66:24,24 74:18
**aspects** 10:7,8,20
**assertion** 21:7
**assignment** 83:2 84:2 85:2
**assistant** 8:18,24 35:11
**assistants** 8:21
**assisted** 8:16,18
**associated** 16:25 60:19 61:2,9 74:12 76:11
**association** 14:2 52:8
**assume** 11:1 49:13
**assuming** 21:1 34:1
**at&t** 75:8,25 76:6
**attached** 2:15 13:17 33:1,2 45:6 52:19 77:9 84:7
**attachments** 67:13
**attempt** 7:7
**attempted** 26:21 28:7
**attempting** 27:13
**attorney** 10:23 81:13
**attorneys** 6:24 11:5
**authorize** 84:11
**automatic** 55:22
**automatically** 51:25 63:22 65:22
**available** 25:21 28:10
**ave** 82:1
**avenue** 4:22
**aware** 9:24,25 13:11 15:2,8,12 17:6,20,22 20:6,8 21:11 23:11 28:14 29:2,12 30:7,9,15 31:1 34:22 43:2 45:8,11 51:8,12 52:2 56:4 59:10 70:6 71:13 73:7 76:16

**b**

**b** 13:25 22:20,21 49:1,4,9 74:13 77:13
**back** 26:14,16 30:2,18 50:17 54:8 56:13 68:23 68:23 69:25 70:4 70:7 71:18 78:20 79:5,9 82:15
**based** 28:22 44:2 57:1 70:23,24 74:9 75:12
**basic** 61:8
**basis** 14:14 57:14 65:5,19
**bates** 31:24,25 33:4 36:17,21 39:5
**baud** 22:2,2,3,10 22:17,18,21,22
**becoming** 65:8
**beginning** 14:21 20:12 39:4 65:7
**behalf** 1:5,15 3:5 3:14 9:11
**believe** 9:1 10:2 17:22 18:20 20:18 23:7 27:10 29:11 31:17 37:6 43:4 61:4,23 71:21 79:3
**belle** 4:14
**belonging** 47:19
**belongs** 70:2
**beneath** 38:15
**benefit** 13:6 64:24
**benefits** 64:21 69:19
**bennett** 9:18
**best** 11:23 27:21 81:8
**better** 18:10 19:3 19:4,5 25:9 40:12 57:16

**bigger** 19:2 31:13
**biggerstaff** 5:8 12:14,18,21 16:20 29:25 41:16
**biggerstaff's** 12:24 41:1,18,20 42:1
**biggest** 67:21
**billing** 80:2
**blocking** 19:10
**bounced** 59:7
**box** 47:4
**breach** 66:16,18
**breadth** 15:13
**break** 7:2,5 26:10 26:15 36:4 56:16 74:24 75:1 79:5 79:10
**brett** 17:15 26:17
**bring** 26:16
**broadcast** 2:10 20:3,16 32:6 37:21
**broadcaster** 17:7 17:10 30:7,11
**broadcasters** 21:13
**broadcasts** 37:21
**brust** 35:4
**build** 48:19
**built** 65:10
**bundle** 64:1,10,12 64:17
**bundling** 63:21
**bureau** 42:13,17 42:21,24 43:1,6,11 43:18
**business** 11:3 15:19 21:10 72:8 72:9,12
**businesses** 57:22
**busy** 63:7 68:19 68:24 69:1,4,6,7 69:10,11,14
**buy** 48:19

**c**

**c** 13:24,25 49:2,5 77:10
**ca** 82:23
**call** 27:15 29:2 41:14,21 61:5,13 61:13,25 62:11,16 63:5,12 64:3,7 68:18,22,24 69:3,8 69:9,10,15 70:18 70:21,23,24 71:8 71:17,24 74:25 75:2 76:17
**calls** 62:19
**campaign** 21:15
**capacity** 41:10 44:23 55:1,9,12,15
**career** 54:20
**carmody** 4:21
**carrier** 60:5 61:20 63:20 72:2,4,19 73:10,16 75:15 76:11,13
**carrier's** 73:8
**carriers** 59:25 60:19,24 71:2 72:4,8 73:1,19,23
**case** 6:12 9:11,19 9:22,25 11:9,13,24 12:8,25 13:5,22 14:24 15:3,14,16 17:7,9,21 18:19 20:7 21:17 22:6 22:15 23:1,6,7,8,9 23:18,23 24:1,6 26:1,4,8,9 28:17 29:1,4,4,5,10,15 29:21 30:7,10 31:20 32:12 34:1 34:9,15,19,23 37:16 39:10 41:7 46:1 54:7,11,13,15 54:19,20,21 57:18 57:23 59:12 74:2 82:6 83:3 84:3
**cases** 9:1,5,10 12:7 17:12 22:5 54:16 70:10 73:2
**castelberg** 13:24
**categorically** 51:15
**categories** 20:21 31:22 41:11
**category** 56:17
**caused** 28:21
**ccr** 1:20 3:16 6:6
**center** 18:8 77:13
**central** 4:22 75:20 76:2,13,14
**certain** 12:5 17:11 37:11 67:20 75:19 75:22
**certainly** 20:8 25:12 26:8 35:20 64:13 70:4 71:7 78:23
**certificate** 81:1 84:11
**certification** 83:1 84:1
**certified** 6:5 81:2
**certify** 81:5
**change** 82:13,14 84:8 85:3
**changes** 82:12 83:7 84:7,9
**charge** 63:25 65:5
**charged** 21:16
**check** 8:20
**cheryl** 13:24
**chesterfield** 4:15
**chief** 42:12
**chiropractor** 51:13
**churn** 15:19,19,20 15:23
**circumstance** 7:3 76:5
**civil** 6:20 83:5 84:5
**claim** 71:25
**clarify** 7:7
**clarifying** 29:13
**class** 14:8 15:7 56:25 58:11,19 60:1,8,13
**classify** 47:22,24
**clean** 29:23
**cleaned** 29:22,23
**cleaner** 49:21
**clear** 24:4 72:11
**cleared** 30:12
**clearly** 28:20 29:16
**cleveland** 82:2
**clicking** 47:9
**clinics** 66:20
**close** 57:25 74:21
**closed** 8:13 16:10 35:5,5,17
**closely** 18:13
**closing** 66:20
**cloud** 44:2 51:2 57:1
**column** 20:22 24:10,21 25:22 26:21 28:6,22 29:18 38:20,22,23

**combination** 50:11
**come** 11:15 39:8 79:5
**comes** 51:22
**commenced** 6:17
**commentary** 34:5
**comments** 41:14 41:15,19,20,22,24 42:1,6
**commission** 42:18 81:21 83:19 84:25 85:25
**commonplace** 65:9
**communicate** 25:5 27:13
**communications** 38:6 66:3 77:19
**companies** 10:21 10:25 11:2 16:24 64:19 65:1 71:13
**company** 8:23 53:23 65:22 67:12 72:20
**compare** 22:1
**competitive** 63:21 65:9
**complaint** 9:22 77:17
**complete** 11:22 13:16 21:18
**completed** 82:15
**completely** 25:23
**compliance** 10:8 10:20
**comply** 10:22 12:9
**computer** 28:2,4,4 28:15,21,24,25 45:17 46:1,2 47:19 49:17,24 50:12 51:14,18
**computerized** 44:10,13 45:10 46:4 50:23 51:23
**computers** 55:13
**concern** 32:22 67:21,25 68:2
**concerned** 32:21
**concludes** 79:18
**conduct** 71:15
**conducted** 7:9
**confidential** 1:11 2:19 33:20,21 36:7,10,19,25 37:2 39:16,17
**confirming** 21:23
**confusing** 73:18
**connection** 22:4 22:22
**connects** 19:25
**conscious** 64:25
**consent** 6:8
**consider** 10:4 12:21 57:14,15 65:11
**consisting** 44:2 58:11,19
**constitute** 55:21 58:9,17
**consultative** 11:3
**consumer** 42:13 42:18
**contact** 36:19
**contain** 16:8 27:7
**contained** 21:7,18 35:14 39:4
**contains** 16:20 33:23
**content** 16:12 32:9 32:13
**contention** 25:17
**context** 38:2
**control** 69:20,22 71:6
**convention** 20:13
**conventional** 46:8 46:13,15
**conversations** 53:5
**convert** 44:20,25 50:1
**converted** 51:24 77:8
**converts** 65:15
**copied** 2:15
**copies** 2:15
**copy** 7:20
**corporate** 37:6
**correct** 8:9,13 10:23 12:15,19 13:8,9 14:18 18:22 20:25 24:15 24:21 27:5,16 30:18 32:14 34:17 38:8 39:10 40:14 41:3 44:10,15 45:14,15,17 47:16 48:4,5,10,16 49:11 49:18,19 50:15 51:6 52:22 53:6,7 55:15 56:20 59:20 59:21 60:9,16 61:6 62:1 64:5,9 64:18,23 67:4 68:13,23 69:3,10 69:15 70:11,25 71:10 73:11,16 74:3,7 76:14 77:21 78:6
**corrected** 30:17 31:2
**corrections** 82:12 84:17
**correctly** 22:17 51:1
**cost** 63:6 64:14,15 64:16,19,23,25
**counsel** 4:1 6:2,2 36:11,14 81:10,13
**counseling** 54:20
**count** 30:1,4
**counted** 30:4
**county** 83:10 84:15
**couple** 6:23
**course** 10:24
**court** 1:1 2:14 3:1 5:1 6:5 13:6 36:8 39:24 60:12 81:2 83:7
**covered** 26:3
**credentials** 46:23 46:25
**cross** 79:16
**crystal** 7:11
**csr** 1:19 3:16
**csv** 17:1
**cured** 23:10
**current** 62:18 63:13 64:4
**currently** 43:3
**customarily** 11:25 45:16
**customer** 45:5,6 53:18 65:16
**customer's** 45:3
**customers** 11:7 21:12 24:11 46:21 50:20 72:6 73:20
**cut** 78:9

**d**

**d** 17:16 22:20,21
**d.c.** 1:4 3:4
**data** 24:10,10,11 30:3 37:20 66:16 66:18
**date** 8:7 15:2,5 16:14 20:23,24,25 31:23 60:1,7 82:8 83:3,9,19 84:3,13 84:25 85:20,25
**dated** 2:7
**dates** 15:9
**day** 3:15 83:16 84:22 85:22
**days** 82:18
**deal** 62:3
**deals** 42:18
**dear** 82:10
**decide** 76:1
**deciding** 66:5
**decision** 64:25
**declaration** 2:9 17:21 18:18 26:17
**declaratory** 40:3 40:24
**declare** 8:11
**declared** 33:21
**deed** 83:14 84:20
**deem** 48:21
**deemed** 82:19
**defendant** 4:19 6:3 30:9,11 37:7 37:20
**defendant's** 58:20
**defendants** 1:9 3:9 15:9 33:4,21
**define** 21:14
**definition** 44:6 60:8
**degrade** 75:3
**delete** 47:6,9,13 50:14 51:5 52:21
**delivery** 48:21
**dep** 54:21
**department** 82:21
**departments** 52:7
**depending** 52:7 64:1
**depends** 24:25 75:5
**deposed** 6:25 9:6 54:10,17
**deposes** 6:13
**deposition** 1:13 3:13 6:3,17,19 7:8 11:16 12:25 13:3 13:10,11,18 33:2 36:9,15,16,17,23 37:2,4,5 39:18 54:11 79:19 80:10 81:6,11 82:8,11 83:1,3 84:1,3
**depositions** 13:1
**describes** 20:21
**describing** 41:25 67:17 69:11
**description** 49:2
**designate** 37:1 78:6
**designated** 1:11 36:6,9,19,25 45:5 45:6 66:4
**designates** 20:22 26:21
**designating** 78:10
**desired** 47:13 50:15 51:6
**determination** 31:5
**determine** 22:4 25:10,17 61:3,5
**determining** 22:24
**developed** 32:23
**device** 44:3 46:3
**difference** 10:12 10:13 57:18
**different** 24:25 25:12,14 50:19 52:7
**difficult** 14:15
**digit** 46:3 50:1
**digital** 44:4 45:1
**direct** 18:25
**direction** 81:9
**directly** 66:3
**disagree** 24:19 74:17
**discoveries** 71:16
**discovery** 78:24
**discussion** 50:16 74:9 76:25
**discussions** 43:5,6 53:25 54:4
**dispute** 25:16 32:15
**disputing** 32:16
**distinguish** 59:18
**district** 1:1,2 3:1,2 6:21
**docs** 17:1
**doctor** 77:5,10,23
**document** 7:25 33:6,13 34:2,17,20 35:14,16 36:6,12 37:10,15 38:12 39:8,15 40:1
**documents** 18:21 32:11 43:10,17 44:4 69:8
**doing** 56:11 64:24
**doors** 68:16
**doorways** 68:17
**dormie** 4:20 82:5
**doubt** 21:6
**downstream** 50:21
**dozen** 70:15
**dozens** 72:10
**dr** 13:3 33:1,2
**drafting** 39:9
**draw** 68:24
**drill** 7:1
**drivers** 47:17
**duly** 6:10 81:6
**dumpster** 66:21
**duration** 16:15 24:21,24 25:2 26:21 27:3,5,7,14 28:7

**e**

**e** 13:7,24,25,25 26:21 28:7 33:1 36:17 40:2 45:4 47:2,3,13 49:10,16 50:14 51:5,25 52:6,9,14,14,19,20 53:21 55:5 59:2,5 59:6 66:4 67:1,11 77:9 80:4,7
**earlier** 26:25
**easier** 66:24 77:24
**eastern** 1:2 3:2 6:21
**effect** 15:15 27:19
**either** 40:7 45:6 71:3 79:5
**electronic** 44:4
**element** 56:8,8
**elements** 10:17

**eliminated** 29:25
**em** 67:13 72:17
**email** 82:16
**emanate** 67:8,13 67:16
**employ** 49:25
**employed** 81:10 81:13
**employee** 17:19 47:3 78:10,11 81:13
**employees** 52:7 59:6 78:6,7
**employs** 45:22
**enclosed** 82:11
**ended** 27:16 57:17
**entered** 84:9
**entire** 15:13 83:5 84:5
**entities** 61:3
**entity** 52:4,5 67:9
**environment** 68:10 78:5
**equipment** 44:12 44:18 46:4 48:1,3 48:4,6,9,15,20 49:23 50:11,12,17
**errata** 82:13,18 84:7,10,18 85:1
**errors** 8:20 25:22 28:3,5
**essentially** 49:10
**et** 1:8 3:8 82:6,6 83:3,3 84:3,3
**event** 54:22
**eventually** 76:10
**everybody** 36:2
**everybody's** 19:15
**everyday** 10:21
**evidence** 22:14 34:9
**exactly** 14:2 31:21 40:22 57:10
**examination** 2:1,3 6:15
**example** 16:6 61:15 66:14,15
**examples** 71:10
**exclude** 60:12
**excluded** 41:18
**executed** 84:10
**execution** 83:14 84:19
**exhibit** 2:7,9,10,12 7:17 8:1 11:18,18 14:4,17,20 17:25 18:1,4 31:9,10,16 33:3,19 36:8,15,16 37:3 38:12 39:19 39:22 40:4,4
**exhibits** 2:5,14 13:17,21 80:8
**existence** 20:8
**existing** 63:5
**expect** 33:12
**expedited** 40:2
**experience** 24:14 25:20 65:4
**experiencing** 19:11
**expert** 7:20 9:2,10 10:5,7 12:12,17,21 18:18 20:7 29:13 34:3 41:1 70:11
**expertise** 10:19
**expiration** 83:19 84:25 85:25
**expires** 81:21
**explain** 79:21
**explicitly** 13:20
**extra** 62:22
**extremely** 14:15

**f**

**f** 40:2 47:10,10 50:10,10
**face** 58:13
**facilitates** 47:8
**facilities** 44:5
**facsimile** 41:7,9 42:2 46:2
**fact** 73:21 75:23 77:6,11
**factor** 22:24
**facts** 10:5
**factual** 20:15
**fail** 30:20
**failed** 75:4
**failure** 29:3
**fair** 48:8
**fairly** 23:8,25
**fallen** 9:20
**false** 22:10
**familiar** 12:14 17:14 20:10 45:19 59:17,21 75:14
**far** 19:1 32:21 61:21 65:17 69:2 79:19
**fast** 22:24
**faulty** 30:3
**fax** 2:10 10:10,11 14:18,22,24 15:5 16:8,10,11,12,13 16:25 17:6,10,12 19:24,25 20:3,10 20:16,21,23,24,24 21:12,12,18 22:9 22:11,25 24:4,5,21 25:10,24 26:22 27:4,6,8,11,12 28:7,14,15 29:1,4 29:17,20 30:6,7,10 30:11,12 31:3,5,24 31:24,25,25 32:5,5 32:9,10,13,13,20 32:21 33:25 34:6 34:11,11,12,23 37:18,19,21,21 38:8,9,15,25 41:10 44:1,2,9,10,13,13 44:18,19,21 45:3,8 45:10,12,25 46:5,8 46:13,14,15,19,19 46:20,21,25 47:2 47:11,17,18,19,20 47:25 48:3,12,15 48:19,24,25,25 49:7,8,9,11,14,15 49:17,18,23,24 50:6,12,13,18,22 50:23,25 51:4,21 51:22,23,23,25 52:8,8,9,9,10,13 52:19,20,21 53:6,9 53:15,19 54:25 55:20 56:5,24,25 57:1,2,11,12 58:8 58:9,16,17,24 59:1 59:2,10,11,13,18 59:19 60:7,14,20 60:24 61:2,10,16 61:18,19,25 62:4,6 62:7,8,9,11,16,17 62:20 63:6,6,13,14 63:15,15,20,23,25 64:1,5,7,8,11,15 64:16 65:2,4,6,10 65:12,13,14,14,16 65:17,18,20 66:8,8 66:11 67:7,18,19 68:3,4,12,15,18,22 69:5,8,9,12,24 70:2,7,18,19 71:2

71:6,6 72:1,3,5,6,9 72:14,23 73:3,7,9 73:10,14,24 74:1,6 74:10,12,15 75:3,9 75:12,17,21,25,25 76:1,3,5,11,16,23 76:24,24 77:3,3,4 77:7,8,16,19,20,24 77:24 78:3,7,12,19 78:25
**faxed** 44:25
**faxes** 15:3 16:9,22 21:20 23:21 25:13 25:18 27:22 28:19 33:3,11 37:16 44:23 47:4,9 51:9 53:20,21 57:5,23 58:20 65:22 68:1 68:23 74:2 75:4
**faxing** 10:7,17,20 10:20,21 12:12,22 15:8,13 41:2 42:1 45:20 49:3 55:25 60:1,8
**fcc** 42:24 43:3,6,18
**feasible** 57:25 58:4 58:10,18
**feature** 65:9 71:4
**federal** 6:20
**field** 10:3 16:14 24:9 59:16
**file** 13:5 45:6 47:10
**files** 44:4 50:21 78:17
**fill** 76:7
**financial** 40:1
**financially** 81:14
**find** 43:24 46:9 63:9 74:7 82:11
**finding** 13:14
**fine** 9:8 19:12 21:11
**firewall** 67:15
**first** 6:10 7:24 23:2 36:21 38:13 59:23 60:2 61:8 62:3 63:12
**fit** 48:21,22
**five** 11:13 14:14 15:5 20:2 26:14 27:8 35:25 36:1 56:10,13 74:20,21 79:9
**florida** 7:12
**focused** 10:19
**folder** 78:15
**follow** 43:16
**followed** 40:23
**foregoing** 8:12 81:6 83:13 84:18
**form** 35:1
**formal** 39:25
**format** 8:19 44:5
**forth** 68:2 78:20
**forward** 36:13 40:6 52:23 62:16 62:19 63:1,12 68:18 70:18 71:8 75:2 82:15
**forwarded** 61:25 62:11 63:15 64:3 64:7 68:22 69:9 70:23 71:16 76:20
**forwarding** 61:6 61:13 63:5 64:20 64:22 69:3,6,12,15 69:19 70:18,22,24 71:17,24 75:1 76:17
**forwards** 65:15
**found** 25:22
**four** 9:6,20 20:1 54:17
**frame** 27:9
**free** 64:12 83:14 84:20
**front** 7:22 57:4
**full** 42:24 43:3
**further** 81:12
**furthermore** 57:21

**g**

**g** 4:12 13:25
**gateways** 44:15
**generally** 71:13
**generated** 14:24 20:7 28:2,4,15,24 28:25 34:3
**getting** 16:3 69:10 69:14 74:21
**give** 55:9,11 70:7 75:23 76:8
**giving** 34:20
**glitch** 29:3
**go** 9:17 11:8 19:9 19:19 30:17 36:12 40:6 43:22 50:9 52:6 53:1 63:1 66:19 67:1 71:18 73:15 76:14 77:7 77:24 78:20
**godaddy** 9:18
**goes** 15:14 27:15 44:12 49:3,7 50:16 51:3 59:24 62:22 77:20 80:2
**going** 11:12 15:24 18:14,14,16,24 26:3 33:19 35:25 35:25 36:7,9 38:24 40:7 41:8 43:23 44:24 45:1 56:17 57:19 64:11 65:1 69:5,7 76:23 77:5 79:4
**good** 4:5 6:22 18:3 18:6,10 19:4,7 36:2,14 39:15 80:7
**governmental** 42:13,18
**graphical** 46:24
**great** 27:23
**group** 4:13 10:17 40:2 45:19,19,22 49:25 80:3
**guarantee** 70:5
**guess** 43:15 54:12 55:8
**gui** 46:24

**h**

**h** 13:24
**hacked** 66:9,11 67:2
**half** 70:15
**hand** 7:15 39:21
**handle** 48:20 79:1
**hands** 58:13
**happen** 54:7 67:18 67:20 69:17 70:5
**happened** 54:7
**happening** 67:21
**happens** 76:4,5 77:6
**happy** 24:12 69:25
**harbor** 12:8
**hard** 7:20
**harms** 55:22,24 56:1
**head** 9:14

**header** 38:23
**hear** 58:14
**heard** 13:23 66:16 66:20 67:21
**helpful** 13:15
**helps** 8:19
**highlighted** 36:20 36:21
**hipaa** 65:6,25 77:17,19,21 78:4,7 79:2
**historical** 14:14
**holder** 48:5
**holding** 58:13
**home** 7:11
**hr** 66:1
**hundred** 57:14 61:16,17 62:6
**hypothetical** 69:16

**i**

**identification** 8:2 10:10 18:2 31:11 32:17 39:20
**identified** 33:11 34:4 57:24 59:11 59:13 60:5 70:17 73:2
**identifies** 19:24,24 20:1
**identify** 38:11 47:2 58:10,18 59:25 60:6,19,25 61:1,9
**identifying** 16:13 32:11 71:2
**identities** 16:21
**identity** 14:13
**ii** 25:4
**iii** 25:3
**il** 3:16 4:8
**image** 45:1,3 47:11,11,13 50:15 51:6
**images** 19:15 44:4
**imagine** 51:17
**implement** 10:21
**implicitly** 35:20 35:23
**important** 53:18
**include** 11:5 33:19 42:7 46:19 63:22
**included** 11:6 16:25 56:24 60:8 82:13
**includes** 34:11
**including** 41:15 43:10 56:2 61:12
**incoming** 62:19
**incorporated** 84:12
**incorrect** 28:15,24
**incur** 64:14,15,16
**index** 2:1,5,19
**indicated** 28:20 29:18 35:17
**indicates** 35:4
**indicating** 82:13
**indication** 25:7 28:18
**indicator** 22:13 24:15
**individual** 59:4 71:15
**individually** 1:4 3:4
**individuals** 57:22
**industry** 15:20 63:20
**infiltrate** 67:10
**inform** 79:6
**information** 14:13 16:14,20 21:15,17 21:23 22:6 24:16 25:8,20,21,23 28:9 28:12,19 29:6,9 30:22 31:4 32:11 32:12,24 34:6,8 39:4 41:5 42:8 44:25 59:15 66:1 66:1,2,17 74:16 76:8 78:7 79:2
**informed** 7:19
**initially** 25:6
**ink** 55:23
**inquiries** 71:15
**insecure** 67:24
**instance** 68:21
**instances** 70:24 73:3
**intended** 16:13,21 32:10,17 38:5,10
**intention** 37:1
**interest** 56:3
**interested** 78:24 81:15
**interface** 46:24
**internet** 45:14 51:14,19 53:11 55:2,6,16,18 57:1 67:1
**interview** 12:5
**introduced** 67:3
**intrusion** 67:15
**invasion** 56:2,2
**investigating** 79:1
**invoice** 31:23,23
**involve** 23:2
**involved** 78:13
**issue** 16:9 23:12 23:18,20 28:21 29:22,23 30:1 32:21 37:16 46:1 57:23 62:2
**issued** 42:24
**issues** 29:15 61:11
**item** 63:25
**items** 39:3

**j**

**january** 14:8,9
**job** 31:23 67:10
**jogs** 14:1
**june** 15:10,14

**k**

**k** 17:16,16
**ken** 79:23
**kenneth** 1:13 3:13 6:9,19 82:8 83:4,9 84:4,13 85:20
**kind** 21:15,22 32:18,18 34:2 40:10 57:17
**kinds** 40:24 66:2 66:22 78:17
**know** 6:22,25 7:1 7:1,2,8 9:24 10:8 10:15,16 12:11 13:20 15:7,7 19:10 21:11 22:3 23:4,6,23 24:11,14 26:13 27:22,25 28:1,10,21,22,23 29:7,11 30:19 31:1 32:16 33:14 33:17 34:7 35:18 35:22,24 42:6,7,20 42:23 46:14 47:1 51:9,22 54:20,24 55:7,19 56:19 57:17 58:25 59:4 61:17 62:7 63:19

66:10 67:5 68:1,7 68:9,11 69:16,17 70:14 71:14,15 72:3 74:5,13,14 79:15,19
**knowing** 65:1 72:1
**knowledge** 11:23 64:11
**knows** 72:2
**ko** 4:20 71:11 79:17,23,25 80:9 82:5
**kokinadis** 2:9 17:15,20 19:24 20:20 26:17

**l**

**l** 13:7,24,25 33:1 36:17
**l.l.c.** 1:8 3:8
**label** 36:21
**labeled** 36:18 39:16
**lack** 34:6,7
**larger** 40:11
**law** 4:13 70:6 80:3
**lawful** 6:10
**laws** 8:11
**lay** 38:4
**laying** 65:23
**learn** 78:3
**leased** 47:20,23 48:1
**leasing** 48:6
**leave** 7:1
**leaves** 61:20
**left** 24:17
**legal** 5:3 11:1,5 82:1 85:1
**lengthy** 41:16
**letter** 82:19
**licensed** 10:23
**likelihood** 70:22
**limited** 15:6 25:20
**line** 28:11 50:2 53:11 63:14,24 64:15 65:2 73:4 82:13 84:7 85:3
**lines** 46:4 49:24 50:6 55:23
**list** 9:1,5 11:22 33:3,7,12,15,16,22 34:10,24 37:15,19 38:6 74:17
**listed** 9:10 11:9,14 18:21 39:11 54:15 54:16,20 55:24 56:2 73:11 84:7 84:17
**listing** 84:7
**little** 19:2 31:12 49:21
**llc** 40:2 82:6 83:3 84:3
**local** 6:21 59:24
**log** 20:11,16,25 22:12 24:4 27:6 28:9,15 30:12,22 31:5,25,25 32:5,13 34:6 46:22,23,25 47:17
**logged** 47:18 49:14
**logs** 14:18,22,24 15:5 16:7,10,11 17:1 20:1,3,9,10 20:22,23 21:18 23:10 24:5,21 27:5 28:2,4,15 29:1,20 30:6,10 31:3 32:9,21,23 34:12 58:9,17,24 59:10,11,13 74:6 74:10
**long** 42:5
**longer** 8:23
**look** 9:15,16 11:11 15:11 18:13,15 19:16 20:23 21:2 31:22 36:1,12 39:22 52:20 67:11 74:6
**looked** 15:4 31:19 53:10
**looking** 18:13 24:4 26:20 36:15 38:13 41:6
**losing** 69:20,22
**lot** 17:12 31:20 34:19 75:5 77:20
**louis** 1:8 3:8 4:23 5:5 82:6 83:3 84:3

**m**

**m** 1:19 3:15 4:5 6:4 81:2
**macdonald** 4:21
**machine** 22:24 25:7 27:11,12 46:2,8,13,15,15 65:12,13,18,20 68:4,12,15 76:24 76:24 77:7,24,25
**madam** 82:10
**mail** 45:4 47:3,13 49:10,16 50:14 51:5 52:6,14,19,20 55:5 59:5,6 66:4 67:1 77:9 80:7
**mailed** 47:2 51:25 52:9,14 59:2
**mailing** 53:21
**mails** 67:11
**maintained** 49:18
**maintaining** 71:6
**major** 77:16
**majority** 25:2
**malicious** 67:12
**malware** 67:3,6
**manage** 48:19
**managed** 50:19
**march** 2:8 8:7 81:21
**margulis** 4:12,13 80:2,3
**margulislaw.com** 4:17
**marked** 2:5 7:16 8:1 18:1 31:10 37:5 39:19,22
**market** 5:4 77:17
**marking** 37:3
**matched** 34:12
**matches** 20:11 32:5
**material** 31:20 34:19
**materials** 11:19,25 12:3,6 39:12 41:13
**matt** 36:17 37:5
**matter** 6:24
**matters** 11:5 78:20
**max** 4:12
**maxmargulis** 4:17
**meadows** 4:8
**mean** 18:12 24:24 24:25 25:1 26:24 38:4 41:23 46:12 48:18 57:8,16 58:3 71:3 72:5,18 73:21 75:5,6 78:11

**means** 38:1 57:25 58:4,10,18 71:5
**meant** 22:7 69:4
**measures** 77:18
**medical** 10:3,3 51:12,17 66:17 68:2,3,12 77:2,3,5 77:7,14
**meet** 79:14
**members** 42:20
**memory** 14:1 39:11
**mentioned** 27:18 58:23
**met** 6:23
**middle** 73:23
**midwest** 82:16 85:1
**minimal** 64:20
**minute** 26:10
**minutes** 74:21
**misalignment** 29:13,16,24
**miscounting** 23:21
**missing** 21:22 28:12 32:24 59:14
**missouri** 1:2,20 3:2 4:23 6:5,21 81:4,20
**mo** 3:16 4:15 5:5
**mobile** 63:20
**modem** 44:22
**monte** 4:14
**month** 54:12
**monthly** 65:5
**morning** 6:22
**move** 15:24 54:22
**moving** 16:18
**mri** 1:8 3:8 16:9 82:6 83:3 84:3

**n**

**n** 17:16 40:2
**name** 13:7,24 16:12 17:16 24:1 29:11 31:19,24 32:10,18 33:8 34:20 38:13,13,14 38:18,20 53:17 79:14 82:6 83:3,4 83:15 84:3,4,21
**named** 17:15
**names** 16:24 33:23 33:24 37:19 53:13 57:22 58:8,16
**naming** 20:12
**narrow** 18:11
**national** 26:4
**nearly** 77:16
**necessarily** 10:6 52:3 61:12 63:17 73:18 76:18
**necessary** 50:17
**need** 7:2 45:13 73:15
**needed** 53:19
**needless** 55:11
**needs** 31:1 48:15 50:13 73:9
**negotiate** 70:4
**neither** 70:20 81:9
**network** 67:15
**never** 23:13,19 55:12 66:10 67:21
**new** 69:24 76:11
**news** 43:22
**nice** 79:14
**normally** 24:13
**notarized** 82:14
**notary** 3:16 6:6 81:4,19 82:23 83:10,18 84:15,23
85:23
**note** 82:12
**notes** 53:24 54:3,5
**notice** 6:20
**nuisance** 56:3
**number** 20:11 21:7,24,25,25 25:13 31:23 33:9 34:20,21 38:8,9,14 38:15 50:2 52:6,8 52:25 53:12 59:24 60:7 62:4,16,17 63:6,13,15,23,25 64:3,5,7,21 68:19 68:22 69:5,9,12,20 69:21,24,25 70:1,7 70:18,22 71:7,16 74:12 75:2,25 76:1,2,5,8,10,14 82:7,13
**numbers** 16:8,25 33:24,25 34:11,11 34:12,23 37:19 46:3 47:2 53:8 58:9,9,17,17 59:25 60:13,19 61:1,1,9 61:16,17,18,20,23 61:25 62:5,6,8,9 64:1 71:18,24 72:3,16,19,21 73:10,15,16,17,20 73:22,23,25 74:1,4 76:21 84:7
**numerous** 6:25 56:1,1

**o**

**o** 17:16
**objection** 7:20 71:11
**objective** 57:24
**obtain** 53:8 71:5 73:9
**obtaining** 14:13
**obviously** 15:22 23:22 55:17,18 78:12
**occasion** 11:4
**offer** 10:25 60:24 76:19
**offered** 15:16 18:19
**offering** 11:13
**offerings** 11:2
**office** 7:11 35:4 51:17 68:4,8,9,12 80:3
**offices** 51:13
**official** 83:15 84:21
**oh** 18:16 19:3,5 23:17 64:13 72:22
**ohio** 82:2
**okay** 8:25 9:21 12:24 15:2,8,24 16:4,5 19:4,16,19 19:19,23 20:20 21:5 24:17 26:7 26:11,13 27:3 30:25 31:8,15 32:25 35:13,24 38:22,24 42:11 45:8 46:16,17 48:8 52:13 53:1,3 53:13 55:14,19 56:10,13,14 59:17 62:15 63:3,4,12 64:14 68:18 74:19 74:23 75:8 78:2 79:7,9,18 80:4
**old** 4:14

**once** 52:13 78:11
**ones** 77:16
**online** 10:10,10 21:12 35:3 44:1 44:13,18 45:8,12 46:19,21,25 47:17 47:18,20,25 48:3 48:12,15,18,24 49:8,9,14,18,23 50:12,13,25 51:21 51:23,25 52:10 53:6,9,14 54:25 56:25 57:2,12 59:1,19 60:7,14,20 60:24 61:2,9,18,19 61:25 62:7,8,11,17 62:20 63:6,15,18 63:20 64:8,11,16 65:4,6,14,16,17 68:22 69:5,12,24 70:2,7,18 71:2,5 72:1,3,5,6,9,14,23 73:3,7,9,10,14,24 74:12 75:9,17,21 75:25 76:3,11,16 76:22,23 77:4,8,16 77:20 78:3,19,25
**open** 25:16 27:13 57:17
**openfax** 16:7 17:6 17:10,19 21:10 23:3 24:11 25:9 25:17 27:18,21
**opens** 47:10 52:20
**opensided** 1:8 3:8 16:8 33:4,5 36:18 36:22 38:16,16 82:6 83:3 84:3
**operational** 10:7 10:13,14,20
**opine** 37:23
**opinion** 13:2 15:18 35:1 41:16 56:22 57:19,20,21 58:8 58:16
**opinions** 11:1,9,12 11:13 13:15 14:7 15:15,17 18:19
**option** 51:5 52:21 60:12
**order** 23:8 26:4 29:7 30:22 31:5 36:11 44:19 45:2 45:13 48:14 78:3
**organization** 67:10,14 78:16
**original** 2:14
**outcome** 81:15
**outside** 15:9
**outweighs** 64:25

**p**

**p** 40:2
**p.c.** 1:4 3:4
**page** 2:2,6 8:4,5 36:21 39:4 82:13 82:15 84:7 85:3
**pages** 2:19,21 11:10,14 16:15 21:24,25,25 22:8,9 22:9 27:8 38:15
**paid** 25:13 27:19
**paper** 35:13,15
**papers** 43:11
**paragraph** 8:25 9:3,4 11:8 14:6,12 14:21 15:24 16:18 16:23 17:2 19:8,9 19:16,21 20:1,20 21:2,7 26:19,20 27:1 32:8 35:3,7 43:22,25 46:7,18 47:7 53:1,4 56:23 57:20 60:18 62:25 63:2,4,9 69:2
**paragraphs** 18:25 19:23 21:3
**pardon** 23:15,15 50:5
**parentheses** 57:4
**parenthesis** 16:10 16:10 57:3
**part** 10:18 18:18 37:15 43:12,23 44:6 60:11,16,24 67:23 72:7 84:9
**partially** 13:13
**particular** 29:22 38:12 39:8 52:10 57:21 64:5 78:20 78:25
**particularly** 34:10
**parties** 81:11,14
**party** 12:1
**patient** 66:21 68:9
**pay** 65:2 66:1
**paying** 63:13,14
**pays** 52:5
**pdf** 44:20 45:7 47:10 50:2,10 51:24 65:15 77:9
**penalty** 8:11
**pending** 7:3
**people** 12:6 53:14 69:17 71:4,7
**percent** 57:14
**percentage** 56:24 57:9,11,15
**perform** 12:4 46:5 59:15 76:20
**period** 9:20 14:8 15:7,22,22
**perjury** 8:11
**permanently** 35:4 35:17
**person** 12:1 13:23 17:14 61:24 66:5 68:5 74:15
**person's** 66:4
**personally** 83:11 84:15
**persons** 1:5 3:5
**petition** 40:2,17 43:7,13
**phase** 25:3,4
**phishing** 67:6
**phone** 15:20 16:14 33:24 38:14,25 55:23 59:25,25 60:5,6 62:4 63:20 64:21 71:12 72:15 72:20 73:4,16 75:15 82:3
**pick** 65:24 68:5
**picks** 68:7
**place** 12:9 67:16
**plaintiff** 1:6,15 3:6 3:14 4:3 6:2,24 9:11,11,19 35:4 62:10
**plaintiff's** 7:17 17:25 18:3 31:9 31:15 39:22 59:17
**plaintiffs** 9:25
**play** 18:18 39:9
**please** 7:6 82:11 82:11
**point** 30:16,19,21 47:12 49:1,1,2,8,9 66:6 74:11,13 77:10,13 78:23
**policies** 12:8

**port** 69:23 76:7
**portability** 59:24
**portal** 46:20,20 47:8,17 49:15 50:22 51:4,21 52:18 59:3
**ported** 76:9,10
**porting** 64:21 69:19,21
**portion** 37:2 39:18
**portions** 1:11
**position** 25:10,12 25:14,19 27:22,23 62:15 68:6 71:23
**possession** 78:12
**possible** 55:13 68:19 75:7
**possibly** 50:24
**potentially** 43:19 47:5 53:16 74:14
**practice** 38:14,19
**practices** 21:10
**preceded** 40:18 43:7
**preclude** 71:25
**preparing** 8:16
**present** 5:8 36:6 43:6 64:17
**presented** 32:23 53:18,22
**presents** 47:11
**president** 67:11
**presswood** 1:4 3:4 82:6 83:3 84:3
**prevalent** 15:20
**prevent** 78:16
**preview** 8:19
**previously** 17:9 37:5 39:16
**primarily** 32:16
**print** 47:13 50:15 51:6 52:21 53:20 55:10,12 78:14,14
**printed** 53:21 55:21 56:6 65:23
**printer** 55:2,5,18 78:14
**printing** 41:10 55:22,23
**prior** 43:17 54:11 74:9
**privacy** 56:2
**probably** 12:17 25:1,3 39:12 54:14,15 57:16
**problem** 23:2,11 29:17 30:12 61:8 71:1
**problems** 58:23 59:10,11,12
**procedure** 6:20 83:5 84:5
**procedures** 12:7,9 78:2
**process** 25:5 48:21 56:18 58:6 59:18 60:12 62:22 70:9 75:3 77:6
**produce** 24:13
**produced** 16:7 22:12 23:10 29:21
**producing** 30:10
**production** 82:15 82:16,21
**products** 11:6
**profession** 51:9
**professional** 6:5 10:3 81:3
**programmed** 62:19
**proposed** 14:8 56:25
**protective** 23:7 26:4 36:11
**protocol** 45:23 46:5 49:25
**protocols** 10:16 77:19 78:13,16,22
**provide** 16:12 32:9,12 48:14 60:12 64:12 66:14 66:15 72:5,6,9,23 75:11,17,20
**provided** 11:16 12:1 24:6 37:23 41:15 46:24 47:3 61:2,19
**provider** 25:24 37:20 53:20 61:17 62:18 63:13 65:10 76:17 77:2,4 78:19,21
**providers** 53:6,9 53:15 54:23 55:1 63:21 65:5 68:2 72:15
**provides** 48:9,11 48:12 49:23 63:6 75:8
**provisioning** 73:20
**provisions** 73:17
**public** 3:16 6:6 43:14 81:4,19 83:10,18 84:15,23 85:23
**publicly** 65:21 67:22
**pull** 17:24
**punitive** 60:1,13
**purchase** 34:24
**purchased** 37:20
**purpose** 50:20
**purposely** 27:25
**pursuant** 6:19
**put** 7:16 14:3 16:19 68:14

**q**

**quality** 75:3
**question** 7:3,4,6,7 7:24 9:9,21 11:6 11:11 12:13 13:20 14:19,23 23:16 41:19 46:12,20 49:6 56:4 57:5 58:15 63:2 66:25 72:13,22,24 73:6 79:6
**questioning** 79:1,7
**questions** 6:16 37:8 40:7 56:17 79:12,17
**quick** 79:5
**quickly** 36:12
**quite** 12:3
**quote** 8:10,13 16:19 35:5 44:1 47:8 57:21,25

**r**

**r** 13:7,24,25 33:1 36:17
**ran** 11:4
**range** 15:2,5
**rate** 22:2,3,4,10,17 22:21,22
**read** 12:17 13:15 19:2,17,19 24:5 28:22 35:13 42:6 43:4,23 44:17 46:11 66:11 75:11

75:12 79:23 83:5 83:6,12 84:5,6,17
**reading** 41:17,21 82:19
**real** 18:11 40:10
**really** 15:17 18:7 53:19 65:24
**reason** 20:18 21:6 27:20 33:19 55:25 71:7,9 82:14 84:8 85:3
**recall** 17:10 31:18 33:8,9,12 34:21 40:20 41:12,21 42:3,9 43:20 53:13 54:13 56:7 76:25
**receipt** 82:18
**receive** 44:3,19,23 49:9 50:18 57:5 57:11 68:3,19 77:5 78:7
**received** 22:1 25:8 47:9 50:1,23 57:23 58:11,19 59:1,4,5,8 66:3 74:15
**receives** 48:25 49:10 51:24 65:14
**receiving** 22:23,23 25:7 27:11 66:5
**recipient** 14:14 16:13 32:17 38:10 45:5 74:14
**recipients** 16:22 32:10 38:5,7 56:24 58:25 59:19 59:19
**recognize** 7:24 40:9
**recollection** 40:22
**recommend** 76:19
**recommends** 76:17
**record** 6:18 7:19 29:3 36:16 38:12 39:15 40:17 41:13 42:4 43:12 59:3,8 65:24 68:3 84:9
**recordkeeping** 12:7
**records** 21:9 28:16 66:21 72:12 77:3 77:6,7,14
**reduced** 81:8
**refer** 40:7 42:25 57:2
**reference** 16:15 82:7 83:2 84:2
**referenced** 83:11 84:15
**referencing** 23:1 23:18 26:2 29:10
**referring** 23:6,24 26:9 29:14 34:5 34:10 40:14 60:23
**reflect** 6:18
**reflected** 27:4
**regarding** 16:20 32:13 41:2 43:7 53:24 66:17 70:21 71:23 74:10 78:4 78:21
**registered** 6:4 81:3
**regular** 21:10
**related** 20:1 41:2,3 41:4,5 77:19 78:7 79:2 81:10
**relates** 37:2 45:20 77:21
**relationship** 78:18
**relative** 81:12
**relevant** 14:7
**reliable** 21:9 58:6
**reliably** 57:24
**relied** 11:19 21:9
**relying** 25:23
**remaining** 71:18
**remains** 62:18
**remarking** 37:4
**remarks** 17:3
**remember** 9:13 12:18 13:19 17:13 17:22,23 23:4 24:1,22 26:2,6,9 31:20 37:12,12 41:17 49:2
**remotely** 7:9
**removed** 39:17
**rendered** 70:11
**rendering** 13:1
**rented** 47:20,22 48:1
**renting** 48:6
**repeat** 14:19
**report** 2:7 7:17,21 7:23 8:7,17,25 11:9,18 14:7,18,20 14:25 15:25 16:19 16:20,23 17:4 18:18,22 19:1 20:7 25:25 29:13 29:24 30:14 34:3 35:2 39:9 41:6,6,8 46:7,9,18 53:1 54:15 56:23 57:3 57:4 60:18 62:25
**reporter** 2:15 5:1 6:5,6 23:15 36:8 39:24 50:5,7 58:12 79:21 80:4 81:1,3,3 83:7
**reporter's** 13:6
**reporting** 22:11
**reports** 12:18 41:2 70:11,16
**represent** 17:18 32:25 33:22 36:15
**representative** 37:6
**representatives** 53:5
**represented** 20:24
**representing** 6:24
**request** 76:7 84:9 84:11
**requests** 40:24
**require** 45:9
**required** 9:5 82:23
**requirement** 56:8
**requirements** 78:8 78:9
**requires** 55:20 56:5 70:6
**rerun** 30:18
**residential** 4:16
**resolved** 23:13,19
**response** 60:5
**responses** 72:11
**rest** 9:19 40:3
**restrictions** 55:25
**resulted** 22:10
**results** 35:14,16 75:4
**retained** 2:14 9:2 9:10,18 11:24
**retains** 12:2
**returned** 82:18
**review** 8:19 11:25 12:4 13:17 14:23 21:3 28:14 43:10 43:17 82:12 83:1

84:1
**reviewed** 9:21 11:19 13:1,10,13 13:20 14:18 18:22 20:9 24:20 32:22 34:19 39:12 40:16 40:23 43:14
**reviewing** 39:25 40:21 41:12
**rgood** 4:10
**right** 7:15 8:24 10:4 11:8 17:14 19:7 27:18 36:2,3 38:24 43:21 44:9 45:23 46:16 47:7 50:3 52:11,12 55:6 56:11,15 57:19 59:23 60:20 62:13,20,23 63:16 74:22 75:23 79:15
**ring** 75:20 76:2,13 76:14
**river** 7:11
**road** 4:7,14
**robert** 5:8 12:14 49:4 79:14
**rolling** 4:8
**room** 7:13 68:15
**rooms** 68:16
**ross** 4:5 8:5 14:3 18:24 26:18 40:10
**row** 24:10 69:9
**rp** 38:20
**rpr** 1:19 3:16
**rules** 6:20,21 10:22 83:5 84:5
**ruling** 2:12 40:3,8 40:13,18 41:13 42:12,23 43:3,8,25
**rulings** 40:25
**ruyle** 13:7 33:1 36:17,20,21 37:5
**ruyle's** 33:2

**s**

**s** 13:25 17:16 33:2 82:15 84:8,8 85:3
**safe** 12:7
**sales** 53:11
**save** 47:13 50:14 51:5
**savings** 63:7
**saw** 65:25
**saying** 21:9 24:5 24:17 25:24 27:24 28:8,13 30:16 33:10,15 34:18,19 47:25 65:19 70:1 73:7 75:6
**says** 6:13 21:23 24:8,18 26:21 28:6 38:20,21,23 42:12
**scenario** 52:2 68:14 75:24 76:15 77:11
**scoma** 26:4
**screen** 7:16,22 18:8 19:13,14
**scroll** 8:3
**seal** 83:15 84:21
**search** 35:3,10,12 35:14,16
**seclusion** 56:3
**second** 12:13 30:1 60:4 68:24 69:10
**seconds** 26:24
**secure** 65:11,18 67:14,15,15 68:10 78:15
**security** 63:7 76:22 77:18,21
**see** 8:14 11:20 12:6,8 14:10 16:16 17:1,3 18:3 19:22 20:4 21:14 21:15 24:20,21 26:19,23 31:13,14 31:23 32:2 33:15 33:16 34:2 35:2,6 39:1 41:9 42:11 44:6 47:14 48:22 49:20 57:6 58:1 63:10,11 69:18 71:16
**seeing** 24:12 31:18 42:3
**seeking** 53:23
**seen** 28:3 31:15 33:6 37:9,18 41:1 72:10
**select** 64:2
**sell** 73:22,23
**send** 44:3 55:5 67:10
**sending** 22:23
**sendings** 46:16
**sense** 28:12,23 51:16
**sent** 16:22 20:25 21:25 22:8,9 24:7 25:18 27:22 30:10 33:4 36:7 46:1 52:15 53:22 74:2 74:5 77:9
**separate** 19:13 63:24 68:15
**server** 44:2,9,10 44:14,19,22 45:2 45:10 47:19 49:17 49:24 50:19,23,25 51:23,25 57:12 70:7
**servers** 46:5 47:19
**service** 44:1,2,13 45:9,13 46:25 47:17,18,20 48:7,9 48:11,12,12,13,14 48:15,19,25 49:8,9 49:18,23 50:13,25 51:22,23 52:1,5,10 52:13 53:6,9,15,19 55:1 57:1,1,2 59:19 60:14,24,25 61:19 62:1,7,8,12 62:17,20 63:6,15 64:8,11,16 65:3,4 65:14,16,17 68:22 69:5,24 70:2,19 72:1,23 73:4,5,7,9 73:10,14 74:13 75:21,25 76:3,12 76:16 77:4,8,21 78:3,19,25
**services** 10:10 21:12 46:19,21 47:25 48:4 49:14 50:12 51:13 59:1 60:7,20 61:2,10 63:22 64:12 65:6 65:10 71:2,6 72:3 72:5,7,10,14 73:8 73:24 75:9,12,17 76:20,23 77:16
**set** 26:18 47:1 50:19
**setup** 51:21
**seven** 46:10
**sheet** 82:13 84:7 84:10,18 85:1
**short** 20:15 26:15 36:4 56:16 74:24 79:10

**shorthand** 6:4
**show** 18:12 19:7 31:8
**shown** 25:21 82:15
**shredded** 66:22
**side** 48:20
**sign** 79:23
**signal** 68:19,24 69:6,7,10,11,14
**signals** 63:8 69:2,4
**signature** 6:7 8:4 8:10 79:22 81:18 82:14
**signed** 83:13 84:18
**significant** 56:23 57:8,11,15
**signing** 82:19
**similar** 44:3,21 63:19
**similarly** 1:5 3:5
**simple** 53:10
**simply** 16:19
**sincerely** 82:20
**single** 29:2,3 70:17
**sir** 7:14 8:3,6,9,15 9:4,12,23 10:2,24 11:21,23 12:16,20 14:1,11,16,19 15:1 16:3,17 17:5,8,12 17:17 18:5,20,23 19:22 20:5 22:18 23:4,25 24:8,23 25:19 26:6,12 27:2,6,17,23 29:6 29:15 30:14,16 31:4,14,17,19 32:3 34:18 35:7,9 37:11,17 40:15,19 41:4 42:5,10,14 43:1,9 44:8,11,16 45:18,21,24 46:6 48:17 49:12 51:7 52:3 53:3,7 54:2,5 56:12,21 57:7,10 58:2,12,13,21 59:14,22 60:3,10 60:17,21,23 61:7 61:22 62:14,21,24 63:3,11,17 64:19 69:16 70:12 71:1 72:22 73:13 74:8 74:11,23 75:16,22 77:1,12,15,22 78:1 79:8 82:10
**sit** 30:25 35:18
**sitting** 50:22,24 51:4 65:21 68:4
**situated** 1:5 3:5
**situation** 20:15 49:13 73:25
**six** 16:7 17:1
**size** 19:8
**small** 18:7 40:10
**smaller** 72:25
**solberg** 2:3 4:4 6:16 7:18 8:5 14:3 17:24 18:24 23:17 26:13,18 31:8,12 36:5,23 37:7 39:13,24 58:15 79:9,11,13,15,18 80:6
**solutions** 5:3 82:1 85:1
**somebody** 30:17
**sorry** 14:4 23:17 35:25 50:7,7 58:12,12 78:8
**sort** 10:3 41:18 44:22 55:24
**source** 67:6,7 71:14
**south** 4:22
**space** 45:2 47:5
**speak** 40:4
**specific** 15:5 33:9
**specifically** 20:9 43:20 56:7 66:10
**specifics** 42:9
**speed** 22:22
**spell** 17:15 22:19
**spend** 78:25
**spine** 26:5
**sponsler** 1:13 2:7 3:13 6:9,19,22 7:19 10:5 11:17 14:6 18:25 19:17 23:18,19 26:16,19 26:20 31:13 34:22 37:9 38:17 39:21 40:6,9,16 43:22 49:21 50:9 51:8 53:2 54:9 55:19 56:11 63:2,10 65:12 74:25 79:3 79:11 82:8 83:4,9 84:4,13 85:20
**sponsler's** 39:25
**spot** 45:3 50:18
**st** 1:8 3:8 4:23 5:5 82:6 83:3 84:3
**staff** 43:7
**stamp** 31:25,25 39:5
**stamped** 33:4
**standalone** 10:11 46:14 59:18 65:12 65:12,18,20 66:8,8 67:18,18 77:7
**standard** 42:2 45:22 49:25
**standards** 41:7,9 45:20
**stands** 71:7,9
**start** 62:5
**started** 59:9
**starts** 25:1 27:11
**state** 8:10 14:7,12 16:19,24 35:3 51:1 57:20 63:4 81:4,20 83:10 84:15
**stated** 36:23
**statement** 83:13 83:14 84:19,19
**statements** 70:21
**states** 1:1 3:1 8:12 16:11 43:25
**status** 16:15 22:6,7
**step** 59:18,23 60:2 60:4
**stipulated** 6:1
**storage** 78:14
**store** 45:2 52:23
**straight** 30:11
**street** 5:4
**strike** 14:4 30:8 46:17 51:10 54:24 61:15 71:22
**structure** 78:15
**stumpf** 1:19 3:15 5:2 6:4 81:2
**subject** 12:5 67:2 67:2
**submitted** 17:20 43:11,18
**subpoena** 56:18 59:23 60:4,5 70:9 72:10,24
**subscribed** 62:17 64:15 83:10 84:14 85:21
**subscriber** 45:12 47:18,21 48:13,18

48:22 49:14,16 50:13,18 51:3 52:1,3,4,19 60:6 60:14 64:4 70:3 70:17 73:4,8,11 75:24 78:4,21
**subscriber's** 48:3
**subscribers** 16:21 50:14 59:1 72:18
**subscribing** 48:7
**subsequent** 23:9 29:12,24
**subsequently** 23:10 29:21,21 30:10
**success** 21:19 22:7 22:13 24:15,18,18 25:22 28:18 29:17
**successes** 30:3
**successful** 11:3 21:24 22:11,14 23:21,22 24:9 25:11,14 29:18 30:2,23,24 31:6 32:1 59:16
**successfully** 24:7 25:18 59:7 74:2,5
**suite** 4:7,22 5:4 82:2
**summary** 2:11
**superior** 82:1
**supporting** 22:13 22:14 24:11,16
**sure** 7:21 14:2,20 15:4 22:3 23:5 24:20 27:23 28:11 30:15,17 34:14 35:15 37:17,22,23 38:3,18 41:23 47:22 50:16 66:18 73:6 76:18,19
**switch** 62:23 69:15
**sworn** 6:10 81:6 83:10,13 84:14,18 85:21

**t**

**t** 13:25 40:2 47:10 50:10
**t.30** 10:17 45:22 46:5 49:25
**t.38** 10:17
**t.39** 10:17
**take** 7:5 9:16 26:10 35:25 36:1 36:1,11 39:14,22 53:24 56:10,13 69:18 74:20 76:2 76:9 77:18 79:4
**taken** 1:15 3:13 6:3,19 13:12 26:15 36:4 54:5 56:16 74:24 79:10 81:7,12
**talk** 12:5 15:19 33:18 49:4 53:4,8
**talked** 27:4 28:17 44:14 49:1 53:14 54:24 61:11 76:22
**talking** 15:21 23:12 26:25 28:25 30:1 48:10,16 56:19 61:7,12 62:4 64:10 71:19 74:25
**target** 33:12,15,16 34:10 37:15,25 38:3,6 74:17
**targets** 33:3,10,24 34:4 51:9 68:1
**tcpa** 9:11 10:9 38:1,3 54:10,21 55:20 56:5 70:10
**technical** 41:21,23 42:8
**technological** 10:18
**technology** 10:5,6 10:11,14,15 12:12 12:22 41:2,7,9,10 42:1
**telecommunicati...** 44:5
**telephone** 4:9 16:25 46:2,3,4 49:24 50:2,2 53:11 58:9,17 60:13 61:9,17 70:17
**tell** 7:7,9 20:24 24:6 44:18 59:12 61:24,24 62:10,11 71:23
**template** 2:10 19:24 20:10,12,13 31:24,24 32:5,20
**templates** 19:25 20:2,2
**temporarily** 36:24
**ten** 62:6 70:15
**term** 10:12 22:16 37:25 38:3 46:8 46:12 57:17
**terming** 42:8
**terms** 24:12 36:10
**test** 31:2
**testify** 6:11
**testimony** 24:3 81:5,7 83:6,7 84:6 84:9,12
**thank** 40:11 79:8 79:12,13,19
**thereabouts** 9:1
**thereto** 81:14
**thing** 18:15 21:8 24:8 32:19 55:24 77:24
**things** 8:20 12:9 24:25 30:17,18,19 52:25 55:13 63:5 66:2 67:1,17 75:6
**think** 13:7 15:19 25:9 27:21 30:23 39:13 42:17 50:24 64:24 65:7,8 73:18 74:17,20 75:12,22 77:23
**third** 60:11,11
**thirty** 46:10 82:18
**thought** 53:25
**three** 59:18 60:16
**throwing** 66:21
**tied** 20:16 32:14 38:7,9
**tier** 73:23
**ties** 20:2
**tiff** 45:7 47:10 50:4,10
**time** 8:24 9:16 25:2,2 27:8 31:19 42:5 54:10 76:9 78:25
**times** 6:23,25 21:13 70:13,15
**tina** 1:19 3:15 5:2 6:4 81:2
**title** 39:25
**titled** 11:18
**today** 8:23 11:15 63:20 79:12
**today's** 66:12
**top** 9:13 31:23 42:11

**topics** 41:3,5
**total** 30:5 31:25 32:1
**tough** 18:16
**training** 12:6
**trans** 80:4
**transaction** 16:7
**transcribe** 44:23 44:24
**transcribed** 6:7 83:7
**transcript** 1:11 2:16 12:25 13:11 13:16,18 36:24 39:18 82:11,12 83:5,12 84:5,11,17
**transmission** 22:25 24:17 25:5 27:8 44:20 65:13 65:13 66:9,11 67:19
**transmissions** 25:11
**transmitted** 16:9 29:4 49:7
**tray** 65:23
**true** 8:13 35:19,21 35:23
**trust** 35:20,23
**truth** 6:11,11,12
**try** 43:24 69:8
**turn** 11:17
**two** 9:25 15:22 22:1,8 26:10 29:15 54:12 57:20 69:8 79:6
**tying** 55:23
**type** 73:25
**typewriting** 6:7 81:9
**typically** 65:21 72:25 73:25

**u**

**u** 13:7 22:20,21 33:1 36:17
**uh** 25:3 34:3 57:16 57:20
**ultimate** 56:24 58:25
**um** 12:3,7 14:1 15:4,6,11 20:9 21:8,11,13,17 22:22 24:9 25:3 27:10 29:18 35:11 35:15 37:23 41:14 42:5 46:14 54:16 56:10 59:7 67:12 71:3 75:11
**un** 66:22
**unauthorized** 78:17
**unaware** 34:16
**understand** 7:6 50:8 57:13 60:2 73:6
**understanding** 9:4 9:7 22:16 28:1 33:23 37:13,14 38:1,4 42:15 45:25 52:16,17 55:4 60:15 66:7 69:23 73:12 75:10
**unheard** 66:12
**united** 1:1 3:1 8:12
**unknown** 72:8
**unsecure** 67:24
**unsolicited** 55:20
**unsuccessful** 32:1
**update** 48:20
**use** 37:25 45:9 55:12,15,23 60:4 61:15 71:5 73:20
**user** 46:24 47:11
**user's** 47:8
**users** 47:12
**utilized** 61:19
**utilizing** 60:7

**v**

**v** 1:7 3:7 82:6 83:3 84:3
**valid** 21:19
**various** 10:16 20:21
**verify** 28:10
**veritext** 5:3 82:1,7 85:1
**veritext.com.** 82:16
**version** 20:16
**versus** 9:18 10:11 26:4 76:23
**video** 19:12
**videoconference** 3:14
**view** 19:11 47:4,9 49:17 51:4 52:21 65:24
**viewing** 7:20,23 49:15,15,16 52:19
**violate** 56:6,9
**violation** 55:21
**visible** 18:6
**visitor** 68:8
**visuals** 19:10
**voip** 75:12
**vonage** 75:15,19

**w**

**waived** 6:8 82:19
**walk** 65:23
**wallace** 4:4
**wanca** 4:6
**want** 7:21 9:15 12:5,6,8 21:14,15 31:2 34:2 47:6 55:14 76:1,2,8 78:6 79:21
**wanted** 53:21
**way** 27:15 34:7 37:14 41:25 45:13 48:21,22 50:17 69:13 71:21
**ways** 61:4,14
**we've** 6:23 48:15
**website** 75:13
**went** 7:18 30:2 74:13
**white** 43:11
**wholesalers** 73:22
**wise** 13:4
**wisen** 13:4
**witness** 6:8,14 9:2 18:5,7,11 19:3,5 31:9 79:13,24 80:1 81:5,7 82:8 82:11 83:1,4,11 84:1,4,15
**witness’** 82:14
**word** 21:23 30:24
**words** 20:14 27:19 28:11 58:5
**work** 11:5,6
**worked** 69:13 73:3
**working** 62:18
**world** 66:12
**worst** 67:23,23
**worth** 64:20
**worthless** 55:11
**written** 12:8 53:17
**wrong** 28:22 30:20 68:5

**wrote** 41:16

**y**

**y** 13:7,24 33:1 36:17
**yeah** 9:8,17 10:25 18:24 19:5,6 27:1 27:1 37:17 40:11 46:11 50:6 55:7,8 65:1 71:20 72:17
**year** 9:20 15:22
**yearly** 65:5
**years** 9:6 11:4 14:14 54:17 71:4

**z**

**zero** 22:7,9,10,13
**zoom** 3:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.