# EXHIBIT C

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

SCOMA CHIROPRACTIC, P.A., )
a Florida corporation, )
FLORENCE MUSSAT, M.D., )
S.C., an Illinois service )
corporation, and )
DR. WILLIAM P. GRESS, an )
Illinois resident, )
individually and as the )
representatives of a class ) Civil Action No:
of similarly-situated ) 2:16-cv-00041-UA-
persons, ) MRM
)
Plaintiffs, )
)
vs. )
)
MASTERCARD INTERNATIONAL )
INCORPORATED, a Delaware )
corporation, )
)
Defendant. )
)
_______________________________/

DEPOSITION OF: KENNETH SPONSLER

DATE: FRIDAY, JANUARY 20, 2023

TIME: 10:00 A.M. - 1:30 P.M.

PLACE: ALL PARTIES APPEARING VIA VIDEOCONFERENCE

STENOGRAPHICALLY
REPORTED BY: BRITTANY O'NEILL VALLADAREZ

A P P E A R A N C E S:

WALLACE SOLBERG, ESQUIRE
OF: ANDERSON & WANCA
3701 ALGONQUIN ROAD
SUITE 500
ROLLING MEADOWS, ILLINOIS 60008
(847) 368-1500, FAX (847) 368-1501
wsolberg@andersonwanca.com
APPEARING ON BEHALF OF THE PLAINTIFFS

JONATHAN MONTCALM, ESQUIRE
OF: DORSEY & WHITNEY, LLP
51 WEST 52ND STREET
NEW YORK, NEW YORK 10019
(212) 415-9347, FAX (646) 417-7238
montcalm.jonathan@dorsey.com
APPEARING ON BEHALF OF THE DEFENDANT

HEATHER KOLBUS, ESQUIRE
OF: EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 SOUTH CLARK STREET
SUITE 1500
CHICAGO, ILLINOIS 60603
(312) 739-4200, FAX (312) 419-0379
hkolbus@edcombs.com
APPEARING ON BEHALF OF THE PLAINTIFFS

CURTIS C. WARNER, ESQUIRE
OF: CURTIS C. WARNER
5 EAST MARKET STREET
SUITE 250
CORNING, NEW YORK 14830
(888) 551-8685
cwarner@warner.legal
APPEARING ON BEHALF OF PLAINTIFFS

RYAN KELLY, ESQUIRE
OF: ANDERSON & WANCA
3701 ALGONQUIN ROAD
SUITE 500
ROLLING MEADOWS, ILLINOIS 60008
(847) 368-1500, FAX (847) 368-1501
rkelly@andersonwanca.com
APPEARING ON BEHALF OF THE PLAINTIFFS



I N D E X


TESTIMONY OF KENNETH SPONSLER
DIRECT EXAMINATION BY MR. KELLY..................5
CERTIFICATE OF OATH................................106
CERTIFICATE OF DEPOSITION TRANSCRIPT................107
ERRATA SHEET........................................108
NOTIFICATION LETTER................................109


INDEX OF EXHIBITS


PLAINTIFFS' EXHIBITS
EXHIBIT 1 SUPPLEMENTAL REPORT
EXHIBIT 2 EXHIBIT B TO THE SUPPLEMENTAL REPORT
EXHIBIT 3 MASTERCARD SUBPOENA
EXHIBIT 5 AMERIFACTORS RULING
EXHIBIT 6 RYERSON RULING
EXHIBIT 14 ANALYSIS
EXHIBIT 22 DECLARATION OF DOROTHY SUE MERRYMAN
EXHIBIT 25 See Fax Without a Fax Machine
EXHIBIT 26 Faxing Isn't Dead; Three Reasons the Predictions Were Wrong
EXHIBIT 27 The Definitive Guide to Online Fax
EXHIBIT 28 See How to Fax Over the Internet in Five Easy Steps
EXHIBIT 31 HIPAA Compliant E-Fax Provider Recommendations
EXHIBIT 33 The Percentage of Businesses That Fail




REPORTER'S NOTE: Exhibits mentioned above were retained by WALLACE SOLBERG, Esquire.

------

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the counsel for the respective parties and the deponent that the reading and signing of the deposition transcript be reserved.

------



P R O C E E D I N G S

*********

THE REPORTER: Would you raise your right hand, please?
Do you solemnly swear or affirm that the testimony you're about to give in this cause is the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.
THEREUPON,

KENNETH SPONSLER

was called as a witness and, after having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SOLBERG:
Q. All right. Let the record reflect that this is the deposition of Kenneth Sponsler, taken pursuant to notice, the Federal Rules of Civil Procedure, and the local rules for the Middle District of Florida.
Good morning, Mr. Sponsler. I've already introduced myself. My name is Wallace Solberg, and I'm one of the attorneys representing the plaintiffs. You've been deposed in numerous cases, so I'm sure you know the drill so I'll make it quick.
I ask the questions; you answer them truthfully. If you don't understand a question please

tell me and I'll attempt to clarify the question so that you do understand it. If you need a break please tell me and we'll do that, but if there's a question pending please answer the question before we take the break. As you know, this deposition is being conducted remotely. Can you tell me where you're at?
A. I'm at my home office in Beverly Hills, Florida.
Q. And you're by yourself, I assume?
A. I am, sir.
Q. And the attorney presenting to you today -- well, strike that.
During the course of this deposition -- we've done this before. If you want to look at a hardcopy of your supplement report in this case, feel free, as long as we can agree as to what you're looking at. I think you'll find it's easier to look at a hardcopy than the screen, but in any event we'll deal with that when we get to it.
So to start, let me direct your attention to what's been previously marked as Exhibit No. 1. And while that's coming up I can tell you it's your supplemental report.
MR. SOLBERG: You know what? I see something on the screen. Let's take about a two-minute break.



Okay? I'll be back.
THE WITNESS: Yes, sir.
(Break was taken.)
BY MR. SOLBERG:
Q. Do you recognize Exhibit 1, Mr. Sponsler?
A. I recognize the name of it. Yes, sir.
Q. Yeah. I don't know. That's what I was talking about. What you're looking at is a list of exhibits, Sponsler deposition exhibits. Right?
A. Yes, sir.
Q. And the exhibit's not open?
MR. KELLY: Yeah. I'll open it.
MR. SOLBERG: Okay.
BY MR. SOLBERG:
Q. And, Mr. Sponsler, this may be a perfect opportunity to get a hardcopy. All right. Here we go.
A. I've got it right here, sir.
Q. Do you? What? A hardcopy or the view on the screen?
A. I have a hardcopy of this supplemental.
Q. For the record, this supplement report consists of pages 1 through 27, and then Exhibits A to -- I'm sorry? I thought someone said something. Let me start again.
Your supplement report consists of pages 1 to



27, and then Exhibits A to N, and N was provided to us yesterday by Counsel. Do you see that?
A. Yes, sir. Well, right now on the screen I see the open Exhibit 1.
Q. Okay. I mean, I guess we can --
A. I'm not arg- -- I'm not disputing the rest of it.
BY MR. SOLBERG:
Q. Yeah. And I hear you, and I think -- let's see if we can agree on that. Your supplemental report, like I said, pages 1 to 27, Exhibits A to N. It's dated December 2nd, 2022. Do you agree with all of that?
A. Yes, sir.
Q. Your signature's on page 27?
A. Yes. Can I grab my printed copy real quick?
Q. Absolutely.
MR. SOLBERG: We're not waiting on me, are we?
THE WITNESS: Sorry. It just ran out of paper in the middle of it.
MR. SOLBERG: That's fine.
THE WITNESS: All right.
BY MR. SOLBERG:
Q. So the last question was: Your signature is on page 27. Correct?
A. Yes, sir.



Q. All right. Now, I've designated as Exhibit 2 your Exhibit B to the supplemental report. Now, if we could pull that up? And that might be a bit of a task. And, again, if you have an electronic version of that in your office --
A. I do. I do have it, sir.
Q. Please do or this dep will take three days.
A. Yeah. I can open up Exhibit B.
Q. And I'm going to ask you some quick identifying questions about that.
A. Yes.
Q. So again, Exhibit B has been designated Exhibit 2. Do you agree that Exhibit 2 consists of three tabs, the first called summary, the second called details, and the third called multiple carriers. Do you see that?
A. I do, sir.
Q. Mr. Sponsler, when were you retained to render this supplemental report?
A. Was the question when was I retained?
Q. Yes. I know you issued an earlier report in this case, but then you were tasked to do a supplemental report. When did that happen?
A. I'm not for certain when it was, sir. At some point we were asked to summarize and kind of collect and

categorize as the subpoena responses were coming in. And as you know, we've done very similar work many times in the past, but I don't remember exactly when the date was.
Q. Do you remember the first time -- well, strike that.
Do you have assistance on putting together the supplemental report?
A. The analysis part of it. Yes, sir.
Q. Who helped you?
A. My team, led by Jennifer Smith. And then we have a team of reviewers that we routinely engage, and they were also assistive.
Q. You know, in your answer you began with analysis. Is there a distinction between compiling those numbers and what you do? I don't know if I missed a part of your answer.
MR. MONTCALM: Objection to form.
BY MR. SOLBERG:
Q. What do you do -- strike that.
MR. SOLBERG: I'm sorry?
MR. MONTCALM: I just said, Objection to form.
MR. SOLBERG: Okay.
BY MR. SOLBERG:
Q. What did you do in this supplemental report



specifically, Mr. Sponsler?
A. I, of course, interacted with the team to help guide this effort from all of my experience of doing this, I participated in the training of the team, I participated in the QA of the process. And as this was progressing and we decided to add additional information, such as the summary sheet, the detail sheet, the multiple carriers issue came to light, so we also documented that.
Q. What issue came to light? You just said an issue came to light, or were you speaking generally?
A. I didn't catch your question, sir.
Q. I thought you just said you and your team addressed an issue that came to light, or did I misunderstand you?
A. Well, just the multiple carriers responding. In other words, Iconectiv and Somos identified more than one carrier for the same number.
Q. And that's Tab 3. Correct? In your supplemental Exhibit E, which is our Exhibit 2.
A. Right. That issue is documented in the multiple carriers tab.
Q. You know, if you could pull up -- as long as we're on this topic, Mr. Sponsler, can you pull up the summary sheet?



A. I'm looking at it, sir.
Q. Now, as you look in -- and we're going to get into this a little later, but Column C is "Indicated no." Do you see that? Up at the top of the page.
A. Yes.
Q. How did you handle that column in relation to multiple carriers? What did you do with multiple carriers relative to the Indicated-no column?
A. Now, this -- it's my recollection that the summary sheet is -- reflects each and every carrier that received a subpoena. I think there were 120-some odd, so we would have responded for each carrier's response that we have listed here in the carrier named from subpoena.
Q. So if we're looking at Indicated-no -- and I just went over to the multiple carriers column, and my count there's 345 listed there. Why don't you check that for yourself and make sure we're on the same page?
A. On the summary sheet?
Q. No. I'm sorry. Page was a poor choice of words. Make sure we're in agreement that the multiple carriers -- it ends in 346, but I always assume the first line was not that. How many multiple carriers were there?
A. Well, on the multiple carriers tab we have 346



telephone numbers listed, which would be -- yes, 345.
Q. Okay. So are those numbers -- were those numbers subtracted from Indicated-no, Column C on the summary sheet or are they still in there?
A. These numbers are in there. You can go back to the summary tab and you can look at the -- so in other words, here's -- the reason that we understand there were multiple carriers identified was because during that time span in December of 2015 there was a time span of the effective time that these faxes were sent, and during that time the carrier had changed for that fax number. So there were faxes received by two separate carriers during that small date window, which came out to be 345 instances of that. So, obviously, you would have two carriers that accounted and responded to the subpoenas because they were identified by Iconectiv and Somos.
Q. So if we were to try to get the -- I don't know if this is the right way to say it, but an absolute -- strike that.
To get a true count of Indicated-no in Column C we would have to subtract those 345 numbers. Is that your understanding?
A. No.
Q. Where am I wrong?

Page 14

A. Because we're talking about a fax that was allegedly going to be a part of this action if someone received it, except we have two carriers who are involved in servicing that number, the same number on two different faxing events. So what you end up with is accounting for the response of each of those carriers since they were servicing the number at different times, different faxes.
Q. So the same -- two carriers that would be listed on the summary report, would they be -- would the Indicated-no column be accounting for two different faxes or just one fax?
A. Well, that column has really nothing to do with faxes. It has to do with the numbers of -- that were subpoenaed by carrier. That's what that has to do with. And if you look at B through G, all of those columns relate to the single question if the carrier provided online fax services to the numbers.
Q. So going to page 4 of your summary if -- and forgetting or not taking into account what's going to happen at this depth, the number is total 275,828. Do you see that?
A. Yes. I do, sir.
Q. Now, would I be correct in saying that as far as Indicated-no, which means did not provide online fax

Page 15

service, that number is accurate?
A. Sir, it is my belief that that number is accurate.
Q. All right. And we'll get back to that later. Do you know how -- strike that.
Mr. Sponsler, CompliancePoint Litigation Services is who is providing this supplemental expert report. Is that correct?
A. Yes, sir.
Q. To date how many hours have been spent on this supplemental report? Do you know?
A. I don't. As you can imagine, there's a lot of work that would go into analyzing all of the subpoena responses and tracking and checking and QAing and all of those things.
Q. Let me ask you this: How do you bill for your report? Is it an hourly rate? Is it a firm fixed price? What is it?
A. We bill an hourly rate. Of course, you know, that's not something personally that any of us receive. That goes to the company. I just run a P&L. So I'm salaried. I'm not based on hourly things for this -- like this. But, yeah. And we have the team that works on this kind of manual review to compile this sort of data, or lower cost resources that help us do that.

Page 16

Q. Do you know the amount that's been billed to date on this effort?
A. I do not, sir.
Q. When you were preparing this supplemental report, Mr. Sponsler, did you review prior reports regarding this subpoena process?
A. Not to my recollection. I mean, I'm extremely familiar with the process. We've done it many, many times, this same work.
Q. Let me direct your attention to your report at page 7, note 2. And I will tell you as you look through that that provides a listing of cases where you've addressed the subpoena process. Of those cases do you recall being deposed in the following: Scoma versus National Spine, Brust versus Opensided, Sharfman versus InfuCare, and Career Counseling versus Amerifactors?
A. Is that in footnote 2, sir?
Q. Yeah. Yes.
A. Okay.
Q. You recall being deposed in those?
A. I don't know if I recall...
Q. Let me ask it this way: You wouldn't be surprised if you were deposed in those. Is that an easier way to answer that question for you?
A. Yes, sir.

Page 17

Q. Let's go to Exhibit B of your report that contains the materials you have reviewed and relied upon in this report.
A. I don't have any Exhibits printed off, so I can print it off -- find it and print it off.
Q. We have them here, but I think it might be -- I think you're going to need to view a couple. Let's see how we can do without doing that. All right? You have Exhibit B in front of you. Correct?
A. I do not have -- oh, you mean the --
Q. The report?
A. I have the report. Yes.
Q. Now, your report goes Exhibit A to Exhibit N. Do you have those exhibits handy to your report?
A. They're not printed. I could go back into my files and find those.
Q. Well, here's what I'm going to do: I'm going to walk through your list and ask you what we have designated as particular exhibits, Is this what you're actually referring to? And Ryan can pull those up on the screen, I guess. There's going to be about four or five of them, so let's give this a shot and see how we do. Okay?
MR. KELLY: Do you see it on the screen?
MR. SOLBERG: I see "Materials reviewed and

relied upon by Mr. Sponsler." Yeah.
MR. KELLY: All right.
BY MR. SOLBERG:
Q. So the first one, Mr. Sponsler, is revised expert report of Robert Biggerstaff dated December 1st, 2017, including Exhibit 1.
A. Yes, sir.
MR. SOLBERG: And, you know, I don't know if this is going to be the way to do this but, Ryan, can you pull up Plaintiff's Exhibit 7?
BY MR. SOLBERG:
Q. What you're looking at is what's been designated as Plaintiff's Exhibit 7, minus the Exhibit 1, which I assume would be the transmission logs. Is this -- if you're able to go through this or if you can tell from the cover page, is this what you reviewed?
A. Yes, sir. This looks like what I reviewed.
Q. And in your career, Mr. Sponsler, I would except you've seen a ton of those expert reports by Mr. Biggerstaff. Is that correct?
A. Yes, sir.
Q. A ton not being too accurate, but quite a few?
A. Yes, sir.
Q. And that's all I want to do with these right



now. I just want to identify exactly what you've reviewed. The next one you state in paragraphs 24 and 25 of Exhibit B to your supplemental report you reviewed Amerifactors and Ryerson, those rulings from the Bureau. Is that your understanding that that's what those are?
A. Yes, sir.
Q. You know, let me show them to you just so we have it in the record.
MR. SOLBERG: Can you pull up Exhibit 5, Ryan?
BY MR. SOLBERG:
Q. And the question for you, Mr. Sponsler, is going to be: Is this what you reviewed or relied upon?
A. Yes, sir.
Q. And then same question if we could pull up Exhibit 6? It's going to be Ryerson, and the question is the same: Is that what you reviewed? And it's referenced in Paragraph 25 of Exhibit B to your supplemental report.
A. It appears to be so, sir. Yes.
Q. And we'll move on then. Let me direct your attention, Mr. Sponsler, to Exhibit C of your supplemental report.
MR. SOLBERG: And, Ryan, I think we're going to have to pull up Exhibit C.
BY MR. SOLBERG:



Q. Now, this is one -- to make this process easier, you don't have these in front of you. Is that what you told us, Mr. Sponsler? Your exhibits to your report?
A. I do not, sir.
Q. Here we go. Do you recognize Exhibit C to your report, Mr. Sponsler? When I say "report" in this dep, you have two reports, a supplemental report and a report. Unless I say otherwise, all these questions are referring to your [unintelligible] report.
A. Unless you specify otherwise --
Q. Unless I specify that it's your original report. Okay? Take a look at Exhibit C to your report and tell me if you recognize it.
A. Yeah. I mean, yes. I mean, it's been a while, but yes.
Q. And that's a question, too, Mr. Sponsler. When's the first time you can recall reviewing a -- well, strike that.
Identify for me, if you would, what Exhibit C is.
A. Is that Exhibit C right there? That looks like a subpoena.
Q. It is. And I'll tell you what, on these kind of questions I'll try to expedite this a bit. This is a



subpoena for deposition to CSC Holdings that I believe was served September 16th, 2022. The place for the deposition is listed as Minneapolis, Minnesota. CSC Holding's address is listed as 1201 Hays Street in Tallahassee, Florida. Can you see all that on the page that's on the screen?
A. I see Minneapolis and Tallahassee. Yes.
Q. And the dep was set for September 30th, 2022?
A. Yes, sir.
MR. SOLBERG: Ryan, if you could go to the rider to the subpoena? There we go.
BY MR. SOLBERG:
Q. Take a look to -- can you see that, Mr. Sponsler, the rider to the subpoena?
A. Yes, sir.
Q. Take a look at Instructions in paragraph 2. "Please note that in most instances providing a declaration or affidavit will obviate the need for a deposition." Do you see that?
A. Under Instructions No. 2?
Q. Yeah.
A. It says, "Questions for additional time to respond to the subpoena inquiries regarding depositions scheduled shall be directed to caitlinhull@dorsey.com."
Q. Next sentence.

A. Say again?
Q. The next sentence is what I was looking for. I'm sorry.
A. Oh, I'm sorry. "Please note that in most instances providing a declaration or affidavit will obviate the need for a deposition."
Q. Mr. Sponsler, did you participate in the drafting of the topics for this deposition?
MR. MONTCALM: Objection to form.
A. In the contents of this subpoena?
BY MR. SOLBERG:
Q. Yes.
A. No, sir.
Q. Not the instructions; what's actually asked.
A. What's actually in it?
Q. Let's roll on. I got ahead of myself. Deposition topic, affidavit topic, and/or document request No. 1, and I'll read that to you. "Whether you have any information or mechanism available to determine whether any subscribing fax number identified in plaintiff's subpoena used an online fax service or standalone fax machine to receive faxes on the dates identified in plaintiff's subpoena, or confirmation that no such information or mechanism exists." Do you see that?



A. Yes, sir.
Q. Did you participate in the drafting of that topic?
A. No, sir.
Q. When were you first made aware that MasterCard was going to serve subpoenas on phone carriers?
A. Sir, it's been a common -- I mean, if you -- if I'm a defendant attorney and I'm looking at similar cases, this has become fairly commonplace to see defendants ask for affidavits about specific things. There's a lot of record -- public record out there on that.
Q. Yeah. But my question is: When did you first become aware that MasterCard was going to serve subpoenas for depositions in this case?
A. Sir, I can't answer that. I just don't know for sure when I became aware. It's a long process. I know it's been going on for a while.
Q. One of the documents you relied on -- and this is Exhibit B, Mr. Sponsler -- was the order allowing MasterCard's motion for discovery. And it was entered May 25th, 2022, and it's paragraph 11 of your materials reviewed and relied upon, and trust me it's there. Do you recall the date the first subpoena was served by MasterCard in this case?



A. I do not, sir.
MR. SOLBERG: Ryan, let's go back to Exhibit C of the supplemental report. And if we could go to the definition section, definition 3. Is everybody getting blocked by pictures on the right? As I look at these exhibits I'm getting cut off. Can you guys see those documents in full?
THE WITNESS: I can.
MR. MONTCALM: Yeah. Me, too.
MR. SOLBERG: You can? Okay.
THE WITNESS: But I've got two different monitors.
BY MR. SOLBERG:
Q. Here's my question, Mr. Sponsler, and I'm going to read to you: "Definition 3 provides online fax service refers to a cloud-based service consisting of a fax server or similar device that is used to send or receive documents, images, and/or electronic files in digital format over telecommunications facilities that allows users to access the faxes the same way that they do e-mail: By logging into a server over the Internet or by receiving a PDF attachment as an e-mail." Do you see that?
A. I see it, sir.
Q. And I read it correctly. Right? You're supposed to say yes to that, Mr. Sponsler. I asked you if I read it correctly.



A. Oh, I'm sorry. Yes. You read it correct.
Q. Is it your understanding that that definition was taken from the Amerifactors' ruling?
A. I have no idea, sir. I didn't have anything to do with this process, so I don't know.
Q. Mr. Sponsler, you're not aware of an online fax service that does not require the use of a fax server, are you?
A. That an online fax server does not require the use of a fax --
Q. No. Just the opposite. That an online fax server does require the use of a fax server.
A. Oh, yes, sir.
Q. And to subscribe to an online fax service the subscriber needs to access the Internet. Correct?
A. Yes, sir.
Q. All right. You're familiar with Groove3 standards for faxing?
A. Yes.
Q. Groove3 employs the T30 protocol. Correct?
A. Yes, sir.
Q. Is it your understanding that the faxes at issue in this case were sent from a telephone, facsimile

machine, computer, or other device to 10-digit telephone numbers over telephone lines to equipment that could perform the T30 protocol?
A. Yes, sir.
MR. MONTCALM: Objection to form.
MR. SOLBERG: Did you catch that answer?
BY MR. SOLBERG:
Q. Your answer was, Yes, sir to that question?
A. Yes, sir.
Q. And whether that process was successful, that's demonstrated by fax logs in this case. Correct?
A. Whether the faxes were successful?
Q. Successfully transmitted from -- and we're going to get to it -- but from Point A to Point B?
A. Yes, sir.
Q. And again, I got ahead of myself. What I was going to ask you and will ask you is: You and Mr. Biggerstaff in the course of your work regarding TCPA fax cases, you talk about Points A, B, and C. Correct?
A. Correct, sir.
Q. And what you're describing is what happens during a fax transmission and thereafter is the Point C?
MR. MONTCALM: Objection to form.
BY MR. SOLBERG:



Q. Did you catch that last question?
A. Yes. I think so, sir. You're saying that Point C is thereafter the fax is received.
Q. Successfully transmitted. All right. Let's talk about what happens with an online fax server using Point A and Point B. When a fax is transmitted from Point A, which is a telephone facsimile machine, computer, or other device, and it arrives at the online fax service, Point B, it arrives at the online fax service's fax server, which is the equipment that performs the T30 protocol and converts the signal received over the telephone line into a PTD or a TIFF. Is that right?
A. Yes, sir.
MR. MONTCALM: Objection to form.
BY MR. SOLBERG:
Q. Can you tell me what a PDF is, Mr. Sponsler?
A. Yeah. A PDF is a -- something document form. It's an abbreviation for a specific type of conversion into a readable, some of them editable, format. The name -- I use them every day, but the name escapes me. I think it's portable document format.
Q. Yeah. I was just going to say. It is portable document format.
A. Yeah.



Q. Now, as to an online fax service, when a fax is transmitted from Point A to Point -- from Point A and arrives at Point B, the fax service doesn't receive something that's essentially an e-mail; it receives a fax. Is that right?
MR. MONTCALM: Objection to form.
A. It does. Yes, sir.
BY MR. SOLBERG:
Q. Now, in going back to the definition up top, the reference to -- and when I say that -- strike that.
Going back to the definition of online fax service in the subpoena by MasterCard, the reference to logging into a fax server over the Internet means logging into the portal of an online fax service. Is that correct?
A. I believe so, sir.
Q. And when a subscriber is logged into the online fax service's portal is the subscriber viewing an image of the fax on a server maintained by the online fax service?
A. Potentially. They can do other things when they're logged into the portal, but potentially they could.
Q. The subscriber -- and again, referencing the definition of online fax service up top -- the



subscriber to an online fax service can also view the fax as an attachment to an e-mail that is sent to the subscriber's e-mail address. Is that right?
A. That's correct.
Q. And it's this combination of equipment, the online fax service, server's fax server, and telephone lines, together with the computer through which the subscriber goes onto the Internet to log into the online fax provider's server or to access -- to access the port- -- you know what? I'm going to try that again. Strike that.
The online fax service, fax server, and telephone lines and the computer of the subscriber, that allows the subscriber to either go onto the portal to look at a fax or receive it by e-mail, and it also allows the subscriber to view, delete, or print the fax. Is that right?
MR. MONTCALM: Objection to form.
A. Among other things, yes, sir, those things.
BY MR. SOLBERG:
Q. Now, in order for an online fax service to provide its services it has to be able to access the Internet. Is that correct?
A. Yes.
Q. And one of the things an online fax service

Page 30

does is it sends e-mails over the Internet. Is that right?
A. Yes.
Q. And if an online fax service can send an e-mail over the Internet the online fax service has the capacity to print because it can access a printer over the Internet. Isn't that correct?
MR. MONTCALM: Objection to form.
A. I'm not assuming they can access a printer over the Internet. They would have to have some printer that they wanted to access or that they have access to. So, yes, they could.
BY MR. SOLBERG:
Q. And what I'm talking about is capacity to print.
MR. MONTCALM: Objection to form.
BY MR. SOLBERG:
Q. So if you can send an e-mail over the Internet you have the capacity to print?
MR. MONTCALM: Objection to form.
A. Well, it's a stretch, but you have a capacity with no use to print. No useful capacity, but...
BY MR. SOLBERG:
Q. But capacity nonetheless. Isn't that correct?
MR. MONTCALM: Objection to form.

Page 31

A. Well, sir, the Internet affords unlimited capacity of things that you might do that are not useful to your business. So I mean, printing is just one thing, but you can do a myriad of things, so...
BY MR. SOLBERG:
Q. So, yes, you have capacity to print. That's one of the myriad of things you can do. Correct?
MR. MONTCALM: Objection to form.
A. Yes, sir.
BY MR. SOLBERG:
Q. Let's go to Exhibit 1 of your supplemental report. Well, strike that.
Let's go to Exhibit G of your supplemental report, Mr. Sponsler.
A. I don't have any of those, sir, here in front of me.
Q. Mr. Sponsler, were you the one who decided what exhibits to include in your supplemental report?
A. Yes, sir. I mean, I think I limited the exhibits to larger carriers. I didn't try to include all of them. Or carriers that indicated something that I thought was relevant.
Q. But you were the one who selected the exhibits? Ken Sponsler, and no one else?
A. I'm not -- you know, definitively answer that?

Page 32

I don't remember. I know that I have done many other reports with exhibits like this from the same carriers, so I probably have a list of these that I would use in any case. But I specifically don't remember. It would have been reasonable for me to select these.
Q. Let's go to Topic 1 if we could. And once again, I will read to you, Mr. Sponsler. "Topic No. 1, for each telephone number on the list below identify whether or not you provided online fax service to the subscriber of that telephone line from December 18th, 2015, to December 23rd, 2015." Do you see that?
A. Yes, sir.
Q. And there's an asterisk. And below that it says, "If any of the phone numbers listed below were assigned to wholesale customers please identify the wholesale customer for each number." Do you see that?
A. I see that, sir.
Q. Now, you testified that you've been involved in the subpoena process in several cases. I think we've talked about them earlier. You know then, as you were going into your report in this case, that plaintiff -- when they define the alternative class plaintiff excludes wholesalers or resellers of fax numbers. Were you aware of that?
A. No, sir. I had never seen this. And I wasn't

Page 33

even sure what it was, to be honest, because it wasn't a numbered topic. It appeared to be associated with the first question because that's where the asterisk was, and so I didn't understand how that -- it really wasn't clear to me what that was, sir.
Q. And you've addressed the subpoena process in Sharfman versus InfuCare and in Brust versus Opensided. Can you remember those cases?
A. I remember being in those cases. Yes, sir.
Q. And as plaintiff conducted its subpoena process in those cases plaintiff -- for the alternative class B where plaintiff excludes online fax service providers, isn't it your understanding that plaintiff excludes wholesalers or resellers of fax numbers as part of that process?
MR. MONTCALM: Objection to form.
A. Yeah. I don't recall that, sir.
BY MR. SOLBERG:
Q. Well, your report here anticipates that. Does it not? If you go to paragraph -- paragraph 37 of your report seems to me anticipates exclu- -- or anticipates wholesalers or resellers.
MR. MONTCALM: Objection to form.
A. 37 does, sir?
BY MR. SOLBERG:

Page 34

Q. Yes. If you could read that?
A. I'm not sure it's anticipating wholesalers, sir. Are you showing me the --
Q. I'm showing you a paragraph number.
A. 37. Is that right?
Q. 37. It says, "Online fax services subscriber."
A. Yes, sir.
Q. Now, that's a situation where an online fax service provider has obtained numbers from a provider that would sell -- resell -- would sell numbers to them.
A. Sir, I meant this in a different way.
Q. How did you mean it?
A. Well, I'm describing that someone could use an online fax service as a subscriber to the service other than obtaining those services directly from their carrier.
Q. And how would they obtain -- how would the online fax service provider obtain a number to provide to a subscriber?
A. It could be a ported number from the subscriber, it could be a number that is transferred from the subscriber to the online fax service, or they could ask the online fax service for a new fax number.
Q. Do you understand -- you don't understand as you're testifying here today what's meant by the term

Page 35

wholesaler of phone numbers?
MR. MONTCALM: Objection to form.
A. Do I -- could you repeat that question, sir?
MR. SOLBERG: Could the court reporter repeat that question?
(Question was read back by the reporter.)
BY MR. SOLBERG:
Q. You don't understand what's meant by the term a wholesaler or reseller of fax numbers?
MR. MONTCALM: Same objection.
A. I mean, I am familiar with wholesaling, I'm familiar with some services could be wholesaled fax numbers, but I do not understand that every online fax service must be a wholesale customer. I do not understand that.
BY MR. SOLBERG:
Q. Well, that wasn't --
A. I thought you were asking me if I understood you were asking me about wholesale fax numbers.
Q. I think I can get a little more specific for you, Mr. Sponsler. Can you go to paragraph 51 of your report? And I will read to you paragraph 51. "Additionally, some carriers, including Bandwidth, indicated in their response that they are wholesalers, and therefore they are selling their services to another

Page 36

carrier." Do you understand that? What that means? Or what you meant?
A. Yes, sir.
Q. And what did you mean?
A. Exactly what it says, sir.
Q. That was my question that started out this line is the question regarding -- in plaintiff's subpoena, "If any of the phone carriers listed below were assigned to wholesale customers, please identify the wholesale customer for each number." Having reviewed paragraph 51, do you have an understanding now of what was requested in plaintiff's subpoena?
A. Well, 51 -- I don't think 51 supports what you're asking me. It's my recollection that Bandwidth was a wholesaler to other wholesale customers who then may have been online fax providers that Bandwidth didn't have any direct customer relationships. They didn't have -- they had no idea who was associated with a particular number. I believe that was what --
Q. Exactly. Exactly. So they were a wholesaler. Correct?
A. It says they were a wholesaler.
Q. Now, when the order came down on May 25th, 2022, to allow MasterCard to do additional discovery did you have any input as to what form or what information

Page 37

that discovery would take?
A. I'm not sure what you mean by additional discovery. If it was some legal process or something, I'm not sure I was involved in any of that.
Q. All right. As we go back to Exhibit C of your supplemental report, and in particular to Roman Numeral III, deposition topic, affidavit topic, and/or document request, do you see those two requests or topics? Affidavit topics or document requests, do you see those?
A. Yes, sir.
Q. Are you aware of anything that would have prevented MasterCard from inquiring, via a deposition topic or the rest of it up top there, inquiring regarding wholesalers of fax numbers?
A. I don't know how to answer that, sir. I'm not sure what you're asking me.
Q. And so we can wrap this part of it up I'll ask you again just so we clarify: You didn't have any input whatsoever in the subpoenas served by MasterCard in this case?
A. No, sir.
Q. Did you review any documents generated regarding the subpoenas for depositions served by MasterCard? And I'm not trying to trick you here. Let me tell you what you describe. In paragraph 7 of your

Page 38

materials reviewed and relied upon you say, "Documents produced by MasterCard in connection with the subpoena process, including the telecarrier's responses to MasterCard's subpoena and nonsubpoena outreach." And you identify -- there's a Bates stamp there, and it's 1 to 277. Do you see that?

A. Yes, sir. But that's referring to something different. When we did our analysis of the responses from the carriers we included in that response to plaintiffs' subpoenas as well as MasterCard subpoenas and nonsubpoena outreach, which I think was described as e-mails and maybe calls, things like that. I don't know if that's what you're referring to.

Q. So in going back to what you just said, nonsubpoena outreach, MasterCard produced documents regarding phone calls they had with subpoena respondents, among other things, examples of declarations, and so forth, they produced quite a few documents. I believe it was over 5,000. Now, did you have occasion to review any of those documents?

A. We reviewed all of the documents that were relevant to the analysis that we provided, which was from plaintiffs as well as defendants.

Q. Do you recall being provided those -- and I'll just say 5,000-or-so pages of documents by MasterCard?

Page 39

A. If the pages had any information in them that related to the determination of the responses, then yes, we would have reviewed those. Now, there could have been some that we didn't that maybe weren't responsive or didn't have any information useful to what we were trying to do, so I can't say if I saw them all.

Q. Going back to Topic 1 of MasterCard subpoena, and this is --

MR. SOLBERG: This is Exhibit 3, Ryan, page -- and again, we're right back at the Roman Numeral III, and I'm just going to abbreviate, deposition topic.

BY MR. SOLBERG:

Q. Just to refresh our recollection here I'm going to tell you again what this says. "Whether you have any information or mechanism to determine whether any subscribing fax number identified in plaintiffs' subpoena used an online fax service or standalone fax machine to receive faxes on the dates identified in plaintiffs' subpoena or confirmation that no such information or mechanism exists." We're getting there, Mr. Sponsler, but -- there you go. So what I had just read, Mr. Sponsler, was Topic No. 1. Is it fair to say you're quite familiar with the TCPA fax provisions?

A. I'm sorry. I'm just reading this again here. Okay.

Page 40

Q. Go ahead. I'm sorry?

A. I was going to ask the reporter to read back your question. I'm sorry.

(Question was read back by reporter.)

A. I am familiar with the TCPA fax provisions.

BY MR. SOLBERG:

Q. And the TCPA prohibits the use of, and now I'm quoting, "any telephone, facsimile machine, computer, or other device to send to a telephone facsimile machine an unsolicited advertisement." And I'm citing 47 U.S.C. 227b1c. Now, what I just read, does that sound familiar to you?

A. Yes, sir.

Q. And it's your understanding that the prohibition I just read prohibits sending unsolicited advertisements, and it doesn't say anything about receiving them. Is that correct?

MR. MONTCALM: Objection to form.

A. What you just read, yes.

BY MR. SOLBERG:

Q. Mr. Sponsler, are you aware of whether the TCPA requires that an unsolicited fax advertisement be printed to be a violation of the TCPA?

MR. MONTCALM: Objection to form.

A. If it were printed it would be a violation?

Page 41

BY MR. SOLBERG:

Q. No. I'm asking: Is printing a requirement for there to be a violation of the TCPA?

MR. MONTCALM: Objection to form.

A. Well, I don't want to get into a legal question here -- answer, but I know that the TCPA exemptions for online fax services discusses that online fax services do not have the ability to print and that the harms that the regulations attempted to govern were not in play, such as tying up a phone line, using paper, using ink, all that stuff. That was all in the commentary of Amerifactors and Ryerson.

BY MR. SOLBERG:

Q. And getting back to my question, is it a requirement that a fax be printed in order for there to be a violation of the TCPA unsolicited fax provisions? If you don't know, just say you don't know.

MR. MONTCALM: Objection to form.

A. Yeah. I don't know. I mean, it's a part of the harms that were described and the reasoning for the Junk Fax Prevention Act. I mean, people can print a fax regardless of how -- if they receive it by e-mail or any other way, they can print it.

MR. SOLBERG: Okay. You know what? This is a good time to -- if it's okay with everyone here, let's

Page 42

take about five minutes. Is that all right?
THE WITNESS: Yes, sir.
MR. MONTCALM: Wallace, can we make it 10, please?
MR. SOLBERG: You got it.
(Break was taken.)
BY MR. SOLBERG:
Q. Mr. Sponsler, directing your attention to paragraph 33 of your supplemental report, which I believe is on the screen in front of you, and I will read this to you: "The fact that the carrier does not itself provide the online fax service," when you say OFS, online fax service, "does not mean that the carrier subscribers must have received the fax on the standalone fax machine. There are multiple ways that a fax recipient may receive a fax other than on a standalone fax machine." Do you see that?
A. I do, sir.
Q. All right. Let's move to the first one, which you have in paragraph 34 is call forwarding, and you state, "Carriers do not know whether their subscribers utilize call forwarding to have their faxes forwarded to an online fax service provider. In that case the telephone carrier would reflect that the customer is a regular subscriber of telephone services and would have

Page 43

no need" -- "no record that the telephone number is used for OFS." Strike the "no need." That was a mistake. Just no record is what it should have been. Mr. Sponsler, when you call forward a fax line to an online fax service the subscribe-to number remains working with your current provider but is programmed to forward all incoming calls to the new online fax service. Is that right?
A. Yes, sir.
Q. And when you call forward your fax number to an online fax service you're not only paying the current provider for the fax line, your call forwarding, you're also paying the online fax service for its service as well. Correct?
A. Yes, sir. But it's worth it to a lot of people.
Q. Regardless -- all right. I'm going to move on. Busy signals. When you call forward your fax number to an online fax service you may receive busy signals because call forwarding can only forward one call at a time. Is that correct?
A. Yes. Call forwarding forwards one number at a time. Yes, sir.
Q. And, again, because of that you can get busy signals. Correct?

Page 44

A. Are you meaning busy signals from..
Q. From the call forwarded number to the online fax service.
A. While the transmission is going on to the online fax service.
Q. Now, let me ask it again. If you have call forwarding to an online fax service from a fax number the call to the call-forwarded number could get a busy signal?
A. Yes, sir.
Q. Now, when you call forwarding -- when you call forward a number doesn't the forwarded call go through an extra switch?
A. I'm sure it does, sir. Yes.
Q. And so when you call forward to an online fax service does that process potentially degrade fax quality and result in more failed faxes as a result of the expanded travel of the fax?
A. I've never seen any evidence of that, sir. No.
Q. Is it a possibility?
A. I would never say that anything is not possible. But, you know, it's nothing that I have read or heard anything about it being a problem associated with call forwarding.
MR. SOLBERG: Bear with me for a second here.

Page 45

THE WITNESS: Yes, sir.
BY MR. SOLBERG:
Q. You've been deposed in several -- strike that.
You've been involved in the subpoena process in several cases. Correct, Mr. Sponsler?
A. Well, it depends on your definition of involved. I've been in cases where the subpoena process was certainly involved. Yes.
Q. And you've been deposed regarding the subpoena process in several cases. Is that correct?
A. That's correct, sir. Some of them by you.
Q. Have you ever identified a single instance of call forwarding a fax number to an online fax service in all of those cases?
A. Sir, as I've said here, call forwarding is something that I know exists; I know it's used. The fax companies themselves, the online fax services, talk about call forwarding, how it can be done. And carriers are largely not aware, so it's not one of the questions; it's not something that they would be aware of.
Q. My question is: Are you aware of a single instance in all of these cases that you've testified in, a single instance of call forwarding from a fax number to an online fax service?
A. It's a void in which I can't answer. I mean,

Page 46

it's not directly addressed by the carrier because they don't know, and so I don't know how to answer that question. It's not something -- it's not a point of information that is sought after in the discovery here.

Q. But again, Mister -- I guess what I'm saying is I think it's a yes-no question. You either can point to a particular fax number that was call forwarded to an online fax service in all these cases or you cannot. And that's my question: Can you?

MR. MONTCALM: Objection to form.

A. Well, it's just an unknown quantity here, so I don't think it's yes or no. It's just unknown. It's another area of nonresponse, is all I can say. I don't want to say that I haven't come across an instance because the responses don't address it.

BY MR. SOLBERG:

Q. What responses?

A. The subpoena responses or the -- you know, the work that the defendants did in this case. It's not an area that has been addressed, so I don't know if the answer is no or yes.

Q. With that in mind, Mr. Sponsler, if we go to paragraph 36 of your report you say, "It is very likely that the fax-forwarding feature was used by a number of the recipients of the subject faxes." What's the basis

Page 47

of that assertion?

A. It is a -- number one, is the fact that I have confirmed with numerous online fax service providers that they do process telephone numbers that have been transferred, they have that capability. The only thing I can think of as to why they have that capability and offer it is because it is something that their customers want. So otherwise, they wouldn't even talk about it. They wouldn't make it available.

Q. What do you mean by transferred? [Unintelligible].

A. Yes. Transferred. I'm sorry. Yes, sir.

Q. Are you using the word transfer synonymous with call forwarding? Or could transfer mean ported?

THE REPORTER: I'm sorry. I didn't hear the beginning of that question.

MR. SOLBERG: Strike it and I'll do it again.

BY MR. SOLBERG:

Q. You used the word transfer, Mr. Sponsler. Are you using the word transfer to mean call forwarding or does it mean something else?

A. No. I misspoke. Call forwarding is the correct term, sir.

Q. When you say very -- strike that.

When you say by a number of the recipients,

Page 48

what do you mean? What would that number be?

MR. MONTCALM: Objection to form.

A. It is unknown what the number would be, sir.

BY MR. SOLBERG:

Q. And what's the basis of the use of the phrase very likely? What we've just been talking about?

A. Yes, sir. Exactly what we've been talking about. It is very likely. There are benefits of forwarding over porting. Many benefits.

Q. Such as? Please can you give me some specifics?

A. Well, sir, when you port your number that number -- you have to fill out a form from the online fax service provided form that you authorized porting your number to them, and you give up subscribership of that number. We also know that once you give up subscribership there are some online fax services that will not forward that number onto a -- or port it -- allow you to port it onto another online fax service or even gain control of it again yourself. So that's a risk you take when you port.

Q. Are you testifying that you have to give up your particular phone number in order to port it?

A. Yes. When you port a number you are no longer the subscriber of that number.

Page 49

Q. And is it your testimony here that if I have a fax number and I want to port that fax number to an online fax service, I have to give up that number to my phone provider? I'm not allowed to port that number to an online fax service?

MR. MONTCALM: Objection to form.

A. You confused me with your question, sir. Maybe I was confused.

BY MR. SOLBERG:

Q. You're not alone, Mr. Sponsler. That was inartfully worded. I just want to have the testimony clear.

It's your testimony that if I port a number to on an online fax service I may be required to give up that number and get a new one from the online fax service. Is that your testimony?

A. No, sir. My testimony is when you port your existing fax number -- let's say you have it plugged into a standalone fax machine -- when you port it to an online fax service you have to fill out an authorization from your current carrier that says that you authorized porting that number away from your control and account to the carrier associated with the online fax service. Then the online fax service will use that number, your number that you had, they will use that number in order

Page 50

to process faxes that come in received at that number. Instead of it processing on your standalone machine you will now receive an e-mail with the PDF or TIFF attached to it, but you lose control of your number. Even though it's used by the online fax service they are the subscriber to the number. Now, you are no longer the subscriber. You are no longer billed for that number.
Q. And when if I wanted to move to another online fax service? Could I port that number to a new online fax service?
A. The answer to that depends on the online fax service. Several have specifically denied that they will do that, that that is now their number, but I don't think it's universal that every online fax service provider would not support it.
Q. Who will not let you port your number? Which online fax services are you referring to?
A. Primarily the J2 family of online fax services that are owned by J2. They have a -- seems to have a universal policy of not reporting.
Q. Anyone else?
A. That's the one -- there's five or six in that group that are major fax providers.
Q. Let's move to paragraph 37 of your supplemental report. You state, "Another way in which users may

Page 51

receive faxes using an online fax service other than retaining those services from on online fax service provider or other intermediary, which is itself the subscriber to the fax number." Did that make sense? That felt funny at the end when I was reading it.
A. Yeah.
Q. Let me give it another shot. "If a supplemental" -- what?
A. It felt funny to me, too.
Q. All right. In your supplemental report in paragraph 37 you state, "Another way in which users may receive faxes using an online fax service other than obtaining those services directly from their carrier is to receive those services from on online fax service provider or other intermediary, which itself is a subscriber to the fax number." Do you see that?
A. Yes, sir.
Q. Is that the wholesaler --
A. No. This has nothing -- well, what I'm saying is -- what I'm doing is describing even if a carrier says, We do not provide online fax service or we do provide it but this particular customer was not using the service, I'm just introducing the fact that they can use directly an online fax service who is not their carrier, it's another online fax service or other

Page 52

intermediary, which itself is a subscriber to the fax number. So we're describing now a situation where you may have ported your number and now they are the subscriber to the fax number but you receive your faxes at the number, or you're assigned a new fax number from this other online fax service provider who is not the carrier -- not your carrier.
Q. Now, we talked about Bandwidth earlier today in this deposition. Would Bandwidth fit within paragraph 37 as you're describing it or characterizing it?
A. Sir, if I'm recalling correctly, Bandwidth is a reseller of wholesale numbers. They do not provide fax service themselves directly, but they wholesale to providers of online fax services who then in turn have customers. I think their response was they have no relationship with any online fax service customer directly.
Q. Yeah. But my question is: Does Bandwidth fit within what you're describing in paragraph 37?
A. Well, not -- I don't think so. Or other intermediary, which itself is the subscriber to the fax number. Yeah. I mean, it could be. It could be the subscriber to the fax number, but then their an intermediary, so they're selling that number to perhaps an online fax service.

Page 53

Q. Now, plaintiff has identified in addition to Bandwidth two other entities, ATL and Peerless, as wholesalers or resellers. Are you aware of that?
A. Yes, sir.
Q. Are you aware of anyone else who would fit that definition, wholesaler or reseller of fax numbers, in this case besides Bandwidth, ATL, and Peerless?
MR. MONTCALM: Objection to form.
A. I can't remember them all. I think perhaps Lumens. Lumens may have been one.
BY MR. SOLBERG:
Q. We'll get to Lumens later on. Other than Lumens, anyone else?
A. Not off the top of my head, sir.
Q. Are there any notes you could refer to to refresh your recollection as to that particular question?
A. I mean, there could be notes that aren't in the record or something. I mean, we may have -- I don't know. I'd have to --
Q. Well, if you had discovered something like that you would have certainly put it in your report, would you not?
MR. MONTCALM: Objection to form.
A. Well, that issue that we're talking about right

Page 54

now was not something that I addressed. The idea of wholesaling and all of that, I didn't address it.
BY MR. SOLBERG:
Q. I thought you did in paragraph 51. Nonetheless, let's move on to the next question. You identify in paragraph 40 an application called Fax Burner. And what you say in paragraph 40, "Applications such as Fax Burner as subscriber, as well as FaxBetter, FaxZero, MyFax, and others facilitate sending and receiving faxes without the need for a phone line or standalone fax machine." Do you see that?
A. Yes, sir.
Q. Are those applications online fax services?
A. Well, they are -- in a way they are online fax services, but it's more of a direct. I mean, these are all services that can -- you know, MyFax definitely is an online fax service, but they have gone into the more modern use of businesses where they can actually interact with mobile phones, they'll set up file-sharing situations for when faxes come in, so you would get things over the Internet from them. They use virtual fax numbers.
Q. These applications that you're describing in paragraph 40, does the provider use a fax server and a telephone line to provide its service?

Page 55

A. No. They are what you call nomadic VoIP services, which are not tied to -- you know, they're movable, they're not static VoIP, and so they take care of -- they take advantage of that technology. One of the biggest ones is like Gmail, Yahoo. They're all users of that same -- it's an integration of these e-mail service providers and with fax.
Q. Do those applications use a fax server?
MR. MONTCALM: Objection to form.
BY MR. SOLBERG:
Q. And by applications I'm referring to the ones listed in paragraph 40, FaxBetter, FaxZero, MyFax.
A. Right. So obviously, they would have to have the capability of transcribing a fax, so there would be a fax modem, which could be called a fax server. Yes.
Q. And faxes sent to and from these applications, are they sent over a 10-digit telephone number?
A. They are sent over a 10-digit telephone number.
Q. So I'll ask you again: What's the difference as far as an online fax service that's described in the subpoena and described in Amerifactors with what these applications provide?
A. These applications go beyond the traditional understanding of an online fax service because of their integration with IOS, with Android, with setting up

Page 56

file-share capabilities. So they're not a standard online fax service in the traditional way.
Q. Would it be your understanding that these applications are covered by the Amerifactors Bureau order as far as the definition of online fax service?
MR. MONTCALM: Objection to form.
A. Well, I don't want to answer a legal question here or give a legal opinion on this. But what they have in similarity to both of those rulings is that the faxes are not automatically printed, they're not tying up a phone line, they're not -- you know, all the harms. And they can be received as an e-mail or through a file share, so that the option of printing or storing or deleting and all that is there just like online fax service.
BY MR. SOLBERG:
Q. And you also say in here that -- and I'm reading the last sentence of paragraph 40. "All of these various methods allow users to simply view, store, delete e-mail, or if desired print the fax images all without the need of a phone line or standalone fax machine." Do you see that?
A. I don't see where you're reading from, sir.
Q. The last sentence of paragraph 40 on your supplemental report. Yeah. Sorry about that. I got

Page 57

ahead of you. There it is.
A. I see that. Yes, sir.
Q. So these applications have the capacity to print?
A. Well, you have --
MR. MONTCALM: Object to form.
A. -- the capacity. Not the application.
THE WITNESS: I'm sorry I interrupted you.
MR. SOLBERG: No. You didn't. You were answering the question.
A. Yes. The application itself doesn't have the capacity to print. The user of the service can view, store, delete, or print, whatever they want to do. Same as any e-mail within an attachment that you would get.
BY MR. SOLBERG:
Q. Well, these applications, you just said they send e-mails. Correct?
A. They send e-mails, they can notify you through text that you have a fax in your file server that you've set up on their servers. Yes. But these services don't print. It's you have the option of printing if you wish to.
Q. So again, if these applications or services have the ability to send an e-mail, your prior testimony is they have the capacity to print. Correct?

Page 58

MR. MONTCALM: Objection to form.
A. Sir, if you have the access to the Internet you have the capacity for unlimited what you could do. I mean --
BY MR. SOLBERG:
Q. Well, I'm not worried about the unlimited; I'm worried about capacity to print. So if you have access to the Internet and you can send e-mails you have the capacity to print. Is that not true?
MR. MONTCALM: Objection to form.
A. I guess. I mean, I guess you could print. I'm not sure what -- it doesn't -- it's a nonsensical capability. I'll just put it that way. And I don't even know if they would actually -- I mean, the only way that you could print over the Internet is to have an Internet-capable, e-mail capable printer that would print if you designated it to go to that printer.
BY MR. SOLBERG:
Q. You know, we've talked about this before, you and me, Mr. Sponsler, and --
A. Oh, yes, we have. Yes, sir.
Q. -- the testimony is -- and I'm getting to it here, so if we could maybe short circuit this. You previously testified that if you can send an e-mail -- you have access to the Internet and you can send an

Page 59

e-mail you have the capacity to print. Now, you've referred to it as a useless capacity or whatever, but nonetheless you've testified that if you can access the Internet to send an e-mail you have capacity to print because you can access a printer. And I'll ask you again: Is that correct?
MR. MONTCALM: Objection to form.
A. That's correct. I don't think I've said anything different today other than describe it as being something that -- yeah. Not very useful, but sure.
BY MR. SOLBERG:
Q. Let's go to paragraph 41, and I will read this to you as well. You say, "Even if a subscriber is not using an OFS," and again, OFS is online fax service, "they may utilize a local fax server or Intranet" -- not Internet, Intranet -- "based fax server that delivers faxes electronically to designated recipients rather than to a standalone fax machine. These local fax servers can be configured to send e-mails to designated employees rather than automatically printing incoming faxes. Multichannel fax server systems are capable of receiving multiple faxes simultaneously without busy signals." So let me ask you this, Mr. Sponsler: Are the terms local fax server and in-house fax server, are those the same? Is it the same

Page 60

piece of equipment we're talking about?
A. I mean, you could term it as in-house fax server, I guess, or a premise-based fax server.
Q. Yeah. And I just wanted to make sure I wasn't mixing something up. So you've got local fax servers and in-house fax servers. They're referring to the same thing?
A. Yes, sir.
Q. And you agree that a local fax server is not an OFS, an online fax service. Is that correct?
MR. MONTCALM: Objection to form.
A. Well, the reason that it's not is because it's Intranet based, it's not Internet based. So online would not probably fit accurately to an Intranet-based server.
BY MR. SOLBERG:
Q. Is it your understanding that if an unsolicited tax advertisement is fed to an in-house fax server without permission, unsolicited, that fax violates the TCPA?
MR. MONTCALM: Objection to form.
BY MR. SOLBERG:
Q. And I'm asking for your understanding.
A. I'm sorry, sir. You kind of backed up away from the mic there, and I'm not sure I heard you

Page 61

clearly.
Q. I'll try again.
A. Okay. Thank you.
Q. Is it your understanding that an unsolicited fax advertisement sent to an in-house fax server recipient violates the TCPA?
MR. MONTCALM: Same objection.
A. That's a legal conclusion I don't want to make. I put this here because it is, in fact, another technology of which many that I've named here, and it is very similar to what the TCPA has decided in Amerifactors and Ryerson because, once again, these are received, the IFE attachment, instead of automatically printing.
BY MR. SOLBERG:
Q. [Unintelligible] fax service e-mails?
THE REPORTER: I'm sorry. I didn't hear that question.
BY MR. SOLBERG:
Q. I lost your train of thought there, Mr. Sponsler. Let me backtrack. I think you testified that a local fax server is not an online fax service. Is that correct?
A. Yes, sir.
Q. All right. Now, going back to the no-mechanism

declarations obtained with MasterCard subpoenas, and you reference those in paragraphs 44, 45, 46, 47, 48, and 49. And what they say is: The phone carriers have said they can't tell whether the telephone number received a fax -- well, strike that. Let me try this again.

All right. Here we go. The no-mechanism declarations obtained with MasterCard subpoenas for deposition state, "The carriers cannot tell whether the customers associated with the telephone numbers used an online fax service from a third party or was using a standalone fax machine or any other technology to receive the faxes." Do you agree with that? Is that a fair assessment of what's stated?

A. Yes, sir. But that paragraph moved away from me there. Okay. Right there. Okay. Yes, sir.

Q. Now, let us assume -- without asking you to make a legal assessment let's assume that sending a fax to a recipient who has an in-house fax server is contrary to -- it violates the TCPA. Okay? Do we have that assumption?

A. Okay.

Q. Now, what's the difference? If a fax violates the TCPA when it's sent to an online -- I'm sorry -- sent to a local fax server and a fax violates the TCPA when it's sent to a standalone fax machine, what's the



difference between those two things as far as violating the TCPA?

MR. MONTCALM: Objection to form.

A. Well, sir, that's your hypothetical. That's not what I believe. You want me to assume that it does violate it. I can't explain that because I don't believe the same way. I believe it's still a fax that's received as an e-mail attachment.

BY MR. SOLBERG:

Q. On an in-house fax server?

A. Yes, sir. That's what I'm describing here.

Q. It's Intranet. Correct? Is that what you said?

A. Yes, sir.

Q. And are you aware of the 2003 order regarding faxes received on fax servers or on computers? Do you recall that?

A. I recall it somewhat. Yes, sir.

Q. And I'll read this to you, Mr. Sponsler. And I'll pull it up as an exhibit if I have to, but let me read this. This is paragraph 200 from the 2003 order of the full FCC. "We conclude that faxes sent to personal computers equipped with or attached to modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes." And then the last



sentence -- well, that's it. Are you familiar with that particular ruling by the FCC?

A. I believe so, sir. Yes.

Q. And a fax that's sent to an in-house fax server is just that, it's sent to an in-house fax server per that order. Isn't that correct?

MR. MONTCALM: Objection to form.

A. I thought you read it was sent to a computer modem or -- I'm not sure if you mentioned in-house.

BY MR. SOLBERG:

Q. I'll read it again. Paragraph 200, and it's the first line. "We conclude that faxes sent to personal computers equipped with or attached to modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes."

A. Well, they're not describing an Intranet-based fax server there.

Q. The last sentence says, "Fax servers enable multiple desktops to send and receive faxes from the same or shared telephone lines." You know what? Let's make this an exhibit.

MR. SOLBERG: Ryan, could you pull up Exhibit 3?

BY MR. SOLBERG:

Q. Can you see that, Mr. Sponsler?



A. Yes, sir.

MR. SOLBERG: And, Ryan, you're going to scroll down to the first, second, third, fourth page -- fifth page, which is page 47 of the order, paragraph 200.

BY MR. SOLBERG:

Q. And if you could, Mr. Sponsler, just review paragraph 200 for yourself.

A. Can you show me that footnote to the last line?

MR. SOLBERG: You know what? The chances of this happening are one in a million, but I have -- the last page of this exhibit has footnote 38, but I have to give you another page, 124, and I will do that. Why don't we take a five-minute break here and I will locate that page and I will show it to you. Okay?

THE WITNESS: Thank you, sir.

(Break was taken.)

BY MR. SOLBERG:

Q. All right. Mr. Sponsler, you wanted the footnote 738, and I will read it to you in its entirety. It says, "See Kaufman comments at 3. Although fax boards alone do not have the ability to transcribe text onto or from paper, the Commission nevertheless determined that fax modem boards, which enable personal computers to transmit messages to or receive messages from conventional facsimile machines or other computer

Page 66

fax boards are the functional equivalent of telephone facsimile, next page machines," and it says, "see 1995 reconsideration order 10 FCC record," which is abbreviated RCD, "at 12404-06, paragraphs 28 to 30." That's what that says.
A. Okay. Thank you.
Q. Here was my question or what should have been my question -- and this is, again, operating on the assumption that a fax sent to an in-house fax server recipient violates the TCPA -- that's our assumption in this question. Here's the question: If receiving an unsolicited fax advertisement violates the TCPA, whether it is received on a standalone fax machine or an in-house, i.e. local fax server, what difference does it make if the phone carriers cannot tell whether the recipient received the unsolicited fax advertisement on a standalone fax machine or local fax server?
MR. MONTCALM: Objection to form.
A. Well, sir, I don't believe that's what any of them said. They said they could not determine how any of the faxes -- what technology any of them were received. I don't recall reading anything about a premise-based fax server they didn't know if it was that technology or not.
BY MR. SOLBERG:

Page 67

Q. No. What I'm asking you, as the expert for MasterCard, which is what difference does -- if both scenarios violate the TCPA, a standalone fax machine recipient and a local fax server recipient, if both violate the TCPA what difference does it make as to whether a telephone carrier can't tell the difference between one or the other by looking at the records?
MR. MONTCALM: Same objection.
A. Well, sir, for one thing what we're reading from is the 2003 order, and faxing technology has changed and improved and broadened greatly between then and 2015. And I am not sure in 2003 how many or the use of Intranet fax servers that did not print -- did not. They sent an e-mail saying as what Amerifactors and Ryerson was subscribing. That's the reason I included it in there as another means of receiving a fax that would be relevant at the 2015 time period at issue here.
BY MR. SOLBERG:
Q. No. My question -- my question is this: Assume that receiving -- being sent an unsolicited fax on a local or in-house fax server violates the TCPA. Just assume that. Don't worry about the 2003 order, just assume it. If that's the case what's the difference between an unsolicited fax advertisement -- strike that. Let me try again.

Page 68

If that's the case what difference does it make if a phone carrier can't tell whether a recipient of an unsolicited fax advertisement received it on a standalone fax machine or a local or in-house fax server?
MR. MONTCALM: Same objection.
A. Well, I mean, that question is sort of cornering those two methods. I mean, it wouldn't make any difference, but I mean, that's not what any of them said. They all said they can't determine how, not what. So given your limited, you know, definition that it would be a violation to have an Intranet-based fax server, then if I were to assume that's true then it would be a violation under your hypothetical.
BY MR. SOLBERG:
Q. But my question is: The fact that the phone carrier can't distinguish between faxes received on a standalone fax machine and faxes received on a local fax server, what difference does that make if both occurrences result in liability under the TCPA?
MR. MONTCALM: Objection to form.
A. The difference it makes is they cannot determine either way -- any way online fax service -- any way they cannot determine.
BY MR. SOLBERG:

Page 69

Q. No. We're not -- we're excluding online fax service. Again, I don't know -- let me do it this way.
MR. SOLBERG: Could the court reporter read back the last question I asked?
(Question read back by reporter.)
A. Well, again, I'm introducing this type of technology in this report that exists that perhaps didn't in 2003. But given your limited hypothetical that it is without question a violation, then it wouldn't make a difference that they -- because it's just one of many, many other things that I've described here that they can't determine how the fax was received.
BY MR. SOLBERG:
Q. But if I heard you correctly, it doesn't make a -- if both are a violation, the standalone fax machine and the local fax server scenario I've described to you, if both of them are assumed to be a violation it just doesn't matter as to those two occurrences whether the phone carrier can distinguish which way the fax was received, on a standalone fax machine or a local fax server. Correct?
MR. MONTCALM: Objection to form.
A. Given your limited scope of the question, it doesn't.
BY MR. SOLBERG:

Page 70

Q. Now, if we exclude that, if we exclude local fax services, all that seems to be left -- well, strike that. Let me do this.
Your supplemental report at page 13, Opinion 1, "It is not possible to determine which recipients received the faxes through a standalone fax machine simply by asking telephone carriers whether they, themselves, provided online fax service to recipients of the subject fax in December 2015." Do you see that?
A. No, sir.
Q. Sorry about that.
MR. SOLBERG: Page 13, Ryan, of 51.
BY MR. SOLBERG:
Q. All right. Did you have a chance to read that, Mr. Sponsler? It's A, Opinion 1.
A. Yes, sir.
Q. All right. Now, if we exclude faxes received from -- faxes received on a standalone fax machine and we exclude faxes received on a local fax server am I correct in stating what's different are the scenarios of call forwarding, resellers, which you call online fax services subscriber, and Fax Burner applications? Am I right about that?
MR. MONTCALM: Objection to form.
A. Given your hypothetical, yes.

Page 71

BY MR. SOLBERG:
Q. I'm going to turn, Mr. Sponsler, to your supplemental report in Exhibit E, and I want to walk through the summary chart and ask you some questions about that.
A. Yes, sir.
Q. Yeah. I would suggest, Mr. Sponsler, if you could pull up electronically your Exhibit E? You might want to do that. I think that will make life a lot easier.
A. Yes, sir.
Q. And I understand Counsel provided us with Exhibit N, but let me walk through this anyway here. I'm looking at Attachment No. 1 to Exhibit E, your summary.
A. The summary sheet?
Q. Yes.
A. Yes, sir.
Q. And the first Column B, it's indicated number with different carrier or customer, and there were 207 of those. How does that number, that 207 number, affect indicated-no on Column C?
A. It's a different -- so again, sir, B through G all relate to the question responses to if carrier provides online fax service to the numbers that they

Page 72

received in the subpoena. One of the possible responses that we received was in Column B, which said that the number was with a different carrier or customer that was not their customer.
Q. And as I'm looking at this, Mr. Sponsler, I think I had my own question answered. Because if you go to Buckeye Communications, which is entry 31, do you see that?
A. Yes, sir.
Q. All right. Now, if you go to count the fax numbers with response, which is Column I, the number's 475. If you go to Column B, different indicated number with different carrier customer, it's 127, and you go to Column C indicated no, that's 313. So having looked at that my assumption is that you've already done the math and what's left for Column C is 313. Correct?
MR. MONTCALM: Objection to form.
A. Are you saying that the number 313 came from us doing math?
BY MR. SOLBERG:
Q. Well, you're excluding. The total -- the count of fax numbers for that particular subpoena responded Buckeye Communications is 475.
A. Correct.
Q. You have 12 nonresponsive, 23 indicated fax

Page 73

line but unclear on the type of fax, 313 indicated no, and 127 indicated number with different carrier or customer. As I look at this I -- so 313 is the answer for indicated no?
A. Right. I'm trying to...
Q. As you're looking at that, what I'm getting at is I don't got to worry about the other columns as I look at your chart here. 313 indicated no?
A. Correct.
Q. All right.
A. No to the question that if they provided online fax services.
Q. Okay.
A. The carrier. Okay.
Q. What is the column next to that? Indicated no analog fax. What does that mean?
A. Which column are you looking at, sir?
Q. D. Column D. D as in "dog."
A. Right. Indicated no analog fax. Yes.
Q. So what does that mean?
A. We did have some that indicated -- very few, but it looks like a total of 47 or so, 42, indicated no. Because I'm assuming they meant it's analog fax -- indicated no analog fax. So no to the question if they provided online fax services.

Page 74

Q. So if I wanted to add up all the indicated noes in this case would Column C and D be the sum of that? Or would I just go with Column C if I want all the indicated noes?
A. Indicated noes to what, sir?
Q. Provided online fax services to carrier.
A. Okay. No. These are -- C is they indicated no to that question, and D is they indicated no analog fax. So I am assuming no to the question of online fax service, and they're indicating analog fax. 47 of these is what I can determine.
Q. So if I'm looking at your summary chart here and I want to compile the number of those carriers that said they do not provide online fax service I would be adding C and D together. Right? So it would be -- if you go to the bottom of this thing it would be 275,828 plus 42?
A. And what are you adding those together? To determine what, sir?
Q. I want to come up with a number for the number of carriers that indicated, No, they did not provide online fax service on the dates in question. And Column C is obviously 275,828. What I'm asking is: Should I add to that number the 42 indicated in Column D?
A. No. That's a different question. That's a

Page 75

different response.
Q. So I should exclude that then if I want to come up with the number that indicated no as to whether they provided online fax services?
A. It's my understanding of what they're saying is if you look at Access 1 there were 66 of the numbers that they indicated no, they did not provide an online fax service. Nine of the total number, which was 75 in this case, they indicated no, they didn't provide an online fax service, but it says "analog fax."
Q. All I'm looking for is you to tell me what that means.
A. I have another sheet that I can -- that's sort of a table that I could look at if you...
Q. By all means. Absolutely. Go ahead.
A. And we're looking at...
Q. You were looking at Access 1, which is entry 4.
A. Yes. And what column was that again?
Q. I'm trying to figure out what Column D means --
A. E?
Q. -- indicated no analog fax. D as in "dog."
A. Okay. Yeah. So all I'm getting here is that these were the responses in the subpoenas, and so those carriers in this case indicated that they believed that nine of those numbers in the case of Access 1 were

Page 76

analog fax. That's my -- what I believe.
Q. Now, let's concentrate on Column C, the summary.
A. C?
Q. C.
A. Okay.
Q. And the total for that column is 275,828, as I've said a few times here. And that number -- and correct me if I'm wrong -- that number represents the phone carrier respondents indicating no for particular phone numbers as to whether they provided online fax service. Am I right about that?
A. I believe that's correct. Yes, sir.
Q. And I've told you during this dep that plaintiff excludes resellers, and I will identify who plaintiff has intended the resellers are. ATL Communications, which had 322 fax numbers, Bandwidth which had 3,068 fax numbers. Those numbers were put in Column C. Those numbers exist. For instance, if you go to Bandwidth you'll see -- and it's the 19th entry -- you'll see 3,068. If you go to ATL Communications --
A. Right.
Q. -- which I'm trying to find, you'll see 322.
A. Right.
Q. Now, there's -- for Peerless there was -- if

Page 77

you look at Peerless, there's no entry for them on the indicated-no C Column. Okay? That's entry 118.
A. Peerless is -- okay.
Q. So if you subtract those two carriers, Bandwidth and ATL Communications, that leaves you with 272,438. You can do your own math, but just trust me on that one. And then if you go to Column F at the end it says 287 indicated yes, but as I recall your expert report trims that by one to 286. And that -- if you need to find that that's in paragraph 29. You say, "Carrier response has indicated 286 were provided with OFS by the carriers."
A. Yes, sir. That's explained in my footnote 10 in my report.
Q. That's fine. So if we compare the noes to the yeses in leaving out the 42 total from Column D the percentage would be 286 divided by 272,438. 272,438. And by my math that's approximately a 10th of a percent. And what I'm doing is I'm comparing the yeses to the noes.
A. Okay, sir. Yeses to noes in what -- what columns are you talking about you're comparing?
Q. I'm comparing Column C --
A. Okay.
Q. -- of the total, and I've subtracted the

Page 78

wholesalers and resellers -- but I'm comparing Column C to Column F. So we have this universe of responses that are yes or no, and the yeses are less than one tenth of one percent -- about one tenth of one percent of the noes. Do you see how I would do that mathematically?
A. You're saying the yeses are in Column E?
Q. No. Column F. If I said E that was my mistake. It's Column F, indicated yes.
A. That they did provide an online fax service?
Q. Yes.
A. Okay. Yes.
Q. So you have those two numbers, the 275,828 minus the resellers, which as I've said were ATL Communications and Bandwidth. So once you subtract them you have a number 272,438. So by my math the 286 yeses are about a tenth of a percent of the noes.
A. Okay.
Q. Can you see how that would operate mathematically? Is it understandable? Whether you agree with it or not, is it understandable mathematically?
A. I think so. Yes.
Q. All right. So if those are the results -- well, period. I'll stop right there. Now, do you consider yourself an expert in statistical analysis,

Page 79

Mr. Sponsler?
A. No.
Q. And you're not credentialed in that regard?
A. No, sir.
Q. Let's go to Lumen, which -- let's look for Lumen in Column C. And that's at entry 96.
A. 96?
Q. Yes.
A. All right.
Q. Now, the entry for Lumen indicated yes is 80. In Column I, count of fax numbers with responses, 46,192. And obviously, you know -- and nonresponsive is 46,112. Can you locate all those numbers?
A. I see that, sir.
Q. So why were the 46,112 designated nonresponsive rather than indicated no?
A. They were not responsive to the question whether they provided online fax services.
Q. Lumen told or responded to the subpoena by saying they provided online fax service for 80 numbers and they identified those numbers. Is that your recollection?
A. Well, yes. But that's not the same as saying that 46,112 were not. There was no indication out of the entire amount of what they were subpoenaed for. The

Page 80

only thing we had to go on was -- to that question, Did they provide an online fax service, was their response. They did not indicate any response to the rest. That's why it's 80 yes and not responsive to the question in G.
MR. SOLBERG: All right. Hey, Ryan, pull up Exhibit 14.
BY MR. SOLBERG:
Q. Let's take a look at this, Mr. Sponsler.
A. Exhibit 14?
Q. Not for you. We'll pull it up.
A. And by the way, sir, can I clarify my last answer to you about statistical analysis?
Q. Sure.
A. In my view we're not presenting a statistical analysis. This is simply logging of the responses by carrier and formulating all of those responses in these three ways that you see here, summary, detail, and multiple carriers. We're not doing any statistical analysis on that.
Q. And please don't take this question the wrong way because the work here is substantial, but this isn't the work of an expert, is it? You don't have to be an expert to compile these numbers. Am I right about that?
MR. MONTCALM: Objection to form.
A. It helps me to formulate and support my

Page 81

opinions is the reason that this is important to my opinions and my report.
BY MR. SOLBERG:
Q. But the statistics that you're compiling in the summary and in the detail portion of this supplemental report, you don't have to be an expert to do that. Correct? You just have to look at the responses and enter the data. Although we're going to disagree about Lumen, but for the most part you don't have to be an expert to do that, do you?
MR. MONTCALM: Objection to form.
A. You have to have experience with the subpoena process and you have to also be very diligent in your analysis and reviewing of those, what they're saying and not saying and how they're saying it and what's omitted and what is stated, maybe unclearly at times. We have multiple carriers with all the same numbers. I mean, there is a complexity to this that we have to understand in order to do this. So I don't -- I don't agree that it's a simple, you know, just recording some simplistic information.
BY MR. SOLBERG:
Q. No. I wasn't suggesting that it's simple. What I was suggesting was in order to do the compilation you certainly have to be diligent, you have to know what

Page 82

you're doing, but you don't have to be an expert?
MR. MONTCALM: Object to form.
A. Okay. I disagree with that, sir.
BY MR. SOLBERG:
Q. I've handed you what's been marked Plaintiffs' Exhibit 14. Could you take a look at that, Mr. Sponsler?
A. Let me pull this down and that down. Let me see if I can get to it this way. Okay. I see Exhibit 14.
MR. SOLBERG: So, Ryan, can you scroll through the whole thing for him and then we'll double back? I think that's going to be it.
BY MR. SOLBERG:
Q. All right. Mr. Sponsler, have you ever seen this document before?
A. Yes, sir.
Q. And by the way, I should have asked you this sooner. You have reviewed plaintiffs' production of subpoenaed responses as well, and I believe you list that on documents reviewed, but that's your recollection. Right? It was 1 to 8- -- let me get the exhibits. It was TCSR 1 to TCSR 863. Does that ring a bell?
A. Yes, sir.

Page 83

Q. Now, if you look at what's been Bates stamped 862, this is a letter from Lumen to Ross Good from Sean Maloney, their associate general counsel, and what he says in paragraph 2, "Based on a reasonable search of its records Lumen has determined that the subscribers identified in the accompanying production utilized online fax services provided by Lumen during December 2015. Lumen is not able to determine if the subscribers who utilized online fax services provided by Lumen between December" -- "is unable to determine who utilized online fax services provided by Lumen between December 18th and December 23rd, 2015."
And again, they list the numbers. You can see them after 863. Now, if they're telling you who they provided online fax service to and they're identifying them, doesn't that mean that what they don't identify they did not provide online fax service to?
A. Sir, Lumen, I believe, is a wholesaler. They could have provided those other numbers to other purchasers of wholesalers, cell services, who were online fax providers who they have no insight into who their customers were. That could be an explanation.
Q. You know Lumen's a wholesaler or you think they're a wholesaler?
A. No. I believe -- yeah. I think they're a

Page 84

wholesaler. Yes. Lumens.
Q. So if they're not a wholesaler -- let's assume that for a second. If they're not a wholesaler would those 46,112 nonresponsive would you believe they should be moved into the indicated-no column?
A. Sir, we didn't guess or assume anything when we put these sheets together. It was based upon this response is how that got put together. We didn't make any assumptions as what it doesn't say or doesn't say. We just had to go by what they said.
Q. And again, to me what they said was there's 46,192, 80 of them we provided online fax service to, which leaves the rest. But I guess we disagree on that one, and I'll leave it at that, but that's what I'm talking about: If you're not one of the 80 you're not getting provided online fax service. But you disagree with that, and we'll leave the transcript to say what it says.
A. Yes, sir.
Q. Let's go to your Opinion 2, Mr. Sponsler. That's on your supplemental report at page 21. What your Opinion 2 is, "It is highly unlikely that a large majority of recipients of the subject faxes used standalone fax machines." And you have paragraphs 54 to 62 underneath. And what these paragraphs say -- I had

Page 85

intended on reading these to you, Mr. Sponsler, but I'll save us that. I would suggest that and ask that you look through paragraphs 57 to 60. And if we want -- you want to take a couple of minutes to do that we could take a very, very short break if that's all right?
A. Okay, sir.
Q. When we come back I'm going to ask you some quick questions about those paragraphs.
A. Okay, sir.
MR. SOLBERG: All right. Back in five.
THE WITNESS: Okay, sir.
(Break was taken.)
BY MR. SOLBERG:
Q. Have you had a chance to read those paragraphs?
A. I did, sir.
Q. It looks to me as you go through paragraphs 57, 58, 59, 60, you're extolling the virtues of online fax services. Is that a fair assessment of those paragraphs?
MR. MONTCALM: Objection to form.
A. That's probably a mischaracterization, sir.
BY MR. SOLBERG:
Q. How would you characterize it then or describe it?
A. I'm just saying that in this case, particularly



Veritext Legal Solutions
www.veritext.com 888-391-3376

in the medical industry, that it is highly likely that a great number, if not the majority of these fax numbers, went to online fax services for those reasons.

Q. And is that your opinion in this case?

A. Yes. I think I've said that -- I think I wrote in here something close to that.

Q. Well, your Opinion 2 says, "It's highly unlikely that a large majority of the recipients of the subject faxes used standalone fax machines." And you did say in paragraph 62 at the end, "I conclude that a significant percentage of the proposed class in this case likely used an OFS," online fax service. You see that?

A. Yes, sir.

Q. So are those both your opinions in this case or [unintelligible] just picking the opinion in -- that's designated Opinion 2?

A. Well, I would say that statement is in support of Opinion 2.

Q. Now, we've just covered the numbers regarding no and yes as to online fax service, and we're -- the equation for those is the yeses -- what percentage are the yeses to the noes? They're a 10th of a percent. Now, does that affect your opinion that a significant percentage of the proposed class likely used an online



fax service?

MR. MONTCALM: Objection to form.

A. No, sir. It doesn't change it at all. All it is telling me, which I have known for a long time after many cases like this, is that very few carriers provide online fax services themselves. That's -- we've seen that over and over again.

BY MR. SOLBERG:

Q. And so to make up -- well, strike that.

Let me ask this: Can you put a number on significant percentage for me?

A. If I could have I would have, sir. But I'm like you, I can't get any definitive information from the carriers. I do study the industry trends, I study the online fax industry trends, and there is a heavy focus on products and services aimed at the medical space to serve the medical industry by the online fax service.

Q. And is that the basis of your opinion regarding significant percentage? What you perceive to be movement in the industry towards OFS?

A. Well, my basis is, you know, I've been obviously involved in this for a long time and I follow it; I study it. So I know that these online fax services have developed specific capability, HIPAA



compliance, medical -- electronic medical record technology, electronic health record technology that is all aimed at the medical industry. And they wouldn't do that if they didn't have a lot of competition among them and a lot of customers in the medical industry.

Q. Now, these faxes, you're aware they were sent in December of 2015. Correct?

A. I am, sir.

Q. All right. And at that point in time don't these numbers -- strike that.

Don't you think if what you're saying is correct there would be more than 286 out of 275,828 or thereabouts? Don't you think there would be more online fax service yeses in Column F if it was as prevalent as you say?

MR. MONTCALM: Objection to form.

BY MR. SOLBERG:

Q. And again, I'm talking in 2015.

A. Sir, that response is to a question of whether the carrier themselves provide online fax services. That is such a miniscule amount of carriers that are involved in that directly they can't compete with these professional online fax service providers, nor do they want to in my opinion.

Q. So what you're left with outside of those



answers is what we talked about earlier. You either have -- and you correct me if I'm wrong here -- you either have call forwarding, wholesalers, or applications like Fax Burner and what have you. That's what has to make up the difference from the 237 to whatever level you consider a significant percentage. Am I correct in that?

MR. MONTCALM: Objection to form.

A. No, sir. You're not correct.

BY MR. SOLBERG:

Q. How am I incorrect?

A. This idea of wholesaling, I have seen nothing. And Mr. Biggerstaff has provided no authority, no citation, no anything to indicate his idea that every single online fax service has to be also a wholesale customer. I don't know where he gets that from. He doesn't support it with anything. I have never come across such an idea and I don't believe it's true.

Q. I think he was looking at the subpoena responses where Bandwidth was identified as a wholesaler and so was Peerless and so was ATL. I think what Mr. Biggerstaff was doing was taking these carriers at their word as far as that response.

MR. MONTCALM: Objection to form. Is there a question there?

Page 90

MR. SOLBERG: I was answering his, but I get it, Counsel.
BY MR. SOLBERG:
Q. And again, I'll ask you again, are you aware of any -- first of all, let me do this: Can you define wholesaler for me?
A. A wholesaler is complex. There are many tiers of wholesalers. But carriers are the genesis of providing and servicing numbers that could be purchased by other entities who are themselves wholesalers and they can sell to other wholesalers who eventually may sell to SMS providers, fax providers, and so on. But it doesn't mean that because no one answered the question about wholesaling it doesn't mean that they're not wholesaling or it also doesn't mean that in order to -- for a number to be associated with an online fax service that it must be a wholesale situation.
Q. So back to your Opinion 2, if I have -- if I'm understanding you correctly, you still have those categories of or scenarios outside of -- strike that.
What you've said is the fact that an online fax service may not -- strike that. We've been at this a while.
The fact that a phone carrier says it did not indicate or indicated no to selling online fax services

Page 91

to a particular number, you've presented certain instances that you claim they just can't tell, we have addressed call forwarding, and we've addressed -- for lack of a better term, wholesaling -- and we've addressed Fax Burner, the applications you talk about with Fax Burner. Is there anything else that I'm missing regarding your opinion in this regard? Those categories of numbers.
MR. MONTCALM: Objection to form.
A. Sir, I don't think I've attempted to address every possible faxing-capable technology that's emerging every day and that was present in 2015. That's not what I'm trying to do here. I am discussing in the report a few of the major -- what I feel major ways that people and companies can receive and send faxes today.
BY MR. SOLBERG:
Q. Yeah. And paragraph 34 is call forwarding, paragraph 37 is online fax service subscriber, paragraph 40 is applications such as Fax Burner and subscriber, and then the next is paragraph 41, local fax servers. Now, all I'm asking is that -- did I miss anything else in your report where you attempt to address the idea that just because a phone carrier indicates it does not provide online fax service there may be other ways that a fax recipient can receive a fax other than on a

Page 92

standalone fax machine?
A. Absolutely, sir. The carriers -- the majority of the carriers said the same thing, that they cannot determine how someone may have received a fax. They've said the same thing, and that's what I have to go on, what they have said.
Q. And we've already covered the idea of standalone fax and local fax server. If those two -- well, strike that. We've covered what we've covered there.
Here's a question for you: What do the fax logs show?
A. Fax logs show nothing about the type of technology that receive the fax.
MR. MONTCALM: Objection to form.
BY MR. SOLBERG:
Q. I didn't ask you what they don't show; I asked you, What do fax logs show?
MR. MONTCALM: Hold on. Ken, you can answer this question, but we're getting pretty far away from the subject of the supplemental report. So I'm just going to give you a sort of caution that if we go too far afield I'll start instructing him not to answer.
BY MR. SOLBERG:
Q. Go ahead, Mr. Sponsler.

Page 93

A. I didn't spend a lot of time on the fax logs. I mean, I wasn't asked to have an opinion about whether or not the fax logs indicated successful or not. That's normally what I do with fax logs. Typically they would have shown a fax number, a date, maybe an ID number for the campaign, it would have showed potentially the number of pages, the length of seconds it took to fax. There may have been some indicator of a successful fax or a busy or a failure and so on.
Q. I think I asked the question the wrong way. And I'll ask this and then I will move on. A fax log -- what a fax log demonstrates -- and you tell me if you disagree -- it demonstrates that a fax was sent from a telephone facsimile machine, computer, or other device to a piece of equipment that could perform the T30 protocol and create an image of the fax. The fax logs will show if that transmission was successful. Am I right?
A. I have seen fax logs that do not show whether they were successful or not.
Q. How about the fax logs in this case?
A. Sir, I did not spend a lot of -- again, I wasn't asked to analyze the fax logs or determine whether from the logs whether or not there was a question about the number of successful faxes, whether

Page 94

that was in dispute or not. So I did not pay close attention to fax logs because I wasn't asked to opine on anything about it.
Q. Let's move on to your Opinion 3, and this is at page 23 of your report. And you state, "It's not possible to rely" -- "it is not possible to reliably determine today the identities of the persons who or business that allegedly received the faxes in 2015." Do you see that?
A. Yes, sir.
Q. One of the things you reviewed is --
MR. MONTCALM: We can't hear you, Wallace.
BY MR. SOLBERG:
Q. One of the things, Mr. Sponsler, you reviewed was the declaration of Dorothy Sue Merryman. Do you remember that?
A. Yes, sir.
MR. SOLBERG: Ryan, could you pull that one up? Exhibit 22.
BY MR. SOLBERG:
Q. Did you take a look at that, Mr. Sponsler?
A. Yes, sir.
Q. Now, if you go to paragraph 14 of Ms. Merryman's declaration you see, "Notice was successfully sent by fax and U.S. mail to 97.7 percent

Page 95

of class members." Do you see that?
A. I see it, sir.
Q. Based on that, what's the basis of -- and other than what you say in -- tell me, what's the basis of your opinion to -- strike that.
Do you have any reason to disbelieve paragraph 14 of this declaration?
A. Yes, sir. The context of it.
Q. What does that mean?
A. That means that there is a U.S. address. Unless they came in with bulldozers and mowed down the houses or apartments it's still there, and U.S. mail could have been successfully delivered to that address. You can't argue with that. The addresses are probably pretty static.
Q. Is that it?
A. Yeah. Well, I think the idea that of the class members, 97.7 percent of the class members, is a stretch.
Q. How so?
A. Well, because this statement doesn't clarify who -- you know, that the addressees, who's our alleged class members, received the mail. Or whether that business, that doctor's office, that medical practice that was there in 2015 is still the same medical

Page 96

practice.
Q. Well, in paragraph 12 Ms. Merryman says, "Out of 90,171 notices sent by mail 8,295 were returned as undeliverable, and a total of 2,211 notices contained call forwarding address information." Do you see that?
A. I see that, sir.
Q. And Ms. Merryman also states that, "The class settlement," which is who she's working with, "was otherwise able to obtain additional address information via skiptracing, and those items were subsequently remailed." Do you see that?
A. I see that, sir.
Q. Is the basis for your opinion in Exhibit C, Opinion 3, it is paragraphs 63 to 76. Is there anything else besides that that you're relying on for that opinion?
MR. MONTCALM: Objection to form.
A. Well, I think I've put everything in here that's part of that opinion.
BY MR. SOLBERG:
Q. Now, in paragraph 66 you say, "Dr. Shaw [ph] attempted to send 500,000 faxes, and only 381,010 were successfully sent. That means 24 percent of the fax numbers provided by CarePrecise were not reachable and the subject faxes were being sent in December 2015." Do

Page 97

you see that?
A. I do, sir.
Q. So you would agree that 381,010 faxes were received. Right?
A. By who? If 24 percent of the list had the fax numbers wrong it is certain that a larger percentage may have had a working fax number but the CarePrecise list of who they were or what business they were was not the same. Because we're only looking at one category, the fax number itself, where 24 percent were wrong.
Q. But the 381,000 were right. Correct?
A. The fax number --
Q. Yeah.
A. -- but not the recipient. Not the identity of the business, the practice, the recipient.
Q. And what's your basis for saying that? Do you have any specific evidence that the recipient was wrong?
A. Yes. I have evidence here that says 24 percent of that list was out of date in terms of a very fundamental fax number. [Unintelligible] --
Q. But the 24 percent --
MR. MONTCALM: Please let him finish his answer.
A. It tells me that there are other elements of that CarePrecise list that also would be very likely to

be inaccurate as well.
BY MR. SOLBERG:
Q. Those 24 percent, they're not part of the class. Correct?
A. Sir, my opinions here in 66 and 7 relate to how poorly that list was compiled and how outdated it was, even in December of 2015. That's the whole point of that. I'm not arguing that there were so many successful. I am arguing that you can rely upon that list to identify who those individuals or businesses were -- practices.
MR. SOLBERG: Let's take five here. And I think I'm getting close to the end or at the end, so let's take five and come back.
THE WITNESS: Yes, sir.
(Break was taken.)
BY MR. SOLBERG:
Q. I have a couple questions for you, Mr. Sponsler, and then I just want you to -- I'm going to walk through some exhibits, and all I want you to do is identify them. They were referenced in your report.
Getting back to your paragraphs 66 and 67 of your report, I want to make sure I understand you correctly. You're extrapolating the fact that the list failed for 24 percent of the witnesses -- I'm sorry --



24 percent of the fax numbers, and you're applying that fact to the 381,000 transmissions that were successful regarding the quality of the list?
A. No, sir. I'm applying the issue that 24 percent of the list had incorrect fax numbers, and I'm extrapolating that poor quality of the list to the ones that were successful except I am -- my opinion is that more than the fax numbers -- even though the fax went through the identity of the recipients is in question in terms of what the list says.
Q. And moving up to paragraph 76, you talk about churn in business, failures in business. Take a second and take a look at that.
A. Yes, sir.
Q. And are you also extrapolating churn in business to the quality of the list and to whether Ms. Merryman's declaration is correct?
A. I am not, sir.
MR. MONTCALM: Objection to form.
A. I'm not extrapolating that to the quality of the list. This is more as of the difficulty in reaching the true alleged class members from 2015 today in 2023 and 2022.
BY MR. SOLBERG:
Q. And it's not based on actual evidence; it's



based on churn rates in business. Am I right about that?
MR. MONTCALM: Objection to form.
A. Well, yes, sir. Well, it is evidence. I mean, a lot of these studies in the healthcare industry especially are that many of these industries are being bought up and assimilated and go out of business. The medical industry is very well subject to those same things.
BY MR. SOLBERG:
Q. But again, I'm talking about this case. Not the general case, this case. And you're applying the churn rate to a case in which 97 percent of the class members have received notice. And that's what I'm asking: Is that what you're doing?
MR. MONTCALM: Objection to form.
A. Yeah. So I disagree that 97 percent of the class members received notice. I don't think that's accurate. And this, though, 76, is pertaining to today versus five years ago. And it goes into my opinion about 97 percent of the correct class members received notice in some way.
BY MR. SOLBERG:
Q. All right. Here's where I wanted the identifying exhibits exercise I had told you about.



MR. SOLBERG: Ryan, let's start with Exhibit 25.
BY MR. SOLBERG:
Q. Mr. Sponsler, your footnote 13 on your report at page 16 references, "See Fax Without a Fax Machine." My question for you is: Looking at Exhibit 25, is this the article that you're referencing?
A. Sir, if that's the article that came up when you clicked on that link, then yes. I don't specifically remember today.
MR. SOLBERG: Ryan, can you -- you know what? Let's just do this in order. Could you pull up Exhibit 26?
BY MR. SOLBERG:
Q. Mr. Sponsler, Exhibit 26 is "Seeing Faxing Isn't Dead; Three Reasons the Predictions Were Wrong." Now, I realize this is blacked out -- not by us, that's just how it came off -- but my question is this: Is Exhibit 26 what's referenced in footnote 16 of your report, "Faxing Isn't Dead; Three Reasons the Predictions Were Wrong"?
A. I'm assuming so, sir.
Q. You don't know one way or the other?
A. I mean, it's hard for me to tell. I mean, I -- that is the title of the article. Yes.

Page 102

MR. SOLBERG: All right. Let's move onto Exhibit 27, Ryan.
BY MR. SOLBERG:
Q. This, Mr. Sponsler, is referenced in footnote 17 of your report. It says, "The Definitive Guide to Online Fax," and is dated 2017. You have Exhibit 27 in front of you, which I believe is that article, and I'm just asking if that's your recollection?
A. Yes, sir. That's my recollection.
MR. SOLBERG: Ryan, can you pull up Exhibit 31?
BY MR. SOLBERG:
Q. Plaintiff's Exhibit No. 31, Mr. Sponsler, is -- what it's titled in your report is, "HIPAA Compliant E-Fax Provider Recommendations."
A. Yes, sir.
Q. And that comes on the third page here. What I pulled up was starting where it starts. Do you understand that this is the article that was referenced in footnote 19 of your report?
A. I'm assuming so. Yes, sir. I remember reading this.
MR. SOLBERG: All right. Let's go back, Ryan, to Exhibit 28.
BY MR. SOLBERG:
Q. Exhibit 28, Mr. Sponsler, was referenced in

Page 103

footnote 18 of your report, "See How to Fax Over the Internet in Five Easy Steps."
A. Yes, sir.
Q. And again, my question for you once this comes up: Is it your understanding that this is the article that's referenced in your report at footnote 18?
A. To the best of my recollection, yes, sir.
MR. SOLBERG: Ryan, can you pull up Exhibit 33?
BY MR. SOLBERG:
Q. And this is an article referenced on page 26 of your report, Mr. Sponsler, at footnote 26, "The Percentage of Businesses That Fail." Now, is it your understanding that this is the article that's referenced in footnote 26 of your report?
A. To the best of my recollection, sir.
MR. SOLBERG: I think that's it. Let me talk to Mr. Kelly for a second in case there's something I ought to note. So we'll get back in a couple, and I think this is it. Are you going to have any redirect or no?
MR. MONTCALM: Not as of this moment.
MR. SOLBERG: All right. Give me five to wrap it up.
MR. MONTCALM: All right.
(Break was taken.)

Page 104

BY MR. SOLBERG:
Q. Last question. Mr. Sponsler, do you know if phone carriers keep records of calls that are call forwarded?
MR. MONTCALM: Objection.
BY MR. SOLBERG:
Q. Go ahead.
A. I didn't -- are you asking if the carriers keep records?
Q. Yes. Do you know that one way or the other?
A. It is my understanding that in past subpoena responses -- I don't think so in this case -- that that question was answered no, that they didn't keep call forwarding information.
MR. SOLBERG: Okay. That's it. Thank you, Mr. Sponsler.
MR. MONTCALM: Thanks, everyone.
MR. SOLBERG: We're going to order a copy of the transcript.
MR. MONTCALM: Me, too.
MR. SOLBERG: What's the turnaround of the dep?
THE REPORTER: It is 10 business days, so it would be two weeks from today, I believe.
MR. SOLBERG: And if we want to get it sooner can we do that?

Page 105

THE REPORTER: Absolutely.
MR. MONTCALM: I can just tell you that we have a pretty tight turnaround, the parties do, for some briefing coming up, and so I think we probably all want it sooner than that.
MR. SOLBERG: So could you get it by next Friday?
THE REPORTER: Absolutely.
MR. SOLBERG: All right. Thank you.
(Deposition concluded at 1:30 p.m.)

Page 106

CERTIFICATE OF OATH

STATE OF FLORIDA:
COUNTY OF HILLSBOROUGH:

I, BRITTANY O'NEILL VALLADAREZ, Notary Public, State of Florida, do hereby certify that KENNETH SPONSLER personally appeared before me on JANUARY 20, 2023, and was duly sworn and produced a United States ID Card as identification.

Signed this 22ND day of JANUARY, 2023.

BRITTANY O'NEILL VALLADAREZ
Notary Public, State of Florida
My Commission No.: GG986657
Expires: 07/06/2024

Page 107

CERTIFICATE OF REPORTER

STATE OF FLORIDA:
COUNTY OF HILLSBOROUGH:

I, BRITTANY O'NEILL VALLADAREZ, Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of KENNETH SPONSLER; that a review of the transcript was requested; and that the foregoing transcript, pages 5 through 105, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 22ND day of JANUARY, 2023.

BRITTANY O'NEILL VALLADAREZ

Page 108

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

January 27, 2023

To: Jonathan Montcalm, Esq.

Case Name: Scoma Chiropractic, P.A., et al. v. Mastercard International Incorporated, etc.

Veritext Reference Number: 5659002

Witness: Kenneth Sponsler Deposition Date: 1/20/2023

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 109

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5659002
CASE NAME: Scoma Chiropractic, P.A., et al. v. Mastercard International Incorporated, etc.
DATE OF DEPOSITION: 1/20/2023
WITNESS' NAME: Kenneth Sponsler

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ _______________________
Date Kenneth Sponsler

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of____________________, 20____.

_________________________________
Notary Public

_________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5659002
CASE NAME: Scoma Chiropractic, P.A., et al. v. Mastercard International Incorporated, etc.
DATE OF DEPOSITION: 1/20/2023
WITNESS' NAME: Kenneth Sponsler

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

______________ ______________________
Date Kenneth Sponsler

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of____________________, 20____.

________________________________
Notary Public

________________________________
Commission Expiration Date



ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 5659002

PAGE/LINE(S) / CHANGE /REASON

________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________
________________________________________________________________

________________ __________________________
Date Kenneth Sponsler

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________
DAY OF ________________________, 20______ .

____________________________________
Notary Public

____________________________________
Commission Expiration Date

**&**

**&** 2:2,7,11,20

**0**

**00041** 1:7
**07/06/2024** 106:17

**1**

**1** 3:11 6:21 7:5 7:22,25 8:4,11 18:6,14 22:18 31:11 32:6,7 38:5 39:7,22 70:4,15 71:14 75:6,17,25 82:22,23
**1/20/2023** 108:9 109:3 110:3
**10** 26:1 42:3 55:17,18 66:3 77:13 104:22
**10019** 2:8
**105** 107:10
**106** 3:4
**107** 3:5
**108** 3:6
**109** 3:7
**10:00** 1:19
**10th** 77:18 86:23
**11** 23:22
**1100** 108:1
**118** 77:2
**12** 72:25 96:2
**120** 12:11
**1201** 21:4
**124** 65:12
**12404-06** 66:4
**127** 72:13 73:2
**13** 70:4,12 101:4
**14** 3:16 80:6,9 82:6,10 94:23 95:7
**14830** 2:17
**1500** 2:12
**16** 101:5,19
**16th** 21:2
**17** 102:5
**18** 103:1,6
**1820** 108:2
**18th** 32:10 83:12
**19** 102:19
**1995** 66:2
**19th** 76:20
**1:30** 1:19 105:10
**1st** 18:5

**2**

**2** 3:12 9:1,13 9:13 11:20 16:11,17 21:16 21:20 83:4 84:20,22 86:7 86:17,19 90:18
**2,211** 96:4
**20** 1:17 2:11 106:8 109:16 110:22 111:22
**200** 63:21 64:11 65:4,7
**2003** 63:15,21 67:10,12,22 69:8
**2015** 13:9 32:11,11 67:12 67:17 70:9 83:8,12 88:7 88:18 91:12 94:8 95:25 96:25 98:7 99:22
**2017** 18:6 102:6
**2022** 8:12 21:2 21:8 23:22 36:24 99:23
**2023** 1:17 99:22 106:8,10 107:18 108:4
**207** 71:20,21
**21** 84:21
**212** 2:8
**216-523-1313** 108:3
**22** 3:17 94:19
**22782** 106:15 107:21
**227b1c** 40:11
**22nd** 106:10 107:18
**23** 72:25 94:5
**237** 89:5
**23rd** 32:11 83:12
**24** 19:2 96:23 97:5,10,18,21 98:3,25 99:1,5
**25** 3:18 19:3,17 101:2,6
**250** 2:16
**25th** 23:22 36:23
**26** 3:19 101:13 101:15,19 103:10,11,14
**27** 3:20 7:22 8:1,11,14,24 102:2,6 108:4
**272,438** 77:6,17 77:17 78:15
**275,828** 14:21 74:16,23 76:7 78:12 88:12
**277** 38:6
**28** 3:22 66:4 102:23,25
**286** 77:9,11,17 78:15 88:12
**287** 77:8
**29** 77:10
**2:16** 1:7
**2nd** 8:12

**3**

**3** 3:13 11:19 24:4,15 39:9 64:23 65:20 94:4 96:14
**3,068** 76:18,21
**30** 66:4
**30th** 21:8
**31** 3:23 72:7 102:10,12
**312** 2:13,13
**313** 72:14,16,18 73:1,3,8
**322** 76:17,23
**33** 3:25 42:9 103:8
**34** 42:20 91:17
**345** 12:17 13:1 13:14,22
**346** 12:22,25
**36** 46:23
**368-1500** 2:4 2:22
**368-1501** 2:4 2:22
**37** 33:20,24 34:5,6 50:24 51:11 52:10,19 91:18
**3701** 2:3,20
**38** 65:11
**381,000** 97:11 99:2
**381,010** 96:22 97:3

**4**

**4** 14:19 75:17
**40** 54:6,7,24 55:12 56:18,24 91:19
**41** 59:12 91:20
**415-9347** 2:8
**417-7238** 2:8
**419-0379** 2:13
**42** 73:22 74:17 74:24 77:16
**44** 62:2
**44114** 108:2
**45** 62:2
**46** 62:2
**46,112** 79:13,15 79:24 84:4
**46,192** 79:12 84:12
**47** 40:10 62:2 65:4 73:22 74:10
**475** 72:12,23
**48** 62:2
**49** 62:3

**5**

**5** 2:16 3:3,14 19:9 107:9
**5,000** 38:19,25
**500** 2:3,21
**500,000** 96:22
**51** 2:7 35:21,22 36:11,13,13 54:4 70:12
**52nd** 2:7
**54** 84:24
**551-8685** 2:17
**5659002** 108:8 109:2 110:2 111:2
**57** 85:3,16
**58** 85:17
**59** 85:17

**6**

**6** 3:15 19:15
**60** 85:3,17
**60008** 2:4,21
**60603** 2:12
**62** 84:25 86:10
**63** 96:14
**646** 2:8
**66** 75:6 96:21 98:5,22
**67** 98:22

**7**

**7** 16:11 18:10 18:13 37:25 98:5
**738** 65:19
**739-4200** 2:13
**75** 75:8
**76** 96:14 99:11 100:19

**8**

**8** 82:22
**8,295** 96:3
**80** 79:10,20 80:4 84:12,15
**847** 2:4,4,22,22
**862** 83:2
**863** 82:23 83:14
**888** 2:17

**9**

**90,171** 96:3
**96** 79:6,7
**97** 100:13,17,21
**97.7** 94:25 95:18

**a**

**a.m.** 1:19
**abbreviate** 39:11
**abbreviated** 66:4
**abbreviation** 27:19
**ability** 41:8 57:24 65:21
**able** 18:15 29:22 83:8 96:9
**above** 4:5 108:17
**absolute** 13:19
**absolutely** 8:16 75:15 92:2 105:1,8
**access** 24:20 25:17 29:9,9 29:22 30:6,9 30:11,11 58:2

58:7,25 59:3,5 75:6,17,25
**accompanying** 83:6
**accordance** 109:5 110:5
**account** 14:20 49:22
**accounted** 13:15
**accounting** 14:6,11
**accurate** 15:1,3 18:23 100:19 107:10
**accurately** 60:14
**acknowledge** 109:11 110:16
**act** 41:21 109:14 110:20
**action** 1:6 14:2 107:15,16
**actual** 99:25
**actually** 17:20 22:14,15 54:18 58:14
**add** 11:6 74:1 74:24
**adding** 74:15 74:18
**addition** 53:1
**additional** 11:6 21:22 36:24 37:2 96:9
**additionally** 35:23
**address** 21:4 29:3 46:15 54:2 91:10,22 95:10,13 96:5 96:9 108:16
**addressed** 11:14 16:13 33:6 46:1,20 54:1 91:3,3,5
**addressees** 95:22
**addresses** 95:14
**advantage** 55:4
**advertisement** 40:10,22 60:18 61:5 66:12,16 67:24 68:3
**advertisements** 40:16
**affect** 71:21 86:24
**affidavit** 21:18 22:5,17 37:7,9
**affidavits** 23:10
**affirm** 5:5
**affixed** 109:15 110:21
**affords** 31:1
**afield** 92:23
**ago** 100:20
**agree** 6:16 8:10 8:12 9:13 60:9 62:12 78:20 81:19 97:3
**agreed** 4:11
**agreement** 12:21
**ahead** 22:16 26:16 40:1 57:1 75:15 92:25 104:7
**aimed** 87:16 88:3
**al** 108:6 109:3 110:3
**algonquin** 2:3 2:20
**alleged** 95:22 99:22
**allegedly** 14:2 94:8
**allow** 36:24 48:19 56:19
**allowed** 49:4
**allowing** 23:20
**allows** 24:20 29:14,16
**alternative** 32:22 33:11
**amerifactors** 3:14 16:16 19:4 25:5 41:12 55:21 56:4 61:12 67:14
**amount** 16:1 79:25 88:21
**analog** 73:16 73:19,23,24 74:8,10 75:10 75:21 76:1
**analysis** 3:16 10:9,15 38:8 38:22 78:25 80:12,15,19 81:14
**analyze** 93:23
**analyzing** 15:13
**anderson** 2:2 2:20
**andersonwan...** 2:5,22
**android** 55:25
**answer** 5:24 6:4 10:14,17 16:24 23:16 26:6,8 31:25 37:15 41:6 45:25 46:2,21 50:11 56:7 73:3 80:12 92:19,23 97:23
**answered** 72:6 90:13 104:13
**answering** 57:10 90:1
**answers** 89:1
**anticipates** 33:19,21,21
**anticipating** 34:2

**anyway** 71:13
**apartments** 95:12
**appear** 109:11 110:15
**appeared** 33:2 106:7
**appearing** 1:21 2:5,9,14,18,23
**appears** 19:19
**appended** 110:11,18
**application** 54:6 57:7,11
**applications** 54:7,13,23 55:8,11,16,22 55:23 56:4 57:3,16,23 70:22 89:4 91:5,19
**applying** 99:1,4 100:12
**approximately** 77:18
**area** 46:13,20
**arg** 8:6
**argue** 95:14
**arguing** 98:8,9
**arrives** 27:8,9 28:3
**article** 101:7,8 101:25 102:7 102:18 103:5 103:10,13
**asked** 9:25 22:14 25:1 69:4 82:18 92:17 93:2,10 93:23 94:2
**asking** 35:18,19 36:14 37:16 41:2 60:23 62:16 67:1 70:7 74:23 91:21 100:15 102:8 104:8
**assertion** 47:1
**assessment** 62:13,17 85:18
**assigned** 32:15 36:8 52:5
**assignment** 109:2 110:2 111:2
**assimilated** 100:7
**assistance** 10:7
**assistive** 10:13
**associate** 83:3
**associated** 33:2 36:18 44:23 49:23 62:9 90:16
**assume** 6:9 12:22 18:14 62:16,17 63:5 67:20,22,23 68:13 84:2,6
**assumed** 69:17
**assuming** 30:9 73:23 74:9 101:22 102:20
**assumption** 62:20 66:9,10 72:15
**assumptions** 84:9
**asterisk** 32:13 33:3
**atl** 53:2,7 76:16 76:21 77:5 78:13 89:21
**attached** 50:3 63:23 64:13 110:7
**attachment** 24:22 29:2 57:14 61:13 63:8 71:14
**attempt** 6:1 91:22
**attempted** 41:9 91:10 96:22
**attention** 6:20 16:10 19:21 42:8 94:2
**attorney** 6:11 23:8 107:13
**attorneys** 5:21 107:15
**authority** 89:13
**authorization** 49:20
**authorize** 110:11
**authorized** 48:14 49:21 107:6
**automatically** 56:10 59:20 61:13
**available** 22:19 47:9
**ave** 108:1
**aware** 23:5,14 23:17 25:8 32:24 37:11 40:21 45:19,20 45:21 53:3,5 63:15 88:6 90:4

**b**

**b** 3:12 9:2,8,12 14:16 17:1,9 19:3,17 23:20 26:14,19 27:6 27:9 28:3 33:11 71:19,23 72:2,12
**back** 7:1 13:5 15:4 17:15 24:2 28:9,11 35:6 37:5 38:14 39:7,10 40:2,4 41:14 61:25 69:4,5 82:12 85:7,10 90:18 98:14,22

102:22 103:18 108:16
**backed** 60:24
**backtrack** 61:21
**bandwidth** 35:23 36:14,16 52:8,9,11,18 53:2,7 76:17 76:20 77:5 78:14 89:20
**based** 15:22 24:16 59:16 60:3,13,13,14 64:16 66:23 68:12 83:4 84:7 95:3 99:25 100:1
**basis** 46:25 48:5 87:19,22 95:3,4 96:13 97:16
**bates** 38:5 83:1
**bear** 44:25
**began** 10:14
**beginning** 47:16
**behalf** 2:5,9,14 2:18,23
**belief** 15:2
**believe** 21:1 28:16 36:19 38:19 42:10 63:5,7,7 64:3 66:19 76:1,13 82:20 83:18,25 84:4 89:18 102:7 104:23
**believed** 75:24
**bell** 82:24
**benefits** 48:8,9
**best** 103:7,15
**better** 91:4
**beverly** 6:7
**beyond** 55:23
**biggerstaff** 18:5,21 26:18 89:13,22
**biggest** 55:5
**bill** 15:16,19
**billed** 16:1 50:7
**bit** 9:3 20:25
**blacked** 101:17
**blocked** 24:5
**boards** 65:21 65:23 66:1
**bottom** 74:16
**bought** 100:7
**break** 6:2,4,25 7:3 42:6 65:13 65:16 85:5,12 98:16 103:25
**briefing** 105:4
**brittany** 1:24 106:5,15 107:5 107:21
**broadened** 67:11
**brust** 16:15 33:7
**buckeye** 72:7 72:23
**bulldozers** 95:11
**bureau** 19:4 56:4
**burner** 54:7,8 70:22 89:4 91:5,6,19
**business** 31:3 94:8 95:24 97:8,15 99:12 99:12,16 100:1 100:7 104:22
**businesses** 3:25 54:18 98:10 103:12
**busy** 43:18,19 43:24 44:1,8 59:22 93:9

**c**

**c** 2:1,15,15 5:1 12:3 13:3,21 19:21,24 20:6 20:13,20,22 24:2 26:19,23 27:3 37:5 71:22 72:14,16 74:2,3,7,15,23 76:2,4,5,19 77:2,23 78:1 79:6 96:13
**ca** 108:25
**caitlinhull** 21:24
**call** 42:20,22 43:4,10,12,18 43:20,20,22 44:2,6,8,8,11 44:11,12,15,24 45:13,15,18,23 46:7 47:14,20 47:22 55:1 70:21,21 89:3 91:3,17 96:5 104:3,13
**called** 5:11 9:14 9:14,15 54:6 55:15
**calls** 38:12,16 43:7 104:3
**campaign** 93:6
**capabilities** 56:1
**capability** 47:5 47:6 55:14 58:13 87:25
**capable** 58:16 58:16 59:21 91:11
**capacity** 30:6 30:14,19,21,22 30:24 31:2,6 57:3,7,12,25 58:3,7,9 59:1,2 59:4
**card** 106:9
**care** 55:3
**career** 16:16 18:19

**careprecise** 96:24 97:7,25
**carrier** 11:18 12:10,13 13:11 14:15,17 34:16 36:1 42:11,13 42:24 46:1 49:21,23 51:13 51:20,25 52:7 52:7 67:6 68:2 68:17 69:19 71:20,24 72:3 72:13 73:2,14 74:6 76:10 77:11 80:16 88:20 90:24 91:23
**carrier's** 12:12
**carriers** 9:15 11:8,16,22 12:7,8,16,22,23 12:25 13:8,13 13:15 14:3,6,9 23:6 31:20,21 32:2 35:23 36:8 38:9 42:21 45:18 62:3,8 66:15 70:7 74:13,21 75:24 77:4,12 80:18 81:17 87:5,14 88:21 89:22 90:8 92:2,3 104:3,8
**case** 6:15 9:22 23:15,25 25:25 26:11 32:4,21 37:20 42:23 46:19 53:7 67:23 68:1 74:2 75:9,24 75:25 85:25 86:4,12,15 93:21 100:11 100:12,12,13 103:17 104:12 108:6 109:3 110:3
**cases** 5:22 16:12,13 23:9 26:19 32:19 33:8,9,11 45:5 45:7,10,14,22 46:8 87:5
**catch** 11:12 26:6 27:1
**categories** 90:20 91:8
**categorize** 10:1
**category** 97:9
**cause** 5:6
**caution** 92:22
**cell** 83:20
**certain** 9:24 91:1 97:6
**certainly** 45:8 53:22 81:25
**certificate** 3:4,5 106:1 107:1 110:11
**certification** 109:1 110:1
**certify** 106:6 107:6,12
**chance** 70:14 85:14
**chances** 65:9
**change** 87:3 108:14,15 110:8 111:3
**changed** 13:11 67:11
**changes** 108:13 109:7 110:7,9
**characterize** 85:23
**characterizing** 52:10
**chart** 71:4 73:8 74:12
**check** 12:17
**checking** 15:14
**chicago** 2:12
**chiropractic** 1:2 108:6 109:3 110:3
**choice** 12:20
**churn** 99:12,15 100:1,13
**circuit** 58:23
**citation** 89:14
**citing** 40:10
**civil** 1:6 5:17 109:5 110:5
**claim** 91:2
**clarify** 6:1 37:18 80:11 95:21
**clark** 2:11
**class** 1:6 32:22 33:11 86:11,25 95:1,17,18,23 96:7 98:4 99:22 100:13 100:18,21
**clear** 33:5 49:12
**clearly** 61:1
**cleveland** 108:2
**clicked** 101:9
**close** 86:6 94:1 98:13
**cloud** 24:16
**collect** 9:25
**column** 12:3,6 12:8,16 13:3 13:21 14:11,13 71:19,22 72:2 72:11,12,14,16 73:15,17,18 74:2,3,22,24 75:18,19 76:2 76:7,19 77:2,7 77:16,23 78:1 78:2,6,7,8 79:6 79:11 84:5 88:14
**columns** 14:16 73:7 77:22

**combination** 29:5
**combs** 2:11
**come** 46:14 50:1 54:20 74:20 75:2 85:7 89:17 98:14
**comes** 102:16 103:4
**coming** 6:22 10:1 105:4
**commentary** 41:11
**comments** 65:20
**commission** 65:22 106:16 109:19 110:25 111:25
**common** 23:7
**commonplace** 23:9
**communicati...** 72:7,23 76:17 76:21 77:5 78:14
**companies** 45:17 91:15
**company** 15:21
**compare** 77:15
**comparing** 77:19,22,23 78:1
**compete** 88:22
**competition** 88:4
**compilation** 81:24
**compile** 15:24 74:13 80:23
**compiled** 98:6
**compiling** 10:15 81:4
**completed** 108:16
**complex** 90:7
**complexity** 81:18
**compliance** 88:1
**compliancep...** 15:6
**compliant** 3:23 102:13
**computer** 26:1 27:8 29:7,13 40:8 64:8 65:25 93:14
**computerized** 63:24 64:14
**computers** 63:16,23 64:13 65:24
**concentrate** 76:2
**conclude** 63:22 64:12 86:10
**concluded** 105:10
**conclusion** 61:8
**conducted** 6:5 33:10
**configured** 59:19
**confirmation** 22:23 39:19
**confirmed** 47:3
**confused** 49:7,8
**connected** 107:15
**connection** 38:2
**consider** 78:25 89:6
**consisting** 24:16
**consists** 7:21 7:25 9:13
**contained** 96:4
**contains** 17:2
**contents** 22:10
**context** 95:8
**contrary** 62:19
**control** 48:20 49:22 50:4
**conventional** 65:25
**conversion** 27:19
**converts** 27:11
**copy** 8:15 104:18
**cornering** 68:8
**corning** 2:17
**corporation** 1:3,4,11
**correct** 8:24 11:19 14:24 15:8 17:9 18:21 25:3,17 25:22 26:11,20 26:21 28:15 29:4,23 30:7 30:24 31:7 36:21 40:17 43:14,21,25 45:5,10,11 47:23 57:17,25 59:6,8 60:10 61:23 63:12 64:6 69:21 70:20 72:16,24 73:9 76:9,13 81:7 88:7,12 89:2,7,9 97:11 98:4 99:17 100:21
**corrections** 108:13 110:17
**correctly** 24:25 25:2 52:11 69:14 90:19 98:24
**cost** 15:25
**counsel** 4:12 8:2 71:12 83:3 90:2 107:13,15

**counseling** 16:16
**count** 12:17 13:21 72:10,21 79:11
**county** 106:3 107:3 109:10 110:15
**couple** 17:7 85:4 98:18 103:18
**course** 6:13 11:2 15:19 26:18
**court** 1:1 35:4 69:3 109:7
**cover** 18:16
**covered** 56:4 86:20 92:7,9,9
**create** 93:16
**credentialed** 79:3
**csc** 21:1,3
**current** 43:6,11 49:21
**curtis** 2:15,15
**customer** 32:16 35:14 36:10,17 42:24 51:22 52:16 71:20 72:3,4,13 73:3 89:16
**customers** 32:15 36:9,15 47:7 52:15 62:9 83:22 88:5
**cut** 24:6
**cv** 1:7
**cwarner** 2:18

**d**

**d** 3:1 5:1 73:18 73:18,18 74:2 74:8,15,24 75:19,21 77:16
**data** 15:25 81:8
**date** 1:17 10:3 13:13 15:10 16:2 23:24 93:5 97:19 108:9 109:3,9 109:19 110:3 110:13,25 111:20,25
**dated** 8:11 18:5 102:6 107:18
**dates** 22:22 39:18 74:22
**day** 27:21 91:12 106:10 107:18 109:16 110:22 111:22
**days** 9:7 104:22 108:19
**dead** 3:19 101:16,20
**deal** 6:18
**dear** 108:10
**december** 8:12 13:9 18:5 32:10,11 70:9 83:7,10,12,12 88:7 96:25 98:7
**decided** 11:6 31:17 61:11
**declaration** 3:17 21:18 22:5 94:15,24 95:7 99:17
**declarations** 38:18 62:1,7
**deed** 109:14 110:20
**deemed** 108:20
**defendant** 1:12 2:9 23:8
**defendants** 23:10 38:23 46:19
**define** 32:22 90:5
**definitely** 54:16
**definition** 24:4 24:4,15 25:4 28:9,11,25 45:6 53:6 56:5 68:11
**definitive** 3:20 87:13 102:5
**definitively** 31:25
**degrade** 44:16
**delaware** 1:11
**delete** 29:16 56:20 57:13
**deleting** 56:14
**delivered** 95:13
**delivers** 59:16
**demonstrated** 26:11
**demonstrates** 93:12,13
**denied** 50:12
**dep** 9:7 20:7 21:8 76:14 104:21
**department** 108:22
**depends** 45:6 50:11
**deponent** 4:13
**deposed** 5:22 16:14,20,23 45:3,9
**deposition** 1:15 3:5 4:13 5:16 6:5,13 7:9 21:1 21:3,19 22:6,8 22:17 37:7,12 39:11 52:9 62:8 105:10 107:7 108:9,12 109:1,3 110:1 110:3
**depositions** 21:23 23:15 37:23

**depth** 14:21
**describe** 37:25 59:9 85:23
**described** 38:11 41:20 55:20,21 69:11 69:16
**describing** 26:22 34:13 51:20 52:2,10 52:19 54:23 63:11 64:16
**designated** 9:1 9:12 17:19 18:13 58:17 59:17,19 79:15 86:17
**desired** 56:20
**desktops** 64:19
**detail** 11:7 80:17 81:5
**details** 9:15
**determination** 39:2
**determine** 22:19 39:15 66:20 68:10,23 68:24 69:12 70:5 74:11,19 83:8,10 92:4 93:23 94:7
**determined** 65:23 83:5
**developed** 87:25
**device** 24:17 26:1 27:8 40:9 93:14
**difference** 55:19 62:22 63:1 66:14 67:2,5,6,24 68:1,9,19,22 69:10 89:5
**different** 14:5,7 14:8,11 24:11 34:11 38:8 59:9 70:20 71:20,23 72:3 72:12,13 73:2 74:25 75:1
**difficulty** 99:21
**digit** 26:1 55:17 55:18
**digital** 24:19
**diligent** 81:13 81:25
**direct** 3:3 5:13 6:20 16:10 19:20 36:17 54:15
**directed** 21:24
**directing** 42:8
**directly** 34:15 46:1 51:13,24 52:13,17 88:22
**disagree** 81:8 82:3 84:13,16 93:13 100:17
**disbelieve** 95:6
**discovered** 53:21
**discovery** 23:21 36:24 37:1,3 46:4
**discusses** 41:7
**discussing** 91:13
**dispute** 94:1
**disputing** 8:6
**distinction** 10:15
**distinguish** 68:17 69:19
**district** 1:1,1 5:18
**divided** 77:17
**doctor's** 95:24
**document** 22:17 27:18,22 27:24 37:7,9 82:16
**documented** 11:9,21
**documents** 23:19 24:7,18 37:22 38:1,15 38:19,20,21,25 82:21
**dog** 73:18 75:21
**doing** 11:3 17:8 51:20 72:19 77:19 80:18 82:1 89:22 100:15
**dorothy** 3:17 94:15
**dorsey** 2:7
**dorsey.com** 2:9
**dorsey.com.** 21:24
**double** 82:12
**dr** 1:5 96:21
**drafting** 22:8 23:2
**drill** 5:23
**duly** 5:11 106:8

**e**

**e** 2:1,1 3:1,23 5:1,1 11:20 24:21,22 28:4 29:2,3,15 30:1 30:4,18 38:12 41:22 50:3 55:7 56:12,20 57:14,17,18,24 58:8,16,24 59:1,4,19 61:16 63:8 67:14 71:3,8 71:14 75:20 78:6,7 102:14
**earlier** 9:21 32:20 52:8 89:1
**easier** 6:17 16:24 20:2 71:10

**east** 2:16
**easy** 3:22 103:2
**edcombs.com** 2:13
**edelman** 2:11
**editable** 27:20
**effective** 13:10
**effort** 11:3 16:2
**either** 29:14 46:6 68:23 89:1,3
**electronic** 9:4 24:18 88:1,2
**electronically** 59:17 71:8
**elements** 97:24
**email** 108:17
**emerging** 91:11
**employee** 107:13,14
**employees** 59:20
**employs** 25:22
**enable** 64:18 65:23
**enclosed** 108:12
**ends** 12:22
**engage** 10:12
**enter** 81:8
**entered** 23:21 110:9
**entire** 79:25 109:5 110:5
**entirety** 65:19
**entities** 53:2 90:10
**entry** 72:7 75:17 76:20 77:1,2 79:6,10
**equation** 86:22
**equipment** 26:2 27:10 29:5 60:1 93:15
**equipped** 63:23 64:13
**equivalent** 66:1
**errata** 3:6 108:14,19 110:7,10,18 111:1
**escapes** 27:21
**especially** 100:6
**esq** 108:5
**esquire** 2:2,6 2:10,15,19 4:6
**essentially** 28:4
**et** 108:6 109:3 110:3
**event** 6:18
**events** 14:5
**eventually** 90:11
**everybody** 24:4
**evidence** 44:19 97:17,18 99:25 100:4
**exactly** 10:3 19:1 36:5,20 36:20 48:7
**examination** 3:3 5:13
**examples** 38:17
**except** 14:3 18:20 99:7
**exclu** 33:21
**exclude** 70:1,1 70:17,19 75:2
**excludes** 32:23 33:12,13 76:15
**excluding** 69:1 72:21
**executed** 110:10
**execution** 109:14 110:19
**exemptions** 41:6
**exercise** 100:25
**exhibit** 3:11,12 3:12,13,14,15 3:16,17,18,19 3:20,22,23,25 6:21 7:5 8:4 9:1,2,8,12,13 9:13 11:20,20 17:1,9,13,13 18:6,10,13,14 19:3,9,15,17,21 19:24 20:6,13 20:20,22 23:20 24:2 31:11,13 37:5 39:9 63:20 64:21,23 65:11 71:3,8 71:13,14 80:6 80:9 82:6,10 94:19 96:13 101:2,6,13,15 101:19 102:2,6 102:10,12,23 102:25 103:8
**exhibit's** 7:11
**exhibits** 3:9,10 4:5 7:8,9,22 8:1,11 17:4,14 17:19 20:3 24:6 31:18,20 31:23 32:2 82:23 98:20 100:25
**exist** 76:19
**existing** 49:18
**exists** 22:24 39:20 45:16 69:7
**expanded** 44:18
**expedite** 20:25
**experience** 11:3 81:12
**expert** 15:7 18:5,20 67:1 77:8 78:25 80:22,23 81:6 81:10 82:1

**expiration** 109:19 110:25 111:25
**expires** 106:17
**explain** 63:6
**explained** 77:13
**explanation** 83:22
**extolling** 85:17
**extra** 44:13
**extrapolating** 98:24 99:6,15 99:20
**extremely** 16:7

**f**

**f** 77:7 78:2,7,8 88:14
**facilitate** 54:9
**facilities** 24:19
**facsimile** 25:25 27:7 40:8,9 65:25 66:2 93:14
**fact** 42:11 47:2 51:23 61:9 68:16 90:21,24 98:24 99:2
**fail** 3:25 103:12
**failed** 44:17 98:25
**failure** 93:9
**failures** 99:12
**fair** 39:22 62:13 85:18
**fairly** 23:9
**familiar** 16:8 25:19 35:11,12 39:23 40:5,11 64:1
**family** 50:18
**far** 14:24 55:20 56:5 63:1 89:23 92:20,23
**fax** 2:4,8,13,22 3:18,18,20,22 3:23 13:11 14:1,12,18,25 22:20,21,22 24:15,17 25:8 25:9,11,12,13 25:14,16 26:11 26:19,23 27:3 27:5,6,9,9,10 28:1,1,3,5,11 28:13,14,18,19 28:19,25 29:1 29:2,6,6,9,12 29:12,15,16,21 29:25 30:4,5 32:9,23 33:12 33:14 34:6,8 34:14,18,22,23 34:23 35:9,12 35:13,19 36:16 37:14 39:16,17 39:17,23 40:5 40:22 41:7,7 41:15,16,21,21 42:12,13,14,15 42:15,16,17,23 43:4,5,7,10,11 43:12,13,18,19 44:3,5,7,7,15 44:16,18 45:13 45:13,16,17,23 45:24 46:7,8 46:24 47:3 48:14,17,19 49:2,2,3,5,14 49:15,18,19,20 49:23,24 50:5 50:9,10,11,14 50:17,18,23 51:1,2,4,12,14 51:16,21,24,25 52:1,4,5,6,12 52:14,16,21,23 52:25 53:6 54:6,8,11,13,14 54:17,22,24 55:7,8,14,15,15 55:20,24 56:2 56:5,14,20,21 57:19 59:14,15 59:16,18,18,21 59:24,25 60:2 60:3,5,6,9,10 60:18,19 61:5 61:5,16,22,22 62:5,10,11,17 62:18,22,24,24 62:25 63:7,10 63:16,24 64:4 64:4,5,14,17,18 65:20,23 66:1 66:9,9,12,13,14 66:16,17,17,23 67:3,4,13,16,20 67:21,24 68:3 68:4,4,12,18,18 68:23 69:1,12 69:15,16,19,20 69:20 70:2,6,8 70:9,18,19,21 70:22 71:25 72:10,22,25 73:1,12,16,19 73:23,24,25 74:6,8,9,10,14 74:22 75:4,8 75:10,10,21 76:1,11,17,18 78:9 79:11,18 79:20 80:2 83:7,9,11,15,17 83:21 84:12,16 84:24 85:17 86:2,3,9,12,21 87:1,6,15,17,24 88:14,20,23 89:4,15 90:12 90:16,21,25 91:5,6,18,19,20 91:24,25,25 92:1,4,8,8,11 92:13,14,18 93:1,3,4,5,7,8 93:11,12,13,16 93:16,19,21,23

94:2,25 96:23 97:5,7,10,12,20 99:1,5,8,8 101:5,5 102:6 102:14 103:1
**faxbetter** 54:8 55:12
**faxes** 13:10,12 14:8,12,14 22:22 24:20 25:24 26:12 39:18 42:22 44:17 46:25 50:1 51:1,12 52:4 54:10,20 55:16 56:10 59:17,21,22 62:12 63:16,22 63:25 64:12,15 64:19 66:21 68:17,18 70:6 70:17,18,19 84:23 86:9 88:6 91:15 93:25 94:8 96:22,25 97:3
**faxing** 3:19 14:5 25:20 67:10 91:11 101:15,20
**faxzero** 54:9 55:12
**fcc** 63:22 64:2 66:3
**feature** 46:24
**fed** 60:18
**federal** 5:17
**feel** 6:15 91:14
**felt** 51:5,9
**fifth** 65:3
**figure** 75:19
**file** 54:19 56:1 56:12 57:19
**files** 17:16 24:18
**fill** 48:13 49:20
**financially** 107:16
**find** 6:17 17:5 17:16 76:23 77:10 108:12
**fine** 8:20 77:15
**finish** 97:22
**firm** 15:17
**first** 9:14 10:5 12:23 18:4 20:18 23:5,13 23:24 33:3 42:19 64:12 65:3 71:19 90:5
**fit** 52:9,18 53:5 60:14
**five** 3:22 17:22 42:1 50:22 65:13 85:10 98:12,14 100:20 103:2 103:22
**fixed** 15:17
**florence** 1:3
**florida** 1:1,3 5:18 6:8 21:5 106:2,6,16 107:2,6
**focus** 87:16
**follow** 87:23
**following** 16:14
**follows** 5:12
**footnote** 16:17 65:8,11,19 77:13 101:4,19 102:4,19 103:1 103:6,11,14
**foregoing** 107:9 109:13 110:18
**forgetting** 14:20
**form** 10:18,22 22:9 26:5,24 27:15,18 28:6 29:18 30:8,16 30:20,25 31:8 33:16,23 35:2 36:25 40:18,24 41:4,18 46:10 48:2,13,14 49:6 53:8,24 55:9 56:6 57:6 58:1,10 59:7 60:11,21 63:3 64:7 66:18 68:21 69:22 70:24 72:17 80:24 81:11 82:2 85:20 87:2 88:16 89:8,24 91:9 92:15 96:17 99:19 100:3,16
**format** 24:19 27:20,22,24
**formulate** 80:25
**formulating** 80:16
**forth** 38:18
**forward** 43:4,7 43:10,18,20 44:12,15 48:18 108:16
**forwarded** 42:22 44:2,8 44:12 46:7 104:4
**forwarding** 42:20,22 43:12 43:20,22 44:7 44:11,24 45:13 45:15,18,23 46:24 47:14,20 47:22 48:9 70:21 89:3 91:3,17 96:5 104:14
**forwards** 43:22
**four** 17:21

**fourth** 65:3
**free** 6:15 109:14 110:20
**friday** 1:17 105:7
**front** 17:9 20:2 31:15 42:10 102:7
**full** 24:7 63:22
**functional** 66:1
**fundamental** 97:20
**funny** 51:5,9
**further** 107:12

**g**

**g** 5:1 14:16 31:13 71:23 80:4
**gain** 48:20
**general** 83:3 100:12
**generally** 11:11
**generated** 37:22
**genesis** 90:8
**getting** 24:4,6 39:20 41:14 58:22 73:6 75:22 84:16 92:20 98:13,22
**gg986657** 106:16
**give** 5:6 17:22 48:10,15,16,22 49:3,14 51:7 56:8 65:12 92:22 103:22
**given** 68:11 69:8,23 70:25
**gmail** 55:5
**go** 7:16 13:5 15:13 17:1,15 18:15 20:6 21:10,11 24:2 24:3 29:14 31:11,13 32:6 33:20 35:21 37:5 39:21 40:1 44:12 46:22 55:23 58:17 59:12 62:6 72:6,10 72:12,13 74:3 74:16 75:15 76:19,21 77:7 79:5 80:1 84:10,20 85:16 92:5,22,25 94:23 100:7 102:22 104:7
**goes** 15:21 17:13 29:8 100:20
**going** 9:9 12:2 14:2,19,20 17:7,17,17,21 18:9 19:12,15 19:23 23:6,14 23:18 24:14 26:14,17 27:23 28:9,11 29:10 32:21 38:14 39:7,11,13 40:2 43:17 44:4 61:25 65:2 71:2 81:8 82:13 85:7 92:22 98:19 103:19 104:18
**good** 5:19 41:25 83:2
**goodwin** 2:11
**govern** 41:9
**grab** 8:15
**great** 86:2
**greatly** 67:11
**gress** 1:5
**groove3** 25:19 25:22
**group** 50:23
**guess** 8:5 17:21 46:5 58:11,11 60:3 84:6,13
**guide** 3:20 11:3 102:5
**guys** 24:6

**h**

**hand** 5:3
**handed** 82:5
**handle** 12:6
**handy** 17:14
**happen** 9:23 14:21
**happening** 65:10
**happens** 26:22 27:5
**hard** 101:24
**hardcopy** 6:14 6:17 7:16,18 7:20
**harms** 41:8,20 56:11
**hays** 21:4
**head** 53:14
**health** 88:2
**healthcare** 100:5
**hear** 8:9 47:15 61:17 94:12
**heard** 44:23 60:25 69:14
**heather** 2:10
**heavy** 87:15
**help** 11:2 15:25
**helped** 10:10
**helps** 80:25
**hey** 80:5
**highly** 84:22 86:1,7
**hills** 6:7
**hillsborough** 106:3 107:3
**hipaa** 3:23 87:25 102:13
**hkolbus** 2:13
**hold** 92:19
**holding's** 21:4
**holdings** 21:1

**home** 6:7
**honest** 33:1
**hourly** 15:17 15:19,22
**hours** 15:10
**house** 59:25 60:2,6,18 61:5 62:18 63:10 64:4,5,9 66:9 66:14 67:21 68:4
**houses** 95:12
**hypothetical** 63:4 68:14 69:8 70:25

**i**

**i.e.** 66:14
**iconectiv** 11:17 13:16
**idea** 25:6 36:18 54:1 89:12,14 89:18 91:22 92:7 95:17
**identification** 106:9
**identified** 11:17 13:8,16 22:20,23 39:16 39:18 45:12 53:1 79:21 83:6 89:20
**identify** 19:1 20:20 32:8,15 36:9 38:5 54:6 76:15 83:16 98:10,21
**identifying** 9:9 83:15 100:25
**identities** 94:7
**identity** 97:14 99:9
**ife** 61:13
**iii** 37:7 39:10
**illinois** 1:4,5 2:4,12,21
**image** 28:18 93:16
**images** 24:18 56:20
**imagine** 15:12
**important** 81:1
**improved** 67:11
**inaccurate** 98:1
**inartfully** 49:11
**include** 31:18 31:20
**included** 38:9 67:15 108:14
**including** 18:6 35:23 38:3
**incoming** 43:7 59:20
**incorporated** 1:11 108:7 109:3 110:3,12
**incorrect** 89:11 99:5
**index** 3:9
**indicate** 80:3 89:14 90:25
**indicated** 12:3 12:8,15 13:3 13:21 14:11,25 31:21 35:24 71:19,22 72:12 72:14,25 73:1 73:2,4,8,15,19 73:21,22,24 74:1,4,5,7,8,21 74:24 75:3,7,9 75:21,24 77:2 77:8,11 78:8 79:10,16 84:5 90:25 93:3
**indicates** 91:23
**indicating** 74:10 76:10 108:14
**indication** 79:24
**indicator** 93:8
**individually** 1:6
**individuals** 98:10
**industries** 100:6
**industry** 86:1 87:14,15,17,21 88:3,5 100:5,8
**information** 11:7 22:19,24 36:25 39:1,5 39:15,20 46:4 81:21 87:13 96:5,9 104:14
**infucare** 16:16 33:7
**ink** 41:10
**input** 36:25 37:18
**inquiries** 21:23
**inquiring** 37:12 37:13
**insight** 83:21
**instance** 45:12 45:22,23 46:14 76:19
**instances** 13:14 21:17 22:5 91:2
**instructing** 92:23
**instructions** 21:16,20 22:14
**integration** 55:6,25
**intended** 76:16 85:1
**interact** 54:19
**interacted** 11:2
**interested** 107:16
**intermediary** 51:3,15 52:1 52:21,24

**international** 1:10 108:7 109:3 110:3
**internet** 3:22 24:21 25:17 28:13 29:8,23 30:1,5,7,10,18 31:1 54:21 58:2,8,15,16,25 59:4,16 60:13 103:2
**interrupted** 57:8
**intranet** 59:15 59:16 60:13,14 63:12 64:16 67:13 68:12
**introduced** 5:20
**introducing** 51:23 69:6
**involved** 14:4 32:18 37:4 45:4,7,8 87:23 88:22
**ios** 55:25
**issue** 11:8,10 11:11,14,21 25:25 53:25 67:17 99:4
**issued** 9:21
**items** 96:10

**j**

**j2** 50:18,19
**january** 1:17 106:8,10 107:18 108:4
**jennifer** 10:11
**jonathan** 2:6 108:5
**junk** 41:21

**k**

**kaufman** 65:20
**keep** 104:3,8,13
**kelly** 2:19 3:3 7:12 17:24 18:2 103:17
**ken** 31:24 92:19
**kenneth** 1:15 3:2 5:10,16 106:7 107:8 108:9 109:4,9 110:4,13 111:20
**kind** 9:25 15:24 20:24 60:24
**know** 5:23 6:5 6:24 7:7 9:21 10:2,14,16 11:23 13:18 15:5,11,19 16:1,21 18:8,8 19:7 23:16,18 25:7 29:10 31:25 32:1,20 37:15 38:12 41:6,17,17,19 41:24 42:21 44:22 45:16,16 46:2,2,18,20 48:16 53:20 54:16 55:2 56:11 58:14,19 64:20 65:9 66:23 68:11 69:2 79:12 81:20,25 83:23 87:22,24 89:16 95:22 101:11 101:23 104:2 104:10
**known** 87:4
**kolbus** 2:10

**l**

**l** 4:10
**lack** 91:4
**large** 84:22 86:8
**largely** 45:19
**larger** 31:20 97:6
**latturner** 2:11
**leave** 84:14,17
**leaves** 77:5 84:13
**leaving** 77:16
**led** 10:11
**left** 70:2 72:16 88:25
**legal** 37:3 41:5 56:7,8 61:8 62:17 108:1 111:1
**length** 93:7
**letter** 3:7 83:2 108:20
**level** 89:6
**liability** 68:20
**life** 71:9
**light** 11:8,10,11 11:14
**likely** 46:23 48:6,8 86:1,12 86:25 97:25
**limited** 31:19 68:11 69:8,23
**line** 12:23 27:12 32:10 36:6 41:10 43:4,12 54:10 54:25 56:11,21 64:12 65:8 73:1 108:14 110:7 111:3
**lines** 26:2 29:7 29:13 64:20
**link** 101:9
**list** 7:8 17:18 32:3,8 82:20 83:13 97:5,7 97:19,25 98:6 98:10,24 99:3 99:5,6,10,16,21
**listed** 12:13,17 13:1 14:10 21:3,4 32:14

36:8 55:12 110:7,17
**listing** 16:12 110:7
**litigation** 15:6
**little** 12:3 35:20
**llc** 2:11
**llp** 2:7
**local** 5:18 59:15,18,24 60:5,9 61:22 62:24 66:14,17 67:4,21 68:4 68:18 69:16,20 70:1,19 91:20 92:8
**locate** 65:13 79:13
**log** 29:8 93:11 93:12
**logged** 28:17 28:22
**logging** 24:21 28:13,14 80:15
**logs** 18:15 26:11 92:12,13 92:18 93:1,3,4 93:16,19,21,23 93:24 94:2
**long** 6:15 11:23 23:17 87:4,23
**longer** 48:24 50:6,7
**look** 6:14,17 12:2 13:6 14:16 16:11 20:13 21:13,16 24:5 29:15 73:3,8 75:6,14 77:1 79:5 80:8 81:7 82:6 83:1 85:3 94:21 99:13
**looked** 72:14
**looking** 6:16 7:8 12:1,15 18:12 22:2 23:8 67:7 71:14 72:5 73:6,17 74:12 75:11,16,17 89:19 97:9 101:6
**looks** 18:18 20:22 73:22 85:16
**lose** 50:4
**lost** 61:20
**lot** 15:12 23:11 43:15 71:9 88:4,5 93:1,22 100:5
**lower** 15:25
**lumen** 79:5,6 79:10,19 81:9 83:2,5,7,8,9,11 83:18
**lumen's** 83:23
**lumens** 53:10 53:10,12,13 84:1

**m**

**m.d.** 1:3
**machine** 3:18 22:22 26:1 27:7 39:18 40:8,9 42:15 42:17 49:19 50:2 54:11 56:22 59:18 62:11,25 66:13 66:17 67:3 68:4,18 69:15 69:20 70:6,18 92:1 93:14 101:5
**machines** 65:25 66:2 84:24 86:9
**madam** 108:10
**made** 23:5 109:7
**mail** 24:21,22 28:4 29:2,3,15 30:4,18 41:22 50:3 55:7 56:12,20 57:14 57:24 58:16,24 59:1,4 63:8 67:14 94:25 95:12,23 96:3
**mails** 30:1 38:12 57:17,18 58:8 59:19 61:16
**maintained** 28:19
**major** 50:23 91:14,14
**majority** 84:23 86:2,8 92:2
**make** 5:23 12:18,21 20:1 42:3 47:9 51:4 60:4 61:8 62:17 64:21 66:15 67:5 68:1,8,19 69:10,14 71:9 84:8 87:9 89:5 98:23
**makes** 68:22
**maloney** 83:3
**manual** 15:24
**marked** 6:21 82:5
**market** 2:16
**mastercard** 1:10 3:13 23:5 23:14,25 28:12 36:24 37:12,19 37:24 38:2,10 38:15,25 39:7 62:1,7 67:2 108:7 109:3 110:3
**mastercard's** 23:21 38:4
**materials** 17:2 17:25 23:22

38:1
**math** 72:15,19 77:6,18 78:15
**mathematically** 78:5,19,21
**matter** 69:18
**meadows** 2:4 2:21
**mean** 8:5 16:7 17:10 20:15,15 23:7 31:3,19 34:12 35:11 36:4 37:2 41:19,21 42:13 45:25 47:10,14 47:20,21 48:1 52:22 53:18,19 54:15 58:4,11 58:14 60:2 68:7,8,9 73:16 73:20 81:17 83:16 90:13,14 90:15 93:2 95:9 100:4 101:24,24
**meaning** 44:1
**means** 14:25 28:13 36:1 67:16 75:12,15 75:19 95:10 96:23
**meant** 34:11,25 35:8 36:2 73:23
**mechanism** 22:19,24 39:15 39:20 61:25 62:6
**medical** 86:1 87:16,17 88:1 88:1,3,5 95:24 95:25 100:8
**members** 95:1 95:18,18,23 99:22 100:14 100:18,21
**mentioned** 4:5 64:9
**merryman** 3:17 94:15 96:2,7
**merryman's** 94:24 99:17
**messages** 65:24 65:24
**methods** 56:19 68:8
**mic** 60:25
**middle** 1:1 5:18 8:19
**midwest** 108:17 111:1
**million** 65:10
**mind** 46:22
**miniscule** 88:21
**minneapolis** 21:3,7
**minnesota** 21:3
**minus** 18:13 78:13
**minute** 6:25 65:13
**minutes** 42:1 85:4
**mischaracteri...** 85:21
**missed** 10:16
**missing** 91:7
**misspoke** 47:22
**mistake** 43:2 78:8
**mister** 46:5
**misunderstand** 11:15
**mixing** 60:5
**mobile** 54:19
**modem** 55:15 64:9 65:23
**modems** 63:23 64:13
**modern** 54:18
**moment** 103:21
**monitors** 24:12
**montcalm** 2:6 10:18,22 22:9 24:9 26:5,24 27:15 28:6 29:18 30:8,16 30:20,25 31:8 33:16,23 35:2 35:10 40:18,24 41:4,18 42:3 46:10 48:2 49:6 53:8,24 55:9 56:6 57:6 58:1,10 59:7 60:11,21 61:7 63:3 64:7 66:18 67:8 68:6,21 69:22 70:24 72:17 80:24 81:11 82:2 85:20 87:2 88:16 89:8,24 91:9 92:15,19 94:12 96:17 97:22 99:19 100:3,16 103:21,24 104:5,17,20 105:2 108:5
**montcalm.jo...** 2:9
**morning** 5:19
**motion** 23:21
**movable** 55:3
**move** 19:20 42:19 43:17 50:8,24 54:5 93:11 94:4 102:1
**moved** 62:14 84:5
**movement** 87:21
**moving** 99:11
**mowed** 95:11

**mrm** 1:7
**multichannel** 59:21
**multiple** 9:15 11:8,16,22 12:7,7,16,21,23 12:25 13:8 42:15 59:22 64:19 80:18 81:17
**mussat** 1:3
**myfax** 54:9,16 55:12
**myriad** 31:4,7

**n**

**n** 2:1 3:1 4:10 5:1 8:1,1,11 17:13 71:13
**name** 5:20 7:6 27:21,21 108:6 109:3,4,15 110:3,4,21
**named** 12:13 61:10
**national** 16:15
**need** 6:2 17:7 21:18 22:6 43:1,2 54:10 56:21 77:10
**needs** 25:17
**never** 32:25 44:19,21 89:17
**nevertheless** 65:22
**new** 2:8,8,17 34:23 43:7 49:15 50:9 52:5
**nine** 75:8,25
**noes** 74:1,4,5 77:15,20,21 78:5,16 86:23
**nomadic** 55:1
**nonresponse** 46:13
**nonresponsive** 72:25 79:12,15 84:4
**nonsensical** 58:12
**nonsubpoena** 38:4,11,15
**normally** 93:4
**notarized** 108:15
**notary** 106:5 106:16 107:5 108:25 109:10 109:18 110:15 110:23 111:23
**note** 4:5 16:11 21:17 22:4 103:18 108:13
**notes** 53:15,18 107:11
**notice** 5:17 94:24 100:14 100:18,22
**notices** 96:3,4
**notification** 3:7
**notify** 57:18
**number** 11:18 13:12 14:4,4,7 14:21 15:1,2 22:20 32:8,16 34:4,18,20,21 34:23 36:10,19 39:16 43:1,5 43:10,18,22 44:2,7,8,12 45:13,23 46:7 46:24 47:2,25 48:1,3,12,13,15 48:16,18,23,24 48:25 49:2,2,3 49:4,13,15,18 49:22,24,25,25 50:1,4,6,7,9,13 50:16 51:4,16 52:2,3,4,5,5,22 52:23,24 55:17 55:18 62:4 71:19,21,21 72:3,12,18 73:2 74:13,20 74:20,24 75:3 75:8 76:8,9 78:15 86:2 87:10 90:16 91:1 93:5,5,7 93:25 97:7,10 97:12,20 108:8 108:14
**number's** 72:11
**numbered** 33:2
**numbers** 10:16 13:1,2,3,5,22 14:14,18 26:2 32:14,23 33:14 34:9,10 35:1,9 35:13,19 37:14 47:4 52:12 53:6 54:22 62:9 71:25 72:11,22 75:6 75:25 76:11,17 76:18,18,19 78:12 79:11,13 79:20,21 80:23 81:17 83:13,19 86:2,20 88:10 90:9 91:8 96:24 97:6 99:1,5,8 110:7
**numeral** 37:6 39:10
**numerous** 5:22 47:3

**o**

**o** 4:10 5:1
**o'neill** 1:24 106:5,15 107:5 107:21
**oath** 3:4 106:1
**object** 57:6 82:2

**objection** 10:18 10:22 22:9 26:5,24 27:15 28:6 29:18 30:8,16,20,25 31:8 33:16,23 35:2,10 40:18 40:24 41:4,18 46:10 48:2 49:6 53:8,24 55:9 56:6 58:1 58:10 59:7 60:11,21 61:7 63:3 64:7 66:18 67:8 68:6,21 69:22 70:24 72:17 80:24 81:11 85:20 87:2 88:16 89:8,24 91:9 92:15 96:17 99:19 100:3,16 104:5
**obtain** 34:17,18 96:9
**obtained** 34:9 62:1,7
**obtaining** 34:15 51:13
**obviate** 21:18 22:6
**obviously** 13:14 55:13 74:23 79:12 87:23
**occasion** 38:20
**occurrences** 68:20 69:18
**odd** 12:11
**offer** 47:7
**office** 6:7 9:5 95:24
**official** 109:15 110:21
**ofs** 42:13 43:2 59:14,14 60:10 77:12 86:12 87:21
**oh** 17:10 22:4 25:3,15 58:21
**ohio** 108:2
**okay** 7:1,13 8:5 10:23 13:2 16:19 17:23 20:13 24:10 39:25 41:24,25 61:3 62:15,15 62:19,21 65:14 66:6 73:13,14 74:7 75:22 76:6 77:2,3,21 77:24 78:11,17 82:3,9 85:6,9 85:11 104:15
**omitted** 81:15
**once** 32:6 48:16 61:12 78:14 103:4
**ones** 55:5,11 99:7
**online** 3:20 14:18,25 22:21 24:15 25:8,11 25:13,16 27:5 27:8,9 28:1,11 28:14,17,19,25 29:1,6,8,12,21 29:25 30:4,5 32:9 33:12 34:6,8,14,18,22 34:23 35:13 36:16 39:17 41:7,7 42:12 42:13,23 43:5 43:7,11,13,19 44:2,5,7,15 45:13,17,24 46:8 47:3 48:13,17,19 49:3,5,14,15,20 49:23,24 50:5 50:8,9,11,14,17 50:18 51:1,2 51:12,14,21,24 51:25 52:6,14 52:16,25 54:13 54:14,17 55:20 55:24 56:2,5 56:14 59:14 60:10,13 61:22 62:10,23 68:23 69:1 70:8,21 71:25 73:11,25 74:6,9,14,22 75:4,7,10 76:11 78:9 79:18,20 80:2 83:7,9,11,15,17 83:21 84:12,16 85:17 86:3,12 86:21,25 87:6 87:15,17,24 88:13,20,23 89:15 90:16,21 90:25 91:18,24 102:6
**open** 7:11,12 8:4 9:8
**opensided** 16:15 33:7
**operate** 78:18
**operating** 66:8
**opine** 94:2
**opinion** 56:8 70:4,15 84:20 84:22 86:4,7 86:16,17,19,24 87:19 88:24 90:18 91:7 93:2 94:4 95:5 96:13,14,16,19 99:7 100:20
**opinions** 81:1,2 86:15 98:5
**opportunity** 7:16
**opposite** 25:13
**option** 56:13 57:21

**order** 23:20 29:21 36:23 41:15 48:23 49:25 56:5 63:15,21 64:6 65:4 66:3 67:10,22 81:19 81:24 90:15 101:12 104:18
**original** 20:12
**ought** 103:18
**outdated** 98:6
**outreach** 38:4 38:11,15
**outside** 88:25 90:20
**own** 72:6 77:6
**owned** 50:19

**p**

**p** 1:5 2:1,1 4:10 5:1
**p&l** 15:21
**p.a.** 1:2 108:6 109:3 110:3
**p.m.** 1:19 105:10
**page** 8:14,24 12:4,18,20 14:19 16:11 18:16 21:5 39:9 65:3,4,4 65:11,12,14 66:2 70:4,12 84:21 94:5 101:5 102:16 103:10 108:14 108:16 110:7 111:3
**pages** 7:22,25 8:11 38:25 39:1 93:7 107:9
**paper** 8:18 41:10 65:22
**paragraph** 19:17 21:16 23:22 33:20,20 34:4 35:21,22 36:10 37:25 42:9,20 46:23 50:24 51:11 52:9,19 54:4,6 54:7,24 55:12 56:18,24 59:12 62:14 63:21 64:11 65:4,7 77:10 83:4 86:10 91:17,18 91:18,20 94:23 95:7 96:2,21 99:11
**paragraphs** 19:2 62:2 66:4 84:24,25 85:3 85:8,14,16,19 96:14 98:22
**part** 10:9,17 14:2 33:14 37:17 41:19 81:9 96:19 98:3 110:9
**participate** 22:7 23:2
**participated** 11:4,5
**particular** 17:19 36:19 37:6 46:7 48:23 51:22 53:16 64:2 72:22 76:10 91:1
**particularly** 85:25
**parties** 1:21 4:12 105:3 107:13,14
**party** 62:10
**past** 10:3 104:11
**pay** 94:1
**paying** 43:11 43:13
**pdf** 24:22 27:17 27:18 50:3
**peerless** 53:2,7 76:25 77:1,3 89:21
**pending** 6:3
**people** 41:21 43:16 91:14
**perceive** 87:20
**percent** 77:18 78:4,4,16 86:23 94:25 95:18 96:23 97:5,10,18,21 98:3,25 99:1,5 100:13,17,21
**percentage** 3:25 77:17 86:11,22,25 87:11,20 89:6 97:6 103:12
**perfect** 7:15
**perform** 26:3 93:15
**performs** 27:11
**period** 67:17 78:24
**permission** 60:19
**personal** 63:22 64:13 65:23
**personally** 15:20 106:7 109:11 110:15
**persons** 1:7 94:7
**pertaining** 100:19
**ph** 96:21
**phone** 23:6 32:14 35:1 36:8 38:16 41:10 48:23 49:4 54:10 56:11,21 62:3 66:15 68:2,16 69:19 76:10,11

90:24 91:23 104:3 108:3
**phones** 54:19
**phrase** 48:5
**picking** 86:16
**pictures** 24:5
**piece** 60:1 93:15
**place** 1:21 21:2
**plaintiff** 32:21 32:22 33:10,11 33:12,13 53:1 76:15,16
**plaintiff's** 18:10,13 22:21 22:23 36:7,12 102:12
**plaintiffs** 1:8 2:5,14,18,23 3:10 5:21 38:10,23 39:16 39:19 82:5,19
**play** 41:9
**please** 5:4,25 6:2,4 9:7 21:17 22:4 32:15 36:9 42:4 48:10 80:20 97:22 108:12 108:12
**plugged** 49:18
**plus** 74:17
**point** 9:25 26:14,14,23 27:3,6,6,7,9 28:2,2,2,3 46:3 46:6 88:9 98:7
**points** 26:19
**policy** 50:20
**poor** 12:20 99:6
**poorly** 98:6
**port** 29:10 48:12,18,19,21 48:23,24 49:2 49:4,13,17,19 50:9,16
**portable** 27:22 27:23
**portal** 28:14,18 28:22 29:14
**ported** 34:20 47:14 52:3
**porting** 48:9,14 49:22
**portion** 81:5
**possibility** 44:20
**possible** 44:22 70:5 72:1 91:11 94:6,6
**potentially** 28:21,22 44:16 93:6
**practice** 95:24 96:1 97:15
**practices** 98:11
**predictions** 3:19 101:16,21
**premise** 60:3 66:23
**preparing** 16:4
**present** 91:12
**presented** 91:1
**presenting** 6:11 80:14
**pretty** 92:20 95:15 105:3
**prevalent** 88:14
**prevented** 37:12
**prevention** 41:21
**previously** 6:21 58:24
**price** 15:18
**primarily** 50:18
**print** 17:5,5 29:16 30:6,15 30:19,22 31:6 41:8,21,23 56:20 57:4,12 57:13,21,25 58:7,9,11,15,17 59:1,4 67:13
**printed** 8:15 17:4,15 40:23 40:25 41:15 56:10
**printer** 30:6,9 30:10 58:16,17 59:5
**printing** 31:3 41:2 56:13 57:21 59:20 61:14
**prior** 16:5 57:24
**probably** 32:3 60:14 85:21 95:14 105:4
**problem** 44:23
**procedure** 5:17 109:5 110:5
**process** 11:5 16:6,8,13 20:1 23:17 25:7 26:10 32:19 33:6,10,15 37:3 38:3 44:16 45:4,7 45:10 47:4 50:1 81:13
**processing** 50:2
**produced** 38:2 38:15,18 106:8
**production** 82:19 83:6 108:16,17,22
**products** 87:16
**professional** 88:23
**programmed** 43:6
**progressing** 11:6

**prohibition** 40:15 63:25 64:15
**prohibits** 40:7 40:15
**proposed** 86:11 86:25
**protocol** 25:22 26:3 27:11 93:16
**provide** 14:25 29:22 34:18 42:12 51:21,22 52:12 54:25 55:22 74:14,21 75:7,9 78:9 80:2 83:17 87:5 88:20 91:24
**provided** 8:1 14:17 32:9 38:22,24 48:14 70:8 71:12 73:11,25 74:6 75:4 76:11 77:11 79:18,20 83:7,9,11,15,19 84:12,16 89:13 96:24
**provider** 3:23 34:9,9,18 42:23 43:6,12 49:4 50:15 51:3,15 52:6 54:24 102:14
**provider's** 29:9
**providers** 33:12 36:16 47:3 50:23 52:14 55:7 83:21 88:23 90:12,12
**provides** 16:12 24:15 71:25
**providing** 15:7 21:17 22:5 90:9
**provisions** 39:23 40:5 41:16
**ptd** 27:12
**public** 23:11 106:5,16 107:5 109:10,18 110:15,23 111:23
**pull** 9:3 11:23 11:24 17:20 18:10 19:9,14 19:24 63:20 64:22 71:8 80:5,10 82:8 94:18 101:12 102:10 103:8
**pulled** 102:17
**purchased** 90:9
**purchasers** 83:20
**pursuant** 5:16
**put** 53:22 58:13 61:9 76:18 84:7,8 87:10 96:18
**putting** 10:7

**q**

**qa** 11:5
**qaing** 15:14
**quality** 44:17 99:3,6,16,20
**quantity** 46:11
**question** 5:25 6:1,3,4 8:23 9:20 11:12 14:17 16:24 19:11,14,15 20:17 23:13 24:14 26:8 27:1 33:3 35:3 35:5,6 36:6,7 40:3,4 41:5,14 45:21 46:3,6,9 47:16 49:7 52:18 53:17 54:5 56:7 57:10 61:18 66:7,8,11,11 67:19,19 68:7 68:16 69:4,5,9 69:23 71:24 72:6 73:11,24 74:8,9,22,25 79:17 80:1,4 80:20 88:19 89:25 90:13 92:11,20 93:10 93:25 99:10 101:6,18 103:4 104:2,13
**questions** 5:24 9:10 20:9,25 21:22 45:19 71:4 85:8 98:18
**quick** 5:23 8:15 9:9 85:8
**quite** 18:23 38:18 39:23
**quoting** 40:8

**r**

**r** 2:1 5:1
**raise** 5:3
**ran** 8:18
**rate** 15:17,19 100:13
**rates** 100:1
**rather** 59:17,20 79:16
**rcd** 66:4
**reachable** 96:24
**reaching** 99:21
**read** 22:18 24:15,25 25:2 25:3 32:7 34:1 35:6,22 39:22 40:2,4,11,15,19 42:11 44:22 59:12 63:19,21 64:8,11 65:19

69:3,5 70:14 85:14 109:5,6 109:12 110:5,6 110:17
**readable** 27:20
**reading** 4:13 39:24 51:5 56:18,23 66:22 67:9 85:1 102:20 108:20
**real** 8:15
**realize** 101:17
**really** 14:13 33:4
**reason** 13:7 60:12 67:15 81:1 95:6 108:15 110:8 111:3
**reasonable** 32:5 83:4
**reasoning** 41:20
**reasons** 3:19 86:3 101:16,20
**recall** 16:14,20 16:21 20:18 23:24 33:17 38:24 63:17,18 66:22 77:8
**recalling** 52:11
**receipt** 108:19
**receive** 15:20 22:22 24:18 28:3 29:15 39:18 41:22 42:16 43:19 50:3 51:1,12 51:14 52:4 62:12 64:19 65:24 91:15,25 92:14
**received** 12:11 13:12 14:3 27:3,12 42:14 50:1 56:12 61:13 62:4 63:8,16 66:13 66:16,22 68:3 68:17,18 69:12 69:20 70:6,17 70:18,19 72:1 72:2 92:4 94:8 95:23 97:4 100:14,18,21
**receives** 28:4
**receiving** 24:22 40:17 54:10 59:22 66:11 67:16,20
**recipient** 42:16 61:6 62:18 66:10,16 67:4 67:4 68:2 91:25 97:14,15 97:17
**recipients** 46:25 47:25 59:17 70:5,8 84:23 86:8 99:9
**recognize** 7:5,6 20:6,14
**recollection** 12:9 16:7 36:14 39:13 53:16 79:22 82:22 102:8,9 103:7,15
**recommendat...** 3:24 102:14
**reconsideration** 66:3
**record** 5:15 7:21 19:8 23:11,11 43:1 43:3 53:19 66:3 88:1,2 107:10 110:9
**recording** 81:20
**records** 67:7 83:5 104:3,9
**redirect** 103:19
**refer** 53:15
**reference** 28:10 28:12 62:2 108:8 109:2 110:2
**referenced** 19:17 98:21 101:19 102:4 102:18,25 103:6,10,13 109:11 110:15
**references** 101:5
**referencing** 28:24 101:7
**referred** 59:2
**referring** 17:20 20:10 38:7,13 50:17 55:11 60:6
**refers** 24:16
**reflect** 5:15 42:24
**reflects** 12:10
**refresh** 39:13 53:16
**regard** 79:3 91:7
**regarding** 16:6 21:23 26:18 36:7 37:14,23 38:16 45:9 63:15 86:20 87:19 91:7 99:3
**regardless** 41:22 43:17
**regular** 42:25
**regulations** 41:9
**relate** 14:17 71:24 98:5
**related** 39:2
**relation** 12:6
**relationship** 52:16

**relationships** 36:17
**relative** 12:8 107:12,14
**relevant** 31:22 38:22 67:17
**reliably** 94:6
**relied** 17:2 18:1 19:12 23:19,23 38:1
**rely** 94:6 98:9
**relying** 96:15
**remailed** 96:11
**remains** 43:5
**remember** 10:3 10:5 32:1,4 33:8,9 53:9 94:16 101:10 102:20
**remotely** 6:5
**render** 9:18
**repeat** 35:3,4
**report** 3:11,12 6:15,23 7:21 7:25 8:10 9:2 9:19,21,23 10:8,25 14:10 15:8,11,17 16:5,10 17:1,3 17:11,12,13,14 18:5 19:3,18 19:22 20:4,7,7 20:8,9,10,13,13 24:3 31:12,14 31:18 32:21 33:19,21 35:22 37:6 42:9 46:23 50:25 51:10 53:22 56:25 69:7 70:4 71:3 77:9 77:14 81:2,6 84:21 91:13,22 92:21 94:5 98:21,23 101:4 101:20 102:5 102:13,19 103:1,6,11,14 107:7
**reported** 1:24
**reporter** 5:3 35:4,6 40:2,4 47:15 61:17 69:3,5 104:22 105:1,8 107:1 109:7
**reporter's** 4:5
**reporting** 50:20
**reports** 16:5 18:20 20:8 32:2
**representatives** 1:6
**representing** 5:21
**represents** 76:9
**request** 22:18 37:8 110:9,11
**requested** 36:12 107:9
**requests** 37:8,9
**require** 25:9,11 25:14
**required** 49:14 108:25
**requirement** 41:2,15
**requires** 40:22
**resell** 34:10
**reseller** 35:9 52:12 53:6
**resellers** 32:23 33:14,22 53:3 70:21 76:15,16 78:1,13
**reserved** 4:14
**resident** 1:5
**resources** 15:25
**respective** 4:12
**respond** 21:23
**responded** 12:12 13:15 72:22 79:19
**respondents** 38:17 76:10
**responding** 11:16
**response** 12:12 14:6 35:24 38:9 52:15 72:11 75:1 77:11 80:2,3 84:8 88:19 89:23
**responses** 10:1 15:14 38:3,8 39:2 46:15,17 46:18 71:24 72:1 75:23 78:2 79:11 80:15,16 81:7 82:20 89:20 104:12
**responsive** 39:4 79:17 80:4
**rest** 8:6 37:13 80:3 84:13
**result** 44:17,17 68:20
**results** 78:23
**retained** 4:5 9:18,20
**retaining** 51:2
**returned** 96:3 108:19
**review** 15:24 16:5 37:22 38:20 65:6 107:8 108:13 109:1 110:1
**reviewed** 17:2 17:25 18:17,18 19:2,3,12,16 23:23 36:10 38:1,21 39:3 82:19,21 94:11 94:14

**reviewers** 10:12
**reviewing** 20:18 81:14
**revised** 18:4
**rider** 21:11,14
**right** 5:3,15 7:9 7:16,17 8:3,21 9:1 11:21 13:19 15:4 17:8 18:2,25 20:22 24:5,25 25:19 27:4,13 28:5 29:3,17 30:2 34:5 37:5 39:10 42:1,19 43:8,17 51:10 53:25 55:13 61:25 62:6,15 65:18 70:14,17 70:23 72:10 73:5,10,19 74:15 76:12,22 76:24 78:23,24 79:9 80:5,23 82:15,22 85:5 85:10 88:9 93:18 97:4,11 100:1,24 102:1 102:22 103:22 103:24 105:9
**ring** 82:23
**risk** 48:21
**rkelly** 2:22
**road** 2:3,20
**robert** 18:5
**roll** 22:16
**rolling** 2:4,21
**roman** 37:6 39:10
**ross** 83:2
**routinely** 10:12
**rules** 5:17,18 109:5 110:5
**ruling** 3:14,15 25:5 64:2
**rulings** 19:4 56:9
**run** 15:21
**ryan** 2:19 17:20 18:9 19:9,23 21:10 24:2 39:9 64:22 65:2 70:12 80:5 82:11 94:18 101:1,11 102:2 102:10,22 103:8
**ryerson** 3:15 19:4,15 41:12 61:12 67:15

**s**

**s** 2:1 4:10,10 5:1 108:16 110:8,8 111:3
**s.c.** 1:4
**salaried** 15:22
**save** 85:2
**saw** 39:6
**saying** 14:24 27:2 46:5 51:19 67:14 72:18 75:5 78:6 79:20,23 81:14,15,15 85:25 88:11 97:16
**says** 21:22 32:14 34:6 36:5,22 39:14 49:21 51:21 64:18 65:20 66:2,5 75:10 77:8 83:4 84:18 86:7 90:24 96:2 97:18 99:10 102:5
**scenario** 69:16
**scenarios** 67:3 70:20 90:20
**scheduled** 21:24
**scoma** 1:2 16:14 108:6 109:3 110:3
**scope** 69:23
**screen** 6:18,25 7:19 8:3 17:21 17:24 21:6 42:10
**scroll** 65:2 82:11
**seal** 109:15 110:21
**sean** 83:3
**search** 83:4
**second** 9:14 44:25 65:3 84:3 99:12 103:17
**seconds** 93:7
**section** 24:4
**see** 3:18,22 6:24 8:2,3,9 9:16 12:4 14:22 17:7,22 17:24,25 21:5 21:7,13,19 22:24 23:9 24:6,23,24 32:11,16,17 37:8,9 38:6 42:17 51:16 54:11 56:22,23 57:2 64:25 65:20 66:2 70:9 72:7 76:20,21,23 78:5,18 79:14 80:17 82:9,9 83:13 86:12 94:9,24 95:1,2 96:5,6,11,12 97:1 101:5 103:1

Case 4:13-cv-02219-HSG Document 573-4 Filed 10/24/25 Page 56 of 65



**seeing** 101:15
**seems** 33:21 50:19 70:2
**seen** 18:20 32:25 44:19 82:15 87:6 89:12 93:19
**select** 32:5
**selected** 31:23
**sell** 34:10,10 90:11,12
**selling** 35:25 52:24 90:25
**send** 24:17 30:4 30:18 40:9 57:17,18,24 58:8,24,25 59:4,19 64:19 91:15 96:22
**sending** 40:15 54:9 62:17
**sends** 30:1
**sense** 51:4
**sent** 13:10 25:25 29:2 55:16,17,18 61:5 62:23,24 62:25 63:22 64:4,5,8,12 66:9 67:14,20 88:6 93:13 94:25 96:3,23 96:25
**sentence** 21:25 22:2 56:18,24 64:1,18
**separate** 13:12
**september** 21:2 21:8
**serve** 23:6,14 87:17
**served** 21:2 23:24 37:19,23
**server** 24:17,21 25:9,11,14,14 27:5,10 28:13 28:19 29:6,9 29:12 54:24 55:8,15 57:19 59:15,16,21,24 59:25 60:3,3,9 60:15,18 61:5 61:22 62:18,24 63:10 64:4,5 64:17 66:9,14 66:17,23 67:4 67:21 68:5,13 68:19 69:16,21 70:19 92:8
**server's** 29:6
**servers** 57:20 59:19 60:5,6 63:16,24 64:14 64:18 67:13 91:20
**service** 1:4 15:1 22:21 24:16,16 25:9,16 27:9 28:1,3,12,14,20 28:25 29:1,6 29:12,21,25 30:4,5 32:9 33:12 34:9,14 34:14,18,22,23 35:14 39:17 42:12,13,23 43:5,8,11,13,13 43:19 44:3,5,7 44:16 45:13,24 46:8 47:3 48:14,19 49:3 49:5,14,16,20 49:23,24 50:5 50:9,10,12,14 51:1,2,12,14,21 51:23,24,25 52:6,13,16,25 54:17,25 55:7 55:20,24 56:2 56:5,15 57:12 59:14 60:10 61:16,22 62:10 68:23 69:2 70:8 71:25 74:10,14,22 75:8,10 76:12 78:9 79:20 80:2 83:15,17 84:12,16 86:12 86:21 87:1,18 88:14,23 89:15 90:16,22 91:18 91:24
**service's** 27:10 28:18
**services** 14:18 15:7 29:22 34:6,15 35:12 35:25 41:7,7 42:25 45:17 48:17 50:17,18 51:2,13,14 52:14 54:13,15 54:16 55:2 57:20,23 70:2 70:22 73:12,25 74:6 75:4 79:18 83:7,9 83:11,20 85:18 86:3 87:6,16 87:25 88:20 90:25
**servicing** 14:4 14:7 90:9
**set** 21:8 54:19 57:20
**setting** 55:25
**settlement** 96:8
**several** 32:19 45:3,5,10 50:12
**share** 56:1,13
**shared** 64:20
**sharfman** 16:15 33:7
**sharing** 54:19
**shaw** 96:21
**sheet** 3:6 11:7,8 11:25 12:10,19 13:4 71:16

75:13 108:14 110:7,10,18 111:1
**sheets** 84:7
**short** 58:23 85:5
**shot** 17:22 51:7
**show** 19:7 65:8 65:14 92:12,13 92:17,18 93:17 93:19
**showed** 93:6
**showing** 34:3,4
**shown** 93:5 108:16
**signal** 27:11 44:9
**signals** 43:18 43:19,25 44:1 59:23
**signature** 8:23 106:15 107:21 108:15
**signature's** 8:14
**signed** 106:10 109:13 110:18
**significant** 86:11,24 87:11 87:20 89:6
**signing** 4:13 108:20
**similar** 10:2 23:8 24:17 61:11
**similarity** 56:9
**similarly** 1:7
**simple** 81:20,23
**simplistic** 81:20
**simply** 56:19 70:7 80:15
**simultaneously** 59:22
**sincerely** 108:21
**single** 14:17 45:12,21,23 89:15
**sir** 6:10 7:2,6 7:10,17 8:3,13 8:25 9:6,17,24 10:9 11:12 12:1 14:23 15:2,9 16:3,17 16:25 18:7,18 18:22,24 19:6 19:13,19 20:5 21:9,15 22:13 23:1,4,7,16 24:1,24 25:6 25:15,18,23 26:4,8,9,15,21 27:2,14 28:7 28:16 29:19 31:1,9,15,19 32:12,17,25 33:5,9,17,24 34:3,7,11 35:3 36:3,5 37:10 37:15,21 38:7 40:13 42:2,18 43:9,15,23 44:10,14,19 45:1,11,15 47:12,23 48:3 48:7,12 49:7 49:17 51:17 52:11 53:4,14 54:12 56:23 57:2 58:2,21 60:8,24 61:24 62:14,15 63:4 63:11,14,18 64:3 65:1,15 66:19 67:9 70:10,16 71:6 71:11,18,23 72:9 73:17 74:5,19 76:13 77:13,21 79:4 79:14 80:11 82:3,17,25 83:18 84:6,19 85:6,9,11,15,21 86:14 87:3,12 88:8,19 89:9 91:10 92:2 93:22 94:10,17 94:22 95:2,8 96:6,12 97:2 98:5,15 99:4 99:14,18 100:4 101:8,22 102:9 102:15,20 103:3,7,15 108:10
**situated** 1:7
**situation** 34:8 52:2 90:17
**situations** 54:20
**six** 50:22
**skiptracing** 96:10
**small** 13:13
**smith** 10:11
**sms** 90:12
**solberg** 2:2 4:6 5:14,20 6:24 7:4,13,14 8:8 8:17,20,22 10:19,21,23,24 17:25 18:3,8 18:11 19:9,10 19:23,25 21:10 21:12 22:11 24:2,10,13 26:6,7,25 27:16 28:8 29:20 30:13,17 30:23 31:5,10 33:18,25 35:4 35:7,16 39:9 39:12 40:6,20 41:1,13,24 42:5,7 44:25 45:2 46:16 47:17,18 48:4 49:9 53:11

54:3 55:10 56:16 57:9,15 58:5,18 59:11 60:16,22 61:15 61:19 63:9 64:10,22,24 65:2,5,9,17 66:25 67:18 68:15,25 69:3 69:13,25 70:12 70:13 71:1 72:20 80:5,7 81:3,22 82:4 82:11,14 85:10 85:13,22 87:8 88:17 89:10 90:1,3 91:16 92:16,24 94:13 94:18,20 96:20 98:2,12,17 99:24 100:10 100:23 101:1,3 101:11,14 102:1,3,10,11 102:22,24 103:8,9,16,22 104:1,6,15,18 104:21,24 105:6,9

**solemnly** 5:5

**solutions** 108:1 111:1

**somewhat** 63:18

**somos** 11:17 13:17

**sooner** 82:19 104:24 105:5

**sorry** 7:23 8:18 10:21 12:20 22:3,4 25:3 39:24 40:1,3 47:12,15 56:25 57:8 60:24 61:17 62:23 70:11 98:25

**sort** 15:24 68:7 75:13 92:22

**sought** 46:4

**sound** 40:11

**south** 2:11

**space** 87:17

**span** 13:9,9

**speaking** 11:11

**specific** 23:10 27:19 35:20 87:25 97:17

**specifically** 11:1 32:4 50:12 101:10

**specifics** 48:11

**specify** 20:11 20:12

**spend** 93:1,22

**spent** 15:10

**spine** 16:15

**sponsler** 1:15 3:2 5:10,16,19 7:5,9,15 9:18 11:1,24 15:6 16:5 18:1,4,19 19:11,21 20:3 20:7,17 21:14 22:7 23:20 24:14 25:1,8 27:17 31:14,17 31:24 32:7 35:21 39:21,22 40:21 42:8 43:4 45:5 46:22 47:19 49:10 58:20 59:24 61:21 63:19 64:25 65:6,18 70:15 71:2,7 72:5 79:1 80:8 82:7 82:15 84:20 85:1 92:25 94:14,21 98:19 101:4,15 102:4 102:12,25 103:11 104:2 104:16 106:7 107:8 108:9 109:4,9 110:4 110:13 111:20

**stamp** 38:5

**stamped** 83:1

**standalone** 22:22 39:17 42:14,16 49:19 50:2 54:11 56:21 59:18 62:11,25 66:13 66:17 67:3 68:4,18 69:15 69:20 70:6,18 84:24 86:9 92:1,8

**standard** 56:1

**standards** 25:20

**start** 6:20 7:23 92:23 101:1

**started** 36:6

**starting** 102:17

**starts** 102:17

**state** 19:2 42:21 50:25 51:11 62:8 94:5 106:2,6 106:16 107:2,6 109:10 110:15

**stated** 62:13 81:16

**statement** 86:18 95:21 109:13,14 110:19,19

**states** 1:1 96:7 106:9

**static** 55:3 95:15

**stating** 70:20

**statistical** 78:25 80:12,14 80:18

**statistics** 81:4
**stenographic** 107:11
**stenographic...** 1:24 107:7
**steps** 3:22 103:2
**stipulated** 4:11
**stop** 78:24
**store** 56:19 57:13
**storing** 56:13
**street** 2:7,11,16 21:4
**stretch** 30:21 95:19
**strike** 6:12 10:5 10:20 13:20 15:5 20:19 28:10 29:11 31:12 43:2 45:3 47:17,24 62:5 67:25 70:2 87:9 88:10 90:20,22 92:9 95:5
**studies** 100:5
**study** 87:14,14 87:24
**stuff** 41:11
**subject** 46:25 63:24 64:14 70:9 84:23 86:9 92:21 96:25 100:8
**subpoena** 3:13 10:1 12:11,14 15:13 16:6,13 20:23 21:1,11 21:14,23 22:10 22:21,23 23:24 28:12 32:19 33:6,10 36:7 36:12 38:2,4 38:16 39:7,17 39:19 45:4,7,9 46:18 55:21 72:1,22 79:19 81:12 89:19 104:11
**subpoenaed** 14:15 79:25 82:20
**subpoenas** 13:16 23:6,15 37:19,23 38:10 38:10 62:1,7 75:23
**subscribe** 25:16 43:5
**subscribed** 109:10 110:14 111:21
**subscriber** 25:17 28:17,18 28:24 29:1,8 29:13,14,16 32:10 34:6,14 34:19,21,22 42:25 48:25 50:6,7 51:4,16 52:1,4,21,23 54:8 59:13 70:22 91:18,19
**subscriber's** 29:3
**subscribers** 42:14,21 83:5 83:8
**subscribership** 48:15,17
**subscribing** 22:20 39:16 67:15
**subsequently** 96:10
**substantial** 80:21
**subtract** 13:22 77:4 78:14
**subtracted** 13:3 77:25
**successful** 26:10,12 93:3 93:8,17,20,25 98:9 99:2,7
**successfully** 26:13 27:4 94:25 95:13 96:23
**sue** 3:17 94:15
**suggest** 71:7 85:2
**suggesting** 81:23,24
**suite** 2:3,12,16 2:21 108:2
**sum** 74:2
**summarize** 9:25
**summary** 9:14 11:7,25 12:10 12:19 13:4,6 14:10,19 71:4 71:15,16 74:12 76:3 80:17 81:5
**superior** 108:1
**supplement** 6:15 7:21,25
**supplemental** 3:11,12 6:23 7:20 8:10 9:2 9:19,22 10:8 10:25 11:20 15:7,11 16:4 19:3,18,22 20:8 24:3 31:11,13,18 37:6 42:9 50:24 51:8,10 56:25 70:4 71:3 81:5 84:21 92:21
**support** 50:15 80:25 86:18 89:17
**supports** 36:13
**supposed** 25:1

**sure** 5:22 12:18 12:21 23:17 33:1 34:2 37:2 37:4,16 44:14 58:12 59:10 60:4,25 64:9 67:12 80:13 98:23
**surprised** 16:23
**swear** 5:5
**switch** 44:13
**sworn** 5:12 106:8 109:10 109:13 110:14 110:18 111:21
**synonymous** 47:13
**systems** 59:21

**t**

**t** 4:10,10
**t30** 25:22 26:3 27:11 93:15
**tab** 11:19,22 12:25 13:6
**table** 75:14
**tabs** 9:14
**take** 6:4,25 9:7 20:13 21:13,16 37:1 42:1 48:21 55:3,4 65:13 80:8,20 82:6 85:4,5 94:21 98:12,14 99:12,13
**taken** 5:16 7:3 25:5 42:6 65:16 85:12 98:16 103:25
**talk** 26:19 27:5 45:17 47:8 91:5 99:11 103:16
**talked** 32:20 52:8 58:19 89:1
**talking** 7:7 14:1 30:14 48:6,7 53:25 60:1 77:22 84:15 88:18 100:11
**tallahassee** 21:5,7
**task** 9:3
**tasked** 9:22
**tax** 60:18
**tcpa** 26:19 39:23 40:5,7 40:21,23 41:3 41:6,16 60:20 61:6,11 62:19 62:23,24 63:2 66:10,12 67:3 67:5,21 68:20
**tcpa's** 63:24 64:15
**tcsr** 82:23,23
**team** 10:11,12 11:2,4,13 15:23
**technology** 55:4 61:10 62:11 66:21,24 67:10 69:7 88:2,2 91:11 92:14
**telecarrier's** 38:3
**telecommuni...** 24:19
**telephone** 13:1 25:25 26:1,2 27:7,12 29:6 29:13 32:8,10 40:8,9 42:24 42:25 43:1 47:4 54:25 55:17,18 62:4 62:9 64:20 66:1 67:6 70:7 93:14
**tell** 6:1,2,6,22 16:11 18:16 20:14,24 27:17 37:25 39:14 62:4,8 66:15 67:6 68:2 75:11 91:2 93:12 95:4 101:24 105:2
**telling** 83:14 87:4
**tells** 97:24
**tenth** 78:3,4,16
**term** 34:25 35:8 47:23 60:2 91:4
**terms** 59:24 97:19 99:10
**testified** 5:12 32:18 45:22 58:24 59:3 61:21
**testifying** 34:25 48:22
**testimony** 3:2 5:6 49:1,11,13 49:16,17 57:24 58:22 109:6,7 110:6,9,12
**text** 57:19 65:21
**thank** 61:3 65:15 66:6 104:15 105:9
**thanks** 104:17
**thereabouts** 88:13
**thing** 31:4 47:5 60:7 67:9 74:16 80:1 82:12 92:3,5
**things** 15:15,22 23:10 28:21 29:19,19,25 31:2,4,7 38:12 38:17 54:21 63:1 69:11 94:11,14 100:9

**think** 6:16 8:9 12:11 17:6,7 19:23 27:2,22 31:19 32:19 35:20 36:13 38:11 46:6,12 47:6 50:14 52:15,20 53:9 59:8 61:21 71:9 72:6 78:22 82:13 83:23,25 86:5 86:5 88:11,13 89:19,21 91:10 93:10 95:17 96:18 98:13 100:18 103:16 103:19 104:12 105:4
**third** 9:15 62:10 65:3 102:16
**thirty** 108:19
**thought** 7:23 11:13 31:22 35:18 54:4 61:20 64:8
**three** 3:19 9:7 9:14 80:17 101:16,20
**tied** 55:2
**tiers** 90:7
**tiff** 27:12 50:3
**tight** 105:3
**time** 1:19 10:5 13:9,9,10,11 20:18 21:22 41:25 43:21,23 67:17 87:4,23 88:9 93:1
**times** 10:2 14:7 16:9 76:8 81:16
**title** 101:25
**titled** 102:13
**today** 6:11 34:25 52:8 59:9 91:15 94:7 99:22 100:19 101:10 104:23
**together** 10:7 29:7 74:15,18 84:7,8
**told** 20:3 76:14 79:19 100:25
**ton** 18:20,23
**took** 93:7
**top** 12:4 28:9 28:25 37:13 53:14
**topic** 11:24 22:17,17 23:3 32:6,7 33:2 37:7,7,13 39:7 39:11,22
**topics** 22:8 37:8,9
**total** 14:21 72:21 73:22 75:8 76:7 77:16,25 96:4
**towards** 87:21
**tracking** 15:14
**traditional** 55:23 56:2
**train** 61:20
**training** 11:4
**transcribe** 65:21
**transcribed** 109:7
**transcribing** 55:14
**transcript** 3:5 4:14 84:17 104:19 107:8,9 108:12,13 109:5,12 110:5 110:11,17
**transfer** 47:13 47:14,19,20
**transferred** 34:21 47:5,10 47:12
**transmission** 18:14 26:23 44:4 93:17
**transmissions** 99:2
**transmit** 65:24
**transmitted** 26:13 27:4,6 28:2
**travel** 44:18
**trends** 87:14,15
**trick** 37:24
**trims** 77:9
**true** 13:21 58:9 68:13 89:18 99:22 107:10
**trust** 23:23 77:6
**truth** 5:7,7,7
**truthfully** 5:25
**try** 13:18 20:25 29:10 31:20 61:2 62:5 67:25
**trying** 37:24 39:6 73:5 75:19 76:23 91:13
**turn** 52:14 71:2
**turnaround** 104:21 105:3
**two** 6:25 13:12 13:15 14:3,5,9 14:11 20:8 24:11 37:8 53:2 63:1 68:8 69:18 77:4 78:12 92:8 104:23
**tying** 41:10 56:10
**type** 27:19 69:6 73:1 92:13

**typically** 93:4

**u**

**u** 4:10
**u.s.** 94:25 95:10 95:12
**u.s.c.** 40:10
**ua** 1:7
**unable** 83:10
**unclear** 73:1
**unclearly** 81:16
**undeliverable** 96:4
**under** 21:20 68:14,20
**underneath** 84:25
**understand** 5:25 6:2 13:7 33:4 34:24,24 35:8,13,15 36:1 71:12 81:18 98:23 102:18
**understandable** 78:19,20
**understanding** 13:23 19:5 25:4,24 33:13 36:11 40:14 55:24 56:3 60:17,23 61:4 75:5 90:19 103:5,13 104:11
**understood** 35:18
**unintelligible** 20:10 47:11 61:16 86:16 97:20
**united** 1:1 106:9
**universal** 50:14 50:20
**universe** 78:2
**unknown** 46:11 46:12 48:3
**unlimited** 31:1 58:3,6
**unsolicited** 40:10,15,22 41:16 60:17,19 61:4 63:25 64:15 66:12,16 67:20,24 68:3
**use** 25:9,12,14 27:21 30:22 32:3 34:13 40:7 48:5 49:24,25 51:24 54:18,21,24 55:8 67:12
**used** 22:21 24:17 39:17 43:1 45:16 46:24 47:19 50:5 62:9 84:23 86:9,12 86:25
**useful** 30:22 31:2 39:5 59:10
**useless** 59:2
**user** 57:12
**users** 24:20 50:25 51:11 55:6 56:19
**using** 27:5 41:10,10 47:13 47:20 51:1,12 51:22 59:14 62:10
**utilize** 42:22 59:15
**utilized** 83:6,9 83:11

**v**

**v** 108:6 109:3 110:3
**valladarez** 1:24 106:5,15 107:5 107:21
**various** 56:19
**veritext** 108:1,8 111:1
**veritext.com.** 108:17
**version** 9:4
**versus** 16:14,15 16:15,16 33:7 33:7 100:20
**videoconfere...** 1:22
**view** 7:18 17:7 29:1,16 56:19 57:12 80:14
**viewing** 28:18
**violate** 63:6 67:3,5
**violates** 60:19 61:6 62:19,22 62:24 66:10,12 67:21
**violating** 63:1
**violation** 40:23 40:25 41:3,16 68:12,14 69:9 69:15,17
**virtual** 54:21
**virtues** 85:17
**void** 45:25
**voip** 55:1,3
**vs** 1:9

**w**

**waiting** 8:17
**waived** 108:20
**walk** 17:18 71:3,13 98:20
**wallace** 2:2 4:6 5:20 42:3 94:12
**wanca** 2:2,20
**want** 6:14 18:25 19:1 41:5 46:14 47:8 49:2,11 56:7 57:13 61:8 63:5 71:3

71:9 74:3,13 74:20 75:2 85:3,4 88:24 98:19,20,23 104:24 105:4
**wanted** 30:11 50:8 60:4 65:18 74:1 100:24
**warner** 2:15,15
**warner.legal** 2:18
**way** 13:19 16:22,24 18:9 24:20 34:11 41:23 50:25 51:11 54:14 56:2 58:13,14 63:7 68:23,23 68:24 69:2,19 80:11,21 82:9 82:18 93:10 100:22 101:23 104:10
**ways** 42:15 80:17 91:14,24
**we've** 6:13 10:2 16:8 32:19 48:6,7 58:19 86:20 87:6 90:22 91:3,4 92:7,9,9
**weeks** 104:23
**went** 12:16 86:3 99:9
**west** 2:7
**whatsoever** 37:19
**when's** 20:18
**whitney** 2:7
**wholesale** 32:15,16 35:14 35:19 36:9,9 36:15 52:12,13 89:15 90:17
**wholesaled** 35:12
**wholesaler** 35:1,9 36:15 36:20,22 51:18 53:6 83:18,23 83:24 84:1,2,3 89:20 90:6,7
**wholesalers** 32:23 33:14,22 34:2 35:24 37:14 53:3 78:1 83:20 89:3 90:8,10 90:11
**wholesaling** 35:11 54:2 89:12 90:14,15 91:4
**william** 1:5
**window** 13:13
**wish** 57:21
**witness** 5:8,11 7:2 8:18,21 24:8,11 42:2 45:1 57:8 65:15 85:11 98:15 108:9,12 109:1,4,11 110:1,4,15
**witnesses** 98:25
**witness'** 108:15
**word** 47:13,19 47:20 89:23
**worded** 49:11
**words** 11:17 12:21 13:7
**work** 10:2 15:13 16:9 26:18 46:19 80:21,22
**working** 43:6 96:8 97:7
**works** 15:23
**worried** 58:6,7
**worry** 67:22 73:7
**worth** 43:15
**wrap** 37:17 103:22
**wrong** 3:19 13:25 76:9 80:20 89:2 93:10 97:6,10 97:17 101:16 101:21
**wrote** 86:5
**wsolberg** 2:5

**x**

**x** 3:1

**y**

**yahoo** 55:5
**yeah** 7:7,12 8:9 9:8 15:23 16:18 18:1 20:15 21:21 23:13 24:9 27:18,23,25 33:17 41:19 51:6 52:18,22 56:25 59:10 60:4 71:7 75:22 83:25 91:17 95:17 97:13 100:17
**years** 100:20
**yeses** 77:16,19 77:21 78:3,6 78:15 86:22,23 88:14
**yesterday** 8:2
**york** 2:8,8,17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.