# EXHIBIT E

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | CC Docket No. 92-90 |
| | ) | |
| | ) | |
| | ) | |

**REPLY COMMENTS OF NEXTEL COMMUNICATIONS, INC.**

Robert McNamara
Senior Counsel – Regulatory
Frank Triveri
Special Counsel – Office of Privacy

**NEXTEL COMMUNICATIONS, INC.**
2001 Edmund Halley Drive
Reston, VA 20191

(703) 433-4000

To-Quyen Truong
Scott Dailard
Jason E. Rademacher

**DOW, LOHNES & ALBERTSON, PLLC**
1200 New Hampshire Avenue, NW
Suite 800
Washington, DC 20036

(202) 776-2000

Its Attorneys

January 31, 2003

# TABLE OF CONTENTS

**Page**

SUMMARY ........ ii

I. The Commission Should Clarify the TCPA Rules to Address Developments in Facsimile Advertising. ........ 2

A. The Commission Should Clarify that Liability Rests with the Party Controlling the Destination of Any Unsolicited Facsimile Advertisements. ........ 2

B. The FCC Should Clarify that the TCPA Does Not Prohibit the Transmission of Unsolicited Advertisements to Fax Servers and Personal Computers, Including Transmissions to So-Called "eFax Accounts." ........ 3

C. The Commission Should Amend Its Regulations To Include Facsimile Advertisements Expressly In Its Existing Business Relationship Rule. ........ 6

II. The Commission Should Retain the Current Established Business Relationship Rule and Incorporate It Into Any National Do-Not Call Scheme It May Adopt. ........ 10

A. The FCC Should Not Regulate the Duration of Established Business Relationships. ........ 11

B. The Commission Should Not Narrow the Definition of an Established Business Relationship To Require an Actual Purchase or Transaction. ........ 14

C. The FCC Should Clarify That the Use of Third-Party Contractors Does not Jeopardize the Applicability of the Established Business Relationship Rule. ........ 15

D. The Commission Should Continue to Recognize That the Established Business Relationship Is a Company-Specific Rule and Not a Product or Service-Specific Rule ........ 17

CONCLUSION ........ 19

**SUMMARY**

In its initial Comments, Nextel proposed a measured and reasonable set of clarifications of the Commission's telemarketing rules concerning facsimile advertising, the established business relationship rule, and several other issues. These suggestions are designed to balance consumers' legitimate right to be free of unwanted solicitations, consumers' equally important right to receive desired commercial communications, and business's First Amendment rights to communicate with interested customers. However, several commenters apparently operating under the misperception that consumers derive no benefits from telemarketing and that all consumers have a wish and a right to be free of all telemarketing all of the time, have proposed drastic new limits on business's telemarketing activities. Neither the law nor the record in this proceeding support this proposed regulatory attack on business's legitimate telemarketing activities.

Accordingly, the Commission should clarify its rules to eliminate ambiguities that create unnecessary burdens and unacceptable risks of liability for legitimate businesses. Specifically, the Commission should clarify that liability for violations of the Telephone Consumer Protection Act (the "TCPA") rests with the party controlling the destination of facsimile advertisements, and that businesses may reasonably rely on dealers' and contractors' representations that they have obtained the requisite customer consent to receive telemarketing communications (whether through an established business relationship or other means recognized by the rules). This common-sense approach would put responsibility where it belongs and short-circuit the multitude of strike-suits attempting to recover damages from perceived deep-pocket businesses that themselves have engaged in no wrong-doing.

The Commission also should clarify that the TCPA does not prohibit the transmission of unsolicited advertisements to fax servers and personal computers, including transmissions to so-

called "eFAX accounts." This clarification is dictated by the TCPA and its legislative history, which provides no basis for regulating facsimile advertisements sent to personal computers.

Moreover, the Commission also should amend its regulations to expressly apply its established business relationship rule ("EBR") to facsimile advertisements. This codification of current FCC policy will eliminate much uncertainty and protect businesses from liability that neither Congress nor the FCC intended.

Finally, the Commission should clarify its EBR rule in several other important respects. First, the Commission should clearly indicate its intention to retain its current EBR rule and incorporate it into any national do-not-call scheme it adopts. In doing so, the FCC should refrain from complicating compliance and enforcement efforts by adding a temporal limitation or purchase requirement to the rule. The FCC should clarify that the established business relationship that exists between a business and its customers covers telemarketing conducted by agents and contractors on the business's behalf.

The current rules risk being interpreted in ways the Commission never has endorsed. The Commission cannot allow the lack of clarity in its rules to continue to breed litigation. The requested clarifications would effectuate Congressional intent, advance sound public policy goals and create certainty by establishing telecommunications carriers' potential liabilities, allowing them to balance knowingly the risks and benefits of future advertising through telemarketers. As the Commission knows, excessive and unreasonable litigation risks – even the risk of relatively frivolous litigation – do nothing but drain businesses' resources and inhibit competition, innovation, and customer service. The clarifications requested herein will eliminate this uncertainty and place the responsibility for unsolicited telemarketing where it belongs.

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 | ) ) | CG Docket No. 02-278 CC Docket No. 92-90 |
| | ) | |
| | ) | |
| | ) | |

To: The Commission

**REPLY COMMENTS OF NEXTEL COMMUNICATIONS, INC**

Nextel Communications Inc. ("Nextel"), by its attorneys, and pursuant to Section 1.415(c) of the Federal Communications Commission's ("FCC" or "Commission") rules, hereby submits these Reply Comments in the above-captioned proceeding.[1] Specifically, Nextel urges the Commission to clarify its rules implementing the Telephone Consumer Protection Act (the "TCPA") as they affect carrier liability for telemarketing by third-parties, facsimile advertising, and application of the established business relationship rule (the "EBR"). As the comments in this proceeding show, there is widespread confusion about the current and proper reach of the Commission's rules. As the Commission is aware, the TCPA is a statute designed to balance the rights of consumers and businesses, not a money machine designed to enrich the plaintiffs' bar through exploitation of the rules' ambiguities. The clarifications requested by Nextel are essential to the Commission's pursuit of the measured course outlined by the TCPA and the important balance between customers' right to be free of unwanted solicitations, their concurrent

[1] Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, *Notice of Proposed Rulemaking*, CG Docket No. 02-278, CC Docket No. 92-90, FCC 02-250 (rel. Sept. 18, 2002) (the "*NPRM*").

right to receive desired commercial information, and businesses' First Amendment right to communicate with existing and potential customers.

## I. The Commission Should Clarify the TCPA Rules to Address Developments in Facsimile Advertising.

### A. The Commission Should Clarify that Liability Rests with the Party Controlling the Destination of Any Unsolicited Facsimile Advertisements.

The comments in this docket and the FCC's findings in other proceedings make clear that fax broadcasters who actively compile and market databases of fax numbers for advertising campaigns are the major perpetrators of TCPA fax violations.[2] Yet, as discussed in Nextel's initial comments, entities whose products or services are advertised in fax broadcasting campaigns currently are exposed to a strict liability standard in civil cases even though they are wholly innocent of any active participation or intent to engage in prohibited fax advertising activities. To ensure proper application of the TCPA, the FCC must clarify that liability rests with the party controlling the destination of unsolicited fax advertisements.

One commenter in this proceeding makes the bare assertion that the FCC "should adopt language that specifically rejects insulation from liability by use of 'independent' contractors."[3] This strict liability standard disregards the resulting inequitable apportionment of responsibility between the fax broadcaster that knowingly sends prohibited fax advertisements and companies that have no knowledge that their products and services are being advertised through unsolicited fax transmissions. The strict liability argument rests on the concept that a company that chooses to fax its advertisements to recipients known not to have provided their consent should not be

---

[2] *See, e.g.*, Fax.com, Inc., *Notice of Apparent Liability for Forfeiture*, 17 FCC Rcd. 15927, 15935-36 (2002).

[3] Comments of Robert Biggerstaff at 24 ("Biggerstaff Comments").

able to escape liability by retaining another party to hit the "send" button for the transmission. There is a vast difference, however, between that scenario and the reality of class action lawsuits brought against companies that had no knowledge independent contractors were faxing advertisements of their products and services to recipients that had not given their consent.

The Commission can assure the proper assignment of liability in all circumstances by clarifying that the party determining the destination of the facsimile transmission is liable under the TCPA, while parties that do not control and have no knowledge of the destination of these transmissions are not. This is the only appropriate apportionment of liability because, in light of the EBR rule and other circumstances under which a database of consensual recipients may be developed, only the party controlling the destination can assess whether the facsimile transmission violates the TCPA. If the Commission fails to provide such clarification, it will encourage abuses of the TCPA and expose legitimate businesses to unacceptable litigation risks and liability, to the ultimate detriment of consumers.[4]

**B. The FCC Should Clarify that the TCPA Does Not Prohibit the Transmission of Unsolicited Advertisements to Fax Servers and Personal Computers, Including Transmissions to So-Called "eFax Accounts."**

The services offered by eFax.com and similar Web-based service bureaus typically are provided for free or at a flat monthly charge and enable users to receive facsimile transmissions as attachments to e-mail messages. These services operate banks of fax servers that receive facsimile transmissions on behalf of their clients and convert these transmissions in real-time

[4] The Commission also should specify that businesses may reasonably rely on the representations of independent contractors and telemarketers regarding those customers with whom these entities claim to have an established business relationship. This issue is discussed as a general matter in Section II.C., *infra*, but the Commission also should clarify that businesses may rely on independent contractors' and telemarketers' representations with respect to facsimile advertising.

into electronic files that end-users receive as an e-mail message attachment.[5] Faxes are received, converted and retransmitted electronically by these services without ever being reduced to paper. Indeed, the faxes delivered via these services are never converted to a paper image unless the end-user affirmatively chooses to print the attachment using a peripheral device.

As Nextel explained in its initial comments, the transmission of faxes to computer fax servers like those operated by eFax.com or to ordinary PCs falls outside the scope of the TCPA, because such transmissions never are sent to a "telephone facsimile machine."[6] As expressly defined by Congress, a "telephone facsimile machine" must have the capacity either to transcribe text or images from paper into an electronic signal, or to transcribe text or images from an electronic signal onto paper.[7] Neither fax servers nor PCs provide this functionality.

Without citation to any supporting authority, some commenters erroneously assert that faxes sent to eFax service accounts should be subject to TCPA restrictions because they inflict the same harm to consumer interests that the TCPA was intended to prevent. This is allegedly because recipients "must open the e-mail, open the attachment, wait for the reader software program to open, examine the ad, close several windows, and delete the ad."[8] These commenters ignore the fact that, with a few key strokes, the recipient of a fax transmission from eFax can easily delete the message from her inbox without ever opening or examining it. The slight effort

---

[5] *See The Technology Behind eFax* at <http://www.efax.com/products/technology.html>

[6] *See* Comments of Nextel Communications, Inc. at 30-37 ("Nextel Comments").

[7] *See* 47 U.S.C. § 227(a)(2).

[8] *See* Comments of Michael Worsham at 20 ("Worsham Coments").

involved in discarding an e-mail fax attachment does not implicate the harms that Congress sought to redress through the TCPA.[9]

The TCPA is not an unsolicited commercial e-mail statute. As the FCC has recognized, Congress designed the Act to redress a very specific cost-shifting problem posed by the transmission of advertising material to conventional stand-alone fax machines.[10] As the House Report accompanying the TCPA explained, "facsimile machines are designed to accept, process and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine."[11]

A consumer cannot avoid absorbing the costs, however slight, of receiving an advertisement over a conventional stand-alone fax machine. She can, however, delete an unwanted eFax message, as she can any other e-mail message, without incurring any costs whatsoever. The costs for printing and paper associated with the receipt of conventional fax advertisements are integral to the constitutional justification for the TCPA's unique restrictions on this form of commercial speech – restrictions that are far more onerous than those imposed under any unsolicited commercial e-mail statute. In the absence of these costs, the constitutional justification for these restrictions falls away. As the United States Supreme Court explained, "[t]he First Amendment does not permit the government to prohibit speech as intrusive unless

---

[9] *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, *Memorandum Opinion and Order*, 10 FCC Rcd. 12391, 12405 (1995) ("*1995 TCPA Reconsideration Order*").

[10] *See id.*

[11] H.R. REP. No. 102-317, at 25.

the 'captive' audience cannot avoid objectionable speech."[12] Applying this principle in a closely analogous context involving a law that purported to prohibit certain forms of direct mail advertising, the Supreme Court noted that recipients could avoid unwanted mailings simply by throwing them away and concluded that "the short, though regular, journey from the mailbox to trash can . . . is an acceptable burden, at least so far as the Constitution is charged."[13] If anything, deleting an eFax advertising message involves an even more transient burden than the slight effort involved in discarding unwanted junk mail. Accordingly, the First Amendment does not permit the application of the TCPA or the FCC's rules to prohibit the transmission of advertising material through eFax accounts and similar services.

### C. The Commission Should Amend Its Regulations To Include Facsimile Advertisements Expressly In Its Existing Business Relationship Rule.

The Commission asks in the *NPRM* whether it should preserve its current EBR rule for facsimile advertisements and, if so, whether the Commission should amend its regulations to provide expressly for the rule. Both questions should be answered in the affirmative. The EBR rule is just as necessary in the facsimile advertising context as it is in the telemarketing arena to avoid unduly restricting ongoing business relationships, raising business costs, and limiting the flow of beneficial information from businesses to their customers. Moreover, the record contains no evidence that facsimiles sent in legitimate reliance on the EBR rule have had any adverse impact on consumer privacy. The Commission has express authorization to adopt rules implementing the facsimile advertising provisions of the TCPA,[14] and the agency should

---

[12] *Bolger v. Young's Drug Prods. Corp.*, 463 U.S. 60, 72 (1983) (internal quotation omitted).

[13] *Id.*

[14] *See* 47 U.S.C. § 227(b)(2).

exercise its authority to codify this rule as it has been continuously communicated by the Commission to consumers and businesses for many years.

The Commission acknowledges that it determined long ago that "a prior business relationship between a fax sender and recipient establishes the requisite consent to receive telephone facsimile advertisement transmissions," and that this determination amounts to "an effective exemption from the prohibition on sending unsolicited facsimile advertisements . . ."[15] This Commission determination is entirely consistent with the legislative history emphasizing that Congress did not intend for the TCPA to interfere unduly with "ongoing business relationships."[16] Moreover, businesses have operated for years in reasonable reliance on the framework established by the Commission.

Although the Commission undoubtedly never would initiate an enforcement action against businesses for sending fax advertisements in compliance with its existing EBR rule, its rulemaking decisions have direct implications for pending and future private lawsuits. Courts owe extreme deference to the Commission's interpretation of its own rules and authorizing statutes, and the TCPA predicates a private right of action directly upon violations of the Commission's rules.[17] Plaintiffs' lawyers undoubtedly would argue that the Commission's failure to affirm expressly its current EBR rule would constitute grounds for a retroactive change in the standard of liability applied in private actions under the TCPA. Accordingly, non-action by the Commission could trigger new claims by the plaintiffs' bar against thousands of

---

[15] *NPRM*, ¶ 25 (citing *1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12408-09).

[16] H.R. Rep. No. 102-317, at 1; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, *Report and Order*, 7 FCC Rcd 8752, 8770-71 (1992) (*TCPA Report and Order*). *See generally*, Part II, *infra*.

[17] *See* 47 U.S.C. § 227(b)(3)(A) (authorizing a private action "based on a violation of this subsection *or the regulations prescribed under this subsection* . . . .") (emphasis added).

businesses arising out of their past conduct and expose them to devastating statutory damages for facsimile advertisements transmitted in compliance with the Commission's current rules.

These new claims would violate businesses' due process rights. As the D.C. Circuit Court of Appeals explained, the "FCC through its regulatory power cannot, in effect, punish a member of the regulated class for reasonably interpreting FCC rules."[18] Or as the same court announced in another decision,

> Because due process requires that parties receive fair notice before being deprived of property, we have repeatedly held that in the absence of notice – for example, where the regulation is not sufficiently clear to warn a party about what is expected of it – an agency may not deprive a party of property by imposing civil or criminal liability. We thus ask whether by reviewing the regulations and *other public statements issued by the agency*, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform . . . .[19]

Thus, regardless of the outcome of its review of the EBR rule, the Commission must foreclose any retroactive claims based on businesses' adherence to the Commission' current policy, by announcing that prior reliance on the Commission's current rule were justified. The Commission should unequivocally acknowledge that companies have been fully justified in relying on its effective EBR rule for facsimiles, and confirm that no facsimile advertisement transmitted prior to the effective date of any final decision by the Commission in this proceeding can give rise to civil liability (in a private lawsuit or otherwise) if sent to a recipient with whom the sender or advertiser had formed an established business relationship.

---

[18] *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987); *accord, Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986).

[19] *Trinity Broadcasting of Florida, Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) (emphasis added; internal quotations and citation omitted).

Of course, as a fundamental matter of federal communications policy, the Commission should exercise its authority to codify its existing EBR rule for facsimile advertisements. Only two commenters argue that the Commission lacks authority to adopt the EBR rule for facsimile advertisements, relying almost exclusively on the doctrine of *expressio unius est exclusio alterius* ("the expression of one is the exclusion of the other."). Specifically, they contend that, by providing an express EBR rule for telephone solicitations while remaining silent on facsimile advertisements, Congress has precluded the Commission from determining that an established business relationship supplies the necessary consent to facsimile advertisements.

These arguments ignore a long line of D.C. Circuit decisions holding that "[w]hatever its usefulness in other circumstances . . . this canon has little force in the administrative setting."[20] As the Court noted in *Cheney*, *expressio unius* is "an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved."[21] This doctrine is rarely applied to overturn an administrative agency's interpretative judgments, because it disregards too many plausible alternative explanations for Congressional silence. As the D.C. Circuit explained:

> The drafter (here Congress) may simply not have been focusing on the point in the second context; and, where an agency is empowered to administer the statute, Congress may have meant that in the second context the choice should be up to the agency. Indeed, where a court cannot find that Congress clearly resolved an issue, it presumes an intention to allow the agency any reasonable interpretative choice.[22]

---

[20] *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991); *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 68-69 (D.C. Cir.), *cert denied* 498 U.S. 985 (1990); *Health Ins. Assoc. of America v. Shalala*, 23 F.3d 412, 422 (D.C. Cir. 1994).

[21] *See Cheney*, 902 F.2d at 69.

[22] *Clinchfield Coal Co. v. Federal Mine Safety and Health Review Com'n*, 895 F.2d 773, 779 (D.C. Cir. 1990) (internal citation omitted).

Unless a statute has "directly addressed a precise question at issue," a federal agency's interpretations of its provisions are binding, if reasonable.[23] Because the TCPA has not addressed this issue directly,[24] the Commission can and should amend its rules to incorporate expressly its existing EBR rule for facsimile advertising context.

## II. The Commission Should Retain the Current Established Business Relationship Rule and Incorporate It Into Any National Do-Not Call Scheme It May Adopt.

As Nextel explained in its initial comments, the Commission's current EBR rule fulfills Congress's intention to create a flexible framework that allows businesses to maintain, renew, and build upon established customer relationships.[25] Maintaining the current EBR rule within a national do-not-call system is necessary to preserve consumers' rights to receive desired commercial information from companies with which they have chosen to do business, and avoid unduly interfering with the marketing of new and expanded products and services to existing customers.[26] The Commission's flexible EBR rule appropriately balances telemarketers' First Amendment rights, consumers' right to be free of unwanted communications, and consumers' equally important right to receive desired commercial information.

The EBR rule is mandated by the TCPA and cannot be severed from the statutory scheme without additional legislation.[27] Advocates for the evisceration of the current rule rely on the

---

[23] *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984*); Republican Nat. Committee v. Federal Election Com'n*, 76 F.3d 400 (D.C. Cir. 1996).

[24] *See Cheney*, 902 F.2d at 69; *Nuclear Information Resources Defense Council, Inc. v. NRC*, 969 F.2d 1169, 1173 (D.C. Cir. 1992) (en banc).

[25] *See* Nextel Comments at 11-16.

[26] *See id.* at 11-15; Comments of Verizon at 15 ("Verizon Comments"); Comments of Sprint Corporation at 17-18; WorldCom Comments at 14-16.

[27] *See* 47 U.S.C. § 227(c)(1)(d); Comments of SBC Communications Inc. at 9 ("SBC Comments").

premise that all consumers want to be free from all telemarketing.[28] The record in this proceeding shows that premise is false. Far from being universally spurned by consumers, telemarketing generates $600 billion annually.[29] As the National Retailers Federation observed, limitations on the EBR rule would foreclose a tremendous volume of commerce and seriously damage an industry that fosters transactions valued by millions of consumers.[30] The need for a flexible EBR is especially acute in the telecommunications industry, where suggested limitations threaten to solidify incumbent service providers' competitive advantages, in direct contravention of the Commission's mandate under the Telecommunications Act of 1996.

### A. The FCC Should Not Regulate the Duration of Established Business Relationships.

The FCC should refrain from regulating the duration of established business relationships, because such limitations are incompatible with the needs of consumers and businesses. Despite the absence of temporal restrictions in the text of the TCPA, several commenters have proposed limiting the EBR rule to calls made within a fixed time period following a particular customer contact.[31] The Federal Trade Commission ("FTC") has adopted an EBR rule that applies for just eighteen months from a prior purchase and three months from any other contact establishing a business relationship.[32] Such restrictions are not well conceived,

---

[28] *See* Comments of the National Consumers League at 5 ("NCL Comments"); Comments of the Electronic Privacy Information Center, et. al. at 1.

[29] *See NPRM*, ¶ 7 & n.35.

[30] *See* Comments of the National Retail Federation at 14-19.

[31] *See*, *e.g.*, Biggerstaff Comments at 18; Texas Office of Public Utilities Counsel Comments at 5 ("Texas PUC Comments"); Comments of the National Association of State Public Utility Advocates at 17 ("NASPUA Comments").

[32] *See* Telemarketing Sales Rule: Final amended Rule and Statement of Basis and Purpose, available at http://www.ftc.gov/os/2002/12/tsrfrn.pdf (Dec. 18, 2002) (to be codified at 16 C.F.R. part 310) ("*FTC Statement*") at 38-39 (explaining new 19 C.F.R. § 310.2(n)).

however, and are particularly inappropriate in the telecommunications industry, which is not subject to the FTC's jurisdiction under the Telemarketing Sales Rule (the "TSR"). The FCC should adhere to its current EBR rule and avoid arbitrary limitations on the term of established business relationships.

As Verizon observed, fixed time windows are incompatible with the needs of many businesses and their customers, leaving unprotected relationships that involve products or services that are needed or purchased on a seasonal, annual, or multi-year basis.[33] The continuity of business relationships based on biennial purchases are entitled to the same respect as those based on more frequent purchases. Such relationships would be stifled by arbitrary time limits and would disrupt valuable communications between consumers and the businesses they know and trust. Even a twenty-four month limitation[34] would frustrate the legitimate marketing efforts of many businesses, including wireless carriers, that compete in markets with high customer turnover and sell services typically provided under multi-year service agreements.[35] Consequently, carriers should be permitted to market new service packages even to former customers that switched carriers in the fairly distant past.

Thus, the FTC's eighteen-month limit on its EBR rule would be inappropriate for the

---

[33] *See* Verizon Comments at 14 (holiday season cards; girl scout cookies, travel agents, lawn maintenance); *see also* Comments of the Direct Marketing Association at 20 ("DMA Comments").

[34] *See, e.g.* Comments of the Magazine Publishers of America at 11 ("MPA Comments"); Texas PUC Comments at 5; NASPUA at 17.

[35] *See* Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993: Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, *Seventh Report*, 17 FCC Rcd 12985, 13007 (rel. July 3, 2002) (describing wireless churn rates).

telecommunications industry, particularly the highly competitive wireless industry.[36] Congress has mandated that the FCC promote vigorous competition in the telecommunications sector of the economy,[37] and that goal would be undermined by arbitrary limits on the period during which competitive carriers can attempt to win customers who have inquired about their services. These limitations would tend to increase incumbent carriers' market power by insulating their customers from competing offers at precisely the time when such information would be most valuable to consumers – at the end of a long-term service commitment. Arbitrary time limitations also are incompatible with the competitive needs of wireline carriers, whose viability depends on their ability to reach customers served by dominant incumbent service providers.

Limiting the EBR rule to three months after a consumer inquiry also would harm competition. The ability to market to inquiring consumers is essential to carriers' ability to compete because these customers have demonstrated an interest in a particular carrier's services. It is unrealistic to assume that this interest would disappear after only three months, especially given that many wireless customers commit to service agreements that last at least twelve to twenty-four months. As a result, a wireless carrier's best opportunity to attract that customer may occur long after the three-month window.

Moreover, arbitrary time restrictions on the EBR rule would dramatically increase administrative burdens and costs for all businesses as they would be forced to monitor and record every customer inquiry and purchasing pattern to ensure compliance with the FCC's rules. These costs would prove especially harmful to new entrants by draining their competitive resources. Likewise, arbitrary time restrictions inevitably would strain the FCC's enforcement

---

[36] *See generally* WorldCom Comments at 14-15.

[37] *See* Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996).

and administrative resources.[38] As the Direct Marketing Association has pointed out, the more complicated the rule, the more difficult (and expensive) enforcement becomes.[39]

These substantial burdens to competition and administrative efficiency are not justified by any public benefit. Existing company-specific do-not-call requirements already protect consumers by enabling them to terminate an established business relationship at any time.[40] In this way, the TCPA and the Commission's existing rules place control over the duration of established business relationships where it belongs – with consumers.

**B. The Commission Should Not Narrow the Definition of an Established Business Relationship To Require an Actual Purchase or Transaction.**

There is no basis in the text or legislative history of the TCPA to require an actual purchase before businesses gain the protection of the EBR rule. Although the Commission did not propose this restriction,[41] some commenters have requested it.[42] This restrictive definition (which, notably, was rejected by the FTC when it revised its TSR) would curtail many legitimate and beneficial communications between businesses and consumers who have manifested an affirmative interest in a business's products or services by means other than an actual purchase.

As Nextel noted in its initial Comments, Congress specifically intended the EBR rule to permit businesses to follow up with consumers who have requested information about a product

[38] *See* DMA Comments at 20.

[39] *See id.*

[40] *See* SBC Comments at 12.

[41] *See NPRM*, ¶ 34.

[42] *See*, *e.g.*, Biggerstaff Comments at 18; Worsham Comments at 10; NASPUA Comments at 17; Texas PUC Comments at 5; Electronic Retailing Association Comments at 11 ("ERA Comments"); NCL Comments at 5.

or service, regardless of whether the initial inquiry resulted in a purchase.[43] Accordingly, the FCC's inclusion in its EBR rule of "voluntary two-way communication[s]" that do not result in a purchase is both prudent and necessary to effectuate Congress' intent.[44]

In contrast, purchase requirements would contravene the legislative purposes underlying the TCPA.[45] Such requirements also would create unfair competitive advantages for incumbent service providers in broad sectors of the economy. For example, WorldCom notes that limiting the EBR rule to purchases would permit incumbent local exchange carriers ("ILECs") to market long distance services to their enormous installed customer bases, but prevent competitive long distance carriers from calling these same consumers even if they had affirmatively inquired about competitive products or services.[46] Competitive local exchange carriers ("CLECs") likewise would be barred from contacting an ILEC's customers. As with the duration restrictions discussed above, this anti-competitive restriction is unnecessary in light of existing company-specific do-not-call rules. The EBR rule is designed to permit marketing only to those consumers who have affirmatively manifested an interest in the caller's product or service offerings, and the current rule does precisely that.

### C. The FCC Should Clarify That the Use of Third-Party Contractors Does not Jeopardize the Applicability of the Established Business Relationship Rule.

Companies such as Nextel have relationships with third parties such as independent

---

[43] *See* Nextel Comments at 12 ( quoting H.R. Rep. No. 102-317 at 13: "consumers who previously have expressed interest in products or services offered by a telemarketer are unlikely to be surprised by calls from such companies or to consider them intrusive").

[44] *See* 47 C.F.R. § 64.1200(f)(4).

[45] *See* Ohio PUC comments at 15-16; Texas PUC Comments at 6; New York Consumer Protection Board Comments at 15 ("NYCPB Comments").

[46] *See* WorldCom Comments at 14-15.

dealers that market Nextel products and services, and contractors that perform various telemarketing functions. The Commission's clarification of its EBR rule also should address these relationships. The Commission's current EBR rule expressly exempts any "call or message by, *or on behalf of*, a caller . . . [t]o any person with whom the caller has an established business relationship at the time the call is made."[47] Verizon asks the Commission to clarify that companies that have established business relationships with certain consumers can use third-party contractors to call those consumers without jeopardizing the protection of the EBR rule.[48] Nextel agrees that the Commission's rule allowing companies to pass through their EBR protection to entities calling on their behalf is well grounded in policy and should be applied to any new or modified rules that the Commission may adopt, including any national do-not-call regime.[49] From the consumer's standpoint, it makes no difference whether she is contacted by a company employee or by a contract representative calling on that company's behalf.[50]

In some circumstances, the consumer may have an established relationship with the company's independent dealer or telemarketing contractor (rather than with the company itself),

---

[47] 47 C.F.R. §§ 64.1200(c); 64.1200(e)(2)(iii) (emphasis supplied). *See also* The Telephone Consumer Protection Act of 1991, *Notice of Proposed Rulemaking*, 7 FCC Rcd 2736, 2738 (1992) (". . . the Commission proposes an exemption to liability for calls placed by a caller, or on behalf of a caller, to its clientele.").

[48] *See* Verizon Comments at 14. *See also* SBC Comments at 11 (requesting clarification that established business relationship exemption applies to affiliated marketing companies); NASPUA Comments at 18; NCL Comments at 5.

[49] Permitting companies to use third-party contractors to contact their customers regarding product offers also is consistent with the Commission's decision to allow contractors retained by charities to rely on the exemption for tax-exempt nonprofit organizations when calling on the charities' behalf. *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12396-97.

[50] The established business relationship rule adopted by the FTC reflects the same judgment. The FTC expressly permits a telemarketing contractor to contact a seller's customers on the seller's behalf, notwithstanding a customer's registration on the FTC's national do-not-call list. *See* new 19 C.F.R. § 310.4(b)(1)(iii)(B)(ii).

which provides the requisite consumer consent to receiving telemarketing communications from that dealer or contractor. Under this scenario, the company should be able to rely on the dealer or telemarketing contractor's representation that it has the requisite customer consent to contact the consumer. The company should not be exposed to liability under the TCPA as a result of any misrepresentation by the independent dealer or contractor in this regard. Accordingly, the Commission should clarify that companies may rely on the customer lists provided by their dealers and contractors to demonstrate the existence of consumer consent under the EBR rule, and liability under the TCPA rests with the entities that represent they have obtained the requisite consent to contact the consumer.

### D. The Commission Should Continue to Recognize That the Established Business Relationship Is a Company-Specific Rule and Not a Product or Service-Specific Rule.

The Commission should reaffirm that the EBR rule exempts *businesses*, not only the products or services, that initially formed the underlying business relationship. Currently, the EBR rule permits businesses to contact consumers with whom the business has formed an established business relationship.[51] Any attempt to limit the EBR rule to only those calls concerning products or services "related" to the original transaction would be inconsistent with the language and purpose of the statute. Congress wisely chose not to limit businesses' ability to market new and different products to their customers, and instead authorized an EBR rule that allows companies to "build upon, follow up, or renew" customer relationships.[52] The mandate of

---

[51] *See* 47 U.S.C. § 227(a)(3) ("The term "telephone solicitation means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message . . . *to any person with whom the caller has an established business relationship*.") (emphasis supplied).

[52] *See* Nextel Comments at 13 (citing H.R. Rep. No. 102-317, at 13-16).

the statute is clear: the EBR protects relationships between consumers and sellers and does not limit the scope of those relationships to dealings related to any particular products or services.

Even if the FCC had the authority to implement a "relatedness" requirement, it would not be in the public interest to do so.[53] Attempting to manage a product-based "relatedness" standard would create ambiguity, "chill" the marketing of new and expanded products and services beneficial to customers, invite wasteful litigation and likely result in arbitrary and conflicting FCC and judicial decisions.[54]

Additionally, technical innovations and developments since the passage of the TCPA in 1991 have enabled many companies to offer multiple services traditionally sold by separate providers over a single network or technology platform. For example, today, wireline and wireless carriers (both fixed and mobile) as well as cable and satellite service providers, all vie to provide Internet services in addition to their traditional voice or video services. As Nextel explained in its initial Comments, telecommunications service providers will continue to rely on telemarketing efforts to current customers to drive consumer acceptance of new and advanced technologies critical to the development of the information economy.[55] These new services will offer many benefits and efficiencies for consumers, and there is every reason to believe that consumers would welcome information about these new offerings from their existing providers. Nonetheless, such communications would be chilled and unduly complicated by carriers' concerns that new services might not be sufficiently "related" to services, products, or

---

[53] Notably, the FTC did not limit the products that a caller may market to its existing customers, even though it limited the extent to which the EBR applies to businesses' affiliated entities. *See FTC Statement* at 39.

[54] *See* Xpedite Comments at 9 (describing hypothetical questions that could be raised by a "relatedness" standard); DMA Comments at 19 (same).

[55] *See* Nextel Comments at 14-15.

information previously provided to a customer to satisfy a nebulous "relatedness" requirement.[56] Companies should not be punished for their innovation, and they are in a better position than federal agencies to predict the types of new service and product offerings that will be welcomed by existing customers. Accordingly, the FCC should refrain from limiting the scope of the EBR rule in a way that would restrict the flow of beneficial information about new products and services to business's existing customers.

## CONCLUSION

For the foregoing reasons, the Commission should specify that liability rests with the party who determines the destination of any telemarketing transmissions, clarify that the TCPA does not prohibit the transmission of unsolicited advertisements to fax servers and personal computers, and retain and codify its current formulation of the EBR.

Respectfully submitted,

**NEXTEL COMMUNICATIONS, INC.**

/s/ To-Quyen Truong

Robert McNamara
Senior Counsel - Regulatory
Frank Triveri
Special Counsel – Office of Privacy
**NEXTEL COMMUNICATIONS, INC.**
2001 Edmund Halley Drive
Reston, VA 20191

(703) 433-4000

To-Quyen Truong
Scott Dailard
Jason E. Rademacher
**DOW, LOHNES & ALBERTSON, PLLC**
1200 New Hampshire Avenue, NW
Suite 800
Washington, DC 20036

(202) 776-2000

January 31, 2003

Its Attorneys

56 *See id.*