# EXHIBIT I

Case3:13-cv-02219-HSG Document209-3 Filed07/16/15 Page1 of 19

# EXHIBIT B

Case3:13-cv-02219-HSG Document209-9 Filed07/16/15 Page2 of 19



# EXPERT REPORT OF ROBERT BIGGERSTAFF

Prepared in the matter of:

***True Health Chiropractic, Inc., v. McKesson Corp.***

No. 13-CV-02219

Pending in the Federal District Court for the Northern District of California

April 22, 2015

**Notice**

This report is proprietary and confidential. If you are not the intended recipient of this document, any use, dissemination, distribution, or duplication of this document or any portion of its contents is expressly prohibited. The information contained in this document may also be privileged and/or subject to nondisclosure under applicable court rules.

Copyright© 2015 Robert Biggerstaff. All Rights Reserved. No portion of this document or any exhibits, appendices, attachments, or any other parts hereof, in whole or in part, may be duplicated or used for any purposes without the express written permission of the author.

**Disclaimer**

This document many contain or describe software, algorithms, methodologies, processes, texts, businesses methods, patents, or other items that are the property of other entities and used under license or other permitted use. Any implementation, distribution, storage, copying, or other use of such property may be subject to restrictions.

Any registered marks used within this document are the property of their respective owners. They are used herein only for the purposes of identification and do not indicate any endorsement or approval by those owners.

Linux® is a trademark of Linus Torvalds.
Windows® is a trademark of Microsoft Corporation.
Visual FoxPro® is a trademark of Microsoft Corporation.
HylaFAX® is a trademark of Silicon Graphics, Inc.
Slackware® is a trademark of Patrick Volkerding.
ReiserFS® is a trademark of Hans Reiser and the Naming System.
FaxFacts® is a registered trademark of Copia International, Ltd.
GNU® is a trademark of the Free Software Foundation.
CAAS® and ISETTLE® are trademarks of A.B. Data, LTD.
MySQL® is a trademark of Oracle Corporation.
MariaDB® is a trademark of Monty Program Ab.
FTK® is a trademark of Access Data, Inc.
Zetafax® is a trademark of Equisys.
RightFax® is a trademark of Captaris, Inc.
WinHex® and X-Ways Forensics® are trademarks of X-Ways Software Technology AG.
ActFax® is a registered trademark of ActFax Communication
Encase® and EnScript® are trademarks of Guidance Software, Inc.
DB2® and RACF® are trademarks of IBM Corp.
WinFax® is a trademark of Symantec Corp.
eFax® is a registered trademark of j2 Global.
Reference Legal®, SalesGenie® and InfoUSA® are trademarks of Infogroup, Inc.
ACT!® is a trademark of Sage Software, Inc.
Goldmine® is a trademark of FrontRange Solutions USA Inc.

# Table of Contents

**Executive Summary** .......... **4**

**Retention and Scope of Work.** .......... **4**

**Background and Qualifications.** .......... **4**

**Materials Reviewed.** .......... **5**

**Analysis.** .......... **7**

- Excel Spreadsheets of fax transmission data .......... 7
- Excel Exhibits to Interrogatory Responses. .......... 7
- Specimen faxes. .......... 9

**Facsimile Technology Standards.** .......... **9**

- Background. .......... 9
- Description of the phases of a fax transmission. .......... 10
- All Group III faxes use a positive acknowledgment protocol. .......... 12
- Confirmation of receipt and subsequent events. .......... 14

**Conclusions.** .......... **15**

**Table of Exhibits.** .......... **17**

## Executive Summary

1. I was asked to examine materials provided by counsel in order to identify documents related to fax transmissions. I found these records documented 83,038 fax transmissions, of which 62,125 were confirmed received. Those 62,125 received faxes were set to 11,979 unique normalized fax numbers. The individual fax numbers to which each of those transmissions were sent, and the content of those faxes, are documented in those records.

## Retention and Scope of Work

2. On May 13, 2014 I was retained in this matter and was informed that I was disclosed pursuant to Rule 26. Ryan Kelly requested that I review records in this case and to report my opinions regarding those records and fax transmissions recorded in those records.

3. Some of the materials I examined are or may be subject to the *Stipulated Protective Order* entered in this matter dated March 21, 2014. This document may therefore contain materials subject to the provisions of that Order.

## Background and Qualifications

4. I obtained a Bachelors of Science in Engineering from Clemson University in 1987. I am retired from the position of Senior Support Systems Engineer, overseeing computer operations at a large production facility. I have continuously worked in the computer field for over 30 years, including work involving VLDB (Very Large DataBase) projects for the Department of Defense and large corporations. My particular expertise for most of this time has been design and implementation of large database projects, network design, forensics and data recovery, and network/ computer security. This includes forensic examinations, intrusion detection, incident response, evidence preservation, integration and analysis of disparate data sources, and complex data recovery and analysis across a wide array of media, operating systems, and platforms from 1984 to present.

5. I am a certified computer forensic examiner and a member of the International Society of Forensic Computer Examiners ("ISFCE"). I have 30 years of experience in forensic computer examinations and data recovery. I have been retained as a forensic

computer expert in over 300 court cases and have performed hundreds of data recovery and ESI preservation assignments across many diverse platforms and filesystems.

6. I have direct experience in the role that computer records play in claims under the Telephone Consumer Protection Act ("TCPA"), specifically with regard to analyzing those records for the purposes of identifying persons to whom facsimile advertisements were sent for purposes of class certification and class notice.

7. As part of my work in network and database design, and as a consultant, I have had direct experience with many facets of facsimile technology, including computer-based facsimile systems, as well as technical specifications and details of facsimile transmissions. This includes both evaluation and testing of many different systems, service and maintenance of such systems on a day to day basis, installation and configuration of such systems, as well as writing drivers and other software for facsimile-enabled software applications.

8. I have extensive knowledge of how fax transmissions are processed, the standards involved, how the various types of devices that send and receive faxes operate, and how various fax forwarding and delivery technologies function over both packet-switched and circuit-switched networks.

9. I have worked with records from many different fax broadcasters, as well as reviewing testimony, forensic examinations of computers used in fax broadcasting, user guides, and many other documents from those companies. In doing so, I have acquired an extensive base of knowledge regarding their records and business practices.

## Materials Reviewed

10. In addition to any materials cited elsewhere herein, I reviewed the following material in the process of producing this report:

    a. Four (4) Specimen faxes attached as exhibits to the Second Amended Complaint.

    b. Three Excel Spreadsheets:

        - RS-TRUEHEALTH 0000350 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx

Case3:13-cv-02219-HSG Document209-3 Filed07/16/15 Page9 of 19



- RS-TRUEHEALTH 000345 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx
- RS-TRUEHEALTH 000351 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx

c. Letters dated Feb 6, 2015 and Jan. 20, 2015 from Tyree Jones to Matthew Stubbs, matching fax templates to specific jobs.

d. Letters dated April 13, 2015 and April 22, 2015 from Tiffany Cheung to Glenn Hara, matching fax templates to certain spreadsheets of fax transmission data.

e. Production archive of 35 Excel spreadsheets, "2015-04-08 (RS-TRUEHEALTH 000402 - 000436).zip"

f. Production archive of 45 fax templates and 3 Excel spreadsheets "2015-04-02 (RS-TRUEHEALTH 000352 - 000401).zip."

g. Defendants McKesson Corporation & McKesson Technologies, Inc.'s Response to Interrogatory Regarding Prior Express Invitation or Permission, dated April 2, 2015, and three exhibits thereto:

- Exhibit A "RS-TRUEHEALTH 000399 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx."
- Exhibit B "RS-TRUEHEALTH 000400 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx."
- Exhibit C "RS-TRUEHEALTH 000401 - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.xlsx."

11. I have also relied generally on applicable facsimile standards including *Procedures for document facsimile transmission in the general switched telephone network, ITU-T T.30* and *Standardization of Group 3 facsimile terminals for document transmission, ITU-T T.4*.

12. I have also relied generally on orders, notices, and other promulgations of the Federal Communications Commission ("the Commission") regarding the agency's administration of the TCPA.

13. In preparing this report, I have also relied on knowledge and skills I acquired through my education, training, career, and experience.

## Analysis

***Excel Spreadsheets of fax transmission data***

14. The three Excel files contained columns of fax transmission (log) records for nine (9) fax jobs and columns of contact data (such as name and address) for the recipients of those fax transmissions. Within the 3 Excel files, data for each of the 9 jobs was segregated into separate tabs, with each tab identifying a job number.

15. The production archive with 35 Excel spreadsheets contained similar data with each Excel file containing data for a single job.

16. In total, these records documented 44 separate fax broadcast jobs. These records contain data that are consistent with data I regularly review that are recorded automatically by a computer-based fax broadcasting platform. In my experience, data produced by such automatically recording systems is highly reliable and accurate, particularly when reporting the metadata regarding individual fax transmissions.

17. As is typical in records I frequently review from computer-based fax broadcasting platforms, these data indicate, among other things, the date, time, destination fax number, and results (e.g. pages confirmed received) for each fax transmission. [1]

18. The summary transmission data for the 44 fax broadcasting jobs, is set out as a table in Exhibit 1 hereto.

19. As reflected in Exhibit 1, the combined documents contained 83,038 fax transmission records, of which 62,125 were confirmed received.[2] Those 62,125 received faxes were sent to 11,979 unique normalized fax numbers.

***Excel Exhibits to Interrogatory Responses***

---

1. Ten of the Excel files did not contain complete metadata about the fax transmissions contained therein. These are indicated on Exhibit 1. For purposes of this analysis, I have treated these records as records of fax transmissions that were **not** received, however other data or testimony may establish that some other treatment is appropriate. These are shown in Exhibit 1 with 0 faxes received.

2. As stated on Exhibit 1, I have excluded one record from one log on the basis that it appears invalid.

Case3:13-cv-02219-HSG Document209-3 Filed07/16/15 Page9 of 19



20. I examined the three spreadsheets attached as exhibits to Defendants McKesson Corporation & McKesson Technologies, Inc.'s Response to Interrogatory Regarding Prior Express Invitation or Permission, dated April 2, 2015 ("Interrogatory Exhibits").

| Filename | Interrogatory Exhibit | Number of data rows | Unique fax numbers |
|---|---|---|---|
| RS-TRUEHEALTH 000399.xlsx | Exhibit A | 13,390 | 13,390 |
| RS-TRUEHEALTH 000400.xlsx | Exhibit B | 2,701 | 2,701 |
| RS-TRUEHEALTH 000401.xlsx | Exhibit C | 55 | 55 |

21. I then compared these three Interrogatory Exhibits to the fax numbers found in the transmission data for the 44 fax broadcasting jobs summarized in Exhibit 1 hereto. I found a high degree—but not complete—overlap based on normalized 10-digit fax numbers. For example, 321 of the fax numbers in the file "RS-TRUEHEALTH 000399.xlsx" ("Exhibit A") were **not** found in **any** of the 44 fax transmission logs. This strongly indicates that either: 1) all the fax logs have not been produced; or 2) the representation that Bates 399 (Exhibit A) only contains customers that received copies of the faxes that have been produced is not accurate.

22. To document the coordinate records between the 44 fax transmission logs and the three above spreadsheets, I generated a list of the 16,446 unique (normalized) fax numbers derived from the combined 83,038 fax transmission records in the 44 log files. I found 11,979 of those 16,446 unique fax numbers had 1 or more confirmed received fax transmissions.

23. I then joined that list of 16,446 unique fax numbers, based on normalized 10-digit fax number, to each of the three Interrogatory Exhibits. The results are attached as Exhibit 2 hereto, and identify for each of the 16,446 unique fax numbers, the number of total records, the number of records documenting a received fax transmission, and a notion for each of the three above Interrogatory Exhibits (if any) that contain that fax number.

24. Using these data, I determined that 10,150 unique fax numbers with confirmed received fax transmissions documented in the 44 fax logs, were found in **one or more** of the three Interrogatory Exhibits.

25. This analysis also found 1,829 unique fax numbers with confirmed received fax transmissions documented in the 44 fax logs, that were **not** found in **any** of the three above spreadsheets. Those 1,829 unique fax numbers received a confirmed 9,313 total fax transmissions.

26. This analysis found 7,670 unique fax numbers with confirmed received fax transmissions documented in the 44 fax logs, that were found **only** in the file "RS-TRUEHEALTH 000399.xlsx" (Interrogatory Exhibit A) and do not appear in Interrogatory Exhibits B or C. Those 7,670 unique fax numbers received a confirmed 39,495 total fax transmissions.

***Specimen faxes***

27. I examined the four faxes attached as exhibits to the Second Amended Complaint, and specifically examined the "header" information to determine what the header stated as date/time of the transmission and the destination fax number to which that transmission was sent. Such information in the headers is automatically created by the fax broadcasting platform which sends the faxes. I then found corresponding records for each fax in the fax transmission records as follows:

| Complaint Exhibit | Header Fax # | Header Date/Time | Job | Date/Time From Fax Log |
|---|---|---|---|---|
| Exhibit A | 614-794-1625 | 04/20/10 13:18 | 22222 | 04/20/2010 01:20:35 PM |
| Exhibit B-1 | 865-687-0279 | 02/03/10 13:32 | 14625 | 02/03/2010 01:33:32 PM |
| Exhibit B-2 | 865-687-0279 | 02/22/10 11:47 | 16294 | 02/22/2010 11:48:08 AM |
| Exhibit B-3 | 865-687-0279 | 05/11/10 08:09 | 24573 | 05/11/2010 08:11:14 AM |

28. Each of the corresponding fax transmission log records for these four faxes was correctly recorded as a fully received transmission.

## Facsimile Technology Standards

***Background***

29. There are four basic facsimile transmission standards established by the International Telecommunication Union (see http://www.itu.int/home/) known as Group 1, Group 2, Group 3, and Group 4. Group 1 and Group 2 are obsolete. Group 3 is the current

standard used by most fax machines bought today. Group 3 employs the T.30 standard which defines the procedures necessary for an analog document transmission between two facsimile devices on the public switched telephone network or PSTN. A T.30 standard facsimile machine can generally send a fax transmission at speeds up to 33.6 Kbps in about 25 seconds per page under good conditions. See ITU-T T.30. Group 4 is a more advanced standard that is used for fax transmissions over digital phone lines such as ISDN, with speeds up to 64Kbps, sending a page in as little as 2 seconds per page. By using these standards, facsimile machines that comply with them can communicate with facsimile machines from other manufacturers that follow the same standards, much like light bulb manufacturers can make light bulbs that will fit into other manufacturer's light fixtures as long as both are using the same standards for that size light bulb socket. The T.30 standard employs a positive confirmation protocol, whereby a fax transmission is positively confirmed by the receiving machine before the sending machine will record the transmission as successful.

***Description of the phases of a fax transmission***

30. The T.30 standard identifies five distinct phases of a fax transmission:

a. Phase A - Call establishment

b. Phase B - Pre-message procedure

c. Phase C - In-message procedure and message transmission

d. Phase D - Post-message procedure

e. Phase E - Call release

31. Prior to beginning a T.30 standard fax transmission, the content of the document to be transmitted, called the "message," is converted into binary data in the correct format (the fax "image") as specified by the T.4 standard of which the most common resolutions are approximately (in scan lines per inch) 200x100 (standard), 200x200 (fine), or 200x400 (superfine). This may be done by scanning a printed document or by converting a digital file or data stream to binary data in the correct format and compressing it using algorithms such as modified Huffman or modified read compression (also specified by T.4). If a "header" is being used, often including a

date/time stamp, the sending fax machine creates it at this time and that header is also converted to a bitmap and made part of the fax image.

32. Unlike a typical human telephone conversation, with faxes, it is the calling machine that usually "speaks" first.[3] Fax sending takes place when the sending fax machine successfully enters the first step of the T.30 fax protocol. Phase A of a fax transmission begins when the sending machine acquires a dial tone and dials the phone, and then starts beaconing over the open telephone connection, that is it begins sending out data in the form of a calling tone, or CNG. If a device with a fax-modem on the other end of the phone line has answered the telephone call and receives the CNG, it can identify that a sending device is attempting to begin a T.30 fax transmission. This is what some people call "fax tones."

33. If a response to the CNG is sent by the receiving machine, the two devices begin Phase B or the pre-message procedure. This is often referred to as "handshaking" and during this phase, the devices exchange information about themselves, their capabilities, and they "negotiate" with respect to certain options to employ for the transmission of the message, such as resolution of the message. Training data are also sent during this phase to test the quality of the phone line and the agreed upon settings.

34. Phase C then begins, and the data constituting the message (the fax image) is transmitted. Error detection, in-message synchronization, and line supervision are also performed while packets of data making up the message are exchanged. The largest portion of the time of a fax transmission is generally spent in Phase C.

35. Phase D is reached when an end-of-page, end-of-message, or other terminating instruction is sent. An end-of-page or end-of-message instruction will cause the receiving device to send a confirmation message to the sender, after which both devices will return to a prior phase for transmission of additional pages. The positive confirmation of a facsimile transmissions occurs in this phase. An end-of-fax instruction which indicates no more messages are left to be sent will cause the receiving device confirm that message back to the sending device, and then to proceed to Phase E.

3. In some cases, particularly with multifunction devices that handle both voice and fax calls or manually assisted receipt, the receiving machine may wait a prescribed period of time and then begin beaconing its own fax tones to signal the sending device that a fax-modem has answered.

Case3:13-cv-02219-HSG Document209-3 Filed07/16/15 Page13 of 19



36. In Phase E, the sending device may transmit a disconnect signal, disconnect, or the timeout period may expire for Phase E with the sending machine. The T.30 standard specifies that a fax transmission ends with the conclusion of Phase E.

***All Group III faxes use a positive acknowledgment protocol***

37. Certain aspects of the postal mail can be used as an analogy for T.30 fax transmissions. When you send a first-class letter, there is always the possibility that it may not be delivered. This is a known possibility with the postal service method of delivering letters.[4] Knowing it is a possibility, a protocol was developed to solve the problem of possible non-delivery, which is to send the letter "return receipt requested." The sender then has proof of the date of delivery, as well as a signature. If the return receipt does not come back (for whatever reason) then the sender has no confirmation of receipt, so the transmission is unsuccessful. This is known as a "positive acknowledgment" protocol.

38. A T.30 fax transmission is a 2-way conversation between two fax machines. Not only is the content of the document image (the "payload") sent from one fax machine to the other, but the two fax machines exchange many pieces of information about the capabilities each has, and about the document image itself. In addition to individual commands and messages, the fax image itself is broken up into individual, self-contained pieces of information, sent to the receiving fax machine, and then the image is "reassembled" at the other end. Continuing the postal service analogy, it is like playing chess by mail, and sending each move with a return receipt card. If you don't get a return receipt back for one move, you can resend it (retransmit), and if you do get the return receipt back, you proceed to the next move. This assures each person is looking at the same chessboard.

39. The T.30 protocol is robust and reliable. The protocol fully expects that commands, messages, and pieces of the fax image sent between fax machines may be lost or corrupted. T.30 solves that problem with special coding such as High-Level Data Link Control ("HDLC") frames. Messages between the two fax machines are packaged into HDLC frames, which include a 16-bit CRC code (the Frame Check Sequence or "FCS") that protects against any errors or corruption.

---

4. The U.S. Postal Service reported in 2006, that 4.7 million parcels and 93.1 million letters were undelivered. *2006 Comprehensive Statement*, USPS. 2006.

40. For each command in the T.30 protocol, there are permitted responses, further ensuring that the fax transmission is protected against any errors such as dropped connections, programming errors, hardware failures, or poor quality phone lines.

41. The T.30 protocol also has error correction ("ECM") which provides 100% accurate image transmissions. A fax image is divided into 64-byte or 256-byte ECM frames and each ECM frame is protected against corruption with a 16-bit CRC. The frames are numbered and any missing or corrupted frames are detected by the receiving machine. Both fax machines know exactly how many frames, blocks, and pages are in the document. For example, at the end of a typical fax transmission, the sending machine sends a PPS message as illustrated below. (Illustration follows).




The PPS message format.

42. This procedure guarantees the receiving machine knows **exactly** what was sent (number of pages, blocks, and frames) and it is protected against corruption by a 16-bit CRC. Any errors in the data or in the messages such as the PPS, are immediately detectable. Each frame has its own CRC, so each individual frame is protected against corruption. For a single-page fax image that contained 170 frames of 256-bytes each of data (a typical single-page consisting of 43K of image data), the sending machine says with the PPS:

*I sent page 1, block 1, that was 170 frames of image data.*

43. The receiving machine **must** respond. If it does not, the fax transmission is recorded as unsuccessful. This is the "positive acknowledgment" aspect of T.30.

44. The receiving fax machine may respond with either a *negative* confirmation message or a *positive* confirmation message. Each confirmation message is also HDLC encoded to protect against any corruption. A typical positive confirmation is an MCF or "message confirmation" message. This means the fax data was checked for any corruption or missing frames, and it was successfully received. A typical *negative* confirmation is a PPR or "partial page request" message, where the receiving machine requests some of the frames be retransmitted, because they contained errors. Lack of a response message, or anything other than a positive confirmation message as the final message from the receiving machine, is logged as a failed transmission by the sending machine.

45. Noisy phone lines and other issues can impact the success rate of faxes. However, those issues have no effect on the ***accuracy*** of the results that record which faxes are received since a positive confirmation is received evincing error-free receipt. Even on a telephone line of very poor quality where 99% of the faxes fail to go through, the receipt of the positive confirmation of successful receipt for the 1% that did go through means exactly that—positive confirmation of successful transmission for those individual faxes. Whether 99% of the faxes fail or 99% of them succeed, those that succeeded can be 100% accurately determined by the T.30 protocol. Put another way, while line quality can affect the success rate of T.30 fax transmissions on that line, it has no effect on the accuracy of the results reporting the fax transmissions on that line as a successful error-free transmission. Whatever the success rate, the T.30 protocol will successfully determine it.

***Confirmation of receipt and subsequent events***

46. In my experience, a record of a "successful" transmission by computer based facsimile transmission systems reflects the successful completion of all the necessary phases of the T.30 fax transmission to a device with a fax-modem and appropriate software. This is true regardless of the type of fax machine (i.e., a "stand-alone" fax machine or a computer with a fax-modem) which received the T.30 fax transmission. This is demonstrated by the receipt from the receiving machine of the positive confirmation of receipt of the transmission (e.g. the message confirmation or "MCF").

47. I have reviewed testimony, documentation, and other documents regarding many facsimile transmission systems, and in particular, systems used for computer-based fax broadcasting. In my experience, the positive confirmation of receipt of the transmission (e.g. the message confirmation or "MCF") is always used as the determining factor when recording a transmission as successfully received versus unsuccessful.

48. Many things can happen to the contents of a fax message after the end of the T.30 fax transmission.

49. I can categorically state that without exception, every device of which I am aware that can receive a T.30 fax transmission, has the capacity to use a regular telephone line for the receipt of a T.30 fax transmission and to print the contents of the T.30 fax transmission.

50. Because a record of a successful transmission by a facsimile transmission system capable of sending standard T.30 fax transmissions, reflects the successful completion of all necessary phases of the T.30 fax transmission to a device with a fax-modem, and every device with a fax-modem capable of receiving a T.30 fax transmission has the capacity to receive that transmission over a regular telephone line and to print the contents of that transmission, a record of a successful transmission by a computer based facsimile transmission system is a record that such a transmission was sent to and received by equipment which has the capacity to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

## Conclusions

51. Taken as a whole, all the available evidence I have reviewed indicates the records I examined are, to a very high degree of certainty, authentic and accurate records of fax transmissions and were contemporaneously recorded automatically by computer software.

52. These records document 83,038 fax transmission, of which 62,125 were confirmed received.

53. Those 62,125 received faxes were sent to 11,979 unique normalized fax numbers.

54. The individual fax numbers to which each of those fax transmissions were sent, and the content of those faxes, are documented in these records.

55. After excluding any fax numbers that are found in the three spreadsheets attached as exhibits to Defendants Interrogatory Responses (Bates Nos. 399, 400, and 401) there are 1,829 unique fax numbers remaining, which received a total of 9,313 confirmed fax transmissions.

56. The facts, conclusions, and opinions stated herein are made to a reasonable degree of scientific certainly based upon examination of the available information. The principles and methods I have used are reliable, repeatable, and generally accepted. To the extent any portion of this report is based on limited information or where further analysis, testimony, opinions, or information are provided, the contents of this report are subject to revision and supplementation.

Robert Biggerstaff, CCE

International Society of Forensic Computer Examiners CCE

April 22, 2015

Case3:13-cv-02219-HSG Document209-3 Filed07/16/15 Page18 of 19



## Table of Exhibits

1. Table of fax templates with associated logs and job numbers.

2. List of 16,446 unique fax numbers with number of received fax transmissions, and status indicators.

# EXHIBIT 1

| Fax Template | Transmission Log | Total Records | Faxes Received | Job Date | Job ID |
|---|---|---|---|---|---|
| RS-TRUEHEALTH 000352 | RS-TRUEHEALTH 000404 | 4,068 | 4,068 | 12-Jan-2010 | 12332 |
| RS-TRUEHEALTH 000353 (aka Bates 0000346) | RS-TRUEHEALTH 000350 | 471 | 379 | 1-Feb-2010 | 14310 |
| RS-TRUEHEALTH 000354 | RS-TRUEHEALTH 000405 | 780 | 780 | 1-Feb-2010 | 14314 |
| RS-TRUEHEALTH 000355 | RS-TRUEHEALTH 000406 | 4,027 | 4,027 | 1-Feb-2010 | 14345 |
| RS-TRUEHEALTH 000356 (SAC Ex. B1) | RS-TRUEHEALTH 000345 | 7,092 | 4,422 | 3-Feb-2010 | 14625 |
| RS-TRUEHEALTH 000357 (SAC Ex. B2) | RS-TRUEHEALTH 000345 | 6,619 | 3,948 | 22-Feb-2010 | 16294 |
| RS-TRUEHEALTH 000358 (SAC Ex. B3) | RS-TRUEHEALTH 000345 | 1,718 | 1,066 | 11-May-2010 | 24573 |
| RS-TRUEHEALTH 000359 | RS-TRUEHEALTH 000417 | 114 | 114 | 20-Apr-2010 | 22195 |
| RS-TRUEHEALTH 000360 | RS-TRUEHEALTH 000350 | 6,492 | 3,984 | 20-Apr-2010 | 22218[1] |
| RS-TRUEHEALTH 000361 | RS-TRUEHEALTH 000418 | 558 | 558 | 20-Apr-2010 | 22219 |
| RS-TRUEHEALTH 000362 (SAC Ex. A) | RS-TRUEHEALTH 000351 | 6,479 | 4,281 | 20-Apr-2010 | 22222 |
| RS-TRUEHEALTH 000363 | RS-TRUEHEALTH 000419 | 354 | 354 | 20-Apr-2010 | 22223 |
| RS-TRUEHEALTH 000364 | RS-TRUEHEALTH 000345 | 1,718 | 1,097 | 20-Apr-2010 | 22194 |
| RS-TRUEHEALTH 000365 | RS-TRUEHEALTH 000420 | 115 | 115 | 11-May-2010 | 24577 |
| RS-TRUEHEALTH 000366 | RS-TRUEHEALTH 000421 | 610 | 610 | 11-May-2010 | 24599 |
| RS-TRUEHEALTH 000367 | RS-TRUEHEALTH 000422 | 4,391 | 4,391 | 11-May-2010 | 24601 |
| RS-TRUEHEALTH 000368 | RS-TRUEHEALTH 000423 | 476 | 476 | 2-Sep-2009 | 2486 |
| RS-TRUEHEALTH 000370 | RS-TRUEHEALTH 000424 | 4,562 | 4,562 | 2-Sep-2009 | 2488 |
| RS-TRUEHEALTH 000372 | RS-TRUEHEALTH 000425 | 4,574 | 4,574 | 17-Sep-2009 | 2996 |
| RS-TRUEHEALTH 000373 | RS-TRUEHEALTH 000426 | 469 | 469 | 17-Sep-2009 | 2997 |
| RS-TRUEHEALTH 000374 | RS-TRUEHEALTH 000427 | 473 | 473 | 5-Oct-2009 | 3689 |
| RS-TRUEHEALTH 000375 | RS-TRUEHEALTH 000428 | 4,545 | 4,545 | 5-Oct-2009 | 3702 |
| RS-TRUEHEALTH 000376 (aka Bates 0000348) | RS-TRUEHEALTH 000350 | 693 | 485 | 7-Oct-2009 | 3998 |
| RS-TRUEHEALTH 000377 | RS-TRUEHEALTH 000429 | 443 | 443 | 23-Oct-2009 | 5584 |
| RS-TRUEHEALTH 000378 | RS-TRUEHEALTH 000430 | 157 | 157 | 23-Oct-2009 | 5594 |
| RS-TRUEHEALTH 000379 | RS-TRUEHEALTH 000431 | 165 | 165 | 2-Nov-2009 | 6391 |
| RS-TRUEHEALTH 000381 | RS-TRUEHEALTH 000432 | 442 | 442 | 9-Nov-2009 | 7026 |
| RS-TRUEHEALTH 000382 | RS-TRUEHEALTH 000433 | 433 | 433 | 16-Nov-2009 | 7690 |
| RS-TRUEHEALTH 000383 | RS-TRUEHEALTH 000434 | 441 | 441 | 20-Nov-2009 | 8290 |
| RS-TRUEHEALTH 000384 | RS-TRUEHEALTH 000435 | 4,454 | 4,454 | 1-Dec-2009 | 8945 |
| RS-TRUEHEALTH 000385 | RS-TRUEHEALTH 000436 | 1,186 | 1,186 | 2-Dec-2009 | 9096 |
| RS-TRUEHEALTH 000386 (aka Bates 0000349) | RS-TRUEHEALTH 000350 | 6,882 | 4,414 | 16-Dec-2009 | 10470 |
| RS-TRUEHEALTH 000387 | RS-TRUEHEALTH 000402 | 171 | 171 | 16-Dec-2009 | 10472 |
| RS-TRUEHEALTH 000388 | RS-TRUEHEALTH 000403 | 41 | 41 | 28-Dec-2009 | 11140 |
| RS-TRUEHEALTH 000389 | RS-TRUEHEALTH 000407 | 6,619 | 0 | n/a | 17592 |
| RS-TRUEHEALTH 000390 | RS-TRUEHEALTH 000408 | 26 | 0 | n/a | 18347 |
| RS-TRUEHEALTH 000391 | RS-TRUEHEALTH 000409 | 14 | 0 | n/a | 18348 |
| RS-TRUEHEALTH 000392 | RS-TRUEHEALTH 000410 | 6 | 0 | n/a | 18350 |
| RS-TRUEHEALTH 000393 | RS-TRUEHEALTH 000411 | 7 | 0 | n/a | 18353 |
| RS-TRUEHEALTH 000394 | RS-TRUEHEALTH 000412 | 7 | 0 | n/a | 18356 |
| RS-TRUEHEALTH 000395 | RS-TRUEHEALTH 000413 | 6 | 0 | n/a | 18358 |
| RS-TRUEHEALTH 000396 | RS-TRUEHEALTH 000414 | 32 | 0 | n/a | 18361 |
| RS-TRUEHEALTH 000397 | RS-TRUEHEALTH 000415 | 50 | 0 | n/a | 18363 |
| RS-TRUEHEALTH 000398 | RS-TRUEHEALTH 000416 | 58 | 0 | n/a | 18516 |
| | | **83,038** | **62,125** | | |

1. One data record in this job appeared to be corrupted, and was not counted.