# EXHIBIT J

Case 4:13-cv-02219-HSG Document 373 Filed 10/10/24 Page 34 of 178

TIFFANY CHEUNG (CA SBN 211497)
TCheung@mofo.com
BONNIE LAU (CA SBN 246188)
BLau@mofo.com
ANGELA E. KLEINE (CA SBN 255643)
AKleine@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.6511
Facsimile: 415.268.7522

ERIN P. LUPFER (CA SBN 317994)
ELupfer@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendants
MCKESSON TECHNOLOGIES INC. and
MCKESSON CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TRUE HEALTH CHIROPRACTIC, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MCKESSON CORPORATION, et al.,<br><br>Defendants. | Case No. 4:13-CV-02219-HSG<br><br>**DEFENDANTS' UPDATED EXPERT REPORT OF KEN SPONSLER**<br><br>Hon. Haywood S. Gilliam, Jr. |

Case 4:13-cv-02219-HSG Document 364 Filed 03/05/20 Page 35 of 175

I, Ken Sponsler, declare as follows:

1. I am Senior Vice President of CompliancePoint Litigation Services ("CompliancePoint"), a wholly-owned subsidiary of PossibleNOW, Inc., with offices in Duluth, Georgia.

2. I have been engaged by Morrison & Foerster LLP on behalf of McKesson Corporation and McKesson Technologies Inc. (collectively "McKesson") to re-assess the expert report and opinions of Plaintiff McLaughlin Chiropractic Associates, Inc.'s expert Robert Biggerstaff.

**SUMMARY OF OPINIONS**

3. I have reached the conclusions set forth below based on my re-review of the two Biggerstaff Reports and the materials cited by Mr. Biggerstaff, as well as other case materials made available to me, listed in Exhibit A, in addition to my expertise and experience in the telecommunications industry. Some of the events that have transpired in the last five years that impact my opinions are a new Federal Communications Commission ("FCC") Declaratory Ruling[1] regarding efaxes adopted in December 2019, new case law, and increased churn across the class due to the passage of time.

4. A significant percentage of class members likely did not receive the fax through a "telephone facsimile machine" as defined by the TCPA. Instead, they used an Internet-based or commercial online fax service that converted faxes to a digital image and notified their customers of the receipt by email. These customers did not receive a fax with a telephone facsimile machine over a regular telephone line. The Biggerstaff Report does not identify whether any class member received the fax image by a "telephone facsimile machine" versus through an Internet-based fax service.

5. Since I rendered my opinions in June, July, and August 2015 rebutting Mr. Biggerstaff's two 2015 reports, almost five years have passed. This passage of time contributes

[1] https://docs.fcc.gov/public/attachments/DA-19-1247A1.pdf – accessed January 3, 2020.

to the impossibility to reliably identify the class members who received the faxes at issue between 2009-2010.

6. Churn of businesses and/or their fax telephone numbers since 2009-2010 is a significant factor in this case. Churn occurs when businesses, including medical practices, change their fax numbers, often in connection with going out of business, merging with others, or modifying their practice areas. Faxes received by a business at a specific fax numbers over ten years ago are unlikely to be associated with the same fax number today due to numerous factors described below.

7. Sworn declarations by major U.S. telephone carriers demonstrate the futility of Mr. Biggerstaff's suggestion that Plaintiffs could subpoena historical subscriber records from these carriers. Notably, it is my understanding that Plaintiffs have not served any subpoenas on these carriers in the five years since Mr. Biggerstaff proposed it.

8. Claims regarding Notice Distribution made by Dorothy Sue Merryman, Sr. Project Manager of Class-Settlements.com, are unverified.

## FAX BACKGROUND

9. **What is an efax?** An efax is a web-based or Internet fax service, also referred to as an online fax, Internet fax, virtual fax, fax to email, digital fax, electronic fax, or vfax. Efax services convert a traditional facsimile transmission into a digital file (typically PDF or TIFF files), allowing faxes to be received and sent via email or accessed via an online portal maintained by the efax service provider. It functions like a webmail (Gmail, Hotmail) service for faxes. The system can integrate with email and other software systems. Users of efax services can usually designate their old "analog" fax number as their efax number or utilize a new number provided by the efax service provider during account set up. Companies using efax services can designate certain persons within their organization to send and receive email attachments of .PDF or .GIF images to and from their efax service account.

10. Efax service refers to any system of faxing where faxes travel partially or completely over the Internet, including regular fax machines communicating with the T.38 fax standard. For example, an efax service can receive a fax from a traditional fax machine, then

convert it to a .PDF or image file and send it via email to recipients designated by customers. Compared with a traditional fax machine, an efax subscriber is not required to maintain equipment, ink/toner, paper, or a landline phone line. The .PDF or image files received as attachments to email may be viewed, deleted, stored, forwarded to others, or printed if needed or desired. No telephone line is "tied up" and there are never busy signals with efaxing. Setting up an efax service is quite easy to do – most of the technology is straightforward. In most cases, all that is needed is an Internet connection, email address, and credit card.[2]

11. The fax "phone number" assigned to an efax service will convert incoming and outgoing faxes to an electronic document that can be managed online via email or through the Web Interface provided by the efax service provider. In other words, no traditional fax machine is needed by the customers of online fax services in order to receive faxes; therefore, no paper or toner is used at all, unless the recipient freely decides to print rather than delete or save fax images on a computer hard drive, thumb drive, or other electronic storage.

## QUALIFICATIONS

12. I have over 20 years of operational experience in business-to-business and business-to-consumer global direct marketing compliance matters. I have personally conducted dozens of onsite compliance assessments, gap analyses, and risk assessment studies. I have assessed numerous call center operations on behalf of potential seller-clients as a due diligence measure prior to sellers entering into contractual relationships for services. I have assessed several facsimile campaigns as a component of my compliance reviews. Additionally, my company has performed fax-specific data analyses and historical subscriber/user research.

13. I founded CompliancePoint's consulting practice, which, among other things, provides historical call data compliance analysis and wireless identification services for clients. These services include call data audits in support of compliance monitoring and enforcement efforts. In my role at CompliancePoint, I have served as a court-appointed monitor, as well as an expert witness, to perform historical call record analyses for the purpose of determining

[2] https://faxauthority.com/online-fax/ - accessed January 3, 2020.

Case 4:13-cv-02219-HSG Document 374-11 Filed 01/10/25 Page 6 of 28

compliance with the Telephone Consumer Protection Act ("TCPA"). As a result, I am intimately familiar with the methodologies that must be used to perform call record analysis and analysis of facsimile transmissions.

14. Prior to taking on my role at CompliancePoint, I also served in a critical role at PossibleNOW, CompliancePoint's parent company. PossibleNOW is an industry leader in telemarketing and telephone communications compliance services. It not only performs compliance suppression and analysis services for companies engaged in telephone communications, it is also the federal government's contractor responsible for performing hygiene on the NDNCR.

15. During my compliance consultative engagements, I have routinely evaluated and opined upon matters related to faxing, including third-party fax service providers. Due to this consultative work, I am familiar with the TCPA's fax-related regulations, as well as the myriad of modern-day faxing technology. I have been retained as an expert witness in approximately twenty-three fax-related cases.

16. Finally, as a member and previous Vice Chairman and member of the Executive Committee of the National Board of Directors for the Professional Association of Customer Engagement ("PACE"), formerly the American Teleservices Association, I interact with hundreds of corporate compliance professionals and companies/providers involved in consumer contact operations. A copy of my CV is attached hereto as Exhibit B.

**SUMMARY OF EXPERT EXPERIENCE**

17. In the last four years I have been retained to provide deposition testimony as an expert in the following matters:

*Bridge v. Credit One Bank*, 2:14-cv-01512 (D.Nev.); *Raffin v. Medicredit*, 2:15-cv-04912 (C.D.Cal.); *Keim v. ADF Midatlantic,* 9:12-cv-80577 (S.D.Fla.); *Marcus v. CVS Pharmacy*, 3:15-cv-00259 (D.N.J.); *Tomeo v. Citigroup and CitiMortgage,* 1-13-cv-04046 (N.D.Ill.); *Tillman v. Ally Financial*, 2:16-cv-00313 (M.D.Fla.); *Slovin v. Sunrun*, 4:15-cv-05340 (N.D.Cal.); *Gorss Motels v. Brigadoon Fitness,* 1:16-cv-00330 (N.D.Ind.); *Larson v. Harman-Management Corp. and 3Seventy*, 1:16-cv-00219 (E.D.Cal.); *Glasser v. Hilton Grand Vacations Co.*, 8:16-cv-00952

(M.D.Fla.); *Gorss Motels v. Otis Elevator Co.*, 3:16-cv-01781 (D.Conn.); *Bakov v. CWT,* 1:15-cv-02980 consolidated with 1:17-cv-00973 (N.D.Ill.); *Gorss Motels v. AT&T*, 3:17-cv-00403 (D.Conn.); *Knapper v. Cox Communications*, 2:17-cv-00913 (D.Ariz.); *Bennett v. GoDaddy.com*, 16-cv-03908 (D.Ariz.); *Sliwa v. Bright House Networks*, 2:16-cv-00235 (M.D.Fla.); *Gorss Motels v. Sprint*, 3:17-cv-00546 (D.Conn.); *Gorss Motels v. Lands' End*, 3:17-cv-00010 (D.Conn.); *E&G, Inc. v. Mt. Vernon Mills*, 6:17-cv-00318 (D.S.C.); *America's Health & Resource Ctr. & Affiliated Health Grp. v. Alcon*, 1:16-cv-04539 (N.D.Ill.); *Hunter v. Time Warner Cable*, 1:15-cv-06445 (S.D.N.Y.); *Morgan v. Orlando Health, Inc. et al.*, 6:17-cv-01972 (M.D.Fla.); *San Pedro-Salcedo v. The Häagen-Dazs Shoppe Company*, 5:17-cv-03504 (N.D.Cal.); *Grigorian v. FCA US*, 1:18-cv-24364 (S.D.Fla.); *Morgan v. Adventist Health System/Sunbelt, Inc.*, 6:18-cv-01342 (M.D.Fla.); *Kawa Orthodontics v. LabCorp*, 9:19-cv-80521 (S.D.Fla.); and *Clark v. FDS Bank et al.*, 6:17-cv-00692 (M.D.Fla.).

I have qualified as an expert in Federal District Court and provided trial testimony in the matters of *United States of America v. DISH Network*, No. 3:09-cv-03070 (C.D.Ill.), and *ADT Security Services Inc. v. Security One International*, No. 11-cv-05149 (N.D.Cal.).

## MATERIALS REVIEWED AND RELIED UPON

18. In preparing this report and rendering my opinions in this case, I reviewed various documents made available to me by McKesson's counsel that were produced in this matter, as well as the materials considered by Mr. Biggerstaff. My opinions and conclusions are relevant to the class period in this matter: September 2, 2009, to May 11, 2010. A list of all documents I relied upon for this report is attached as Exhibit A. I also relied upon my knowledge of fax transmission systems, fax detail records, as well as operational matters related to TCPA, as amended by the Junk Fax Prevention Act ("JFPA") and the Federal Communications Commission's ("FCC") Declaratory Ruling DA19-1247 In the Matter of Amerifactors Financial Group, LLC Petition for Expedited Declaratory Ruling, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 0278, Junk Fax Protection Act of 2005, CG Docket No. 05-338, adopted and released December 9, 2019. I performed research, as noted, on various fax delivery and receipt mechanisms in common use as well as the evolution of

Case 4:13-cv-02219-HSG Document 363 Filed 10/24/24 Page 40 of 173

the technology. My opinions are also formed by my experience with historical telephone number compliance audits and reviews of consumer contact operations including fax campaigns. I stay current with industry developments—both in terms of technology and compliance—and this knowledge has also informed my opinions.

## OPINIONS

19. Mr. Biggerstaff erroneously assumed that the class members – the recipients of the faxes – are identified in the documents produced in this case. That is not the case. The individuals and entities identified in the fax transmission logs are simply the customers separately associated with the fax numbers in Defendants' customer databases. The three terms "recipient," "user," and "subscriber" are not synonymous but may overlap. The term "recipient" could be any person who picked up the fax from the fax machine. "User" encompasses anyone authorized to use the fax machine, even if they are not the owner, subscriber, or person who picked up the fax at issue. The term "subscriber" is more limited and means the account holder (i.e., the person or business billed by the telecommunications provider for use of the fax number). In 2015, I opined, "*In paragraph 11 of Mr. Biggerstaff's 2nd Report, Mr. Biggerstaff's assertion that 'in practice, the current subscriber is the same as the person who used the number 5 years ago in 2010 for the majority of the 11,979 phone numbers at issue' is completely baseless, and he offers no evidence to support this opinion. Additionally, any number of employees, including administrative personnel, could have used these fax machines five years ago without necessarily being the account holder. The subscriber may have authorized numerous individuals to give out the fax number and receive faxes at that number. Authorized users of fax services and fax machines may also be much more transient than subscribers, due to employee turnover and movement within a company*." I reaffirm my opinion and emphasize that now, more than five years after my above-referenced report and approximately ten years after the faxes at issue were allegedly sent, it is even more improbable that the same entity that used a particular fax number in 2009/2010 uses that same fax number today, and even more difficult to determine who actually received the fax a decade or so ago. The original named Plaintiff True Health Chiropractic, Inc., which is now

permanently closed,[3] is a prime example of this movement in the healthcare industry, especially of single and/or small healthcare providers going out of business and/or merging with a large healthcare organization.

## I. The Proliferation Of Internet-Based Facsimile Technology Presents Major User Identification Issues In This Case That Are Not Addressed By The Plaintiff.

20. On December 9, 2019 the FCC issued an order on a petition for declaratory relief filed by Amerifactors Financial Group LLC on July 13, 2017. The FCC held that:

> **[A]n online fax service** that effectively receives faxes 'sent as email over the Internet' and is not itself 'equipment which has the capacity ... to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper' is not a 'telephone facsimile machine' and thus **falls outside the scope of the statutory prohibition**.[4]

### a. *History of efax services*

21. Efax technology is a technological advancement that has completely changed faxing. The first efax services became available in the early to mid-1990s.[5] Since then, individuals, businesses, and other organizations have been able to choose from a wide selection of Software-as-a-Service ("SaaS"), Integration-as-a-Service ("IaaS"), Platform-as-a-Service ("PaaS"), and numerous other options that have rapidly been displacing traditional fax machines and the dial-up modem technologies of yesteryear.

22. There are many efax service or commercial facsimile providers that offer faxing service at cheap prices. Nearly every efax provider will provide users with a fax phone number

---

[3] https://www.google.com/search?rlz=1C1GCEU_enUS821US821&ei=E7UPXqKtDcTa-gTIw5nADQ&q=True+Health+Chiropractic%2C+Inc.+ohio&oq=True+Health+Chiropractic%2C+Inc.+ohio&gs_l=psy-ab.3...6886.6886..7125...0.0..0.124.361.0j3......0....1..gws-wiz.......33i10.Pfn5pcZAW8c&ved=0ahUKEwjigvLlsujmAhVErZ4KHchhBtgQ4dUDCAs&uact=5 – accessed January 3, 2020.

[4] FCC Dec. 9, 2019, Amerifactors Order at ¶2 (emphasis added). https://docs.fcc.gov/public/attachments/DA-19-1247A1.pdf – accessed January 20, 2020.

[5] http://umich.edu/~archive/mac/misc/documentation/internetfaxingfaq0.7.txt; https://www.fax.com/aboutus.html; https://www.efax.com.au/docs/default-source/PressReleaseDocs/jcom_news_2012_8_8_general.pdf?sfvrsn=820383b5_0

when they join as customers. The chart below depicts some but certainly not all of the major US Efax Service Providers:

| Internet Fax Provider | Web Address | Founded |
|---|---|---|
| Fax.com | https://www.fax.com/ | 1996 |
| Metrofax | https://www.metrofax.com/home | 1997 |
| RingCentral | https://www.ringcentral.com/fax/features/how-it-works.html | 1997 |
| Vonage | https://www.vonage.com/business/business-cloud/features/paperless-fax/ | 1997 |
| eFax | https://www.efax.com/ | 2000 |
| MyFax | https://www.myfax.com/ | 2004 |
| Nextiva | https://www.nextiva.com/products/online-fax-service.html | 2006 |

Table 1

23. Since 1996, efax service has been made available to the general public allowing users to send and receive a facsimile via a computer without fax machines. Since then, it has been possible to fax and receive faxes online, from a computer.

24. Research shows in 2008, j2 (an efax provider that owns efax brands including eFax, MyFax, Metrofax, and Fax.com) had nearly 11.2 million Direct Inward Dial (DID) phone numbers deployed with more than 900,000 paying subscribers.[6]

25. By 2010, traditional faxing had largely disappeared, having fallen victim to the same technological and economic processes that had created it.[7]

---

[6] *See* Plunkett Research, Ltd., J2 Global Communications, published 2008, stating in relevant part: "j2 Global Communications, Inc. is an Internet-based global provider of messaging and communications services to individuals and businesses. The firm's services are marketed primarily under the brand names: jConnect, jBlast, eFax, eFax Corporate, eFax Broadcast, eFax Plus, and eFax Pro. The Fax Mail division, which represents the majority of the company's revenue." Plunkett's Companion to the Almanac of American Employers 2008, Mid-Size Firms, Jack W. Plunkett https://books.google.com/books?id=qeZy4K_FolsC&pg=PT378&dq=efax&hl=en&newbks=1&newbks_redir=0&sa=X&ved=2ahUKEwiejaL44PnmAhU-JzQIHYDTD_AQ6AEwAHoECAUQAg#v=onepage&q=efax&f=false – accessed January 10, 2020.

[7] *See* Faxed, The Rise and Fall of the Facsimile Machine, Jonathan Coopersmith (2015) (John Hopkins' University Press).

26. Efaxes are increasing at a rate of 12 percent per year, research shows. A 2012 market research report on computer-based faxing noted that the computer-based fax market was already $385 million in 2011, and expected to grow to $700 million in 2016, a 12.1% compound annual growth rate ("CAGR").[8, 9] Another researcher stated that the market for virtual fax services was anticipated to grow at an estimated 15.2 percent CAGR.[10]

***b. Benefits of efaxes***

27. The development away from the traditional fax machine has resulted in many businesses in the marketplace offering non-traditional faxing solutions, including, for example, those listed in Table 1 above. Many of these commercial facsimile services specifically market to the healthcare market, including entities such as plaintiffs in the instant matter, for example, expressly offering HIPAA-compliant fax services that enable health care professionals ("HCPs") to take advantage of efax solutions while remaining HIPAA compliant.[11] The privacy implications of efaxes are much improved and therefore appealing to companies large and small. Confidential information, such as Social Security Numbers, salary/wages, HIPAA, HR-related matters, accounting, medical, legal, and business-proprietary information will not need to be printed out on a paper fax that will sit on a tray with open access to anyone who happens to view or even take possession of the content.

28. Because efaxes offer a layer of security much greater than email, using efax services has increasingly become the standard way for many health practices to send their documents quickly and securely.[12] There are many variations of equipment and software. Companies, such as Plaintiffs McLaughlin and True Health Chiropractic (when it was still in

---

[8] Compound Annual Growth Rate.

[9] https://www.businesswire.com/news/home/20121120005651/en/Research-Markets-Computer-Based-Fax-Markets---Forecasts#.Us6_zGRDsxg - accessed January 3, 2020.

[10] https://bebusinessed.com/online-fax/impressive-stats-of-online-fax/ - accessed January 3, 2020.

[11] https://enterprise.efax.com/industry/healthcare - accessed January 3, 2020.

[12] Top Ten Reviews has searched and evaluated online fax services since 2006. https://www.toptenreviews.com/best-online-fax-services – accessed January 13, 2020.

business), can use efax services that host all of the equipment and software and require no phone-system integration. There are online services marketed to small businesses that require only an Internet connection. In short, the efax industry, the technology it utilizes, and the customer experience have evolved.

29. According to a recently released paper publishing research from International Data Group ("IDC"), 90 percent of fax users have already integrated or are evaluating integrating fax with other technologies or applications like email, or Enterprise Resource Planning ("ERP"), Customer Relationship ("CRM") and Electronic Health Record ("EHR") systems.

***c. Inability to identify which class members received efaxes***

30. Efax and commercial fax-type services make it nearly impossible for a web-based fax platform to determine if faxes were received by an Internet/cloud or "commercial" fax service or traditional premise-based analog fax machine, or how any such faxes might have been received. As a result, while it is almost certain that some of the class members' fax numbers were assigned to an efax/virtual fax/cloud-based fax number in 2009 or 2010, there is no way to determine which fax numbers were assigned to a fax machine as opposed to an efax service.

31. This is very much in line with the knowledge and experience I have acquired during my many years of working with fax providers. For example, in *Etter v. Allstate*, Barry Clark, Owner of WestFax,[13] a major efax broadcaster in today's marketplace, testified in July 2017 in relevant part:

> Question: "How do you know those [faxes] are successful? How do you know that number? Where did that come from?
>
> Answer: It came from the tone from the recipient's fax machine that says that the fax was received there; however, there's a significant question now as to what constitutes a received fax. Many and I previously testified that **60 percent**, even **as many as 60 percent**, is my estimation, **of faxes are now received via e-mail**."[14] (Emphasis added.)

---

[13] *See* Clark, Barry deposition, *Etter v. Allstate*, No. 3:17-cv-00184-WHA (N.D. Cal.), p. 5, 4:5.

[14] *Id*., p. 33, 24:25 and p. 34, 1:9.

Case 4:13-cv-02219-HSG Document 376-4 Filed 03/05/20 Page 45 of 75

32. The Fax Detail Records ("FDRs") produced relevant to this case do not show which faxes were "sent" to an Internet or email-based facsimile service, and therefore potentially not subject to the TCPA. Indeed, as Barry Clark acknowledged, ***there is no way to know whether the facsimile was received by a fax service that converts the transmission into an image and sends the image as an email to a recipient associated with the fax number***.[15]

33. As a result, while it is certain that some class members received efaxes not subject to the TCPA, it is impossible to different such class members from other class members that received faxes through a traditional telephone facsimile machine.

## II. Telephone Numbers, Including Fax Numbers, Experience Significant Churn Due to Changes in Fax Contact Numbers and Businesses Closing, Merging, or Consolidating.

34. Churn is relevant in this case in two significant ways. First, there is business churn. Businesses, including the medical profession, experience churn when providers close, are merged with other medical entities, or modify practice specialty areas. Business churn can impact the accuracy of previously listed fax numbers. A second aspect of churn is when entities, including medical practices, change telephone carriers, fax numbers, cease using a traditional fax machine, and/or convert to an efax service. In 2009-2010, continuing on to today, fax lines can be changed from analog lines connected to traditional fax machines to virtual fax numbers provided by efax service providers.

35. In paragraph 12 of Mr. Biggerstaff's 2nd Report, he refers to FCC documents regarding landline reassignment rates or churn. However, these rates did not then—nor do they now—distinguish residential from business landline churn. In my experience, business churn, particularly for small businesses, is significantly higher than residential telephone number churn.

36. Business churn in the health care industry is much higher than typical landline reassignments. In fact, a 2013 CNN Money article noted that "Chapter 11 bankruptcy filings by physician practices have spiked."[16] This fact is also supported by a 2014 Forbes article noting

---

[15] Mr. Clark *Etter* deposition, page 34.

[16] http://money.cnn.com/2013/04/08/smallbusiness/doctors-bankruptcy/ - accessed January 6, 2020.

that a "2014 survey of American docs that sampled 20,000 U.S. physicians found that 35% of doctors described themselves as independent, down from 49% in 2012 and 62% in 2008."[17] These facts are indicators that health care professionals of the type associated with this case are likely to have a much higher than average telephone number churn than that reported as the "average" churn in the FCC statistics cited by Mr. Biggerstaff.

37. In paragraph 13 of Mr. Biggerstaff's 2nd Report he inexplicably states that 24% of telephone numbers would be expected to be reassigned over the 5-year class period and that only 3% of telephone numbers are connected to fax machines. Research indicates that in 2009 there were approximately 152.87 million landlines active in the U.S.[18] By 2010 that number dropped to about 149.65 million active landlines in the United States,[19] approximately 10 million of those were business landlines (*see* paragraph 38). Two years later, in 2012, the number of landlines had dropped by 10.65 million to 139 million.[20] As of December 2013, the latest date for which the FCC has records, there are 85 million landlines—a number that has suffered a 10 percent decline each year. As of June 2010, the most recent date for which the FCC has data, over 185 million customers have ported wireless and landline numbers. (*see* FCC, Numbering Resource Utilization in the United States 33 (Apr. 2013). https://apps.fcc.gov/edocs_public/attachmatch/DOC-319997A1.pdf, accessed January 13, 2020). These include over 94 million landline to landline transfers, over 4 million wireline (landline) to wireless transfers, and about 275,000 wireless to landline transfers.[21] According to Fax Re-Brand, a fax research and statistical source,

---

[17] http://www.forbes.com/sites/scottgottlieb/2014/12/08/washingtons-plan-to-end-private-practice-medicine/ - accessed January 6, 2020.

[18] https://www.nationmaster.com/country-info/stats/Media/Telecoms/Telephone-lines#2009 – accessed January 6, 2020.

[19] http://www.nationmaster.com/country-info/stats/Media/Telecoms/Telephone-lines#2010 – accessed January 6, 2020.

[20] https://www.nationmaster.com/country-info/stats/Media/Telecoms/Telephone-lines#2012 – accessed January 6, 2020.

[21] *See* Brief of Amici Curiae EPIC and Six Consumer Privacy Organizations iso Respondents, *ACA Internat'l v. FCC*, no. 15-1222 (C.D. Cir.), pages 23 and 31, https://epic.org/amicus/tcpa/aca-international/EPIC-Amicus.pdf – accessed January 13, 2020.

there were over 18 million fax machines in the United States in 2010.[22] This equates to about 12% of telephone lines connected to fax machines in 2010, rather than 3% as Mr. Biggerstaff suggests.

38. Research shows that in 2010, more than 10 million businesses were using landline (aka fixed line) phones; however, by 2018 that number had fallen by more than one third to just 6.4 million. Thanks to dwindling landline use, experts now predict that traditional telephone systems are about to become a thing of the past.[23]

39. As I stated in my June 15, 2015 report (paragraphs 18-20), business telephone numbers are frequently disconnected and reassigned, meaning that just because a particular carrier shows that a certain telephone number is now assigned to it, does not mean that said number has always been assigned to that carrier. Mergers, acquisitions, and other industry changes redefined telecoms in recent years and continue to do so. What this means for this case is that in 2015 it was already extremely difficult to determine which carrier was assigned a particular number on a given day (before we even consider the data retention and disclosure practices of each and every carrier as it pertains to their historical subscribers). Now, an additional five years later, it is significantly more difficult.

40. CompliancePoint's parent company PossibleNOW, has been selected to perform "hygiene" on the National Do Not Call Registry. The hygiene process was instituted by the Federal Trade Commission ("FTC") after the Do-Not-Call Improvement Act of 2007 (the "Act") was enacted. Among other things, the Act eliminated the former expiration policy of telephone numbers on the Registry of five years. Telephone numbers now remain on the Registry permanently. However, the Act initiated a "hygiene" process whereby telephone numbers that have been disconnected from the original subscriber and reassigned to a different subscriber are removed from the Registry. PossibleNOW maintains historical National Directory Assistance

---

[22] https://faxrebrand.wordpress.com/2010/06/17/facts-and-statistics-fax-machine-groups/ - accessed January 3, 2020.

[23] https://markets.businessinsider.com/news/stocks/landlines-predicted-obsolete-by-2020-ultatel-explains-what-this-means-for-businesses-1027370976 – accessed January 13, 2020.

Case 4:13-cv-02219-HSG Document 536-11 Filed 10/24/25 Page 16 of 28

("NDA") 411 and business listing data, enabling them to perform the hygiene service. The NDA 411 data maintained by PossibleNOW includes daily updates of residential, business, and government telephone lines. This data feed is obtained through Listing Services Solutions Inc. ("LSSi"). LSSiDATA is a Tier 1 supplier of data, compiling residential, business, and government names, addresses and phone numbers directly from (and in partnership with) the vast majority of carriers in North America. Subscribers to this NDA list service, such as PossibleNOW, receive near daily updates (6 days a week) of listing changes to the 411 data.

41. The NDA data source and historical records maintained by PossibleNOW facilitated an analysis of the 11,979 fax numbers identified by Mr. Biggerstaff in 2015 in this case to determine: (1) how many numbers can be associated with a subscriber; and (2) how many numbers have been disconnected from the original subscriber and reassigned to a different subscriber after the last date a fax was purportedly sent to that number. The 2015 analysis of the 11,979 numbers revealed:

| **Data Point** | **Result** |
|---|---|
| 11,979 telephone numbers that received faxes were compared to the 411 directory; | 2,644 telephone numbers of the 11,979 telephone numbers that received faxes have Telco history in the 411 directory. |
| 2,644 telephone numbers with Telco History in the 411 directory were queried for first issue date after May 11, 2010; | 1,208 of the 2,644 telephone numbers show a first issue date after May 11, 2010. * |
| 2,644 telephone numbers with Telco History in the 411 directory were queried for re-issue dates after May 11, 2010; | 1,009 of the 2,644 telephone numbers were re-issued after May 11, 2010—579 telephone numbers with initial issue dates prior to May 11, 2010 and 430 telephone numbers with initial issue dates after May 11, 2011. ** |
| 2,644 telephone numbers were queried for active status on June 15, 2015; | 446 of 2,644 telephone numbers are currently active in the 411 directory as a business or residential listing. |

Table 2

* Telco History data consists of Telco Issue Date, Transaction Date, Processing Date, Transaction Code, Business/Residential designator.

** A single telephone number may have multiple Telco Issue Dates. A change in Telco Issue Date indicates a major change in the account—service address, payment information, etc.

Case 4:13-cv-02219-HSG Document 578-4 Filed 01/22/25 Page 49 of 75

42. The 2015 NDA data revealed that, on average four to five million business numbers were disconnected and reassigned annually.

43. At the conclusion of our analysis of the data in this case in 2015, we identified 2,644 telephone numbers that purportedly received faxes and we could identify historically in the National Directory Assistance Database (often referred to as the 411 Database), as shown in Table 2 above.

44. Now that the Class has been certified consisting of 9,499 telephone numbers, we compared the 2,644 telephone numbers that we identified in our 2015 analysis to find how many of those 2,644 numbers existed in the Class. This maintained the integrity of the analysis by working with numbers that we had a known history on from our previous analysis. This process produced a list of 2,178 of the previously identified telephone numbers that existed in the Class.

45. Using these 2,178 records, we replicated our 2015 analysis by querying the 411 database to insure that we had historical information on those records. As expected, we found historical information for all 2,178 numbers.

46. We then queried the 411 database for Telephone Company Issue Dates (Telco History Dates) for the 2,178 telephone numbers to identify which numbers had an initial Telco Issue Date after May 11, 2010. 1,004 of the 2,178 telephone numbers have initial Telco Issue Dates after May 11, 2010. This indicates that these telephone numbers were not issued by the Telco until *after* the date of the end of the class period. Therefore, they could not have received a fax during the class period.

47. We then queried the 411 database for any re-issue dates for the entire 2,178 record set for any re-issue activity after May 11, 2010. We found that 1,705 of the 2,178 records had re-issue indicators after May 11, 2010. Of those, 785 telephone numbers had initial issue dates prior to May 11, 2010, but had re-issue activity after May 11, 2010. This indicates that these telephone numbers no longer belong to the class member who owned it prior to May 11, 2010. 920 of the records that had initial issue dates after May 11, 2010, have re-issue activity after their initial issue dates. This is an indicator of the "churn" that takes place on these particular telephone numbers since the end of the class period.

48. Finally, we analyzed the 2,178 records for their current status in the 411 database. This analysis is done by identifying the last action taken on the account and finding that the last action is noted as an "I" (Insert as opposed to a "D" for delete). As of January 23, 2020, we found that 699 of the 2,178 telephone numbers have a current active status in the 411 database. The remaining 1,479 numbers are no longer active landlines. As a result, they cannot receive faxes, and there is no clear proof that they ever could. This is another indicator of the "churn" that has occurred in the decade since the end of the class period.

49. These findings are graphically depicted in Table 3 below.

| Data Point | Result |
|---|---|
| We compared the 2,644 telephone numbers that purportedly received faxes and had Telco history in the 411 directory in our 2015 analysis to the sub class of 9,499 telephone numbers. | 2,178 of the 2,644 telephone numbers that purportedly received faxes are in the proposed sub class. |
| 2,178 telephone numbers in the sub class that purportedly received faxes were compared to the 411 directory. | 2,178 telephone numbers in the sub class that purportedly received faxes have Telco history in the 411 directory. |
| 2,178 telephone number with Telco history in the 411 directory were queried for first issue data after May 11, 2010. | 1,004 of the 2,178 telephone numbers show a first issue date after May 11, 2010. |
| 2,178 telephone numbers in the sub class that purportedly received faxes were queried for re-issue dates after May 11, 2010. | 1,705 of the 2,178 telephone numbers that purportedly received faxes were re issued after May 11, 2010 - 785 telephone numbers with initial issue dates prior to May 11, 2010 and 920 with initial issue dates after May 11, 2010. |
| 2,178 telephone numbers that purportedly received faxes were queried for active status in the 411 directory on January 23, 2020. | 699 of 2,178 are currently active in the 411 directory as a business or residential listing. |

Table 3

50. Additionally, 40 telephone numbers on the class list are wireless. Eight of those telephone numbers are on the wireless block, so they have never been fax-lines. Thirty-two of those telephone numbers are ported wireless, which means that they cannot be fax lines anymore.

51. As a result of churn over the last decade, a significant number of the fax numbers on the class list may no longer belong to class members, and there is no administratively feasible method to identify the actual class members.

**REVIEW OF CLASS ADMINISTRATOR'S METHODOLOGIES**

52. In a letter to Counsel dated November 12, 2019, the Notice Administrator describes how the 9,499 fax numbers provided were compared to Class-settlement.com's *proprietary* database of fax numbers and related contact information. This memo describes at a very high level the steps supposedly taken by Class-settlement.com to identify and provide notice to alleged class members.

53. The Notice Administrator has not described how or if any of the sources or methodologies described that involve the use of third-party reverse look-up or fax ID services have been explained, audited, or verified. In paragraph (2) the Notice Administrator explains that some unknown reverse look-up process was used to determine "current ownership" of 9,499 fax numbers on the Class List. However, current owners are not necessarily class members, unless they were "recipients" of the fax(es) in question back in 2009/2010, which is highly unlikely.

54. Finally, the Notice Administrator did not account for efaxes or how the use of efax services may affect class notice. Efax service providers may offer "virtual" telephone numbers to their customers to use as a fax number. However, the efax service is paid directly by the customer. The efax service provider would have the relationship with the telephone service provider rather than the fax recipient. Therefore, a change of efax customer associated with a fax number through an efax service provider would not necessarily be registered with the telephone service. On February 5, 2020, I confirmed this fact through a telephone call to eFax Customer Service at 800-878-7151. The Customer Service Representative confirmed that eFax has an available bank of local, toll free, and international numbers that customers can select from for use as their efax number. The cost for the efax number is included in the monthly fax plan. The eFax customer has no relationship with any telephone carrier and pays no additional fees to any carrier for the eFax line. My experience with other efax service providers shows this same model is often used in the industry.

Case 4:13-cv-02219-HSG Document 534 Filed 10/22/25 Page 52 of 75

**SUBPOENAING OF TELEPHONE CARRIERS**

55. In paragraph 15 of Mr. Biggerstaff's 2nd Report he states that, according to his research, the top seven U.S. telephone carriers in 2015 were:

| Rating | Carrier | Market Share % per 2015 Biggerstaff Report | Market Share 2009 | Market Share % 2017[24] |
|---|---|---|---|---|
| 1 | AT&T | 39.5 | 39.5 | 40 |
| 2 | Verizon | 24.7 | 24.7 | 1 |
| 3 | CentruyLink [sic] | 9.9 | 9.9 | 2 |
| 4 | Level 3 | 6.5 | 6.5 | 0 (CenturyLink acquired Level 3 in 2017)[25] |
| 5 | Frontier | 4.9 | 4.9 | 3 |
| 6 | Paetec | 3.9 | 3.9 | 0 (Windstream acquired Paetec in 2011)[26] |
| 7 | Fairpoint | 1.7 | 1.7 | 0 (Consolidated Communications acquired Fairpoint in 2017.)[27] |
| 8 | Windstream | | | 1 |

Table 4

56. I added the results of my research conducted to Table 5 and it is plain to see that the telephone carrier market has changed dramatically in the five years since Mr. Biggerstaff's 2015 report. (*See* Table 4.)

[24] https://www.statista.com/statistics/718484/share-of-landline-subscribers-in-the-us-by-service-provider/ - accessed January 13, 2020.

[25] https://www.prnewswire.com/news-releases/centurylink-completes-acquisition-of-level-3-300547357.html – accessed January 13, 2020.

[26] https://dealbook.nytimes.com/2011/08/01/windstream-to-buy-paetec-for-891-million/ - accessed January 13, 2020.

[27] https://vtdigger.org/2016/12/05/fairpoint-sold-illinois-based-consolidated-communications/ - accessed January 13, 2020.

Case 4:13-cv-02219-HSG Document 378-4 Filed 10/22/20 Page 53 of 75

| Rating | Carrier | Market Share % per 2015 Biggerstaff Report | Market Share 2009 | Market Share % 2017[28] |
|---|---|---|---|---|
| 1 | AT&T | 39.5 | 39.5 | 40 |
| 2 | Verizon FIOS | Not listed | Not listed | 13 |
| 3 | Xfinity/Comcast | Not listed | Not listed | 8 |
| 4 | Charter Spectrum | Not listed | Not listed | 8 |
| 5 | T-Mobile | Not listed | Not listed | 6 |
| 6 | Frontier | 4.9 | 4.9 | 3 |
| 7 | Century Link | 9.9 | 9.9 | 2 |

Table 5

57. The current top seven landline subscriptions carriers (*see* Table 5) only include three from Mr. Biggerstaff's 2015 list: AT&T (#1), Frontier (#6), and CenturyLink (#7).[29]

58. Mr. Biggerstaff also opines that the top seven carriers hold over 90 percent of phone numbers. While that information may or may not have been accurate in 2015, it is no longer accurate today. Research shows that now only three of the top seven Mr. Biggerstaff listed five years ago are still in the top seven, and those three add up to 59 percent of the market.

59. I understand that Plaintiffs have never attempted to subpoena the major carriers as Mr. Biggerstaff had proposed. Even if Plaintiff had done so, however, recent research clearly indicates that, for at least 59 percent of wireline carriers, such subpoenas would not have returned data with the historical subscriber information that Mr. Biggerstaff posited would result. Additionally, my experience reveals that some of these major carriers will only provide consumer call data information for customers who have agreed to the release of the requested information, which would be unlikely and unmanageable for the 9,499 fax numbers at issue in this case.

[28] https://www.statista.com/statistics/718484/share-of-landline-subscribers-in-the-us-by-service-provider/ - accessed January 13, 2020.

[29] https://www.thelsa.org/lsa/clec-information.aspx ("With the deregulation of the telephone industry, thousands of Local Exchange Carriers ("LECs") have emerged.") – accessed January21, 2020.

a. ***Carrier Retention Policies Do Not Always Cover the Class Period***

60. In paragraph 15 of Mr. Biggerstaff's 2nd Report, he claims that in his experience, larger carriers maintain historical subscriber information, but he offers no evidence of this. In my experience, carriers have no incentive to retain volumes of data that relate to former customers. The legal requirement for carriers is 18 months for landlines; however, my research and experience shows that retention varies from carrier to carrier and by call record type. For example, AT&T, Verizon, and Verizon FIOS retain subscriber records for landline customers, business and private, for seven years and in some cases up to ten years. AT&T, Verizon, and Verizon FIOS start purging subscriber records after seven years.[30] Bill reprints for Sprint's postpaid customers are kept for a period of ten years, but its retention periods are subject to change.

61. Frontier retains landline subscriber records, business and residential for seven years. That means that, as of the writing of this report, Frontier records go back no further than January 2013, years after the close of the class period.

62. CenturyLink's billing systems data generally is retained six years plus current year, however, these guidelines are subject to multiple conditions.[31] As of the date of this report, the furthest CenturyLink's data can go back is January 2013.

***b. Carriers' Inability to Produce Records In Certain Circumstances***

63. Verizon sold most of its California landlines to Frontier in April 2016, including all records, including archived. Frontier purchased landline telephone services from Verizon in the states of Texas and Florida as well.[32]

---

[30] Information provided telephonically by AT&T's Global Legal Demand Center and Verizon's Law Enforcement Resource Team agents respectively, January 22, 2020.

[31] https://www.centurylink.com/aboutus/legal/privacy-policy/law-enforcement-support/law-enforcement-support-faqs-for-third-parties.html – accessed January 23, 2020.

[32] https://go.frontier.com/welcome-verizon and https://www.dallasnews.com/business/2017/06/27/a-year-later-frontier-s-verizon-fios-deal-is-a-textbook-case-of-how-not-to-do-an-acquisition/ - both accessed Januarys 22, 2020.

Case 4:13-cv-02219-HSG Document 576-1 Filed 01/22/25 Page 52 of 78

64. Frontier's Communications Subpoena Compliance Team ("FCSCT") consists of three (3) people only. Therefore, they do not have the manpower to process voluminous requests for subscriber records. Every number for which the FCSCT has a subpoena or a court order to produce records must be entered into their system manually. There is no automated process, there is no database through which they can just run the numbers. The FCSCT generally only receives requests regarding one or two telephone numbers. If the telephone numbers are not Frontier numbers, they return the request because they will only research Frontier numbers. Once the FCSCT has determined a subpoena request in a civil matter includes Frontier numbers only, they notify all subscribers associated with the telephone numbers and provide a 21-day period for the subscriber to object (for example, file a Motion to Quash), if desired. If a Motion to Quash is received, Frontier will not produce the record(s). If they receive no reply, they will produce the records. If the number was a Frontier number but was ported to another carrier during the last seven years, all their system will show is that as of the porting date, the new carrier is …[33] Frontier's response time is approximately three weeks.

65. AT&T notifies each subscriber when a subpoena requesting subscriber information is received. If a party objects to a subpoena on the basis that the subpoena seeks information protected by privacy laws, AT&T typically will not produce that information absent a court order. AT&T is not able to verify with certainty the identity of a user of a particular number on a particular date or time, nor would it be able to verify with certainty whether a particular subscriber was an actual user of the number(s) at issue.

66. AT&T does not possess subscriber information after those subscribers have ported their numbers to other carriers. It is highly likely that historical subscribers to the fax numbers on the class list have ported their number(s) since the past decade since the faxes at issue were sent and, as a result, their subscriber information was lost.

[33] Information provided telephonically by a Frontier Communications Subpoena Compliance agent, January 23, 2020.

67. After June 30, 2017 Sprint discontinued providing wireline services, citing among its reasons that the telecommunication industry is constantly changing and traditional long distance service options are declining.[34]

68. T-Mobile announced on April 14, 2016 its entry into the landline market by introducing a device that enables Voice over IP ("VoIP") service using existing landlines.[35] Traditional faxes cannot be transmitted via VoIP lines, only efaxes can.

### *c. Subscriber Consent and Other Prohibitions on Disclosure*

69. Verizon must have customer consent to disclose subscriber information in civil matters.

70. In a civil matter, upon receipt of a subpoena, AT&T notifies every customer associated with the numbers on the subpoena to give the customer the opportunity to file a Motion to Quash. The amount of time AT&T allows for customers to object depends if the subpoena has a timeline (such as a court date, for example). AT&T will produce all the records that they found to be AT&T customers UNLESS the customer has filed a formal objection with a court (e.g., a Motion to Quash) and the court ruled that AT&T cannot produce the phone record.

71. AT&T states in a sworn declaration that before disclosing any subscriber information, AT&T may first need to obtain the consent of the subscriber or provide notice to the subscriber, depending on, among other things, the type of information that is sought and the jurisdiction in which the subscriber is located. AT&T is, in some states, prohibited by law from directly disclosing the identity of its subscribers without notice, consent and/or a court order. [36]

72. CenturyLink will release no subscriber information without a subpoena, court order, or other legal demand specifically requesting this information.

---

[34] https://www.sprint.com/en/support/solutions/services/faqs-about-consumer-landline-decommissioning.html – accessed January 6, 2020.

[35] https://www.rcrwireless.com/20160414/carriers/t-mobile-us-offers-service-on-landline-phones-tag4 – accessed January 23, 2020.

[36] Declaration of Lisa Likely, a Director, for AT&T Mobility LLC ("AT&T"), attached as Exhibit C.

73. One of T-Mobile US, Inc.'s ("T-Mobile") Director, Legal Affairs stated in a sworn declaration that T-Mobile collects certain personal information from subscribers in connection with its postpaid services, such as their name and address, as of the date of account activation. Before disclosing any subscriber information, T-Mobile may first need to obtain the consent of the subscriber or provide notice to the subscriber, depending on, among other things, the type of information that is sought and the jurisdiction in which the subscriber is located. T-Mobile is, in some states, prohibited by law from directly disclosing the identity of its subscribers without notice, consent and/or a court order.[37]

74. Before disclosing any subscriber information, U.S. Cellular may first need to obtain the consent of the subscriber or provide notice to the subscriber, depending on, among other things, the type of information that is sought and the jurisdiction in which the subscriber is located. U.S. Cellular is, in some states, prohibited by law from directly disclosing the identity of its subscribers without notice, consent and/or court order. If an interested party objects to a subpoena on the basis that the subpoena seeks information protected by privacy laws, U.S. Cellular typically will not produce that information absent a court order.[38]

***d. Cost, Burden, or Inability to Respond to Massive Subpoena Requests***

75. Contrary to the impression Mr. Biggerstaff attempts to create, carriers do not have teams of compliance employees standing by to respond to civil demand subpoenas. Responding to a subpoena requesting subscriber information for thousands of numbers during a historical timeframe would be burdensome and time consuming for most carriers.

76. For example, AT&T has cited this burden when facing past subpoenas.[39] AT&T charges a $45.00 one-time processing fee for each subpoena in addition to $25 per search per

---

[37] Declaration of Patricia Cauldwell, Director, Legal Affairs, for T-Mobile US, Inc. ("T-Mobile"), attached as Exhibit D.

[38] Declaration of George Kamba, Manager of Privacy and Compliance, for U.S. Cellular Corporation ("U.S. Cellular"), attached as Exhibit E.

[39] Declaration of Lisa Likely, Director, for AT&T Mobility LLC ("AT&T"), attached as Exhibit C.

phone number, no matter for how many months or years. In this case, if AT&T were to receive a spreadsheet with 9,499 telephone numbers, they would enter all 9,499 into their system and charge 9,499 * $25 + $45 = **$237,520**.

77. A Supervisor of Subpoena Compliance for the Sprint Corporation ("Sprint"), declares that costs associated with the production of Sprint subscriber records in response to subpoena in civil litigation is determined by the overall magnitude of the request.[40] Sprint's Subpoena Manual posted online indicates the minimum cost recovery fee is $50.00.[41]

78. To provide such large quantities of information constitutes a substantial expense to Verizon. In a sworn declaration, a Supervisor with the Verizon Security Assistance Team ("VSAT") describes how burdensome the demand for user information is for the carrier.[42] Verizon states it does not currently possess billing statements for 2010 or 2011 because its retention policy provides that it retains billing documents for a period of seven years. Accordingly, for Verizon to produce documents related to a period of 2009-2010, Verizon personnel would need to manually look up potentially thousands of separate billing statements (x accounts times number of billing cycles), review them, manually add them to a spreadsheet, refine that data, and then put the data into a producible format. Verizon estimates, based on its previous sampling, 480 personnel hours would be required to perform the database queries needed to gather and produce the information in that previous case. "Verizon cannot avoid this expense by merely shifting employees' responsibilities, **as Verizon does not have personnel simply sitting idle**. All Verizon employees are fully committed."[43] (Emphasis added.)

---

[40] Affidavit of Calli Keep, Sprint Corporation, Supervisor of Subpoena Compliance, attached as Exhibit F.

[41] https://info.publicintelligence.net/SprintSubpoenaManual.pdf, page 10 – accessed January 6, 2020.

[42] Declaration of Donna Najar, Supervisor with the Verizon Security Assistance Team, executed June 14, 2019, attached as Exhibit G.

[43] Declaration of Donna Najar, Supervisor with the Verizon Security Assistance Team, ¶ 24, executed June 14, 2019, attached as Exhibit G.

79. Therefore, Verizon would be compelled to hire temporary workers. Verizon normally charges $75 per hour for subpoena compliance tasks. Based on Verizon's normal rate and the processes required, Verizon estimated it would incur $36,000 to complete the request of that particular plaintiff.

80. Yet another example of the burden of the subpoenas Mr. Biggerstaff proposed—yet Plaintiffs never employed—comes from Frontier. Frontier stated that researching thousands of telephone numbers would be an immense burden for their three-person Subpoena Compliance Team. Their fee structure is based on the type of request, some requests incur a charge, others do not. (*See* FN 33.)

81. CenturyLink bills for "voluminous and burdensome" requests for customer records or other information served on CenturyLink in the form of subpoenas, warrants, court orders, or associated customer consent. Criteria considered when determining whether a request is voluminous and burdensome include, but are not limited to, the following:

a. 30 numbers or more requesting subscriber information

b. The response to a subpoena amounts to 100 pages or more of print or electronic copy; or

c. The subpoena requires three (3) or more hours to process.

Voluminous & burdensome charges may apply to a single subpoena or multiple subpoenas from the same agency associated with the same case or cause number, as determined by CenturyLink.[44]

## **CONCLUSIONS**

1. There is a strong likelihood that many of the 9,499 fax numbers on the class list received the faxes at issue via efax. However, there is no method of which I am aware to identify which class members received efaxes as compared to faxes on a traditional facsimile machine.

---

44 https://www.centurylink.com/asset/aboutus/downloads/legal/privacy/Law%20Enforcement%20Support%20Fee%20Schedule.pdf – accessed January 23, 2020.

2. Mr. Biggerstaff's Second Report does nothing to change or impact my conclusion in my original rebuttal report. Mr. Biggerstaff is simply incorrect in his assertions that historical "users" or "subscribers" can be readily and easily ascertained. There is no administratively feasible way to identify historical fax subscribers. Mr. Biggerstaff's proposal to subpoena historical records from the leading landline providers would be ineffective and has not been undertaken by Plaintiffs in any event.

3. The Notice Administrator's claims regarding distribution of class notice are unverified and do not shed light on whether class members actually received notice. Nor did the Notice Administrator take into account how the use of efax services could affect class notice.

## COMPENSATION

The hourly rate CompliancePoint receives for my services are attached as Exhibit H. My compensation is not dependent upon the outcome of this matter.

## RESERVATION OF RIGHT TO AMEND

I reserve the right to amend this declaration based on information received after issuance of the same.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Executed in Beverly Hills, Florida on this 6th day of February, 2020.

By: ______________________

Ken Sponsler