UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TRUE HEALTH CHIROPRACTIC INC, et al.,

Plaintiffs,

v.

MCKESSON CORPORATION, et al.,

Defendants.

Case No. 13-cv-02219-HSG

**ORDER DENYING SECOND RENEWED MOTION FOR CLASS CERTIFICATION**

Re: Dkt. No. 573

Pending before the Court is Plaintiffs' second renewed motion for class certification. Dkt. No. 573 ("Mot."); Dkt. No. 581 ("Opp."); Dkt. No. 583 ("Reply"). The Court held a hearing on the motion and now **DENIES** it.

## I.    BACKGROUND

Plaintiffs True Health Chiropractic, Inc. and McLaughlin Chiropractic Associates, Inc. filed their operative putative class action complaint on July 18, 2014, alleging that Defendants McKesson Corporation and McKesson Technologies, Inc. sent "unsolicited advertisements" by facsimile ("fax") in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. *See* Dkt. No. 90 ¶ 2. The Court granted Plaintiffs' first renewed motion for class certification in August 2019. Dkt. No. 331.

Then, in December 2019, the FCC's Consumer and Governmental Affairs Bureau ("Bureau") issued a declaratory ruling finding that "online fax services" are not "telephone facsimile machines," suggesting that unsolicited faxes sent to such services "fall[] outside the scope of the statutory prohibition" at issue in the case. *In the Matter of Amerifactors Fin. Grp., LLC*, 34 F.C.C. Rcd. 11950 ¶ 3 (2019) ("*Amerifactors*"). Defendants moved to decertify the class for lack of predominance and superiority, arguing that "[t]here is no common proof available to

show which class members received the faxes at issue by efax versus by telephone facsimile machine." Dkt. No. 362 at 7.[1] The Court denied Defendants' motion to decertify, but modified the class definition to include a Stand-Alone Fax Machine Class and an Online Fax Services Class. Dkt. No. 393 at 11–13. The Court then entered summary judgment against the Online Fax Services Class, concluding that (1) under Ninth Circuit precedent, *Amerifactors* was a final, binding order; and (2) as a result, Defendants were not liable under the TCPA for unsolicited fax messages sent to online fax services. *See id.* at 9–11, 13–14; Dkt. No. 418. Later, the Court decertified the Stand-Alone Fax Machine Class for failure to demonstrate a workable, class-wide methodology for identifying "the core fact establishing TCPA liability" of whether "each purported class member received the faxes at issue via a means other than an 'online fax service.'" Dkt. No. 487 at 3, 6. Finally, the Court held a bench trial on Plaintiffs' individual claims. *See* Dkt. No. 536.

The parties cross-appealed, and the Ninth Circuit affirmed. *True Health Chiropractic, Inc. v. McKesson Corp.*, No. 22-15710, 2023 WL 7015279, at *2 (9th Cir. Oct. 25, 2023). But the Supreme Court then reversed and remanded, holding that "[t]he Hobbs Act does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of the relevant statute is correct." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025). The Supreme Court declined to address whether the FCC's interpretation of "telephone facsimile machine" was correct, leaving that issue for remand.

---

[1] The precise distinction between an "efax" and an "online fax service" is somewhat unclear. Plaintiffs use the terms interchangeably to refer to any circumstance where the "end user views the fax on a computer." *See* Mot. at 10. Defendants argue that the terms are distinct, citing *Amerifactors*. *See* Opp. at 20. There, the Bureau defined an online fax service as "a cloud-based service consisting of a fax server or similar device that is used to send or receive documents, images and/or electronic files in digital format over telecommunications facilities that allows users to access faxes the same way that they do email: by logging into a server over the Internet or by receiving a pdf attachment [as] an email." *Amerifactors* ¶ 2 (quotation marks and citations omitted). The Bureau seemingly distinguished its prior discussion of an "efax" in its 2015 declaratory ruling, which "was sent to a computer with an attached fax modem that had the capacity to print the fax." *See id.* ¶ 15. Ultimately, the precise difference is not important here, since the parties do not appear to dispute that (1) the cloud-based services falling into the Bureau's definition of an online fax service are at issue here; and (2) there is no class-wide method available to separate out class members who used online fax services, stand-alone traditional fax machines, or some other service in between.

2

*Id.* at 169.  Plaintiffs now renew their motion for class certification in light of that opinion.  *See generally* Mot.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. Proc. 23(a).  That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action.  *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022).

If the four prerequisites of Rule 23(a) are met, a court also must find that the plaintiff "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Rule 23(b)(3) applies where there is both "predominance" and "superiority," meaning "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Proc. 23(b)(3).  To determine whether a putative class action satisfies the requirements of Rule 23(b)(3), courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. Proc. 23(b)(3)(A)–(D).  Plaintiffs, as the party seeking certification, "must

3

affirmatively demonstrate" their compliance with Rule 23 by a preponderance of the evidence. *See White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (quotation omitted). To do so, Plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Id.* (quotation omitted) (emphasis in original).

## III. DISCUSSION

The TCPA states that "[i]t shall be unlawful . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). The parties agree that the key issue here is whether a recipient "online fax service" qualifies as a "telephone facsimile machine" under 47 U.S.C. § 227(a)(3). If it does not, Defendants are not liable under § 227(b)(1)(C) for sending unsolicited fax advertisements to online fax services. This will defeat predominance, because the parties do not challenge the Court's prior determination that "the individualized question of whether each class member received the faxes at issue on a stand-alone fax machine predominates over common questions" in such a case, since Plaintiffs did not offer a valid methodology for identifying "via class-wide, common proof that each purported class member received the faxes at issue via a means other than an 'online fax service.'" Dkt. No. 487 at 2–3, 5.[2]

The Court must "interpret the TCPA under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *McLaughlin*, 606 U.S. at 152. As with all questions of statutory interpretation, the Court "begins with the plain language of the statute." *See Cheneau v. Garland*, 997 F.3d 916, 919 (9th Cir. 2021) (en banc) (quoting *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009)). The Court "read[s] the words 'in their context and with a view to their place in the overall statutory scheme.'" *Cheneau*, 997 F.3d at 919 (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). "Where the statute does not define the relevant terms, [courts] give them 'their ordinary, contemporary, common meaning,' and 'may consult dictionary

---

[2] As before, the "individual inquiries required to establish the proposed class members' claims" would also mean that "class action treatment is not the superior method of adjudication." Dkt. No. 487 at 6.

United States District Court<br>Northern District of California

definitions.'" *City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019) (quotation omitted). "The plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results." *Robinson v. United States*, 586 F.3d 683, 687 (9th Cir. 2009) (quotation omitted). If the language is ambiguous, the Court may also look to "canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir. 2006).

### a. Plain Meaning

"'[T]elephone facsimile machine' means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." 47 U.S.C. § 227(a)(3). The parties dispute how broadly to construe "*equipment*" and "*capacity . . . to transcribe text or images . . . over a regular telephone line onto paper.*" *Compare* Mot. at 14, *with* Opp. at 12. Plaintiffs argue that "equipment" has consistently been interpreted to include multiple devices that "together, serve[] a single purpose." Mot. at 15 (quoting *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 872 (3d Cir. 2022)). They also argue that "capacity" only requires "that the equipment . . . be *able* to perform the listed functions . . . not that it 'actually' performs those functions." *Id.* at 16–17 (emphasis in original). Because (according to Plaintiffs' expert) all online fax services can receive a T.30 fax transmission, they all "ha[ve] the capacity to use a regular telephone line for the receipt of a T.30 fax transmission." *Id.* at 17 (quoting Dkt. No. 573-10 ¶¶ 49–50).[3] And because every online fax service can connect to the Internet to send an email, they can also connect online to a printer and have the capacity to print. *Id.* at 17–18. Defendants, in contrast, argue that an online fax service "is neither a 'machine' nor 'equipment' that uses a 'regular telephone line,' but a 'cloud-based service' that operates via the internet." Opp. at 11.

The dictionary definitions of "equipment" and "capacity" are theoretically broad enough to support Plaintiffs' interpretation, though they are largely unhelpful. *See, e.g.*, *Equipment*, Black's

---

[3] T.30 is a fax message standard or protocol. Dkt. No. 573-10 ¶ 29.

United States District Court
Northern District of California

Law Dictionary (6th ed. 1990) ("Furnishings or outfit for the required purposes. Whatever is needed in equipping; the articles comprised in an outfit; equippage."); *Capacity*, Black's Law Dictionary (6th ed. 1990) ("Legal qualification . . . , competency, power or fitness."). Even Defendants' definition acknowledges that equipment can include multiple "resources." *Equipment*, Webster's Ninth New Collegiate Dictionary (9th ed. 1991) ("[T]he set of articles or physical resources serving to equip a person or thing.").[4]

But when viewing these terms "in their context and with a view to their place in the overall statutory scheme," *Cheneau*, 997 F.3d at 919 (quotation omitted), it is clear that "telephone facsimile machine" cannot be read as broadly as Plaintiffs suggest. First, the TCPA establishes liability when someone uses (1) a telephone facsimile machine; (2) a computer; or (3) any other device to send an unsolicited advertisement to (1) a telephone facsimile machine. 47 U.S.C. § 227(b)(1)(C). As Defendants correctly observe, Opp. at 10–12, this language distinguishes a telephone facsimile machine from a computer or other device. Moreover, while Congress established liability for senders using any of these three categories of devices, it only established liability when the advertisement was sent to a telephone facsimile machine.[5] The plain language thus indicates that a computer is distinct from a telephone facsimile machine, and that the covered receiving devices are more limited than the covered sending devices. *Cf. Wadler v. Bio-Rad Lab'ys, Inc.*, 916 F.3d 1176, 1186 (9th Cir. 2019) (noting that "when a statute uses the phrase 'law, rule, or regulation' in one section but uses only 'law' in a different section, the word 'law' does not encompass administrative rules or regulations"). Plaintiffs' interpretation—where seemingly every computer is also a telephone facsimile machine—would impermissibly collapse those distinctions. *See Bare v. Barr*, 975 F.3d 952, 968 (9th Cir. 2020) (noting the "well-established canon of statutory interpretation that the use of different words or terms within a

_____

[4] Defendants emphasize that equipment must be comprised of *physical* resources. Opp. at 11. But a cloud-based service is presumably still hosted and operated on a series of physical devices, including the recipient fax server. *See* Mot. at 17.

[5] This undercuts Plaintiffs' assertion that "the language of the TCPA is not concerned with how a recipient receives a fax." Mot. at 16. It may be true that the TCPA creates liability without requiring proof of receipt, *see id.*, but the statutory language clearly distinguishes between sending and receiving devices.

statute demonstrates that Congress intended to convey a different meaning for those words" (quotation omitted)).

Plaintiffs argue that the inclusion of "computer, or other device" in the sending list "ensures that high-volume spamming tools—not just traditional stand-alone fax machines—are covered." Reply at 10. Plaintiffs cite concerns about "specialized, send-only computer system[s] . . . evading liability on the basis that they were not technically using a 'telephone facsimile machine.'" *Id.* "Congress drafted the prohibition in § [227](b)(1)(C) to be anticipatory and resistant to evasion by the fax sender." *Id.* However, Plaintiffs provide no evidence that such specialized send-only computer systems existed (or currently exist), or that Congress was concerned about this problem. This explanation also begs the obvious question: if Congress was concerned about violators escaping on technicalities, why not include the same coverage for the recipient devices?

Plaintiffs argue more generally that "Congress presumably understood that a computer, as a stand-alone device, can be distinct from a telephone facsimile machine and yet part of one as an integrated piece of 'equipment.'" *Id.* at 9 (quoting *Lyngaas v. Curaden Ag*, 992 F.3d 412, 426–27 (6th Cir. 2021)). This doesn't meaningfully explain the textual distinction, though. Plaintiffs do not identify any stand-alone computer that would not already constitute a telephone facsimile machine under their expansive interpretation and that would have needed additional statutory coverage. Moreover, this explanation does not resolve why a computer would need to be listed as one of the sending devices, but not one of the receiving devices.

Plaintiffs finally argue that this kind of "*expressio unius* [reasoning] does not apply if there are 'contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion,' and it applies only when 'circumstances support a sensible inference that the term left out must have been meant to be excluded.'" Reply at 9 (first quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 380 (2013); and then quoting *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 290 (2017)). They argue that "[t]he 'contrary indications' here are that the TCPA has expressly defined 'telephone facsimile machine' to include any 'equipment,' and thus there can be no 'sensible inference' that Congress at the same time meant to exclude any 'equipment.'" *Id.* This

United States District Court
Northern District of California

is also not an explanation for distinguishing between different kinds of devices.  Instead, Plaintiffs are simply relying on their interpretation of equipment and capacity, which the Court further rejects below.

Second, Plaintiffs' sweeping theory would mean that almost "every device with an internet connection (and that thus has the theoretical ability to remotely connect to a printer and a fax modem) is a 'telephone facsimile machine.'"  Opp. at 13.  Plaintiffs claim that this is a mischaracterization.  Reply at 12.  They explain that "any 'equipment' that can (1) receive a fax transmission over a telephone line, leading to a transmission log recording a successful transmission, and (2) send that message as an email over the Internet certainly has the capacity to print the document instead of emailing it."  *Id.*  The Court gathers Plaintiffs might be trying to carve out some Internet-connected devices that cannot readily send emails or connect to a fax modem.  But this doesn't change the fact that Plaintiffs' interpretation essentially writes out "capacity . . . to transcribe text or images . . . onto paper," 47 U.S.C. § 227(a)(3), in favor of "capacity to send a file over the Internet," a seemingly de minimis requirement for any device that can connect to a fax modem (or for any modern Internet-connected device, generally).  *See* Dkt. No. 573-10 ¶ 49 (expert testimony noting that "every device . . . that can receive a T.30 fax transmission[] has the capacity . . . to print"); *cf. United States v. 144,774 pounds of Blue King Crab*, 410 F.3d 1131, 1134–35 (9th Cir. 2005) ("It is an accepted canon of statutory interpretation that we must interpret the statutory phrase as a whole, giving effect to each word and not interpreting the provision so as to make other provisions meaningless or superfluous.").

Finally, Plaintiffs' interpretation collapses any distinction between a "telephone facsimile *machine*," and an "automatic telephone dialing *system*."  Elsewhere in the same section of the TCPA, Congress prohibited certain uses of an "automatic telephone dialing system."  *See* 47 U.S.C. § 227(b)(1)(A).  The TCPA defines an automatic telephone dialing system as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator . . . [and] to dial such numbers."  *Id.* § 227(a)(1).  Plaintiffs rely on cases interpreting automatic telephone dialing systems as a reflection of how broadly equipment and capacity can sweep.  For example, in *Panzarella v. Navient Solutions, Inc.*, 37 F.4th 867 (3d

Cir. 2022), the Third Circuit interpreted the TCPA's use of "automatic telephone dialing system" in § 227(b)(1)(A)(iii). It explained that "as ordinarily understood, equipment could constitute several discrete objects that, together, served a single purpose." *Id.* at 872. But the court noted that "[s]tatutory language cannot be construed in a vacuum" and looked to the "equipment's context," noting that "[c]ritically, Congress chose to regulate the use of 'automatic telephone dialing *system*[s].'" *Id.* at 872–73 (quotation omitted) (emphasis in original). "By focusing on systems, [Congress] signaled that the TCPA would reach combinations of devices that operate together." *Id.* at 873.

Here, Congress chose to define a telephone facsimile *machine*, and the Court must give meaning to that choice. *See Bare*, 975 F.3d at 968. It is clear to the Court that a "system" is typically more expansive than a "machine." *Compare System,* Black's Law Dictionary (6th ed. 1990) ("Orderly combination or arrangement, as of particulars, parts, or elements into a whole; especially such combinations according to some rational principle. Any methodic arrangement of parts."), *and System*, Webster's Ninth New Collegiate Dictionary (9th ed. 1991) ("[A] group of devices or artificial objects or an organization forming a network esp. for distributing something or serving a common purpose."), *with Machine*, Webster's Ninth New Collegiate Dictionary (9th ed. 1991) ("[A] mechanically, electrically, or electronically operated device for performing a task."). Plaintiffs do not explain why Congress made this choice if it wanted to broadly include systems relying on an indeterminate number of devices to receive and print a fax.[6][7]

Several courts have considered this exact statutory question and have similarly concluded

---

[6] In addition, Plaintiffs cite *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036 (9th Cir. 2012), for the uncontroversial and circular proposition that "'capacity' does not mean that equipment must 'actually' perform the listed function, but 'need only have the *capacity* to do it.'" Mot. at 16 (emphasis in original). *Meyer* determined that "hardware, when paired with certain software, has the capacity" required of the "automatic telephone dialing system." *Id.* at 1043 (quotation omitted). Again, this does not mean that a *system* with capacity to do something is the same thing as a *machine* with capacity to do something.

[7] Defendants also cite 47 U.S.C. § 227(d)(2), which states that "[t]he commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which is manufactured after one year after December 20, 1991, clearly marks . . . the date and time sent," and other basic information. *See* Opp. at 11–12. The Court agrees that the use of "manufactured" here suggests that Congress understood a "telephone facsimile machine" to be a particular physical device.

United States District Court
Northern District of California

United States District Court
Northern District of California

that the plain language of the TCPA excludes liability for unsolicited advertisements sent to online fax services.  *See, e.g.*, *Fischbein v. IQVIA, Inc.*, No. CV 19-5365, 2025 WL 1616793, at \*4–\*6 (E.D. Pa. June 5, 2025) ("The plain language of this provision clearly distinguishes between the equipment used to send the advertisement and that used to receive the advertisement."); *Astro Companies, LLC v. WestFax Inc*, No. 1:23-CV-02328-SKC-CYC, 2025 WL 474931, at \*2–\*3 (D. Colo. Feb. 12, 2025) (emphasizing the same difference between sending and receiving devices and the use of "machine").  Most notably, in *Career Counseling, Inc. v. AmeriFactors Financial Group, LLC*, 91 F.4th 202 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 2845 (2025), the Fourth Circuit recently concluded that "pursuant to its plain statutory language, the TCPA prohibits the sending of unsolicited advertisements to what the district court labelled as 'stand-alone fax machines,' but not to what the court accepted to be 'online fax services.'"  *Id.* at 209.  It recognized that "to fall within the § 227(b)(1)(C) prohibition, a fax can be sent from a 'telephone facsimile machine' (as defined in § 227(a)(3)), or from a 'computer,' or from some 'other device.'  But that fax can be received in only one way: on a 'telephone facsimile machine.'"  *Id.*  And while "an online fax service may qualify as a 'computer' or some 'other device' within the meaning of the TCPA," § 227(b)(1)(C) did not impose liability for "faxes sent *to* a 'computer' or 'other device.'"  *Id.* at 210 (emphasis in original).

Plaintiffs dispute the Fourth Circuit's conclusion that "an online fax service neither receives an electronic signal 'over a regular telephone line' nor has the capacity to transcribe text or images 'onto paper.'  Rather, online fax services receive faxes over the Internet and cannot themselves print any faxes."  *Id.* at 210; *see* Reply at 9.  They argue that "all 'online fax service' faxes are sent over regular telephone lines to ten-digit telephone numbers, arrive at the online fax service's fax server, which performs the T.30 protocol and converts the signal to a PDF (electronic paper) or TIFF, which is then forwarded via email attachment to the subscriber or is stored on the online fax service's portal for viewing by the subscriber."  Reply at 9.  Admittedly, the parties here do not clearly dispute that an online fax service can receive an electronic signal over a regular telephone line.  Nevertheless, the Fourth Circuit's other reasoning about the statutory distinction between telephone facsimile machines, computers, and other devices and the inability of an online

United States District Court
Northern District of California

fax service to print without connecting or sending to other equipment is persuasive.

Not every court has reached the same conclusion, and Plaintiffs rely extensively on the Sixth Circuit's contrary decision in *Lyngaas v. Curaden Ag*, 992 F.3d 412 (6th Cir. 2021). In *Lyngaas*, a divided panel determined that "a telephone facsimile machine encompasses more than traditional fax machines that automatically print a fax received over a telephone line." *Id.* at 426. The majority determined that construing a telephone facsimile machine narrowly was contrary to the TCPA's definition of equipment with the capacity to transcribe text or images. *Id.* at 425–26. It explained that the FCC's 2003 order and the Bureau's 2015 declaratory ruling "reinforced this point," though the opinion did not consider the arguments raised in *Amerifactors*. *Id.* at 426–27.

The Court is not persuaded by the majority's reasoning in *Lyngaas*. The majority never considered whether the reasoning in the final *Amerifactors* decision was persuasive, in part because the underlying facts in *Lyngaas* predated that decision. *See id.* at 427. It also minimized arguments about Congressional intent, noting that the TCPA "does not require the actual printing of the advertisement, which dispels the defendant's argument that Congress was concerned only with the burdensome ink-and-paper costs of fax advertising." *Id.* But the majority did not consider whether messages sent to online fax services implicated any other costs that Congress said it was concerned about when enacting the TCPA.[8]

Instead, the Court agrees with the dissent, which noted that the TCPA "makes it illegal to use a 'telephone facsimile machine' or a 'computer' to send an unsolicited advertisement . . . [b]ut . . . omitted computers from the list of receiver devices." *Id.* at 445 (Thapar, J., dissenting). Like this Court, *Career Counseling*, and the other opinions cited above, the *Lyngaas* dissent found that the court must give effect to each word in the statute and assume that Congress acted intentionally in defining the covered sending and receiving devices differently. *Id.* at 445–46. As a result, the dissent concluded that "understanding a 'computer' to be a 'telephone facsimile machine' conflicts with the statutory definition, the syntax of the relevant provision, and the common understanding

---

[8] As discussed above, the Court is also not persuaded by the majority's conclusory treatment of the differing lists of covered sending and receiving devices.

of both terms." *Id.* at 446.[9]

In short, the Court agrees that stretching the definition of a "telephone facsimile machine" to include a cloud-based system of devices that theoretically can print because they have an Internet connection does not constitute a "fair reading" of the TCPA. *See Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1123 (9th Cir. 2024) (quotation omitted).[10]  As a result, the Court joins the several other courts that have rejected Plaintiffs' arguments and interpretation. *See Fischbein*, 2025 WL 1616793, at *6 (noting that this "broad interpretation would render the capacity to print requirement superfluous by ignoring the statutory distinction between the sending equipment . . . and the receiving equipment" (emphasis omitted)); *Astro*, 2025 WL 474931, at *2 (noting that the "statute specifically contemplates a 'machine' that receives and prints faxes and not a service that does so"); *Career Counseling*, 91 F.4th at 209–10.

### b.  Legislative History

Because the Court finds that the statute is unambiguous on its face, the Court need not consider the legislative history. *See CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017) ("If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there.").[11]  However, the legislative history also supports the Court's conclusion.

---

[9] Plaintiffs also cite *Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*, 343 F.R.D. 581 (E.D. Mo. 2023), and call Defendants out for failing to address it.  Reply at 8.  But *Brust* simply adopted the Sixth Circuit's reasoning without additional analysis.  *See* 343 F.R.D. at 589.

[10] The Court uses "theoretically" here because Plaintiffs acknowledge testimony from Defendants' expert that online fax service providers do not actually offer the service of printing a received fax, instead of forwarding it as an email to another device with the ability to print.  *See* Mot. at 18.  But Plaintiffs still claim that these online fax services have the "capacity" to print to paper because they can connect to other devices that have this capability, such as a remote printer.  As the Court has already explained, this view of capacity is almost limitless in allowing devices to be strung together to form the necessary "machine."

[11] Similarly, the Court need not reach Plaintiffs' argument that the TCPA should be construed to protect consumers.  *See* Mot. at 19–20; *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017) ("Because the TCPA is a remedial statute intended to protect consumers from unwanted automated telephone calls and messages, it should be construed in accordance with that purpose.").  Even if the Court concluded there was some ambiguity and applied this presumption, the "proposition that remedial statutes should be interpreted in a liberal manner" is not a "substitute for a conclusion grounded in the statute's text and structure."  *See CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014).  Here, the Court would remain persuaded by the statutory text, the legislative history, and the most well-reasoned agency guidance.

United States District Court
Northern District of California

When discussing the rise of unsolicited facsimile advertising, Congress identified particular concerns about the costs of automatic printing and tying up fax lines:

> Facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine. This type of telemarketing is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax.

H.R. Rep. No. 102-317 at 10 (1991). The report further noted:

> [W]hen an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter. In the case of fax advertisements, however, the recipient assumes both the cost associated with the use of the facsimile machine and[] the cost of the expensive paper used to print out facsimile messages. It is important to note that these costs are borne by the recipient of the fax advertisement regardless of their interest in the product or service being advertised.
>
> In addition to the costs associated with fax advertisements, when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications. Only the most sophisticated and expensive facsimile machines can process and print more than one message at a time. Since businesses have begun to express concern about the interference, interruptions and expense that junk fax have placed upon them, states are taking action to eliminate these telemarketing practices.

*Id.* at 25. From this history, it is clear that Congress was concerned about (1) "the cost associated with the use of the facsimile machine"; (2) "the cost of the expensive paper used to print out facsimile messages"; and (3) the time where the "fax machine is unable to process actual business communications." *Id.* Those costs are not seriously implicated for anything other than stand-alone fax machines.

Plaintiffs (and the 2003 and 2015 agency decisions discussed below) instead read the report's mention of "interference, interruptions and expense," Opp. at 23 (quotation omitted), as an expansive category that includes harms that recipients can sustain even when they receive faxes via online fax services. They argue that "even where junk faxes are ultimately received by email," Congressional concerns about general costs associated with fax advertisements "are implicated

because the faxes 'may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business.'" *Id.* (quoting the FCC's 2003 order).

Nothing in the legislative history suggests that this kind of nominal time-based expense was a motivating concern for Congress. Congress contrasted the expenses of unsolicited mailed advertisements with unsolicited advertisements sent by facsimile, H.R. Rep. No. 102-317 at 25, but needing to quickly look to see if an inbound advertisement is junk is a cost incurred by the recipient of both types of advertisements. The Court is not persuaded that Congress meant to include online fax services—which do not implicate concerns about automatic printing or tying up the line—merely because Plaintiffs can identify *some* non-zero cost. *Cf. Career Counseling*, 91 F.4th at 210–11 (noting that Congress' concerns "do not exist with online fax services, as the recipient can choose whether [to] print a particular fax and there can be multiple incoming transmissions at once"). "[T]he Committee [did] not attempt to make all unsolicited telemarketing or facsimile advertising illegal," H.R. Rep. No. 102-317 at 6, and the Court will not circumvent its language to do so here.

### c. Agency Interpretation

"[A]ppropriate respect to the agency's interpretation" also supports the Court's conclusion. *McLaughlin*, 606 U.S. at 168. Under current precedent, courts "may look to agency interpretations for guidance, but do not defer to the agency." *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024). The respect due to an agency decision "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 1039 (quoting *Skidmore v. Swift Co.*, 323 U.S. 134, 140 (1944)); *see also Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 872 (9th Cir. 2022) (noting that deference given may "range from great respect to near indifference" depending on these factors (internal quotation marks and citation omitted)).[12]

---

[12] As Plaintiffs note, the Supreme Court did not elaborate in *McLaughlin* on what "appropriate respect" means. Mot. at 20. Both parties analyze this question using *Skidmore*, and the Court

The FCC has considered this issue on three prior occasions. First, in late 2002, "[t]he Commission sought comment on any developing technologies, such as computerized fax services, that might warrant revisiting" its understanding of the TCPA. *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 ¶¶ 14, 198 (2003) ("2003 Order"). The Commission considered many similar arguments regarding Congressional intent and the definition of equipment with the capacity to transcribe text or messages onto paper. *Id.* ¶ 199. In 2003, the Commission concluded that "faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes," though "the prohibition does not extend to facsimile messages sent as email over the Internet." *Id.* ¶ 200.

Then, in 2015, the Commission's Consumer and Governmental Affairs Bureau responded to a petition from WestFax, Inc. and issued a declaratory ruling reiterating that "an efax, a document sent as a conventional fax then converted to and delivered to a consumer as an electronic mail attachment – is covered by the" relevant TCPA provision. *In the Matter of Westfax, Inc. Petition for Consideration & Clarification*, 30 F.C.C. Rcd. 8620 ¶ 1 (2015) ("2015 Ruling"). The Bureau again held that the "definition of 'telephone facsimile machine' sweeps in the fax server and modem, along with the computer that receives the efax because together they by necessity have the capacity to 'transcribe text or images (or both) from an electronic signal received over a telephone line onto paper.'" *Id.* ¶ 9 (quotation omitted). The Bureau emphasized that these kinds of efaxes "may shift the advertising costs of paper and toner to the recipient if they are printed and can cause 'interference, interruptions, and expense' that can result from junk faxes, whether physical or electronic." *Id.* ¶ 10 (quoting the 2003 Order and the House Report). In addition, "[e]faxes, just like paper faxes, can increase labor costs for businesses, whose employees must monitor faxes to separate unwanted from desired faxes." *Id.* The Bureau "share[d] commenters' concerns that efaxes could be used to avoid the TCPA's protections resulting in

---

reads *Lopez v. Garland* to require the same. *See* Mot. at 20; Opp. at 18; *Lopez*, 116 F.4th at 1039.

increased unwanted fax ads on their computers." *Id.* ¶ 11.[13]

Finally, in 2019, the Bureau apparently changed course in *Amerifactors* when considering another petition and held that "an online fax service that effectively receives faxes 'sent as email over the Internet' and is not itself 'equipment which has the capacity . . . to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper' is not a 'telephone facsimile machine.'" *Amerifactors* ¶ 3. After reviewing "a great deal of information on the nature and operations of current online fax services," the Bureau determined that "a fax received by an online fax service as an electronic message is effectively an email," and faxes sent as email over the Internet are not subject to the TCPA. *Id.* ¶¶ 8, 11. The Bureau also found that "an online fax service cannot itself print a fax—the user of an online fax service must connect his or her own equipment in order to do so." *Id.* ¶ 11. As a result, the Bureau concluded that an online fax service was not equipment which has the capacity to transcribe text or images onto paper. *Id.* Consistent with this Court's conclusion above, the Bureau also noted that the TCPA only addressed faxes sent to telephone facsimile machines, not computers or other devices. *Id.* ¶ 10. Finally, the Bureau observed that "faxes sent to online fax services do not cause the specific harms to consumers Congress sought to address," as there is no automatic printing or tying up of transmission lines. *Id.* ¶¶ 12–13. And "the more general harms . . . such as time spent monitoring unwanted faxes sorted by online fax services . . . go beyond the specific harms Congress identified in enacting the TCPA." *Id.* ¶ 14.

Plaintiffs argue that the FCC and Bureau considered and rejected many of Defendants' exact arguments in their 2003 Order and 2015 Ruling, and they urge the Court to view those decisions as persuasive. Mot. at 20–26. They further argue that *Amerifactors* "is based on the fallacy that the only harms the TCPA sought to remedy are wasted 'paper and ink' and interruption of use of a stand-alone fax machine," and thus the appropriate respect due to the decision "is none." *Id.* at 26. Defendants argue that the 2003 Order and 2015 Ruling dealt with

---

[13] This analysis is functionally the same as in the 2003 Order, as the parties seem to recognize. *See* Opp. at 19 ("The FCC's 2015 ruling reiterated the 2003 order's reasoning and broke no new ground."); *see also* Mot. at 25.

efax technology that still involved "other kinds of physical device set-ups, such as 'a modem attached to a personal computer' that 'allows one to transmit and receive electronic documents as faxes.'" Opp. at 18 (quoting 2003 Order ¶ 200). They argue that *Amerifactors* was the only decision that addressed modern online fax services and that, viewed in this way, the three orders show "a consistent statutory understanding as applied to evolving technology." *Id.* at 20.[14]

The Court does not find the reasoning in the 2003 Order or 2015 Ruling particularly persuasive. First, neither decision seriously addresses the statutory language, including the difference between the sending and receiving machines. Second, the orders assert that "Congress could not have intended to allow easy circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal computers and fax servers, rather than to traditional stand-alone facsimile machines." 2003 Order ¶ 201; 2015 Ruling ¶ 11. However, Congress may not have viewed this as circumvention at all, since unsolicited faxes to fax servers wouldn't have implicated the same historical problems discussed above.[15] Finally, the orders identified three possible costs when faxes are received by computers or fax servers: (1) paper and toner, if the materials are printed; (2) tying up lines and printers; and (3) "increase[d] labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business." 2003 Order ¶ 202; 2015 Ruling ¶ 11. But paper and toner costs are only incurred by users that affirmatively choose to print these faxes, the parties do not dispute that tying up the line is no longer a legitimate concern for the online fax services at

[14] Defendants also argue that "the FCC's three orders are either consistent (and thus persuasive) or inconsistent (and thus not)." Opp. at 18. It's not clear why the Court would have to reject all three orders if it determines that one or more are inconsistent. The Court is skeptical that these decisions really can be reconciled given, for example, their seemingly divergent views on whether Congress was concerned about more generalized harms like monitoring unwanted faxes when enacting the TCPA. *See* Mot. at 27. But even if Plaintiffs are correct that these decisions are inconsistent and should still be independently evaluated, the Court finds that *Amerifactors* is the most persuasive decision, as discussed below.

[15] In addition, the 2003 Order comes to this conclusion after stating that "[t]he purpose of the requirement that a 'telephone facsimile machine' have the 'capacity to transcribe text or images' is to ensure that the prohibition on unsolicited faxing not be circumvented." *Id.* ¶ 201. The Court doesn't understand how adding a definitional requirement for "capacity to transcribe text or images" would *broaden* the set of devices that are covered by the prohibition. This statement also ignores the obvious explanation for why "capacity to transcribe text or images" was included: to match the traditional conception of a telephone facsimile machine.

issue, and there is no evidence that Congress was concerned about generalized labor costs in enacting these provisions of the TCPA for the reasons discussed earlier.

The Court finds *Amerifactors* to be more persuasive than the other two decisions. First, it actually addresses the statutory differences between sending and receiving devices. *Amerifactors* ¶ 10. It also apparently considered much more information about modern fax services, including cloud-based services. *See id.* ¶¶ 2, 8. And while those technologies may have existed at the time of the 2015 Ruling, *Amerifactors* more specifically addressed modern services beyond a single computer, modem, and printer setup. *See id.* ¶ 15. Finally, the Court is more persuaded by the reasoning in *Amerifactors* that not every inconvenience from unsolicited advertisements is covered by the TCPA. *See id.* ¶ 14.

Because the Court concludes that an "online fax service" does not qualify as a "telephone facsimile machine," and the parties do not dispute that there is no class-wide mechanism to disaggregate class members who received the allegedly unsolicited faxes via online fax services, individualized issues predominate, and class action treatment is not the superior method of adjudication. Accordingly, the Court **DENIES** Plaintiffs' renewed motion for class certification. The Court does not reach Defendants' arguments about standing.

//

//

//

//

//

//

//

//

//

//

//

//

//

18

United States District Court
Northern District of California

## IV.   CONCLUSION

The Court **DENIES** the motion for class certification.  Dkt. No. 573.

The Court further **SETS** a case management conference in this case on June 23, 2026, at 2:00 p.m.  The hearing will be held by Public Zoom Webinar.  All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg.  All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities.  The Court **DIRECTS** the parties to meet and confer and file a joint case management statement addressing next steps by June 16, 2026.

**IT IS SO ORDERED.**

Dated:    5/22/2026

HAYWOOD S. GILLIAM, JR.
United States District Judge

19